UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

IN RE STATE STREET BANK AND TRUST          :
CO. ERISA LITIGATION                       :
                                           :
                                           :          07 Civ. 8488 (RJH)
This document relates to:                  :
                                           :
07 Civ. 8488 (*Prudential Retirement Insurance and* :
*Annuity Company v. State Street Bank and Trust* :
*Company and State Street Global Advisors, Inc.*)  :
                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## PRUDENTIAL'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO
## DISMISS OR FOR SUMMARY JUDGMENT


Of Counsel:                          Edwin G. Schallert
  Matthew D. Siegel                 DEBEVOISE & PLIMPTON LLP
  Courtney M. Dankworth             919 Third Avenue
                                     New York, New York 10022
                                     (212) 909-6000

                                     Attorneys for Plaintiff Prudential
                                     Retirement Insurance and Annuity Company

Dated: New York, New York
       March 10, 2008

Table of Contents

Page

Summary of Argument ...............................................................................................1

Statement of the Case...............................................................................................3

      A.     The Allegations of the Complaint.......................................................3

          1.     The Parties ..............................................................................3

          2.     The Bond Funds and the Prudential Separate Accounts............................4

          3.     State Street's Breaches of Fiduciary Duties...................................5

          4.     Relief Sought by Prudential ......................................................6

      B.     The Loan Process...........................................................................7

      C.     State Street's Mischaracterizations of the Loan Process ........................9

Argument ................................................................................................................10

I.     Prudential's Lawsuit Is a "Case or Controversy" under Article III ..................10

II.     Prudential Has Standing to Pursue the ERISA Claims................................13

      A.     The Motion Improperly Relies on Matters Outside the Complaint ...............13

      B.     The Loans Did Not Destroy Prudential's ERISA Claims against State Street on Behalf of the Plans..................................................................14

          1.     The Plans' Economic Interest ................................................14

          2.     The Plans' Legal Interest .....................................................14

          3.     The Structure of the Loans....................................................17

          4.     ERISA Policy.......................................................................18

III.     State Street Is Not Entitled to Summary Judgment on Damages.....................19

IV.     The Court Should Reject State Street's Attempt to Preclude the Relief Sought under Section 502(a)(3) of ERISA ..............................................................21

V.     If the Court Grants Any Portion of the Motion, It Should Grant Leave to Replead..........23

Conclusion .............................................................................................................24

i

Table of Cited Authorities

Page

## FEDERAL CASES

*Aetna Insurance Co. v. Henry Du Bois Sons Co.*,
　　144 F.2d 262 (2d Cir. 1944)................................................................16

*Aetna Life Insurance Co. v. Haworth*,
　　300 U.S. 227 (1937)..........................................................................11

*Allstate Insurance Co. v. Mazzola*,
　　175 F.3d 255 (2d Cir. 1999)...............................................................23

*Alton Memorial Hospital v. Metropolitan Life Insurance Co.*,
　　656 F.2d 245 (7th Cir. 1981) ..............................................................16

*Arado v. General Fire Extinguisher Corp.*,
　　626 F. Supp. 506 (N.D. Ill. 1985) .......................................................20

*Bona v. Barasch*,
　　No. 01 Civ. 2289 (MBM), 2003 WL 1395932 (S.D.N.Y. Mar. 20, 2003) ........................21

*Carlson v. Principal Financial Group*,
　　320 F.3d 301 (2d Cir. 2003)...............................................................13

*Central States Southeast & Southwest Areas Health & Welfare Fund v.*
　　*Merck-Medco Managed Care, LLC*,
　　433 F.3d 181 (2d Cir. 2005)...............................................................12

*Chambers v. Time Warner, Inc.*,
　　282 F.3d 147 (2d Cir. 2002)................................................................3

*Chemung Canal Trust Co. v. Sovran Bank/Maryland*,
　　939 F.2d 12 (2d Cir. 1991)................................................................23

*City of Wichita, Kansas v. United States Gypsum Co.*,
　　828 F. Supp. 851 (D. Kan. 1993),
　　*rev'd on other grounds*, 72 F.3d 1491 (10th Cir. 1996) ..................................20

*Coan v. Kaufman*,
　　457 F.3d 250 (2d Cir. 2006)...............................................................16

*Comer v. Cisneros*,
　　37 F.3d 775 (2d Cir. 1994)..................................................1, 10, 11, 12

*Cortec Industries v. Sum Holding L.P.*,
　　949 F.2d 42 (2d Cir. 1991)................................................................13

Table of Cited Authorities
(continued)

Page

*Cutter v. Wilkinson,*
 544 U.S. 709 (2005)...................................................................................12

*Diduck v. Kaszycki & Sons Contractors, Inc.,*
 974 F.2d 270 (2d Cir. 1992)......................................................................22

*Dillard v. Runyon,*
 928 F. Supp. 1316 (S.D.N.Y. 1996), *aff'd*, 108 F.3d 1369 (2d Cir. 1997) ......................13

*Donovan v. Bierwirth,*
 754 F.2d 1049 (2d Cir. 1985)........................................................................7

*Eastern States Health & Welfare Fund v. Philip Morris, Inc.,*
 11 F. Supp. 2d 384 (S.D.N.Y. 1998).........................................................23

*Evergreen International, S.A. v. Marinex Construction Co.,*
 477 F. Supp. 2d 697 (D.S.C. 2007).............................................................20

*Firestone Tire & Rubber Co. v. Bruch,*
 489 U.S. 101 (1989).......................................................................................23

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,*
 528 U.S. 167 (2000).......................................................................................12

*Harley v. Minnesota Mining & Manufacturing Co.,*
 284 F.3d 901 (8th Cir. 2002) ......................................................................12

*Havens Realty Corp. v. Coleman,*
 455 U.S. 363 (1982).......................................................................................11

*Hellstrom v. United States Department of Veterans Affairs,*
 201 F.3d 94 (2d Cir. 2000)...........................................................................20

*In re Marsh ERISA Litigation,*
 No. 04 Civ. 8157 (SWK), 2006 WL 3706169 (S.D.N.Y. Dec. 14, 2006) ......................22

*John Hancock Mutual Life Insurance Co. v. Harris Trust & Savings Bank,*
 510 U.S. 86 (1993)..........................................................................................4

*Katsaros v. Cody,*
 744 F.2d 270 (2d Cir. 1984).........................................................................22

*LaRue v. DeWolff, Boberg & Associates,*
 128 S. Ct. 1020 (2008)........................................................................7, 16, 21

*Lee v. Burkhart,*
 991 F.2d 1004 (2d Cir. 1993).......................................................................16

Table of Cited Authorities
(continued)

Page

*Lillbask v. Connecticut Department of Education*,
    397 F.3d 77 (2d Cir. 2005)..................................................................11

*Luckenbach v. W.J. McCahan Sugar Refining Co.*,
    248 U.S. 139 (1918)................................................................15, 16

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000)................................................................3

*Marcella v. Capital District Physicians' Health Plan, Inc.*,
    293 F.3d 42 (2d Cir. 2002)..................................................................17

*Mason Tenders District Council v. Duce Construction Corp.*,
    No. 02 Civ. 9044 (LTS) (GWG), 2003 WL 1960584 (S.D.N.Y. Apr. 25, 2003)..............22

*Massachusetts Mutual Life Insurance Co. v. Russell*,
    473 U.S. 134 (1985)................................................................16

*McCullough v. Aegon USA, Inc.*,
    521 F. Supp. 2d 879 (N.D. Iowa 2007)................................................12

*Miller v. Wolpoff & Abramson, LLP*,
    321 F.3d 292 (2d Cir. 2003)................................................................19

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982)................................................................11

*Oliver Schools, Inc. v. Foley*,
    930 F.2d 248 (2d Cir. 1991)................................................................23

*Parke v. First Reliance Standard Life Insurance Co.*,
    368 F.3d 999 (8th Cir. 2004) ................................................................22

*Porat v. Lincoln Towers Community Association*,
    464 F.3d 274 (2d Cir. 2006)................................................................23

*R. J. Enstrom Corp. v. Interceptor Corp.*,
    520 F.2d 1217 (10th Cir. 1975) ................................................................16

*Refined Syrups & Sugars, Inc. v. Travelers Insurance Co.*,
    136 F. Supp. 907 (S.D.N.Y. 1954)................................................................16

*Reid v. Local 966 Pension Fund*,
    No. 03 Civ. 9231 (LAP), 2004 WL 2072086 (S.D.N.Y. Sept. 15, 2004)................13

*Richards v. FleetBoston Financial Corp.*,
    427 F. Supp. 2d 150 (D. Conn. 2006)................................................................12

iv

Table of Cited Authorities
(continued)

Page

*Salovaara v. Eckert*,
  222 F.3d 19 (2d Cir. 2000)................................................................18

*Securities & Exchange Commission v. Thrasher*,
  152 F. Supp. 2d 291 (S.D.N.Y. 2001)................................................20

*Texas Life, Accident, Health & Hospital Service Insurance Guaranty Association v. Gaylord Entertainment Co.*,
  105 F.3d 210 (5th Cir. 1997) .......................................................18, 19

*Tullis v. UMB Bank*,
  Nos. 06-4632/4633 (GSM), 2008 WL 215535 (6th Cir. Jan. 28, 2008)............................21

*Varity Corp. v. Howe*,
  516 U.S. 489 (1996)........................................................................21


**STATE CASE**

*Connecticut National Bank v. Giacomi*,
  699 A.2d 101 (Conn. 1997) .............................................................24


**FEDERAL STATUTES AND REGULATIONS**

29 C.F.R. § 2510.3-101(h)(1)(iii) .........................................................5, 9

29 U.S.C. § 1001(b) .................................................................................18

29 U.S.C. § 1002(17) ..................................................................................4

29 U.S.C. § 1101(b)(2)(B) ..........................................................................5

29 U.S.C. § 1101(c)(1)(A) ...........................................................................4

29 U.S.C. § 1106(a) ..............................................................................10, 17

29 U.S.C. § 1106(b) .................................................................................10

29 U.S.C. § 1108(a) .................................................................................17

29 U.S.C. § 1109(a) ..........................................................................6, 7, 21

29 U.S.C. § 1132(a)(2)..................................................................... *passim*

29 U.S.C. § 1132(a)(3)..................................................................2, 7, 21, 22

29 U.S.C. § 1132(g) ....................................................................................7

v

Table of Cited Authorities
(continued)

Page

29 U.S.C. § 1144(b)(2)(A) .................................................................24

Federal Rule of Civil Procedure 8(a) .................................................22

Federal Rule of Civil Procedure 12(b)(1) ...............................3, 10, 13

Federal Rule of Civil Procedure 12(b)(6) ........................2, 3, 13, 23

Federal Rule of Civil Procedure 15(a) ..............................................23

Federal Rule of Civil Procedure 56(a) ..............................................20

Federal Rule of Civil Procedure 56(b) ..............................................20

Federal Rule of Civil Procedure 56(c) ..............................................20

Federal Rule of Civil Procedure 56(f) ...............................................19

## STATE STATUTE

Conn. Gen. Stat. § 36b-29 .................................................................24

## MISCELLANEOUS

22 Eric Mills Holmes & John Allen Appleman, *Holmes' Appleman on Insurance* 2d
    § 141.10[D][2] (Matthew Bender & Co., 2007) ...............................15

Amendment to Prohibited Transaction Exemption 80-26,
    71 Fed. Reg. 17917 (Apr. 7, 2006) ...............................................17

*Grant of Individual Exemptions:  Larson Distributing Co.*,
    61 Fed. Reg. 3478, 3483 (Jan. 31, 1996) ......................................17

Susan Lorde Martin, *The Litigation Financing Industry:  The Wild West of Finance
    Should Be Tamed Not Outlawed*, 10 Fordham J. Corp. & Fin. L. 55 (2004) ...................16

*Proposed Exemption:  Larson Distributing Co.*,
    60 Fed. Reg. 55857, 55861-62 (Nov. 3, 1995) ...............................17

2 Alan D. Windt, *Insurance Claims and Disputes* § 10.05 (1995) ...............................23

vi

Table of Appendices

Appendix

22 Eric Mills Holmes & John Allen Appleman, *Holmes' Appleman on Insurance* 2d
    § 141.10[D][2] (Matthew Bender & Co., 2007) ..................................................................A

Amendment to Prohibited Transaction Exemption 80-26,
    71 Fed. Reg. 17917 (Apr. 7, 2006) ..................................................................................B

*Grant of Individual Exemptions:  Larson Distributing Co.*,
    61 Fed. Reg. 3478, 3483 (Jan. 31, 1996) ........................................................................C

*Proposed Exemption:  Larson Distributing Co.*,
    60 Fed. Reg. 55857, 55861-62 (Nov. 3, 1995) ................................................................D

2 Alan D. Windt, *Insurance Claims and Disputes* § 10.05 (1995)..................................................E

Plaintiff Prudential Retirement Insurance and Annuity Company ("Prudential") submits this memorandum in opposition to the motion of defendants State Street Bank and Trust Company and State Street Global Advisors, Inc. (together, "State Street") to dismiss the Complaint, or in the alternative for summary judgment.

## Summary of Argument

Prudential brought this action on behalf of 210 retirement plans (the "Plans") that suffered economic losses as a result of State Street's breaches of fiduciary duties in managing two bond funds. The Plans had invested in the bond funds by purchasing units of Prudential separate accounts. Under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), both State Street and Prudential are fiduciaries to the Plans. Prudential sued State Street pursuant to provisions of ERISA that allow one fiduciary to sue another for breaches of its fiduciary duties.

State Street's motion does not question the legal sufficiency of the Complaint's allegations that State Street violated its ERISA obligations. Instead, the motion focuses primarily on loans that Prudential made to the separate accounts that provided advances to most of the Plans. State Street both mischaracterizes those loans and misstates their legal significance. The motion should be denied in all respects.

**Article III standing.** State Street's attempt to dismiss the Complaint for lack of constitutional standing fails for four reasons:

- By premising its argument on loans made *after* the filing of the Complaint, State Street ignores the settled rule that a plaintiff's standing is assessed "as of the time the lawsuit is brought." *Comer v. Cisneros*, 37 F.3d 775, 787 (2d Cir. 1994).

- While post-complaint events can remove a case from Article III judicial power by making it moot, State Street does not and cannot establish mootness.

- Contrary to State Street's assertions, the Plans retain an interest in this lawsuit, have damage claims against State Street in excess of the amounts of the loans, and

have not been made whole. State Street's motion hinges on mischaracterizations of the loans and relies entirely on inapposite cases in which plan participants or beneficiaries sustained no injury.

- State Street's motion ignores Plans injured by its breaches that did not receive advances. Under controlling law, Prudential can seek each form of relief in the Complaint on the basis of a single injured plan.

**ERISA standing.** State Street's motion to dismiss for lack of ERISA standing fails on several grounds:

- Because this challenge arises under Rule 12(b)(6), State Street's reliance on matters outside the Complaint is improper.

- State Street's argument misconstrues the nature of Prudential's ERISA claims. Prudential sued as a fiduciary on behalf of the Plans. The loans did not change the nature of Prudential's claims.

- Plans that received advances retain an economic interest in the recoveries against State Street and a legal interest in the ERISA claims.

- Prudential's loans to the separate accounts protected the interests of the Plans and their participants, and the loans were structured in accordance with specific guidance from the Department of Labor. To hold that the loan process absolved State Street of responsibility for its violations of ERISA would frustrate the statute's broad remedial purpose.

**Damages.** State Street's alternative motion for summary judgment as to damages repackages its flawed standing arguments. Repeating its mischaracterizations that the Plans have been "made whole" and have "no damages," State Street ignores the interests that all Plans have in the separate accounts and their stake in recoveries against State Street. This argument is another attempt by State Street to frustrate ERISA's purpose by using the loans to escape liability. In addition, it would be inappropriate to determine at this stage the extent of damages that can be recovered on behalf of the Plans.

**Section 502(a)(3).** State Street's argument about the relief available to Prudential under Section 502(a)(3) of ERISA ignores the fact that Prudential is entitled to each component of the relief it seeks under Section 502(a)(2). Section 502(a)(3) provides an additional basis for

equitable relief.  State Street's attempt to foreclose any equitable relief at the pleading stage should be rejected.

**Leave to amend.**  Even if the Court were inclined to grant State Street's motion, it should dismiss the Complaint without prejudice and with leave to replead.

## Statement of the Case

On a Rule 12(b)(6) motion to dismiss, the allegations of the Complaint are assumed to be true and should be construed liberally, with all reasonable inferences drawn in favor of Prudential.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  On a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the Court may consider matters outside the Complaint, but it should construe all ambiguities and draw all inferences in Prudential's favor.  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).[1]

## A.    The Allegations of the Complaint

### 1.    The Parties

Prudential provides retirement products and services to defined contribution and defined benefit plans.  These products make available to plans a large variety of mutual funds and bank collective trusts managed by investment professionals.  Defined contribution plans offer a menu of investments that participants can select in their individual accounts, and defined benefit plans use a mix of investments to generate retirement benefits that have been promised to beneficiaries.  Complaint ¶ 11.

---

[1]    State Street has submitted as Exhibits 4-6 to the declaration of Daniel B. Goldman ("Goldman Dec.") the Explanation and Authorization materials Prudential distributed to certain Plans (the "Authorization Forms").  In opposition to defendants' Rule 12(b)(1) motion, Prudential is submitting the accompanying declaration of Matthew D. Siegel ("Siegel Dec.").  State Street's Memorandum of Law is cited herein as "Mem."

Defendant State Street Bank and Trust Company is a bank that provides investment management products and services. Defendant State Street Global Advisors, Inc. is an affiliate of the bank. ¶¶ 7, 8.[2] Starting in 1996, State Street entered into agreements with Prudential and its predecessor pursuant to which it provided investment management services. ¶¶ 11, 13, 15.

### 2.    The Bond Funds and the Prudential Separate Accounts

The investment choices that Prudential offered to the Plans included collective trusts for which State Street was the investment manager. Two of these trusts were the Intermediate Bond Fund and the Government Credit Bond Fund (together, the "Bond Funds"). State Street described each Bond Fund as an "enhanced bond index" fund that sought "stable, predictable returns" slightly above an index consisting of U.S. Government and investment-grade corporate bonds. Complaint ¶ 2.[3] Plans invested in the Bond Funds through Prudential separate accounts offered in group annuity contracts. ¶ 11. Plans purchased and held interests in the separate accounts, which in turn purchased and held units of the Bond Fund trusts.

