# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HOUSTON POLICE OFFICERS' PENSION SYSTEM, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 08 CV _____ |
| STATE STREET BANK AND TRUST COMPANY and STATE STREET GLOBAL ADVISORS, INC. | § § § § § | |
| Defendants. | § | JURY TRIAL DEMANDED |

## ORIGINAL COMPLAINT

Plaintiff Houston Police Officers' Pension System ("HPOPS") brings this action against Defendants State Street Bank and Trust Company ("SSB") and State Street Global Advisors, Inc. ("SSgA") (collectively "State Street") and alleges:

## PRELIMINARY STATEMENT

1.    This action arises out of State Street's deceptive, imprudent and incompetent performance of its obligations as a fiduciary and investment manager. State Street acted as a fiduciary and investment manager with respect to assets invested by HPOPS in a commodities strategy known as the Enhanced Dow Jones-AIG Commodities Strategy (the "Commodities Strategy"). HPOPS put up $72,000,000.00 as collateral for the Commodities Strategy to cover potential losses on commodities futures swaps. State Street held and invested $54,298,176.00 of the collateral funds. The collateral funds themselves were to be invested in new cash investments that would provide security through diversification, a modest return, and daily liquidity. Daily liquidity was

183294

necessary in the event of a margin call for the Commodities Strategy. SSgA used its discretion as investment manager to invest the entire $54,298,176.00 into its Limited Duration Bond Fund. SSB served as the trustee of the Limited Duration Bond Fund.

2.    State Street represented to HPOPS that the Limited Duration Bond Fund would be invested in accordance with HPOPS' requirements in a high-quality, low-risk, well-diversified fixed income portfolio. The Limited Duration Bond Fund reportedly had a conservative rate-of-return objective to match or exceed the JP Morgan one-month US Dollar LIBOR Index by a mere 50 basis points (basis points where a basis point equals one-hundredth of one percent, or .01%). The Fund's stated objective was "to maximize income while *preserving capital* by investing in a *diversified portfolio of highly rated fixed income securities*," and State Street represented that the Fund would use "an *expanded universe of securities*" to include "repurchase agreements and United States Treasuries; debts of agencies of the United States Government; corporate debt; asset-backed securities, rated investment grade by Moody's and ERISA eligible; commercial mortgage backed securities, rated investment grade by Moody's and ERISA eligible; derivative securities; deposits and other debt instruments of US Banks; and bank commingled funds." Indeed, the Limited Duration Bond Fund's singular purpose was to serve as a slightly enhanced short-term cash vehicle for the collateral put up by HPOPS in the Commodities Strategy. HPOPS required daily liquidity so that cash would be readily available in the event of a margin call to cover the spread of commodity swaps. State Street failed to disclose that the Limited Duration Bond Fund itself would be invested almost solely in a single, residential mortgage sector, much of which was

subprime, or that the Limited Duration Bond Fund would itself be highly leveraged and illiquid.

3.      Although the full dimensions of State Street's misconduct have not yet been revealed, HPOPS has learned that State Street – without advising HPOPS - radically misrepresented the investment strategy for the Limited Duration Bond Fund.   For example, although State Street represented in or about August 2005 that only 5.3% of the Limited Duration Bond Fund was invested in mortgage securities and further represented that the Fund would, on average, be comprised of AAA-rated, low risk and well-diversified, core fixed income securities, HPOPS has since learned that as much as 94% of the Fund was invested in undisclosed positions in subprime, mortgage-related financial derivatives and that the Limited Duration Bond Fund was highly leveraged by using interest rate swaps and the ABX index swaps.   State Street thereby concentrated the holdings of the Limited Duration Bond Fund in these risky assets and exposed the Limited Duration Bond Fund to an inappropriate level of risk for a slightly enhanced short-term cash vehicle intended to provide daily liquidity for HPOPS' Commodities Strategy.   By investing HPOPS' collateral in the Limited Duration Bond Fund, State Street put HPOPS in an investment vehicle they knew or should have known was not suitable for HPOPS' needs either from a risk or liquidity standpoint.

4.      State Street's approach produced catastrophic results during the summer of 2007 and the Limited Duration Bond Fund diverged dramatically from its benchmark. Although the Limited Duration Bond Fund was supposed to exceed the JP Morgan one-month US dollar LIBOR index by a mere 50 basis points and should have had a return of approximately 6.7% during the relevant time period, it instead incurred tens of millions in

losses. Compounding the harm, State Street failed to disclose accurate information to HPOPS and instead provided untimely, incomplete and misleading information.

5.    Further, on information and belief, State Street engaged in blatant self-dealing by giving preferential treatment to other State Street-related entities, including other State Street-commingled funds that owned up to 38,856,819 units of the Limited Duration Bond Fund, in allowing them to get out of the Limited Duration Bond Fund before HPOPS and redeem their units in-kind for what appears to have been the most saleable of the securities held in the Fund; *i.e.* the 2004 and 2005 "vintage" year mortgage securities that actually held equity. Instead, HPOPS was left with 88% of the ownership of units in the Fund that consisted of illiquid, odd-lot subprime mortgage securities with little or no equity.

