the Fund was used as further leverage to purchase additional subprime holdings. Because the portfolio was basically fully invested (*i.e.* State Street did not have the cash to purchase US Treasuries), State Street instead entered into interest rate swaps, further leveraging the portfolio, in order to take an additional bet in the portfolio on the direction of interest rates.

**V.    State Street's Self-Dealing:  State Street Gave Preferential Treatment to State Street-Related Entities and Refused to Provide Timely, Material Information to HPOPS**

52.    When HPOPS learned that State Street had grossly misrepresented its investment strategy and that the Limited Duration Bond Fund was actually undiversified, highly leveraged and primarily invested in subprime residential mortgage-backed securities, it was too late for HPOPS to take any action to protect its remaining collateral. This was due not only to the fact that State Street had continually misrepresented and denied HPOPS access to material information to enable it to discover the truth, but also due to State Street's blatant self dealing in allowing other State Street Funds owning units in the Limited Duration Bond Fund to exchange their units in-kind for what appears to have been the most saleable of the securities owned by the Limited Duration Bond Fund. State Street never communicated to HPOPS that there was a mass exodus from the Fund or that the most desirable of the securities would be sold. Nor did State Street freeze the fund and limit redemptions in order to ensure that all participants would be treated fairly. Importantly, State Street took no actions to protect HPOPS. Only after the fact did HPOPS learn that there had been a mass exodus from the Fund and that it had been left with dramatically devalued holdings.

53.    In an email from Megan Gibber of SSgA on or about August 8, 2007 to Pat Franey, State Street disclosed for the first time not only that there were "[c]ertain SSgA commingled funds holding interests in LDBF," but that those SSgA Funds intended to redeem in-kind their respective proportionate interests. Although State Street represented in bold lettering that *"[b]ecause the SSgA Funds are redeeming in-kind a 'perfect slice' of LDBF, the redemption will not negatively affect the liquidity of the assets in the LDBF portfolio,"* on information and belief, State Street in fact gave preferential treatment to its own State-Street commingled funds by liquidating the units held by them in a manner that negatively affected the liquidity and quality of the remaining units in the Fund held by HPOPS.

54.    On or about August 27, 2007, Craig DeGiacomo sent a spreadsheet to Pat Franey reflecting the number of units in the Limited Duration Bond Fund from June 29, 2007 through August 27, 2007. The spreadsheet reflects that on August 8, 2007 – the day Megan Gibber disclosed that State Street-commingled funds would be selling their units of the Limited Duration Bond Fund in-kind – there were 44,135,003 units held in the Fund. HPOPS' percentage of ownership then was approximately 10.54%. Two days after the disclosure, on August 10, 2007, the number of units dropped dramatically to 5,278,184 units, thereby increasing HPOPS' ownership of units to 88.133%    On information and belief, of the 44,135,003 units held in the Fund, 38,856,819 were owned by State Street-related parties.    On information and belief, State Street allowed these State Street-related parties to get out first and trade its units in-kind for what appears to have been the most saleable securities held by the Limited Duration Bond Fund.    State Street thus put its own interests ahead of HPOPS' and thereby breached its fiduciary

duties. HPOPS was never notified that the more desirable securities held in the Fund would be liquidated. Again, it discovered this only after those securities were no longer held in the Fund.

55.     Thus, in spite of State Street's representation, its affiliates' redemption of units for in-kind securities in fact did negatively affect HPOPS' liquidity. When State Street redeemed those units, the most saleable assets were distributed – the 2004 and 2005 mortgages that actually had equity. What were left were unsaleable, illiquid odd-lot positions of 2006 and 2007 mortgages with little or no equity. The quality of securities held by the Limited Duration Bond Fund thus dramatically changed. The same spreadsheet that reflects a decrease of 38,856,819 units on August 10, 2007 shows a cumulative decrease in unit value as of August 10, 2007 of negative 23.3%.

56.     Further, Paul Greff had represented at the September 11, 2007 meeting with HPOPS that the characteristics of the portfolio were substantially the same both before and after the withdrawals of the other participants from the Fund. This turned out to be far from true. In response to Pat Franey's request for proof of equivalence, State Street sent a bar graph on or about October 4, 2007 which reflected that the distribution of assets as of July 31, 2007, before the August 8 and 9 redemption, was 57.5% in AAA, 35.5% in AA, 5.8% in A and 1.2% in BBB. In contrast, the distribution as of September 17, 2007 was 19.4% AAA, 51% AA, 1.9% AA-, 8.2% A+, 5.9% A, 3.6% A-, and 4.2% BBB. The decrease in quality was not due to downgrades of the securities in the Limited Duration Bond Fund, but rather to State Street's selling off the higher-rated securities and leaving HPOPS with the dregs.

57.    Further, as of June 29, 2007, there were approximately 112,947,390 units in the Fund at a unit price of 11.876. By August 24, 2007, there were only 5,278,184 units at a price of 6.547. Thus, just two days after State Street's "disclosure" that it was allowing other parties to redeem their units in-kind, the Limited Duration Bond Fund was a remarkably different and devalued fund with 90% of its holdings gone.

