UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

IN RE STATE STREET BANK AND TRUST   :
CO. ERISA LITIGATION   :
  :
  :       07 Civ. 8488 (RJH)
This document relates to:   :
  :
07 Civ. 8488 (*Prudential Retirement Insurance and* :
*Annuity Company v. State Street Bank and Trust*   :
*Company and State Street Global Advisors, Inc.*)   :
  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DECLARATION OF EDWIN G. SCHALLERT
## IN OPPOSITION TO DEFENDANTS' MOTION TO
## <u>TRANSFER TO DISTRICT OF MASSACHUSETTS</u>

I, Edwin G. Schallert, hereby declare as follows:

1.      I am an attorney admitted to practice in New York.  I am a member of the bar of

this Court and a member of the firm of Debevoise & Plimpton LLP, which represents plaintiff

Prudential Retirement Insurance and Annuity Company ("Prudential") in this action.

2.      I submit this declaration to place before the Court certain facts and documents

relevant to Prudential's opposition to the motion by State Street Bank and Trust Company and

State Street Global Advisors Inc. (together, "State Street"), pursuant to 28 U.S.C. § 1404(a), to

transfer this action to the District of Massachusetts.

### <u>Pretrial Proceedings in the *Prudential* Case</u>

3.      On October 26, 2007, the Court issued an Initial Scheduling Conference Notice

and Order, requiring Prudential and State Street to confer regarding an agreed-on scheduling

order and submit such an order to the Court in advance of the initial scheduling conference.  A copy of the Court's Order is attached as Exhibit A.

4.      In November and December 2007, I conferred several times with lawyers at Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings") in New York, which represents State Street in this action.  I proposed a scheduling order to Paul Hastings in November 2007, and discussed with Paul Hastings versions of that proposed order in November and December 2007.  During those discussions, Paul Hastings advised me that State Street would move to dismiss on the ground that Prudential lacked standing to bring this action.

5.      On November 21, 2007, Paul Hastings wrote to the Court confirming State Street's intention to move to dismiss the *Prudential* case and seeking a pre-motion conference to discuss its motion to dismiss.  In that letter, Paul Hastings asserted that Prudential lacked standing and had no legal right to obtain certain of the relief it sought.  A copy of Paul Hastings's November 21, 2007 letter is attached as Exhibit B.

6.      After I received a copy of Paul Hastings's letter, Paul Hastings and I discussed and agreed on a briefing schedule for State Street's motion to dismiss, which I set forth in a letter to the Court dated December 6, 2007.  In the course of our discussions about the briefing schedule for the motion to dismiss, Paul Hastings did not mention a motion to transfer the *Prudential* case.  Accordingly, the agreed-on briefing schedule did not refer to a motion to transfer.  A copy of my December 6, 2007 letter is attached as Exhibit C.

### Pretrial Consolidation

7.      On November 7, 2007, the *Prudential* case was consolidated for pretrial purposes with *Unisystems, Inc. v. State Street Bank and Trust Co.*, No. 07 Civ. 9319.  On January 7, 2008, this Court consolidated *Merrimack Mutual Fire Insurance Co. v. State Street Bank & Trust Co.*, No. 07 Civ. 9687, with the *Prudential* case.  On January 31, 2008, *Nashua Corp. Composite*

*Pension Trust v. State Street Bank and Trust Co.*, No. 08 Cv. 0265, was added to the pretrial consolidation. Copies of the Court's consolidation orders are attached as Exhibits D, E and F, respectively.

8.      On November 30, 2007, State Street sent a letter advising the Court that it wished to move, pursuant to 28 U.S.C. § 1404(a), to transfer the *Unisystems* and *Merrimack* class actions to the District of Massachusetts. A copy of State Street's letter dated November 30, 2007 is attached as Exhibit G.

9.      A scheduling conference addressing the *Prudential*, *Unisystems* and *Merrimack* cases was held on January 4, 2008. The scheduling conference was not transcribed. At the conference, State Street was represented by Paul Hastings in the *Prudential* case, and by Ropes & Gray LLP in the *Unisystems* and *Merrimack* cases. State Street's counsel made separate oral presentations about the *Prudential* case and about the class actions.

10.     In its presentation to the Court on the *Prudential* case, State Street asserted that a key issue would be Prudential's lack of standing to bring its claims and that State Street would raise this through its motion to dismiss. State Street sought a stay of all discovery pending the outcome of its motion to dismiss. The Court denied this request. The Court asked whether State Street sought to file a motion to transfer the *Prudential* case. State Street indicated that it was not seeking to file such a motion.

11.     In its presentation on the class actions, State Street advised the Court that a pivotal issue in those cases would be the plaintiffs' motion for class certification. State Street requested that discovery in the class actions be bifurcated, with discovery limited to class issues first and with merits discovery to follow. The Court denied State Street's request. During the conference, counsel for the class plaintiffs advised the Court that the *Nashua Corp.* case, then

3

pending in the District of Massachusetts, would soon be dismissed and refiled in this Court. State Street restated its intention to move to have each of the *Unisystems*, *Merrimack* and *Nashua Corp.* cases, but not the *Prudential* case, transferred to the District of Massachusetts.

12.     On January 15, 2008, I had a telephone conversation with Paul Hastings, who informed me for the first time that State Street would move to transfer the *Prudential* case to the District of Massachusetts.  State Street had not previously sought a pre-motion conference in relation to its motion to transfer the *Prudential* case.

13.     On January 16, 2008, the parties submitted a proposed Joint Pretrial Scheduling Order in the *Prudential*, *Unisystems*, *Merrimack* and *Nashua Corp.* cases.  On January 31, 2008, the Court entered that Order, a copy of which is attached as Exhibit H.

**Initial Disclosures**

14.     On February 1, 2008, Prudential and State Street exchanged initial disclosures pursuant to Rule 26(a)(1)(A) of the Federal Rules of Civil Procedure.  Copies of Prudential's and State Street's initial disclosures are attached as Exhibits I and J, respectively.

15.     On information and belief, in 2007 and early 2008, several of the former State Street employees identified by State Street and/or Prudential in their initial disclosures as individuals likely to have discoverable information that the disclosing party may use to support its claims or defenses were dismissed or resigned.  Copies of newspaper articles describing some of these dismissals or resignations are attached as Exhibit K.

16.     Among the former employees named in State Street's initial disclosures is William Hunt, who was President and Chief Executive Officer of State Street Global Advisors. State Street disclosed the existence of a separation agreement with Mr. Hunt in a Form 8-K filed with the Securities and Exchange Commission on January 3, 2008.  A copy of that filing is attached as Exhibit L.  Mr Hunt's separation agreement was filed with the Securities and

4

Exchange Commission on February 15, 2008. A copy of that filing is attached as Exhibit M. We have been unable to locate any other public disclosures of separation agreements between State Street and the former employees named in its initial disclosures.

### Documents

17.    On February 4, 2008, Prudential served its initial document requests on State Street. On February 8, 2008, class plaintiffs served their initial document requests on State Street. Copies of Prudential's and class plaintiffs' document requests are attached as Exhibits N and O respectively. Most of class plaintiffs' document requests are similar, if not identical, to requests made by Prudential. As a result, State Street is being asked to produce most of the documents responsive to Prudential's requests to the lawyers for class plaintiffs in the *Unisystems*, *Merrimack* and *Nashua Corp*. class actions. Prudential expects that State Street will produce documents electronically to meet its overlapping production obligations. Class plaintiffs have requested that State Street produce documents responsive to their requests at the offices of Bernstein Litowitz Berger & Grossmann LLP New York. Lawyers for class plaintiffs are located in New York City, Seattle, Boston and Florida.

18.    On February 15, 2008, State Street served document requests on Prudential. A copy of State Street's document requests is attached as Exhibit P.

### Prudential Witnesses

19.    At this early stage, Prudential believes that six of its employees and consultants are likely trial witnesses, on whose testimony it intends to rely:

a.    Matthew Dingee, Senior Investment Analyst, who resides in Rocky Hill, Connecticut and works in Hartford. Mr. Dingee is the Prudential investment analyst who was responsible for monitoring the performance of the State Street Global Advisors Intermediate Bond Fund and the State Street Global Advisors

5

Government Credit Bond Fund (together, the "Bond Funds") from May 2006 onwards. He can testify about Prudential's analyses of the Bond Funds, and the requests that he made to State Street for information concerning the Bond Funds during 2007.

b. Robert Frascona, Vice President of Investment Products, who resides in East Granby, Connecticut and works in Hartford. Mr. Frascona was the product manager responsible for the Bond Funds prior to Prudential's decision to request that State Street redeem all remaining amounts in the Bond Funds. He previously worked for CIGNA Corporation, much of whose retirement business became part of Prudential Financial, Inc. in 2004. He can testify about Prudential's and CIGNA's understanding about the Bond Funds, about State Street's representations regarding the Bond Funds' investment strategy, and about communications among Prudential (and its predecessor CIGNA), State Street and Prudential's clients regarding the Bond Funds.

c. Amy Hatfield, a consultant to Prudential's investment products group, who resides in Granby, Connecticut and works in Hartford. Before her retirement in 2005, she worked for CIGNA and then for Prudential. She can testify about Prudential's development, management and marketing of retirement plan products, about CIGNA's decision to offer the Bond Funds as an investment option to clients and Prudential's decision to continue to offer the Bond Funds to clients, and about communications with State Street and with one of Prudential's largest clients regarding the Bond Funds' deteriorating performance.

d.    James Mallozzi, Senior Vice President, Institutional Solutions, who resides in Avon, Connecticut and works at both Prudential's headquarters in Hartford and Prudential's office in Woodbridge, New Jersey.  Mr. Mallozzi can testify about Prudential's communications with its clients regarding the Bond Funds before and after Prudential's decision to request that State Street redeem all remaining amounts in the Bond Funds, including communications about Prudential's non-recourse loans to the separate accounts that held the Plans' investments in the Bond Funds.  He can also testify about Prudential's decision to request that State Street redeem all remaining amounts in the Bond Funds.

e.    Dean Molinaro, Vice President and Investment Strategist, who resides in West Hartford, Connecticut and works in Hartford.  Mr. Molinaro is an investment strategist to some of Prudential's large clients.  He can testify about Prudential's marketing of the Bond Funds to its clients, and about communications between Prudential, State Street and the Prudential clients he advises regarding the Bond Funds' deteriorating performance.

f.    George Palms, Jr., Senior Vice President, Retirement Plan Strategies, who resides in Weatogue, Connecticut and works in Hartford.  Mr. Palms is the leader of Prudential's investment products group.  He can testify about the development, marketing and management of the investment products through which the Bond Funds were offered to Prudential's clients.  Mr. Palms can also testify about his requests to State Street for information concerning the Bond Funds during August 2007 and Prudential's decision to request that  State Street redeem all remaining amounts in the Bond Funds.

20.     At this early stage, Prudential is unable to identify any of these six witnesses for whom video deposition testimony would be a sufficient alternative to testifying live at trial.

**State Street Witnesses**

21.     Prudential intends to depose State Street's witnesses, and expects that it will coordinate with class plaintiffs regarding the deposition of those witnesses.  Prudential is willing to conduct those depositions at locations to suit the convenience of witnesses or their counsel. Prudential expects that the depositions of State Street's witnesses will be videotaped.

22.     Prudential estimates that ten current or former State Street employees are likely trial witnesses in the Prudential case.  Seven of these witnesses are named by State Street as likely witnesses in its Memorandum of Law in Support of Defendants' Motion to Transfer Venue:

    a.     Mark Flinn, Relationship Manager.

    b.     Paul Greff, former Director of Global Fixed Income.

    c.     James Hopkins, Head of U.S. Fixed Income Product Engineering.

    d.     Greg Mulready, former Relationship Manager.

    e.     Robert Pickett, former Portfolio Manager (Intermediate & Enhanced Intermediate Bond Fund).

    f.     Michael Wands, former Director of North American Fixed Income.

    g.     Susan Reigel, former Portfolio Manager (Daily Bond Market & Government Credit Bond Fund).

23.     The following current or former State Street employees whom Prudential believes are also likely trial witnesses are not identified in the papers supporting State Street's motion to transfer:

    a.     Patrick Armstrong, Director of Investment Risk Management;

      b.      Ting Li, who is or was a risk analyst; and

      c.      Michael O'Hara, former Director of Active U.S. Fixed Income.

    24.     Mr. Armstrong and Mr. O'Hara were both listed in State Street's initial disclosures under Rule 26(a)(1)(A) of the Federal Rules of Civil Procedure. Prudential is not aware of the current place of work or residence of any of these individuals.

    25.     Prudential believes that the eight individuals identified by State Street as likely trial witnesses in the *Prudential* case in the papers supporting State Street's motion to transfer – namely Marc Brown, Brian Burke, Joseph Dougherty, Frank Gianatasio, Sonya Hughes, Adele Kohler, Staci Reardon and Eric Saarinen – are likely to present duplicative or otherwise less material testimony than the witnesses identified above.

    26.     On information and belief, Mr. Brown, Ms. Kohler and Ms. Reardon were not involved in management of the Bond Funds and did not have significant communications with Prudential at any time regarding the Bond Funds. While Messrs. Burke, Dougherty and Saarinen and Ms. Hughes may have communicated on occasion with Prudential regarding the Bond Funds in their capacity as relationship managers, Prudential believes that their testimony will not relate to any of State Street's investment decisions or to State Street's representations to Prudential concerning the Bond Funds' investment strategies, and is likely to be cumulative of other witnesses and each other. Prudential believes that Mr. Gianatasio's testimony is likely to be cumulative of that of Mr. Pickett and Ms. Reigel, who are alleged to have been the portfolio managers of the Bond Funds at the relevant time.

### Denial of Motion to Transfer Southern District of Texas Case

    27.     On February 25, 2008, the United States District Court for the Southern District of Texas denied State Street's motion, pursuant to 28 U.S.C. § 1404(a), to transfer *Memorial*

*Hermann Healthcare System v. State Street Bank & Trust Co.* to the District of Massachusetts.

A copy of the Court's order denying the motion is attached as Exhibit Q.

### Application to the Judicial Panel on Multidistrict Litigation

28.     On February 29, 2008, State Street moved, pursuant to 28 U.S.C. § 1407, to

transfer the *Prudential*, *Unisystems*, *Merrimack*, *Nashua Corp.*, *Memorial Hermann* and *Houston*

*Police Officers' Pension System v. State Street Bank & Trust Co.* cases to the District of

Massachusetts for coordinated or consolidated pretrial proceedings.

I declare under the penalty of perjury that the foregoing is true and correct to the best of

my knowledge.

Executed in New York, New York, on March 10, 2008.


/s/ Edwin G. Schallert
Edwin G. Schallert

10

**EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
**PRUDENTIAL RETIREMENT INSURANCE
and ANNUITY COMPANY,**


                    Plaintiffs,

          - against -                              **2007  Civ.  08488**(RJH )


**STATE STREET BANK and TRUST
COMPANY, ET AL,**


                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### Initial Scheduling Conference Notice and Order

        This action has been assigned to Judge Richard J. Holwell for all purposes.  It is hereby
ORDERED as follows:

   1.    Counsel receiving this Order shall promptly mail or fax copies hereof to all other
         counsel of record or, in the case of parties for which no appearance has been
         made, to such parties.  Counsel for all parties should note their appearance as
         counsel in this matter by letter immediately.
   2.    Counsel for <u>all</u> parties are directed to confer regarding an agreed scheduling order
         pursuant to Fed. R. Civ. P. 26(f).  If counsel are able to agree on a schedule **and
         the agreed schedule calls for filing of the pretrial order not more than nine
         (9) months from the date of this order**, counsel shall sign and email a PDF of
         the proposed schedule to the Orders and Judgment Clerk within fourteen (14) days
         from the date hereof, following the scheduling order requirements attached hereto.
         Counsel should note, in submitting their consent scheduling order, that the
         otherwise scheduled conference should be adjourned.
   3.    If such a consent order is <u>not</u> filed within the time provided, an initial scheduling
         conference will be held in this matter on **January 04, 2008 at 10:00 a.m.** in
         Courtroom 17B at the U.S. Courthouse, 500 Pearl Street, New York, New York
         10007.  A proposed scheduling order, following the scheduling order
         requirements attached hereto, should be submitted to Chambers three days before
         the initial scheduling conference.

4.      **Any requests for adjournments** must be made in writing and must be received in Chambers **not later than 48 hours** before the scheduled time. Alternative dates that are mutually agreeable to all parties must be suggested when requesting to reschedule the initial scheduling conference. Parties should consult the Individual Practices of Judge Holwell with respect to communications with Chambers and related matters.

5.      This case has been designated an electronic case. The parties are advised that **all orders after this Initial Scheduling Conference Notice and Order will be issued via the Electronic Case Filing ("ECF") system and parties will not be sent copies by mail or facsimile.** It is the responsibility of counsel to become familiar with and follow ECF procedures. A subsequent Initial Scheduling Conference Notice and Order attaching Judge Holwell's Individual Practices will be issued via ECF. Judge Holwell's individual practices may also be found at http://www.nysd.uscourts.gov/Individual_Practices/Holwell.pdf. Parties should direct questions regarding ECF to the ECF Help Desk at 212-805-0800.


                **SO ORDERED**

Dated:  New York, New York
        **October 26, 2007.**

                                        Richard J. Holwell
                                        United States District Judge

## Scheduling Order Requirements

1.   Description of the Case
     a.   Identify the attorneys of record for each party, including lead trial attorney;
     b.   State the basis for federal jurisdiction;
     c.   Briefly describe the claims asserted in the complaint and any counterclaims;
     d.   State the major legal and factual issues in the case; and
     e.   Describe the relief sought.

