UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

IN RE STATE STREET BANK AND   :
TRUST CO. ERISA LITIGATION   :   07 Civ. 8488 (RJH)
  :
This document relates to:   :
  :   CONSOLIDATED AMENDED
07 Civ. 9319   :   COMPLAINT
07 Civ. 9687   :
08 Civ. 0265   :
  :
  :
  :
  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

BERMAN, DEVALERIO
PEASE TABACCO BURT
& PUCILLO
Jeffrey C. Block
Patrick T. Egan
Kristen D. Tremble
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300
Fax: (617) 542-1194

BERNSTEIN LITOWITZ
BERGER &
GROSSMANN LLP
William C. Fredericks
Jonathan Harris
Jerald D. Bien-Willner
1285 Ave. of the Americas
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

KELLER ROHRBACK LLP
Lynn L. Sarko
Derek W. Loeser
Karin B. Swope
Laura R. Gerber
Gary Gotto
David Preminger
1201 Third Ave., Ste 3200
Seattle, WA 98101
Tel: (206) 623-1900
Fax: (206) 623-3384

*Co-Lead Counsel and Interim Class Counsel*

Court-appointed Lead Plaintiffs Alan Kober, as Trustee and fiduciary of The Andover Companies Employees Savings and Profit Sharing Plan (the "Andover Plan"), Warren Cohen, as Trustee and fiduciary of the Unisystems, Inc., Employees' Profit Sharing Plan (the "Unisystems Plan"), and John L. Patenaude and Margaret Callan as members of the Nashua Corporation Pension Plan Committee, fiduciary for the Nashua Corporation Retirement Plan for Salaried Employees and the Nashua Corporation Hourly Employees Retirement Plan (collectively, the "Nashua Plan"), together with the Additional Plaintiffs identified in ¶¶ 25-35 , on behalf of the Andover, Unisystems, Nashua Plans, the plans identified in ¶¶ 16-24 below, and all other ERISA Plans that suffered losses as a result of State Street's fiduciary breaches as alleged herein, as defined in ¶¶ 62-94 below (the "Plans"), by and through their undersigned attorneys and court-approved Co-Lead Counsel Bernstein Litowitz Berger & Grossmann LLP, Keller Rohrback L.L.P., and Berman Devalerio Pease Tabacco Burt & Pucillo LLP, allege the following based upon personal knowledge and information obtained through investigation by their counsel.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Consolidated Amended Complaint after a reasonable opportunity for discovery.

## I.    **PRELIMINARY STATEMENT**

1.    This complaint arises from Defendants State Street Bank and Trust Company's ("State Street Bank") and State Street Global Advisors, Inc.'s ("SSgA") (collectively "State Street") reckless disregard of the best interests of investors in conservative bond funds managed by State Street in violation of the Employee Retirement Income Security Act of 1974 ("ERISA").  State Street breached its fiduciary

duties under ERISA as Investment Manager to of the Plans, Plan participants and Plan beneficiaries by causing State Street's purportedly conservative bond funds, identified below in ¶¶ 48-61 ("Bond Funds"), which are held in collective trusts by State Street and offered to retirement and health and welfare plans throughout the country, to invest in high-risk and/or highly leveraged financial instruments tied to, among other things, mortgage-backed securities.  State Street described the Bond Funds as conservative investments designed to closely track, and slightly outperform, designated bond market indices. In reality, however, State Street, through acts undertaken solely by State Street, converted these purportedly-stable and conservative investments into a high-stakes financial gamble in breach of State Street's fiduciary duties under ERISA.

2.       Contrary to the stated profile of the Bond Funds, State Street caused the Bond Funds to invest in high-risk derivative instruments including volatile asset-backed securities and subprime mortgage-backed securities.  Further compounding the risk to Plaintiffs and the Class, State Street highly leveraged the Bond Funds' investments in such instruments, thereby exponentially increasing the risk to which ERISA plans, plan participants and plan beneficiaries in these purportedly "stable" and "predictable" funds were exposed.  In addition to these highly leveraged investments in subprime mortgage-backed securities, State Street also improperly invested in exotic financial instruments such as Treasury futures, options on futures, interest rate swaps, and interest rate "swaptions," and as a result, exposed the Plans to further imprudent levels of risk.

3.       An analyst at Lipper, Inc. summarized State Street's mismanagement of these funds: "When you're investing in an investment-grade debt fund, you are expecting

some level of preservation of capital.  Some funds have held certain subprime issues, and for their intrepid adventures, investors have suffered terribly."

4.      In the wake of the decline and ultimate collapse of the subprime mortgage industry, the extent to which State Street took aggressive, improper and imprudent risks with the retirement and other assets that ERISA plans had invested in the Bond Funds was eventually exposed.  By the late summer of 2007 State Street was forced to admit that the value of the mortgage-backed securities in which State Street had invested had plummeted, with some of the Bond Funds reporting investment performance in the third quarter of 2007 that was nearly *30 percent* below the benchmark indices that those Funds purported to track.  Moreover, the decline and ultimate collapse of the subprime market eviscerated demand for such securities, forcing State Street to sell those mortgage-backed securities into an illiquid market.  By the time ERISA plans and plan participants and beneficiaries became aware of the dire consequences of State Street's imprudent actions, there was effectively no market for the securities, further compounding the losses to investors in the Bond Funds.

5.      An exchange during State Street's October 16, 2007 teleconference suggests the extent to which State Street's active mismanagement of fixed income funds and aggressive investing in subprime securities has resulted in staggering losses for investors:

> Mike Mayo, Deutsche Bank Analyst:
>
> And then lastly, the fixed income funds that are actively managed dealing with subprime, it went from $8 billion down to $3 billion in the last three months. So, does that mean your potential legal exposure is $5 billion, and if it isn't can you size potential risk?

Ron Logue, State Street Chairman and CEO:

It's hard to size potential risk, Mike, people get in and out, there were withdrawals, transfers during that period of time. So it's a difficult thing to do.

6.     State Street has attempted to limit negative publicity and its exposure to claims by trying to negotiate payouts to certain of its biggest and most valued investors who suffered losses in the Bond Funds.  For example, on December 20, 2007, State Street entered into a settlement which provides that State Street will compensate the State of Alaska Supplemental Annuity Plan and the State of Alaska Defined Contribution Plan for fifty percent of the money lost in those plans' investment in the State Street Global Advisors Daily Government / Corporate Bond Fund between June 30, 2007 and August 28, 2007.  Pursuant to the settlement, State Street agreed to waive some fees on other investment accounts it manages for Alaska.  The settlement also includes fee rebates in addition to cash.

