UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE STATE STREET BANK AND TRUST CO. ERISA LITIGATION<br><br>This document relates to:<br><br>07 Civ. 8488 | 07 Civ. 8488 (RJH)<br><br>**MEMORANDUM OPINION AND ORDER** |

      This is an action brought pursuant to sections 409(a) and 502(a)(2) and (3) of the Employee Retirement Income Security Act of 1974 ("ERISA") by plaintiff Prudential Retirement Insurance and Annuity Company ("Prudential") as the fiduciary of over two hundred retirement plans (the "Plans") to recover losses due to the Plans' investments in funds offered by defendants State Street Bank and Trust Company and/or State Street Global Advisors, Inc. (collectively, "State Street"). Prudential alleges that two State Street funds lost significant value due to State Street's breaches of fiduciary duties in managing these funds. State Street now moves to dismiss the complaint filed in this action ("Complaint" or "Compl.") pursuant to Federal Rules of Civil Procedure 12(b)(1), for lack of standing, and 12(b)(6), for failure to state a claim, or in the alternative for summary judgment. For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND

      Plaintiff Prudential "offers institutional retirement plan sponsors access to a wide variety of mutual funds and bank collective trusts . . . enabling plan sponsors to assemble a menu of investment choices for retirement plans and plan participants." (Compl. ¶ 10.)

Prudential is an ERISA fiduciary of 210 or 215 retirement plans that invested, through Prudential, in two collective bank trusts managed by State Street—the "Government Credit Fund" and the "Intermediate Bond Fund" (collectively, the "Funds").  By virtue of its control over plan assets invested in the Funds, State Street also acts as an ERISA fiduciary with respect to each Plan.  (*Id.* ¶¶ 15, 31.)[1]  The Plans invest their assets through Prudential by investing in a "separate account" set up by Prudential to correspond to each fund on its "menu".  The assets of Plans that wish to invest in a particular fund through Prudential are pooled in the appropriate separate account, which then purchases an interest in that fund.  (*Id.* ¶¶ 11, 14, 32.)

According to the Complaint, the Plans lost roughly $80 million in the summer of 2007 due to State Street's overly risky investment strategies, including "undisclosed, highly leveraged positions in mortgage-based financial derivatives." (*Id.* ¶ 3.)  By concentrating the holdings of the Funds in such assets, State Street "exposed the . . . Funds to an inappropriate level of risk," contrary to State Street's representations that the Funds were "enhanced bond index" funds that sought "'stable, predictable returns'

---

[1]  Under ERISA, an entity is a fiduciary with respect to a retirement plan "to the extent (i) [it] exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) [it] renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) [it] has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

Under section 409(a) of ERISA, a fiduciary to a covered retirement plan that breaches its fiduciary obligations to the plan "shall be personally liable to make good to any plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. § 1109(a).  Under section 502(a)(2), a fiduciary of an ERISA plan may bring action for relief under section 409; such an action is brought "in a representative capacity on behalf of the plan as a whole." 29 U.S.C. § 1132(a)(2); *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 (1985).  Under section 502(a)(3), a fiduciary may bring an action "to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or . . . to obtain other appropriate equitable relief . . . to redress such violations or . . . to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

slightly above an index consisting of investment-grade U.S. Government and corporate bonds." (*Id.* ¶¶ 2, 3.)

In October 2007, Prudential made the Plans a proposal under which Prudential would loan a participating plan an "up-front payment" in an amount that to some extent compensated a plan for losses from its investment in the State Street Funds (the "Loan"), in exchange for the plan's authorization for Prudential to commence litigation against State Street on its behalf. (*See, e.g.,* Goldman Decl. Exs. 4, 5, 6.)

The proposed Loans consisted of (1) an amount necessary to increase a plan's balance to the value it would have achieved had it been invested in the Lehman Brothers Intermediate U.S. Government Credit Index (the "Benchmark Index") instead of the State Street Funds between July 1 and August 29, 2007, plus (2) the return that would have been received on the plan's July and August losses in the State Street Funds if these had instead been invested in the Benchmark Index from August 29, 2007 to October 8, 2007, plus (3) a portion of the costs of bringing legal action against State Street. (*See, e.g.,* Goldman Decl. Exs. 4, 5, 6; Siegel Decl. Ex. C.)