ERISA recognizes the distinct nature of separate accounts, § 3(17), 29 U.S.C. § 1002(17), and Section 401(c)(1)(A) of ERISA differentiates them from insurance company general accounts, 29 U.S.C. § 1101(c)(1)(A). ERISA "includes all *separate account* assets within the [statutory] definition of 'plan assets.'" *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav.*

---

[2]    According to State Street, the affiliate is an empty shell, and Prudential did business with an identically named division of the bank. Mem. at 1 n.1.

[3]    State Street asserts that Prudential "inaccurately represented to the Plans that one of the Bond Funds was a passive index fund." Mem. at 4 n.2. This representation was based on misinformation from State Street. In September 2005, State Street told Prudential that the name of one of the Bond Funds had been changed to the "Passive Intermediate Bond Index Securities Lending Series Fund – Class A." Siegel Dec. Ex. A. Nearly two years later, State Street informed Prudential that it had "*inadvertently* added 'Passive' in the name of the [] Intermediate Bond Fund." Siegel Dec. Ex. B (emphasis added).

*Bank*, 510 U.S. 86, 101 n.12 (1993) (emphasis in original).[4]  When a plan "acquires or holds an

interest" in an insurance company separate account, "its assets include its investment and an

undivided interest in each of the underlying assets" of the separate account.  29 C.F.R. § 2510.3-

101(h)(1)(iii).  As a result, the assets of each Prudential separate account are assets of the Plans

that purchased interests in that separate account.

Prudential is a fiduciary with respect to each Plan as a result of its management of the

separate accounts.  Complaint ¶ 14.  By virtue of its authority and control over the Plan assets

invested in the Bond Funds, State Street also acted as a fiduciary with respect to each Plan.  ¶ 31.

State Street and Prudential acknowledged their status as ERISA fiduciaries in written

agreements.  ¶ 15.

### 3.        State Street's Breaches of Fiduciary Duties

The Complaint details State Street's "deceptive, imprudent and incompetent

performance" of its obligations as a fiduciary.  ¶ 1; *see* ¶¶ 18-29.  From 1996 to 2007, State

Street's descriptions of the Bond Funds "consistently emphasized its control and avoidance of

risk to investors."  ¶ 18.  It stressed the "Low Risk" features of its approach and its ability to

achieve "stable, predictable returns."  ¶¶ 19, 20(b).  Each Bond Fund sought to add minimal

value over a conservative bond index "while mirroring its risk profile."  ¶¶ 18, 20(b)-(c).  State

Street explained that it monitored "tracking error" – the potential difference between each of the

Bond Funds' performance and that of its benchmark index over a one-year period – and

represented that the Bond Funds would have a "maximum" tracking error of 75 basis points, or

0.75%.  ¶ 20(d).

---

[4]     There is a statutory exception, which is not relevant here, for guaranteed benefit policies.
        29 U.S.C. § 1101(b)(2)(B).

Prudential relied on information provided to it by State Street to describe the Bond Funds in periodic communications with the Plans.  Prudential also relied on the information in monitoring the investments in the separate accounts.  State Street had sole investment discretion as to the Bond Funds, and Prudential had no control over State Street's investment process or investment decisions.  ¶ 17.

Without advising Prudential or the Plans, State Street at some point markedly changed its investment strategy for the Bond Funds.  State Street took highly leveraged positions in mortgage-related financial instruments including the BBB ABX Index, which State Street subsequently described as a "relatively new . . . synthetic index whose returns are linked to 20 sub-prime mortgage pools."  ¶¶ 21-22.  State Street imprudently exposed the Bond Funds to risks far out of line with the benchmark indexes, and it failed to meet the standard of care of a prudent investment manager.  ¶¶ 23-24.

As a result of State Street's misconduct, the performance of the two Bond Funds diverged dramatically from that of their benchmark indexes.  In July and August 2007 alone, the Bond Funds declined by 25% and 12% while their respective benchmark indexes increased by 3% and 2%.  ¶ 27.  These results translated into about $80 million in losses in the Bond Fund separate accounts during that two-month period.  ¶ 29.  On August 29, 2007, Prudential requested that State Street redeem all remaining amounts in the Bond Funds.  State Street subsequently terminated and liquidated the Bond Funds.  ¶ 28.

### 4.    Relief Sought by Prudential

Section 409(a) of ERISA provides that a fiduciary to a plan who breaches any of its obligations "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other

equitable or remedial relief as the court may deem appropriate."  29 U.S.C. § 1109(a).  Section 502(a)(2) of ERISA authorizes a fiduciary to bring an action for relief under Section 409. 29 U.S.C. § 1132(a)(2).  Section 502(a)(3) provides additional authority for a fiduciary to seek equitable relief.  29 U.S.C. § 1132(a)(3).  The Complaint invokes each of these provisions. ¶¶ 35-37.

The Court of Appeals has held that the "measure of loss applicable under ERISA section 409 requires a comparison of what the Plan actually earned on the [imprudent] investment with what the Plan would have earned had the funds been available for other Plan purposes." *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985).  "Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these."  *Id.*; *see LaRue v. DeWolff, Boberg & Assocs.*, 128 S. Ct. 1020, 1024 n.4 (2008) (ERISA "encompasses appropriate claims for 'lost profits'").

After it obtains through discovery the facts about "the full dimensions of State Street's misconduct" (Complaint ¶ 3), Prudential will establish the damages to the Plans in accordance with these rules.  Consistent with § 409(a), Prudential also seeks recovery of all profits State Street made in connection with the Plan assets invested in the Bond Funds.  Prudential is seeking prejudgment interest, as well as its attorneys' fees and costs pursuant to Section 502(g) of ERISA, 29 U.S.C. § 1132(g).  In addition, Prudential seeks injunctive relief.

**B.    The Loan Process**

After Prudential filed the Complaint, it implemented a process "designed to protect the interests of the affected Plans and their participants while Prudential [] pursues remedies against State Street."  Authorization Forms at 1.  The process, which depended on individual authorizations from Plans, had the following features:

7

- Prudential loaned to each of the separate accounts an amount sufficient to restore the Plan's account balance to the level it would have achieved if it had earned a return equal to the relevant benchmark index for the period from July 1, 2007 through redemption of the Plan's Bond Fund units, plus a return through October 8, 2007. *Id.* at 2. The loans were interest-free. *Id.*

- The separate accounts' obligation to repay the loans is limited to the Plans' interests in proceeds from Prudential's lawsuit against State Street. *Id.* at 6. Plans authorizing the loans are obligated to repay them only to the extent those Plans receive any of these proceeds. *Id.*

- A Plan expressly authorized Prudential to prosecute and settle the lawsuit on its behalf, including any claim for damages in excess of the loans. *Id.* If the lawsuit proceeds allocable to a Plan exceed the loan amounts, such proceeds are to be allocated to each Plan consistent with Prudential's obligations as a fiduciary to the separate accounts. *Id.*

- Each Plan that participated in the loan process redeemed "its remaining investment interest" in the separate accounts, receiving a payment from the loaned amounts. *Id.* at 2.[5]

Each Plan had until December 1, 2007, to avail itself of the loan process.[6] 190 elected to participate. Siegel Dec. Ex. D. Prudential has advanced $79 million pursuant to the process.

---

[5]   State Street points to Prudential's public disclosures, which stated that Prudential was "implementing a process under which affected plan clients that authorize [Prudential] to proceed on their behalf will receive payments from funds provided by [Prudential] for the losses referred to above." Mem. at 3 (quoting Goldman Dec. Ex. 1). Such statements are entirely consistent with the loan process.

[6]   Siegel Dec. Ex. C is a copy of the loan agreement.

Goldman Dec. Ex. 8.  Two Plans that experienced losses in the Bond Funds after July 1, 2007

and 18 Plans that had invested in the Bond Funds prior to July 1 did not participate in the loan

process.  *See* Siegel Dec. Ex. D.

**C.      State Street's Mischaracterizations of the Loan Process**

Drawing inaccurate and self-serving inferences from the Authorization Forms, State

Street mischaracterizes the loan process in several respects.

State Street repeatedly asserts that those Plans that received advances "have been made

whole."  *E.g.*, Mem. at 7, 10, 13.  State Street bases this argument on defined terms in the

Authorization Forms but ignores the definitions of those terms.  The Forms use the terms

"Benchmark Make Whole Amount" and "Total Make Whole Amount," which are defined as

losses suffered by the Plans over discrete periods starting on July 1, 2007, as measured against a

benchmark index.  Authorization Forms at 2.  These amounts did not compensate the Plans for

all the potential damages that might be recoverable from State Street, and Prudential never

represented that they did.  To the contrary, the Authorization Forms explicitly state that proceeds

from the lawsuit may *exceed* the loan amounts.  *Id.* at 4, 6.

State Street contends that the Plans that received advances "no longer have any interest"

in Prudential's separate accounts because those Plans were "redeemed out of" the separate

accounts.  Mem. at 2, 6, 8, 10.  State Street is wrong.  In fact, those Plans redeemed only their

"remaining *investment* interest" in the separate accounts.  Authorization Forms at 2, 4 (emphasis

added).  The separate accounts continue to hold other assets, including the Plans' claims against

State Street and rights to any recoveries from this lawsuit.  Under ERISA, assets of a separate

account are Plan assets in which the Plans have an "undivided interest."  29 C.F.R.

§ 2510.3-101(h)(1)(iii).  State Street's assertion that a lawsuit "recovery would go directly to the

Prudential Separate Accounts" (Mem. at 2) does not mean the Plans have no interest in that

9

recovery; it means they *do* have such an interest.  Plans that did not authorize loans will be entitled to their "share of the recovery received from State Street for the Separate Account." Authorization Forms at 3.  Plans that authorized loans have encumbered their share of separate account recoveries, but they will receive lawsuit proceeds once the separate accounts have repaid the loans.  *Id.* at 4.

Pointing to "the convoluted structure Prudential set up between different accounts within Prudential itself," State Street refers to the transaction as "a so-called loan" because the loans were made to the separate accounts and not to the Plans.  Mem. at 2; *see also id.* at 1, 6.  Since the assets of the separate accounts are Plan assets and ERISA treats a transaction with the separate account in the same manner as a transaction with the Plan, there is no meaningful distinction under ERISA between a loan to the Plans and a loan to the separate accounts.  The Plans were required to authorize the loan process for the advances to be made, and the loans had to be structured to comply with exemptions from ERISA's "prohibited transaction" rules, which generally prohibit a fiduciary from lending money to a plan or dealing with plan assets for its own account.  § 406(a), (b), 29 U.S.C. § 1106(a), (b).

## Argument

### I.    Prudential's Lawsuit Is a "Case or Controversy" under Article III.

State Street's motion under Rule 12(b)(1) suffers from four fatal flaws.

*First*, State Street ignores the settled rule that a plaintiff's Article III standing is "assessed as of the time the lawsuit is brought."  *Comer v. Cisneros*, 37 F.3d 775, 787 (2d Cir. 1994).  State Street does not argue that Prudential lacked standing to sue on behalf of the Plans when it filed

the Complaint on October 1, 2007.  Instead, State Street relies on loans that Prudential made

weeks *after* the Complaint was filed.[7]

   *Second*, while post-complaint events can remove a case from the reach of Article III

judicial power by making a plaintiff's claim moot, *id.* at 797-98, State Street fails to assert – let

alone establish – Article III mootness.  The doctrine of Article III mootness, in addition to being

"riddled with exceptions," *id.* at 798, requires only that the plaintiff's claims remain "'definite

and concrete, touching the legal relations of parties having adverse legal interests.'"  *Havens

Realty Corp. v. Coleman*, 455 U.S. 363, 371 (1982) (quoting *Aetna Life Ins. Co. v. Haworth*, 300

U.S. 227, 240-41 (1937)).  *Havens Realty Corp.* illustrates the narrowness of this doctrine.  The

Supreme Court rejected a mootness challenge even where the parties had settled their dispute

with a stipulation that one party would pay the other $400 if it prevailed.  *Id.*; *see also Nixon v.

Fitzgerald*, 457 U.S. 731, 744 (1982) (same holding as to $28,000 payment).  Far more is at

stake if Prudential prevails in this lawsuit.[8]

   *Third*, State Street's Article III argument hinges on State Street's mischaracterization of

the loans and their effect on the Plans' legal interest.  Contrary to State Street's repeated

assertions (Mem. at 2, 6, 7, 8), the Plans that received advances as a result of the loans have an

interest in the separate accounts and have not been "made whole."  Under ERISA, any recovery

to the separate accounts is a plan asset in which the Plans have an interest, so Prudential's claims

for recoveries to the separate accounts on behalf of the Plans continue to "touch[] the legal

relations of parties having adverse legal interests."  *Havens Realty Corp.*, 455 U.S. at 371.  In

---

[7]    Plans had until December 1, 2007 to authorize the loans, and payments were made after
      receipt of Plan authorizations.  Authorization Forms at 3, 4.

[8]    By erroneously invoking Article III standing instead of mootness, State Street tried to place
      the burden of proving justiciability on Prudential.  Mem. at 7.  The burden of establishing
      mootness lies with State Street.  *See Lillbask v. Conn. Dep't of Educ.*, 397 F.3d 77, 84 (2d
      Cir. 2005) ("A party seeking to have a case dismissed as moot bears a heavy burden.").

addition, the Plans that received advances have economic interests at stake because their damage claims under ERISA exceed the amounts of the loans. Unlike the loan amounts, a damage claim under ERISA would (i) include all losses from State Street's breaches of its fiduciary duties, not just those that occurred after July 1, 2007, (ii) not measure losses against the benchmark index but rather would use the most profitable alternative investment strategy that is plausible, and (iii) include any profits State Street earned on Plan assets during the period it violated ERISA.

By contrast, in all the cases cited by State Street, the plan participants or beneficiaries did not suffer any injury. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 433 F.3d 181, 185 (2d Cir. 2005) (plan participants and beneficiaries "suffered neither economic nor medical injuries"); *Richards v. FleetBoston Fin. Corp.*, 427 F. Supp. 2d 150, 173 (D. Conn. 2006) (plaintiff admitted that "she has not yet suffered any harm"); *Harley v. Minn. Mining & Mfg. Co.*, 284 F.3d 901, 906 (8th Cir. 2002) (no injury to participants in a defined benefit plan because the loss "to Plan surplus is a loss only to . . . the Plan's sponsor"); *McCullough v. Aegon USA, Inc.*, 521 F. Supp. 2d 879, 891 (N.D. Iowa 2007) (same).

*Finally*, State Street's motion ignores Plans that are alleged to have been injured by State Street's misconduct but did not receive advances. Standing is required only as to "each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 185 (2000). Prudential can seek each form of relief on the basis of any one of these Plans. *See Comer*, 37 F.3d at 788 ("[O]nly one named plaintiff need have standing with respect to each claim."). The same rule applies to a challenge based on Article III mootness. *Cutter v. Wilkinson*, 544 U.S. 709, 712 n.1 (2005) (holding claims justiciable even though relief sought by several of the plaintiffs had become moot).

## II.    Prudential Has Standing to Pursue the ERISA Claims.

Even though Prudential brings this action on behalf of the Plans, as Section 502(a)(2) of ERISA expressly authorizes it to do, State Street argues that Prudential lacks "statutory standing." Mem. at 9-11.

### A.    The Motion Improperly Relies on Matters Outside the Complaint.

While presented as a "standing" challenge, this prong of State Street's motion contends that Prudential fails to state a legally sufficient ERISA claim. That argument does not raise a question about subject matter jurisdiction. This Court has subject matter jurisdiction because Prudential's "complaint was drawn so as to seek recovery under ERISA." *Carlson v. Principal Fin. Group*, 320 F.3d 301, 307 (2d Cir. 2003). "Whether [a plaintiff] is able to assert a valid claim under ERISA is irrelevant to the question of whether the District Court has subject matter jurisdiction over her complaint." *Id.*; *see also Reid v. Local 966 Pension Fund*, No. 03 Civ. 9231 (LAP), 2004 WL 2072086, at *2 (S.D.N.Y. Sept. 15, 2004) (whether plaintiff was a "participant" under ERISA implicates Rule 12(b)(6)). Accordingly, State Street's ERISA motion should be assessed under Rule 12(b)(6), not Rule 12(b)(1).

On a Rule 12(b)(6) motion, State Street's reliance on the documents pertaining to the loan process is improper. *See Dillard v. Runyon*, 928 F. Supp. 1316, 1322 (S.D.N.Y. 1996) (under Rule 12(b)(6), court "generally is prohibited" from considering matters that may be considered on Rule 12(b)(1) motion), *aff'd*, 108 F.3d 1369 (2d Cir. 1997).[9]

---

[9]    A court may consider on a Rule 12(b)(6) motion materials that are "integral to the complaint" or that plaintiff "has relied upon . . . in framing the complaint." *Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 47, 48 (2d Cir. 1991). Here, the loan Authorization Forms proffered by State Street relate to events that post-date the filing of the Complaint.

**B.      The Loans Did Not Destroy Prudential's ERISA Claims
against State Street on Behalf of the Plans.**

State Street misapprehends the nature of Prudential's claim under ERISA when it asserts

that Prudential "does not seek any relief for the Redeemed Plans" and is suing to recover "its

*own* losses" and "losses suffered on its own account."  Mem. at 10 (emphasis in original).

Prudential brought these claims as a fiduciary for the Plans before any loans had been made.  The

loans did not alter the nature of Prudential's claims and did not extinguish those claims.  The

Bond Fund units in the separate accounts were Plan assets that Prudential held as a fiduciary, not

property that Prudential held for its own account.  In precisely the same way, the ERISA claims

against State Street remain Plan assets, and the rights to recoveries against State Street "via the

Prudential Separate Accounts" (Mem. at 11) are also Plan assets.  Consistent with its fiduciary

duty to the Plans and its rights under ERISA, Prudential is seeking to maximize the value of

these Plan assets by pursuing these claims on behalf of the Plans.

**1.      The Plans' Economic Interest**

The claims against State Street on behalf of the Plans exceed the amount of the loans.  If

there is a recovery to the separate accounts on behalf of a Plan that exceeds the advance to it, the

Plan will receive the additional proceeds.  Any Plan that did not receive an advance will receive

all amounts that are recovered on its behalf.  All Plans retain an economic interest in the outcome

of the claims that Prudential is bringing on their behalf.