6.    As a result of State Street's breaches of fiduciary duty, breaches of contract, fraudulent misrepresentations and omissions, violations of the Texas Securities Act and other acts of misconduct, HPOPS lost tens of millions of dollars.

## THE PARTIES

7.    Plaintiff Houston Police Officers' Pension System ("HPOPS") is a governmental retirement plan organized under Article 6243g-4 of the Texas Revised Civil Statutes for the Police Officers of the City of Houston, Texas. Tex.Rev.Civ.Stat. art. 6243g-4 (Vernon Supp. 2007). HPOPS has its principal place of business at 602 Sawyer, Suite 300, Houston, Texas 77007.

8.    SSB, which does business as State Street Bank and Trust Company, is a wholly-owned subsidiary of State Street Corporation, a publicly registered financial holding company. SSB is a bank organized under the laws of the Commonwealth of

Massachusetts with its principal place of business in Boston, Massachusetts. Further, SSB is the trustee, custodian and record-keeper of the Limited Duration Bond Fund at issue in this Complaint and has "exclusive management and control of the Trust" which established the Limited Duration Bond Fund.

9.    SSgA is a Delaware corporation and has its principal place of business in Boston, Massachusetts. SSgA is a wholly-owned subsidiary of State Street Corporation. SSgA acted as Investment Manager for certain HPOPS funds and specifically directed that such funds should be invested in the Limited Duration Bond Fund. SSgA also served as the Investment Manager of the Limited Duration Bond Fund and directed the investments of the bond fund.

## JURISDICTION AND VENUE

10.    This court has jurisdiction over this lawsuit because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000.

11.    A substantial part of the events or omissions giving rise to this claim occurred in this district. Defendants purposefully availed themselves of the benefits of doing business in the State of Texas. Venue is therefore proper in this district pursuant to 28 U.S.C. § 1391(a)(2). Moreover, Section 13 of the Investment Management Agreement governing the parties' relationship provides that venue "shall be exclusively in the state or federal courts located in Houston, Harris County, Texas."

5

## FACTUAL ALLEGATIONS

**I.  The Inducement:  State Street Induces the Sale of its Services as Investment Manager for a Commodities Strategy with Collateral Invested in a Well-Diversified, High-Quality Limited Duration Bond Fund**

12.     Plaintiff HPOPS was established in 1947 by the Texas Legislature to provide retirement, death, and disability benefits to its approximately 7,328 members – active and retired Police Officers of the City of Houston, Texas and certain of their surviving family members.  HPOPS is governed by Texas state law under Article 16, § 67(a) and (c) of the Texas Constitution, Article 6243g-4 of the Texas Revised Civil Statutes, entitled "Police Officers' Pension System in Certain Municipalities," and contracts pursuant to Section 27 thereof.  Under the Texas statute, the Board of Trustees ("the Trustees") of the Pension System is authorized to control or manage the investment of pension funds and may "employ professional investment managers and advisors to manage, or advise, the board regarding the management and investment of, the fund."  TEX. R. CIV. STAT. art. 6243g-4, § 5(c) (Vernon Supp. 2004); *see also id.* at § 10. HPOPS is also subject to the Texas Government Code, Section 802, *et. seq.*, governing public retirement systems.  While HPOPS is not subject to the Employees' Retirement Income Security Act of 1974, as amended ("ERISA"), many of the state law provisions governing HPOPS are analogous to ERISA's statutory provisions.

13.     In July 2005, the Trustees authorized HPOPS' Chief Investment Officer, Pat Franey, to consider investments in a Treasury Inflation Protected Securities (TIPS) and a commodities futures strategy.  HPOPS began evaluating presentations made from

various investment management firms regarding their commodities investment capabilities.

14    On or about August 30, 2005, Eric Roberts, a principal of the Public Funds Group of SSgA, sent a Power Point presentation to HPOPS' Franey regarding State Street's TIPS and commodities futures strategies' capabilities.    Regarding their Commodities Strategy, Roberts represented that SSgA was very experienced with commodities investing, claiming that it was the "#1 Passive International index fund manager" with a "nine year track record" and "low cost trading" and that it was "currently managing $18b in equity and commodity futures and swaps." SSgA purported to be the world's largest institutional asset manager. Further, SSB allegedly has $1.9 Trillion of assets under management.

15.    Generally, in a commodities strategy using a swap, the investor enters into an agreement with the swap provider wherein the investor and the swap provider agree to exchange certain amounts on pre-specified settlement dates based upon changes in the commodities markets. As part of the swap agreement, the investor is required to deposit cash or securities into a margin account with the swap provider, generally 5-10 percent of the notional value of the swap.  If the investor provides the minimum required margin, then the investment can be significantly leveraged.  Alternatively, if the investor does not desire a leveraged strategy, as HPOPS decided to do in this case, then additional funds up to the full notional value of the swap are deposited with an investment manager.  In HPOPS' case here, seventy-five percent (75%) of the required funds were held by State Street for investment in the Limited Duration Bond Fund and twenty-five percent (25%) were held by AIG Financial Products Corp. ("AIG"), the swap provider.  This effectively

7

produced two accounts: a margin account with the swap provider and a collateral account with the investment manager. On each settlement date, the swap provider – whose twenty-five percent (25%) margin account was required to be maintained at all times -- was either to deposit additional funds into the State Street collateral account or else withdraw funds from the State Street collateral account depending on the variation in the commodities markets. Thus, a primary objective was to invest the State Street collateral account funds in a diversified manner that protects principal while allowing a liquid, conservative rate-of-return so that these additional funds would be available on a daily basis to replenish the twenty-five percent (25%) margin account held by AIG.