58.    Indeed, in an email dated August 28, 2007 from James Thorsen of SSgA to Pat Franey, State Street confirmed that as of August 24, 2007, there were **only 2 participants remaining in the Fund** and that HPOPS' approximate share was $30,507,880 out of a total fund of $34,556,273. HPOPS, whose percentage of ownership in the Fund prior to the State Street-related parties' in-kind redemption had been only 10.54%, became the majority owner of the Fund with 88.133% of the holdings. Franey was further warned that if the market value of the Fund fell below $20 million, the Trustee may close and liquidate the Fund. Because the remaining holdings in the Fund were not saleable, State Street left HPOPS with few options. Moreover, State Street effectively foreclosed HPOPS' ability to protect itself by constantly reversing its position on whether HPOPS could take the assets of the fund in kind or not. In short it was impossible for HPOPS to execute an exit strategy with State Street constantly changing HPOPS' options. Finally, because State Street committed self dealing, it bears the burden of proof to show that the redemption of units in-kind by its own State Street-related funds was not a breach of its fiduciary duties.

59.    Compounding the harm was State Street's refusal to timely provide material information to HPOPS when requested, thereby preventing HPOPS from making informed investment decisions. For example, during the August 28, 2007 presentation,

30

Pat Franey asked what State Street-commingled funds were invested in the Limited Duration Bond Fund, when they withdrew from the Limited Duration Bond Fund, and whether their withdrawals harmed HPOPS' liquidity since it was left with odd-lot positions. Again, on September 12, 2007, Pat Franey of HPOPS asked for information that would explain why some securities in the portfolio were sold completely while others were sold down proportionately. State Street refused to answer or provide any further information in direct violation of their fiduciary obligations of candor and full disclosure.

60.   Indeed, from July 2007 to present, HPOPS has requested, without success, the following information from State Street about its investment:

a.   A daily detail of leverage in the portfolio and an explanation as to why it was increased significantly as the market for these securities started to deteriorate;

b.   Schedules that detail the characteristics of the portfolio, including, without limitation, its market value, listing of securities held, and notional value for at least two days a week for the months of July, August, and September 2007;

c.   The SSgA Valuation Policy for the portfolio and any changes thereto for the last few years;

d.   An updated retracement schedule (from June 30, 2007 to the present) that details the gains or losses attributable to HPOPS and not just the loss inherent in the remaining positions;

e.   A reconciliation of the retracement schedule to the cash flow schedule;

f.   An analysis on when the ABX Index security was purchased in the Fund to support State Street's claim that the security had been held in the Fund for the entire year, and not just purchased during the August 2007 downturn, when the portfolio detail it had provided to HPOPS for March through July 2007 showed no such holding;

g.   A reconciliation of the change in cash in the portfolio;

h.    Activity and attribution on the interest rate swaps;

i.    A detail of all redemptions and liquidations after 6/30/07 (no names unless to a party related to State Street), to include dollar amounts, number of units, dates and type (cash or in-kind), whether the distribution was external or to an SSgA fund or other related party, if in-kind, and a detail of the securities transferred;

j.    A review of the CDO activity;

k.    Dates and details of downgrades in the portfolio;

l.    Any and all policy change statements regarding the use of IDC pricing;

m.    A description of how prior in-kind distributions were determined and which securities were selected for distribution;

n.    Analyses of how expenses are accrued and paid in the fund;

o.    An explanation of the analysis used to construct a portfolio that required significant leverage to meet the return objective of cash plus 50bps; and

p.    A P&L statement and a schedule of all activity in the fund for the months of July, August and September 2007.

These requests have been met with resistance and delay tactics.

61.    Indeed, on or about November 7, 2007, HPOPS made a formal request pursuant to Section 10 of the IMA for an audit of HPOPS' collateral investments into the Limited Duration Bond Fund, including specifically these categories of information. Pursuant to that provision, the Trustees requested that their representative be granted access to the books and records related to HPOPS' holdings in the Limited Duration Bond Fund beginning no later than Monday, November 19, 2007. State Street failed to comply in violation of both the plain language of the IMA and the fiduciary duties of candor and full disclosure.

## VI.    Damages:  State Street's Conduct Damaged HPOPS by Tens of Millions of Dollars

62.    As a direct and proximate result of State Street's blatant self-dealing, breaches of fiduciary duties, fraudulent misrepresentations and non-disclosures, and breaches of contract, HPOPS' investment in the Limited Duration Bond Fund suffered tens of millions of dollars in actual loss.  As of May 31, 2007, the month-end valuation of HPOPS' investment of collateral in the Limited Duration Bond Fund was $56,272,569.26.  By July 31, 2007, the month-end valuation of HPOPS' holdings dropped to $49,165,363.23.  The month-end valuation as of August 31, 2007 fell further to $28,224,565.54.  By December 17, 2007, the value had fallen to $26,381,160.37. HPOPS has suffered tens of millions in damages.