2.   Proposed Case Management Plan
     a.   Identify all pending motions;
     b.   Propose a cutoff date for joinder of additional parties;
     c.   Propose a cutoff date for amendments to pleadings;
     d.   Propose a schedule for completion of discovery, including:
           i.    A date for Rule 26(a)(1) disclosures, if not previously completed;
           ii.   A fact discovery completion date;
           iii.  A date for Rule 26(a)(2) disclosures; and
           iv.   An expert discovery completion date, including dates for delivery
                 of expert reports;
     e.   Propose a date for filing dispositive motions;
     f.   Propose a date for filing a final pretrial order; and
     g.   Propose a trial schedule, indicating:
           i.    Whether a jury trial is requested;
           ii.   The probable length of trial; and
           iii.  When the case will be ready for trial.

3.   Consent to Proceed Before a Magistrate Judge:  Indicate whether the parties
     consent unanimously to proceed before a Magistrate Judge.

4.   Status of Settlement Discussions
     a.   Indicate whether any settlement discussions have occurred;
     b.   Describe the status of any settlement discussions; and
     c.   Whether parties request a settlement conference.

3

**EXHIBIT B**

**Paul**Hastings

Paul, Hastings, Janofsky & Walker LLP
Park Avenue Tower
75 East 55th Street
First Floor
New York, NY 10022
telephone 212-318-6000 • facsimile 212-319-4090 • www.paulhastings.com

Atlanta
Beijing
Brussels
Chicago
Hong Kong
London
Los Angeles
Milan
New York
Orange County
Palo Alto
Paris
San Diego
San Francisco
Shanghai
Stamford
Tokyo
Washington, DC

(212) 318-6085
barrysher@paulhastings.com

November 21, 2007

**BY FACSIMILE (212-805-7948)**

Hon. Richard J. Holwell
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Room 1950
New York, New York 10007

Re:     *Prudential Retirement Insurance and Annuity Company v. State Street Bank and Trust
Company and State Street Global Advisors, Inc.*, Index No. 07-cv-8488 (RJH)

Dear Judge Holwell:

This firm represents the defendants, State Street Bank and Trust Company and State
Street Global Advisors (together, "State Street"), in the above-referenced action.  Pursuant
to Your Honor's individual rules of practice, we respectfully request a pre-motion
conference to discuss a motion to dismiss the Complaint that State Street intends to file.
The basis for the motion is briefly set forth below.

**Prudential Lacks Standing to Pursue the Claims**

Prudential Retirement Insurance and Annuity Company ("Prudential") purports to bring
this suit under ERISA in its capacity as a fiduciary on behalf of separate accounts and
retirement plans that Prudential administers (the "Plans").  Prudential alleges that the
Plans suffered losses in two actively managed State Street funds, known as the
Government Credit Fund and the Intermediate Bond Fund (collectively, the "Funds").
Prudential seeks to require State Street to make the Plans whole, and makes no claims on
its own behalf.

On October 1, 2007, Prudential publicly announced that it is reimbursing the Plans for all
of their investment losses related to the Funds.  As a result of this unilateral action by
Prudential, the Plans have no losses, and Prudential has no standing under either Article
III of the United States Constitution or ERISA to pursue claims on behalf of the Plans
against State Street.

As the Second Circuit recently held, "obtaining restitution or disgorgement under ERISA
requires a plaintiff to satisfy the strictures of constitutional standing by demonstrating
individual loss; to wit, that they have suffered an injury in fact."  *Central States Southeast
and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,

Paul*Hastings*

Hon. Richard J. Holwell
November 21, 2007
Page 2

433 F.3d 181, 200 (2d Cir. 2005). Prudential's claims are asserted on behalf of the Plans, but the Plans have no losses, and constitutional standing thus fails.

Prudential also lacks standing under ERISA to pursue its claims pursuant to ERISA Sections 409 and 502(a)(2). As the statutory text of Section 409 makes clear, claims by a fiduciary pursuant to these sections of ERISA may only be brought on a plan's behalf when a plan is injured by a breach of fiduciary duty, "to make good *to such plan* any losses *to the plan* resulting from such breach." 29 U.S.C.A. § 1109 (emphasis added). Prudential cannot simultaneously make the Plans whole for their losses and sue State Street under Sections 409 and 502(a)(2) to recover those very same losses on behalf of the Plans.

**Prudential's Complaint Contains No Viable Claims For Equitable Relief**

Prudential's attempt to assert a claim under Section 502(a)(3) of ERISA also fails for an additional reason, beyond Prudential's lack of standing. Section 502(a)(3) allows only equitable relief, not claims for damages. Despite the "equitable" label Prudential applies to its claims, in reality, they are for monetary damages at law – specifically, an amount equal to the Plans' alleged investment losses. As the Supreme Court most recently made clear in Great-West Life and Annuity Ins. Co. v. Knudson, 534 U.S. 204 (2002), Section 502(a)(3) does not allow such relief, and Prudential cannot recast this as an equitable claim by seeking an injunction for "restitution and disgorgement."

**Conclusion**

In short, Prudential has no standing to bring this action and no right to the relief it seeks. State Street therefore intends to file a motion to dismiss the Complaint. If the Court requires any additional information about State Street's intended motion, please do not hesitate to contact the undersigned.

Respectfully,

Barry Sher
of PAUL, HASTINGS, JANOFSKY & WALKER LLP

cc:    Edwin G. Schallert, Esq.

LEGAL_US_E # 77295205.1

**EXHIBIT C**

# DEBEVOISE & PLIMPTON LLP

919 Third Avenue
New York, NY 10022
Tel  212 909 6000
www.debevoise.com

Edwin G. Schallert
Partner
Tel  212 909 6295
Fax  212 909 6836
egschallert@debevoise.com

**Via Facsimile**

December 6, 2007

Hon. Richard J. Holwell
United States District Court
Southern District of New York
500 Pearl Street, Room 1950
New York, NY  10007

**Prudential Retirement Insurance and Annuity Company v.
State Street Bank and Trust Company and State Street
Global Advisors, Inc., No. 07 Civ. 8488 (RJH)**

Dear Judge Holwell:

On behalf of plaintiff Prudential Retirement Insurance and Annuity Company ("Prudential"), I write in response to the November 21, 2007 letter from counsel for defendants State Street Bank and Trust Company and State Street Global Advisors, Inc. (together, "State Street"). The letter requested a pre-motion conference concerning a motion to dismiss the Complaint that defendants intend to file.

**Nature of the Lawsuit**

As elaborated in the Complaint, Prudential through separate accounts made available to retirement plans and their participants two State Street "enhanced index" bond funds that were supposed to closely track indexes consisting of government and corporate bonds. Instead, in a two-month period, the performance of both funds deviated significantly from their benchmarks, resulting in substantial losses. Prudential has alleged that defendants violated their fiduciary duties under ERISA in managing the assets invested in the bond funds. Prudential seeks, *inter alia,* (i) restitution of approximately $80 million in investment losses suffered by about 165 plans with 28,000 plan participants, (ii) disgorgement of millions of dollars in fees earned by State Street on investments in the bond funds, and (iii) injunctive relief. The Complaint alleges that Prudential is a fiduciary under Sections 502(a)(2) and 502(a)(3) of ERISA, and it seeks relief both on behalf of the plans and on behalf of the separate accounts.

Prudential believes it has ample standing both under Article III and under ERISA to pursue the multiple forms of relief sought in the Complaint, including recovery of the

Hon. Richard J. Holwell                    2                    December 6, 2007

investment losses, which is the only relief addressed in State Street's letter. The Court of Appeals' decision on which defendants rely[1] addressed Article III standing in the context of plan participants who had apparently suffered no economic or other injuries – a situation that is entirely inapposite.

**Proposed Briefing Schedule**

On the assumption that defendants will make their motion notwithstanding its lack of merit, we have consulted with defendants' counsel and jointly propose the following schedule:

-- Defendants serve their motion no later than Friday, December 14, 2007;

-- Plaintiff serves its opposition no later than Friday, January 18, 2008;

-- Defendants serve their reply no later than Friday, February 15, 2008.

**Other Matters**

The parties have conferred about a scheduling order and have been drafting a proposed order in advance of the scheduling conference.

                                        Respectfully submitted,

                                        Edwin G. Schallert

cc:     (via email)
        Barry Sher, Esq.
        Daniel B. Goldman, Esq.
        Harvey J. Wolkoff, Esq.
        Derek W. Loeser, Esq.
        Jerome C. Katz, Esq.
        Avi Josefson, Esq.
        Gretchen Freeman Cappio, Esq.
        Lynn Lincoln Sarko, Esq.
        Tyler L. Farmer, Esq.
        Gerald H. Silk, Esq.

---

[1]    *Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, LLC,* 433 F.3d 181 (2d Cir. 2005).

**EXHIBIT D**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/13/07

PRUDENTIAL RETIREMENT INSURANCE
AND ANNUITY COMPANY,

             Plaintiff,

-against-

07 Civ. 08488 (RJH)

**ORDER**

STATE STREET BANK AND TRUST
COMPANY and STATE STREET GLOBAL
ADVISORS, INC.,

             Defendants.

UNISYSTEMS, INC. EMPLOYEES PROFIT
SHARING PLAN,

             Plaintiff,

-against-

07 Civ. 09319 (RJH)

STATE STREET BANK AND TRUST
COMPANY; STATE STREET GLOBAL
ADVISORS, INC.; and JOHN DOES 1–20

             Defendants.

     The Clerk of Court is directed to consolidate the above-captioned actions for

pretrial purposes only under the earlier-filed docket number pursuant to Rule 42(a) of

the Federal Rules of Civil Procedure. *See Devlin v. Transp. Commc'ns Int'l Union*, 175

F.3d 121, 130 (2d Cir. 1999) ("A district court can consolidate related cases under

Federal Rule of Civil Procedure 42(a) sua sponte.").

SO ORDERED.

Dated: New York, New York
November 7, 2007

Richard J. Holwell
United States District Judge

**EXHIBIT E**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/8/08
```

IN RE STATE STREET BANK AND TRUST
CO. ERISA LITIGATION

This document relates to:

07 Civ. 8488
07 Civ. 9319
07 Civ. 9687

07 Civ. 8488 (RJH)

**ORDER**

   The Clerk of Court is directed to consolidate, for pretrial purposes only, the actions with

docket numbers 07 Civ. 8488, 07 Civ. 9319, and 07 Civ. 9687 under the caption "In re State

Street Bank and Trust Co. ERISA Litigation," pursuant to Rule 42(a) of the Federal Rules of

Civil Procedure. *See Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999)

("A district court can consolidate related cases under Federal Rule of Civil Procedure 42(a) sua

sponte."). The actions with docket numbers 07 Civ. 9319 and 07 Civ. 8488 were previously

consolidated for pretrial purposes by Order dated November 13, 2007.

   Filings in any of the consolidated actions should indicate in the caption the docket

numbers of the particular action(s) to which the document relates.


SO ORDERED.

Dated: New York, New York
       January 7, 2008

                                        Richard J. Holwell
                                        United States District Judge

**EXHIBIT F**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY F
DOC #:
DATE FILED: 2/7/08

---

**In re State Street Bank and Trust Co. ERISA Litigation**

**This document relates to:**

**No. 07 Civ. 9319**
**No. 07 Civ. 9687**

**07 Civ. 8488 (RJH)**
**(Consolidated Actions)**

---

**NASHUA CORP. PENSION PLAN COMMITTEE, ET AL.**

        **Plaintiffs,**

    v.

**STATE STREET BANK AND TRUST CO., ET AL.**

        **Defendants**

**08-CV-0265 (RJH)**

---

## PROPOSED ORDER CONSOLIDATING ACTIONS, APPOINTING LEAD PLAINTIFFS, AND APPROVING THEIR SELECTION OF INTERIM CLASS COUNSEL

WHEREAS, a pre-trial conference was held in this matter on January 4, 2008;

WHEREAS, by Order of the Court dated January 8, 2008, the Court consolidated for pre-trial purposes only pursuant to Rule 42(a) of the Federal Rules of Civil Procedure the putative class actions captioned *Unisystems, Inc. et al. v. State Street Bank and Trust Co., et al.,* 07 Civ. 9319 (the "*Unisystems* Action") and *Merrimack Mutual Fire Insurance Co. et al. v. State Street Bank and Trust Co., et al.,* 07 Civ. 9687 (the "*Andover* Action") with the individual action captioned *Prudential Retirement Insurance and Annuity Company v. State Street Global Advisors, Inc.,* 07 Civ. 8488 (the "*Prudential* Action") under the caption "In re State Street Bank and Trust Co. ERISA Litigation."

WHEREAS, on January 14, 2008, another putative class action, that had been pending in the District of Massachusetts, was filed in this Court under the caption *Nashua Corporation Pension Plan Committee, et al. v. State Street Bank and Trust Co., et al.,* No. 08-CV-0265 (RJH) (the "*Nashua* Action");

WHEREAS, the Court has been advised that plaintiffs and their counsel in the *Andover, Unisystems* and re-filed *Nashua* actions have agreed to the consolidation of those respective putative class actions under the common leadership structure provided for herein, and the Court has been provided with information concerning the qualifications and experience of the class plaintiffs' proposed counsel;

IT IS HEREBY ORDERED THAT:

1.    Pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, the *Nashua* action and any subsequently filed or transferred related actions are **CONSOLIDATED** for pre-trial purposes only with the previously consolidated *Unisystems, Andover* and *Prudential* actions, under the same caption.

2.    In accordance with this Court's January 8, 2008 Order, filings in any of the actions consolidated pursuant to this Order should indicate in the caption the docket numbers of the particular action(s) to which the document relates.

3.    Named plaintiffs Warren Cohen as Trustee of the Unisystems, Inc., Employee' Profit Sharing Plan (the "Unisystems Plan"), Alan Kober as Trustee of the Andover Companies Employee Savings and Profit Sharing Plan (the "Andover Plan"), and John L. Patenaude, Margaret Callan and Karen Adams (as members of the Nashua Corporation Pension Plan Committee) (the "Nashua Plan") (collectively, the "Plans") are hereby

2

**APPOINTED** to serve as Lead Plaintiffs in the above-captioned action and any other related class actions that may be consolidated pursuant to this Order.

4.    The Court hereby APPROVES the Lead Plaintiffs' choice of counsel, namely Bernstein Litowitz Berger & Grossmann LLP, Keller Rohrback L.L.C. and Berman DeValerio Pease Tabacco Burt & Pucillo and hereby APPOINTS them as Co-Lead Counsel and Interim Class Counsel for the proposed Class pursuant to Fed. R. Civ. P. 23(g)(2)(A).

SO ORDERED.

Richard J. Holwell, U.S.D.J.

January 31, 2008

3

**EXHIBIT G**



ROPES & GRAY LLP
1211 AVENUE OF THE AMERICAS    NEW YORK, NY 10036-8704    212-596-9000    F 212-596-9090
BOSTON    NEW YORK    PALO ALTO    SAN FRANCISCO    WASHINGTON, DC    www.ropesgray.com

November 30, 2007

Harvey J. Wolkoff
617-951-7522
harvey.wolkoff@ropesgray.com

**BY HAND**

Hon. Richard J. Holwell
Daniel Patrick Moynihan United States
Courthouse
500 Pearl Street, Room 1950
New York, New York 10007

Re:    *Unisystems, Inc. Employees Profit Sharing Plan v. State Street Bank and Trust Co., et al.*,
       Case No. 07 Civ. 9319 (RJH) ("*Unisystems*"); and

       *The Andover Companies Employees Savings and Profit Sharing Plan v. State Street Bank
       and Trust Co., et. al.*, Case No. 07 Civ. 9687 (Unassigned) ("*Andover*")

Dear Judge Holwell:

       We write on behalf of defendants State Street Bank and Trust Company ("SSBT") and
State Street Global Advisors ("SSgA") (together, "State Street") regarding the two actions
referenced above. The *Unisystems* action has been assigned to Your Honor, while *Andover* has
been referred to Your Honor by the Clerk as possibly related to *Unisystems* and also to a third
action captioned *Prudential Retirement Insurance and Annuity Company v. State Street Bank
and Trust Company, et al.*, Case No. 07 Civ. 8488 (RJH) ("*Prudential*"). We write to request a
pre-motion conference regarding motions to dismiss the *Unisystems* and *Andover* complaints for
lack of standing, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), or in the alternative to
transfer both actions to the District of Massachusetts pursuant to 28 U.S.C. § 1404(a). State
Street intends to request that the Court hear oral argument on these motions.

**Plaintiffs Lack Standing Under ERISA to Bring a Breach of Fiduciary Claim**

       The *Unisystems* and *Andover* complaints are virtually identical, and so are the grounds
for dismissing them. The plaintiff in each case is an "ERISA-qualified plan" that purports to
bring a single claim for breach of fiduciary duty against State Street under ERISA arising from
losses incurred by plan participants in an actively managed bond fund offered by State Street.
The funds lost value in the wake of recent unprecedented market volatility and lack of liquidity.
Each plaintiff purports to sue on behalf of the named plan and a class consisting of all ERISA
plans invested in any State Street bond fund.

ROPES & GRAY LLP

Hon. Richard J. Holwell                    - 2 -                    November 30, 2007

The complaints should be dismissed because the plaintiffs, as plans, lack standing to assert their respective breach of fiduciary duty claims.[1]  ERISA § 502 is clear that only participants, beneficiaries, and fiduciaries of employee benefit plans, as well as the Secretary of Labor, can bring breach of fiduciary duty claims under the statute.  *See* 29 U.S.C. §§ 1109(a), 1132(a)(2).  Plans are not granted standing under Section 502, and these actions must therefore be dismissed.  *See Pressroom Unions-Printers League Income Sec. Fund v. Cont'l Assurance Co.*, 700 F.2d 889, 891-892 (2d Cir. 1983) (dismissing case with prejudice where plaintiff, an ERISA fund, did not qualify to bring action under Section 502.)

Further, the plaintiffs cannot draft around their lack of standing with conclusory allegations that in addition to their roles as plans, they are also participants or fiduciaries within the meaning of ERISA § 502.  A "participant" under ERISA is defined as a present or former employee or member of an employee organization.  *See* 29 U.S.C. § 1002(7).  Clearly, the benefit plans do not fit this definition, and there are no facts alleged in the complaint to suggest they do.  Nor can plaintiffs properly claim to be fiduciaries.  Under ERISA, fiduciaries are defined by their relationship *to* a plan.  *See id.* § 1002(21)(A) (defining a person "as a fiduciary *with respect to a plan*" based upon exercise of "discretionary authority or control" over the plan or rendering of "investment advice" to the plan).  A plan cannot be a fiduciary "with respect to" itself.  In fact, the complaints are replete with allegations that State Street had "sole investment discretion" for the plans, dispelling any notion that the plans themselves acted as fiduciaries.

Finally, plaintiffs cannot create standing by bringing these actions on behalf of purported classes.  *See Tucker v. Berkshire Life Ins. Co.*, No. 98-12575, 1999 WL 329727, at *3-5 (D. Mass. May 19, 1999) (holding that plaintiff who was not an "ERISA beneficiary, participant, or fiduciary" could not "maintain class action claims under ERISA which he does not have standing to assert as an individual").  Because neither plaintiff is a fiduciary, participant, or beneficiary of a covered plan, these actions must be dismissed.

## In the Alternative, This Action Should Be Transferred to the District of Massachusetts

If the Court does not grant State Street's motions to dismiss, it should transfer both *Unisystems* and *Andover* to the District of Massachusetts pursuant to 28 U.S.C. § 1404(a).  The threshold requirement for a transfer is satisfied here: the actions could have been brought in Massachusetts because State Street's principal place of business is in Boston.  *See Glass v. S&M NuTec, LLC*, 456 F. Supp. 2d 498, 501 (S.D.N.Y. 2006).

Having determined that the threshold requirement is met, a court is empowered with discretion to grant a transfer, with consideration to be given to the following factors: (1) plaintiff's choice of forum; (2) locus of operative facts; (3) convenience of the witnesses;

---

[1]  In addition, SSgA is not a separate corporate entity, but only a division of SSBT, and thus should be dismissed from the complaint for this reason alone.

ROPES & GRAY LLP

Hon. Richard J. Holwell                    - 3 -                    November 30, 2007

(4) convenience and means of the parties; (5) location of documents and other sources of proof; (6) availability of process to compel attendance of witnesses; (7) a forum's familiarity with governing law; and (8) efficiency and the interest of justice based on the totality of the circumstances. *See Strauss v. West Highland Corp.*, No. 00 Civ. 0118, 2000 WL 1505957, at *1 (S.D.N.Y. Oct. 6, 2000). On balance, these factors strongly militate in favor of a transfer to Massachusetts.

The location of the witnesses alone, which has been recognized as the most important factor in a transfer motion, *see Hershman v. Unumprovident Corp.*, No. 06 Civ. 5604, 2007 WL 1217271, at *2 (S.D.N.Y. Apr. 25, 2007), warrants a transfer to Massachusetts. The complaints allege that State Street breached its fiduciary duties by investing bond funds in mortgage-backed securities and derivative instruments, and by failing to disclose to plaintiffs the level of risk in the bond funds' portfolios. The State Street employees who may testify to the facts underlying these allegations all reside and work in Massachusetts: the portfolio managers who made the challenged investment decisions; the product engineering teams who analyzed and disclosed the funds' makeup and performance; and the client relationship teams who had the primary contacts with plaintiffs. One of the two named plaintiffs, Andover, is also located in Massachusetts. Material non-party witnesses also reside in Massachusetts. In addition, the relevant documents, likely to be voluminous, are maintained by State Street in Massachusetts, and the conduct underlying the plaintiffs' claims occurred largely in Massachusetts.

Finally, transferring these actions to Massachusetts would promote judicial efficiency because a case involving precisely the same issues is pending in Massachusetts, captioned *Nashua Corporation Composite Trust v. State Street Bank & Trust*, No. 07-CV-12021 (D. Mass. Oct. 24, 2007). *See Barnet v. Elan Corp.*, 245 F.R.D. 158, 164 (S.D.N.Y. 2005).

The totality of the circumstances here, where the parties, witnesses, and documents are in Massachusetts, where the underlying conduct occurred in Massachusetts, and also where a parallel action is proceeding in Massachusetts, strongly counsels in favor of transfer to Massachusetts. *See Mitsui Marine & Fire Ins. Co. v. Nankai Travel Int'l Co.*, 245 F. Supp. 2d 523, 527 (S.D.N.Y. 2003).

* * *

We welcome the opportunity to discuss these motions further with the Court, and respectfully request that the Court inform us if further information is desired.

Respectfully Submitted,

Harvey J. Wolkoff (CRB)

Harvey J. Wolkoff

ROPES & GRAY LLP

Hon. Richard J. Holwell                    - 4 -                    November 30, 2007

cc:    Derek W. Loeser, Esq.
       Barry G. Sher, Esq.
       Edwin G. Schallert, Esq.

**EXHIBIT H**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------X
                                            :
IN RE STATE STREET BANK AND TRUST :
CO. ERISA LITIGATION                        :
                                            :
This document relates to:                   :        07 Civ. 8488 (RJH)
                                            :
07 Civ. 8488                                :
07 Civ. 9319                                :
07 Civ. 9687                                :
                                            :
-----------------------------------------------------------X
```