7.     While Plaintiffs believe they are entitled to make-whole relief from State Street, Plaintiffs note that despite its ERISA fiduciary duties to the Plans and the Class (defined below), State Street has not afforded the Plans and the Class equal consideration in light of the Bond Funds' massive losses.  In fact, it appears that State Street attempted to conceal its preferential treatment of some plans by requiring that its compensation to those plans be kept secret from the public and from other Bond Fund investors.  For example, the December 20, 2007 settlement with Alaska provides that:

Neither the State of Alaska nor any of its officers, directors, officials, employees, or agents, or other persons or entities acting on its behalf, shall issue a press release that announces, discloses, comments on, or discusses this Agreement or the terms of this Agreement.  The State may respond to questions posed by the public or the legislature with a factually based response that does not subjectively characterize this Agreement.  The State will notify

5

> State Street of any public records request submitted under AS 40.25.120 for documents related to the Disagreement or this Agreement.

Par. 8(ii) of the Agreement between State Street Bank and Trust Co. and State of Alaska and the Alaska Retirement Management Board, on its own behalf and on behalf of certain Alaska plans, dated Dec. 20, 2007.

8.      In its Annual Report for the Year Ending December 31, 2007, State Street acknowledged that it had set aside approximately $625 million in reserves for "legal exposure and related costs in connection with [its] fixed income strategies." State Street Annual Report (Form 10-K) (December 31, 2007) at 16.

9.      State Street's imprudent actions have caused the Plans (for which State Street served as the Investment Manager within the meaning of ERISA) to suffer hundreds of millions, if not billions, of dollars of losses.

10.     State Street's conduct in connection with its management of the Bond Funds was a gross dereliction of its fiduciary duties under ERISA for which State Street is personally liable.  Accordingly, Plaintiffs allege that State Street, as the investment manager for the Bond Funds for the Plans throughout the country, breached its duties of prudence, loyalty, and exclusive purpose under ERISA §404(a) by investing the assets of the Bond Funds recklessly and imprudently, and by acting disloyally with respect to remuneration of the Plans and the Class's losses caused by State Street's imprudent actions.

11.     This action is brought on behalf of the Plans.  All of the Plans were subject to, and were affected by, State Street's conduct in the same manner and with the same general effect: substantial losses due to the imprudent investment conduct of State Street

as Investment Manager and fiduciary for the Plans.  Lead Plaintiffs seek losses to the Plans for which State Street is personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Lead Plaintiffs, on behalf of the Plans and the proposed Class, seek other equitable relief from State Street, including, without limitation, injunctive relief and, as available under applicable law, an accounting, constructive trust, restitution, equitable tracing, and other monetary relief.

12.    ERISA §§ 409(a) and 502(a)(2) authorize ERISA plan participants and plan fiduciaries such as Plaintiffs to sue in a representative capacity for losses suffered by the plans as a result of breaches of fiduciary duty.  Pursuant to that authority, Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23 on behalf of plans that offered the Bond Funds and suffered losses due to State Street's gross dereliction of its fiduciary duties under ERISA during the Class Period.

13.    In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in State Street's possession, certain of Plaintiffs' allegations are by necessity upon information and belief.  At such time as Plaintiffs have had the opportunity to conduct discovery, Plaintiffs will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support Plaintiffs' claims.

## II.    JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).  The claims asserted herein are brought as a class action under Rule 23 of the Federal Rules of Civil Procedure.

15.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

### III.    THE PARTIES

**A.    THE PLAINTIFFS**

**(i)    Lead Plaintiffs and Their Related Plaintiff Entities**

16.    Lead Plaintiff Warren Cohen is a Trustee of the Unisystems, Inc., Employees Profit Sharing Plan (the "Unisystems Plan") pursuant to § 7.1 of the Unisystems, Inc. Employees' Profit Sharing Plan, Amended and Restated Effective as of May 1, 2000. In that capacity, Mr. Cohen is a Plan fiduciary with authority to bring claims for breach of fiduciary duty on behalf of the Plan pursuant to ERISA §§ 409 and 502(a)(2). In addition, Mr. Cohen is specifically authorized to "begin, maintain, or defend any litigation necessary in connection with the administration of the Plan." Mr. Cohen, in his capacity as Trustee of the Unisystems Plan, was appointed to serve as a Lead Plaintiff in this consolidated action by Order of the Court dated January 31, 2008.

17.    Plaintiff Unisystem, Inc. is designated Plan Administrator for the Plan. The Plan is an ERISA-qualified plan established for the benefit of employees of Unisystems, Inc. ("Unisystems"). Unisystems is a publishing company headquartered in New York, New York.

18.    During the Class Period, the Unisystems Plan invested in the Intermediate Bond Fund for Employee Trusts ("Intermediate Bond Fund"). State Street served as the Investment Manager for the Unisystems Plan, and in particular, the Intermediate Bond Fund. The Unisystems Plan suffered substantial losses as a result of State Street's imprudent investment management of the Intermediate Bond Fund.

19.     Lead Plaintiff Alan Kober is an Individual Trustee of The Andover Companies Employees' Savings and Profit Sharing Plan (the "Andover Plan") pursuant to § 10.03 of The Andover Companies Employees' Savings and Profit Sharing Plan and Trust Agreement, Amended and Restated Effective as of January 1, 1989.  In this capacity, Mr. Kober is a Plan fiduciary with authority to bring claims for breach of fiduciary duty on behalf of the Plan pursuant to ERISA §§ 409, and § 502(a)(2).  Mr. Kober, in his capacity as Trustee of the Andover Plan, was appointed to serve as a Lead Plaintiff in this consolidated action by Order of the Court dated January 31, 2008.

20.     Plaintiff Merrimack Mutual Fire Insurance Company ("Merrimack Mutual") is the designated Plan Administrator for the Andover Plan.  The Andover Plan is an ERISA-qualified plan established for the benefit of the employees of Merrimack Mutual and its sister companies, Cambridge Mutual, and Bay State, which, together with Merrimack Mutual, comprise the Andover Companies ("Andover Companies"). Andover Companies is a New England mutual insurance institution which offers insurance programs and is managed from its headquarters in Andover, Massachusetts.

21.     During the Class Period, the Andover Companies Plan invested in the SSgA Enhanced Intermediate Bond Fund ("Enhanced Intermediate Bond Fund").  State Street served as the Trustee for Andover Plan, and served as the Investment Manager for Andover Companies Plan's investment in the Enhanced Intermediate Bond Fund.  The Andover Companies Plan suffered substantial losses as a result of State Street's imprudent investment management of the Enhanced Intermediate Bond Fund.

22.     Lead Plaintiffs John L. Patenaude and Margaret Callan are  members of the Nashua Corporation Pension Plan Committee, and are fiduciaries, as defined by

ERISA, of the Nashua Corporation Retirement Plan for Salaried Employees and the Nashua Corporation Hourly Employees Retirement Plan, ERISA-qualified retirement plans (collectively, the "Nashua Plan").  The Nashua Corporation is headquartered in Nashua, New Hampshire and manufactures and markets a wide variety of specialty imaging products and services to industrial and commercial customers to meet various print application needs. Mr. Patenaude and Ms. Callan, in their capacity as members of the Nashua Corporation Pension Plan Committee, were appointed to serve as  Lead Plaintiffs in this consolidated action by Order of the Court dated January 31, 2008. Patenaude and Callan are also plaintiffs in their capacity as participants in, and beneficiaries of, the Nashua Plan.