To accept the proposal, Plans were required to respond before December 1, 2007. Prudential has represented that 190 of the Plans accepted Prudential's Loan proposal (the "Participating Plans") (Siegel Decl. Ex. D), and that the total amount of the Loans was approximately $80 million (Goldman Decl. Exs. 1, 2, 3). Under the terms of the agreement entered into by the Participating Plans (the "Authorization Agreement"), a plan that receives a Loan is only obligated to repay Prudential from the proceeds (by judgment, settlement, or otherwise) of litigation against State Street. (*See, e.g., id.* Ex. 4 at 6.) If the amount of such recovery is less than the Loan amount, the unpaid balance is

forgiven.  (*See, e.g., id.* Ex. 4 at 3.)  If the amount of recovery exceeds the Loan amount, the excess will be paid to the Plan.  (*See, e.g., id.* Ex. 4 at 4, 6.)

The Loans are structured such that the Loans are not paid directly to individual Plans, but rather to the separate accounts previously invested in the Funds (the "Separate Accounts").  (*See, e.g., id.* Ex. 4; Siegel Decl. Ex. C.)  The Separate Accounts are then obliged to pay disbursements to the Plans and to make repayment to Prudential out of any litigation proceeds that are received.  (*See, e.g.,* Goldman Decl. Ex. 4; Siegel Decl. Ex. C.)

State Street has moved to dismiss the Complaint pursuant to Rule 12(b)(1), asserting that Prudential lacks standing to bring this action because (1) it can only act on behalf of the Plans, which State Street contends have been "made whole" as a result of the Loans, and (2) it seeks recovery on behalf of the Separate Accounts, in which State Street contends the Plans no longer have any interest.  In the alternative, State Street seeks partial summary judgment that the Loan amount shall be set off against any damages awarded in this action.  Finally, State Street moves under Rule 12(b)(6) to dismiss all of Prudential's claims brought pursuant to ERISA Section 502(a)(3), claiming that the Complaint states no viable claim for equitable relief.

**DISCUSSION**

**I.     The Plans Do Not Lack Standing to Recover Amounts Received From Prudential**

State Street characterizes its motion as a challenge to Prudential's standing pursuant to Rule 12(b)(1).  *See Alliance For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 89 n.6 (2d Cir. 2006) (stating that the proper procedural route for a

challenge to standing is a motion under Rule 12(b)(1)).  However, a plaintiff's standing is "assessed as of the time the lawsuit is brought," *Comer v. Cisneros*, 37 F.3d 775, 787 (2d Cir. 1994), in this case October 1, 2007.  There is no evidence that any Plan had accepted Prudential's Loan proposal or received any payment from Prudential on or before this date.  Indeed, State Street's own evidence indicates that the Authorization Agreements and materials describing the proposal were distributed to the Plans sometime in October 2007 and that these materials refer to the fact that this action had already been filed.  (*See* Goldman Decl. Exs. 4, 5, 6, 8.)

State Street appears to contend that the Plans lacked standing at the time of filing because Prudential "publicly offered to make the Plans whole" in an October 1, 2007 SEC filing in which Prudential stated that it was "implementing a process under which affected plan clients . . . will receive payments . . . for the losses [from investments in State Street funds]," because at this time, "the Plans had the legal right and ability to be made whole, and thus had no injury-in-fact." (Reply Mem. 5; Goldman Decl. Ex. A.)  This argument has no basis in the law and is rejected.

Because standing undisputedly existed when the complaint was filed, State Street's motion is properly characterized not as a challenge to standing but as a challenge based on mootness due to post-filing events.  *See Comer*, 37 F.3d at 797–98 (explaining that "[w]hile the standing doctrine evaluates a litigant's personal stake at the onset of a case, the mootness doctrine ensures that the litigant's interest in the outcome continues throughout the life of the lawsuit," and that "[i]n general, a case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome").  "A case can become moot at any stage of litigation, though the burden on the

party alleging mootness is a 'heavy' one." *Associated Gen. Contractors of Conn., Inc. v. City of New Haven*, 41 F.3d 62, 65 (2d Cir. 1994).