**2.      The Plans' Legal Interest**

Even if the Plans did not retain an economic interest in the recovery, this would be a

proper ERISA claim because Prudential is asserting the Plans' legal interest in recovering against

State Street.  State Street's assertion that Plans "no longer have any interest in the Prudential

Separate Accounts" (Mem. at 10) is incorrect.  The assets of those separate accounts are still held

for the benefit of Plans, and the ERISA claims and potential recoveries remain Plan assets, notwithstanding that certain Plans have authorized up to $79 million of any recovery to be used to repay loans from which they received advances.

State Street tries to sow confusion from the fact that Prudential made advances to Prudential separate accounts, as if that constituted loans by Prudential to itself. Mem. at 2. That ignores the very nature of the separate accounts: the assets in those accounts are Plan assets, not Prudential's. If Citibank rather than Prudential had made the loans to the separate accounts, Prudential would be bringing exactly the same ERISA claims as a fiduciary on behalf of the Plans. Prudential would not be suing for "Citibank's losses."[10] Prudential is not asserting ERISA claims as a lender. It is suing under ERISA on behalf of the Plans.

Loans made in analogous circumstances do not impede the ability of injured parties to pursue their claims. For at least a century, insurance companies have made non-recourse loans to insureds with claims against third parties. Pursuant to a "loan receipt agreement," an insurer makes "an interest-free loan that must be repaid to the extent that money is recovered in an action brought by the insurer in the name of the insured." 22 Eric Mills Holmes & John Allen Appleman, *Holmes' Appleman on Insurance* 2d § 141.10[D][2] (Matthew Bender & Co., 2007). In *Luckenbach v. W.J. McCahan Sugar Refining Co.*, 248 U.S. 139 (1918), the Supreme Court upheld the right of a borrower/shipper to maintain a claim for damages against a common carrier, notwithstanding its receipt of funds under a loan receipt agreement. Rejecting an argument similar to State Street's that the non-recourse loan was "in substance a payment," the Court held there was "no good reason . . . either for questioning [the loan's] legality or for denying it effect." *Id.* at 148. Justice Brandeis observed that the insurers' advances had provided funds

---

[10]    Since Citibank would not be constrained by ERISA's "prohibited transaction" rules, it would presumably profit from any loans.

promptly to the insured and that it was "creditable to the ingenuity of business men that an arrangement should have been devised which is consonant both with the needs of commerce and the demands of justice." *Id.* at 149; *see also Aetna Ins. Co. v. Henry Du Bois Sons Co.*, 144 F.2d 262, 264 (2d Cir. 1944) (following *Luckenbach*).  Numerous courts have followed *Luckenbach* in recognizing that the borrower under a loan receipt agreement retains the right to the underlying claim.  *E.g.*, *R. J. Enstrom Corp. v. Interceptor Corp.*, 520 F.2d 1217, 1219-20 (10th Cir. 1975); *Refined Syrups & Sugars, Inc. v. Travelers Ins. Co.*, 136 F. Supp. 907, 910-11 (S.D.N.Y. 1954).[11]

The cases cited by State Street (Mem. at 9-10) do not remotely support its position that Prudential's loans extinguished the Plans' ERISA rights and immunized State Street from ERISA liability.  In those cases, plan beneficiaries or participants sought individual relief even though there had been no losses to the plan.  *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140-44, 148 (1985); *Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir. 1993); *Coan v. Kaufman*, 457 F.3d 250, 261-62 (2d Cir. 2006).[12]  By contrast, the Plans suffered substantial economic losses.

---

[11]    Loan receipt agreements are not the only analogous practice.  "Lending money to plaintiffs to finance their lawsuits has become an industry within the last ten years. . . . The litigation financing firms make non-recourse loans to plaintiffs in exchange for a share of the proceeds of their lawsuits, if there are any."  Susan Lorde Martin, *The Litigation Financing Industry: The Wild West of Finance Should Be Tamed Not Outlawed*, 10 Fordham J. Corp. & Fin. L. 55, 55 (2004).  While this practice has led to controversy over, among other things, the interest rates charged by the lenders, *id*. at 56, there appears to be no suggestion that tortfeasors are not liable insofar as their victims have received non-recourse loans.

[12]    *Alton Mem. Hosp. v. Metro. Life Ins. Co.*, 656 F.2d 245, 249 (7th Cir. 1981), is even further afield since the claimant sought "damages that it alone suffered through a series of events which did not in any way affect the pension plan or its beneficiaries or participants."

In *LaRue*, 128 S. Ct. at 1024-26, the Supreme Court distinguished its prior decision in *Mass. Mutual* on the ground that it involved a defined benefit plan.  The Court held that a participant in a defined contribution plan had standing to sue for its losses regardless of whether the plan as a whole had been injured.  The Complaint alleges that 28,000 individual plan participants suffered losses.  ¶ 4.

### 3. The Structure of the Loans

In deriding the "convoluted structure Prudential set up" for the "so-called loan" to the separate accounts (Mem. at 2), State Street seems oblivious to the fact that ERISA does not permit Prudential, as a fiduciary, to deal with the Plans or the assets of the separate accounts on any terms that it may choose. Section 406 of ERISA generally prohibits self-dealing by fiduciaries, including loans by fiduciaries to plans, 29 U.S.C. § 1106(a), while Section 408(a) authorizes administrative exemptions from "prohibited transactions" where the exemptions are "in the interests of the plan and of its participants and beneficiaries." 29 U.S.C. § 1108(a). Prudential's loans fell within exemptions established by the Department of Labor (the "DoL"), "the agency charged with interpretation and enforcement" of ERISA. *Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 48 (2d Cir. 2002).

The DoL grants administrative exemptions both on a "class" basis and on an individual basis. As explained on page two of the Groom Law Group attachment to the Authorization Forms, Prudential's loans comported with a class exemption that permits a fiduciary to make certain loans to a plan if they are interest-free and unsecured. Amendment to Prohibited Transaction Exemption 80-26, 71 Fed. Reg. 17917 (Apr. 7, 2006). Additionally, Prudential's loans were consistent with individual exemptions that the DoL has granted in analogous circumstances. For example, a plan sponsor that had sued a plan administrator to recover investment losses to the plan wanted the plan to receive immediately the amounts sought in the lawsuit; the DoL granted an exemption for a loan by the fiduciary to the plan, so long as the loan was interest-free and repayments by the plan were "restricted solely to amounts recovered" in the litigation. *Proposed Exemption: Larson Distributing Co.*, 60 Fed. Reg. 55857, 55861-62 (Nov. 3, 1995); *Grant of Individual Exemption: Larson Distributing Co.*, 61 Fed. Reg. 3478, 3483

17

(Jan. 31, 1996). The terms of Prudential's loans to the separate accounts followed the DoL's guidance.

### 4.   ERISA Policy

State Street is asserting that there is no remedy for the losses caused by its breaches of fiduciary duties because the Plans, to obtain funds during the pendency of this lawsuit, received advances under terms that complied with ERISA. That result not only has no support as a matter of legal analysis, but it would be inconsistent with ERISA's broad remedial purpose of protecting "the interests of participants in employee benefit plans and their beneficiaries." § 2(b), 29 U.S.C. § 1001(b). Retirement plans with claims for breaches of fiduciary duties should be able to avail themselves of advances while those claims are pursued. If such loans – made on a non-recourse, interest-free basis to comply with ERISA – are held to make the plans "whole" and to extinguish their claims, no fiduciary would make such loans in the future. The Court of Appeals has rejected other attempts to "undermine ERISA's essential remedial purpose of protecting beneficiaries of pension plans." *Salovaara v. Eckert*, 222 F.3d 19, 31 (2d Cir. 2000). This Court should do the same.

In *Texas Life, Accident, Health & Hosp. Serv. Ins. Guar. Ass'n v. Gaylord Ent. Co.*, 105 F.3d 210 (5th Cir. 1997), the Fifth Circuit considered the standing of a Guaranty Association that had paid a plan's losses and received an assignment of the plan's claims against plan administrators. Even though the Association was not one of the parties enumerated in Section 502(a)(2) of ERISA as authorized to bring suit, the court held that the Association had derivative standing as an assignee to sue on behalf of the plan. The court observed that it was important to hold the plan administrators "accountable for breaches of fiduciary duty" and that, if the Association that had paid the claim could not sue, "no one would be able to sue the plan administrator." *Id.* at 215. While it ultimately held that there had not been a valid assignment

under federal law, *id.* at 217, the court was emphatic that "allowing derivative standing advances ERISA's goal of safeguarding pension funds." *Id.* at 216. Here, Prudential is not seeking an expansion of ERISA standing. Rather, State Street invites the Court to impose a novel and unwarranted limitation on ERISA claims brought on behalf of plans that have received financing from a fiduciary. The Court should decline the invitation.

### III.    State Street Is Not Entitled to Summary Judgment on Damages.

State Street alternatively seeks summary judgment or partial summary judgment on the ground that the Plans "have been 'totally made whole'" through Prudential's non-recourse loans and have "no damages." Mem. at 11-12. State Street's summary judgment motion suffers from the legal defects outlined above. The fact that Plans obtained advances does not mean the ERISA claims on their behalf have vanished; the Plans retain a legal interest in these claims, and ERISA authorizes Prudential to pursue those claims on their behalf. Moreover, State Street has made no factual showing that advances from the separate accounts made Plans "whole" – *i.e.*, that the advances fully compensated them for their damages from State Street's breaches. Plans that received advances have damage claims that exceed the loans; Plans that have not received advances unquestionably have not been "made whole" for their injuries.

Insofar as State Street seeks to require Prudential to present evidence that the Plans' recoverable damages exceed the amount of the loans, its motion should be denied as premature. Prudential cannot present that evidence at the pleadings stage before it has obtained discovery. *See* the accompanying Declaration of Edwin G. Schallert Pursuant to Fed. R. Civ. P. 56(f). Prudential should not be required to prove up its damages, including the presentation of expert testimony, at the very outset of the case. *See Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 203-04 (2d Cir. 2003) ("'Only in the rarest of cases may summary judgment be granted against a

plaintiff who has not been afforded the opportunity to conduct discovery.'") (quoting *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000)).

State Street's request for "partial summary judgment" to foreclose the recovery of $79 million (Mem. at 13) is an improper use of Rule 56 since it seeks summary judgment on an issue rather than on a claim or a defense. "'Rule 56(c) authorizes only the entry of judgment on claims, not single issues or elements that are not dispositive of judgment on those claims.'" *S.E.C. v. Thrasher*, 152 F. Supp. 2d 291, 296 (S.D.N.Y. 2001) (quoting *City of Wichita, Kan. v. U.S. Gypsum Co.*, 828 F. Supp. 851, 869 (D. Kan. 1993), *rev'd on other grounds*, 72 F.3d 1491 (10th Cir. 1996)). Courts should not "use summary judgment as a vehicle for fragmented adjudication of non-determinative issues." 152 F. Supp. 2d at 295. As another district court recently explained:

> Rules 56(a) and 56(b) . . . do not allow the "piecemealing" of a single claim. *Arado v. Gen. Fire Extinguisher Corp.*, 626 F. Supp. 506, 509 (N.D. Ill. 1985). The "all or any part" language in Rule 56(a) authorizes the granting of summary judgment with respect to all claims in an action or only some claims in a multiple claim action. A party is simply not entitled to summary judgment if the judgment would not be dispositive of an entire claim.

*Evergreen Int'l, S.A. v. Marinex Constr. Co.*, 477 F. Supp. 2d 697, 699 (D.S.C. 2007) (additional citations omitted). State Street does not acknowledge this procedural problem with its motion.[13]

State Street's partial summary judgment motion suffers from the same substantive flaws as its motion to dismiss. Lawsuit proceeds would be Plan assets in the separate accounts in which all Plans have an interest. Plans that received advances are entitled to a recovery on their behalf for the injuries caused by State Street's wrongdoing, to have amounts recovered used to repay the loans and then, if the recovery is sufficient, to receive the balance. State Street errs in

---

[13]    Nor was this procedural issue raised in any of the cases cited by State Street. *See* Mem. at 11-13.

saying that any recovery up to $79 million would benefit "only Prudential" and not the Plans

(Mem. at 13), since the Plans would benefit in that the loans would be repaid, reducing the loan

balance and bringing them closer to a distribution. Prudential's loans did not reduce State

Street's ERISA liability, any more than a loan receipt agreement reduces a defendant's liability.

Under Section 409(a) of ERISA, State Street should be "personally liable" for the losses from its

breaches; using loan proceeds to absolve State Street of this liability would frustrate ERISA's

purpose.

**IV.    The Court Should Reject State Street's
Attempt to Preclude the Relief Sought
under Section 502(a)(3) of ERISA.**

State Street seeks dismissal of Prudential's request for relief under Section 502(a)(3) of

ERISA, contending that there are no viable grounds for equitable relief. Mem. at 13-17.

Section 502(a)(3) is a "catchall" provision that acts "as a safety net, offering appropriate

equitable relief for injuries caused by violations that Section 502 does not elsewhere adequately

remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996). Because Prudential has standing

under Section 502(a)(2) to seek each form of relief sought in the Complaint, there is no need for

the Court at this stage to address the scope of the "safety net" that Section 502(a)(3) provides.

*See Tullis v. UMB Bank*, Nos. 06-4632/4633 (GSM), 2008 WL 215535, at *3 n.4 (6th Cir. Jan.

28, 2008) (Because plaintiffs had standing under Section 502(a)(2), the court did not reach the

question whether plaintiffs could seek equitable relief under Section 502(a)(3)); *see also LaRue*,

128 S. Ct. at 1023 (Court did not decide whether relief sought under Section 502(a)(3) was

"equitable" in light of its ruling on Section 502(a)(2)).[14]

---

[14]    In one respect, Section 502(a)(3) reaches more broadly than Section 502(a)(2). The former
allows the plaintiff to sue on its own behalf and not solely on behalf of a Plan. *Bona v.
Barasch*, No. 01 Civ. 2289 (MBM), 2003 WL 1395932, at *9-*10 (S.D.N.Y. Mar. 20,
2003). If the Court were to conclude that Prudential did not have standing under Section

21

State Street nonetheless asks the Court to rule that no equitable relief can be awarded because "the Plans no longer have an investment in the Funds." Mem. at 17. However, the retirement products made available by Prudential to Plans include other State Street funds, and Plans continue to invest through other separate accounts in several of these other State Street funds. Siegel Dec. Ex. E. State Street has an ongoing fiduciary role with respect to approximately $280 million of Plan assets, and Prudential and the Plans have a significant interest in ensuring that State Street does not engage in similar misconduct in these other funds.

"ERISA grants the court wide discretion in fashioning equitable relief to protect the rights of pension fund beneficiaries." *Katsaros v. Cody*, 744 F.2d 270, 281 (2d Cir. 1984). Courts exercising that discretion have awarded injunctive relief to avoid a repetition of misconduct that might affect other Plan assets. *Id.* (court appointed an asset manager to prevent recurrence of breach); *Mason Tenders Dist. Council v. Duce Constr. Corp.*, No. 02 Civ. 9044 (LTS) (GWG), 2003 WL 1960584, at *3-*4 (S.D.N.Y. Apr. 25, 2003) (ordering defendants to cooperate in an audit). Moreover, the prejudgment interest Prudential seeks is another form of equitable relief that is available under ERISA. *See Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 286 (2d Cir. 1992) (availability of prejudgment interest); *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1009 (8th Cir. 2004) (prejudgment interest is equitable relief). Accordingly, State Street's attempt to preclude equitable relief as "moot" (Mem. at 17) should be rejected.[15]

_____

502(a)(2) because it was not suing on behalf of Plans, Prudential would still be entitled to seek equitable relief under Section 502(a)(3).

[15] State Street also asserts that the injunctive relief sought in the Complaint is not sufficiently specific. Mem. at 17 n.5. "However, at the pleading stage, the Court will not foreclose the later possibility of more narrowly tailored injunctive relief." *In re Marsh ERISA Litig.*, No. 04 Civ. 8157 (SWK), 2006 WL 3706169, at *4 (S.D.N.Y. Dec. 14, 2006) (holding that plaintiffs had met Rule 8(a)'s notice pleading requirement).

## V.  If the Court Grants Any Portion of the
## Motion, It Should Grant Leave to Replead.

If the Court grants any portion of State Street's motion, its order should permit Prudential

to file an amended complaint.  Rule 15(a) mandates that leave to amend "shall be freely given

when justice so requires."  Fed. R. Civ. P. 15(a).  "Without doubt, this circuit strongly favors

liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)."

*Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006).[16]  Where an amendment

might strengthen the legal viability of the complaint, leave to amend should be granted as a rule.

*See Oliver Sch., Inc. v. Foley*, 930 F.2d 248, 251-53 (2d Cir. 1991).

If the ERISA claims in the Complaint are held to be legally deficient on the grounds

argued by State Street, Prudential can plead claims for equitable subrogation.  The common law

recognizes a right of equitable subrogation that "'one party has against a third party following

payment, in whole or in part, of a legal obligation that ought to have been met by the third

party.'"  *Allstate Ins. Co. v. Mazzola*, 175 F.3d 255, 258 (2d Cir. 1999) (quoting 2 Alan D.

Windt, *Insurance Claims and Disputes* § 10.05 (1995)).[17]  Were the Court to accept State

Street's argument that Prudential's loans to the separate accounts were actually payments that

compensated Plans for their injuries from State Street's ERISA violations, it would follow that

---

[16]   The Court of Appeals has made it clear that "where a plaintiff clearly has expressed a desire
to amend, a lack of a formal motion is not a sufficient ground for a district court to dismiss
without leave to amend."  *Porat*, 464 F.3d at 276.

[17]   In *Allstate*, the Second Circuit was construing New York common law.  Similarly, "'courts
are to develop a federal common law of rights and obligations under ERISA-regulated
plans.'"  *Chemung Canal Trust Co. v. Sovran Bank/Md.*, 939 F.2d 12, 16 (2d Cir. 1991)
(quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989)).  Apparently, no
court in this Circuit has decided whether there is a right of equitable subrogation under
ERISA.  *See E. States Health & Welfare Fund v. Philip Morris, Inc.*, 11 F. Supp. 2d 384,
402-06 (S.D.N.Y. 1998) (declining to decide issue).

Prudential is subrogated to those Plans' ERISA claims against State Street and can pursue those claims as a subrogee.

Prudential would also have claims on behalf of the separate accounts under state securities laws.  Connecticut's Blue Sky law provides a private right of action to parties that purchased securities based on misstatements or omissions.  Conn. Gen. Stat. § 36b-29; *see also Conn. Nat'l Bank v. Giacomi*, 699 A.2d 101, 118-19 (Conn. 1997) (stating elements of claim under Conn. Gen. Stat. § 36b-29).[18]  Prudential has alleged that State Street made misstatements and omitted material facts in selling securities (units of the Bond Funds) to the separate accounts.