16.     One of the commodities strategies offered by State Street was the "Enhanced DJ-AIG Strategy" referred to herein as the Commodities Strategy. State Street represented in the August 2005 presentation that the Commodities Strategy would be comprised of three separate funds: (1) the Enhanced DJ-AIG Total Return Fund, in which SSgA would provide for "commodity exposure through index futures, underlying commodity futures and swaps," (2) the Limited Duration Bond Fund as the short term cash vehicle in which the collateral beyond the margin requirement for the commodities investments would be held, described by SSgA as a fund that "seeks to match or exceed the returns of the one-month US Dollar LIBOR Index by 50 bps," has investments of "Average Quality AA," and a "Historical Effective Duration of 0.25 [years]," and (3) SSgA Money Market Fund utilized for margin variation. Importantly, SSgA represented that the Commodities Strategy in the DJ-AIG Total Return Fund would be "unleveraged - - residual cash would be invested in high quality money market securities or pooled

8

funds." State Street further touted that the investment strategy associated with the Limited Duration Bond Fund provided for "daily liquidity."

17. The August 2005 presentation also included a page entitled "Limited Duration Bond Fund – Portfolio Characteristics" dated as of June 30, 2005. State Street claimed that the composition of the Bond Fund had an "average quality of AAA," effective duration of 0.14 [years], and a 38.1 basis points yield over the one month LIBOR. The presentation broke down the quality of securities held in the Limited Duration Bond Fund as 76% AAA, 20.8% AA, 1.3% A and only 1.9% BBB. It further represented that the Fund was composed of the following sectors by market value: 75.8% in asset-backed securities; 11.1% in commercial mortgage-backed securities; 5.7% in cash; 2.0% in agency securities; and only 5.3% in mortgage-backed securities. "Asset-backed" securities generally do not include mortgage-backed securities. This is especially the case where, as here, SSgA presented mortgage-backed securities in its own category with only 5.3% of the Limited Duration Bond Fund and asset-backed securities were separately identified.

18. The Limited Duration Bond Fund was formed by SSB under the State Street Bank and Trust Company Investment Funds for Tax Exempt Retirement Plans Declaration of Trust ("the Trust"), dated February 21, 1991, most recently amended and restated on August 15, 2005. SSB is trustee, custodian and record-keeper of the Limited Duration Bond Fund and has exclusive management and control of the Trust. SSgA is the Limited Duration Bond Fund's investment manager. SSB as trustee, pursuant to the Declaration of Trust, issued an Amended Fund Declaration for the Limited Duration Bond Fund effective as of October 1, 2005. Pursuant to the Amended Fund Declaration,

SSB as trustee of the Limited Duration Bond Fund agreed to hold funds received by it as trustee in accordance with the Declaration of Trust and Amended Fund Declaration for the benefit of the Limited Duration Bond Fund's beneficiaries – the owner of units in the Fund.  SSB issued units of the Limited Duration Bond Fund to HPOPS and HPOPS thereby became a beneficiary of the Trust and/or Limited Duration Bond Fund.  Under this arrangement, both SSB and SSgA owe HPOPS fiduciary duties with respect to investments in the bond fund.

**II.**     **The Investment Management Agreement – State Street Accepts the Highest Fiduciary Duties**

19.     Relying on State Street's representations, on or about September 13, 2005, the Trustees selected SSgA as the investment manager for HPOPS' commodities futures and TIPS strategies.  During negotiations for the Investment Management Agreement, the Trustees initially elected to proceed first with the TIPS strategy and to wait for a short period before proceeding with the Commodities Strategy.   On or about December 6, 2005, the Board of Trustees of HPOPS ("Trustees") and SSgA executed an Investment Management Agreement ("IMA"), pursuant to which the Trustees appointed and retained SSgA as investment manager with respect to the investment and management of account assets to be directed in accordance with the TIPS strategy.

20.     On or about April 24, 2006, Pat Franey of HPOPS emailed Christopher Douglass and Donna Watkins of SSgA that HPOPS was ready to move forward on the previously discussed Commodities Strategy.  An email from Pat Franey to Donna Watkins of June 8, 2006 notified SSgA that HPOPS intended to average in over the next twelve months, starting in July 2006, $6 million per month in the Commodities Strategy, for a total investment of $72 million.

21.    On or about June 16, 2006, HPOPS and SSgA executed the First Amendment to the IMA. The First Amendment to the IMA added provisions relating to the Commodities Strategy previously presented by SSgA. The IMA and the Amendment to the IMA are attached hereto as Exhibit A.[1] As amended, the IMA is referred to herein as the "Amended IMA."