63.    Further, SSgA initially refused to allow HPOPS to redeem its holdings in-kind, as it had allowed its own SSgA-commingled funds.  After representing that HPOPS could take its securities in-kind for some time, State Street claimed on October 5, 2007 that HPOPS in fact could not take securities in-kind.  Again, on October 8, 2007, James Thorsen of SSgA told Pat Franey, Executive Director John Lawson and Stacy Ables that HPOPS could not have a distribution in kind.  When Franey requested that State Street's position be placed in writing, Thorsen refused.  On October 9, 2007, HPOPS had a conference call with State Street during which State Street represented that the only way to do an in-kind distribution would be if either the other participant in the Fund were to receive 100% of the value of its units in cash, or as a second option, HPOPS could transfer its securities into another State Street fund and then take an in-kind distribution for this second fund.  Considering that State Street's own funds had been allowed to have an in-kind distribution, neither option was equitable.  The only option available to

33

HPOPS then was that it liquidate its units holding only odd-lots of subprime residential mortgage-backed securities. This was hardly a viable option given that the President and CEO of SSgA, William W. Hunt, had characterized the saleability of these securities in his October 5, 2007 letter to clients as a "largely illiquid market creating realized losses." Indeed, in the call on October 9, 2007, Marc Brown of State Street acknowledged to Franey, Ables and Lawson that HPOPS had been disadvantaged by remaining in the Limited Duration Bond Fund after other participants, including other State Street-commingled funds, had redeemed their units in-kind. State Street could not, as it had previously promised, give HPOPS its perfect slice of the Limited Duration Bond Fund.

64.    On November 13, 2007, HPOPS sent a letter to State Street terminating them and requesting that they liquidate the Limited Duration Bond Fund and return HPOPS' proceeds to it, but not until they had discussed with HPOPS the mechanics and timing of such liquidation. Craig DeGiacomo told Pat Franey that State Street would send HPOPS a letter notifying it that the Limited Duration Bond Fund would be liquidated and then follow up with another letter describing the liquidation process.

65.    On November 26, 2007, HPOPS received the letter stating that the Fund would be closed and notifying HPOPS that its relationship manager would be contacting HPOPS to discuss the liquidation process.

66.    On December 4, 2007, DeGiacomo called and said that it would be possible for HPOPS to take its share of the Fund in-kind and asked if HPOPS wanted to pursue this. HPOPS agreed to the arrangement.

34

67.    On December 11, 2007, HPOPS received a letter from State Street stating that HPOPS had until December 21, 2007 to elect to take an in-kind distribution from the Limited Duration Bond Fund.

68.    On December 13, 2007, HPOPS had a conference call with Bob Pickett, Dominic Janson, Mark Hoeful, Charles Coheny, and DeGiacomo of State Street. They told HPOPS that, in spite of HPOPS' request to be informed of the liquidation procedure for the Fund, they in fact had been liquidating the portfolio since the beginning of December and would continue to do so.   HPOPS sent State Street a letter asking for a distribution in-kind shortly after this call.

69.    On December 17, 2007, HPOPS received $14,270,970 in cash plus securities valued at $13,315,199. Thus, by December 17, 2007, as a direct and proximate result of State Street's misconduct and omissions, HPOPS had suffered tens of millions in damages.   HPOPS will realize additional actual damages upon liquidation of the remaining securities. Those securities have permanently declined in value.

70.    Finally, State Street must disgorge the fees it was paid by HPOPS while in breach of its fiduciary duties to HPOPS.  The following is a schedule of fees paid:

| Qtr Ended | Amount |
| --- | --- |
| 9/30/2007 | $ 37,500.00 |
| 6/30/2007 | 45,043.63 |
| 3/31/2007 | 37,500.00 |
| 12/31/2007 | 22,688.89 |
| 9/30/2006 | 10,968.15 |

Thus, in addition to this and other damages to be calculated prior to trial, State Street must disgorge fees in the amount of at least $153,700.67 to HPOPS.

## CAUSES OF ACTION

### Cause of Action I:  Breach of Fiduciary Duty (Against SSgA and SSB)

71.    HPOPS incorporates the allegations set forth in paragraphs 1 to 70 as if fully set forth herein.

72.    SSgA was HPOPS' fiduciary under both law and contract.  As HPOPS' investment manager with full discretion to make investment decisions for the benefit of HPOPS, SSgA owed HPOPS the highest fiduciary duties to exercise fidelity in good faith on its behalf.   Further, under the Amended IMA, SSgA explicitly agreed and acknowledged that it would be acting as a fiduciary to HPOPS and would be subject to the "prudent expert" rule with regard to SSgA's investments related to the Commodities Strategy, including the investment of its cash collateral account.

73.    By making unjustified investments of all of the cash collateral held by State Street into the Limited Duration Bond Fund, a leveraged, high-risk, long-duration fund with no real diversification beyond the subprime residential mortgage market, SSgA breached its fiduciary duties to HPOPS.   Indeed, no prudent expert who understood HPOPS' investment needs and criteria would have made such an investment.

74.    In addition, SSgA was also the investment manager for the Limited Duration Bond Fund.  As such, SSgA owed HPOPS, a beneficiary of the fund, fiduciary duties with respect to the investments made by the Limited Duration Bond Fund.  Once again, SSgA violated its fiduciary responsibilities, as more particularly described above, by improperly investing the bond fund's assets into a single industry sector, with

substantial leverage and with long-term duration.   These characteristics were not in accordance with the stated purposes or objectives of the Limited Duration Bond Fund.