**PROPOSED JOINT PRE-TRIAL SCHEDULING ORDER**

Pursuant to the January 4, 2008 scheduling conference held before the Court, counsel for

all parties submit the following proposed scheduling order:

**1.    Cutoff date for joinder of additional parties:**

Thursday, July 3, 2008

**2.    Cutoff date for amendments to pleadings:**

Thursday, July 3, 2008

**3.    Schedule for completing discovery:**

**a.    Rule 26(a)(1) disclosures, if not previously completed:**

Friday, February 1, 2008

**b.    Fact discovery completion date:**

Friday, September 12, 2008 for completion of document discovery

Friday, January 2, 2009 for completion of fact depositions

**c.    Rule 26(a)(2) disclosures:**

Friday, January 23, 2009

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/7/08

d.     **Expert discovery completion date:**

Friday, January 23, 2009 for delivery of initial expert reports

Friday, February 27, 2009 for delivery of any rebuttal reports

Friday, May 1, 2009 for completion of expert discovery, including depositions

e.     **Date for filing dispositive motions**

Friday, June 5, 2009

f.     **Date for filing a final pretrial order**

Friday, July 31, 2009

g.     **Propose a trial scheduling, indicating:**

    i.     **Whether a jury trial is requested**

    Plaintiffs do not request a jury trial at this time.

    ii.     **The probable length of trial**

    3-4 weeks

    iii.     **When the case will be ready for trial**

    Monday, August 17, 2009

4.     **Additional matters**

a.     **Briefing schedule on State Street's Response to the Complaint in *Prudential* and its Motion to Transfer**

State Street's response to the Complaint in *Prudential* and its motion to transfer due Monday, February 4, 2008

Plaintiffs' opposition to any motions due Monday, March 10, 2008

State Street's reply in support of any motions due Monday, April 7, 2008

**b. Class certification**

Class Plaintiffs shall submit a motion for class certification by July 31, 2008

**5. Conference with the Court**

The parties will appear before the Court for a conference on May 8, 2009, at 10:00 AM.

Dated:    January 16, 2008

6. absent retraining circumstances, the parties should not anticipate that any requests for extensions of time will be granted

William C. Fredericks (WF-1576)
Jonathan Harris (JH-3047)
Jerald D. Bien-Willner
BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
1285 Avenue of the Americas
New York, New York 10019
Phone: (212) 554-1400
Fax: (212) 554-1444

Lynn L. Sarko (LS-3700)
Derek W. Loeser (DL-6712)
Karin B. Swope (KS-3369)
Tyler L. Farmer (TF-6398)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Phone: (206) 623-1900
Fax: (206) 623-3384

*Attorneys for the Class Action Plaintiffs*

Edwin G. Schallert
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022

*Attorneys for Plaintiff Prudential Retirement
Insurance and Annuity Company*

Jerome C. Katz (JK-0850)
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036-8704
Phone: (212) 596-9000
Fax: (212) 596-9090

Harvey J. Wolkoff
Robert A. Skinner
Olivia S. Choe
ROPES & GRAY LLP
One International Place
Boston, Massachusetts 02110-2624
Phone: (617) 951-7000
Fax: (617) 951-7050

*Attorneys for Defendants State Street Bank
and Trust Company and State Street Global
Advisors, Inc. in the Class Actions*

Barry Sher (BS-4252)
Daniel B. Goldman (DG-4503)
PAUL, HASTINGS, JANOFSKY &
 WALKER LLP
75 East 55th Street
New York, New York 10022-3205
Phone: (212) 318-6000

*Attorneys for Defendants State Street Bank
and Trust Company and State Street Global
Advisors, Inc. in the Prudential Action*

SO ORDERED.

Richard J. Holwell, U.S.D.J.

January 31, 2008

- 4 -

**EXHIBIT I**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
PRUDENTIAL RETIREMENT INSURANCE   :
AND ANNUITY COMPANY,                        :
                                     :
             Plaintiff,        :
                                     :
      vs.                          :        07 Civ. 8488 (RJH)
                                     :
                                     :
STATE STREET BANK AND TRUST      :
COMPANY and                          :
STATE STREET GLOBAL ADVISORS, INC.,  :
                                     :
            Defendants.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PLAINTIFF'S INITIAL DISCLOSURES
## PURSUANT TO RULE 26(a)(1)

Plaintiff Prudential Retirement Insurance and Annuity Company ("Prudential")

hereby provides its initial disclosures pursuant to Rule 26(a)(1) of the Federal Rules of

Civil Procedure. These initial disclosures are based on the information that is available,

after reasonable inquiry, to Prudential as of the date of these disclosures.

By referring in these disclosures to documents and electronically stored

information ("ESI"), Prudential does not represent or acknowledge that such documents,

ESI, or types of documents or ESI, are appropriate subjects for discovery. Prudential

reserves its right to object to any request for the production of documents or ESI (and to

the seeking of discovery by any other means) on any proper ground, including privilege, the attorney work-product doctrine, lack of relevance and undue burden.

## A.    Rule 26(a)(1)(A)(i):  Individuals Likely to Have Discoverable Information

Pursuant to Rule 26(a)(1)(A)(i), Prudential is identifying two groups of individuals who it believes are likely to have discoverable information that Prudential may use to support its claims: (1) Prudential's and its affiliates' employees and consultants, and (2) defendants' and their affiliates' current and former employees.  The individuals in the first group may be contacted through counsel for Prudential.  Prudential does not believe it has contact information that defendants do not have for any of the individuals in the second group.

### 1. Employees and Consultants to Prudential

Tonia Anderson is likely to have discoverable information about the information and data that defendants provided to Prudential regarding the Bond Funds.

Michelle Cappalla is likely to have discoverable information about the information and data that defendants provided to Prudential regarding the Bond Funds.

Adam Cohen is likely to have discoverable information about reports that were created by Prudential for Prudential clients, for use by plan sponsors, plan participants, or both, incorporating information provided by defendants relating to the characteristics and/or performance of the State Street Global Advisors Government Credit Bond Fund and State Street Global Advisors Intermediate Bond Fund (the "Bond Funds").

Joelle Conley is likely to have discoverable information about requests by Prudential, and by one or more Prudential clients, for information regarding the Bond

Funds in the months leading up to Prudential's complete withdrawal from the Bond Funds, and about defendants' responses to such requests, and about Prudential's actions in response to the severe underperformance of the Bond Funds.

Carolyn Delisle is likely to have discoverable information about reports that were created by Prudential for Prudential pension-plan clients or their participants, and/or reports that were created by CIGNA Corporation (much of whose retirement business became part of Prudential's parent company effective April 1, 2004) (together with its subsidiaries, "CIGNA") for CIGNA's pension-plan clients or their participants, incorporating information provided by defendants relating to the description and/or performance of the Bond Funds.

Matthew Dingee is likely to have discoverable information about Prudential's analyses of the performance of the Bond Funds, and about communications between Prudential and defendants and/or Prudential's clients and defendants regarding the Bond Funds, including communications about defendants' investment strategies for the Bond Funds.

Robert Frascona is likely to have discoverable information about Prudential's (or CIGNA's) analyses of the performance and/or characteristics of the Bond Funds and about communications between Prudential (or CIGNA) and defendants (and/or Prudential's (or CIGNA's) clients and defendants) regarding the Bond Funds, including communications concerning defendants' investment strategies for the Bond Funds.

Kathy Gorman is likely to have discoverable information about Prudential's communications with clients about the Bond Funds.

22661606v1

3

Amy Hatfield is likely to have discoverable information about CIGNA's and Prudential's development, marketing and management of retirement plan products, about CIGNA's decision to offer the Bond Funds as an investment option to clients and about Prudential's decision to continue to offer the Bond Funds to clients, including disclosures by defendants about the Bond Funds and communications with Prudential clients regarding the Bond Funds' deteriorating performance.

John Kalamarides is likely to have discoverable information about CIGNA's and Prudential's development, marketing and management of their retirement plan products, including products through which the Bond Funds were offered to CIGNA or Prudential clients.

James Mallozzi is likely to have discoverable information about Prudential's development, marketing and management of its retirement plan products, and its communications with clients about the Bond Funds.

Dean Molinaro is likely to have discoverable information about Prudential's marketing of the Bond Funds to pension-plan clients and their participants and about communications between Prudential and defendants regarding the Bond Funds, including communications about defendants' investment strategies for the Bond Funds.

Marilyn Ortiz is likely to have discoverable information about the information and data that defendants provided to Prudential regarding the Bond Funds.

George Palms, Jr., is likely to have discoverable information about CIGNA's and Prudential's development, marketing and management of their retirement-plan products, including products through which the Bond Funds were offered to clients.

Laura Stern is likely to have discoverable information about Prudential's activities in assisting clients and providing clients with information about funds, including the Bond Funds.

Valerie Weber is likely to have discoverable information about determinations by Prudential of net asset values for the Bond Funds.

## 2. Current and Former Employees of Defendants

The following current and former employees of defendants are likely to have discoverable information about the Bond Funds, including defendants' investment strategies for the Bond Funds and defendants' disclosures to Prudential, CIGNA and others about the nature, performance and investment strategies of the Bond Funds:

| | |
|---|---|
| Marc P. Brown | Mitch James |
| Joseph Dougherty | Kimberly Jones |
| Jane Flaherty | Robert Kania |
| Sean Flannery | John (Chuck) LaPosta |
| Mark Flinn | Ting Li |
| Paul Greff | Ronald Logue |
| Kallie Hapgood | John Morton |
| James Hopkins | Greg Mulready |
| Sonya Hughes | Michael O'Hara |
| William Hunt | Robert Pickett |
| | Michael Wands |

**B.     Rule 26(a)(1)(A)(ii):  Categories of Documents that Prudential May Use**

Pursuant to Rule 26(a)(1)(A)(ii), Prudential states that it may use the following categories of documents, electronically stored information, and tangible things to support its claims:

1.     The declaration of trust establishing the trust or trusts of which defendants served as trustee, units of which were the primary investments of the Bond Funds, together with fund declarations, class descriptions and other ancillary documents.

2.     The contracts between defendants and Prudential (or between defendants and CIGNA), including the investment management agreements between CIGNA and defendants relating to the Bond Funds.

3.     The contracts, agreements and insurance policies between Prudential (or CIGNA) and defined benefit or defined contribution plans, relating to the investment or opportunity for investment of assets of such plans in the Bond Funds or in either of them, including group annuity contracts issued by Prudential (or CIGNA).

4.     Defendants' disclosures to Prudential (or CIGNA) of information about the Bond Funds, including information about the risk characteristics, objectives, investment constraints, asset classes, features and benefits of the Bond Funds.

5.     Defendants' disclosures to Prudential (or CIGNA) of information about the performance of the Bond Funds.

6.    Prudential's (or CIGNA's) disclosures to clients of information about the Bond Funds, and about Prudential's role in monitoring the Bond Funds' performance or other features.

7.    Communications between Prudential (or CIGNA) and defendants relating to the Bond Funds, including Prudential's requests to defendants for disclosure of information relating to the Bond Funds and defendants' responses, and including communications regarding the redemption of investments in the Bond Funds.

These materials are located in (a) documents at the offices of Prudential Financial, Inc., 751 Broad Street, Newark, NJ, 07102, and/or the offices of Prudential Retirement Insurance and Annuity Company, 280 Trumbull Street, Hartford, CT, 06103, and (b) electronic storage devices maintained by Prudential or its affiliates.

## C.    Rule 26(a)(1)(A)(iii):  Computation of Damages

Prudential has not calculated the amounts that it will seek to recover under paragraphs A, B, D or E of its Prayer for Relief.  In paragraph 29 of the Complaint, Prudential stated that the losses to Prudential separate accounts from defendants' misconduct were "currently estimated to be approximately $80 million."  That amount was based on a computation that Prudential performed in September 2007, on the basis of information in Prudential's possession at that time.