23.    Plaintiff Nashua Corporation Pension Committee, as a fiduciary, and the individual Nashua Pension Plan Committee members as plan fiduciaries, participants and beneficiaries are authorized under ERISA §§ 409(a), 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1 132(a)(2) and (a)(3), to sue in a representative capacity for losses suffered by members of the Class as a result of Defendants' ERISA violations.

24.    During the Class Period, the Nashua Plan invested in the Bond Market Fund.  State Street served as the Investment Manager for the Nashua Plan's investment in the Bond Market Fund.   The Nashua Plan suffered substantial losses as a result of State Street's imprudent investment management of the Bond Market Fund.

**(ii)    Additional Plaintiffs**

25.    Plaintiff Alan Gordon, in his capacity as a Trustee and fiduciary of the AGMA Retirement Plan and the AGMA Health Fund (the "AGMA Plans) is a resident of the state of New York.  The AGMA Plans are ERISA-qualified plans established for the

benefit of employees represented by the American Guild of Musical Artists ("AGMA"). AGMA is headquartered in New York, New York.

26.     During the Class Period, the AGMA Health Fund invested in the SSgA Intermediate Bond CTF Fund and the AGMA Retirement Plan invested in the SSgA Intermediate Bond NL Fund.  State Street served as the Investment Manager for the AGMA Plans' investment in the SSgA Intermediate CTF Fund and the SSgA Intermediate Bond NL Fund.  The AGMA Plans suffered substantial losses as a result of State Street's imprudent investment management of the Intermediate CTF Fund and the SSgA Intermediate Bond NL Fund.

27.     Plaintiff David Palmisciano, in his capacity as Chairman of the Board of Trustees and fiduciary of the Rhode Island Carpenters Plans ("R.I. Carpenters Plans"), is a resident of the state of Rhode Island.  The R.I. Carpenters Plans, consisting of the Rhode Island Carpenters Pension Fund and the Rhode Island Carpenters Annuity Fund, are ERISA-qualified plans established for the benefit of members of the New England Regional Council of Carpenters, Local 94.  The R.I. Carpenters Plans are headquartered in Warwick, Rhode Island.

28.     During the Class Period, each of the R.I. Carpenters Plans invested in the SSgA Bond Market Fund.  State Street served as the Investment Manager for the R.I. Carpenters' investment in the SSgA Bond Market Fund.  The R.I. Carpenters Plans suffered substantial losses as a result of State Street's imprudent investment management of the SSgA Bond Market Fund.

29.     Plaintiff Albert Massaro is a resident of Rochester, New York.  He works for Eastman Kodak Co., and is a participant in the Eastman Kodak Employees' Savings

11

and Investment Plan, an ERISA-qualified retirement plan ("Kodak Plan"). Accordingly, Plaintiff Massaro has standing to bring suit on behalf of the Kodak Plan for losses to the Plan due to breaches of fiduciary duty under ERISA.

30.     During the Class Period, a portion of Plaintiff Massaro's Plan account was invested in the Daily Bond Market Fund. State Street served as the Investment Manager for the Kodak Plan's investment in the Daily Bond Market Fund. The Kodak Plan, and Plaintiff Massaro's Plan account suffered substantial losses as a result of State Street's imprudent investment management of the Bond Market Fund.

31.     Plaintiff Glenn Kingsbury brings suit for the benefit of, and in his capacity as a Trustee and fiduciary of, the New England Electrical Workers Benefit Fund (the "Electrical Workers Plan"), an ERISA plan with its offices and principal place of business located in Wallingford, Connecticut. The Electrical Workers Plan is an ERISA-qualified plan established for the benefit of members of the Local Union Nos. 7, 42, 104, 223, 300, 490, 567 and 1837 of the International Brotherhood of Electrical Workers, AFL-CIO.

32.     During the Class Period, the Electrical Workers Plan invested in the State Street Short Term Bond Fund CTF ("Short Term Bond Fund CTF"). State Street served as the Investment Manager for the Electrical Workers Plan's investment in the Short Term Bond Fund CTF. The Electrical Workers Plan suffered substantial losses as a result of State Street's imprudent investment management of the Short Term Bond Fund CTF.

33.     Plaintiff William W. Keye is a resident of Sacramento, California. He is a participant in the Waste Management, Inc. Retirement Savings Plan, an ERISA-qualified

12

plan ("Waste Management Plan").  Accordingly, Plaintiff Keye has standing to bring suit on behalf of the Waste Management Plan for losses to the Waste Management Plan due to breaches of fiduciary duty under ERISA.

34.    During the Class Period, a portion of Plaintiff Keye's Plan account was invested in the Bond Market Non-Lending Fund.  State Street served as the Investment Manager for the Waste Management Plan's investment in the Bond Market Non-Lending Fund.  The Waste Management Plan, and Plaintiff Keye's Plan account suffered substantial losses as a result of State Street's imprudent investment management of the Bond Market Non-Lending Fund.

35.    The Lead and Additional Plaintiffs identified herein have standing to bring this action, and pursuant to Fed. R. Civ. P. 23, to bring a representative action on behalf of the Plans, all of which incurred losses as a result of State Street's breach of its fiduciary duties as the Investment Manager of the Plans' investment in the Bond Funds.

**B.    THE DEFENDANTS**

36.    State Street Bank is a registered financial holding company with its principal place of business in Boston, Massachusetts, and which maintains an office in New York, New York.

37.    SSgA purports to be the world's largest institutional asset manager. SSgA's principal office is located in Boston, Massachusetts.  SSgA acted as the Investment Manager for the Plans' investment in the Bond Funds as that term is defined by ERISA § 3(38), 29 U.S.C. § 1002(38).

38.    John Does 1-20.  Plaintiffs currently lack the names of the individual State Street employees responsible for discharging State Street's duties and responsibilities as the Investment Manager under ERISA for the Bond Funds at issue.  Once the names of

these persons are identified, to the extent necessary and appropriate, Plaintiffs will amend the Complaint to add their true identities.

## IV.    CLASS ACTION ALLEGATIONS

39.    **Class Definition**.  Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plans and the following class of persons similarly situated (the "Class"):

> All qualified ERISA plans, and the participants, beneficiaries, and named fiduciaries of those plans, that invested directly or indirectly in the State Street Limited Duration Bond Fund or any other unregistered State Street fund (collectively, the "Subject Funds," which includes the "Bond Funds" identified in this complaint) between January 1, 2007 and December 31, 2007 (the "Class Period") that suffered losses as a result of the Subject Funds' direct or indirect investment in mortgage-related securities or mortgage-related derivatives. Specifically excluded from the Class are the individual Defendants herein, officers and/or directors of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party, other than qualified ERISA plans offered by State Street or any of its affiliates to its employees and which suffered losses as well due to investment in the Subject Funds.