The Court therefore interprets State Street's motion as seeking to dismiss this action as moot because the Plans no longer have any interest in this litigation, having already been "made whole" by Prudential. According to State Street, the Plans no longer have a legally cognizable injury because Prudential intended the Loans as complete compensation for the Plans' losses in State Street funds and referred to portions of the Loans in materials describing the proposal as "Make Whole Amounts". (*See, e.g.,* Defs.' Mem. 1–11 (citing Goldman Decl. Ex. 4).) As an alternative to dismissal for lack of standing, State Street seeks partial summary judgment that the $79 million Loan amount shall be set off against any damages awarded in this action.

The premise of State Street's motions—that an action is necessarily mooted when a plaintiff's damages are reimbursed—is flawed. Federal courts regularly apply the "collateral source rule," which permits a plaintiff to recover damages from a tortfeasor though the plaintiff has already received compensation for its injuries from a third-party and even when such an award would lead to double recovery. "According to this doctrine, which is an established exception to the general rule that damages in a negligence action must be compensatory, a wrongdoer is not permitted to reduce a plaintiff's recovery because of benefits which the latter may have received from another source." *Cunningham v. Rederiet Vindeggen A/S*, 333 F.2d 308, 316 (2d Cir. 1964); *see also* 2 Dan B. Dobbs, Law of Remedies § 8.6(3) (2d ed. 1993) ("The collateral source or collateral benefit rule denies the defendant any credit for payments or benefits conferred

6

upon the plaintiff by any person other than the defendant himself or someone identified with him.").

To the extent State Street is arguing that the "collateral source rule" should not apply, it offers no case law or argument suggesting that the circumstances of this case justify an exception to this generally applicable rule.[2] *See Hartnett v. Reiss S. S. Co.*, 421 F.2d 1011, 1016 (2d Cir. 1970) ("The general rule in the federal courts is that the collateral source rule is applied . . . ."); *King v. City of New York*, No. 06 Civ. 6516 (SAS), 2007 WL 1711769, at *1 (S.D.N.Y. June 13, 2007) ("The collateral source rule is a substantive rule of law that bars the reduction of an award by funds or benefits received from collateral or independent sources. It applies to cases governed by federal law . . . ."); *Ebert v. City of New York*, No. 04 Civ. 9971 (LMM), 2006 WL 3627103, at *2 (S.D.N.Y. June 26, 2006); *see also* 2 Dan B. Dobbs, Law of Remedies § 8.6(3) (2d ed. 1993) ("Except as modified by statute, the [collateral source] rule is almost invariably accepted in the courts."); *compare Garofalo v. Empire Blue Cross & Blue Shield*, 67 F. Supp. 2d 343, 347 (S.D.N.Y. 1999) (noting that plaintiff had cited no cases indicating that collateral source rule applied in ERISA cases and declining to apply collateral source rule to claim for breach of fiduciary duty that, unlike the instant case, was "at worst, neither purposeful nor negligent," reasoning that "[i]n these no-fault circumstances, it would be inequitable to apply the fault-premised collateral-source rule"). In fact,

---

[2] *Harley v. Minnesota Mining & Manufacturing*, 284 F.3d 901 (8th Cir. 2002), cited by State Street, is distinguishable. In that case, the court held that beneficiaries of a defined benefit plan lacked standing to sue their employer for an allegedly imprudent investment of plan assets, because the employer's voluntary contributions to the plan had created a substantial surplus. *Id.* at 905–08. This holding was based on the unique characteristics of a defined benefit plan, under which beneficiaries receive a "fixed periodic payment," "a decline in the value of a plan's assets does not alter accrued benefits," and "members have no entitlement to share in a plan's surplus." *Id.* at 905 (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439–40 (1999)). The court found that the beneficiaries suffered no injury-in-fact because the plan's surplus was sufficiently large that the investment loss did not affect the beneficiaries' interests. *Id.* at 907.