### Conclusion

For the foregoing reasons, defendants' motion should be denied in all respects.

Dated: New York, New York
       March 10, 2008

                                   Respectfully submitted,


                                   DEBEVOISE & PLIMPTON LLP


Of Counsel:                        By:  /s/ Edwin G. Schallert

 Matthew D. Siegel                 Edwin G. Schallert
 Courtney M. Dankworth             919 Third Avenue
                                   New York, New York 10022
                                   (212) 909-6000
                                   egschallert@debevoise.com

                                   Attorneys for Plaintiff Prudential
                                   Retirement Insurance and Annuity
                                   Company


22687488

---

[18]    State securities laws are not preempted by ERISA.  29 U.S.C. § 1144(b)(2)(A).

24

**APPENDIX A**

# HOLMES'
# APPLEMAN ON INSURANCE 2D

ERIC MILLS HOLMES
Charter Professor and Dean Emeritus
Appalachian School of Law
Grundy, VA 24614

ORIGINAL EDITION
by
JOHN ALAN APPLEMAN

VOLUME 22
CHAPTERS 136–144
§§136.1-144.10

LAW OF LIABILITY INSURANCE



Matthew Bender®

## QUESTIONS ABOUT THIS PUBLICATION?

For questions about the **Editorial Content** appearing in these volumes or reprint permission, please call:

Kristin M. Colquhoun, Esq., at .......................................... 1-800-252-9257 (ext. 2218)
Internet Address: kristin.m.colquhoun@lexisnexis.com
Edward Berger, J.D., at ...................................................... 1-800-252-9257 (ext. 2510)
Internet Address: edward.berger@lexisnexis.com
Outside the United States and Canada please call ................................. (973) 820-2000

For assistance with replacement pages, shipments, billing or other customer service matters, please call:

Customer Services Department at ........................................................... (800) 833-9844
Outside the United States and Canada, please call    ........................... (518) 487-3000
Fax number ............................................................................................. (518) 487-3584

For information on other Matthew Bender publications, please call
Your account manager or .................................................................... (800) 223-1940
Outside the United States and Canada, please call ................................ (518) 487-3000

Library of Congress Catalog Card Number 97-108902
ISBN 0-327-00050-3 (set)

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other expert assistance is required, the services of a competent professional should be sought.

LexisNexis, the knowledge burst logo, and Michie are trademarks of Reed Elsevier Properties Inc, used under license. Matthew Bender is a registered trademark of Matthew Bender Properties Inc.

Copyright © 2003 Matthew Bender & Company, Inc., a member of the LexisNexis Group.
Originally published in 2002.

All Rights Reserved.
No copyright is claimed in the text of statutes, regulations, and excerpts from court opinions quoted within this work. Permission to copy material exceeding fair use, 17 U.S.C. §107, may be licensed for a fee of $1 per page per copy from the Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA. 01923, telephone (978) 750-8400.

Editorial Offices
744 Broad Street, Newark, NJ 07102 (973) 820-2000
201 Mission St., San Francisco, CA 94105-1831 (415) 908-3200
www.lexis.com

§ 141.10                          SUBROGATION                          Ch. 141

deceased, and had no interest in the insurer's claim for contribution against the insured's estate.[193]

## § 141.10    Actions to Enforce Subrogation Rights

### [A]    Real Party in Interest; Joinder of Necessary Parties

In enforcing subrogation rights, a question rises as to whether the cause of action should be in the name of the insured or the insurer. Procedural as well as substantive rights may be affected, depending on whose name appears in the lawsuit.

An insurer that has paid the insured may pursue a claim in its own name.[194]

In some jurisdictions and in federal courts, the insurer is subrogated to any rights the insured may have had against a third party because of the loss and is the real party in interest. Therefore, the insurer must bring suit in its own name against a third party under the applicable real party in interest statute.[195]

In federal courts, the insurer that has paid part of the insured's losses need not be joined initially. However, the insurer is a real party in interest[196] and, in most federal jurisdictions, must be joined, if the defendant demands it.[197] In the Fifth Circuit, the rule remains that the insurer need not be joined, if the insured retains an interest in the claim the insured is asserting.[198]

At common law, in an action to enforce subrogation, the subrogee (the insurer) is neither a proper nor a necessary party plaintiff, but he or she must sue in the name of the subrogor (the insured).[199]

---

[193] *See* **Minn.**—Appeal of Schunk, 231 Minn. 219, 228, 43 N.W.2d 104, 111 (1950).

[194] **Iowa**—Boyd v. Norman, 634 N.W.2d 630, 637 (Iowa 2001).

**Kan.**—Thompson v. James, 3 Kan. App. 2d 499, 597 P.2d 259, 263 (1979). The insurer becomes the real party in interest when a loss is fully paid.

**Tex.**—Houston Gas & Fuel Co. v. Perry, 127 Tex. 102, 109, 91 S.W.2d 1052, 1054 (1936).

[195] **Fed.**—*See, e.g.,* **Fed. R. Civ. P. 18 and 19.**

*See* § 141.5[C] *above,* for a more detailed discussion of this statute.

[196] *See* Fourth Cir.—Virginia Elec. & Power Co. v. Westinghouse Elec. Corp. 485 F.2d 78, 84 (4th Cir. 1973), *cert. denied,* 415 U.S. 935, 94 S. Ct. 1450, 39 L. Ed. 2d 493 (1974); **Tenth Cir.**—Garcia v. Hall, 624 F.2d 150, 152 (10th Cir. 1980).

[197] *See*

**First Cir.—State Farm Mut. Liab. Ins. Co., v. United States, 172 F.2d 737, 740 (1st Cir. 1949).**

**Eighth Cir.**—National Garment Co. v. New York, C. & St. L. R. Co., 173 F.2d 32, 34–35 (8th Cir. 1949).

[198] **Fifth Cir.**—Dudley v. Smith, 504 F.2d 979, 983 (5th Cir. 1974).

[199] **Mo.**—Kroeker v. State Farm Mut. Auto. Ins. Co., 466 S.W.2d 105, 110 (Mo. Ct. App. 1971). Where an insurer was unable to maintain a subrogation action in its own name, The action had to be brought in the name of the insured.

Pursuing the subrogation right in the insured's name may be advisable because of the inherent prejudice in naming the insurer as the plaintiff. Even where an action is brought by the insurer in the insured's name, there would seem to be some fairness and logic in having the subrogated claim tried to the jury in the name of the insured against the tortfeasor, without the introduction of the possible prejudice caused by evidence that the insured had insurance covering his loss. Joining the insurer may result in prejudice in actions tried before a jury. For example, in the standard subrogation action involving a liability insurance company, the insurer brings suit against the tortfeasor who is most likely be insured. The tortfeasor's insurer provides the defense, and if the tortfeasor is found to liable, becomes responsible for payment up to the limit of the policy. Therefore, the plaintiff-insurer must disclose its name under the "real party in interest" doctrine, but the defendant-insurer does not.[200]

The risk of multiple obligations by the tortfeasor can be eliminated without the necessity for the prejudice resulting from joining the insurer in the suit by a final judgment of the district court at the request of the tortfeasor. The court may refuse to join the insurer as a party plaintiff (at the defendant's request) for the purpose of prejudicing the jury,[201] although the Tenth Circuit has followed a different rule and required the insurer to be joined as a party plaintiff.[202]

In a case of partial subrogation, both the insured and the insurer are real parties in interest.[203] The question of joinder of parties is also involved in the issue of whether or not a partially subrogated insurer is a real party in interest who may not bring an action solely in the name of the insured due to the operation of Federal Rule of Civil Procedure 17(a) or similar state rule. In federal courts, the question of who must or may be joined in the suit is a question of federal, not state, law.[204] On the other hand, the question of whether or not the insurer is a real party in interest is a matter of state substantive law.[205]

---

[200] *See, e.g.,* **Fed.**—Fed. R. Evid. 411; Cal. Evid. Code § 155.

[201] **Fifth Cir. and Tex.**—United Servs. Auto. Ass'n v. Russom, 241 F.2d 296 (5th Cir. 1957).

[202] **Tenth Cir.**—Continental Bus Sys. v. Rohwer, 172 F. Supp. 487, 488 (D. Colo. 1959). If the partial subrogee has the substantive right to the amount which he has paid, then he is a real party in interest and must be joined upon motion by the defendant.

[203] **Third Cir.**—Northboro Apartments v. Wheatland Tube Co., 198 F. Supp. 245 (E.D. Pa. 1961).

[204] **U.S.**—Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 125 n.22, 88 S. Ct. 733, 746 n.22, 19 L. Ed. 2d 936 (1968).

[205] *See:*

**Ala.**—Industrial Dev. Bd. of City of Prattville v. Brown & Root, 99 F.R.D. 58, 60 (M.D. Ala. 1983), applying Alabama law.

**Mo.**—See v. Emhart Corp. 444 F. Supp. 71, 73 (W.D. Mo. 1977), applying Missouri law.

If the holder of subrogated right is or becomes a necessary party to complete the determination or settlement of questions involved in a lawsuit, the plaintiff by his attorney could propose to make the holder a party to the action.[206]

An insurer that refused to sue the third person, and was made a party defendant by the insured suing for the insurer's benefit was not allowed to recover without filing a pleading in its own name.[207] Even when a suit is brought for an insurer's benefit, at least in some states it is proper to bring it in the insured's name.[208]

The following cases are examples where courts did not require joinder of a particular party in a subrogation action:

- primary tortfeasors were not necessary parties to an injured party's subrogation action against his liability insurer.[209]

- truck driver was not a necessary party to an action by his employer's general comprehensive liability insurer against the automobile liability insurer.[210]

## [B]  Bifurcation

A party should consider bifurcation of the subrogated insurer's claim in order to prevent the jury from finding out about the presence of the injured party's insurer.[211] The rationale is that the disclosure of insurance may prejudice the jury.[212]

---

[206] **Wis.**—State Farm Mut. Auto. Ins. Co. v. Geline, 48 Wis. 2d 290, 301, 179 N.W.2d 815, 821 (1970).

[207] **Tex.**—Houston Gas & Fuel Co. v. Perry, 127 Tex. 102, 91 S.W.2d 1052 (1936).

[208] **N.Y.**—Michigan Alkali Co. v. Bankers Indem. Ins. Co., 103 F.2d 345, 348 (2d Cir. 1939), applying New York Law. In an action by the lessee of a truck and a trailer on a liability policy procured by the owner for benefit of the lessee and the owner to recover what the lessee itself had paid out, the complaint could not be dismissed on ground that the lessee was not the real party in interest because the lessee's liability insurer had agreed to defray attorney's fees and indemnify lessee if its action should fail. Even when a suit is for an insurer's benefit, it may be brought in the insured's name.

**Tenn.**— Carter v. E. T. & W. N. C. Transp. Co., 35 Tenn. App. 196, 203, 243 S.W.2d 505, 508 (1949). A carrier with a certificate permitting him to haul commodities in interstate commerce entered into a lease agreement with a trucker for use of the trucker's equipment for hauling freight. While delivering freight, the trucker's driver negligently caused an accident. The carrier's insurer was subrogated to the carrier's rights, and the carrier could, for the use and benefit of the insurer, maintain an action against the trucker for damages it was forced to pay because of collision.

[209] **Okla.**—New York Casualty Co. v. Sinclair Refining Co., 108 F.2d 65, 70 (10th Cir. 1939), applying Oklahoma law.

[210] **Miss.**—U. S. Fidelity & Guar. Co. v. Western Casualty & Surety Co., 235 F. Supp. 915, 917 (S.D. Miss. 1963), aff'd, 339 F.2d 261 (5th Cir. 1964), applying Mississippi law.

[211] **N.M.**— Martinez v. Reid, 132 N.M. 237, 46 P.3d 1237, 1243 (2002).

[212] See § 141.5[C] above for a discussion of the inherent prejudice in joining the insurer as a party to the action.

At the same time, courts have occasionally prohibited the splitting of the cause of action. For example, in an Oklahoma case, an insurer, who sought to recover as subrogee for medical expenses incurred by the insured during the first year following the accident, was precluded from maintaining an action after the tortfeasor had already been subjected to an action based on his tortuous conduct. The defendant could not be subjected to defense of multiple actions arising from his single wrong or tort upon separate or separable items of damage arising from that single wrong or tort from which he has but a single liability.[213]

In another case, the Indiana Supreme Court held that by bringing a separate subrogation suit against a tortfeasor to recoup medical payments made to the insured before the insured resolved his suit against the tortfeasor, the automobile insurer impermissibly split the insured's personal injury claim. An insurer, as subrogee of some, but not all, of its insured's personal injury claims, could not sue independently to enforce a personal injury claim arising from the subrogation prior to the resolution of its insured's claims, absent an agreement with the insured granting explicit and unequivocal authority to initiate a lawsuit or settlement that governed the forum for resolution of both the insured's and the insurer's claims.[214]

## [C] Intervention

Once an action has been brought, the non-party subrogee or subrogor may seek to intervene.[215] Intervention protects the interests of both the subrogor and the subrogee and generally benefits the defendant, because all of the issues are, then, resolved in one action. Absent a written agreement, state or local rule of procedure or statute, both subrogor and subrogee must be named plaintiffs in order for both to recover damages.[216]

Note that intervention in a personal injury lawsuit by an insurer asserting derivative rights does not change the nature of the underlying suit or how the court or jury analyzes the issues of the case.[217]

---

[213] **Okla.**—Lowder v. Oklahoma Farm Bureau Mut. Ins. Co., 436 P.2d 654, 657 (Okla. 1967). Rule against splitting cause of action precluded insurer from maintaining action.

[214] **Ind.**—Erie Ins. Co. v. George, 681 N.E.2d 183, 188 (Ind. 1997).

[215] *See, e.g.,* **Fed.**—Fed. R. Civ. P. 24.

[216] *See:*

**Ill.**—Nitrin, Inc. v. Bethlehem Steel Corp., 35 Ill. App. 3d 577, 592, 342 N.E.2d 65, 76 (1976) (damages for machine in insured's manufacturing plant).

**Kan.**—Ellsaesser v. Mid-Continent Casualty Co., 195 Kan. 117, 119, 403 P.2d 185, 187 (1965).

**Va.**—Travelers Ins. Co. v. Riggs, 671 F.2d 810, 813 (4th Cir. 1982), applying Virginia law (property damage claim).

[217] **Sixth Cir.**—Daugherty v. Reynolds Metals Co., 967 F. Supp. 240, 242 (W.D. Ky. 1997).

## [D]  Securing Subrogation Rights

### [1]  Subrogation Receipt

A subrogation receipt is an agreement that is entered into after the insured receives the proceeds of insurance.[218] A subrogation receipt acts as a release of the insurer, because it acknowledges that the insured has received the insurance proceeds, and it sets forth the insurer's subrogation rights. It also delineates the duties that the insured has concerning the loss. These duties include cooperating fully with the insurer in its prosecution of the claim, furnishing all documents necessary to pursue the claim, and attending the trial and testifying at the trial, if desired by the insurer.

### [2]  Loan Receipt

A loan receipt is an agreement stating that the insurance proceeds paid by the insurer to the insured constitute an interest-free loan that must be repaid to the extent that money is recovered in an action brought by the insurer in the name of the insured.[219]

The loan receipt, now used primarily to avoid real party in interest rules, was first used for a different purpose.[220] The original purpose of the loan receipt was not to determine which party could sue, but whether any party could sue the wrongdoer. The loan receipt originated in marine cargo cases to avoid the conflict between bills of lading, which provided that the carrier would be entitled to the benefit of any insurance the shipper bought on the cargo, and policy provisions in the shippers' cargo insurance that the insurance would not apply to benefit the negligent carrier.

The United States Supreme Court first considered the validity of loan receipts in *Luckenbach v. W. J. McCahan Sugar Refining Co.*,[221] In *Luckenbach*, the insurer and the insured faced a dilemma. The carrier would, in no event, be liable to the shipper for the damages occasioned by unseaworthiness, unless the carrier was guilty of negligence. The insurer would, in no event, be liable to the shipper, if the carrier was liable. If the insurer refused to pay until the shipper had established that recovery against the carrier was not possible, prompt settlement for loss (which was essential to actual indemnity and demanded in the interest of commerce) would be defeated. If, on the other hand, the insurers settled the loss, before the question of the carrier's liability for loss had been determined,

---

[218] *See* Form 141-4 *below.*
[219] *See* Form 141-1 *below.*
[220] *See* § 141.5[C] *above.*
[221] 248 U.S. 139, 148, 39 S. Ct. 53, 63 L. Ed. 170 (1918).

**Ch. 141    ACTIONS TO ENFORCE SUBROGATION RIGHTS    § 141.10**

the insurer would lose the benefit of all claims against the carrier, to which it would have been subrogated in the absence of a provision to the contrary in the bill of lading and the carrier would have been freed from liability to anyone. Thus, the insurer could not have asserted a right of subrogation against the carrier after it paid the claim because the bill of lading, under which the freight was shipped, gave the carrier the benefit of the shipper's insurance. This made the carrier a coinsured and the insurer could not recover subrogation against an insured. The loan receipt was designed to solve this problem. The insurer lent the insured (the shipper) an amount equal to the insured loss. The terms of the loan, as set forth in the loan receipt, were that the insured would not have to repay the loan, except out of the net proceeds of the recovery against the wrongdoer causing the loss (the carrier). If the shipper did not recover against the carrier, the matter was closed. The loss had been paid in the form of the loan, which would never have to be repaid. The carrier, of course, argued that the loan receipt was a sham and not really a loan. Rather, it argued, the money paid pursuant to the loan receipt was payment of the loss, triggering the bill of lading provision, which relieved it of liability. The United States Supreme Court, however, disagreed and held that the loan receipt transaction was a true loan, not a sham. Because the insurers had not "paid" the proceeds, the insured shipper could still recover against the carrier.[222]

The contrary view construes *Luckenbach* narrowly and emphasizes the contingent nature of the obligation of the insurer in *Luckenbach* to pay the insurance proceeds. Thus, loan receipts are not valid and the insurer is the real party in interest whenever the insurer is unconditionally obligated to pay the proceeds.[223] This contrary view that the insurer that pays pursuant to a loan receipt is the real party in interest and must be joined, reflects the view that the insurers have an unworthy motive, if not an improper and illegal purpose, in attempting to avoid subrogation by frustrating the enforcement of the real party in interest rule of Federal Rule of Civil Procedure 17(a).[224]

A number of jurisdictions have accepted the view that loan receipts are valid.[225]

[222] U.S.—Luckenbach v. W.J. McCahan Sugar Refining Co., 248 U.S. 139, 149, 39 S. Ct. 53, 63 L. Ed. 170 (1918).
[223] D.C. Cir.—City Stores Co. v. Lerner Shops, 410 F.2d 1010, 1012 (D.C. Cir. 1969); Fifth Cir.—F. L. Crane Co. v. Cessna Aircraft Co., 74 F.R.D. 414, 416 (N.D. Miss. 1977).
[224] *See* D.C. Cir.—City Stores Co. v. Lerner Shops, 410 F.2d 1010, 1014 (D.C. Cir. 1969).
*See also* Sixth Cir. and Ohio—Executive Jet Aviation v. United States, 507 F.2d 508, 512 (6th Cir. 1974).
[225] *See, e.g.,*
Fifth Cir.—Sanders v. Liberty Mut. Ins. Co., 354 F.2d 777, 778 (5th Cir. 1965).