22.    Under the Amended IMA, SSgA represented and covenanted that "it will be acting as a fiduciary with respect to the Account Assets and that it is subject to the applicable fiduciary standards of conduct imposed by federal and Texas state law, and the Code of Ethics of the Houston Police Officers' Pension System." More specifically, SSgA agreed to exercise the "care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with matters of the same type would use in the conduct of an enterprise with a like character and with like aims." IMA at § 5.c. Likewise, pursuant to HPOPS' Code of Ethics, which was adopted in toto by SSgA, SSgA agreed that:

> In the performance of these duties, all trustees, employees, consultants, vendors and other fiduciaries of the System [which by definition would include State Street] **are subject to the "prudent expert" rule which requires that they exercise their duties with the care, skill, prudence, and diligence under the prevailing circumstances that a prudent person acting in a like capacity and familiar with matters of the type would use in the conduct of an enterprise with like character and like aims.** Further, all fiduciaries of the System shall maintain high ethical and moral character both professionally and personally, such that the conduct of all fiduciaries shall not reflect negatively upon the Board of Trustees of the System.

Code of Ethics at § 602.02.

---

[1]    On or about April 20, 2007, because of rising fees in the TIPS account, HPOPS closed its TIPS portfolio with SSgA. The parties continued to operate under the IMA, as amended, with respect to HPOPS' investment in the SSgA commodities futures strategy.

23.    HPOPS had no control over the investment process or investment decisions of the Limited Duration Bond Fund. Further, under the Amended IMA, SSgA had discretion to manage the assets held in the collateral account to meet HPOPS' investment objectives, including the collateral invested in the Limited Duration Bond Fund. This discretion, however, was to be exercised subject to "the terms and conditions of [the IMA], [HPOPS'] Code of Ethics, and in accordance with the investment guidelines established by the [HPOPS'] Trustees (as set forth in the Statement of Policy Guidelines and Investment Objectives of the Fund)." IMA at § 5. The Code of Ethics (Exhibit C to IMA) and the Statement of Policy Guidelines and Investment Objectives of the Fund (Exhibit B to IMA) were all attached to and specifically made a part of the IMA.

24.    Therefore, in addition to being subject to a "Prudent Expert" rule, SSgA also specifically agreed that "[f]ixed income investments should provide a positive cash flow to the System, dampen the volatility of the System, and provide positive real returns even on a short time horizon." HPOPS Investment Policy at § 407.04.A.  *Id.* Importantly, SSgA also agreed that "*[n]o more than 25% of the portfolio at market value shall be invested in any one single industry sector.*" *Id.* at § 407.04.E (emphasis added).    As discussed further below, State Street recklessly violated each of these policies and breached its contractual and fiduciary duties in doing so.

25.    Under the Commodities Strategy, HPOPS was also required to execute an International Swap Dealers Association, Inc. Agreement or ISDA with the counterparty for the commodities trading, AIG. Pursuant to that agreement, AIG became the swap counterparty for the commodities futures swaps. As with any commodities futures

strategy, HPOPS was required to put up collateral for the margin account associated with the commodities futures swaps. Pursuant to the ISDA, HPOPS, State Street and AIG agreed that 25% of the HPOPS' collateral would be sent immediately to AIG to be invested in AIG's general corporate cash and that the remaining 75% of collateral funds would be invested by SSgA in a secure, well-diversified portfolio of low-duration, fixed income securities.

26.    Notably, HPOPS did not desire to leverage the Commodities Strategy. Therefore, 100% of the notional value of the swaps was put up in cash as collateral for the swaps. In other words, for every dollar pledged to buy commodities futures swaps, the parties agreed that there would be a corresponding dollar in a cash or cash equivalent fund to cover any loss. If HPOPS lost money on the commodities swaps, the parties agreed that any loss would come first out of the SSgA account. Therefore, it was well understood that there was a need for great liquidity in the SSgA short-term-cash-vehicle account holding the cash collateral – the Limited Duration Bond Fund.

27.    As set forth in the Amended IMA, the parties agreed that HPOPS would invest six-million dollars ($6,000,000) every month for 12 months for a total investment in the Commodities Strategy of seventy-two million dollars ($72,000,000). Thus, HPOPS invested $72,000,000 as collateral to participate in commodities futures swaps. Each month from July 2006 through May 2007, HPOPS sent $6,000,000 to their trust company, Northern Trust Company, with instructions to wire the funds to SSgA. As agreed, each month, State Street immediately sent 25% of the cash collateral to AIG. The remaining 75% was invested by SSgA pursuant to the Amended IMA. Under the Amended IMA, SSgA represented that the collateral would be invested in "money market

13

funds and other cash management funds including, but not limited to, money market mutual funds for which an affiliate of the Manager acts as an investment advisor or other funds for which the Manager serves as investment advisors." Amended IMA at § 1. Exercising its sole discretion, SSgA placed HPOPS' cash collateral in the Limited Duration Bond Fund, of which SSgA served as investment manager and SSB was trustee and custodian.

28.     As of May 31, 2007, HPOPS' investment in the Commodities Strategy totaled $74,672,819, according to the SSgA Account Summary. SSgA invested 75% of HPOPS' cash collateral in the Limited Duration Bond Fund, purchasing 4,719,665.291 units of the Fund with a market value as of May 31, 2007 of $56,272,569.26.