75.    SSB, as trustee, custodian and record-keeper of the Limited Duration Bond Fund and with "exclusive management and control of the Trust," owed HPOPS, an owner of units of the Limited Duration Bond Fund and therefore a beneficiary of the Limited Duration Bond Fund and/or Trust, specific fiduciary duties imposed by law and the contract.  These fiduciary duties include, without limitation, the duty of good faith, fair dealing, loyalty, and fidelity over the trust's affairs and its principal; the duty to make the assets of the trust productive while preserving the assets; the duty to disclose all material facts known to the trustee that might affect the beneficiaries' rights; the duty to account for all trust transactions; the duty to properly manage, supervise and safeguard trust funds; the duty to refrain from self-dealing with trust assets; and the duty to refrain from lending trust funds to itself or an affiliate.  As set forth herein, SSB breached these and other fiduciary duties owed to HPOPS.

76.    Further, both SSgA and SSB owed HPOPS the general, common-law fiduciary duties of loyalty and utmost good faith, the duty of candor, the duty to refrain from self-dealing or dealing with other entities whose interests are closely identified with those of the fiduciary, the duty to act with integrity of the strictest kind, the duty of fair and honest dealing, and the duty of full disclosure and to not conceal matters that might influence a fiduciary to act in a manner prejudicial to its principal.   As set forth herein, SSgA and SSB also breached these and other fiduciary duties owed to HPOPS.

77.    The fiduciary relationship forbids conduct on the part of SSgA and SSB which is fraudulent or adverse to HPOPS' interests and imposes on both SSgA and SSB a

positive duty to communicate all information they may possess or acquire which is material to HPOPS' advantage.

78.    SSB and SSgA breached the fiduciary duties they owed to HPOPS in at least the following ways:

(a) By misrepresenting that the Limited Duration Bond Fund was a short-term cash vehicle comprised of high quality and well-diversified fixed income securities when in reality it consisted of up to 94% of subprime, residential mortgage-backed securities and the ABX Index;

(b) By misrepresenting that the Limited Duration Bond Fund would be a suitable investment for HPOPS' cash collateral for investment in the Limited Duration Bond Fund when its holdings were highly leveraged and concentrated in the subprime mortgage market;

(c) By misrepresenting that the Limited Duration Bond Fund would provide for daily liquidity for State Street's commodities futures strategy when its holdings were unsaleable, illiquid odd-lots of subprime, residential mortgage-backed securities and when State Street's own "prospectus" (which was not provided to HPOPS until on or about July 23, 2007) itself provided that the Limited Duration Bond Fund "should not be used for daily liquidity";

(d) By misrepresenting the Limited Duration Bond Fund's objective as conservative in seeking to match or exceed the returns of the JP Morgan one-month US Dollar LIBOR Index by a mere 50 basis points when investing primarily in subprime, residential mortgage-backed securities was core to its strategy;

(e) By failing to disclose that the Limited Duration Bond Fund would itself be highly leveraged;

(f) By failing to disclose that the Limited Duration Bond Fund would invest in speculative, subprime, residential mortgage-backed securities and derivatives, including the ABX Index;

(g) By investing in the Limited Duration Bond Fund, by allowing the Limited Duration Bond Fund to make investments, and by failing to disclose that the Limited Duration Bond Fund would consist of, primarily (and by as much as 94%) subprime, residential mortgage-backed securities;

(h) By self-dealing in giving preferential treatment to State Street-related entities and SSgA-commingled funds by allowing them to redeem their units in the Limited Duration Bond Fund in-kind ahead of HPOPS and for the most saleable of the Fund's holdings, thereby undermining the liquidity and quality of HPOPS' holdings;

(i) By representing that the in-kind redemption of units in the Limited Duration Bond Fund by SSgA-related entities would not negatively affect the liquidity and quality of HPOPS' holdings and by failing to disclose that there would be a mass exodus from the Fund and that the most desirable of the securities would be sold off;

(j) By failing to timely disclose material information regarding the true nature of the investments in the Limited Duration Bond Fund and the Limited Duration Bond Fund's actual investment strategy and holdings, preventing HPOPS from taking any actions to protect its assets;

(k) By refusing to allow HPOPS to redeem all of its units in-kind in a manner equal to what it had allowed its own State Street-related entities to do or to otherwise provide for equitable treatment of all participants in the Fund; and

(l) By violating the fiduciary duties of full disclosure and candor regarding HPOPS' investment of cash collateral in the Limited Duration Bond Fund.

79.    Upon information and belief, SSgA and SSB committed self-dealing by giving preferential treatment to other State Street-related entities, including other State Street-commingled funds that owned up to 38,856,819 units of the Limited Duration Bond Fund, by allowing them to get out in front of HPOPS and redeem their units in-kind for what appears to have been the most saleable of the securities held in the Fund; *i.e.* the 2004 and 2005 mortgage securities that actually held equity. HPOPS was left with 88% of the ownership of units in the Fund that consisted of illiquid odd-lot positions in subprime residential mortgage securities with little or no equity. State Street thus benefited at HPOPS' expense. Because SSgA and SSB entered into transactions with other State Street-related entities, there is an equitable presumption that these transactions were unfair and inequitable to HPOPS. Both the burden of persuasion and the burden of

39

producing evidence therefore fall on SSgA and SSB to prove that these transactions were fair, equitable, and do not constitute a breach of fiduciary duty.