Prudential does not expect to rely on that calculation as its measure of damages in this action.  Prudential expects that discovery, fact-finding and expert testimony will lead to the development and presentation of a damages calculation or calculations that will be

substantially higher. For example, Prudential expects that the damages calculation that it will present (a) will reflect losses for a significantly longer period than the computation described in these disclosures and (b) will likely compare losses in the Bond Funds with alternative investment returns that are higher than the index returns used for the computation described herein.

Accordingly, Prudential does not represent or acknowledge that this computation is a calculation of "damages claimed by" Prudential that it intends to use in this action, and does not believe this computation needs to be disclosed under Rule 26(a)(1)(A)(iii).

Prudential states that it made this computation as follows:

1.    For units of the Intermediate Bond Fund that were held by Prudential separate account SA-55A3 (*i.e.*, the "State Street Global Advisors Intermediate Bond Fund") at any time during the period from July 1, 2007, until August 29, 2007, inclusive (the "Intermediate Bond Fund Period"), and for units of the Government Bond Fund that were held by Prudential separate account SA-55A2 (*i.e.*, the "State Street Global Advisors Government/Corporate Bond Fund") at any time during the period from July 1, 2007, until September 5, 2007, inclusive (the "Government Bond Fund Period," and, together with the Intermediate Bond Fund Period, the "Bond Fund Periods"), Prudential computed the aggregate loss in the value of such units during the respective portions of the respective Bond Fund Periods (including, where applicable, an entire Bond Fund Period) during which each such unit was held by one of these separate accounts.

2.      For all units of the Intermediate Bond Fund or Government Bond Fund described in paragraph 1 above, Prudential computed what the aggregate gain in the value of such units hypothetically would have been during the respective portions of the respective Bond Fund Periods (including, where applicable, an entire Bond Fund Period) during which each such unit was held by one of these separate accounts, under the following assumptions:

    (a)    the value of the units in each Bond Fund at the end of the trading day on June 30, 2007 was what the value of those units in fact was at that time;

    (b)    the value of the units in each Bond Fund at the end of each trading day on or after July 1, 2007 was what that value would have been if the performance of each Bond Fund had matched the performance of that Bond Fund's target index on each such day; and

    (c)    the number of units of the Bond Funds that were purchased or sold by the separate accounts on each trading day was the same as the number of units that in fact were bought or sold on that day.

3.      Prudential determined the difference between the aggregate gain calculated as described in paragraph 2 and the aggregate loss calculated as described in paragraph 1, by adding those two amounts. That difference is approximately $79.2 million.

**D.**     **Rule 26(a)(1)(A)(iv):  Insurance Agreement**

Prudential does not maintain any insurance agreement within the terms of Rule

26(a)(1)(A)(iv).

Dated: New York, New York
February 1, 2008

DEBEVOISE & PLIMPTON LLP

By: _Edw Schallert_
       Edwin G. Schallert
919 Third Avenue
New York, New York 10022
(212) 909-6000

Attorneys for Plaintiff

**EXHIBIT J**

PAUL, HASTINGS, JANOFSKY & WALKER LLP
Barry Sher (BS-4252)
Daniel B. Goldman (DG-4503)
75 East 55th Street
New York, NY 10022-3205
Telephone: (212) 318-6000
*Counsel for Defendants State Street Bank and Trust Company
and State Street Global Advisors, Inc.*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE STATE STREET BANK AND TRUST CO. ERISA LITIGATION | Index No. 07-CV-8488 (RJH) |
| This document relates to: 07-CV-8488 (*Prudential Retirement Insurance and Annuity Company v. State Street Bank and Trust Company and State Street Global Advisors, Inc.*) | |

**STATE STREET BANK AND TRUST COMPANY
AND STATE STREET GLOBAL ADVISOR, INC.'S
INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(a)(1)**

Defendants State Street Bank and Trust Company and State Street Global

Advisors[1] (collectively, "State Street"), by and through counsel, hereby comply with Rule

26(a)(1) of the Federal Rules of Civil Procedure, as follows:

### I.      Objections and Reservations

In making these initial disclosures, State Street expressly reserves all objections to

(a) any demand or discovery request by Prudential, or (b) the materiality or admissibility of any

documents or information referred to herein.

---

[1] State Street notes that State Street Global Advisors, Inc. is erroneously named as a defendant. State Street Global Advisors, Inc. is a Delaware holding company with no employees and no operations, and has nothing to do with Prudential or the Funds.  "State Street Global Advisors," a different entity, is a division of State Street Bank and Trust Company.

1

State Street expressly reserves and does not waive the attorney-client privilege, the protections of the work-product doctrine, and any other applicable privileges. State Street will not produce any documents protected by the foregoing privileges and doctrines or any documents containing confidential or proprietary information not relevant to the claims at issue in this action and not likely to lead to the discovery of admissible evidence. State Street further reserves the right to seek an appropriate confidentiality agreement and protective order.

In the event that any document produced by State Street contains privileged, confidential, proprietary or irrelevant information, its disclosure is inadvertent and does not constitute a waiver of any privilege or objection with respect to the disclosed document or any of the information contained therein.

This disclosure is based upon information now available to State Street from its ongoing review of files and other materials in its possession, custody, or control, which it may use to support its defenses.

State Street hereby reserves the right, at any time, to revise, correct, supplement, modify, or clarify the information set forth below, or in the documents referred to herein, to the extent required by law. State Street also reserves the right to identify and call as witnesses additional persons if it learns, during the course of discovery and investigation related to this litigation, that such additional persons may have knowledge of relevant matters.

## II.    Disclosures Pursuant to Rule 26(a)(1)(A)

### A.  Individuals:

A list of individuals likely to have discoverable information that State Street may use to support its claims or defenses is attached as Exhibit A.  All of the identified individuals may be contacted through counsel for State Street (Paul, Hastings, Janofsky & Walker, 75 East 55th Street, New York, NY 10022; (212) 318-6000).  In addition to the individuals listed in Exhibit A, employees or agents of Plaintiff may also have discoverable information that State Street may use to support its claims or defenses.  State Street reserves the right to supplement this disclosure as may be necessary or appropriate.

### B.  Documents:

State Street hereby provides a description of the categories and locations of the documents, electronically stored information ("ESI"), and tangible things in State Street's possession, custody, or control, which it may use to support its claims or defenses.  Unless otherwise indicated, the categories of documents below are located at State Street's principal place of business at One Lincoln Street, Boston, Massachusetts 02111; or at the offices of its counsel, Ropes & Gray, One International Place, Boston, Massachusetts 02110 or Paul, Hastings, Janofsky & Walker, 75 East 55th Street, New York, New York 10022.  State Street reserves the right to supplement these disclosures as may be necessary or appropriate.

1.    Agreements or contracts between State Street and Prudential (or Cigna) governing their relationship and setting forth the investment guidelines.

       2.      Reports and other communications between State Street and Prudential concerning the status of the Prudential accounts, investment decisions made on behalf of the accounts, transaction history, and investment performance.

       3.      Other documents relating to Prudential accounts.

       4.      Documents relating to portfolio management of, and investment decision-making for, the active fixed income funds named in the Complaint.

### C.  Damages:

No disclosure by State Street is currently called for.  State Street reserves the right to supplement this disclosure as may be necessary or appropriate.

### D.  Insurance:

State Street states that it has insurance agreements under which an insurance business may be liable to satisfy part or all of a judgment that may be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment, and will make such agreements available for inspection and copying as under Rule 34.

Dated: New York, New York
       February 1, 2008

                               By:_____/s/ Barry Sher_____
                               Barry Sher (BS-4252)
                               Daniel B. Goldman (DG-4503)
                               75 East 55th Street
                               New York, NY 10022-3205
                               Telephone: (212) 318-6000
                               Counsel for Defendants State Street Bank and Trust Company and State Street Global Advisors, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 1, 2008, I caused a true and correct copy of the

foregoing document to be served by e-mail and first class mail, postage prepaid, upon the

following counsel of record:

Edwin G. Schallert, Esq.
DEBEVOISE & PLIMPTON, LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000
*Attorneys for Plaintiff*

/s/ Barry Sher
Barry Sher

## EXHIBIT A

**William Hunt**

Former President and Chief Executive Officer, State Street Global Advisors

Communications with Prudential regarding fixed income funds


**Sean Flannery**

Former Chief Investment Officer, Americas

Fixed income management practices


**Paul Greff**

Former Director of Global Fixed Income

Fixed income management practices


**Michael Wands**

Former Director of North American Fixed Income

Fixed income management practices


**Michael O'Hara**

Former Director of Active U.S. Fixed Income

Fixed income management practices


**Robert Pickett**

Former Fixed Income Portfolio Manager

Portfolio management of Limited Duration Bond Fund and Intermediate Bond Fund


**Susan Reigel**

Former Fixed Income Portfolio Manager

Portfolio management of Government/Credit Bond Fund

6

**Frank Gianatasio**

Former Fixed Income Portfolio Manager

Portfolio management of Limited Duration Bond Fund


**Brian Kinney**

Fixed Income Portfolio Manager

Fixed income management practices


**James Hopkins**

Vice President and Head of U.S. Fixed Income Product Engineering

Active fixed income product engineering


**Adele Kohler**

Senior Managing Director and Head of Product Engineering

Product engineering practices


**Patrick Armstrong**

Director of Investment Risk Management

Fixed income risk management practices


**Peter Lindner**

Vice President and Head of North American Fixed Income Risk Management

Fixed income risk management practices


**Marc Brown**

Chief Marketing Officer

Communications with Prudential regarding fixed income funds


**Michael Dalis**

Director of Institutional Sub-Advisory Services

Communications with Prudential regarding fixed income funds

**Mark Flinn**

Relationship Manager

Communications with Prudential regarding fixed income funds


**Sonya Hughes**

Relationship Manager

Communications with Prudential regarding fixed income funds


**Brian Burke**

Relationship Manager

Communications with Prudential regarding fixed income funds


**Greg Mulready**

Former Relationship Manager

Communications with Prudential regarding fixed income funds


**Eric Saarinen**

Former Relationship Manager

Communications with Prudential regarding fixed income funds

**EXHIBIT K**



Print | Close this window

## State Street makes more staff changes

Tue Feb 5, 2008 4:35pm EST

By Svea Herbst-Bayliss

BOSTON, Feb 5 (Reuters) - State Street Corp's (STT.N: Quote, Profile, Research) money management unit made more high-profile staff changes in the last four weeks to try to move past last summer's losses at several fixed income funds.

State Street Global Advisors (SSgA), which invests roughly $2 trillion mainly for institutional clients, told its clients that Otello Sturino, who had been the unit's chief operating officer, resigned late last month, according to a document obtained by Reuters on Tuesday.

Sturino's departure came only weeks after his former boss, William Hunt, who had run the fast-growing SSgA unit for three years, resigned.

State Street had announced Hunt's resignation on the same day it said it was forced to set aside $618 million to defend against legal claims stemming from losses on investments tied to mortgage securities.

Sturino's departure will have no impact on the unit's operations, State Street spokeswoman Hannah Grove said on Tuesday, as most of his team will report to Jim Phalen, who was named SSgA's interim CEO in January.

State Street also "terminated" six senior members of SSgA's fixed income team, including Michael Wands, who had been director of North American Fixed Income, and Frank Gianatasio, who had headed structured debt, according to the document.

SSgA appears to be cleaning house after a number of its funds, which had promised clients to pursue low-risk strategies, posted heavy losses in July and August that prompted many investors to ask what happened and whether risk management had been adequate.

The unit's limited duration bond fund, for example, invested the bulk of its assets in mortgage-backed securities and dropped over 40 percent in July and August when the market seized up, people familiar with the offering said.

Late last year, a unit of Prudential Financial Inc was the first State Street client to sue the company over $80 million in losses in 165 retirement plans that were invested in fixed income funds.

In October, months after the heavy losses were first reported, State Street's chief executive Ron Logue touched on the fixed income problem only briefly

on an earnings call when he told analysts he was disappointed by the poor performance at a small number of fixed income funds.

In November, three executives -- Sean Flannery, SSgA's chief North American investment officer; Paul Greff, director of global fixed income; and Michael O'Hara, head of active global fixed income -- left the company.

And in early January, the company made its announcement about Hunt and the charge it would take to defend against the lawsuits. (Editing by Gary Hill)

) Reuters 2007. All rights reserved. Republication or redistribution of Reuters content, including by caching, framing or similar means, is expressly prohibited without the prior written consent of Reuters. Reuters and the Reuters sphere logo are registered trademarks and trademarks of the Reuters group of companies around the world.

Reuters journalists are subject to the Reuters Editorial Handbook which requires fair presentation and disclosure of relevant interests.

# Business Day

## The New York Times

FRIDAY, JANUARY 4, 2008



|  |  |
|---|---|
| & P 500 | 1,447.16 |
| ow industrials | 13,056.72 |
| asdaq composite | 2,602.68 |
| 3-yr. Treasury yield | 3.98% |
| 1e euro | $1.4744 |

| | |
|---|---|
| Unch. | |
| 12.76 | |
| 6.95 | |
| 0.01 | |
| 0.0018 | |

## Street Scene

### Drop Dead Zones for Deals

A number of deals remain in the works, left over from 2007. But many are struggling to close.  **C6**

Intel Exits Laptops for Students    **C3**
Geopolitics and the Price of Oil    **C3**
Tata on Track for Land Rover and Jaguar    **C5**
More Than 4 Years for Inside Trader    **C3**

**C1**

---

## Securities, In a Swoon, Come Home

### FLOYD NORRIS

GRILLOW FINANCE

What better time of year is here than New Year's Eve to re-ease some bad news?

On the other hand, what better ne of year is there for a money manager to engage in a little window dressing to make a portfolio look better? Either way, one end-of-year incident in 2007 illustrates those absurdities: the techniques at banks use to make them-ives appear healthier than they ally are, and the determination some portfolio managers to get hbrous-looking securities out of eir portfolios by the end of the year.

Perhaps, just perhaps, it also ows that some investors have retracted to the credit squeeze 2007, and that there really are rying opportunities around.

The bank in question is Zions encorporation, which operates 10 banks in states from a base Utah. On the other hand, it notified the Securities and xchange Commission that it ad been forced to bail out an off-liance-sheet affiliate by pur-asing $840 million of securities om it. That move produced an mmediate loss of $33 million, nce Zions paid more than the

... month charge in outstanding sset-backed commercial paper

---

## Parent of Dating Sites Looks for a Match

### By ANDREW ROSS SORKIN

Wanted: Single dot-com Yenta seeks ambitious Mr. Big with deep pockets for a long-term re-lationship.

The parent company of the popular Jewish online dating site JDate has put itself up for sale, people close to the auction said Thursday, and is already in talks with several prominent media companies.

The owner of JDate.com, Spark Networks, which owns dozens of online personal sites aimed at religious, ethnic and other special interests, is in ear-ly talks with IAC/Inter-ActiveCorp, the Barry Diller company that owns Match.com, and MySpace, which is part of the News Corporation, these people said.

Shares of Spark, which trades under the ticker LOV, have jumped more than 20 percent in recent weeks; its shares closed from 2005 to 2008.

Online dating sites have ex-

### LEADING ONLINE PERSONALS SITES

Web sites for dating and personals have grown rapidly though in recent years have begun to slow. Here are some of the leading sites and groups of sites.

| SITE(S) | VISITORS (NOV.) IN MILLIONS |
|---|---|
| Yahoo Personals | |
| Match.com sites | |
| Singlesnet.com | |
| eHarmony.com | |

Source: comScore Media Metrix

| TOP SPARK NETWORKS SITES | VISITORS (NOV.) IN MILLIONS |
|---|---|
| AmericanSingles.com | 1.20 |
| BBWPersonalsPlus.com | 0.57 |
| blacksingles.com | 0.24 |
| ChristianMingle.com | 0.22 |
| JDate.com | 0.12 |

THE NEW YORK TIMES

ploded in popularity in recent years as both the younger and older generations have flocked to them to meet people. Social net-works generated nearly $650 million a year in sales.

Some industry executives, however, have questioned the company's growth prospects; the company's growth only 5 percent year-over-year gains of more than 70 percent early in the dec-

Continued on Page 2

company a market value of $314.4 million. Analysts suggest-ed that a suitor might pay as much as $185 million for the company.

---

## State Street Corp. Is Sued Over Pension Fund Losses

### By VIKAS BAJAJ

The State Street Corporation, which manages $2 trillion for pension funds and other institu-tions, ousted a senior executive on Thursday and said it would set aside $618 million to cover legal claims stemming from in-vestments tied to mortgage se-curities.

State Street made the an-nouncement after five executives were told would be largely in-vested in risk-free debt, like State Street funds that they sued it, claiming they had lost tens of millions of dollars in State Street funds that they were told would be largely in-vested in risk-free debt, like Treasuries. One fund lost 28 per-cent of its value during the cred-it troubles in the summer after placing big bets on mortgage-related securities, according to the lawsuits.

The move by State Street highlights the legal challenges that lie ahead for financial firms

that were involved in the origi-nation, packaging and sale of complex mortgage securities.

Last month, a town in Aus-tralia sued a unit of **Lehman Brothers** for selling it collater-ized debt obligations that it de-refuted by the firm. In Norway, eight towns have sued over in-vestments tied to mortgage se-curities.