40.    **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that hundreds of ERISA qualified plans throughout the country offered the Bond Funds and had assets invested in the Bond Funds during the Class Period, and sustained losses as a result, and that these plans collectively have tens of thousands of participants and beneficiaries.

41.     **Commonality**.   The claims of Plaintiffs and the members of the Class
have a common origin and share a common basis.   The claims of all Class members
originate from the same misconduct, breaches of duties and violations of ERISA,
perpetrated by the Defendants.   Proceeding as a class is particularly appropriate here
because the Bond Funds are held in collective trusts managed by State Street, in which
assets of every plan that invests in the Bond Funds are pooled, and, therefore, State
Street's imprudent actions affected all plans that invested in the Bond Funds in the same
manner.

42.     Furthermore, common questions of law and fact exist as to all members of
the Class and predominate over any questions solely affecting individual members of the
Class.   The many questions of law and fact common to the Class include:

a.      Whether Defendants breached their fiduciary duties under ERISA;

b.      Whether Defendants deviated from the true and proper purpose of
the Bond Funds when they invested in highly risky, exotic, leveraged, and speculative
investments in the Bond Funds;

c.      Whether Defendants failed to provide complete and accurate
information to plan sponsors, fiduciaries, and participants when they invested in highly
risky, exotic, and speculative investments in the Bond Funds;

d.      Whether Defendants' acts proximately caused losses to the plans at
issue, and if so, the appropriate relief to which Plaintiffs, on behalf of the Plans and the
Class, are entitled;

43.     **Typicality**.   Lead and Additional Plaintiffs' claims are typical of the
claims of the members of the Class because:  (a) Lead and Additional Plaintiffs seek

relief on behalf of the Plans pursuant to ERISA § 502(a)(2), and, thus, their claims on behalf of the Plans are not only typical to, but identical to, a claim under this section brought by any Class member; and (2) Lead and Additional Plaintiffs seek relief under ERISA § 502(a)(3) on behalf of the Plans for equitable relief, that relief would affect all Class members equally. If brought and prosecuted individually, each of the members of the Class would necessarily be required to prove the instant claims upon the same material and substantive facts, upon the same remedial theories and would be seeking the same relief.

44. **Adequacy**. Lead and Additional Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel that are competent and experienced in class action, complex, and ERISA litigation, and that have been duly appointed as Lead Counsel and Interim Class Counsel for the proposed Class. Lead and Additional Plaintiffs have no interests antagonistic to or in conflict with those of the Class. Lead and Additional Plaintiffs will undertake to vigorously protect the interests of the absent members of the Class.

45. **Rule 23(b)(1)(A) & (B) Requirements**. Class action status in this ERISA action is warranted under the Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status also is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

46.     **Rule 23(b)(2) Requirements**.   Certification under 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

47.     **Rule 23(b)(3) Requirements**.  In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## V.     THE STATE STREET BOND FUNDS AT ISSUE

48.     The Intermediate Bond Fund for Employee Trusts is a fixed-income fund. Its strategy is to match or somewhat exceed the return of the Lehman Brothers Intermediate Government Corporate Bond Index. The Intermediate Bond Fund for Employee Trusts was offered to ERISA Plans during the Class Period.

49.     The SSgA Enhanced Intermediate Bond Fund[1] is a fixed-income fund. Its strategy is to match or somewhat exceed the returns of the Lehman Brothers Intermediate Government/Credit Bond Index. The Enhanced Intermediate Bond Fund was offered to ERISA Plans during the Class Period.

50.     The SSgA Intermediate Bond CTF Fund is a fixed-income fund. Its strategy is to match or somewhat exceed the returns of the Lehman Brothers Intermediate

---

[1] The Andover Plan is invested in the Enhanced Intermediate Bond Fund; however, according to a Form 5500 filed by State Street, the Andover Plan was invested in the Intermediate Bond SL Series Fund - Class A as of December 31, 2005.  Plaintiffs reserve the right to amend their complaint to revise the Bond Funds' denominations based on information learned through discovery.

Government Corporate Bond Index. The Intermediate Bond CTF Fund was offered to ERISA Plans during the Class Period.

51.     The SSgA Intermediate Bond NL Fund is a fixed-income fund. Its strategy is to match or somewhat exceed the returns of the Lehman Brothers Intermediate Government Credit Bond Index. The Intermediate Bond NL Fund was offered to ERISA Plans during the Class Period.

52.     The Daily Bond Market Fund is a fixed-income fund. On information and belief, the Daily Bond Market Fund is designed to match or somewhat exceed the performance of the Lehman Brothers Aggregate Bond Index. The Daily Bond Market Fund was offered to ERISA Plans during the Class Period.

53.     The Daily Corporate/Government Bond Fund is a fixed-income fund. Its strategy is to match or somewhat exceed a Lehman Brothers market index. The Daily Corporate/Government Bond Fund was offered to ERISA Plans during the Class Period.

54.     The SSgA Government Credit Bond Non-Lending Fund is a fixed-income fund. Its strategy is to match or somewhat exceed the return of the Lehman Brothers Government Credit Bond Index. The SSgA Government Credit Bond Non-Lending Fund was offered to ERISA Plans during the Class Period.

55.     The SSgA Yield Plus Fund is a fixed-income fund. The fund is benchmarked against, and its strategy is to match or somewhat exceed the return of, the LIBOR - BBA London Index 90-day. On information and belief, the SSgA Yield Plus Fund was offered to ERISA Plans during the Class Period.

56.     The Total Bond Market Fund is a fixed-income fund. Its strategy is to match or somewhat exceed the returns of the Lehman Brothers Aggregate Bond Index. The Total Bond Market Fund was offered to ERISA Plans during the Class Period

57.     The SSgA Bond Market Fund is a fixed-income fund. Its strategy is to match or somewhat exceed the returns of the Lehman Brothers Aggregate Bond Index. The SSgA Bond Market Fund was offered to ERISA Plans during the Class Period.

58.     The Limited Duration Bond Fund is a fixed-income fund. Its strategy is to match or somewhat exceed the JP Morgan one-month US Dollar LIBOR Index. The Limited Duration Bond Fund was offered to ERISA Plans during the Class Period.

59.     The SSgA Bond Market NL (Non-Lending) Fund is a fixed income fund. Its strategy is to match or somewhat exceed the Lehman Brothers Aggregate Bond Index. The SSgA Intermediate Bond NL Fund was offered to ERISA Plans during the Class Period.

60.     The State Street Short Term Bond Fund CTF is a fixed income fund.  Its strategy is to match or somewhat exceed the Lehman Brothers One to Three Year Government Bond Index.  The State Street Short Term Bond Fund CTF was offered to ERISA Plans during the Class Period.