7

application of the collateral source rule is particularly appropriate in this case. It permits Prudential, in effect, to subrogate the Plans' claims against State Street and will potentially prevent State Street from receiving a windfall benefit from a payment intended by Prudential to benefit the Plans. 2 Dan B. Dobbs, Law of Remedies § 8.6(3) (2d ed. 1993) (citing protection of subrogation rights and prevention of windfall benefits to wrongdoers as two frequently cited rationales for the collateral source rule). Furthermore, because the terms of the Loans require the Plans to repay Prudential the Loan amount from any recovery obtained in this litigation, there is no threat of double recovery in this case.

Application of the collateral source rule here is also consistent with "ERISA's essentially remedial purpose of protecting beneficiaries of pension plans." *Salovaara v. Eckert*, 222 F.3d 19, 31 (2d Cir. 2000). A fiduciary in Prudential's position would obviously be deterred from making similar loans to pension plans and bringing claims on the plans' behalf if the fiduciary were unable to recover its payment from litigation proceeds. *See id.* at 28 (stating that "the purpose of ERISA [is] to promote the interests of plan beneficiaries and allow them to enforce their statutory rights."). Furthermore, permitting a set-off for the Loan amount may prevent the Plans from receiving damages to which they are legally entitled, should such damages exceed $79 million, because any award up to this amount must be repaid to Prudential under the terms of the Loan. Finally, it is obviously not in the interests of ERISA plan beneficiaries to permit a defendant that has breached its fiduciary obligations to escape liability for its actions.[3]

---

[3] Even if State Street were correct that a Plan's receipt of a Loan divested it of standing, dismissal of Prudential's complaint in its entirety would not be warranted because some Plans did not accept the Loan proposal and therefore have received no payment in compensation for their losses. State Street does not purport to challenge the standing of any of these non-participating Plans. Furthermore, while the Loans

## II.     The Separate Accounts Are Plan Assets

State Street also asserts that the Plans lack standing in this action because the Complaint requests that relief be paid to the Separate Accounts, not to the Plans, and therefore seeks recovery for Prudential, not for the Plans.  State Street alleges that the Participating Plans no longer have funds invested in the Separate Accounts, citing a provision in the Authorization Agreement permitting Prudential to redeem a Participating Plan's investment in the Separate Account and deposit that amount in a "substitute investment option" selected by the plan.  (*See, e.g.,* Goldman Decl. Ex. 4 at 6.)

A "separate account" under ERISA is defined as "an account established or maintained by an insurance company under which income, gains, and losses, whether or not realized, from assets allocated to such account, are, in accordance with the applicable contract, credited to or charged against such account without regard to other income, gains, or losses of the insurance company."  29 U.S.C. § 1002.

As noted, retirement plans that wanted to invest in the State Street Funds using Prudential did so by purchasing interests in Prudential separate accounts, which in turn purchased units of the State Street Funds.  (Opp'n Mem. 4; Compl. ¶ 11.)  Prudential alleges that "[u]nder ERISA, the assets of each . . . separate account are treated as the assets of the pension plans investing in such separate account."  (Compl. ¶ 14); *see also* 29 C.F.R. § 2510.3-101(h)(1)(iii) (stating that a plan that holds or acquires an interest in

---

approximated the Plans' losses based on returns earned by a benchmark index during the summer months of 2007, damages under ERISA for a Section 409(a) violation are calculated by "compar[ing] . . . what the Plan actually earned on the . . . investment with what the Plan would have earned had the funds been available for other Plan purposes."  *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985).  "Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these."  *Id*.  Therefore, the amount recoverable from State Street under Section 409(a) of ERISA may potentially exceed the amount of the Loan.  In light of this fact, the Court would be unable to find as a matter of law that the Plans have been fully compensated for their losses.