Although most courts have upheld the validity of loan receipts, the cases have reached different results for a variety of stated reasons.[226] It is difficult to group the cases into neat categories. Generally, those cases treating the loan receipt as a true loan and not as a disguised form of payment, have treated the insured as the real party in interest and have declined to require joinder of the insurer.[227] These courts have held that there was no payment and no subrogation. Thus, the insured retains title to the claim and can sue on the claim. To these courts, it should make no difference whether the insurer has "paid" the whole loss or only a part of it. If the loan receipt is a true loan, the insurer has not "paid."

---

Tenth Cir.—R. J. Enstrom Corp. v. Interceptor Corp., 520 F. 2d 1217, 1219 (10th Cir. 1975).

**Ga.**—Frank Briscoe Co. v. Georgia Sprinkler Co., 713 F.2d 1500, 1502 (11th Cir. 1983), applying Georgia law.

**Nev.**—Duboise v. State Farm Mut. Auto. Ins. Co., 619 P.2d 1223, 1224 (Nev. 1980).

**226 Fifth Cir.**—Sanders v. Liberty Mut. Ins. Co., 354 F.2d 777, 778 (5th Cir. 1965); **Fifth Cir.**—Celanese Corp. of America v. John Clark Industries, Inc., 214 F.2d 551, 556 (5th Cir. 1954). The purpose of the "real party in interest" rule was to assure finality of judgment and protect the defendant from further suit by the real party in interest.

**Tenth Cir.**—R. J. Enstrom Corp. v. Interceptor Corp., 520 F. 2d 1217, 1219 (10th Cir. 1975).

**Ga.**—Frank Briscoe Co. v. Georgia Sprinkler Co., 713 F.2d 1500, 1502 (11th Cir. 1983), applying Georgia law.

**Nev.**—Duboise v. State Farm Mut. Auto. Ins. Co., 619 P.2d 1223, 1224 (Nev. 1980).

**227 Ala.**—Ketona Chem. Corp. v. Globe Indem. Co., 404 F.2d 181 (5th Cir. 1968), applying Alabama law. Insured is the real party in interest.

**Cal.**—Palmer v. Financial Indem. Co., 215 Cal. App. 2d 419, 434, 30 Cal. Rptr. 204, 212 (1963). A loan receipt agreement whereby, after a loss, an insurer reimbursed its insured for the amount of the loss, with a provision for repayment of the loan contingent upon recovery in an action in the insured's name for the benefit of the insurer against a third party, did not relieve the third party from liability on a theory that the named insured was not the real party in interest.

**Ga.**—Childers v. Eastern Foam Prods., Inc., 94 F.R.D. 53, 55–56 (N.D. Ga. 1982), applying Georgia law; **Ga.**—Greenbriar Shopping Center v. Lorne Co., 310 F. Supp. 303, 308 (N.D. Ga. 1969), applying Georgia law; **Ga.**—United States Fire Ins. Co. v. Farris, 146 Ga. App. 177, 178, 245 S.E.2d 868, 869 (1978).

**Kan.**—Cullen v. Atchison, T. & S.F. Ry., 211 Kan. 368, 376, 507 P.2d 353, 362 (1973); **Kan.**—Hiebert v. Millers' Mut. Ins. Ass'n, 212 Kan. 249, 255, 510 P.2d 1203, 1209 (1973). Where a loan receipt transaction is a true loan, whether it covers all or only a portion of the loss, there being no subrogation, the insured is the proper party to maintain an action against a third party.

**Mass. and Okla.**—R. J. Enstrom Corp. v. Interceptor Corp., 520 F.2d 1217, 1219 (10th Cir. 1975), applying Massachusetts and Oklahoma law;

**Minn.**—Riewe v. Arneson, 381 N.W.2d 448, 455 (Minn. Ct. App. 1986).

**Mo.**—State ex rel. Bartlett & Co. Grain v. Kelso, 499 S.W.2d 579, 582 (Mo. Ct. App. 1973).

**N.D.**—State Farm Mut. Auto Ins. Co. v. Wee, 196 N.W.2d 54, 60 (N.D. 1971).

**Okla. and Mass.**—R. J. Enstrom Corp. v. Interceptor Corp., 520 F.2d 1217, 1219 (10th Cir. 1975), applying Oklahoma and Massachusetts law; **Okla.**—C & C Tile Co. v. Indep. School Dist. No. 7 of Tulsa Cy. 503 P.2d 554, 561 (Okla. 1972).

**R.I.**—Corning Glass Works v. Seaboard Surety Co., 308 A.2d 813, 816 (R.I. 1973).

In contrast, other jurisdictions have held that the loan transaction constitutes payment.[228] Once the loan receipt is invalidated, the "real party in interest" doctrine is applied and generally, a complete payment by the insurer requires that the insurer sue in its own name.

There are other state courts and some federal courts that have required that the insurer be joined on the defendant's motion.[229] Still other states recognize that the loan receipt is fiction but, nevertheless, have upheld suit in the insured's name, as a matter of policy.[230]

While subrogated insurers usually favor upholding loan receipts, that is not always the case. If the insurer has used a loan receipt in a jurisdiction that treats loan receipts as true loans, the insurer may not sue in its own name. The insurer has no right to subrogation because it has not paid the loss. This may become important if the insurer wants to sue in its own name because of an uncooperative insured[231] or in order to establish or defeat federal court diversity jurisdiction.

## [3]  Trust Agreement

Much less commonly used than loan receipts, trust agreements are also intended to bring an insurance payment within an exception to the real party in interest statutes or rules.[232] Federal Rule of Civil Procedure 17(a) provides

---

[228] **D.C. Cir.**—City Stores Co. v. Lerner Shops, 410 F.2d 1010, 1014 (D.C. Cir. 1969).

**Mont.**—McNeil Constr. Co. v. Livingston State Bank, 300 F.2d 88, 91 (9th Cir. 1962), applying Montana law.

**Ohio**—Executive Jet Aviation, Inc. v. United States, 507 F.2d 508, 512 (6th Cir. 1974), applying federal and Ohio law.

[229] **Eighth Cir.**—National Garment Co. v. New York, C. & St. L. R. Co., 173 F.2d 32, 38 (8th Cir. 1949).

**Colo.**—Continental Bus Systems, Inc. v. Rohwer, 172 F. Supp. 487, 488 (D. Colo. 1959). If the partial subrogee has the substantive right to the amount which he has paid, then he is a real party in interest and must be joined upon motion by the defendant.

[230] **Ky.**—Aetna Freight Lines, Inc. v. R. C. Tway Co., 298 S.W.2d 293, 296 (Ky. 1956). The insurer entered into a loan agreement with the insureds in Ohio whereby the insureds borrowed from the insurer the amounts required to settle actions for deaths and injuries arising out of a collision of a trailer and an automobile and agreed to pay the insurer in full settlement of a loan any sum recovered from the manufacturer of the trailer. The loan was not a payment of an unconditional liability under a policy, and the insurer was not real party in interest in action against the manufacturer of the trailer.

**N.Y.**—Refined Syrups & Sugars, Inc. v. Travelers Ins. Co., 136 F. Supp. 907, 910 (S.D. N.Y. 1954), aff'd, 229 F.2d 439 (2d Cir. 1956). Insured was the real party in interest.

[231] **Ga.**—Clark v. American Casualty Co., 96 Ga. App. 328, 334, 99 S.E.2d 897, 902 (1957). The insurer could recover against its insured who took payment on a loan receipt but then refused to cooperate with the insurer, settled with the tortfeasor and refused to pay the insurer.

[232] See FORM 141-2 below.

that a trustee of an express trust' may sue in that party's name, without joining the party for whose benefit the action is brought. State real party in interest statutes or rules often contain the same provision.[233]

The trust agreement makes the insured the trustee of an express trust, with the corpus of the trust being the claim payment made by the insurer.[234] Under the trust agreement, the insured is considered the trustee of an express trust. As such, it is the real party in interest to prosecute the claim.[235] Under the trust agreement, the insured retains both legal and equitable title to the claim.[236]

In a Colorado case, as a condition to payment of a claim on an uninsured motorist policy, the insured was required to sign a trust agreement. The court held that this was valid, and not against public policy.[237]

---

[233] *See*:

**Ill.**—Nitrin, Inc. v. Bethlehem Steel Corp., 35 Ill. App. 3d 577, 342 N.E.2d 65 (1976).

**Iowa**—Boyd v. Norman, 634 N.W.2d 630, 637 (Iowa 2001); **Iowa**—Connor v. Thompson Constr. & Dev. Co., 166 N.W.2d 109, 114 (Iowa 1969).

**Kan.**—Kan. Stat. Ann § 60-217; **Kan.**—Ellsaesser v. Mid-Continent Casualty Co., 195 Kan. 117, 403 P.2d 185 (1965).

**Mo.**—See v. Emhart Corp. 444 F. Supp. 71, 73 (W.D. Mo. 1977), applying Missouri law. Whether or not the insurer or the insured has an enforceable right, that is, whether or not it is a real party in interest, is a matter of state substantive law.

**Neb.**—Jelinek v. Nebraska Natural Gas Co., 196 Neb. 488, 490, 243 N.W.2d 778, 779 (1976).

[234] **N.Y.**—Bruner-Ritter, Inc. v. Town Park Garage, 91 N.Y.S.2d 873, 874 (Sup. Ct. 1949).

[235] **Ill.**—Remsen v. Midway Liquors, 30 Ill. App. 2d 132, 143, 174 N.E.2d 7, 12 (1961).

[236] **Ill.**—Marshall v. Solomon, 335 Ill. App. 302, 306, 81 N.E.2d 777, 780 (1948).

[237] **Colo.**—Granite State Ins. Co. v. Dundas, 34 Colo. App. 382, 386, 528 P.2d 961, 963 (1974).

**APPENDIX B**

demographic and socioeconomic characteristics of the area.

The alternatives considered in the preparation of this FONSI were as follows: (1) No Action; and (2) Continue Project as Proposed. The No Action alternative was not selected. The U.S. Department of Labor's goal of improving the Job Corps Program by improving the learning environment at Job Corps Centers would not be met under this alternative. Due to the suitability of the proposed site for establishment of a new Job Corps Center, and the absence of any identified significant adverse environmental impacts from locating a Job Corps Center on the subject property, the "Continue Project as Proposed" alternative was selected.

Based on the information gathered during the preparation of the EA, no environmental liabilities, current or historical, were found to exist on the proposed Job Corps Center site. The construction of the Job Corps Center at the Dome Industrial Park on 5th Avenue and 22nd Street in St. Petersburg, Florida will not create any significant adverse impacts on the environment.

Dated: April 3, 2006.

**Esther R. Johnson,**
*National Director of Job Corps.*
[FR Doc. E6–5107 Filed 4–6–06; 8:45 am]
**BILLING CODE 4510–23–P**

---

## DEPARTMENT OF LABOR

### Employee Benefits Security Administration

[Application Number D–11046]

### Amendment to Prohibited Transaction Exemption 80–26 (PTE 80–26) for Certain Interest Free Loans to Employee Benefit Plans

**AGENCY:** Employee Benefits Security Administration, U.S. Department of Labor.

**ACTION:** Adoption of Amendment to PTE 80–26.

---

**SUMMARY:** This document amends PTE 80–26, a class exemption that permits parties in interest with respect to employee benefit plans to make certain interest free loans to such plans, provided that the conditions of the exemption are met. The amendment affects all employee benefit plans, the participants and beneficiaries of such plans, and parties in interest with respect to those plans engaging in the described transactions.

**DATES:** *Effective Date:* The amendment to PTE 80–26 is effective December 15, 2004.

**FOR FURTHER INFORMATION CONTACT:** Christopher Motta, Office of Exemption Determinations, Employee Benefits Security Administration, U.S. Department of Labor, (202) 693–8540 (this is not a toll-free number).

**SUPPLEMENTARY INFORMATION:** On December 15, 2004, notice was published in the **Federal Register** (69 FR 75088) of the pendency before the Department of a proposed amendment to PTE 80–26 (45 FR 28545 (April 29, 1980), as amended at 65 FR 17540 (April 3, 2000) and 67 FR 9485 (March 1, 2002)).[1] PTE 80–26 provides an exemption from the restrictions of section 406(a)(1)(B) and (D) and section 406(b)(2) of the Employee Retirement Income Security Act of 1974 (ERISA or the Act) and from the taxes imposed by section 4975(a) and (b) of the Internal Revenue Code of 1986 (the Code), by reason of section 4975(c)(1)(B) and (D) of the Code.

The amendment to PTE 80–26 adopted by this notice was proposed by the Department on its own motion pursuant to section 408(a) of ERISA and section 4975(c)(2) of the Code, and in accordance with the procedures set forth in 29 CFR part 2570, subpart B (55 FR 32836, 32847, August 10, 1990).[2]

The notice of pendency gave interested persons an opportunity to comment or to request a hearing on the proposed amendment. The Department received two comment letters, and no requests for a public hearing. Upon consideration of the comments received, the Department has determined to grant the proposed amendment, with one minor modification. The modification and the comments are discussed below.

For the sake of convenience, the entire text of PTE 80–26, as amended, has been reprinted in this notice.

### Executive Order 12866 Statement

Under Executive Order 12866, the Department must determine whether the regulatory action is "significant" and therefore subject to the requirements of the Executive Order and subject to review by the Office of Management and Budget (OMB). Under section 3(f), the order defines a "significant regulatory action" as an action that is likely to result in a rule (1) Having an annual effect on the economy of $100 million or more, or adversely and materially affecting a sector of the economy,

---

[1] A minor correction was made to the title of the final exemption in a notice published in the **Federal Register** on May 23, 1980. (45 FR 35040).

[2] Section 102 of the Reorganization Plan No. 4 of 1978 (5 U.S.C. App. at 214 (2000 ed.) generally transferred the authority of the Secretary of the Treasury to issue administrative exemptions under section 4975 of the Code to the Secretary of Labor.

productivity, competition, jobs, the environment, public health or safety, or State, local or tribal governments or communities (also referred to as "economically significant"); (2) creating serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

This amendment has been drafted and reviewed in accordance with Executive Order 12866, section 1(b), Principles of Regulation. The Department has determined that this amendment is not a "significant regulatory action" under Executive Order 12866; section 3(f). Accordingly, it does not require an assessment of potential costs and benefits under section 6(a)(3) of that order.

### Paperwork Reduction Act

As part of its continuing effort to reduce paperwork and respondent burden, the Department of Labor conducts a preclearance consultation program to provide the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This helps to ensure that the public can provide the requested data in the desired format and clearly understand the Department's collection instruction; and that the Department properly assesses the impact of its collection requirements on respondents and minimizes the reporting burden (time and financial resources) imposed on the public.

Currently, EBSA is soliciting comments concerning the information collection request (ICR) included in this Notice of Adoption of Amendment to PTE 80–26 (for certain interest-free loans to employee benefit plans). A copy of the ICR may be obtained by contacting Susan G. Lahne, Office of Policy and Research, U.S. Department of Labor, Employee Benefits Security Administration, 200 Constitution Avenue, NW., Room N–5618, Washington, DC are not toll-free numbers. Comments should be sent to the Office of Information and Regulatory Affairs, Office of Management and Budget, Room 10235, New Executive Office Building, Washington, DC 20503; Attention: Desk Officer for the Employee Benefits Security

Administration. Although comments may be submitted through June 6, 2006 OMB requests that comments be received within 30 days of publication of the Notice of Amendment to PTE 80–26 to ensure their consideration. The Department and OMB are particularly interested in comments that:

• Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

• Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

• Enhance the quality, utility, and clarity of the information to be collected; and

• Minimize the burden of the collection of information on those who are to respond, including through the use of appropriated automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., by permitting electronic submission of responses.

As proposed on December 15, 2004, the amendment to PTE 80–26 did not contain any information collection as defined under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3520) (PRA). Therefore, the Department did not submit an information collection request (ICR) to the Office of Management and Budget (OMB) in connection with the proposal. In response to public comments on the proposal, the final amendment to PTE 80–26 adopted by this notice adds a condition to availability of the exemption that requires any loan with a duration of more than sixty days to be made pursuant to a written loan agreement that contains all of the material terms applicable to such loan.

The Department believes that it is a usual and customary business practice, generally within the business community and especially with respect to employee benefit plans, to evidence the creation of a loan agreement that involves an employee benefit plan as a party through a written document that sets forth the terms of the loan. Therefore the Department believes that the addition of this condition to the exemption does not impose any appreciable additional paperwork burden under the PRA. However, the Department has submitted an ICR for OMB control number 1210–0091 to OMB in connection with the adoption of the amendment to the PTE because the condition newly added to the

exemption constitutes an information collection within the meaning of the PRA.

**Discussion of the Proposed Exemption and the Comments Received**

On December 15, 2004, the Department proposed to remove the three-day duration limit that applied to loans engaged in under PTE 80–26 for a purpose incidental to the ordinary operation of a plan. The Department recognizes that broadening the scope of the exemption in this manner would greatly benefit plans facing liquidity problems. The Department believes that plans will be adequately protected regarding such loans, i.e., loans for a purpose incidental to the ordinary operation of a plan where such loans have durations that exceed three days, to the extent the conditions of the class exemption, as amended herein, have been met. Accordingly, the Department has determined that the effective date of the amendment will be December 15, 2004; the date the proposed amendment was published in the **Federal Register**.

One of the commenters recommended that the class exemption expressly require that loans with durations that exceed a certain number of days be in writing. This commenter expressed concern that the removal of the three-day limit without additional conditions will raise the potential for abuse of a plan's assets.