### III. State Street's Representations:  State Street Represented that the Limited Duration Bond Fund Would Consist of a High Quality, Well Diversified, Fixed Income Securities Allocation Providing for Daily Liquidity

29.     In inducing HPOPS to invest in the Commodities Strategy with State Street, State Street represented to HPOPS, and in particular to Pat Franey, Chief Investment Officer at HPOPS, that the cash collateral for the strategy would be placed in very conservative funds investing in AAA-rated, near zero duration, well-diversified, fixed income securities. State Street further represented that the collateral would be conservatively invested allowing for daily liquidity because its intended purpose was to provide cash in the event of a margin call to cover the spread of commodity swaps.

30.     After securing HPOPS' investment in State Street's commodities futures strategy, State Street did not send any information to HPOPS, nor did it make any representations of any kind, either verbally or in writing, about the composition or performance of the Limited Duration Bond Fund until the late spring/early summer of

2007. Indeed, in May 2007, HPOPS became worried about the lack of information, and Pat Franey asked State Street for account reconciliations. State Street, however, provided no specific account information about the nature or amount of specific investments until July 2007.

31.    On or about May 11, 2007, Pat Franey sent Craig DeGiacomo of SSgA an email to double check on the liquidity of HPOPS' investments and asked how long it would take to obtain a substantial amount from the commodities portfolio. DeGiacomo responded: "You could get all of the money (around $68m) with one day's notice – just our normal notification." He explained that if the trade date is Monday, HPOPS could get its cash on Tuesday. This representation, like State Street's previous promises of daily liquidity, proved to be false.

32.    In the early summer of 2007, HPOPS became concerned when the portfolio account summary first reflected significant losses in the overall Commodities Strategy. Indeed, on July 18, 2007, SSgA sent the final performance numbers for HPOPS' commodities portfolio for the month of June. Notably, this account did not specifically show the performance of the Limited Duration Bond Fund. Rather it only showed that, as of June 30, 2007, the entire account, which had been $74,672,819 as of May 31, 2007, had depreciated by $1.5 million for an ending balance of $73,135,502. HPOPS deciphered that the depreciation was due, not to the performance of the commodities swaps themselves, but to State Street's investments of the collateral in the supposedly conservative, high quality, diversified Limited Duration Bond Fund. Because the Commodities Strategy lost 2% in June and the commodities index was down only

1.4%, HPOPS suspected, but was not sure, that the loss was due to the negative performance of the Limited Duration Bond Fund of 60 basis points.

33.    Accordingly, Pat Franey requested on or about July 23, 2007 copies of all monthly statements of the account in the Limited Duration Bond Fund since inception. Holly Barclay of State Street informed him that there were no such monthly performance reports for the Limited Duration Bond Fund. Without such reports, Franey was not able to monitor how HPOPS' cash collateral was specifically being invested. However, Barclay did provide an excel spreadsheet showing the return streams for the Limited Duration Bond Fund since HPOPS' inception in June 2006 and an Appraisal Report showing HPOPS' market value as of month's end since inception. Those reports reflected that, as of June 2007, performance of the fund since inception was approximately 2.14% versus the targeted benchmark of 2.94%. HPOPS was misled, once again, about the true condition of the Limited Duration Bond Fund.

34.    On or about July 23, 2007, Franey requested from Holly Barclay a "prospectus"[2] and annual report for the Limited Duration Bond Fund. Incredibly, those materials continued to represent the Fund as an enhanced cash vehicle invested in high quality, well-diversified fixed income securities with a conservative benchmark to match or exceed the JP Morgan one-month US Dollar LIBOR Index. As reported in the prospectus, State Street described the Limited Duration Bond Fund's strategy as seeking "to maximize income while *preserving capital* by investing in a *diversified portfolio of highly rated fixed income securities.* The Strategy seeks to match or exceed the returns of the JP Morgan one-month US Dollar LIBOR Index over trailing one-year periods." It

---

[2]  On or about July 23, 2007, State Street sent Franey a document that will be referenced herein as a "prospectus" entitled "Limited Duration Bond Strategy" dated June 30, 2007.

further described the fund as utilizing "an *expanded universe of securities* that goes beyond typical money markets including: Treasuries, agencies, collateralized mortgage obligations, adjustable rate mortgages, corporate bonds, asset backed securities, futures, options, and swaps." SSgA represented that "all securities purchased for the fund have a minimum investment grade rating by either Standard and Poor's or Moody's Investment Service" and a maximum effective duration of one year.    The prospectus further represented that the Limited Duration Bond Fund strategy has "better sector diversification, higher average credit quality, and higher expected returns" than the typical 2A-7 regulated money market portfolio.