80.    SSgA and SSB's breaches of fiduciary duty were intentional and committed in bad faith.

81.    As a direct and proximate result of SSgA and SSB's breaches of fiduciary duties to HPOPS, HPOPS has been injured by tens of millions of dollars and State Street has received inequitable benefits at HPOPS' expense.    HPOPS seeks all actual, consequential, incidental, and exemplary damages from State Street as may be allowed by law.  Further, HPOPS seeks a constructive trust on all proceeds, funds, or property obtained by State Street as a result of its breaches of fiduciary duties.  HPOPS also pleads that State Street cannot retain any benefits it acquired while in breach of its fiduciary duties to HPOPS and thus requests that State Street be required to forfeit any fees it collected as a result of the breach.

### Cause of Action II: Breach of Contract (Against SSgA)

82.    HPOPS incorporates the allegations set forth in paragraphs 1 to 81 as if fully set forth herein.

83.    SSgA and HPOPS entered into an Investment Management Agreement, as amended on or about June 16, 2006 ("the Amended IMA").  Under the Amended IMA, SSgA agreed to act as investment manager with sole investment discretion for the benefit of HPOPS and explicitly agreed and acknowledged that it would be acting as a fiduciary to HPOPS.  HPOPS fully performed its obligations under the Amended IMA, and all conditions precedent to HPOPS' claims for relief have been performed or have occurred.

40

84.    SSgA materially breached these contractual obligations to HPOPS by, among other things:

(a) violating the fiduciary obligations SSgA agreed to be bound by;

(b) investing HPOPS' $54,298,176.00 of collateral in a Limited Duration Bond Fund that would be comprised primarily of subprime residential mortgage-backed securities in violation of its obligation to exercise the "care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with matters of the same type would use in the conduct of an enterprise with a like character and with like aims." IMA at § 5.c;

(c) failing to disclose the true nature of HPOPS' investment in the Limited Duration Bond Fund in violation of its agreement to exercise the "care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with matters of the same type would use in the conduct of an enterprise with a like character and with like aims." IMA at § 5.c;

(d) failing to "use reasonable care in good faith to transact business in the most efficient manner utilizing the best stock, bond and currency executions" by selecting the Limited Duration Bond Fund as the short term cash vehicle for the commodities futures strategy;

(e) failing to "use reasonable care in good faith to maintain and achieve the Objectives of the Account Assets . . .." by investing the collateral in a Limited Duration Bond Fund that was not diversified, highly leveraged and would fail to provide needed liquidity (*Id.* at § 5.f);

(f) upon information and belief, by failing to disclose self-dealing in violation of its agreement to disclose in a signed document to the Board any decision "being made concerning any investment, benefit or other action in which the fiduciary has an interest" by allowing other State Street-related entities to redeem their units in kind for the most saleable of the holdings to HPOPS' detriment;

(g) violating the Investment Policy of HPOPS requiring that SSgA invest "[n]o more than 25% of the portfolio at market value [ ] in any one single industry sector," that a fixed income portfolio on a weighted value basis shall be A-rated or higher, and that no investment would be rated less than investment grade; and

(h) refusing to provide timely material information requested by HPOPS as obligated to do under the IMA.

85.    As a direct and proximate result of SSgA's breach of contract, HPOPS has been injured by tens of millions of dollars.    HPOPS seeks all actual, consequential, incidental, and exemplary damages from SSgA as may be allowed by law.    HPOPS also seeks reasonable attorney's fees and expenses under Texas Civil Practices & Remedies Code section 38.001 and the contract.

## Cause of Action III:  Common Law Fraud – Fraudulent Misrepresentation and Fraudulent Inducement (Against SSgA and SSB)

86.    HPOPS incorporates the allegations set forth in paragraphs 1 to 85 as if fully set forth herein.

87.    State Street committed fraud against HPOPS by making numerous fraudulent misrepresentations that the investment of HPOPS' cash collateral in the Limited Duration Bond Fund would be in a high-quality, well-diversified fixed income securities allocation that would provide for daily liquidity and would not be leveraged, with a conservative objective to match or exceed the JP Morgan one-month US Dollar LIBOR Index by a mere 50 basis points.    State Street, through its agents and representatives, made the following material misrepresentations to HPOPS, including, without limitation:

(a) representing in the initial August 2005 presentation that residual cash invested in the commodities futures strategy would be placed in *"high quality* money market securities or pooled funds," that the investment would "provide for *daily liquidity*," that the Limited Duration Bond Fund would be invested in securities with an "average quality of AAA" with only 1.8% in BBB; and that *only 5.3%* of the Limited Duration Bond Fund's holdings would be invested in *mortgage-backed securities*;

(b) representing through its agent Craig DeGiacomo on or about May 11, 2007 that HPOPS could liquidate its investment in the Limited Duration Bond Fund with one day's notice;

42

(c) representing in its "prospectus" for the Limited Duration Bond Fund dated June 30, 2007 that the Limited Duration Bond Fund's objective was "to maximize income while preserving capital by investing in *diversified portfolio of highly rated fixed income securities*" and to "match or exceed one-month US Dollar LIBOR index over trailing one-year periods," and that the Fund would utilize "an *expanded universe of securities*;"

(d) representing in its Amended Fund Declaration, dated October 1, 2005, and sent to HPOPS in July 2007, that the Fund would be *well-diversified* in several types of fixed income securities;

(e) representing in both its August 28, 2007 and September 11, 2007 Power Point presentations that the Limited Duration Bond Fund, as of July 31, 2007, held only 15.35% in mortgage-backed securities; and

(f) representing through its agent Megan Gibber in an August 8, 2007 email that SSgA-commingled funds' redemption of units in the Limited Duration Bond Fund for in-kind securities would not negatively affect HPOPS' liquidity.