**Terra Securities** filed for bank-ruptcy protection in November after regulators revoked its li-cense for selling risky Ameri-can securities to a cluster of towns near the Arctic Circle. The eight towns bought the se-curities, which were sold by these securities' fraud suits," said Gregory J. Hindy, a secur-ties lawyer and partner at Mc-Carter & English in Newark. "There could be many, many more."

A study published by the Stanford Law School and Cor-nerstone Research on Thursday

Continued on Page 6



# State Street, the Investment Manager, Is Sued Over Pension Fund Losses

*From First Business Page*

found that the number of securities lawsuits filed in 2007 increased 43 percent from the year before. The study attributed the increase to the subprime crisis.

The total number of lawsuits, 166, still remained below...

The company will take a $279 million after-tax charge to account for the reserve. State Street also said it had closed some funds, dismissed a few lower-level employees and changed some investment...

"However, I want to be clear here," Ronald E. Logue, chairman and chief executive, said in a conference call with analysts. "We will continue to defend ourselves against inappropriate claims, including those that seek recovery of investment losses arising solely from changes in market condition."

State Street, which is based in Boston, said it had set aside the reserves because it wanted to put the issue behind it and because of a "desire to fully respond to customer concerns," the company said William H. Hunt had resigned as chief executive of State Street Global Advisors, its investment management unit. He will be succeeded on an interim basis by James S. Phalen, who is currently an executive vice president.



James S. Phalen, left, will succeed William W. Hunt at State Street.

PHOTOGRAPHS BY BOB LIN/PORTRAIT



Shares of State Street surged after the announcement, closing at $6.49, or stocks, upgraded State Street stock to a buy, citing the company's strong revenue...

At least four of the lawsuits against State Street stem from mortgage- or sub-prime-related investments the company made for pension fund clients. The suits assert that the company has not yet responded to the complaints in court, but is seeking to have the Nashua case dismissed.

has been bearish on other financial pension funds at a manufacturing firm in New Hampshire, Nashua Corporation, and an insurance company, Andover Companies.

State Street executives declined to discuss the allegations.

The company has not yet responded to the complaints in court, but is seeking to have the Nashua case dismissed.

Others seeking damages include pension funds at a manufacturing firm in New Hampshire, Nashua Corporation, and an insurance company, Andover Companies.

One executive at State Street told Prudential employees that its strategy had changed and it "forgot there was a lot more risk in the strategy," according to the suit.

in securities that did not fit the tolerance of its clients. It was unclear who brought the fifth suit.

In one case, Prudential Retirement Insurance and Annuity Company asserts that its clients — 165 retirement plans covering 28,000 people — lost $80 million by investing with State Street. The lawsuit asserts that State Street had, over the last year, invested in subprime mortgages and other derivative contracts in a fund that was supposed to invest only in Treasuries and corporate bonds. When Prudential sought information about the investments, the suit alleges, its representatives received evasive and incomplete answers.

The pension funds are suing under the Employee Retirement Income Security Act, or Erisa, a law passed in 1974 to protect employees' pension benefits. The law requires managers to act "solely in the interest" of the plan's participants and beneficiaries.

Proving that a manager breached a fiduciary duty to pensioners is generally harder than proving securities fraud, said Mr. Hindy. In the suit, he said a recent decision by the Supreme Court made it even more difficult to win such cases by requiring that plaintiffs demonstrate that the defendants intended to defraud investors.

"The plaintiffs' bar is very clever," Mr. Hindy said. "They are looking at Erisa as a way to get out of fraud pleading requirements."

Mr. Hindy said defendants in subprime securities lawsuits would most likely argue that investors made money from the investments for a time and knew or should have known that they were at risk they could lose money. They may prefer to settle the lawsuits in question, rather than let the bonds in question were highly rated by credit ratings agencies.

Gerald H. Silk, a lawyer who is representing two of the plaintiffs, Andover and Unisystems, said State Street had so far not offered to settle the suits.

---

## Securities, in a Swoon, Come Home

*From First Business Page*

> *Indebtedness can be shifted around, but it cannot be maintained.*

buy them at book value. If Lockhart cannot raise money by selling commercial paper to investors, Zions will buy the paper or buy some of Lockhart's assets. For all practical purposes, Lockhart is part of Zions.

Zions has disclosed this arrangement over the years, to investors presumably understood per market, and at lower rates than Lockhart was offering to pay that seems odd. Why would anyone prefer lower-yielding paper with less security? If the answer is that this is true of dozens of other banks.

The reason for the last-minute disclosure of the purchase of assets is that as 2007 ended Lockhart found it impossible to sell enough asset-backed commercial paper, even though Zions itself has purchased $710 million of Lockhart paper. Since Lockhart could not sell the paper, Zions had to buy the paper.

in the unsecured commercial paper market, and at lower rates than Lockhart was offering to pay. That seems odd. Why would anyone prefer lower-yielding paper with less security? If the answer is that this is true of dozens of other banks.

The reason for the last-minute disclosure of the purchase of assets is that as 2007 ended Lockhart found it was backed by both collateral and your promise to repay, and had a higher interest rate?

The answer is that asset-backed commercial paper has gotten a bad name, as unwary investors...

mortgages. So money managers, whose year-end portfolios were subject to scrutiny by customers, fled from such paper. The amount of outstanding asset-backed commercial paper declined rapidly as the end of the year approached, although it edged up this week, after the year-end numbers were recorded.

The Financial Accounting Standards Board and the bank regulators know all about this, and they have been talking about making changes for years. But it is complicated, and nothing seems to happen.

We probably will get action if and when there is a good scandal. Perhaps some bank will fail all seven though it seemed to be safe plenty of capital. It turned to reflect economic reality. In the meantime, banks will be able to keep assets of capital, it seemed to have plenty of capital. I turned to reflect economic reality. In the meantime, changing the rules to reflect economic reality. In the meantime, banks will be able to keep assets

---

*Back of the Envelope*

Wall Street firms are expected to pare jobs the way, but the cuts could be deep. Nationwide, the securities industry employed a record 848,400 people as of September, eclipsing the previous peak set in March 2001.

**U.S. securities industry employment**

```
800,000 workers
600,000
400,000
200,000
0
        '92 '93 '94 '95 '96 '97 '98 '99 '00 '01 '02 '03 '04 '05 '06 '07
```

THE CHURN

Source: U.S. Bureau of Labor Statistics                 THE NEW YORK TIMES

THE WALL STREET JOURNAL.

# MUTUAL FUNDS

**FUND TRACK | By Diya Gullapalli and Jennifer Levitz**

# Credit Woes Hit Mutual-Fund Executives

## Units of Bank of America, State Street Reshuffling Their Investment Teams

State Street Global Advisors and Bank of America's Columbia Management unit are making significant changes to their investment teams—suggesting that the recent credit-market turmoil is starting to hit fund companies' executive ranks.

State Street Global, a **State Street Corp.** unit, announced the departure of three executives in its bond team earlier this week, including its chief investment officer for investments in North America. Yesterday, Columbia Management said it is combining its bond and cash areas and changing the reporting structure for some key executives in that unit.

Such firms have had headaches in recent months as some of their big holdings have come under selling pressure for instance, those tied to structured investment vehicles and mortgage-related debt.

Regarding the management changes, "I think you could expect to see more of this," says one executive who is based at the Chicago research arm Morningstar Inc. "I don't think that these are one-time changes."

The three departures of high-ranking executives come amid fresh regulatory scrutiny over losses in certain bond funds at State Street Global, or SSGA. State Street is already facing three lawsuits, two of which could potentially be named class-actions, and is steadily losing assets in its bond mutual funds, with the matter likely to get aired yesterday that securities regulators in the office of Massachusetts Secretary of State William Galvin sent a subpoena to State Street concerning the losses.

Regulators are looking at whether investors in the funds were informed of the risks, and whether the funds followed disclosed objectives.

A State Street spokeswoman says, "We routinely work with governmental agencies and other regulators and do not comment on individual inquiries."

Asked whether the executive exits were related to the losses, Arlene Roberts, a spokeswoman at State Street, said: "We certainly hold people accountable for investment performance. As a result, changes were inevitable."

The departures include Sean Flannery, who was the chief investment officer for issued holdings, SSGA in North America. Mr. Flannery wrote to pension-fund and other institutional clients on Aug. 14 saying State Street's fixed-income funds had seen a more day that the money-market-type funds it manages "are certain to have seen a more lated losses" to find attractive yields, and that the "level of underperformance" was "unprecedented in our 30-year history as a fixed-income manager."

In a statement, State Street said Mr. Flannery left to pursue other opportunities.

Also exiting were Paul Greff, who led State Street's fixed-income team for the past two years, and Michael O'Hara, who was head of the active fixed-income division. State Street has switched to having four new chief investment officers—each in charge of an asset class—instead of a regional chief investment officer, a role Mr. Flannery filled.

Columbia managed $215 billion in cash assets through the end of September.

Meanwhile, Columbia Management announced the formation of the new "Fixed-income Investments and Liquidity Strategies" area, which will be run by Stephen Peacher, formerly head of the bond investment group. To manage the changes, the firm's head of cash investment, Randy Royther, will report to Mr. Peacher.

The changes will report directly to William Hunt, the president and chief executive officer of SSGA.

### 'Market Timing' Payout Made

The Securities and Exchange Commission yesterday said it distributed $31.5 million to about 150,000 Massachusetts Financial Services Co. investors who were injured by "market timing" between 1999 and 2003 at the unit of **Sun Life Financial.**

The commission said this is the first in a series of disbursements that will return about $1 billion to affected MFS account holders.

The Fair Fund resulted from an SEC enforcement action in 2004 charging unlawful conduct by MFS and two of its former officers by allowing widespread market-timing trading in certain of its mutual funds contrary to those funds' public disclosures.

—Shirleen Dorman

funds, given recent challenges in their STV-issued holdings.

Such moves help explain why Standard & Poor's Ratings Services reported yesterday that the money-market-type funds it manages "are certain to have seen a more lated" Assets in STV exposure in the past two months. It states STV exposure in the past 40% decline in STV exposure in the past two months to about $50 billion through early November.

The decrease was attributed to the maturity of existing holdings and sponsors of rated funds purchasing STV holdings.

## Mutual Fund Scorecard



Health & Biotechnology

**Objective**
Funds investing in companies related to health care, medicine and biotechnology. At right, $10,000 invested 52 weeks ago.

### Ways to Invest

Returns for periods ended November 20, 2007 on the biggest and on the best and worst 3-year-to-date Health & Biotechnology Funds

### Benchmarks & best fund

| | | |
|---|---|---|
| Science & Technology Finds | 12.1 | 11.5 |
| Touchstone HlthSci&A | 20.6 | 20.6 |

### 10 biggest funds

### Year-to-date top performers

### Year-to-date bottom performers

## Lipper Indexes

(Stock-fund and bond-fund index data tables)

**EXHIBIT L**



# STATE STREET CORP (STT)

STATE STREET FINANCIAL CENTER
ONE LINCOLN STREET
BOSTON, MA 02111
617. 786.3000
http://www.statestreet.com/

# 8–K

**8–K**
**Filed on 01/03/2008 – Period: 01/02/2008**
File Number 001–07511



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C.  20549**

# FORM 8–K
### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported):  **January 2, 2008**

# State Street Corporation
(Exact name of registrant as specified in its charter)

| **Massachusetts** | **001–07511** | **04–2456637** |
|---|---|---|
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

| **One Lincoln Street, Boston, Massachusetts** | **02111** |
|---|---|
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code:  **(617) 786–3000**

Check the appropriate box below if the Form 8–K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐     Written communications pursuant to Rule 425 under the Securities Act
☐     Soliciting material pursuant to Rule 14a–12 under the Exchange Act
☐     Pre–commencement communications pursuant to Rule 14d–2(b) under the Exchange Act
☐     Pre–commencement communications pursuant to Rule 13e–4(c) under the Exchange Act

**Item 2.02.          Results of Operations and Financial Condition.**

On January 3, 2008, State Street Corporation announced that it will record a charge in the fourth quarter of 2007 and updated its guidance for the 2007 fiscal year. The press release issued by State Street in connection with the announcement is furnished as Exhibit 99.1 to this current report on Form 8–K and is incorporated herein by reference.

The press release furnished with this current report on Form 8–K includes ranges and estimates for State Street's expected 2007 full year earnings per share and return on equity, each stated on an operating basis, excluding the impact of the fourth quarter 2007 charge identified above, the impact of merger and integration costs relating to State Street's acquisition of Investors Financial Services Corp. in 2007 and, for purposes of 2006 comparisons, tax–related adjustments in 2006 primarily associated with tax legislation and leveraged leases. Operating–basis results, as defined by management, for 2007 exclude the impact of the fourth quarter 2007 charge identified above and the merger and integration costs relating to the Investors Financial acquisition and for 2006 exclude the impact of the 2006 tax–related adjustments. Management measures State Street's financial goals and related results on an operating basis to provide financial information that is comparable from period to period and to present comparable financial trends with respect to our ongoing business operations. The fourth quarter 2007 charge identified above, the merger and integration costs related to the Investors Financial acquisition and the 2006 tax adjustments are not part of our normal ongoing business operations, and as a result, may limit a meaningful comparison of earnings per share and return on equity with that of other periods. Management believes that operating–basis financial information, in addition to financial information prepared in accordance with generally accepted accounting principles, facilitates an investor's understanding and analysis of State Street's underlying performance and trends.

**Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

(b)          On January 2, 2008, William W. Hunt, Vice Chairman of State Street Corporation and President and Chief Executive Officer of State Street Global Advisors, State Street's investment management business, resigned from his positions with State Street and SSgA.

(e)          On January 2, Mr. Hunt and State Street entered into an agreement, setting forth the terms of Mr. Hunt's separation from State Street. Pursuant to the agreement and related State Street plans, Mr. Hunt is entitled to severance compensation and benefits in a mix of cash payments and resolution of outstanding equity awards with a value of approximately $14.1 million in the aggregate. This value excludes the intrinsic value of Mr. Hunt's stock options and stock appreciation rights that were already vested (approximately $4.1 million, based on the per share closing price of State Street common stock  on the New York Stock Exchange on January 2, 2008) and vested retirement benefits (approximately $900,000 as of December 31, 2006). Mr. Hunt is not entitled to any bonus payment in respect of 2007 under the separation agreement, State Street's Senior Executive Annual Incentive Plan or any other State Street annual incentive compensation plan. The separation agreement will become effective on January 10, 2008, provided that Mr. Hunt does not revoke the release of claims against State Street set forth in the

–2–

agreement.  As of the filing of this current report on Form 8–K, Mr. Hunt has not revoked the release.

    In accordance with the terms of State Street's severance plan, Mr. Hunt is entitled to cash severance compensation in an amount equal to his current annual base pay of $750,000 for each year during the two–year period following his separation.  In addition, pursuant to the separation agreement, Mr. Hunt is entitled to cash payments equal to $5.5 million in the aggregate in full satisfaction of all equity–based awards held by Mr. Hunt under State Street's 1997 and 2006 equity incentive plans, other than the stock options, the stock appreciation rights, the 1997 equity incentive plan performance award and the SSgA performance–based equity award described below.  Due to the requirements of Section 409A of the Internal Revenue Code, the first six months of the cash severance compensation payments and the cash payments in satisfaction of these equity awards will not be paid to Mr. Hunt until six–months following his separation from State Street.

    Mr. Hunt holds stock options and stock appreciation rights under State Street's 1997 and 2006 equity incentive plans.  Pursuant to the terms of the equity plans and award agreements, Mr. Hunt will retain his vested stock options and vested stock appreciation rights, which will remain exercisable for three months following his separation from State Street.  Mr. Hunt's unvested stock options and stock appreciation rights will continue to vest and be exercisable following his resignation to the extent so–provided under the terms of the equity incentive plans and award documentation, which may be for up to four years following his separation from State Street.  The approximate intrinsic value of Mr. Hunt's unvested stock options and stock appreciation rights that are scheduled to vest following his separation from State Street, based on the per share closing price of State Street common stock on the New York Stock Exchange on January 2, 2008, is $1.3 million.  This amount is included in the $14.1 million aggregate value amount referenced above.  In addition, Mr. Hunt holds a performance award under the 1997 equity incentive plan that vested on December 31, 2007, pursuant to which Mr. Hunt is entitled to receive shares of State Street common stock on or about February 15, 2008.  The approximate value of this performance award is $770,000, based on the per share closing price of State Street common stock on the New York Stock Exchange on January 2, 2008.

    Mr. Hunt also holds a performance–based equity award under the 2006 SSgA performance equity program covering the 2006–2008 period.  In accordance with the terms of this award, on February 15, 2009, Mr. Hunt is entitled to receive two–thirds of the number of shares of State Street common stock Mr. Hunt would have received under the award had he remained employed by State Street through that date.  However, pursuant to the separation agreement, if the aggregate value of those shares is greater than $5.0 million, Mr. Hunt will be entitled to only that number of shares with an aggregate value equal to $5.0 million, and the remainder of the shares underlying the award will be forfeited.  If the aggregate value of those shares is less than $5.0 million, pursuant to the separation agreement, Mr. Hunt is entitled to receive a cash payment in an amount equal to $5.0 million minus the value of the shares.  The value of shares delivered under this award will be determined based upon the per share closing price of State Street common stock on the New York Stock Exchange on February 15, 2009.

    The separation agreement recognizes that Mr. Hunt is entitled to receive his accrued vested benefits under State Street's tax–qualified and non–qualified retirement plans in

–3–

accordance with their terms.  Mr. Hunt is not entitled to any benefits under State Street's executive supplemental retirement plan, as he was not vested in his accrued benefit under that plan as of his separation from State Street.