61.     On information and belief, each of these Bond Funds was established by State Street Bank, as Trustee, and held pursuant to the State Street Bank and Trust Company Investment Funds for Tax Exempt Retirement Plans ("State Street Retirement Plans Trust") declaration of trust created on February 21, 1991.  Pursuant to ¶3.4 of the Fourth Amended and Restated Declaration of Trust for the State Street Retirement Plans

Trust, "the funds shall be under exclusive management and control of the Trustee in conformity with the provision of this Declaration of Trust."

62.     Pursuant to ¶2.1 of the State Street Retirement Plans Trust, the Bond Funds were offered to both ERISA and health and welfare Plans throughout the country. State Street served as the Investment Manager under ERISA for each of the Plans' investment in the Bond Funds, and as a result of State Street's imprudent investment of the underlying assets that comprise each of the Bond Funds, the Bond Fund, and, thus the Plans, each incurred losses due to the same mismanagement by State Street.

## VI.    THE ERISA PLANS

63.     Under the terms of the Bond Funds offered to the ERISA Plans, State Street was at all relevant times responsible for the management and control of the assets invested in the Bond Funds, and acted as the Bond Funds' Investment Manager, as that term is defined in Section 3(38) of ERISA.

64.     Numerous ERISA retirement plans invested in the Bond Funds as a conservative investment option for retirement savings, and numerous ERISA health and welfare benefit plans invested in the Bonds Funds as a conservative investment option for funding participants' health and welfare benefits.  ERISA plans and plan participants directed hundreds of millions of dollars of retirement and health and welfare plan savings into the Bond Funds.

65.     On information and belief, each of the Bond Funds was managed pursuant to common strategies, by a handful of State Street employees.  As alleged herein, at some juncture as late as early 2007, State Street's management caused each of the Bond Funds to deviate from their stated strategy and directed increasingly large amounts of the Bond Funds' assets into leveraged positions on high-risk investments, including subprime

mortgage-backed securities and other illiquid asset-backed securities, exposing all of the Bond Funds to enormous risk.

66.     Because all of the Bond Funds were centrally managed by SSgA's Fixed Income division, State Street's imprudent conduct with respect to the Bond Funds affected all ERISA plans that invested in the Bond Funds in the same manner, that is, they all were all similarly exposed to the same unacceptable risk, and suffered losses because of the same imprudent management by State Street.

67.     As State Street itself has admitted in its Current Report (Form 8-K) (January 17, 2008):

> Among other things, the portfolio managers for certain actively managed fixed-income strategies materially increased the exposure of these strategies to securities backed by sub-prime mortgages and shifted the weighting of these portfolios to more highly rated sub-prime instruments. During the third quarter of 2007, as the liquidity and valuations of these securities, including the more highly rated instruments, came under increased pressure, the performance of these strategies was adversely affected, in some cases significantly. The underperformance, which was greater than that typically associated with fixed-income funds, also caused a number of our customers to question whether the execution of these strategies was consistent with their investment intent. This has resulted in several civil suits, including putative class action claims. These lawsuits allege, among other things, that we failed to comply with our standard of care in managing these active funds as a fiduciary under ERISA. We have also received inquiries from regulatory authorities regarding SSgA's active fixed-income strategies. Given our desire to fully respond to customer concerns, following the end of the third quarter of 2007, State Street undertook a further review of all the actively managed fixed-income strategies at SSgA that were exposed to sub-prime investments. Based on our review and on-going discussions with customers who were invested in these strategies, we established the reserve to address our estimated legal exposure.

68.     On January 3, 2008, State Street also announced the resignation of William W. Hunt, then President and Chief Executive Officer of SSgA.   The Boston Globe, *State Street Ousts Chief Executive*, Jan. 3, 2008.

69.     State Street reportedly also "terminated" six senior members of SSgA's fixed income team, including Michael Wands, who had been director of North American Fixed Income, and Frank Gianatasio, who had headed structured debt.   Svea Herbst-Bayliss , *State Street Makes More Staff Changes*, Reuters, Feb. 5, 2008.

70.     In its Initial Disclosures, State Street identified nine individuals who may have information regarding the Bond Funds' investment strategy and investment decisions.   On information and belief, eight of those nine individuals have been terminated from their positions due to their mismanagement of the Bond Funds. Accordingly, on information and belief, a small group of State Street personnel engaged in the conduct that caused all the Plans to incur the losses that are the subject of this class action.   The focus of this litigation, thus, is the conduct of State Street employees whose imprudent actions had far-reaching but uniform effects, none of which was caused by any action, or inaction of the Class members or other third parties.   State Street and State Street alone is liable for the losses at issue in this case.

## VII.     DEFENDANTS' FIDUCIARY STATUS

71.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.   Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or

indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

72.     **Investment Manager.**   Under ERISA, an investment manager is a fiduciary.  ERISA defines investment manager as:

> (38) any fiduciary (other than a trustee or named fiduciary, as defined in section 1102 (a)(2) of this title)—
>
> (A) who has the power to manage, acquire, or dispose of any asset of a plan;
>
> (B) who
>
> (i) is registered as an investment adviser under the Investment Advisers Act of 1940 [15 U.S.C. 80b–1 et seq.];
>
> (ii) is not registered as an investment adviser under such Act by reason of paragraph (1) of section 203A(a) of such Act [15 U.S.C. 80b–3a (a)], is registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filed the registration form most recently filed by the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary;
>
> (iii) is a bank, as defined in that Act; or
>
> (iv) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and
>
> (C) has acknowledged in writing that he is a fiduciary with respect to the plan.

Section 3(38), 29 U.S.C. § 1002(38).

73.      Here, State Street served as the Investment Manager for the Bond Funds. In this capacity, State Street was responsible for prudently and loyally managing the assets that were invested in the Bond Funds.

74.      State Street expressly acknowledges its status as Investment Manager in the governing documents for the specific plans identified herein.

75.      On information and belief, State Street has similarly acknowledged its fiduciary status as Investment Manager for the Bond Funds for all other ERISA qualified plans that invested in the Bond Funds.

## VIII.      FACTS BEARING ON FIDUCIARY BREACH

### A.      THE STATE STREET BOND FUNDS AND THEIR PURPORTED INVESTMENT STRATEGY

76.      State Street had sole investment discretion as to each of the Bond Funds at all relevant times.  Neither Plaintiffs, the Plans, nor any member of the Class had the discretion to direct the manner in which State Street invested any of the assets of the Bond Funds offered to the Plans or any other plans included in the Class. State Street represented that the Bond Funds were safe, conservative investments that would provide stable, predictable levels of return.  The Bond Funds were purportedly designed to track, and exceed, the performance of the specified bond market indices. These Funds, sometimes referred to as "enhanced index funds," purportedly offered the security and stability of an index fund with a slight benefit provided by moderate active management intended to provide a somewhat better return than that of the designated indices.  Indeed, State Street stressed in communications with plan sponsors, fiduciaries, and participants that the Bond Funds were low risk investments.