9

an insurance company's "separate account" has an "undivided interest" in the underlying assets of the separate account).  This is generally consistent with State Street's description of the Separate Accounts as "accounts set up within Prudential in order to aggregate the investments of participating plans for the purpose of making pooled investments in the State Street Funds."  (Defs.' Mem. 2.)

The limited evidence indicates that the Plans retain an interest in the Separate Accounts.  Even if a plan has transferred its funds out of the Separate Account, it retains an interest in the Separate Accounts pursuant to the Authorization Agreement, which states that Prudential "is a fiduciary of the Plan in connection with the Plan's investment in the Separate Account," and that "if Lawsuit Proceeds allocable to the Plan exceeds [the Loan amount plus allocable legal fees], any such excess amount will be allocated to the Plan in a manner consistent with [Prudential's] obligation as a fiduciary in connection with the Separate Account."  (Goldman Decl. Ex. 4 at 6.)  Furthermore, the agreement between Prudential and the Separate Accounts, pursuant to which the Loan amount is transferred to the Separate Accounts, indicates that if a recovery is obtained in litigation, repayment will be made from the Separate Accounts and that Prudential has no claim for repayment from and no security interest in any other asset of the Separate Accounts.  (Siegel Decl. Ex. C at 2.)

The Court finds that the Plans retain an interest in this litigation seeking recovery to the Separate Accounts.  The record indicates that the Separate Accounts are maintained by Prudential as a fiduciary for the benefit of the Plans and the Plans have an ongoing interest in the litigation proceeds paid to these accounts.

### III.     State Street's Motion to Dismiss Prudential's § 502(a)(3) Claims

State Street has also moved under Rule 12(b)(6) to dismiss Prudential's claims brought pursuant to ERISA section § 502(a)(3). State Street argues that these claims must be dismissed because Prudential's complaint states no viable claim for equitable relief.

"[E]quitable relief" under § 502(a)(3) refers to "'those categories of relief that were typically available in equity,'" *Great West Lift & Annuity Ins. Co. v. Knudson*, 534 U.S. 708, 712 (2002) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993)), and does not generally include money damages, which are "'the classic form of legal relief,'" *id.* at 713 (quoting *Mertens*, 508 U.S. at 255). "For restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 714–15.

Prudential does not contend that its claim for "restitution and disgorgement" falls into this category of equitable restitution, and, indeed, does not dispute State Street's claim that Section 502(a)(3) cannot be used to recovery monetary damages for "restitution and disgorgement" or for the "management fees" paid to State Street. The Court agrees that these demands for monetary relief are legal, not equitable, and dismisses them to the extent they are brought pursuant to Section 502(a)(3).

State Street also argues that Prudential has not alleged facts to support a demand for a permanent injunction against State Street "from further breaching, violating, or failing to discharge its duties under ERISA." (Compl. 15.) "The basic requirements to obtain injunctive relief have always been a showing of irreparable harm and the inadequacy of legal remedies." *Nechis v. Oxford Health Plans*, *Inc.*, 421 F.3d 96,

103 (2d Cir. 2005). Irreparable harm requires a showing of "'real or immediate threat that the plaintiff will be wronged again.'" *Levin v. Harleston*, 966 F.2d 85, 90 (2d Cir. 1992) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 111 (1983)). Prudential alleges no facts indicating that it or the Plans face irreparable harm and no facts indicating that legal remedies are inadequate. Therefore, Prudential's claim for an injunction is dismissed.[4]

## CONCLUSION

For the reasons discussed herein, State Street's motion to dismiss for lack of standing **[24]** is denied, State Street's motion for summary judgment **[24]** is denied, and State Street's Rule 12(b)(6) motion to dismiss **[24]** is granted.

SO ORDERED.

Dated: New York, New York
September 30, 2008

Richard J. Holwell
United States District Judge

---

[4] In its opposition papers, Prudential argues that its request for prejudgment interest is an equitable claim that can be awarded under Section 502(a)(3). (Opp'n Mem. 22.) State Street has not moved to dismiss Prudential's claim for prejudgment interest. The Court expresses no opinion at this time about whether and/or under what statutory provision an award of prejudgment interest might be available in this action.