For example, the commenter describes a scenario in which a plan sponsor pays certain expenses on behalf of a plan without intending to be repaid. Years later, the plan sponsor seeks to re-characterize such payment as a "loan" covered by PTE 80–26, and, thereafter, causes the plan to "repay" the plan sponsor in reliance on the relief provided by the class exemption. The commenter states that the situation described above may arise where a plan sponsor experiences a change in personnel, including the plan's fiduciaries, and the "new" plan fiduciaries are unsure whether the payment by the plan sponsor was originally intended to be a loan covered by PTE 80–26. According to the commenter, it is also possible that a plan sponsor may seek to re-characterize a payment the sponsor previously made on behalf of a plan, notwithstanding the sponsor's full awareness that such payment was not intended to be repaid by the plan.

The commenter states that, in the above situations, the Department may have difficulty demonstrating that the payments by the plan sponsor are not loans covered by PTE 80–26. The commenter recommends that the class

exemption contain a condition expressly requiring that all loans of extended durations be made in writing, and that such written loan agreements exist at the time the plan enters into the loans.

As noted in the preamble to the proposed class exemption, section 404 of ERISA requires, among other things, that a fiduciary act prudently and discharge his or her duties respecting the plan solely in the interest of the participants and beneficiaries of the plan. Accordingly, a plan fiduciary would violate section 404 of ERISA if such fiduciary transferred plan assets to the plan sponsor in the absence of specific written proof or other objective evidence demonstrating that the plan originally intended to enter into a loan transaction with the plan sponsor. In this regard, a written loan agreement executed at the time of the loan transaction and demonstrable evidence that the plan was experiencing liquidity problems, would alleviate the uncertainty regarding whether the parties actually entered into a loan or other extension of credit. Of course, any attempt to re-characterize past payments as loans after the fact would be outside the scope of relief provided by the exemption.

With regards to the commenter's suggestion that the Department may have difficulty demonstrating that certain payments by a plan sponsor are not "loans" covered by PTE 80–26, the Department notes that the party seeking to take advantage of an administrative exemption, and not the Department, has the burden of demonstrating that the conditions of the exemption have been met. However, in light of the commenter's concern, the Department has determined to require that loans with durations that exceed sixty days be made pursuant to a written loan agreement that contains all of the material terms that are applicable to such loan. This requirement will apply prospectively to loans with durations of 60 days or longer where such loans involve the payment of a plan's ordinary operating expenses. Loans with durations of 60 days or longer that are engaged in for a purpose incidental to the ordinary operation of the plan will be subject to the requirement effective December 15, 2004.

Another commenter sought clarification regarding section IV(e) of the proposed amendment.[3] This condition provides that loans described

---

[3] Section IV(e) of the proposed amendment was incorrectly identified therein as section IV(3). This error has been corrected in this adopted amendment.

in section 408(b)(3) of ERISA or section 4975(d)(3) of the Code are not covered by the class exemption.[4] The commenter states that, since section IV(e) only references sections 408(b)(3) of ERISA and 4975(d)(3) of the Code which generally refer to exemptive relief for loans involving ESOPs, but not the regulations promulgated under those exemptions which more narrowly define the types of ESOP loans that are eligible for exemptive relief under those exemptions, section IV(e) may be interpreted as precluding relief for any loan from a party in interest to an ESOP.[5]

In response to the comment, the Department has revised section IV(e) of the proposed amendment to more accurately reflect the Department's intent. In this regard, the Department intended that section IV(e) of PTE 80–26 would preclude relief for loans involving ESOPs to the extent that such loans relate to the acquisition by the ESOP of employer securities. The Department is therefore revising section IV(e) of PTE 80–26 to provide that loans described in section 408(b)(3) of ERISA and the regulations promulgated thereunder, or section 4975(d)(3) of the Code and the regulations promulgated thereunder, are not covered by the class exemption.

**General Information**

The attention of interested persons is directed to the following:

(1) The fact that a transaction is the subject of an exemption under section 408(a) of ERISA and section 4975(c)(2) of the Code does not relieve a fiduciary, or other party in interest or disqualified person with respect to a plan, from certain other provisions of ERISA and the Code, including any prohibited transaction provisions to which the exemption does not apply and the general fiduciary responsibility provisions of section 404 of ERISA which require, among other things, that a fiduciary act prudently and discharge his or her duties respecting the plan solely in the interests of the participants and beneficiaries of the plan. Additionally, the fact that a transaction is the subject of an exemption does not

affect the requirement of section 401(a) of the Code that the plan must operate for the exclusive benefit of the employees of the employer maintaining the plan and their beneficiaries;

(2) This exemption does not extend to transactions prohibited under section 406(b)(1) and (3) of the Act or section 4975(c)(1)(E) or (F) of the Code;

(3) In accordance with section 408(a) of ERISA and section 4975(c)(2) of the Code, the Department makes the following determinations:

(i) The amendment set forth herein is administratively feasible,

(ii) The amendment set forth herein is in the interests of the plan and its participants and beneficiaries,

(iii) The amendment set forth herein is protective of the rights of participants and beneficiaries of the plan;

(4) The amendment is applicable to a particular transaction only if the transaction satisfies the conditions specified in the exemption; and

(5) The amendment will be supplemental to, and not in derogation of, any other provisions of ERISA and the Code, including statutory or administrative exemptions and transitional rules. Furthermore, the fact that a transaction is subject to an administrative or statutory exemption is not dispositive of whether the transaction is in fact a prohibited transaction.

**Amendment**

Under section 408(a) of the Act and section 4975(c)(2) of the Code and in accordance with the procedures set forth in 29 CFR 2570, Subpart B (55 FR 32836, 32847, August 10, 1990), the Department amends PTE 80–26 as set forth below:

*Section I. Retroactive General Exemption*

Effective January 1, 1975 until December 14, 2004 the restrictions of section 406(a)(1)(B) and (D) and section 406(b)(2) of the Act, and the taxes imposed by section 4975(a) and (b) of the Code, by reason of section 4975(c)(1)(B) and (D) of the Code, shall not apply to the lending of money or other extension of credit from a party in interest or disqualified person to an employee benefit plan, nor to the repayment of such loan or other extension of credit in accordance with its terms or written modifications thereof, if:

(a) No interest or other fee is charged to the plan, and no discount for payment in cash is relinquished by the plan, in connection with the loan or extension of credit;

(b) The proceeds of the loan or extension of credit are used only—

(1) For the payment of ordinary operating expenses of the plan, including the payment of benefits in accordance with the terms of the plan and periodic premiums under an insurance or annuity contract, or

(2) For a period of no more than three business days, for a purpose incidental to the ordinary operation of the plan;

(c) The loan or extension of credit is unsecured; and

(d) The loan or extension of credit is not directly or indirectly made by an employee benefit plan.

*Section II. Temporary Exemption*

Effective November 1, 1999 through December 31, 2000, the restrictions of section 406(a)(1)(B) and (D) and section 406(b)(2) of the Act, and the taxes imposed by section 4975(a) and (b) of the Code, by reason of section 4975(c)(1)(B) and (D) of the Code, shall not apply to the lending of money or other extension of credit from a party in interest or disqualified person to an employee benefit plan, nor to the repayment of such loan or other extension of credit in accordance with its terms or written modifications thereof, if:

(a) No interest or other fee is charged to the plan, and no discount for payment in cash is relinquished by the plan, in connection with the loan or extension of credit;

(b) The proceeds of the loan or extension of credit are used only for a purpose incidental to the ordinary operation of the plan which arises in connection with the plan's inability to liquidate, or otherwise access its assets or access data as a result of a Y2K problem.

(c) The loan or extension of credit is unsecured;

(d) The loan or extension of credit is not directly or indirectly made by an employee benefit plan; and

(e) The loan or extension of credit begins on or after November 1, 1999 and is repaid or terminated no later than December 31, 2000.

*Section III. September 11, 2001 Market Disruption Exemption*

Effective September 11, 2001 through January 9, 2002, the restrictions of section 406(a)(1)(B) and (D) and section 406(b)(2) of the Act, and the taxes imposed by section 4975(a) and (b) of the Code, by reason of section 4975(c)(1)(B) and (D) of the Code, shall not apply to the lending of money or other extension of credit from a party in interest or disqualified person to an employee benefit plan, nor to the

---

[4] Section 408(b)(3) of ERISA provides a statutory exemption from the prohibitions set forth in section 406 of ERISA for "a loan to an employee stock ownership plan." Section 4975(d)(3) provides a statutory exemption from the prohibitions set forth in section 4975 of the Code for "any loan to a leveraged employee stock ownership plan" if certain conditions are met.

[5] See 29 CFR 2550.408b–3 and 26 CFR 54.4975–7(b). Among other things, the regulations limit relief under the statutory exemptions to loans that relate to the acquisition of qualifying employer securities by an ESOP.

repayment of such loan or other extension of credit in accordance with its terms or written modifications thereof, if:

(a) No interest or other fee is charged to the plan, and no discount for payment in cash is relinquished by the plan, in connection with the loan or extension of credit;

(b) The proceeds of the loan or extension of credit are used only for a purpose incidental to the ordinary operation of the plan which arises in connection with difficulties encountered by the plan in liquidating, or otherwise accessing its assets, or accessing its data in a timely manner as a direct or indirect result of the September 11, 2001 disruption;

(c) The loan or extension of credit is unsecured;

(d) The loan or extension of credit is not directly or indirectly made by an employee benefit plan; and

(e) The loan or extension of credit begins on or after September 11, 2001, and is repaid or terminated no later than January 9, 2002.

*Section IV. Prospective General Exemption*

Effective as of December 15, 2004, the restrictions of section 406(a)(1)(B) and (D) and section 406(b)(2) of the Act, and the taxes imposed by section 4975(a) and (b) of the Code, by reason of section 4975(c)(1)(B) and (D) of the Code, shall not apply to the lending of money or other extension of credit from a party in interest or disqualified person to an employee benefit plan, nor to the repayment of such loan or other extension of credit in accordance with its terms or written modifications thereof, if:

(a) No interest or other fee is charged to the plan, and no discount for payment in cash is relinquished by the plan, in connection with the loan or extension of credit;

(b) The proceeds of the loan or extension of credit are used only—

(1) for the payment of ordinary operating expenses of the plan, including the payment of benefits in accordance with the terms of the plan and periodic premiums under an insurance or annuity contract, or

(2) for a purpose incidental to the ordinary operation of the plan;

(c) The loan or extension of credit is unsecured;

(d) The loan or extension of credit is not directly or indirectly made by an employee benefit plan;

(e) The loan is not described in section 408(b)(3) of ERISA and the regulations promulgated thereunder (29 CFR 2550.408b–3) or section 4975(d)(3)

of the Code and the regulations promulgated thereunder (26 CFR 54.4975–7(b)); and

(f)(1) Any loan described in section IV(b)(1) that is entered into on or after April 7, 2006 and that has a term of 60 days or longer must be made pursuant to a written loan agreement that contains all of the material terms of such loan.

(2) Any loan described in (b)(2) of this paragraph that is entered into for a term of 60 days or longer must be made pursuant to a written loan agreement that contains all of the material terms of such loan.

*Section V: Definitions*

(a) For purposes of section II, a "Y2K problem" is a disruption of computer operations resulting from a computer system's inability to process data because such system recognizes years only by the last two digits, causing a "00" entry to be read as the year "1900" rather than the year "2000."

(b) For purposes of section III, the "September 11, 2001 disruption" is the disruption to the United States financial and securities markets and/or the operation of persons providing administrative services to employee benefit plans, resulting from the acts of terrorism that occurred on September 11, 2001.

(c) For purposes of this exemption, the terms "employee benefit plan" and "plan" refer to an employee benefit plan described in ERISA section 3(3) and/or a plan described in section 4975(e)(1) of the Code.

Signed at Washington, DC, this 3rd day of April, 2006.

**Ivan L. Strasfeld,**

*Director, Office of Exemption Determinations, Employee Benefits Security Administration, U.S. Department of Labor.*

[FR Doc. E6–5075 Filed 4–6–06; 8:45 am]

**BILLING CODE 4510–29–P**

---

**DEPARTMENT OF LABOR**

**Employment and Training Administration**

**Request for Certification of Compliance—Rural Industrialization Loan and Grant Program**

**AGENCY:** Employment and Training Administration, Labor.

**ACTION:** Notice.

**SUMMARY:** The Employment and Training Administration is issuing this notice to announce the receipt of a "Certification of Non-Relocation and Market and Capacity Information

Report" (Form 4279–2) for the following:

*Applicant/Location:* Dyna Harvest, LLC, Morgantown, Kentucky.

*Principal Product:* Dyna Harvest, LLC is a real estate holding company co-owned by Dynastrosi Laboratories, LLC and Harvest Wind Energy Corporation (HWEC), who plan to jointly establish a vertically integrated wind turbine generator systems manufacturing facility in Morgantown, KY. Dyna Harvest will own the fixed assets (facilities) that will be acquired, financed, and leased to Dynastrosi Laboratories and HWEC. The NAICS industry codes for this enterprise are 531120 (Lessors of Nonresidential Buildings (except Mini warehouses), and 532490 (Other Commercial and Industrial Machinery and Equipment Rental and Leasing).

**DATES:** All interested parties may submit comments in writing no later than April 21, 2006. Copies of adverse comments received will be forwarded to the applicant noted above.

**ADDRESSES:** Address all comments concerning this notice to Anthony D. Dais, U.S. Department of Labor, Employment and Training Administration, 200 Constitution Avenue, NW., Room N–4514, Washington, DC 20210; or transmit via fax 202–693–3015 (this is not a toll-free number).

**FOR FURTHER INFORMATION CONTACT:** Anthony D. Dais, at telephone number (202) 693–2784 (this is not a toll-free number).

**SUPPLEMENTARY INFORMATION:** Section 188 of the Consolidated Farm and Rural Development Act of 1972, as established under 29 CFR part 75, authorizes the United States Department of Agriculture (USDA) to make or guarantee loans or grants to finance industrial and business activities in rural areas. The Secretary of Labor must review the application for financial assistance for the purpose of certifying to the Secretary of Agriculture that the assistance is not calculated, or likely, to result in: (a) A transfer of any employment or business activity from one area to another by the loan applicant's business operation; or (b) An increase in the production of goods, materials, services, or facilities in an area where there is not sufficient demand to employ the efficient capacity of existing competitive enterprises unless the financial assistance will not have an adverse impact on existing competitive enterprises in the area. The Employment and Training Administration (ETA) within the Department of Labor is responsible for the review and certification process. Comments should address the two bases

**APPENDIX C**

of publicly—traded securities from non-ERISA accounts (the Accounts) of Concord Hospital, Inc. and its parent corporation, Capital Region Health Care Corporation; (2) the transfer of $3,761,319 of publicly-traded securities from the Plan to the Accounts in August of 1994; and (3) the proposed transfer of approximately $3.6 million from the Plan to the Accounts, provided the following conditions are satisfied: (a) The decision for the Plan to enter the subject transactions was made at the recommendation of the Plan's independent investment advisor; (b) the Plan has not paid and will not pay commissions or other fees in connection with the subject transactions; (c) the transactions involve publicly-traded securities, the fair market values of which were based upon published prices on established markets; and (d) the Plan's independent fiduciary has reviewed the transactions and has determined that the transactions were in the best interest of the Plan and protective of the rights of the participants and beneficiaries of the Plan.

For a more complete statement of the facts and representations supporting the Department's decision to grant this exemption, refer to the notice of proposed exemption published on November 3, 1995 at 60 FR 55857.

**EFFECTIVE DATE:** This exemption is effective July 7, 1994.

**FOR FURTHER INFORMATION CONTACT:** Gary H. Lefkowitz of the Department, telephone (202) 219–8881. (This is not a toll-free number.)

## Larson Distributing Co. Profit Sharing Plan (the Plan) Located in Denver, Colorado

[Prohibited Transaction Exemption 96–4; Exemption Application No. D–10083]

*Exemption*

The restrictions of section 406(a), 406 (b)(1) and (b)(2) of the Act and the sanctions resulting from the application of section 4975 of the Code, by reason of section 4975(c)(1) (A) through (E) of the Code, shall not apply to (1) the extension of credit to the Plan (the Loan) by Larson Distributing Co., Inc. (the Employer), the sponsor of the Plan, with respect to the Plan's investments in annuity accounts maintained with USG Annuity and Life Co. and All American Life Insurance Company (the Annuities), and (2) the Plan's potential repayment of the Loan (the Repayments); provided the following conditions are satisfied:

(A) The Plan does not pay any interest or incur any expenses with respect to the Loan;

(B) The Repayments are restricted solely to the amounts recovered by the Employer on behalf of the Plan (the Recovery Amounts) in litigation concerning the Annuities; and

(C) To the extent that Loan exceeds the total Recovery Amounts, the Repayments shall be waived.

For a more complete statement of the facts and representations supporting the exemption, refer to the notice of proposed exemption published on November 3, 1995 at 60 FR 55881.

**FOR FURTHER INFORMATION CONTACT:** Ronald Willett of the Department, telephone (202) 219–8881. (This is not a toll-free number.)

## Retirement Savings Plan and Trust for Employees of the J.H. Heafner Company, Inc. (the Plan) Located in Lincolnton, North Carolina

[Prohibited Transaction Exemption 96–5; Exemption Application No. D–10125]

*Exemption*

The restrictions of sections 406(a), 406 (b)(1) and (b)(2) of the Act and the sanctions resulting from the application of section 4975 of the Code, by reason of section 4975(c)(1) (A) through (E) of the Code, shall not apply to the sale of the Plan of certain limited partnerships units (the Units) in two limited partnerships to the J.H. Heafner Company, Inc. (Heafner), provided the following conditions are satisfied: (a) The sale is a one-time transaction for cash; (b) the Plans pays no commissions or other expenses in connection with the transaction; and (c) the Plan receives no less than the greater of: (1) Its cost for the Units; or (2) the fair market value of the Units on the date of the sale.

For a more complete statement of the facts and representations supporting the Department's decision to grant this exemption, refer to the notice of proposed exemption published on November 3, 1995 at 60 FR 55862.

**FOR FURTHER INFORMATION CONTACT:** Gary H. Lefkowitz of the Department, telephone (202) 219–8881 (This is not a toll-free number.)