35.    State Street, through Holly Barclay, also sent to Pat Franey on or about July 23, 2007, financial statements for the Limited Duration Bond Fund issued by SSB, as audited by Price WaterhouseCoopers, dated December 31, 2006.    The report represented the fund's net assets as of December 31, 2006 to be $1,639,638,308 with a net realized gain for the year of $90,385,558.    The report also enclosed a schedule of investments that reflected a diversification of investments as follows: 1.1% in commercial mortgage-backed securities, 0.7% in credit card asset-backed securities; 32.2% in home equity asset-backed securities; 0.2% in municipal securities; 41.6% in other asset-backed securities; 0.1% in student loan asset-backed securities; 8.4% in WL Collateral collateralized mortgage obligations; and 15.7% in State Street Bank & Trust Company Collective Investment Funds.    HPOPS would soon thereafter become very concerned about the dramatic increase in residential mortgage investments.    The true story, however, was yet to be revealed by State Street.    HPOPS would later learn that

even the higher percentage in this report was false and the actual percentage of holdings in subprime residential mortgage-backed securities was much, much higher.

36.     On or about July 24, 2007, State Street sent the Amended Fund Declaration for the Limited Duration Bond Non-Lending Fund, dated October 1, 2005 ("Fund Declaration"). The Fund Declaration provided that the objective of the Limited Duration Bond Fund was to "match or exceed the total rate of return of the J.P. Morgan one month U.S. Dollar Libor Index." The Fund Declaration again represented that the Fund would be well-diversified and would achieve its objective by investments in, including but not limited to, repurchase agreements and United States Treasuries; debts of agencies of the United States Government; corporate debt; asset-backed securities, rated investment grade by Moody's and ERISA eligible; commercial mortgage backed securities, rated investment grade by Moody's and ERISA eligible; derivative securities; deposits and other debt instruments of US Banks; and bank commingled funds.

37.     State Street in fact continued to tout the Fund as well-diversified and failed to disclose the true extent of its exposure in the subprime residential mortgage market throughout the summer and early fall of 2007. Indeed, as late as August 28, 2007 and September 11, 2007, State Street's Power Point presentations to HPOPS represented that the holdings in the Fund as of July 31, 2007 included 28.7% of securities in the government sector, 54.1% in asset-backed securities, 1.85% in commercial mortgage backed securities and only 15.35% in mortgage-related investments.     SSgA representatives later admitted at these very meetings that these disclosures were in fact misleading.

**IV. The Truth Is Revealed: State Street Breached Its Fiduciary Duties by
Concentrating the Limited Duration Bond Fund's Holdings in Leveraged, Subprime
Residential Mortgage-Backed Securities and Derivatives**

38.    HPOPS has since learned that, without advising HPOPS or otherwise
correcting their disclosures regarding the Limited Duration Bond Fund, State Street
dramatically misrepresented the investment objectives and strategy of the Limited
Duration Bond Fund.    Rather than investing in high-quality, well-diversified fixed
income securities as State Street had represented, State Street had in fact invested the
fund almost exclusively in subprime, residential mortgage-backed securities and
derivative investments.  Indeed, during 2007, State Street purchased a long position on
the BBB ABX Index, an investment in derivative instruments backed by subprime
mortgages that was rated below investment grade.    This investment was in direct
contravention of State Street's representations that the Fund would not be significantly
exposed to non-investment grade investments.  Inexplicably, ABX Index swaps exposed
the fund to the volatility of the subprime mortgage market at precisely the time when it
was publicly reported that defaults of subprime mortgages were skyrocketing and
numerous subprime lenders were facing insolvency.  To make matters worse, HPOPS
learned that the Limited Duration Bond Fund, which was to serve as the cash account
subject to daily liquidity for the completely unleveraged Commodities Strategy, was itself
highly leveraged.

39.    State Street first revealed that the Limited Duration Bond Fund had been
affected by the subprime, residential mortgage crisis when Craig DeGiacomo emailed Pat
Franey on or about July 20, 2007, that he was "working on a letter that I will send to you
explaining the underperformance [of the commodities portfolio] as a result of the

Subprime issue." State Street, however, failed to disclose the true extent of the problem and continued to misrepresent the actual composition of the Limited Duration Bond Fund. Indeed, around this point, HPOPS was desperately trying to get accurate information about the fund's asset allocation so that it could determine if any steps needed to be taken to protect its investment – steps that State Street should have already taken pursuant to its fiduciary obligations as investment manager to HPOPS and the Limited Duration Bond Fund and as trustee of the Limited Duration Bond Fund.

      40.     On or about July 26, 2007, State Street sent an email entitled "Update on the Subprime Market and SSgA's Fixed Income Strategies," in which State Street disclosed as follows:

> [P]roblems in the subprime mortgage market continue to unsettle credit markets. Moody's and Standard and Poor's recently downgraded some securities involving subprime debt and placed other securities on credit watch. This comes amid a continuing wave of mortgage payment delinquencies and foreclosures and could disturb credit markets for some months to come. Already we have seen pricing on certain tranches of each of the three ABX Indexes, which are linked to pools of subprime mortgage debt, reach historic lows. These events are impacting performance in some of our active fixed income portfolios in which you are invested directly or indirectly.

This was the first time HPOPS had ever learned that its collateral was being used to purchase swaps of the ABX Index. State Street, however, assured its clients, including HPOPS, that the crisis was "driven more by liquidity and leverage issues" rather than long term fundamentals and represented that it was seeking to reduce risk by taking advantage of liquidity in the market where it exists. State Street, in its fiduciary capacities, made no recommendation to HPOPS to protect its investment. Instead, State Street continued to mask the extent of the devastating losses.