88.     These representations were false and State Street knew that they were false when made or made them recklessly without knowledge of their truth. HPOPS later discovered that the Limited Duration Bond Fund was not invested in high-quality, well-diversified fixed income securities to meet a conservative objective of 50 basis points over cash (a mere .050%), but rather was imprudently and unsuitably invested 80% - 90% in subprime, residential mortgage-backed securities and derivatives.

89.     State Street's representation that the Limited Duration Bond Fund, which was intended to be a short-term cash vehicle for an entirely unleveraged commodities account, would itself not be leveraged also was false.  In August 2007, Stacy Ables learned through a voicemail left by Craig DeGiacomo that the Fund was leveraged up to approximately three times.

90.     Further, State Street's representations that the Limited Duration Bond Fund would be invested in high-quality, investment-grade securities was also false. The

43

Fund's long position on the BBB ABX Index, an investment in derivative instruments backed by subprime mortgages, was rated below investment grade.

91.    Finally, contrary to its representations, State Street's affiliates' redemption of units for in-kind securities did in fact harm HPOPS' liquidity and the quality of their holdings.    On information and belief, State Street gave to its own affiliates those securities that were most saleable and that had equity, thereby leaving HPOPS only odd-lots of much less saleable securities.

92.    State Street made these material representations with the intention that HPOPS rely upon them.    Indeed, State Street's August 2005 presentation was made specifically to induce HPOPS to select State Street as the investment manager for its commodities futures strategy.    HPOPS in fact did justifiably rely on these material representations to its detriment in not only initially electing to invest money in State Street's Commodities Strategy, but also remaining in the strategy and allowing State Street to continue to have sole discretion over its investment.    HPOPS would not have granted SSgA discretion to invest its $54,298,176.00 of cash collateral required to fund its Commodities Strategy had it known that State Street would not invest it in a high-quality, well-diversified fixed income allocation providing for daily liquidity, but rather would put almost every penny in the residential mortgages market, most in the subprime market, and do so with leverage.

93.    As a direct and proximate result of State Street's fraudulent misrepresentations, HPOPS has been injured by tens of millions of dollars.    In connection with this claim, HPOPS seeks all actual, consequential, incidental, and exemplary damages as allowed by law.

**Cause of Action IV : Common Law Fraud – Fraud by Non-Disclosure (Against SSgA and SSB)**

94.    HPOPS incorporates the allegations set forth in paragraphs 1 to 93 as if fully set forth herein.

95.    As a fiduciary, State Street had a duty to fully and truthfully disclose all material facts regarding HPOPS' investments with State Street to HPOPS.

96.    By failing to disclose that the Limited Duration Bond Fund would not be invested in a high-quality, well-diversified fixed income securities allocation that would provide for daily liquidity, but instead would be comprised primarily of investments in the subprime residential mortgage market, State Street committed fraud against HPOPS by such non-disclosure. State Street concealed from and failed to disclose material facts to HPOPS regarding its investment of cash collateral in the Limited Duration Bond Fund, to include, without limitation:

(a) Failing to disclose that the Limited Duration Bond Fund consisted of up to 94% of subprime, residential mortgage-backed securities, instead allowing HPOPS to believe that the Limited Duration Bond Fund was a short-term cash vehicle comprised of high quality and well-diversified fixed income securities;

(b) Failing to disclose that the Limited Duration Bond Fund's holdings were concentrated in the subprime mortgage market, instead allowing HPOPS to believe that the Limited Duration Bond Fund would be a suitable investment for its cash collateral;

(c) Failing to disclose that the holdings were unsaleable, illiquid odd-lot positions and that State Street's own "prospectus" for the Fund (which was not provided to HPOPS until on or about July 23, 2007) itself provided that the Limited Duration Bond Fund "should not be used for daily liquidity," instead allowing HPOPS to believe that the Limited Duration Bond Fund would provide for daily liquidity for State Street's commodities futures strategy;

(d) Failing to disclose that core to the Limited Duration Bond Fund's strategy was to invest primarily in the subprime residential mortgage

45

market, instead allowing HPOPS to believe that the Limited Duration Bond Fund's objective was conservative, seeking only to match or exceed the returns of the JP Morgan one-month US Dollar LIBOR Index by a mere 50 basis points;

(e) Failing to disclose that the Limited Duration Bond Fund would itself be highly leveraged;

(f) Failing to disclose that the Limited Duration Bond Fund would invest in speculative subprime residential mortgage-backed securities and the ABX Index, instead allowing HPOPS to believe all investments would be high quality and rated investment grade;

(g) Failing to disclose that the Limited Duration Bond Fund would consist of, primarily (and by as much as 94%) subprime, residential mortgage-backed securities;

(h) Upon information and belief, failing to disclose that allowing State Street-related entities that owned units in the Limited Duration Bond Fund to redeem their units in-kind ahead of HPOPS would materially undermine the liquidity and quality of HPOPS' holdings;

(i) Failing to disclose that there might be or that there was a mass exodus from the Fund and that the most desirable of the securities held in the Fund would be sold off; and

(j) Failing to timely disclose, and/or refusing to disclose, material information regarding the true nature of the investments in the Limited Duration Bond Fund and the Limited Duration Bond Fund's actual investment strategy and holdings as requested by HPOPS.