Under the separation agreement, Mr. Hunt has agreed that he will not, during the 18–month period following his resignation, accept employment with or provide services to specified competitors of State Street, solicit any customer, prospective customer, investor, officer or principal of State Street or induce a client or customer of State Street with whom he or persons he supervised had significant personal contact to transfer its business from State Street.  However, Mr. Hunt may establish a hedge fund six months following his separation from State Street or join an independent hedge fund twelve months following that separation without violating his obligations under the agreement.  Mr. Hunt has also agreed not to disclose State Street confidential information or disparage State Street, its personnel or its customers, and State Street has agreed not to disparage Mr. Hunt.  Pursuant to the agreement, in the event that Mr. Hunt breaches any of these obligations, State Street is entitled, among other things, to immediately cease making any severance payments to Mr. Hunt, including the cash payments related to his equity awards, and to cancel any outstanding unexercised stock options or stock appreciation rights or unsettled stock awards.

As noted above, the separation agreement will be effective upon the effective date of a release of claims against State Street by Mr. Hunt.  Under the agreement, State Street has also released Mr. Hunt from certain types of claims, if any, arising prior to his separation.

**Item 9.01.**    **Financial Statements and Exhibits.**

(d) *Exhibits.*

99.1    Press release dated January 3, 2008.

–4–

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

STATE STREET CORPORATION

By:      /s/ James J. Malerba
Name:   James J. Malerba
Title:    Senior Vice President and
          Corporate Controller

Date: January 2, 2008

S–1

**EXHIBIT INDEX**

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press release dated January 3, 2008. |

E–1



# STATE STREET CORP (STT)

STATE STREET FINANCIAL CENTER
ONE LINCOLN STREET
BOSTON, MA 02111
617. 786.3000
http://www.statestreet.com/

# EX–99.1

**EX–99.1**
**8–K Filed on 01/03/2008 – Period: 01/02/2008**
File Number 001–07511



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Exhibit 99.1

# STATE STREET PRESS RELEASE

January 3, 2008

**Investors and Analysts:**

Edward J. Resch                Kelley MacDonald
+1 617/664–1110                +1 617/664–2888

**Media:**

Hannah Grove                  Arlene Roberts                Carolyn Cichon
+1 617/664–3377               +1 617/664–3933               +1 617/664–8672

## STATE STREET RECORDS NET AFTER–TAX CHARGE OF $279 MILLION, OR $0.71 PER SHARE, IN THE FOURTH QUARTER OF 2007

### Establishes Reserve to Address Legal Exposure and Other Costs Relating to Active Fixed–Income Strategies Exposed to Sub–Prime Mortgage Markets

### James S. Phalen Named Interim CEO of State Street Global Advisors

### 2007 Revenues Expected to Grow in Excess of 30% Compared to 2006, Driven by Strong Business Growth

**Boston — January 3, 2008** — State Street Corporation (NYSE:STT) announced today that it will record a net charge, after taxes, in the fourth quarter of 2007 of $279 million, or $0.71 per share. The purpose of the charge is to establish a reserve to address legal exposure and other costs associated with the underperformance of certain active fixed–income strategies managed by State Street Global Advisors (SSgA), the company's investment management arm, and customer concerns as to whether the execution of these strategies was consistent with the customers' investment intent. As a consequence of the unprecedented events in the credit markets over the past six months, these strategies were adversely impacted by exposure to, and the lack of liquidity in, sub–prime mortgage markets. In aggregate, the reserve will be $618 million on a pre–tax basis. The impact to earnings of the net charge, after taking into account the tax effect of the reserve and associated lower incentive compensation cost, will be $279 million.



State Street also announced that James S. Phalen, currently executive vice president and head of international operations for investment servicing and investment research and trading, is returning to SSgA as interim president and chief executive officer. Phalen, age 57, succeeds William W. Hunt who has resigned from State Street. Phalen will report to Ronald E. Logue, chairman and chief executive officer of State Street. The company has initiated a global search for SSgA's new CEO, which will focus on both internal and external candidates.

Logue said, "We have reviewed the actively managed fixed–income strategies at SSgA that contained investments backed by sub–prime mortgages. Based on our review and discussions with certain customers who were invested in these strategies, we have established this reserve to address legal exposure and other costs relating to these strategies."

Logue continued, "State Street values its reputation as a trusted fiduciary to institutions around the world and recognizes the critical importance of preserving this reputation with its customers. Some of our customers that were invested in the active fixed–income strategies have raised concerns that we intend to address. Nevertheless, we will continue to defend ourselves vigorously against inappropriate claims, including those that seek recovery of investment losses arising solely from changes in market conditions. With this reserve, SSgA can continue its focus on delivering the highest quality of service to its customers and on steadily expanding its business."

Earnings per share for 2007 are expected to be between $3.42 and $3.45 per share, and return on equity is expected to be approximately 13%, all on a GAAP basis.

On an operating basis, which excludes the impact of the charge announced today, the merger and integration costs associated with State Street's acquisition of Investors Financial in July 2007, and, for 2006, the effect of 2006 tax adjustments of $65 million, or $0.20 per share, 2007 earnings per share is expected to be between $4.54 and $4.57 per share and return on equity is expected to be approximately 17.5%. Both operating earnings per share and return on equity for 2007 are expected to be above the ranges provided on October 15, 2007. This outlook for full–year earnings per share on an operating basis compares to 2006 results of $3.46 per share. The company continues to expect to exceed the year–over–year revenue growth range of 20% to 22% provided on October 15, 2007.

"Our business continues to be very strong, with revenue growth expected to be in excess of 30 percent in 2007 compared to 2006. We also continue to expect to exceed our ranges for operating earnings per share and return on equity," said Logue. "We remain committed to the active investment management business and have made changes to the investment teams to address the underperformance experienced in the active fixed income strategies exposed to sub–prime mortgages. We are very fortunate to have an experienced executive like Jim Phalen to step in and lead the business

2

and work alongside SSgA's strong management team.  His deep understanding of State Street's customers will allow a seamless transition in his interim role."

In his current role, Phalen is responsible for State Street's investment services and investment research and trading operations outside of North America and is a member of State Street's Operating Group, the company's most senior strategy and policy–making team. He spent more than five years at SSgA as a member of its Executive Management Group managing significant portions of SSgA's business.  In 2000, having overseen the combination of SSgA and Citigroup's retirement business to form CitiStreet, he became CitiStreet's CEO.

He returned to State Street in 2005 and was appointed head of State Street's investment servicing business in North America before assuming his international role in 2007.

"I welcome this opportunity to return to SSgA and to work directly again with many of my longstanding colleagues," said Phalen. "SSgA has an exceptional team of professionals, and I look forward to helping them continue to build on their track record of growth and industry innovation."

**INVESTOR CONFERENCE CALL**

State Street will webcast an investor conference call to discuss this announcement today, January 3, 2008, at 8:30 a.m. EST, available at www.statestreet.com/stockholder. The conference call will also be available via telephone, at +1 719/325–4829 (confirmation code 4642630). Recorded replays of the conference call will be available on the website, and by telephone at +1 719/457–0820 (passcode 4642630), beginning at 2:00 p.m. today. This press release is available on State Street's website, at www.statestreet.com/stockholder, under "Investor News."

**About State Street Corporation**

State Street Corporation (NYSE: STT) is the world's leading provider of financial services to institutional investors including investment servicing, investment management and investment research and trading. With $15.1 trillion in assets under custody and $2.0 trillion in assets under management at September 30, 2007, State Street operates in 26 countries and more than 100 geographic markets worldwide. For more information, visit State Street's web site at www.statestreet.com.

**About State Street Global Advisors**

State Street Global Advisors, the investment management arm of State Street Corporation (NYSE: STT), delivers investment strategies and integrated solutions to clients worldwide across every asset class, investment approach and style. With $2.0 trillion in assets under management as of September

3

30, 2007, State Street Global Advisors has investment centers in Boston, Hong Kong, London, Milan, Montreal, Munich, Paris, Singapore, Sydney, Tokyo and Zurich, and offices in 25 cities worldwide. For more information, visit State Street Global Advisors at www.ssga.com.

## FORWARD–LOOKING STATEMENTS

This news announcement contains forward–looking statements as defined by United States securities laws, including statements about the financial outlook and business environment, exposure to claims and the adequacy of our reserve. These statements are not guarantees of future performance, are inherently uncertain, are based on current assumptions that are difficult to predict and involve a number of risks and uncertainties. Therefore, actual outcomes and results may differ materially from what is expressed in those statements, and those statements should not be relied upon as representing State Street's expectations or beliefs as of any date subsequent to the date of this release.

Important factors that may affect future results and outcomes include:

- State Street's ability to integrate and convert acquisitions into its business, including the acquisition of Investors Financial Services Corp.;

- the level and volatility of interest rates, particularly in the U.S. and Europe; the performance and volatility of securities, currency and other markets in the U.S. and internationally; and economic conditions and monetary and other governmental actions designed to address those conditions;

- the liquidity of the US and European securities markets, particularly the markets for fixed income securities, including asset–backed commercial paper; and the liquidity requirements of our customers;

- State Street's ability to attract non–interest bearing deposits and other low–cost funds;

- the results of litigation and similar disputes and the effect that any such results may have on SSgA's reputation and its ability to attract and retain customers;

- the possibility that the ultimate costs of the legal exposure associated with SSgA's actively managed fixed income strategies may exceed or be below the reserve, in view of the uncertainties of the timing and outcome of litigation, and the amounts involved;

- the possibility of further developments of the nature giving rise to the legal exposure associated with SSgA's actively managed fixed income and other investment strategies;

- the performance and demand for the investment products we offer;

- the competitive environment in which State Street operates;

- the enactment of legislation and changes in regulation and enforcement that impact State Street and its customers, as well as the effects of legal and regulatory proceedings, including litigation;

- State Street's ability to continue to grow revenue, control expenses and attract the capital necessary to achieve its business goals and comply with regulatory requirements;

- State Street's ability to control systemic and operating risks;

- trends in the globalization of investment activity and the growth on a worldwide basis in financial assets;

- trends in governmental and corporate pension plans and savings rates;

- changes in accounting standards and practices, including changes in the interpretation of existing standards, that impact State Street's consolidated financial statements; and

- changes in tax legislation and in the interpretation of existing tax laws by U.S. and non–U.S. tax authorities that impact the amount of taxes due.

Other important factors that could cause actual results to differ materially from those indicated by any forward–looking statements are set forth in State Street's 2006 Annual Report on Form 10–K and its subsequent SEC filings. State Street encourages investors to read its 10–K, particularly the section on Risk Factors, and its subsequent SEC filings for additional information with respect to any forward–looking statements and prior to making any investment decision. The forward–looking statements contained in this press release speak only as of the date hereof, January 3, 2008, and State Street will not undertake efforts to revise those forward–looking statements to reflect events after this date.

# # #

5

**EXHIBIT M**



# STATE STREET CORP (STT)

STATE STREET FINANCIAL CENTER
ONE LINCOLN STREET
BOSTON, MA 02111
617. 786.3000
http://www.statestreet.com/

# EX–10.16

**EX–10.16**
**10–K Filed on 02/15/2008 – Period: 12/31/2007**
File Number 001–07511



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

QuickLinks  –– Click here to rapidly navigate through this document

EXHIBIT 10.16

## SEPARATION AGREEMENT

This Separation Agreement (hereinafter the "Agreement") is made and entered into by and between State Street Corporation ("State Street"), and on behalf of State Street Bank and Trust Company (together with State Street, the "Company"), and William W. Hunt (the "Executive"), dated as of January 2, 2008, and effective on the Effective Date (as defined in Section 20(i) hereof). The parties seek through this Agreement to recite the mutually agreed upon terms and conditions of the Executive's separation from the Company.

1.  *Termination of Employment.*    The Executive hereby resigns, as of January 2, 2008 (the "Separation Date"), from his position of employment as Vice Chairman of State Street and Chief Executive Officer of the State Street Global Advisors business unit of the Company, as well as from all officerships and directorships of the Company and any of its affiliates and subsidiaries (the "Company Group"), including from the boards and committees of any related trusts or foundations and from any other entities controlled by the Company Group. The Company hereby accepts the Executive's voluntary resignation from the Company Group, as herein described, effective as of the Separation Date.

2.  *Base Salary; Additional Payments.*    The Executive shall be entitled to receive base salary at the annualized rate of $750,000 currently in effect (the "Base Pay") for any unpaid periods of employment through and including the Separation Date, such amount to be paid in accordance with the Company's standard payroll practices. The Executive shall receive reimbursement for all properly documented and reimbursable business expenses that are submitted to the Company within 30 days of the Effective Date. The Executive shall additionally receive payment for any accrued but unused vacation, as reflected in the books and records of the Company, within two weeks of the Effective Date.

3.  *Severance Compensation.*    Subject to Section 20(i) hereof, upon the Separation Date and continuing until the second anniversary of the Separation Date (the "Severance Compensation Period"), the Company will provide the Executive with severance compensation in an amount equal to the Base Pay for such two–year period in accordance with the terms of the State Street Corporation Severance Plan (the "Severance Plan") (except as otherwise modified herein); *provided* that so much of such severance compensation as would be payable on such basis within the first six months following the Separation Date shall instead be paid in a single lump sum on that day that falls six months and one day after such Separation Date (the "Delayed Payment Date"), and the balance shall be paid thereafter in accordance with the Company's standard payroll practices as in effect on the Separation Date.

4.  *Benefits Continuation.*

(a)  Provided he makes a timely election to participate and in accordance with the terms of the Severance Plan (except as modified herein), the Executive shall be eligible for continuation of coverage, at his expense, under the Company's group medical, dental and vision plans, but only to the extent required by and subject to the terms of Part 6 of Subtitle B of Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). If, at the conclusion of the first 18 months of the Severance Compensation Period, the Executive immediately prior thereto is still receiving continuation coverage pursuant to the immediately preceding sentence, has not accepted new employment and has not secured alternate health, dental and vision insurance coverages, either through new employment or otherwise, the Company will arrange for comparable coverage (through self–insurance or otherwise) at comparable cost to the Executive through the balance of the Severance Compensation Period or, if earlier, until the Executive accepts new employment. The Executive agrees to notify the Company immediately if he accepts new employment during the Severance Compensation Period.

(b)  Eligibility to participate in the Company's short–term disability plan will end as of the Separation Date, and eligibility to participate in the Company's long–term disability plan will end as of the last day of the calendar month in which the Executive's Separation Date occurs.

(c)   The Executive may continue his life insurance (*i.e.*, Basic Life Insurance, Optional Employee Life Insurance, Spouse/Domestic Partner Life Insurance and Dependent Child Life Insurance, as applicable) during the Severance Compensation Period by making the premium payments therefor. Such coverage will terminate at the conclusion of the Severance Compensation Period, unless the Executive directly elects to convert his coverage pursuant to the terms of these policies by private arrangement with the life insurance carrier.

(d)   The Executive shall continue to receive repatriation tax equalization and tax preparation benefits related to his service with the Company Group as an expatriate in accordance with Company policy in effect as of the date hereof.

(e)   The Executive's participation in all other Company benefit plans and programs, including, but not limited to, the Qualified Plan and the Savings Plan (each as defined below), will end as of the Separation Date, in accordance with the terms of the respective plans.

5.   *Stock–Based Compensation, Retirement and Other Benefits.*

(a)   *Stock Options/SARs.*   State Street has previously awarded stock options and stock appreciation rights to the Executive under its 1997 Equity Incentive Plan (the "1997 Plan") and its 2006 Equity Incentive Plan (the "2006 Plan" and collectively with the 1997 Plan, the "Equity Plans"). The Company has furnished the Executive a schedule (including vesting schedules and expiration dates), appended hereto as *Exhibit A*, reflecting those outstanding (*i.e.*, not earlier expired or been exercised) stock options and stock appreciation rights held by the Executive as of the Separation Date (each, a "Stock Option"). The Stock Options shall continue to vest and be exercisable, subject to the Executive's compliance with Section 6, Section 7 and Section 8 hereof, and/or become forfeitable in accordance with the terms of the applicable Equity Plan and/or the applicable option agreement or other award documentation. The Company and the Executive agree that the restraints and obligations of the Executive pursuant to Section 6, Section 7 and Section 8 hereof shall be deemed for all purposes as controlling, in lieu of any different restraints or undertakings of the Executive on the same subject under the Equity Plans and any related award documentation. For the avoidance of doubt, those 8,271 Stock Options granted to the Executive under the 1997 Plan that were scheduled to vest on March 2, 2010 shall be immediately and automatically forfeited as of the Separation Date in accordance with their terms.

(b)   *Performance Awards.*   The Executive holds performance share awards granted under the Equity Plans. The following provisions shall govern the treatment of certain of these awards:

(i)   *Cycle O Performance Award.*   State Street has previously awarded to the Executive a Cycle O performance award under the 1997 Plan as set forth on *Exhibit A* hereto (the "Cycle O Award"), that vested on December 31, 2007. Notwithstanding anything to the contrary under the terms of the 1997 Plan and/or the applicable performance share award agreement or other award documentation, but subject to the Executive's compliance with Section 6, Section 7 and Section 8 hereof, the Company shall deliver to the Executive, on or about February 15, 2008, but not later than March 15, 2008, that number of shares of common stock of State Street, par value $1 ("Common Stock"), equal to the number of such shares the Executive would have received under the Cycle O Award had the Executive remained employed by the Company Group. The Company and the Executive agree that the restraints and obligations of the Executive pursuant to Section 6, Section 7 and Section 8 hereof shall be deemed for all purposes as controlling, in lieu of any different restraints or undertakings of the Executive on the same subject under the 1997 Plan and the award documentation with respect to the Cycle O Award.