77.   For example, the Enhanced Intermediate Bond Fund was described as appropriate for low to intermediate risk investors seeking only moderate potential fluctuations in their account balance.  State Street described the Investment Objective of the Enhanced Intermediate Bond Fund as "to match or exceed the return of the Lehman Brothers Intermediate Government/Credit Bond Index   State Street further represented that the "the Fund invests only in high quality bonds."

78.   The very selection of that particular Lehman Index as the benchmark for the Fund signaled the Fund's purportedly conservative investment profile, because the Lehman Brothers Intermediate Government/Credit Bond Index which features a blend of U. S. Treasury, government-sponsored (U. S. Agency and supranational), mortgage and corporate securities limited to a maturity of no more than ten years.  The selection of this benchmark thus reinforced State Street's representation that the Bond Funds would invest in conservative, stable securities.

79.   State Street represented in documents and information it disseminated that its management of the State Street Bond Funds reflected a disciplined, risk-controlled investment process that would protect investors from risk driven by random and unpredictable events.  For example, the Intermediate Bond Fund's December 31, 2006 Fact Sheet states that "this fund may be appropriate for you if you have a short to medium investment time frame or if you are looking to generate income and add stability of principal to your portfolio as you near retirement."

80.   Participants in the Plans throughout the country that offered the State Street Bond Funds invested in the Bond Funds as a safe and secure, conservative

investment for retirement assets.  For example, during the Class Period, the Andover Plan invested approximately $3 million in the Bond Funds.

81.    Collectively, hundreds of millions, if not billions, of dollars were invested in the Bond Funds.  All of the money invested in the funds through the hundreds of Plans that offered the Bond Funds was pooled by State Street into collective trusts.  As a result, State Street's imprudent management of the Bond Funds affected all of the many ERISA Plans that invested in the Bond Funds in the same manner.

**B.    STATE STREET ABANDONED THE BOND FUNDS' CONSERVATIVE INVESTMENT PROFILE TO SPECULATE IN HIGH-RISK MORTGAGE-BACKED INVESTMENTS**

82.    State Street could not have picked a worse time to violate its fiduciary duties, which it owed to the Plans and the Class that had invested in State Street's supposedly stable, conservative Bond Funds, by speculating in high risk securities.  By no later than the first quarter of 2007, State Street – in violation of its fiduciary duties and with wanton disregard for the interests of the investors in the Bond Funds – began to heavily invest the Bond Funds in risky financial instruments, including mortgage-backed securities and derivatives.  These high-risk investments directly exposed the Bond Funds to the volatility of the subprime mortgage market at precisely the time when it was publicly reported that defaults of subprime mortgages were skyrocketing, and that numerous subprime lenders were facing insolvency.

83.    For example, between December 31, 2006 and June 30, 2007, the percentage of the Enhanced Intermediate Bond Fund comprised of asset-backed securities doubled, from 17.18% to 35.75%.  Over that same period, State Street also quadrupled the Fund's allocation of mortgage-backed securities from 0 .73% to 2.5%.

84.     "Subprime" mortgage loans refer to loans with unconventional terms, such as discounted "teaser" interest rates, an inordinately high loan to equity ratio or an extended period for repayment, as well as loans made to borrowers with low income and/or poor credit history who do not qualify for standard ("prime") mortgage loan terms. To create liquidity for these subprime mortgages, lenders combine them with other asset-backed securities to form a "collateralized debt obligation" or "CDO."   Tranches of the CDOs are then sold to investors, who are entitled to the cash flow from the bundled monthly mortgage payments (principal and/or interest) paid by the mortgage borrowers. This type of bundling increases funding to the lenders by reducing risk – through the pooling of the loans – and also results in the transfer of risk to investors that are willing to purchase these securities.

85.     In 2005 and 2006, the Federal Reserve instituted a series of interest rate hikes, and the interest rates on variable rate loans, including mortgage loans, began to rise.  Subprime borrowers who were able to afford the initially low "teaser rate" loan payments could no longer meet their monthly payment obligations.  At the same time, home values began to decline (with particularly sharp declines experienced in various parts of the country), leading many borrowers to walk away from loans when they could neither afford their increasing monthly mortgage payments nor re-sell their property for a profit. As a result, many borrowers (and in particular subprime borrowers) stopped making payments on their mortgages, causing mortgage defaults to increase dramatically. The widespread failure of the subprime mortgages that underlie CDOs and other mortgage-backed securities significantly impaired the value of those securities.

86.    The imminent collapse of the subprime lending industry was widely-documented.  In December 2006, the Center for Responsible Lending issued a report predicting the worst foreclosure crisis in the modern mortgage market.  *See* Ron Nixon, *Study Predicts Foreclosure For 1 In 5 Subprime Loans*, New York Times, (December 20, 2006).  Shortly thereafter, several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries from SEC and FDIC, and resulting in several bankruptcy filings by mortgage lenders.  In this financial environment, during the Class Period State Street exposed the Plans and the Class to inordinate and unacceptable risk by investing increasing amounts of the Bond Funds' assets in such securities and instruments, and caused losses that would not have occurred had State Street managed the Bond Funds according to their stated purpose.

87.    The subsequent collapse of the subprime lending industry – which was in full swing by March of 2007 – simply confirmed that securities and derivative instruments backed by subprime and other high-risk asset-backed securities were not highly risky and not suitable for conservative, fixed-income funds such as the Bond Funds.  Indeed, on March 13, 2007, the Mortgage Bankers Association announced that during the fourth quarter of 2006, U.S. subprime borrowers fell behind in their mortgages at the highest rate in over four years—up nearly a point from the previous quarter—and that foreclosures had jumped to an all-time high.  Still, State Street continued investing the Bond Funds' assets in subprime mortgage-backed securities and risky asset-backed securities, even though State Street served as the Investment Manager for hundreds of ERISA retirement Plans that invested in the Bond Funds, and had represented in

documents and information that it disseminated that the Bond Funds were stable and conservative investments.

**C.    STATE STREET'S HIGH RISK GAMBLE WITH PLANS' AND PARTICIPANTS' RETIREMENT AND HEALTH & WELFARE ASSETS COMES TO LIGHT**

88.    On or about August 2007, after much of the damage already was done, State Street began to reveal the massive risk to which it had exposed investors in the Bond Funds.

89.    According to The Wall Street Journal, on August 14, 2007, Sean Flannery, then Chief Investment Officer for SSgA, wrote to State Street's clients that "in the midst of the recent turmoil in the fixed-income markets, many of our active bond strategies sharply underperformed."  Flannery attributed that underperformance to the fact that State Street had "focused increasingly on housing-related assets" in order to increase returns.