*General Information*

The attention of interested persons is directed to the following:

(1) The fact that a transaction is the subject of an exemption under section 408(a) of the Act and/or section 4975(c)(2) of the Code does not relieve a fiduciary or other party in interest or disqualified person from certain other provisions to which the exemptions does not apply and the general fiduciary responsibility provisions of section 404 of the Act, which among other things

require a fiduciary to discharge his duties respecting the plan solely in the interest of the participants and beneficiaries of the plan and in a prudent fashion in accordance with section 404(a)(1)(B) of the Act; nor does it affect the requirement of section 401(a) of the Code that the plan must operate for the exclusive benefit of the employees of the employer maintaining the plan and their beneficiaries;

(2) These exemptions are supplemental to and not in derogation of, any other provisions of the Act and/or the Code, including statutory or administrative exemptions and transactional rules. Furthermore, the fact that a transaction is subject to an administrative or statutory exemption is not dispositive of whether the transaction is in fact a prohibited transaction; and

(3) The availability of these exemptions is subject to the express condition that the material facts and representations contained in each application accurately describes all material terms of the transaction which is the subject of the exemption.

Signed at Washington, D.C., this 25th day of January 1996.

**Ivan Strasfeld,**
*Director of Exemption Determinations, Pension and Welfare Benefits Administration.*

[FR Doc. 96–1777 Filed 1–30–96; 8:45 am]

**BILLING CODE 4510–29–M**

---

[Application No. D–09627, et al.]

## Proposed Exemptions; Hassan Zekavat, M.D., P.A. Money Purchase Pension Plan (the Plan)

**AGENCY:** Pension and Welfare Benefits Administration, Labor.

**ACTION:** Notice of proposed exemptions.

---

**SUMMARY:** This document contains notices of pendency before the Department of Labor (the Department) of proposed exemptions from certain of the prohibited transaction restriction of the Employee Retirement Income Security Act of 1974 (the Act) and/or the Internal Revenue Code of 1986 (the Code).

## Written Comments and Hearing Requests

Unless otherwise stated in the Notice of Proposed Exemption, all interested persons are invited to submit written comments, and with respect to exemptions involving the fiduciary prohibitions of section 406(b) of the Act, requests for hearing within 45 days from the date of publication of this **Federal Register** Notice. Comments and request for a hearing should state: (1) The name,

**APPENDIX D**

investment in the Partnership by the Fund is LaSalle Advisors.

(j) In addition, it is possible that one or more other Plans may become Limited Partners at some future time. Therefore, this proposed exemption is intended to cover any such Plan so long as the Plan meets the terms and conditions described herein.

(k) Limited Partners which are not Plans include:

(1) Allstate Insurance Company which has undertaken a total capital commitment of $25,000,000.

(2) Allstate Life Insurance Company, which has undertaken a total capital commitment of $10,000,000.

(3) Columbia University, which has undertaken a total capital commitment of $10,000,000.

(4) Cornell University, which has undertaken a total capital commitment of $10,000,000.

(5) The Ministers and Missionaries Benefit Board of the American Baptist Churches, which has undertaken a total capital commitment of $20,000,000.

(6) The New York State Common Retirement Fund, which has undertaken a total capital commitment of $75,000,000.

(7) The Commonwealth of Pennsylvania Public School Employes' Retirement System, which has undertaken a total capital commitment of $50,000,000.

(8) Puma, which has undertaken a total capital commitment of $13,500,000.

(9) NC/TREIT which has undertaken a total capital commitment of $20,000,000.

(10) Endowment Realty Investors II, Inc., which has undertaken a total capital commitment of $25,000,000.

(11) The Oregon Public Employees' Retirement Fund, which has undertaken a total capital commitment of $75,000,000.

(12) Tiger, which has undertaken a total capital commitment of $38,250,000.

5. IBJ represents that the Partnership has obtained an opinion of counsel that the Partnership will constitute an "operating company" under the Department's plan asset regulations [29 CFR 2510.3–101(c)] if the Partnership is operated in accordance with the Agreement and the offering memorandum (the Offering) distributed in connection with the private placement of the limited partnership interests.[4]

---

[4] The Department expresses no opinion herein as to whether the Partnership will constitute an operating company under the regulations at 29 CFR 2510.3–101.

6. IBJ represents that the Security Agreement constitutes a form of credit security which is customary among financing arrangements for real estate limited partnerships, wherein the financing institutions do not obtain security interests in the real property assets of the partnership. IBJ also represents that the obligatory execution of the Security Agreement by the Limited Partners for the benefit of the Lenders was fully disclosed in the Offering as a requisite condition of investment in the Partnership during the private placement of the limited partnership interests. IBJ represents that the only direct relationship between any of the Limited Partners and any of the Lenders will be in the execution of the Security Agreements. All other aspects of the transaction, including the negotiation of all terms of the Facility are exclusively between the Lenders and the Partnership. IBJ represents that the proposed executions of the Security Agreements will not affect the abilities of the Trusts to withdraw from investment and participation in the Partnership. The only Plan assets to be affected by the proposed transaction are each Plan's limited partnership interests in the Partnership and the related Plan obligations as Limited Partners to respond to drawdowns up to the total amount of each Plan's capital commitment to the Partnership.

7  IBJ represents that neither it nor any Lender will act in any fiduciary capacity with respect to any Trust's investment in the Partnership and that IBJ is independent of and unrelated to those fiduciaries (the Trust Fiduciaries) responsible for authorizing and overseeing the Trusts' investments in the Partnership. Each Trust Fiduciary represents independently that its authorization of Trust investment in the Partnership was free of any influence, authority or control by the Lenders. The Trust Fiduciaries represent that the Trust's investments in and capital commitments to the Partnership were made with the knowledge that each Limited Partner would be required subsequently to grant a security interest in the Partnership to the Lenders and to honor drawdowns made on behalf of the Lenders without recourse to any defenses against the General Partner. Each Trust Fiduciary individually represents that it is independent of and unrelated to IBJ and the Lenders and that the investment by the Trust for which that Trust Fiduciary is responsible continues to constitute a favorable investment for the Plans participating in that Trust and that the execution of the Security Agreement is

in the best interests and protective of the participants and beneficiaries of such Plans.

8. In summary  the proposed applicants represent that the proposed transactions satisfy the criteria of section 408(a) of the Act for the following reasons: (a) The Plans' investments in the Partnership were authorized and are overseen by the Trust Fiduciaries, which are independent of the Lenders; (b) none of the Lenders have any influence, authority or control with respect to the Plans' investments in the Partnership or the Plans' executions of the Security Agreements; and (c) the Trust Fiduciaries invested in the Partnership on behalf of the Plans with the knowledge that the Security Agreements are required of all Limited Partners investing in the Partnership.

**FOR FURTHER INFORMATION CONTACT:**
Karin Weng of the Department, telephone (202) 219–8881. (This is not a toll-free number.)

**Larson Distributing Co. Profit Sharing Plan (the Plan) Located in Denver, Colorado**

[Application No. D–10083]

*Proposed Exemption*

The Department is considering granting an exemption under the authority of section 408(a) of the Act and section 4975(c)(2) of the Code and in accordance with the procedures set forth in 29 CFR Part 2570, Subpart B (55 F.R. 32836, 32847  August 10, 1990). If the exemption is granted the restrictions of sections 406(a), 406 (b)(1) and (b)(2) of the Act and the sanctions resulting from the application of section 4975 of the Code, by reason of section 4975(c)(1) (A) through (E) of the Code, shall not apply to (1) the proposed extension of credit to the Plan (the Loan) by Larson Distributing Co., Inc. (the Employer), the sponsor of the Plan, with respect to the Plan's investments in annuity accounts maintained with USG Annuity and Life Co. and All American Life Insurance Company (the Annuities), and (2) the Plan's potential repayment of the Loan (the Repayments); provided the following conditions are satisfied:

(A) The Plan does not pay any interest or incur any expenses with respect to the Loan;

(B) The Repayments are restricted solely to the amounts recovered by the Employer on behalf of the Plan (the Recovery Amounts) in litigation concerning the Annuities; and

(C) To the extent the Loan exceeds the total Recovery Amounts, the Repayments shall be waived.

*Summary of Facts and Representations*

1. The Plan is a defined contribution plan with 47 participants and total assets of $446,784 as of October 31, 1994. The Employer is a Colorado closely-held corporation engaged in the wholesale distribution of floor coverings and building materials, with its principal place of business in Denver, Colorado. The trustees of the Plan are John L. Larson, Sr. and Allen W Kliewer (the Trustees), each of whom is an officer and director of the Employer.

2. The Plan provides for individual participant accounts and participant-directed investment of the accounts among investment options (the Funds) selected by the Trustees. Commencing October 1987 the Trustees engaged the services of Moore Resources Group, Inc. (MRGI) as a third party administrator of the Plan. MRGI's duties included responsibility for receiving all Plan contributions for distribution and deposit among the Funds in accordance with participant directions. Among the Funds under MRGI's responsibility was the Money Market Annuity Fund, the assets of which included annuity accounts with USG Annuity and Life Co. (USG) and All American Life Insurance Company (All American; together, the Insurers).

3. The Employer represents that from October 1991 through December 1993, MRGI fraudulently deposited into its own account at Norwest Bank in Denver, Colorado, a total of $150,595.24 generated by forging checks and fraudulently surrendering annuities with respect to the Plan's accounts with the Insurers. The Employer details the allegations of fraud and forgery as follows: Twenty one checks, totalling $78,472.71, in Plan contributions payable to USG were deposited into MRGI's account at Norwest Bank and were never paid to USG. Nineteen checks totalling $51,203.52 issued by USG as surrendered annuities, pursuant to forged surrender applications submitted by MRGI, were endorsed by forgery and deposited by MRGI into its account at Norwest Bank. Twelve checks totalling $20,919.01 issued by All American as surrendered annuities, pursuant to forged surrender applications submitted by MRGI, were endorsed by forgery and deposited by MRGI into its account at Norwest Bank. Previously on May 14, 1991, according to the Employer, MRGI's chief executive officer had forged the signature of one of the Trustees on a letter to USG requesting that all correspondence regarding the Plan be forwarded to MRGI. Furthermore, the Employer states that the Form 5500's for the Plan which

were prepared by MRGI and sent to the Employer for review and signature contained false entries with respect to the amount of contributions to the Insurers and the balances of the participant accounts invested with the Insurers. In addition, the Employer represents that the year-end statements sent to Plan participants by MRGI reflected not the actual balances of the individual accounts but an approximation of the amounts which would have been in the participant accounts without the forgeries.

4. The Employer is initiating litigation on behalf of the Plan against MRGI, USG, All American, and Norwest Bank to recover the amounts fraudulently diverted from the Plan as described above (the Litigation). The Employer is paying all court costs and attorneys fees in initiating and pursuing the Litigation. Meanwhile, the Employer wishes to restore to the Plan the amounts of the forged checks and fraudulently surrendered annuities, plus interest, in the form of a loan to the Plan (the Loan). The Employer represents that by making a special contribution to the Plan in the form of the Loan the Plan will be able to recover immediately the amounts sought in the Litigation, and to prevent further lost earnings on the amounts which have been diverted by MRGI. Accordingly the Employer is requesting an exemption for the Loan, including its potential repayment by the Plan (the Repayments), as described herein.

5. The Employer proposes to execute a written agreement (the Agreement) under which the Employer undertakes the obligation to make a special cash contribution to the Plan (the Special Contribution), which will constitute the Loan principal. The Agreement provides that the Special Contribution is to be made to the Plan only after the grant of the exemption proposed herein, if granted. The amount of the Special Contribution is defined in the Agreement as the amount of the forged checks for contributions and fraudulently surrendered annuity contracts plus an amount to reflect earnings that would have accumulated under the contracts with the Insurers absent the fraud, as determined on the basis of rate information provided by the Insurers. The Agreement requires that the Special Contribution be allocated to the Plan participants in the proportion that their accounts were affected by the fraud and forgery.

With respect to repayment of the Loan (the Repayment), the Agreement provides that the Special Contribution is to be repaid to the Employer only if the Litigation is successful in recovering monetary amounts on behalf of the Plan

either through a final judgment or settlement of the Litigation. If the Litigation does not result in any monetary recovery the Plan shall not reimburse the Employer for any of the Special Contribution. Upon the entry of a final judgment or upon settlement of the Litigation, the Plan shall repay the Special Contribution to the Company in the amount of the lesser of (a) the amount of the Special Contribution plus Litigation costs and attorneys' fees, or (b) the amount actually recovered in the Litigation. If the amount of such recovery is greater than the amount of the Special Contribution plus costs of the Litigation and attorneys fees, the excess recovery shall enure to the benefit of the Plan. If the amount of such recovery is less than the amount of the Special Contribution plus costs of the Litigation and attorneys fees, repayment of the difference will be waived and the Employer will have no further right of reimbursement with respect to the Special Contribution.

6. In summary, the applicant represents that the proposed transaction satisfies the criteria of section 408(a) of the Act for the following reasons: (a) The Loan will enable the Plan to recover immediately the amounts allegedly diverted, including interest on such amounts as determined by the Insurers, and to prevent further loss of earnings on such amounts; (b) The Plan will not pay any interest or incur any expenses with respect to the Loan; (c) Repayment of the Loan will be restricted to the proceeds, if any recovered in the Litigation; and (d) To the extent the Loan exceeds the amount recovered in the Litigation, the Repayments will be waived.

**FOR FURTHER INFORMATION CONTACT:** Ronald Willett of the Department, telephone (202) 219–8881. (This is not a toll-free number.)

**Retirement Savings Plan and Trust for Employees of the J.H. Heafner Company, Inc. (the Plan), Located in Lincolnton, North Carolina**

[Application No. D–10125]

*Proposed Exemption*

The Department is considering granting an exemption under the authority of section 408(a) of the Act and section 4975(c)(2) of the Code and in accordance with the procedures set forth in 29 CFR Part 2570, Subpart B (55 FR 32836, 32847 August 10, 1990). If the exemption is granted, the restrictions of sections 406(a), 406(b)(1) and (b)(2) of the Act and the sanctions resulting from the application of section 4975 of the Code, by reason of section 4975(c)(1)(A) through (E) of the Code,

**APPENDIX E**

Insurance Claims & Disputes: Representation of Insurance Companies & Insureds
Database updated March 2007

Allan D. Windt

Chapter 10. Contribution, Subrogation, and Indemnity

**§ 10:5. Subrogation—In general**

**West's Key Number Digest**

West's Key Number Digest, Insurance ⚷⟶3512, 3513(4)

**A.L.R. Library**

West's A.L.R. Digest, Insurance ⚷⟶3512 , 3513(4)

**Legal Encyclopedias**

Am. Jur. 2d, Insurance §§ 1768, 1769

C.J.S., Insurance § 1465

**Treatises and Practice Aids**

Couch on Insurance 3d §§ 222:24, 222:31

Leitner, Simpson, and Bjorkman, Law and Practice of Insurance Coverage Litigation §§ 42:4, 42:5

**Law Reviews and Other Periodicals**

Parker, The Made Whole Doctrine: Unraveling the Enigma Wrapped in the Mystery of Insurance Subrogation, 70 Mo. L. Rev. 723 (Summer, 2005)

Greenblatt, Insurance and Subrogation: When the Pie Isn't Big Enough, Who Eats Last?, 64 U. Chi. L. Rev. 1337 (Fall, 1997)

Baron, Subrogation: A Pandora's Box Awaiting Closure, 41 S.D. L. Rev. 237 (1996)

Quinn, Subrogation, Restitution, and Indemnity, 74 Tex. L. Rev. 1361 (1996)

Subrogation is the right that one party has against a third party following the payment, in whole or in part, of a legal obligation that ought to have been met by such third party. Insurance policies routinely include a provision entitling the insurer, on paying a loss, to be subrogated to the insured's right of action against any person

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whose act or omission caused the loss or who was legally responsible to the insured for the loss caused by the wrongdoer. A right to subrogation provided for by contract is called *conventional* or *contractual subrogation*.

Even in the absence of such a policy provision, an insurer is still entitled to *legal* or *equitable subrogation*.[FN1] The only differences between the insurer's rights under contractual as opposed to legal subrogation are that, in many states, under the former, the insurer will not have to demonstrate (1) that it is not a volunteer in order to obtain any subrogation rights,[FN2] and (2) that its equities are superior to the party against whom it is seeking subrogation.[FN3] Note, however, that if an insurance policy does contain a subrogation provision and this provision somehow limits the insurer's right to subrogation, the insurer will not be entitled to equitable subrogation in contravention of the terms of the policy.[FN4]

Under either doctrine of subrogation, therefore, assuming the insurance company is not a volunteer, the company is ordinarily entitled,[FN5] on making a payment to or on behalf of the insured, (a) to be reimbursed by the insured if the insured recoups his or her loss from a third party,[FN6] or (b) to step into the shoes of the insured and assert any cause of action against a third party that the insured could have asserted for his or her own benefit had the insured not been compensated by the insurer. With the exception of certain releases issued by the insured to a wrongdoer that are not binding on the insurer,[FN7] however, the insurer-subrogee's rights rise no higher than those of the insured.[FN8]

Moreover, the insurer should be entitled to sue only for an amount of money necessary to make it whole.[FN9] This should include prejudgment interest, if otherwise available.[FN10] The insurer should not, however, in its capacity as subrogee, be able to recover for damages incurred by the insured in excess of the amount that the insured was paid by the insurer. This should be true even if the company intends to give the excess recovery to the insured. Absent an actual assignment of the insured's right to the carrier, the carrier has no standing to make such a claim.[FN11] Insurer-subrogees have, on occasion, been allowed to recover such excess damages, but those cases merely evidence a failure on the part of the defendant-tortfeasor to assert the defense that was available.[FN12]

Similarly, absent an assignment from the insured, an excess insurer, suing based upon equitable subrogation,[FN13] should not be allowed to collect punitive damages from a primary insurer.[FN14]

When more than one insurer contributes to the payment of a loss, the highest level insurer is, of course, entitled to be made whole before a lower level insurer can be reimbursed.[FN15]