41.     Upon receiving these emails, Pat Franey began asking questions of Craig DeGiacomo in late July/early August 2007 regarding the composition of the portfolio to determine how much was invested in the subprime market.  Franey desperately needed this information so that he could evaluate State Street's continuing investment in the Limited Duration Bond Fund.  When Franey could not get a straight answer, he had HPOPS independent consultant, Jerry Woodham of Hammond Associates, make calls to SSgA on HPOPS' behalf to see if he could determine the exact amount of subprime holdings.  In or about early August 2007, HPOPS learned for the first time, through its consultant, that in reality the Limited Duration Bond Fund had substantial holdings in subprime mortgage-backed securities.   When confronted by HPOPS, State Street representatives would confirm months later that indeed it had subjected almost the entirety of HPOPS' collateral held at State Street to the volatile subprime mortgage crisis.

42.     In the first week of August 2007, Craig DeGiacomo sent a letter to Pat Franey purporting to "update" SSgA on the Subprime issues.  DeGiacomo revealed that the Limited Duration Bond Fund was "most notably" affected by the subprime mortgage crisis and that it had "experienced significant negative performance due to its exposure to ABX Indices," which represent "swaps whose returns are derived from underlying credit default swaps of the 20 representative subprime mortgage securitizations issued in the United States over a 6 month timeframe." DeGiacomo continued: "The Limited Duration Bond Strategy experienced negative performance in the second quarter of 2007 as a result of technical pressures (hedge fund selling) and spread widening in BBB-rated securities secured by subprime mortgages. The Limited Duration Bond Strategy experienced even more pronounced negative performance in the second quarter of 2007 which continued in

July as spread widening moved up the capital structure to AAA and AA-rated securities by subprime mortgages." He further represented that the DJ-AIG Commodities Futures Strategy has experienced "significant negative performance primarily due to the performance of the underlying collateral pool which is invested in the Limited Duration Bond Strategy." SSgA concluded the letter by reassuring HPOPS that State Street was reducing risk in the Limited Duration Bond Fund by reducing a significant portion of its BBB-rated securities and selling a significant amount of AAA-rated cash positions. Once again, State Street's representations were flatly false. In fact, SSgA's James Hopkins later admitted that State Street was selling securities only to fund liquidations. Any decrease in risk, therefore, was simply a by-product of this forced selling, not some stated strategy to reduce risk.

43.     On August 28, 2007, Craig DeGiacomo, James D. Hopkins, and John A. Tucker of SSgA made a presentation to HPOPS regarding the Limited Duration Bond Fund. The Power Point slides continued to represent the Limited Duration Bond Fund as well-diversified and in high quality fixed income securities with the conservative benchmark of matching or exceeding the returns of the one month US dollar LIBOR index. The presentation represented that as of July 31, 2007, the fund had an average quality of AA2 and a 7.87% yield. Indeed, the breakdown of holdings by sector reflected only 15.4% of the holdings in mortgage securities and 54.15% in asset-backed securities. Once again, SSgA did not provide a break-down as to what kind of asset-backed securities that sector included.

44.     However, during the August 28, 2007 meeting, SSgA's James Hopkins acknowledged to HPOPS representatives Pat Franey, John Lawson, and Stacy Ables that

the sector allocations reflected in the presentation were misleading. Indeed, State Street admitted that the percentage of holdings in residential mortgage-backed securities was as high as 85%. When Pat Franey asked why the portfolio had not been diversified as previously represented, Hopkins admitted for the first time that State Street had never had an intention of diversifying outside of the mortgage sector. Hopkins also claimed that the high percentage of investments in residential mortgage backed securities was "core to their strategy." This, of course, had never before been disclosed to HPOPS and was entirely contrary to (i) State Street's presentation in August 2005 that represented that the Fund would hold only 5.3% in mortgage-backed securities and would be well-diversified; (ii) the PriceWaterhouseCoopers Audit Report (sent to HPOPS in July 2007) which reflected the Fund's holdings as of December 31, 2006 as 32.2% in home equity asset-backed securities; (iii) both the Fund Declaration and the Prospectus for the Limited Duration Bond Fund (sent to HPOPS in July 2007) which represented that the Fund had been and would continue to be a *"diversified portfolio of highly rated fixed income securities"*; and (iv) the August 28, 2007 and September 11, 2007 Power Point presentations which reflected a sector diversification of only 15.4% in mortgages.

45.    Further, at the meeting on or about August 28, 2007, State Street discussed its recent disclosure that the Limited Duration Bond Fund had invested in the BBB tranche of the ABX Index. SSgA described the ABX Index as a "20-name index of recently issued subprime residential mortgage securities that is tranched into five rating categories (*i.e.*, AAA to BBB)." In neither the August 2005 presentation, the Limited Duration Bond Fund Prospectus, the Fund Declaration, or any other disclosures previously made to HPOPS had State Street revealed that it would invest in the ABX

Index. ABX contracts are commonly used by investors to speculate on or to hedge against the risk that the underling mortgage securities are not repaid as expected. A decline in the ABX Index signifies investor sentiment that subprime mortgage holders will suffer increased financial losses from those investments. These investments do not fit the profile of a high-quality, well diversified fixed income securities fund.