97.    Each of the facts that State Street failed or refused to disclose were material in that HPOPS would not have allowed its cash collateral for the commodities futures strategy to be invested in the Limited Duration Bond Fund had it known the truth about State Street's actual investment strategy for the Fund and the Fund's actual holdings. Likewise, a reasonable person would attach importance to each of these facts and would be induced to act on the information in determining whether to invest in the Commodities Strategy, or remain invested in the strategy, had he or she known that the

collateral would be invested in a Limited Duration Bond Fund consisting almost exclusively of subprime, residential mortgage-backed securities and derivatives.

98.    By failing to disclose the facts, State Street intended to induce HPOPS to invest in the Commodities Strategy with its collateral in the Limited Duration Bond Fund and to keep HPOPS in the fund.

99.    HPOPS relied on State Street's nondisclosures to its detriment by not only initially electing to invest money in State Street's Commodities Strategy, but also remaining in the strategy and allowing State Street to continue to have sole discretion over its investment. HPOPS would not have granted State Street sole discretion to invest its $54,298,176.00 of cash collateral required to fund its Commodities Strategy had it known that State Street would not invest it in a high-quality, well-diversified fixed income allocation providing for daily liquidity, but rather would put almost every penny in the subprime residential mortgages market and do so on margin.

100.    As a direct and proximate result of State Street's fraudulent nondisclosures and omissions, HPOPS has been injured by tens of millions of dollars. In connection with this claim, HPOPS seeks all actual, consequential, incidental, and exemplary damages as allowed by law.

## Cause of Action V – Negligent & Grossly Negligent Misrepresentation (Against SSgA and SSB)

101.    HPOPS incorporates the allegations set forth in paragraphs 1 to 100 as if fully set forth herein.

102.    As stated above, State Street owed HPOPS a duty as a fiduciary to exercise fidelity in good faith on its behalf. State Street also owed HPOPS the duty to exercise reasonable care in handling its portfolio account and to reasonably and fully

disclose to HPOPS the actual nature of its investments. By investing HPOPS' funds, without its knowledge or authorization, in a portfolio that was not adequately diversified but instead was invested almost exclusively in high risk, subprime mortgage-backed securities, State Street has breached those duties and such breach has proximately resulted in harm to HPOPS. Thus, State Street is liable to HPOPS for negligence. Further, because the breach involved an extreme degree of risk, of which State Street had actual awareness but proceeded nonetheless in conscious indifference to HPOPS' rights, State Street is also liable to HPOPS for gross negligence.

103.    As a direct and proximate result of SSgA's and SSB's negligence and gross negligence, HPOPS has been injured by tens of millions of dollars. In connection with this claim, HPOPS seeks all actual, consequential, incidental, and exemplary damages as allowed by law.

**Cause of Action VI - Violations of the Texas Securities Act (Against SSgA and SSB)**

104.    HPOPS incorporates the allegations set forth in paragraphs 1 to 103 as if fully set forth herein.

105.    State Street also committed violations of the Texas securities laws by trading securities for HPOPS without disclosing to it the material facts regarding the transactions. Specifically, State Street invested HPOPS' funds in a cash collateral account primarily holding leveraged, subprime, residential mortgage-backed securities and derivatives without its knowledge or authorization. In so doing, State Street engaged in the sale of securities by means of either untrue statements or omissions of material facts which are necessary in order to make the statements made, in light of all circumstances, not misleading.

106.     Specifically, SSB, as the trustee of the Limited Duration Bond Fund that issued units of the Limited Duration Bond Fund to HPOPS, is liable to HPOPS as a seller under article 581-33 of the Act.     The units of the Limited Duration Bond Fund sold to HPOPS qualify as securities under article 581-4(A) of the TSA.     SSB offered or sold the units of the Limited Duration Bond Fund to HPOPS, as an investment for HPOPS' collateral under the Commodities Strategy, by means of untrue statements and/or omissions of material facts necessary to make the statements made not misleading in that SSB represented the Limited Duration Bond Fund to be a short-term cash vehicle, providing for liquidity, and invested in well-diversified, highly-rated fixed income securities, when in reality it was invested almost entirely in highly leveraged, subprime residential mortgage-backed securities.

107.     SSgA is jointly and severally liable under article 581-33 as a person who directly or indirectly with an intent to deceive or defraud or with reckless disregard for the truth, materially aided SSB in its sale of the units of the Limited Duration Bond Fund by means of an untruth or omission.

108.     As damages for violations of the Texas Securities Act under article 581-33, HPOPS is entitled to recover all consideration paid for the units of the Limited Duration Bond Fund plus interest thereon at the legal rate from the date of payment less the value of the units at the time HPOPS disposed of them, equaling tens of millions of dollars.