(ii)   *2006 PEP Performance Award.*   State Street has previously awarded to the Executive performance–based equity awards under the 2006 State Street Global Advisors Performance Equity Program pursuant to the 1997 Plan as set forth on *Exhibit A* hereto (the "2006 PEP Award"). In

2

accordance with the terms of the 2006 PEP Award (as modified herein) and subject to the Executive's compliance with Section 6, Section 7 and Section 8 hereof, the Company shall deliver to the Executive in full satisfaction of the 2006 PEP Award, on February 15, 2009 (the "Settlement Date"), but not later than March 15, 2009, that number of shares of Common Stock (the "2006 PEP Shares") equal to the product of (I) the number of the shares of Common Stock the Executive would have received under his 2006 PEP Award had the Executive remained employed by the Company Group through the Settlement Date and (II) 24/36 (66.66%); *provided* that if the aggregate value of the 2006 PEP Shares (determined using the closing price of a share of Common Stock on the New York Stock Exchange on the Settlement Date) is greater than $5 million, the Executive shall only be entitled to the delivery, in full satisfaction of the 2006 PEP Award, of such number of 2006 PEP Shares with an aggregate value equal to $5 million, and the remainder of the 2006 PEP Shares shall be forfeited. The Company and the Executive agree that the restraints and obligations of the Executive pursuant to Section 6, Section 7 and Section 8 hereof shall be deemed for all purposes as controlling, in lieu of any different restraints or undertakings of the Executive on the same subject under the 1997 Plan and the award documentation with respect to the 2006 PEP Award.

(c)    *Payments in Respect of Other Stock–Based Awards.*    The Executive holds certain deferred stock awards and performance share awards (in addition to those discussed under Section 5(b) hereof) granted under the Equity Plans. The following provisions shall govern the treatment of these awards:

(i)    *Deferred Stock Awards.*    State Street has previously awarded to the Executive an award of shares of deferred stock under the 1997 Plan as set forth on *Exhibit A* hereto (the "DSAs"), which are scheduled to vest on February 15, 2008. In full satisfaction of the DSAs and subject to the Executive's compliance with Section 6, Section 7 and Section 8 hereof, the Company shall pay the Executive on the Delayed Payment Date a single lump sum cash payment of $900,000, *provided* that in no event shall such payment occur prior to February 15, 2008. The Company and the Executive agree that the restraints and obligations of the Executive pursuant to Section 6, Section 7 and Section 8 hereof shall be deemed for all purposes as controlling, in lieu of any different restraints or undertakings of the Executive on the same subject under the 1997 Plan and the award documentation with respect to the DSAs.

(ii)    *Other Stock–Based Awards.*    In full satisfaction of all other equity–based awards held by the Executive under the Equity Plans, including, without limitation, all performance–based equity awards under the 2005 State Street Global Advisors Performance Equity Program pursuant to the 1997 Plan, all performance–based equity awards under the 2007 State Street Global Advisors Performance Equity Program pursuant to the 2006 Plan, and the "Cycle P" and "Vice Chairman" performance awards under the 1997 Plan, but specifically excluding only the Stock Options, the Cycle O Award, the 2006 PEP Award and the DSAs (which shall be subject to Section 5(a), Section 5(b)(i), Section 5(b)(ii) and Section 5(c)(i) hereof, respectively), the Company shall pay the Executive on the Delayed Payment Date a lump sum cash payment of $4.6 million; *provided* that in the event that the aggregate value of the 2006 PEP Shares (determined in accordance with Section 5(b)(ii) hereof) is less than $5 million as of the Settlement Date, the Company shall pay the Executive on the Settlement Date, but not later than March 15, 2009, an additional lump sum cash payment equal to (i) $5 million less (ii) the aggregate value of the 2006 PEP Shares (determined in accordance with Section 5(b)(ii) hereof). Any amounts payable by the Company pursuant to this Section 5(c)(ii) are subject to the Executive's compliance with Section 6, Section 7 and Section 8 hereof. The Company and the Executive agree that the restraints and obligations of the Executive pursuant to Section 6, Section 7 and Section 8 hereof shall be deemed for all purposes as controlling, in lieu of any different restraints or undertakings of the Executive on the same subject under the Equity Plans and any related award documentation.

3

(d) *Pension Benefits.* The Executive is vested in his currently accrued benefit as of the Separation Date under the Company's tax–qualified defined benefit pension plan, the State Street Retirement Plan (the "Qualified Plan"), and State Street's Management Supplemental Retirement Plan, as amended and restated effective as of January 1, 2008 (the "SERP" and together with the Qualified Plan, the "Retirement Plans"). The Company has furnished to the Executive a schedule showing his vested benefits under the Retirement Plans (the "Retirement Benefits"). The Executive shall be entitled following the Separation Date to receive the Retirement Benefits in accordance with and subject to the terms of the applicable Retirement Plans. In addition to the foregoing benefits, the Executive will be entitled to receive, following the Separation Date, all of his accrued benefits as of the Separation Date under State Street's Salary Savings Program (the "Savings Plan") and its Management Supplemental Savings Plan, as amended and restated effective as of January 1, 2008 (formerly, the 401(k) Voluntary Deferral Plan) (the "MSSP"), in each case in accordance with and subject to the terms of the applicable plan. The Company has furnished the Executive a schedule showing his vested accrued benefits under the Qualified Plan, the SERP, the Savings Plan, the MSSP and the Supplemental Pension Plan, as amended and restated effective as of January 1, 2008 (formerly, the Supplemental Defined Benefit Pension Plan) (the "ESRP"). For the avoidance of doubt, for purposes of determining the Executive's benefits under the foregoing programs, compensation or remuneration paid or payable pursuant to Section 2 hereof or otherwise paid or payable pursuant to this Agreement shall be disregarded.

6. *Non–Competition/Non–Solicitation.* The Executive agrees that he will not, during the 18–month period commencing on the Separation Date (the "Restricted Period"), (a) accept employment with, work for or otherwise provide services to, whether directly or indirectly or whether with or without compensation, any Institution (as defined below); (b) directly or indirectly solicit or encourage any customer or prospective customer (the latter defined to mean any person or entity with which any member of the Company Group has made a business–seeking contact other than by mass mailing or general advertising within 12 months preceding the Separation Date) of, or investor in, any member of the Company Group as of the Separation Date to conduct with anyone else any business activity which such customer, prospective customer or investor could conduct with the Company Group; (c) directly or indirectly hire or solicit any officer or principal of the Company Group to discontinue or curtail his/her employment with the Company Group (other than through generalized solicitations or advertising); (d) directly or indirectly solicit or encourage any independent contractor providing services to any member of the Company Group to terminate or curtail his/her/its relationship with the Company Group; (e) directly or indirectly attempt to induce a client or customer of the Company Group with whom the Executive has had or with whom persons supervised by the Executive have had significant personal contact while employed by the Company Group to (i) transfer its business from the Company Group to any other person or entity; (ii) cease or curtail its business with the Company Group; or (iii) divert a business opportunity from the Company Group to any other person or entity. Notwithstanding the foregoing, (A)(i) on and after the six–month anniversary of the Separation Date, the Executive may provide services to any hedge fund established after the Separation Date of which the Executive is a founding principal and (ii) on or after the first anniversary of the Separation Date, the Executive may accept employment with, work for or provide services to any hedge fund which is not controlled by or under common control with an Institution, and (B) nothing herein shall prevent the Executive from owning not in excess of 1% of any security issued and outstanding of an entity listed on a national securities exchange or the Nasdaq National Market. For purposes of this Agreement, an "officer", "principal" or "independent contractor" of the Company Group is any person who acquired such status on or within 12 months preceding the date of the asserted breach. For purposes of this Agreement, "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity or person, whether through the ownership of voting securities, by contract, or otherwise.

4

For purposes of this Agreement, each of the following entities (together with its affiliates and subsidiaries) is an "Institution": Fidelity Investments, Barclays Global Investors, N.A., Wellington Management Co., LLP, The Bank of New York Mellon, Putnam Investments, Goldman Sachs Asset Management LP, BlackRock, Inc. and any institution in addition to the foregoing that is among the five institutions with the highest value of total assets under management as listed in Institutional Investor's annual ranking of America's Top Money Managers, Total Assets Under Management (historically published in the month of July) or Pensions & Investments' annual ranking of Top Firms Ranked By Worldwide Assets (historically published in the month of May) (the "Top Five(5)") published most recently prior to the Separation Date (the "Publication Date"); *provided* that, if one or both of these publications change the title of their rankings, the ranking(s) utilized will be ranking(s) of total assets under management; and *provided further* that, if one or both of these publications change their names, or cease to carry out the described annual rankings, the ranking(s) utilized will be by the publication(s) that are recognized in the worldwide investment community as the most trustworthy rankings, as determined by the Executive Compensation Committee of the Board (as defined in Section 10 hereof) in its sole discretion. If for any reason the publications used to determine the Top Five (5) institutions have different rankings, then any Institution listed in the Top Five (5) list of any such publication will be considered an Institution. For purposes of this Agreement, Institutions shall be determined without regard to, and shall not include, the Company Group. Furthermore, any successor entity to an Institution, by way of merger, acquisition (either of stock or substantially all of the assets), reorganization, change of name or other similar event occurring subsequent to the Publication Date, shall be deemed to be an Institution.

7.  *Confidential Information.*    The Executive agrees that, except as authorized in writing by the Company's Chief Executive Officer, as required by applicable law, rule, regulation or legal process, or as may be reasonably required in connection with obtaining legal advice, he will not, directly or indirectly, use or disclose any Confidential Information belonging to the Company Group. For purposes of this Agreement, "Confidential Information" means any and all information of the Company Group that is not generally known by others with whom it competes or does business, or with whom, during the 12 months preceding the Separation Date, it planned to compete or do business, including but not limited to (a) all proprietary information of the Company Group, including but not limited to the products and services, technical data, methods, processes, trade secrets, know–how, developments, inventions, and formulae of the Company Group, (b) the development, research, testing, marketing, financial activities and strategic plans of the Company Group, (c) the manner in which the Company Group operates, (d) the Company Group's actual and projected financial performance, (e) the identity and special needs of the customers, clients, prospective customers, prospective clients and investors of the Company Group, and (f) the people and organizations with whom any member of the Company Group has business relationships and the substance of those relationships. Confidential Information also includes any information that any member of the Company Group may receive or has received from customers, investors, business partners or others with any understanding, express or implied, that the information would not be publicly disclosed. Anything in this paragraph to the contrary notwithstanding, the Executive shall be bound by his obligations to maintain attorney/client confidences, and the Company does not hereby waive any attorney/client privilege. Notwithstanding the foregoing, "Confidential Information" shall not include any information (i) that is currently or becomes publicly available or a matter of public knowledge or domain through no wrongful act or omission by the Executive, or (ii) that is received by the Executive from a third party who is not known by the Executive to be bound by an obligation of confidentiality to the Company Group not to disclose such information. The Executive further agrees that, on or before five days subsequent to the Separation Date, he will return to the Company all documents, materials and information (whether in hard copy, on electronic media or otherwise) related to Company business, and all keys, access cards, credit cards, computer hardware and software, telephones and telephone–related equipment and all other property of the Company Group in his possession or control, and hereby certifies that he has not and will not

5

knowingly retain copies of any such Company Group documents, materials or information; *provided* that the Executive shall be entitled to retain copies of all compensation and benefit plans and agreements, including, without limitation, the Equity Plans and related documentation, referenced in Section 3, Section 4 and Section 5 hereof.

8.  *Non–Disparagement.*   The Executive agrees that he shall not make any intentionally false, or any disparaging or derogatory statements, to any media outlet (including, but not limited to, any Internet–based chat rooms, message boards and/or web pages), industry groups, financial institutions, current or former employees, consultants, clients or customers of the Company Group regarding the Company Group or any of its directors, officers, employees, agents or representatives, or about the Company Group's business affairs and/or financial condition. The Company, in turn, agrees that it will not, in any authorized corporate communications to third parties, and will endeavor to direct those individuals set forth on *Exhibit C* hereto not to, make any intentionally false, or any disparaging or derogatory statements about the Executive; *provided, however*, that nothing herein shall prevent either party from giving truthful testimony and/or from otherwise making good faith statements in connection with legal investigations and/or other proceedings. In addition, the Company shall, prior to its public release, provide the Executive with a copy of the press release regarding the Executive's separation from the Company.

9.  *Certain Remedies.*

(a)  *Remedies.*   The Company and the Executive agree without reservation that the restraints set forth in Section 6, Section 7 and Section 8 hereof are necessary for the reasonable and proper protection of the Company, or the Executive, as the case may be; that each and every one of the restraints is reasonable with respect to subject matter, length of time and geographic area; and that these restraints will not prevent the Executive from obtaining other suitable employment, if he wishes to do so, during the Restricted Period. The Company and the Executive further agree that the restraints and obligations of the Executive pursuant to Section 6, Section 7 and Section 8 hereof shall be deemed for all purposes as controlling, in lieu of any different restraints or undertakings of the Executive on the same subject contained in any agreement previously entered into or binding between the Executive and any member of the Company Group, including, without limitation, under the Equity Plans and any related award documentation. The Executive further agrees that, were he to breach any of the covenants contained in Section 6, Section 7 or Section 8 hereof, the damage to the Company would be irreparable. The Executive therefore agrees that the Company, in addition to any other remedies available to it, including, without limitation, under Section 9(b) hereof, shall be entitled to preliminary and permanent injunctive relief against any breach or threatened breach by the Executive of any of those covenants, together with an award of attorney's fees incurred in connection with securing the same. It is expressly agreed that the Company will not have to post bond in connection with any such injunction, and that the Executive will not take, and will not permit anyone else to take on his behalf, any position in a court or any other forum inconsistent with any of his covenants and agreements herein. The Company and the Executive further agree that, in the event that any provision of Section 6 or Section 7 hereof is determined by a court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area, or too great a range of activities, the relevant provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law. Further, the Company and the Executive agree that the period of restriction described in Section 6 hereof shall be tolled, and shall not run, during any period of time in which the Executive is judicially determined by a court of competent jurisdiction to have been in breach of the terms of Section 6 hereof.

(b)  *Forfeiture.*   In the event that the Executive (i) fails to comply with Section 6, Section 7 or Section 8 hereof, other than any isolated, insubstantial and inadvertent failure that is not in bad faith, or (ii) files any charge, claim, demand, action or arbitration with regard to the Executive's employment, compensation or termination of employment under any federal, state or local law, or an arbitration

6

under any industry regulatory entity, except in either case for a claim for breach of this Agreement or failure to honor the obligations set forth herein, the Company shall be entitled to cease making any payments due hereunder, subject to written notice to the Executive specifying in reasonable detail the nature of the breach, and the Executive agrees that he shall forfeit, in each of the following clauses (i) and (ii) as of the date of the breach by the Executive: (i) any amounts not already paid pursuant to Section 3 and Section 5(c) hereof; and (ii) all Stock Options, the Cycle O Award and the 2006 PEP Award (including any right to a cash payment pursuant to Section 5(c)(ii) hereof) to the extent not vested, settled, paid and/or exercised, as applicable, as of the date of the breach by the Executive. Any disputes with respect to the application of this Section 9(b) shall be subject to Section 19 hereof; *provided* that during the pendency of any such dispute the Company shall be entitled to withhold any payments and/or settlement of any awards to the Executive pursuant to this Section 9(b).

10.   *Post–Employment Cooperation.*   The Executive agrees he will reasonably cooperate with the Company with respect to any matters arising during or related to his employment, including but not limited to reasonable cooperation in connection with any litigation, governmental investigation, or regulatory or other proceeding which may have arisen or which may arise following the execution of this Agreement; *provided* this obligation shall not extend to any litigation or other proceeding commenced by the Company against the Executive or to any litigation or other proceeding commenced by the Executive against the Company to enforce the Executive's rights under this Agreement or with respect to any right, claim or cause of action which the Executive has not released pursuant to Section 12 hereof. As part of such reasonable cooperation, the Executive shall provide reasonably requested information to the Company and its attorneys with respect to any matter arising during or related to his employment, shall make himself reasonably available to meet with Company Group personnel, the Company's attorneys, the attorneys of the Board of Directors of State Street (the "Board") and/or the attorneys of any committee of the Board, and shall, at the Company's request and upon reasonable notice, travel to such places as the Company may specify (for which the Company will reimburse the Executive for his travel and lodging expenses in accordance with the Company's expense practices applicable to the Executive immediately prior to the Separation Date). Finally, as part of such reasonable cooperation agreed to herein, to the extent allowed by law, the Executive shall promptly notify the Company's Chief Legal Officer, by the third business day following his actual, personal receipt, or actual, personal notice of receipt, from any third party or governmental entity of a request for testimony and/or documents, whether by legal process or otherwise, relating to any matter arising during or relating to his employment or other relationship with the Company Group. In the event that the Executive's required cooperation pursuant to this Section 10 exceeds an aggregate of 24 working hours, and to the extent not connected to the deposition or testimony of the Executive, the Company shall compensate the Executive at an hourly rate of $250 per hour for such cooperation, not to exceed $2,000 for any single day's work. The Company shall promptly notify the Executive, within three business days, of its actual receipt from any third party or governmental entity of a request for testimony of and/or documents from the Executive, whether by legal process or otherwise, relating to any matter arising during or relating to the Executive's employment or other relationship with the Company Group. The Company agrees to provide the Executive reasonable access to information regarding his employment benefits and to Company personnel who have knowledge of such matters.