90.    In that letter, State Street also disclosed that it had multiplied the risk inherent in those investments by making the investments with borrowed funds. Specifically, the letter stated that, as of July 31, the Government/Credit Bond Fund was leveraged to nearly 6-to-1 – meaning that the fund borrowed to increase its portfolio to about six times the amount of money clients invested.  In addition, State Street's August 14 letter disclosed that State Street had also caused the Bond Funds to invest in Treasury futures, options on futures, interest rate swaps and interest rate "swaptions."

91.    There is no question that the losses incurred by the Bond Funds resulted from imprudent investments in subprime mortgage-backed securities, derivatives of such securities and other exotic instruments, including losses compounded by imprudent leveraging.  According to Bloomberg News, a State Street spokeswoman confirmed that

29

"portfolios with over-weights in residential mortgage-backed securities, representing various risk/return profiles, have been impacted negatively by the recent market conditions." Since then, State Street has set aside $625 million to cover legal exposure stemming from the Bond Funds' losses.

92.     The actual losses incurred as a result of State Street's misconduct are staggering. The Limited Duration Bond Fund lost about 37 percent of its value during the first three weeks of August 2007 alone, and by late August had fallen 42 percent for the year. Between July 1, 2007 and September 1, 2007, the Government Credit Bond Fund declined by 12% and the Intermediate Bond Fund declined by 25%, while the indices they purported to track actually increased. The Andover Plan's investment in the Enhanced Intermediate Bond Fund lost approximately 14% of its value since January 1, 2007.

93.     Had State Street managed the Bond Funds appropriately and according to their stated objective and risk level, the losses suffered by the Plans and the Class would not have occurred. Instead, by gambling with the Plans' assets, State Street squandered hundreds of millions of dollars in retirement and health and welfare Plan assets. State Street and the individual State Street fund managers involved, whose identities are not yet established with certainty, are personally liable for the losses they caused.

**D.   STATE STREET IMPRUDENTLY MANAGED THE BOND FUNDS IN VIOLATION OF ITS DUTIES UNDER ERISA**

94.     State Street's conduct with respect to the Bond Funds was grossly negligent and a clear dereliction of its duties as an ERISA Investment Manager. The conduct was manifestly imprudent because, among other reasons:

- The Defendants knew of and/or failed to investigate the hazards of its highly risky and speculative investments in securities and derivatives, and the highly leveraged manner in which it made these investments;

- The risk associated with the investment in mortgage-backed financial instruments and other investments described herein during the Class Period was far above and beyond the normal, acceptable risk associated with investment in fixed income securities;

- Defendants failed to fully and fairly disclose to ERISA plan participants and beneficiaries  State Street's deviation from the stated objectives of the Bond Funds and the extreme risk to the Plans' retirement and health and welfare assets caused by this change;

- Defendants had a duty to avoid speculating with the Plans' retirement and health and welfare assets and mismanaging the assets in the manner alleged herein; and

- Knowing that the Bond Funds were intended to be diversified funds, tracking public indices, and that to the extent that any portion of the assets of the Bond Funds could be invested in higher risk investments, Defendants had a heightened responsibility to avoid placing a significant portion of the assets of the Bond Funds in such investments, so as to avoid the risk of large losses precipitated by such investment.

95.    A prudent Investment Manager acting prudently, loyally, and for the exclusive purpose of plan participants, as required by ERISA, would not have gambled

with the Plans' retirement and health and welfare savings as State Street did in this case, and instead would have adhered to the stated conservative objective of the Bond Funds.

## IX.    THE RELEVANT LAW

96.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action for breach of fiduciary duty may be brought by the Secretary of Labor, or a participant, beneficiary or fiduciary of a plan for relief under ERISA § 409, 29 U.S.C. § 1109.

97.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part,

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

98.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

99.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man

acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

100.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwith*, 680 F.2d 263, 272 n.2 (2d Cir. 1982).  They entail, among other things:

> (a)    The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance the Bond Funds;
>
> (b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and
>
> (c)    The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

101.    According to DOL regulations and case law interpreting this statutory provision, in order to comply with the prudence requirement under ERISA §404(a), a fiduciary must show that: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

102.    Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), *to further the purposes of the plan*, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

  o The composition of the portfolio with regard to diversification;

  o The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

  o The projected return of the portfolio relative to the funding objectives of the plan.

103.    As set forth herein and specifically in the Count I of the Complaint, State Street failed abysmally in this regard, and generally, in their duty to manage the assets of the Bond Funds prudently, loyally, and in the best interests of the Plans and the Class.

104.    Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Bond Funds arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1).

## X.      ERISA § 404(C) DEFENSE INAPPLICABLE

105.    ERISA § 404(c) is an affirmative defense that provides a limited exception
to fiduciary liability for losses that result from participants' exercise of control over
investment decisions in ERISA-governed retirement plans.   For § 404(c) to apply,
participants must in fact exercise "independent control" over investment decisions, and
the fiduciaries must otherwise satisfy the numerous procedural and substantive
requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated
under it.

106.    ERISA § 404(c) does not apply here for several reasons.   First, ERISA §
404(c) does not and cannot provide any defense to State Street's decision to implement
and maintain an imprudent investment strategy for the Bond Funds, as these were not
decisions that were made or controlled by the participants.   *See* Final Reg. Regarding
Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final
404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992)
(codified at 29 C.F.R. pt. 2550) (noting that "the act of limiting or designating investment
options which are intended to constitute all or part of the investment universe of an
ERISA § 404(c) plan is a fiduciary function which, whether achieved through fiduciary
designation or express plan language, is not a direct or necessary result of any participant
direction of such plan").   Rather, State Street exclusively controlled how the assets
invested in the Bond Funds were invested.

107.    Second, ERISA § 404(c) does not apply because Defendants failed to
ensure effective participant control by providing complete and accurate material
information to participants and plans regarding the manner in which State Street managed
the Bond Funds.   *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be

provided with "sufficient information to make informed decisions"). State Street claimed the Bond Funds were stable, conservative investments; in truth, State Street invested the Bond Fund assets in highly risky and inappropriate securities and derivatives. As a consequence, participants did not have informed control over the portion of their assets that were invested in the Bond Funds as a result of their investment directions, and the Defendants remain entirely responsible for losses that result from such investment.

108.   Because ERISA § 404(c) does not apply here, State Street's liability to the Plans, Plaintiffs, and the Class (as defined above) for losses caused by the Bond Funds' undisclosed, risky investment strategies is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period.

## XI.   CLAIMS FOR RELIEF

### COUNT I

#### AGAINST STATE STREET BANK, SSgA AND JOHN DOES 1-20 FOR FAILURE TO PRUDENTLY AND LOYALLY MANAGE THE PLANS AND THEIR ASSETS

109.   Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

110.   Under Section 3(21) of ERISA, 29 U.S.C. § 1002(21), State Street was at all relevant times an ERISA fiduciary with respect to the Plans and the assets of the Plans invested in the Bond Funds.