[FN1] *E.g.*, Fisher v. Aldi Tire, Inc., 78 Wash. App. 902, 902 P.2d 166, 168 (Div. 1 1995), disapproved of on other grounds in later appeal, 135 Wash. 2d 398, 957 P.2d 632 (1998), order corrected on other grounds on denial of reconsideration, 966 P.2d 305 (Wash. 1998); Title Ins. Co. of Minnesota v. Costain Arizona, Inc., 164 Ariz. 203, 791 P.2d 1086, 1089 (Ct. App. Div. 1 1990); Culver v. Insurance Co. of North America, 221 N.J. Super. 493, 535 A.2d 15, 19 (App. Div. 1987), judgment rev'd, on other grounds 115 N.J. 451, 559 A.2d 400 (1989); City Stores Co. v. Lerner Shops of District of Columbia, Inc., 410 F.2d 1010, 1011 (D.C. Cir. 1969); Turner Const. Co. v. John B. Kelly Co., 442 F. Supp. 551, 552 (E.D. Pa. 1976); McGuire v. Wilson, 372 So. 2d 1297, 1300 (Ala. 1979); Transit Casualty Co. v. Spink Corp., 94 Cal. App. 3d 124, 156 Cal. Rptr. 360, 365 (3d Dist. 1979) (disapproved of on other grounds by, Commercial Union Assurance Companies v. Safeway Stores, Inc., 26 Cal. 3d 912, 164 Cal. Rptr. 709, 610 P.2d 1038 (1980)); Farmers Ins. Co., Inc. v. Farm Bureau Mut. Ins. Co., Inc., 227 Kan. 533, 608 P.2d 923, 928 (1980); Western Sur. Co. v. Loy, 3 Kan. App. 2d 310, 594 P.2d 257, 260

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

; Skauge v. Mountain States Tel. & Tel. Co., 172 Mont. 521, 565 P.2d 628, 630 (1977); Warren v. Kir-wan, 598 S.W.2d 598, 599 (Mo. Ct. App. S.D. 1980); Royal Indem. Co. v. Aetna Cas. & Sur. Co., 193 Neb. 752, 229 N.W.2d 183, 190 (1975); Valley Power Co. v. Toiyabe Supply Co., 80 Nev. 458, 396 P.2d 137, 138 (1964); Employers Mut. Cas. Co. v. Griffin, 46 N.C. App. 826, 266 S.E.2d 18, 20 (1980); Travelers Indem. Co. v. Brooks, 60 Ohio App. 2d 37, 14 Ohio Op. 3d 19, 395 N.E.2d 494, 495 (6th Dist. Lucas County 1977); State v. Divers, 51 Or. App. 351, 625 P.2d 681, 683 (1981); Maryland Cas. Co. v. Delzer, 283 N.W.2d 244, 248 (S.D. 1979); Rushing v. International Aviation Underwriters, Inc., 604 S.W.2d 239, 243–44 (Tex. Civ. App. Dallas 1980), writ refused n.r.e., (Dec. 17, 1980); New York Bd. of Fire Underwriters v. Trans Urban Const. Co., Inc., 91 A.D.2d 115, 458 N.Y.S.2d 216, 219 (1st Dep't 1983), order aff'd, 60 N.Y.2d 912, 470 N.Y.S.2d 578, 458 N.E.2d 1255 (1983); Republic Under-writers Ins. Co. v. Fire Ins. Exchange, 1982 OK 67, 655 P.2d 544, 546 (Okla. 1982); Elovich v. Nation-wide Ins. Co., 104 Wash. 2d 543, 707 P.2d 1319, 1326 (1985). *Contra* Harris v. Illinois-California Exp., Inc., 687 F.2d 1361, 1374, 11 Fed. R. Evid. Serv. 1207, 34 Fed. R. Serv. 2d 1647 (10th Cir. 1982) (New Mexico law); Cincinnati Ins. Co. v. Vulcan Materials Co., Inc., 587 F. Supp. 466, 469 (N.D. Ala. 1984), judgment rev'd on other grounds, 762 F.2d 1021 (11th Cir. 1985).

It has, however, been held that there is no implied right of subrogation with regard to "personal insurance," such as life, accident, or medical insurance. *E.g.,* Wolters v. American Republic Ins. Co., 149 N.H. 599, 827 A.2d 197, 201-202 (2003); Frost v. Porter Leasing Corp., 386 Mass. 425, 436 N.E.2d 387, 390 (1982).

The elements of an insurer's cause of action based on equitable subrogation have been summarized as follows:

> 1. The insured has suffered a loss for which the party to be charged is liable, either because the lat-ter is a wrongdoer whose act or omission caused the loss or because he is legally responsible to the insured for the loss caused by the wrongdoer

> 2. The insurer, in whole or in part, has compensated the insured for the same loss for which the party to be charged is liable

> 3. The insured has an existing, assignable cause of action against the party to be charged, which ac-tion the insured could have asserted for his own benefit had he not been compensated for his loss by the insurer

> 4. The insurer has suffered damages caused by the act or omission upon which the liability of the party to be charged depends

> 5. Justice requires that the loss should be entirely shifted from the insurer to the party to be charged, whose equitable position is inferior to that of the insurer

> 6. The insurer's damages are in a stated sum, usually the amount it has paid to the insured, assum-ing the payment was not voluntary and was reasonable

Patent Scaffolding Co. v. William Simpson Const. Co., 256 Cal. App. 2d 506, 64 Cal. Rptr. 187, 190 (2d Dist. 1967).

It has been held that, in the absence of an express contractual provision providing for subrogation, an insurer is not entitled to subrogation in personal injury cases. *E.g.,* American Pioneer Life Ins. Co. v. Rogers, 296 Ark. 254, 753 S.W.2d 530, 532 (1988).

[FN2] *See* § 10:10.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN3] *E.g., National Union Fire Ins. Co. of Pittsburgh, Pa. v. Riggs Nat. Bank of Washington, D.C., 646 A.2d 966, 968–71 (D.C. 1994).*

[FN4] *Spirek v. State Farm Mut. Auto. Ins. Co., 65 Ill. App. 3d 440, 21 Ill. Dec. 817, 382 N.E.2d 111, 117–18 (1st Dist. 1978); Skauge v. Mountain States Tel. & Tel. Co., 172 Mont. 521, 565 P.2d 628, 630 (1977); Hodge v. Kirkpatrick Development, Inc., 130 Cal. App. 4th 540, 30 Cal. Rptr. 3d 303, 307 (4th Dist. 2005),* review denied, (Sept. 28, 2005) ("Under the doctrine of subrogation, when an insurer pays money to its insured for a loss caused by a third party, the insurer succeeds to its insured's rights against the third party in the amount the insurer paid. (Citation omitted). Upon subrogation, the insurer steps into the shoes of its insured").In *Cunningham v. Metropolitan Life Ins. Co., 121 Wis. 2d 437, 360 N.W.2d 33, 37-38 (1985),* the court summarized the case law holding that if a policy is found to be one of investment, as opposed to indemnity, the insurer is not entitled to subrogation absent an express subrogation clause. *See also Ridge Tool Co. v. Silva, 33 Ohio App. 3d 260, 515 N.E.2d 945, 946–47 (9th Dist. Lorain County 1986)* (no equitable subrogation "where the contract of insurance is non-indemnity, such as life, automobile, or hospitalization").

[FN5] Under unusual circumstances, an insurer may also be estopped from seeking subrogation. In *Vining v. Chase, 410 So. 2d 1 (Ala. 1981),* a title insurer reimbursed the owner of a title policy for the damages occasioned by the fact that the insured did not have good title to the property. The carrier then sought subrogation from the vendor of the property, who had conveyed the property by warranty deed. The court held that the insurer was estopped from seeking subrogation because the vendor had requested that the insurer issue a title binder and had sold the property in reliance upon the insurer's conclusion that the vendor had good title. *Vining v. Chase, 410 So. 2d 1, 2 (Ala. 1981).*

An insurer does not lose its right to subrogation because it has breached the insurance contract. *See, e.g., Ingersoll Mill. Mach. Co. v. M/V Bodena, 829 F.2d 293, 309, 1988 A.M.C. 223 (2d Cir. 1987).*Note, too, that under extraordinary circumstances, an insurer may be deemed to have waived its subrogation rights. *See Faraino v. Centennial Ins. Co., 117 Misc. 2d 297, 458 N.Y.S.2d 444, 448 (Sup 1982),* order rev'd on other grounds, 103 A.D.2d 790, 477 N.Y.S.2d 664 (2d Dep't 1984).

A particularly interesting factual scenario was presented in *Commercial Union Ins. Co. v. Ford Motor Co., 599 F. Supp. 1271 (N.D. Cal. 1984).* The insurer, after breaching its duty to settle, paid the injured party an amount more than $2 million in excess of the policy limits. The insurer then sought subrogation from a joint tortfeasor. The court held that equity precluded the insurer from seeking subrogation for the amount paid in excess of the policy limit because such payment was the result of the insurer's breach of its duty to its insured. *Commercial Union Ins. Co. v. Ford Motor Co., 599 F. Supp. 1271, 1275 (N.D. Cal. 1984).*

Uninsured motorist statutes may affect an insurer's right to subrogation. Most of those statutes, by their terms, provide for pro tanto subrogation by the insurer as to any recovery otherwise obtained by the insured. The courts, however, have resisted allowing subrogation when the insured has not been fully compensated for his injuries. Most, therefore, have construed the statute to apply only to recoveries from the uninsured motorist and not to sums obtained from parties commonly or jointly liable with the uninsured motorist. *E.g., Hughes v. State Farm Mut. Auto. Ins. Co., 604 F.2d 573, 577 (8th Cir. 1979)* (North Dakota law); *Craig v. Iowa Kemper Mut. Ins. Co., 565 S.W.2d 716, 726 (Mo. Ct. App. 1978); Raitt v. National Grange Mut. Ins. Co., 111 N.H. 397, 285 A.2d 799, 802 (1971); cf Capps v. Klebs, 178 Ind. App. 293, 382 N.E.2d 947, 951–52 (3d Dist. 1978)* (interpreting statute as not allowing pro tanto subrogation even as to recovery obtained from uninsured motorist); *Dunnam v. State Farm Mut.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Auto. Ins. Co., 366 So. 2d 668, 672 (Miss. 1979) (interpreting statute as not allowing pro tanto subroga-
tion even as to recovery obtained from uninsured motorist). *Contra* Traders & General Ins. Co. v. Reyn-
olds, 477 S.W.2d 937, 940 (Tex. Civ. App. Texarkana 1972), writ refused n.r.e., (July 12, 1972).

Presumably, however, the fact that subrogation provisions in the uninsured motorist statute are inapplic-
able under certain circumstances will not deprive the insurer altogether of any subrogation rights. The
insurer should have a common law right to subrogation if and when the insured has been fully com-
pensated for his or her injuries. *E.g.,* Hughes v. State Farm Mut. Auto. Ins. Co., 604 F.2d 573, 579 (8th
Cir. 1979) (North Dakota law); Raitt v. National Grange Mut. Ins. Co., 111 N.H. 397, 285 A.2d 799,
802 (1971). *Contra* American Mut. Ins. Co. v. Romero, 428 F.2d 870, 872 (10th Cir. 1970) (New Mex-
ico law) (uninsured motorist insurer never entitled to subrogation with respect to sums obtained by in-
sured from third parties because such subrogation would be against public policy).

It has also been held that a wrongful death statute may affect an insurer's subrogation rights. In National
Bank of Bloomington v. Podgorski, 57 Ill. App. 3d 265, 14 Ill. Dec. 951, 373 N.E.2d 82, 83-84 (4th
Dist. 1978), an insurance company sought to be reimbursed for payments that it had made to a widow
pursuant to the survivor's benefits provisions of an automobile insurance policy that it had issued to the
widow's deceased husband. Such reimbursement was sought out of the monies obtained by the widow
pursuant to a settlement of the wrongful death action that she had brought against the tortfeasor whose
negligence caused the automobile accident in which her husband had been killed. The court held that
the insurer was not entitled to subrogation. Relying on the provision in the wrongful death statute stat-
ing that the amount recovered was to be for the exclusive benefit of the surviving spouse and next of
kin, the court concluded that the public policy of the state exempted wrongful death awards from sub-
rogation claims.

[FN6] *E.g.,* Roberts v. Safeco Ins. Co., 87 Wash. App. 604, 941 P.2d 668 (Div. 1 1997).

[FN7] *See* § 3:7.

[FN8] *E.g.,* Williams v. Globe Indem. Co., 507 F.2d 837, 839 (8th Cir. 1974) (Arkansas law); Home
Ins. Co. v. Stuart-McCorkle, Inc., 291 Ala. 601, 285 So. 2d 468, 472, 91 A.L.R.3d 833 (1973); Aetna
Cas. & Sur. Co. v. Windsor, 353 A.2d 684, 685 (D.C. 1976); Georgia Farm Bureau Mut. Ins. Co. v.
Southeastern Fidelity Ins. Co., 144 Ga. App. 811, 242 S.E.2d 743, 744 (1978); Farmers Ins. Co., Inc. v.
Farm Bureau Mut. Ins. Co., Inc., 227 Kan. 533, 608 P.2d 923, 928 (1980); Hartford Fire Ins. Co. v.
Western Fire Ins. Co., 226 Kan. 197, 597 P.2d 622, 628 (1979); Foremost Life Ins. Co. v. Waters, 88
Mich. App. 599, 278 N.W.2d 688, 690 (1979), judgment rev'd on other grounds, 415 Mich. 303, 329
N.W.2d 688 (1982); American Sur. Co. v. State Farm Mut. Auto. Ins. Co., 274 Minn. 81, 142 N.W.2d
304, 306–07 (1966); State Auto. and Cas. Underwriters v. Farmers Ins. Exchange, 204 Neb. 414, 282
N.W.2d 601, 603 (1979); Colonial Penn Ins. Co. v. Ford, 172 N.J. Super. 242, 411 A.2d 736, 737 (Law
Div. 1979); Seven Sixty Travel, Inc. v. American Motorists Ins. Co., 98 Misc. 2d 509, 414 N.Y.S.2d
254, 256 (Sup 1979); Jones v. Transamerica Ins. Co., 592 P.2d 609, 612 (Utah 1979); United Services
Auto. Ass'n v. Nationwide Mut. Ins. Co., 218 Va. 861, 241 S.E.2d 784, 788–89 (1978); Mentis v. U.S.
Postal Service, 547 F. Supp. 164, 165 (W.D. N.Y. 1982); Motors Ins. Co. v. Southern Bell Telephone
Co., 431 So. 2d 1308, 1309 (Ala. Civ. App. 1983); Pace v. Cage, 419 So. 2d 443, 444 (La. 1982);
Peterson v. Kludt, 317 N.W.2d 43, 48 (Minn. 1982); New York Bd. of Fire Underwriters v. Trans Urb-
an Const. Co., Inc., 91 A.D.2d 115, 458 N.Y.S.2d 216, 221 (1st Dep't 1983), order aff'd, 60 N.Y.2d 912,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

470 N.Y.S.2d 578, 458 N.E.2d 1255 (1983); Brinkley v. Pealer, 341 Pa. Super. 432, 491 A.2d 894, 898 (1985); St. Paul Fire & Marine Ins. Co. v. Glassing, 269 Mont. 76, 887 P.2d 218, 220–21 (1994).

For example, in Hartford Acc. & Indem. Co. v. CNA Ins. Companies, 99 A.D.2d 310, 472 N.Y.S.2d 342, 345–46 (1st Dep't 1984), one insurer was precluded from recovering against a co-insurer because the insured had failed to comply with the notice provisions in the latter policy.

The court in Solomon v. Consolidated Resistance Co. of America, Inc., 97 A.D.2d 791, 468 N.Y.S.2d 532, 533 (2d Dep't 1983), held that if the insured would have been required to submit his or her claim against a third party to arbitration, then the carrier is also so required when it asserts its subrogation rights.

[FN9] *E.g.,* Colorado Farm Bureau Mut. Ins. Co. v. CAT Continental, Inc., 649 F. Supp. 49, 51-52 (D. Colo. 1986) (insurer could not recover punitive damages in action brought in its capacity as subrogee or assignee); Maryland Cas. Co. v. Brown, 321 F. Supp. 309, 312 (N.D. Ga. 1971) (insurer could not recover punitive damages in action brought in its capacity as subrogee or assignee); Carolina Cas. Ins. Co. v. Local No. 612 Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, 136 F. Supp. 941, 943 (N.D. Ala. 1956) (insurer could not recover punitive damages in action brought in its capacity as subrogee); Colonial Penn Ins. Co. v. Ford, 172 N.J. Super. 242, 411 A.2d 736, 737 (Law Div. 1979) (insurer could not recover punitive damages in action brought in its capacity as subrogee); Crown Crane Rental Co., Inc. v. Eberhart Const. Co., Inc., 117 Misc. 2d 268, 458 N.Y.S.2d 165, 166 (Sup 1983) (insurer could not properly institute suit with respect to portion of insured's loss that it had not paid); Associated Hospital Service of Philadelphia v. Pustilnik, 497 Pa. 221, 439 A.2d 1149, 1152 (1981) (health insurer entitled to subrogation for amount of hospital charges it actually paid, not for amount of credits it caused to be attributed to insured's hospital bill). *But see* Brown Mechanical Contractors, Inc. v. Centennial Ins. Co., 431 So. 2d 932, 937 (Ala. 1983) (insurer could seek subrogation from wrongdoer even though insurer had not paid the insured, because the insurer's judgment against the wrongdoer could be made contingent upon payment to the insured).

[FN10] *E.g.,* Neitlich v. Amica Mut. Ins. Co., 7 Mass. App. Ct. 661, 389 N.E.2d 1017, 1019 (1979). *Contra* Employers Ins. of Wausau v. Dunaway, 626 F. Supp. 1144, 1146 (S.D. Miss. 1986).

[FN11] *See generally* J & B Slurry Seal Co. v. Mid-South Aviation, Inc., 88 N.C. App. 1, 362 S.E.2d 812, 819 (1987) (carrier would not be able to sue wrongdoer for entire loss because carrier did not reimburse insured for entire loss, and assignment that carrier received from insured transferred only insured's claims "to the extent" carrier was entitled to subrogation).

[FN12] *See, e.g.,* Neitlich v. Amica Mut. Ins. Co., 7 Mass. App. Ct. 661, 389 N.E.2d 1017, 1019 (1979).

[FN13] As discussed in § 7:8, in most states, an excess insurer does not have a right to sue a primary insurer on any other basis.

[FN14] National Union Fire Ins. Co. of Pittsburgh, Pa. v. Insurance Co. of North America, 955 S.W.2d 120, 133 (Tex. App. Houston 14th Dist. 1997), order withdrawn without opinion, (July 8, 1999) and aff'd, 20 S.W.3d 692 (Tex. 2000).

[FN15] *E.g.,* Westchester Fire Ins. v. Heddington Ins. Ltd., 883 F. Supp. 158, 167 (S.D. Tex. 1995),

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

aff'd without opinion, 84 F.3d 432 (5th Cir. 1996) ("money recouped by insurers after paying a claim is first applied to the highest layer of coverage").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

INCD § 10:5

END OF DOCUMENT