46.    On September 11, 2007, SSgA again met with HPOPS to make a presentation to its Board of Trustee. Craig DeGiacomo, Paul Greff and John Tucker of SSgA continued to tout State Street as the "Leading Provider of Financial Services to Institutional Investors." Despite its verbal acknowledgment of the misleading nature of the sector allocation in the August 28, 2007 presentation, State Street again represented that the holdings in the Fund as of July 31, 2007 included 28.7% of securities in the government sector, 54.1% in asset-backed securities, 1.85% in commercial mortgage backed securities, and only 15.35% in mortgages.

47.    State Street should have known it was embarking on a reckless investment strategy for what was supposed to be a short-term cash vehicle. The imminent collapse of the subprime lending industry was widely documented. In December 2006, the Center for Responsible Lending issued a report predicting the worst foreclosure crisis in the modern mortgage market. *See* Ron Nixon, *Study Predicts Foreclosure For 1 in 5 Subprime Loans*, New York Times, December 20, 2006. Shortly thereafter, several major mortgage lenders disclosed extraordinary rates of loan defaults, resulting in SEC and FDIC inquiries and several bankruptcy filings. In this financial environment, State Street exposed HPOPS to unacceptable risk by investing cash equivalent funds into the Limited Duration Bond Fund and by mismanaging the fund to invest its assets not in

accordance with its stated objectives.  SSgA breached its fiduciary duties to HPOPS assured under the IMA and its fiduciary duty to HPOPS as a unit holder in the Limited Duration Bond Fund.  SSB, as trustee of the Limited Duration Bond Fund, breached its fiduciary duty to HPOPS by providing misleading information on the fund and by mismanagement and lack of oversight of the fund's investments.

48.    The high concentration of subprime mortgage investments in the Limited Duration Bond Fund was again confirmed on or about September 19, 2007, when Craig DeGiacomo of SSgA sent to Pat Franey an email with a retracement analysis for the entire fund, which showed that HPOPS was left holding 89.5% of the entire fund by that point.[3]  The analysis confirmed that, in spite of State Street's previous representations, the vast majority of the investments in the Fund were in the subprime mortgage market.  The Fund had a total market value of $31,955,000 as of September 14, 2007, with 72.37% reported to be in subprime mortgage securities.  The remaining holdings in CDO-ABS, commercial MBS, Home Equity, Mortgage Aussie, and Prime MBS, were also mortgage-concentrated, other than a small percentage of cash.  On October 1, 2007, Robert Pickett of SSgA sent Franey a spreadsheet reflecting the approximately 89.5% weighting of the Fund's assets to show HPOPS' "slice" of the Fund.  HPOPS' holdings as of September 14, 2007 had a market value of just $28,792,000, of which $20,699,000 or 72% was reported to be in subprime residential mortgage backed securities.  However, an accurate picture of the Limited Duration Bond Fund was yet to be released.

49.    It was in October 2007 that State Street sent Pat Franey a spreadsheet which confirmed **for the first time** that, as of July 31, 2007, *94%* of the Fund's holdings

---

[3]  Prior to this point, State Street failed to tell HPOPS that there had been a mass exodus from the Limited Duration Bond Fund -- primarily from distributions to State Street-related entities.  See §§ 52-61 of Complaint.

were, not just in mortgage-backed securities, but in *subprime* residential mortgage-backed securities. Inexplicably, a similar spreadsheet dated as of September 17, 2007 represented that the Fund's subprime mortgage holdings were around 76.9%.

50.    HPOPS has learned that State Street never intended that the Limited Duration Bond Fund be the well-diversified, conservative, high quality fixed income securities portfolio it was represented to be.  Contrary to State Street's representations that the fund would be well-diversified, low-duration, and nonleveraged, State Street mislead HPOPS by intentionally misrepresenting that the Fund would hold only 5.3% in mortgage-backed securities when, in reality, the majority of the Fund's holdings were in *subprime* residential, mortgage-backed securities and derivatives.

51.    Further, HPOPS learned that State Street had highly leveraged the Limited Duration Bond Fund.  This was indeed ironic considering that the Limited Duration Bond Fund's stated purpose was to provide daily liquidity for the entirely *unleveraged* Commodities Strategy.  State Street never disclosed it would leverage HPOPS' collateral when it marketed the Commodities Strategy.  Indeed, it was not until on or about August 13, 2007 that HPOPS learned from a voice mail left by Craig DeGiacomo for Stacy Ables that the Limited Duration Bond Fund actually was leveraged 3.3 times. DeGiacomo refused to confirm this in writing.  Thus, State Street had failed to disclose not only that the supposedly conservative, high quality and highly diversified Limited Duration Bond Fund would be comprised primarily of subprime residential mortgage-backed securities, but also that State Street entered into ABX index swaps in order to increase the Fund's subprime mortgage exposure through a leveraged strategy. Indeed, on information and belief, State Street's investment in government holdings in