109.     In addition, SSgA is an investment adviser as defined by Tex. Rev. Civ. Stat. Ann. art. 581-4(N). Pursuant to Tex. Rev. Civ. Stat. Ann. art. 581-33-1, SSgA committed fraud and/or engaged in a fraudulent practice in rendering services as an

investment advisor in investing HPOPS' collateral in the Limited Duration Bond Fund by representing it to be a short-term cash vehicle, providing for liquidity, and invested in well-diversified, highly-rated fixed income securities, when in reality it was invested almost entirely in high risk, leveraged, subprime residential mortgage-backed securities.

110.    SSB is jointly and severally liable as a person who directly or indirectly with an intent to deceive or defraud or with reckless disregard for the truth, materially aided SSgA as investment adviser.

111.    As damages for violations of the Texas Securities Act under article 581-33-1, HPOPS is entitled to recover all consideration paid to SSgA for its investment services, losses incurred in acting on the services totaling tens of millions of dollars, and interest at the legal rate.    In connection with this claim, HPOPS seeks all actual, consequential, incidental, and exemplary damages as allowed by law.

112.    HPOPS pleads no federal cause of action whatsoever, notwithstanding any allegation set forth in this complaint that might suggest otherwise.

**Cause of Action VII – Conspiracy (Against SSgA and SSB)**

113.    HPOPS incorporates the allegations set forth in paragraphs 1 to 112 as if fully set forth herein.

114.    Defendants SSgA and SSB conspired with one another to defraud HPOPS by falsely representing to HPOPS that its investment of $54,298,176.00 of cash collateral in the Limited Duration Bond Fund would be placed in a high quality, well-diversified, fixed income securities allocation with a conservative objective to match or exceed the JP Morgan one month U-S Dollar LIBOR Index by a mere 50 bps and would provide for daily liquidity to enable HPOPS to meet any margin calls from commodities swaps.

50

Defendants failed to disclose that, in reality, the Limited Duration Bond Fund would be invested primarily in the subprime residential mortgage market, would be highly leveraged, and would not provide daily liquidity as needed to support the Commodities Strategy.

115.    Defendants SSB and SSgA each agreed that they would induce HPOPS to invest in the Commodities Strategy by falsely representing that the collateral HPOPS would have to provide would be safely invested in a slightly enhanced short-term cash vehicle – the Limited Duration Bond Fund, which they represented would be well-diversified in highly rated fixed income securities and would further provide for daily liquidity to meet any margin calls in the Commodities Strategy.  Defendants, however, intended only to induce HPOPS to provide the capital to allow State Street to purchase more subprime, residential mortgage backed securities and derivatives in the Limited Duration Bond Fund – and to not disclose to HPOPS the true make-up of that Fund. Defendants accomplished that end by making numerous fraudulent misrepresentations and non-disclosures, breaches of fiduciary duty, breaches of contract, violations of the Texas Securities Laws, among other overt acts and omissions.

116.    As a direct and proximate result of the conspiracy, HPOPS has been injured by tens of millions of dollars.  In connection with this claim, HPOPS seeks all actual, consequential, incidental, and exemplary damages as allowed by law.

### Damages

117.    As a proximate result of the actions and omissions of State Street, HPOPS has suffered damages.  The value of HPOPS' commodities account dropped by tens of millions of dollars as a result of State Street's conduct.  HPOPS is also entitled to

attorney's fees under Chapter 38 of the Texas Civil Practices and Remedies Code, costs and expenses, punitive damages, and pre- and post-judgment interest as allowed by law. HPOPS is entitled to exemplary and punitive damages as a result of State Street's malicious and intentional conduct and gross negligence. All damages are sought jointly and severally against SSB and SSgA.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, HPOPS prays that State Street Bank and State Street Global Advisors, Inc. be cited to answer and appear and that HPOPS have judgment against them as follows:

     (i)     for actual damages resulting from breach of fiduciary duty, breach of contract, common law fraud, fraudulent inducement, fraud by non-disclosure, statutory fraud, negligence, gross negligence, violations of the Texas securities laws, and conspiracy;

     (ii)     for reasonable and necessary attorney's fees;

     (iii)     for pre- and post-judgment interest at the maximum lawful rate;

     (iv)     for expenses and costs;

     (v)     for exemplary and punitive damages as a result of the malicious and intentional fraud, breaches of fiduciary duty, and gross negligence; and

     (vi)     for such other and further relief to which HPOPS may show itself entitled.

Respectfully submitted,


/s/ Robert R. Burford

By:_____

Robert R. Burford
State Bar No. 03371700
GIBBS & BRUNS, L.L.P.
1100 Louisiana, Suite 5300
Houston, Texas 77002
(713) 650-8805 – Telephone
(713) 750-0903 - Facsimile
**ATTORNEY-IN-CHARGE FOR PLAINTIFF**

**OF COUNSEL:**
Caren S. Sweetland
State Bar No. 24001333
GIBBS & BRUNS, L.L.P.
1100 Louisiana, Suite 5300
Houston, Texas 77002
(713) 650-8805 – Telephone
(713) 750-0903 - Facsimile

53