11.   *Reciprocity of Obligations.*   The performance by State Street of its commitment to pay moneys to the Executive hereunder, and the Executive's right to receive and retain the same, shall be expressly conditioned on the Executive's material fulfillment of all of his obligations in this Agreement, including, without limitation, those set forth in Sections 6, 7, 8 and 10 hereof. Similarly, the Executive's performance of his commitments hereunder shall be expressly conditioned upon the Company's material fulfillment of all of its obligations set forth herein. Either party may suspend or terminate its performance hereunder in the event the other commits a material breach of this Agreement.

7

12. *Executive's Release of Claims.*

(a)  *Generally.*   In consideration of the benefits to be provided the Executive hereunder, and after consultation with counsel, the Executive, and each of the Executive's respective heirs, executors, administrators, representatives, agents, successors and assigns (collectively, the "Releasors"), hereby releases, waives and forever discharges the Company Group and all those persons, employees, directors, agents and entities affiliated with it ("Releasees") from and against any and all claims, rights and causes of action arising on or prior to the date hereof, both known and unknown, including but not limited to all claims of breach of contract or misrepresentation, wrongful discharge, and claims of alleged violations of Title VII of the Civil Rights Act of 1964, the Fair Labor Standards Act, ERISA, the Americans With Disabilities Act, Massachusetts G.L. c. 151B, Massachusetts G.L. c. 149, § 148, and any other local, state, or federal law, regulation or other requirement and any other claim relating to or arising out of the Executive's employment and/or other relationship with the Company Group and/or his ownership of Common Stock. The Executive hereby covenants that he will not institute any charge, complaint or lawsuit to challenge the validity of this release or to otherwise assert claims against the Releasees that have been waived hereunder. It is agreed and understood that the foregoing general release does not waive any of the following rights: (a) to the pay or benefits to be provided to the Executive as set forth herein; (b) to enforce the terms of this Agreement; (c) to exercise the Stock Options in accordance with Section 5(a) hereof; (d) to access any benefit to which the Executive is entitled under the Qualified Plan, the SERP or the Savings Plan; (e) to pursue counterclaims and defenses directly related to claims that the Company has not waived pursuant to this Agreement and claims which the Executive may not release pursuant to applicable laws and regulations; (f) to file a charge with the Equal Employment Opportunity Commission ("EEOC") or similar state agency or otherwise participate in an investigation or proceeding conducted by the EEOC or similar state agency; (g) to avail himself of any rights to insurance or indemnification that the Executive may have (including with respect to matters that are the subject of this release) under State Street's articles, by–laws or applicable insurance policies, under applicable law, and under any agreement between the Executive and the Company; and (h) to pursue claims arising after the date hereof.

(b)  *Specific Release of ADEA Claims.*   In further consideration of the payments and benefits provided to the Executive under this Agreement, the Releasors hereby unconditionally release and forever discharge the Company Group, and the officers, employees, directors and agents of each member of the Company Group from any and all claims that the Releasors may have as of the date the Executive signs this Agreement arising under the Federal Age Discrimination in Employment Act of 1967, as amended, and the applicable rules and regulations promulgated thereunder ("ADEA"). In signing this Agreement, the Executive acknowledges that he understands its provisions; that his agreement is knowing and voluntary; that he has been afforded a full and reasonable opportunity of at least 21 days to consider its terms and consult with or seek advice from an attorney of his choosing; that he is providing this release and discharge set forth in this Section 12(b) only in exchange for consideration in addition to anything of value to which he is already entitled; and that he has been advised to seek counsel from an attorney and has in fact done so.

13. *Company's Release of Claims.*   In exchange for the commitments of the Executive set forth herein, the Company, for itself and on behalf of the Company Group, hereby voluntarily and forever releases, waives and discharges the Executive from and against any and all causes of action, rights or claims arising on or prior to the date hereof, both known and unknown, to the Company, including but not limited to all claims of breach of contract or misrepresentation, breach of fiduciary duty, and claims of violation of any local, state or federal law, regulation or other requirement and any other claim relating to or arising out of the Executive's employment and/or other relationship with the Company Group. The Company hereby covenants that it will not institute any charge, complaint, or lawsuit to challenge the validity of this release or to otherwise assert claims against the Executive that have been waived hereunder. It is agreed and understood that the foregoing general release does not waive any of

8

the following rights: (a) to enforce the terms of this Agreement; (b) to pursue claims arising from criminal, fraudulent or otherwise intentionally wrongful misconduct on the Executive's part or claims arising from a knowing violation of federal or state laws or regulations; (c) to pursue claims arising from the Executive's obtaining an impermissible or illegal benefit from the Company; (d) to pursue claims arising from actions taken after the date hereof; (e) to pursue counterclaims and defenses directly related to claims that the Executive has not waived pursuant to this Agreement; and (f) to pursue claims which the Company may not release pursuant to applicable laws and regulations.

14.    *Indemnification.*    The Executive shall be entitled (a) to such rights to indemnification as shall exist in the Company's articles and by–laws, as amended from time to time, under applicable law, and under any agreement between the Executive and the Company, and (b) to coverage under the Company's directors' and officers' insurance policy and other applicable liability policies, as in effect from time to time, for causes relating to acts or omissions occurring on or prior to the Separation Date, to the extent set forth in such documents. The Executive agrees to promptly notify the Company of any claims made against the Executive in his capacity as a former officer/employee of the Company or any other member of the Company Group.

15.    *Entire Agreement.*    This Agreement, together with all of the plans, agreements and documents referred to herein and as modified hereby, constitutes the entire agreement between the Company and the Executive, and supersedes any other contracts or commitments with respect to the Executive's employment with the Company and/or other service to the Company, and/or his separation therefrom (including any contracts or commitments to the extent they relate to the Executive's activities following the Separation Date), except to the extent expressly provided for herein. It is agreed and understood that, except as expressly set forth in this Agreement, the Executive shall receive no other compensation or benefits of any kind from the Company, including, without limitation, under the ESRP or the Change of Control Agreement (defined below).

16.    *Modification of Agreement.*    This Agreement may only be amended, modified or waived by a writing signed by parties duly authorized to do so.

17.    *Successors and Assigns; Death Benefits.*    It is agreed and understood that this Agreement shall inure to the benefit of and be binding upon the parties' respective heirs, executors, beneficiaries, successors and assigns. In the case of benefits under an employee benefit plan or program of the Company (including, but without limitation, the Qualified Plan, the SERP, the Savings Plan, the MSSP, the Equity Plans, and any life insurance policy or program under which the Executive is covered), the heirs or beneficiaries of the Executive shall be entitled only to such death benefits and other rights and benefits, if any, as are provided under the terms of the applicable plan or program. In addition, in the event of the Executive's death prior to his receipt of all the payments, compensation and benefits provided for herein, the unpaid portions of any such payments, compensation and/or benefits shall, subject to the proviso in Section 20(b) hereof, be paid to the Executive's beneficiary or beneficiaries or to the Executive's estate, as the case may be, at the same time or times, and in the same form and amounts, as they would have been paid had the Executive survived.

18.    *Notices.*    All notices and other communications hereunder shall he in writing and shall be deemed to have been given three days after having been mailed by first–class mail or registered or certified mail, two days after having been mailed by private overnight courier service or 12 hours after having been delivered or sent by facsimile or email (provided in each case that the day on which notice is deemed to have been given is a business day), to the following addresses or to such other addresses

9

as the parties shall have furnished to each other in writing; *provided* that notice provided to copy parties shall not be deemed to be notice to the parties to this Agreement.

      If to the Executive:

              William W. Hunt
              304 Marsh Street
              Belmont, MA 02478
              Email: *wwhunt304marsh@hotmail.com*

      With a copy to:

              Michael F. O'Connell, Esq.
              Rackemann, Sawyer & Brewster
              160 Federal Street
              Boston, MA 02110–1700
              Facsimile: 1–617–542–7437
              Email: *moconnell@rackemann.com*

      If to the Company:

              State Street Corporation
              Attn: Chief Legal Officer
              1 Lincoln Street
              Boston, MA 02111
              Facsimile: (617) 664–8209
              Email: *jcarp@StateStreet.com*

      With a copy to:

              Linda E. Rappaport, Esq.
              Shearman & Sterling LLP
              599 Lexington Avenue
              New York, NY 10022
              Facsimile: 1–212–848–7179
              Email: *lrappaport@shearman.com*

    19.   *Disputes.*   Any dispute or controversy arising under this Agreement that cannot be mutually resolved by the Executive and the Company shall be settled exclusively by arbitration in accordance with the rules of the American Arbitration Association or JAMS (an "Arbitration Association"), as selected by the Company in its sole discretion, in Boston, Massachusetts before one arbitrator of exemplary qualifications and stature, who shall be selected jointly by the Executive and the Company, or, if agreement on the selection of the arbitrator cannot be reached, shall be selected by the Arbitration Association (*provided* that any arbitrator selected by the Arbitration Association shall not, without the consent of both the Executive and the Company, be affiliated with the Executive or the Executive's affiliates or the Company Group). Judgment may be entered on the arbitrator's award in a Massachusetts State Court. The arbitrator shall be empowered to enter an equitable decree mandating specific enforcement of the terms of this Agreement. Each party shall bear his or its own expenses incurred in any arbitration arising out of a dispute or controversy under this Agreement.

    20.   *Miscellaneous.*

    (a)  All payments to the Executive and all benefits, entitlements and accruals of the Executive under this Agreement or under any other Company Group plan or program (whether or not expressly mentioned in this Agreement) are conditioned upon the payment by the Executive of the employee's portion of applicable required tax withholdings, including, without limitation, FICA (including

Medicare) tax withholdings. The Company may reduce any cash payments by the amount of any such applicable tax withholdings, including, without limitation, any such applicable tax withholdings with respect to any taxable non–cash benefits or payments. The Executive agrees that the Company may, upon written notice by the Company to the Executive specifying in reasonable detail the nature of the following deductions, deduct from the severance compensation all outstanding financial obligations that he may have to the Company, including, without limitation, such items as expense account balances, credit card balances, employee advances (including advanced vacation days) and reimbursement for any property of the Company Group retained by him.

(b)   The Executive acknowledges that he is a "specified employee" under Treas. Reg. § 1.409A–1(i). Any amounts payable under this Agreement that constitute deferred compensation subject to Section 409A of the Internal Revenue Code of 1986, as amended, as determined by the Company in its reasonable discretion, that would (but for this sentence) be payable within six months following the Separation Date shall instead be paid on the Delayed Payment Date; *provided* that in the event the Executive dies prior to the Delayed Payment Date, any payments that would be payable on the Delayed Payment Date pursuant to this Agreement shall instead be paid, subject to Section 20(i) hereof, on the earlier of (i) the 30th day following the date of the Executive's death or (ii) the Delayed Payment Date.

(c)   Effective as of the Separation Date, the Executive shall cease to be covered by that certain change of control employment agreement between the Company and the Executive (the "Change of Control Agreement"), and the Change of Control Agreement shall have no further force or effect; *provided*, *however*, that nothing herein shall eliminate or otherwise adversely affect any protections that the Executive may have upon a change of control of State Street under other plans, awards or agreements of the Company Group, including, without limitation, accelerated vesting of outstanding Stock Options.

(d)   In order to be certain that this Agreement will resolve any and all concerns that the Executive might have, the Company requests that he carefully consider its terms, including the general release of claims set forth above. For a period of seven days following his execution of this Agreement (the "Revocation Period"), the Executive may revoke his acceptance hereof as to the release of claims under ADEA, and this Agreement shall not become effective or enforceable as to the release of such claims until after the Revocation Period has expired. In the event of any such revocation by the Executive all obligations of the parties under this Agreement shall terminate and be of no further force and effect as of the date of the Executive's revocation; *provided* that no such revocation by the Executive shall be effective unless it is in writing and signed by the Executive and received by the Company prior to the expiration of the Revocation Period.

(e)   The parties' substantive and procedural rights with respect to this Agreement shall be governed by the laws of the Commonwealth of Massachusetts, without resort to choice of law or conflict of law principles.

(f)   The headings of this Agreement are for convenience of reference only, and will not affect the construction of any provision hereof.

(g)   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and which together shall be deemed to be one and the same instrument.

(h)   The failure of any party to this Agreement to enforce any of its terms, provisions or covenants shall not be construed as a waiver of the same or of the right of such party to enforce the same. Waiver by any party hereto of any breach or default by another party of any term or provision of this Agreement shall not operate as a waiver of any other breach or default.

(i)   This Agreement shall take effect on the eighth day following the Executive's execution hereof (the "Effective Date"), *provided* that the Executive has not earlier revoked his acceptance of the

11

Agreement in accordance with the provisions of Section 20(d) hereof. The Company represents and warrants that it has due authority to enter into this Agreement and that upon the Effective Date, this Agreement shall be a valid and binding obligation of the Company.

12

THE EXECUTIVE HEREBY ACKNOWLEDGES THAT THE EXECUTIVE HAS READ THIS AGREEMENT, THAT THE EXECUTIVE FULLY KNOWS, UNDERSTANDS AND APPRECIATES ITS CONTENTS, AND THAT THE EXECUTIVE HEREBY ENTERS INTO THIS AGREEMENT VOLUNTARILY AND OF HIS OWN FREE WILL.

ACCEPTED AND AGREED TO:                    ACCEPTED AND AGREED TO:

_____

William W. Hunt                            STATE STREET CORPORATION

                                           By: _____

*EXHIBIT A*

*EQUITY GRANT TREATMENT*

| Award | Grant Date | Vesting Schedule 2008 | | 2009 | | 2010 | | 2011 | |
|---|---|---|---|---|---|---|---|---|---|
| Vested Stock Options—1,600 options, 3 months from 1/2/08 to exercise | 06/17/99 | | | | | | | | |
| Vested Stock Options—12,500 options, 3 months from 1/2/08 to exercise | 06/15/00 | | | | | | | | |
| Vested Stock Options—2,100 options, 3 months from 1/2/08 to exercise | 09/20/01 | | | | | | | | |
| Vested Stock Options—20,000 options, 3 months from 1/2/08 to exercise | 02/21/02 | | | | | | | | |
| Vested Stock Options—3,569 options, 3 months from 1/2/08 to exercise | 03/21/02 | | | | | | | | |
| Vested Stock Options—15,247 options, 3 months from 1/2/08 to exercise | 12/19/02 | | | | | | | | |
| Vested Stock Options—37,000 options, 3 months from 1/2/08 to exercise | 12/17/03 | | | | | | | | |
| Vested Stock Options—20,000 options, 3 months from 1/2/08 to exercise | 03/03/04 | | | | | | | | |
| Vested Stock Options—18,500 options; expire 3 months after 12/09 | 03/02/05 | | | | | | | | |
| Unvested Stock Options—18,500 unvested options vesting through 12/09, then 3 months to exercise | 03/02/05 | 9,250 | 3/2/08 | 9,250 | 3/2/08 | | | | |
| Vested Stock Appreciation Rights—8,271 SARs; expire 3 months after 12/09 | 03/01/06 | | | | | | | | |
| Unvested Stock Appreciation Rights—16,542 unvested SARs vesting through 12/09, then 3 months to exercise | 03/01/06 | 8,271 | 3/2/08 | 8,271 | 3/2/09 | | | | |
| Unvested Stock Appreciation Right Grant—51,050 unvested SARs vesting through 2/11; expire 2/12] | 02/15/07 | 12,762 | 3/2/08 | 12,762 | 2/15/09 | 12,763 | 2/15/10 | 12,763 | 2/15/11 |
| Deferred Stock Award Grant—11,576 shares vesting 2/08—cashed out ($900,000) | 03/01/06 | | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2005 SSgA Performance Equity Plan Award—44,405 units canceled | 03/02/05 | | | | | | |
| 2006 SSgA Performance Equity Plan Award Grant—31,934 units granted; 21,289 units ($^2/_3$ of original grant) paid in accordance to plan | 03/01/06 | | | 21,289 | 02/15/09 | | |
| 2007 SSgA Performance Equity Plan Award—56,666 units cashed out at grant value ($4.0 million) | 02/14/07 | — | — | — | — | — | — |
| 2006 Performance Award Grant—Cycle O—9,793 units paid as scheduled in 2/08 | 03/01/06 | 9,793 | 12/31/07 | | | | |
| 2007 Performance Award Grant—Cycle P—15,111 units granted; 7,556 units ($^1/_2$ of original grant) cashed out ($600,000) | 02/14/07 | | | | | | |
| 2006 Vice Chairman Award Grant—29,443 units canceled | 12/20/06 | | | | | | |

***EXHIBIT B***

*Accrued Vested Benefits under Pension Plans as of December 31, 2006*

| | | |
|---|---|---|
| Qualified Plan | $ | 146,718.72 |
| SERP | $ | 517,297.39 |
| ESRP | $ | 0 |
| Savings Plan | $ | 230,362.27 |
| MSSP | $ | 0 |

*EXHIBIT C*

*Non−Disparagement*

Mr. Joseph C. Antonellis
Mr. Jeffrey N. Carp
Mr. Joseph W. Chow
Mr. Joseph L. Hooley
Mr. Ronald E. Logue
Mr. David C. O'Leary
Mr. James S. Phalen
Mr. Edward J. Resch
Mr. Stanley W. Shelton

QuickLinks

EXHIBIT 10.16
SEPARATION AGREEMENT
EXHIBIT A
EXHIBIT B
EXHIBIT C