111.   Under Section 3(38) of ERISA, 29 U.S.C. § 1002(38), State Street was at all relevant times the Investment Manager of the Bond Funds that were made available to the Plans.

112.    As alleged above, the scope of the fiduciary duties and responsibilities of State Street included managing the assets of the Bond Funds.

113.    The Defendants were obligated to discharge their duties with respect to the Plans' investment in the Bond Funds with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

114.    Contrary to their duties and obligations under ERISA, the Defendants failed to loyally and prudently manage the assets of the Plans in the Bond Funds managed by State Street.  Specifically, State Street breached its duties to the participants, in violation of ERISA § 404(a), by, *inter alia*, (a) failing to provide complete and accurate information regarding the investments it made in the Bond Funds, and specifically, its decision to invest in highly risky and speculative securities and derivatives instead of the stable, and conservative investments as was appropriate for the Bond Funds; (b) failing to notify Plaintiffs or the Plans of State Street's change in investment strategy, (c) altering the Bond Funds' investment strategy to include investments fundamentally inconsistent with the stated purposes of the Bond Funds, (d) exposing the Bond Funds to excessive levels of risk through inappropriate leverage and accumulation of investments in mortgage-related financial derivatives, (e) failing to maintain sufficient diversification in the investments held by the Bond Funds in light of their stated objectives, and (f) generally failing to invest and manage the assets of the Bond Funds in the manner of a reasonably prudent fiduciary acting under similar circumstances.

115.     Moreover, the Defendants failed to conduct an appropriate investigation of the merits of its highly risky and speculative investment management decisions even in light of the high risk of these inappropriate investments and the particular dangers that these holdings posed to the Bond Funds.  Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of mismanaging the assets of the Bond Funds in the manner alleged herein.  A reasonably prudent fiduciary would have managed the assets according to their stated objective as opposed to gambling with participants' retirement savings as Defendants did in this case.

116.     As a consequence of the Defendants' breaches of fiduciary duties alleged in this Count, the Bond Funds suffered massive losses.  Had Defendants discharged their fiduciary duties to prudently invest the Bond Funds' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans and the other Class members, lost hundreds of millions of dollars of retirement savings.

117.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## XII.     LOSS CAUSATION

118.     The State Street Bond Funds suffered hundreds of millions of dollars in losses because substantial assets of the State Street Bond Funds were imprudently invested or allowed to be invested by Defendants during the Class Period, in breach of Defendants' fiduciary duties.

119.    Defendants are liable for these losses because they were caused by Defendants' breaches of fiduciary duty, including but not limited to, their imprudent decision to alter the investment strategy of the Bond Funds' and invest the Bond Funds' assets in volatile asset-backed securities and risky mortgage-backed instruments, engage in highly leveraged and risky transactions with Bond Fund assets, invest Bond Funds' assets in securities that are not typical of those in the indices which State Street purportedly designed the Bond Funds to track, all of which was imprudent under the circumstances presented here.

120.    Had the Defendants properly discharged their fiduciary duties, the ERISA plans that offered the Bond Funds and for which State Street served as Investment Manager, would have avoided some or all of the losses that the Plans, and, indirectly, the plan participants and beneficiaries suffered.

## XIII.    REMEDY FOR BREACHES OF FIDUCIARY DUTIES

121.    The Defendants breached their fiduciary duties in that they knew, or should have known, the facts as alleged above, and therefore knew, or should have known, that the Bond Funds' assets should not have been invested in mortgage-backed instruments during the Class Period, or otherwise invested improperly as described herein.

122.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes the Secretary of Labor, or a participant, beneficiary or fiduciary of a plan to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary…who breaches any of the…duties imposed upon fiduciaries…to make good to such plan any losses to the plan…."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

39

123.    With respect to calculation of the losses to the Bond Funds, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans would not have made or maintained their investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plans' assets prudently and appropriately, and in this instance, according to the stated objective of the Bond Funds. In this way, the remedy restores the Plans' lost value and puts the participants in the position they would have been in if the Plans had been properly administered.

124.    Plaintiffs, on behalf of the Plans and the Class, are therefore entitled to relief from the Defendants in the form of: (a) a monetary payment to the ERISA plans that offered the Bond Funds to make good to the ERISA plans the losses resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), to the extent applicable for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

125.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered in this case.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.       A determination that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.       A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Plans and the Class;

C.       A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

D.       An Order compelling the Defendants to make good to the ERISA Plans that offered the Bond Funds for which State Street served as the Investment Manager all losses to the ERISA Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the plans resulting from imprudent investment of the Bond Fund's assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.       Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the plans as the result of breaches of fiduciary duty;

F.       An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Bond Funds for ERISA Plans;

G.       Actual damages in the amount of any losses to the ERISA, Plans included in the Class to be allocated among the participants' individual accounts within the Plans in proportion to the accounts' losses as required by ERISA;

H.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.    An Order awarding attorneys' fees pursuant to the common fund doctrine,

29 U.S.C. § 1132(g), and other applicable law;

J.    An Order for equitable restitution and other appropriate equitable and

injunctive relief against the Defendants; and

K.    Granting such other and further relief as the Court may deem just and

proper.


Dated: August 22, 2008                              Respectfully submitted,

**KELLER ROHRBACK LLP**                             **BERNSTEIN LITOWITZ BERGER**
Lynn L. Sarko (LS-3700)                             **& GROSSMANN LLP**
Derek W. Loeser (DL-6712)                           William C. Fredericks (WF-1576)
Karin B. Swope (KS-3369)                            Jonathan Harris (JH-3047)
Laura R. Gerber                                     Jerald D. Bien-Willner
1201 Third Avenue, Suite 3200                       1285 Avenue of the Americas
Seattle, Washington 98101                           New York, New York 10019
Telephone: (206) 623-1900                           Telephone: (212) 554-1400
Facsimile: (206) 623-3384                           Facsimile: (212) 554-1444

Gary Gotto
3101 North Central Avenue
Suite 1400
Phoenix, AZ 85012                                   **BERMAN, DEVALERIO PEASE**
Telephone: (602) 248-0088                           **TABACCO BURT & PUCILLO**
Facsimile: (602) 248-2822                           Jeffrey C. Block (JCB 0387)
                                                    Patrick T. Egan
David Preminger (DP-1057)                           Kristen D. Tremble
275 Madison Ave                                     One Liberty Square
Suite 1425                                          Boston, Massachusetts 02109
New York, NY 10016                                  Telephone: (617) 542-8300
Telephone: 212-878-8890                             Facsimile: (617) 542-1194
Facsimile: 212-878-8895

42

*Co-Lead Counsel and Interim Class Counsel*

**ROBERT M. CHEVERIE & ASSOCIATES**
Robert M. Cheverie
Gregory S. Campora
333 East River Drive, Suite 101
East Hartford, CT  06108
Telephone: (860) 290-9610
Facsimile: (860) 290-9611

*Additional Counsel for Plaintiff Glenn Kingsbury*