UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

IN RE STATE STREET BANK AND
TRUST CO. FIXED INCOME FUNDS          MDL No. 1945
INVESTMENT LITIGATION

_____

IN RE STATE STREET BANK AND
TRUST CO. ERISA LITIGATION
                                      **ANSWER AND**
This document relates to:             **COUNTERCLAIM**

07 Civ. 8488

_____


Defendants State Street Bank and Trust Company ("SSBT") and State Street Global

Advisors, Inc. (collectively, "State Street") for their Answer and Counterclaim to Plaintiff's

Complaint dated October 1, 2007 (the "Complaint"), hereby state as follows:

1.      State Street admits that the Intermediate Bond Fund and the Government Credit

Bond Fund (collectively, the "Bond Funds") were collective bank trusts and that Prudential

Retirement Insurance and Annuity Company ("PRIAC") invested in the Bond Funds managed by

State Street Global Advisors ("SSgA"), a division of SSBT, on behalf of retirement plans

through so-called "segregated" or "separate" accounts, says that the allegations of the first two

sentences of paragraph numbered 1 constitute legal conclusions to which no answer is required,

but to the extent an answer is required and as to the remaining allegations of paragraph numbered

1, denied.

2.      State Street says that its descriptions of the Bond Funds and their investment

objectives are set forth in written documents that speak for themselves, and to the extent these

written documents differ from the language quoted in paragraph numbered 2, State Street denies the same, and denies the remaining allegations of paragraph numbered 2.

3.      Denied.

4.      Denied.

5.      The allegations in paragraph numbered 5 constitute legal conclusions to which no answer is required, but to the extent an answer is required, denied.

6.      State Street is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph numbered 6.

7.      State Street admits that SSBT is a wholly owned subsidiary of State Street Corporation, which is a publicly registered financial holding company, that SSBT is a bank organized under the laws of the Commonwealth of Massachusetts, that its principal place of business is Boston, Massachusetts, and that it provides investment servicing and investment management services, and otherwise denies the remaining allegations of paragraph numbered 7.

8.      State Street says that State Street Global Advisors, Inc., is a Delaware corporation and a wholly-owned subsidiary of State Street Corporation, but denies that State Street Global Advisors, Inc., is the same as SSgA, or that it has any connection to the allegations of the Complaint, and says that SSgA, which provided the investment management services at issue in the Complaint, has its principal place of business in Boston, Massachusetts.  State Street further says that the language quoted in paragraph numbered 8 comes from written documents that speak for themselves, and otherwise denies the remaining allegations of paragraph numbered 8.

9.      The allegations in paragraph 9 constitute legal conclusions to which no answer is required, but to the extent an answer is required, denied.

10.     The allegations in paragraph 10 constitute legal conclusions to which no answer is required, but to the extent an answer is required, denied.

11.     State Street admits that PRIAC is a fiduciary that advises defined contribution and defined benefit plans and offers them retirement products and services, but is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph numbered 11.

12.     State Street admits that prior to April 1, 2004, CIGNA Retirement & Investment Services ("CIGNA Retirement") invested in the Bond Funds on behalf of its retirement plan clients and that, effective April 1, 2004, CIGNA Retirement was acquired by PRIAC, but otherwise denies the remaining allegations of paragraph numbered 12.

13.     State Street says that the trust referenced in paragraph numbered 13, and the terms governing the funds that are part of the trust, were established pursuant to written documents that speak for themselves, further says that PRIAC invested in the Bond Funds on behalf of its clients, and otherwise denies the remaining allegations of paragraph numbered 13.

14.     State Street says that the terms of the trust referenced in paragraph numbered 14 are set forth in written documents that speak for themselves, further says that the allegations in the second sentence of paragraph numbered 14 constitute legal conclusions to which no answer is required, and otherwise denies the remaining allegations of paragraph numbered 14, except admits that PRIAC is a fiduciary under ERISA.

15.     State Street admits that it entered into a Second Amended and Restated Investment Management Agreement with Connecticut General Life Insurance Company effective June 2003, which is a written document that speaks for itself, and to the extent that the written document differs from the allegations in paragraph numbered 15, State Street denies the same, and denies the remaining allegations of paragraph numbered 15.

16.     State Street says that the Investment Management Agreement referenced in paragraph numbered 16 is a written document that speaks for itself, and to the extent that the

written document differs from the allegations of paragraph numbered 16, State Street denies the same, and denies the remaining allegations of paragraph numbered 16.

17.     State Street says that any "Fund Fact Sheets" prepared by PRIAC are written and speak for themselves, is otherwise without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of the third and fourth sentences of paragraph numbered 17, and otherwise denies the remaining allegations of paragraph numbered 17 in the form and manner alleged, and specifically denies the implication that all of PRIAC's "Fund Fact Sheets" accurately reflected information provided by State Street.

18.     State Street says that the descriptions of the Bond Funds are set forth in written documents that speak for themselves, and to the extent that the written documents differ from the language quoted in paragraph numbered 18, State Street denies the same and otherwise denies the remaining allegations of paragraph numbered 18.

19.     State Street says that the chart and statements referenced in the paragraph numbered 19 come from written documents that speak for themselves, and to the extent that the written documents differ from the language quoted in paragraph numbered 19, State Street denies the same and otherwise denies the remaining allegations of paragraph numbered 19.

20.     State Street says that its descriptions of the Bond Funds, as well as the composition of the indices referenced in paragraph numbered 20(c), are set forth in written documents that speak for themselves, and to the extent that these written documents differ from the allegations in paragraph numbered 20, State Street denies the same.  State Street specifically denies the implication in paragraph numbered 20(c) that it ever represented that the composition of the actively managed Bond Funds would mirror the composition of their respective benchmarks, further denies the implication in paragraph numbered 20(d) that it ever guranteed that either Bond Fund's "'maximum'" tracking error was limited to 75 basis points, and further

denies the implication in paragraph numbered 20(e) that PRIAC asked State Street to approve, or that State Street approved, all "Fund Fact Sheets" that PRIAC prepared and disseminated to its clients.

21.     State Street admits that, consistent with governing fund documents, the Bond Funds invested in mortgage-related financial instruments, including derivatives based on asset-backed securities such as the BBB ABX Index, further says that the language quoted in paragraph numbered 21 comes from a written document that speaks for itself, and otherwise denies the remaining allegations of paragraph numbered 21.

22.     State Street says that the quoted language and numbers in the second sentence of paragraph numbered 22 come from a written document that speaks for itself, further says that the Bond Funds' notional exposure "as of July 31" could not have been disclosed prior to that date, and otherwise denies the remaining allegations of paragraph numbered 22 and specifically denies that August 2007 was the "first time" that State Street had disclosed the use of notional leverage in the Funds to PRIAC.

23.     Denied.

24.     The allegations of paragraph numbered 24 constitute legal conclusions to which no answer is required, but to the extent an answer is required, denied.

25.     The quoted language in paragraphs numbered 25(a) and (c), as well as the communications referenced in paragraphs numbered 25(b), (d), and (e) are contained in written documents that speak for themselves, and State Street otherwise denies the remaining allegations of paragraph numbered 25 and specifically denies that it provided untimely, incomplete or misleading information to PRIAC.

26.     State Street admits that a conference call between representatives of the parties occurred on August 22, 2007, admits that State Street representatives Mark Flinn and Michael

Wands participated in the call, admits that during the call, the parties discussed notional leverage and exposure to mortgage-related investments in the Bond Funds, but denies the remaining allegations of paragraph numbered 26.

27.     State Street admits that during the two-month period beginning July 1, 2007, the benchmark indices for the Bond Funds increased while the returns of the Bond Funds declined, further says that the allegations in the second sentence of paragraph numbered 27 refer to a written document that speaks for itself, and otherwise denies the remaining allegations of paragraph numbered 27.

28.     State Street admits that on or about August 29, 2007, PRIAC requested that State Street redeem the vast majority of its remaining investments in the Bond Funds and that State Street subsequently liquidated the Bond Funds, and otherwise denies the remaining allegations of paragraph numbered 28.

29.     Denied.

30.     State Street incorporates by reference the answers set forth in paragraphs numbered 1 through 29 as if fully set forth herein.

31.     The allegations in paragraph numbered 31 constitute legal conclusions to which no answer is required, but to the extent an answer is required, denied.

32.     The allegations in paragraph numbered 32 constitute legal conclusions to which no answer is required, but to the extent an answer is required, denied.

33.     The allegations in paragraph numbered 33 constitute legal conclusions to which no answer is required, but to the extent an answer is required, denied.

34.     Denied.

35.     The allegations in paragraph numbered 35 constitute legal conclusions to which no answer is required, but to the extent an answer is required, denied.

36.     The allegations in paragraph numbered 36 constitute legal conclusions to which no answer is required, but to the extent an answer is required, denied, except admitted that PRIAC is a fiduciary within the meaning of Section 502(a)(2) of ERISA.

37.     The allegations in paragraph numbered 37 constitute legal conclusions to which no answer is required, but to the extent an answer is required, denied, except admitted that PRIAC is a fiduciary within the meaning of Section 502(a)(3) of ERISA.

38.     Denied.

39.     Denied.

State Street denies each and every allegation of the Complaint to which it has not specifically admitted or otherwise responded herein.

State Street denies that plaintiff is entitled to the relief requested or to any relief whatsoever.

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

The Complaint is barred by reason of plaintiff's lack of standing both under Article III of the Constitution and under ERISA.

### THIRD AFFIRMATIVE DEFENSE

The Complaint is barred in whole or in part by plaintiff's wrongful conduct and breach of its fiduciary duties.

### FOURTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, by the doctrines of waiver, laches, and estoppel.

## FIFTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, by the doctrines of unclean hands and *in pari delicto*.

## SIXTH AFFIRMATIVE DEFENSE

The Complaint is barred insofar as plaintiff has named an incorrect party – State Street Global Advisors, Inc. – as a defendant in this action.

## SEVENTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, because plaintiff is not as a matter of law entitled to the forms of relief it seeks in this action.

## EIGHTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, because State Street did not breach any duties or obligations it allegedly owed under ERISA or any other applicable law.

## NINTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, because plaintiff suffered no damages as a result of State Street's alleged breaches of fiduciary duty.

## TENTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, because plaintiff has failed, refused and/or neglected to mitigate or avoid damages it allegedly incurred as a result of State Street's alleged breaches of fiduciary duty.

## ELEVENTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, because State Street has not received any benefit or enrichment as a result of the alleged breaches.

## TWELFTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, because State Street has complied with all disclosure requirements under all applicable laws.

## THIRTEENTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, because plaintiff did not rely upon State Street's alleged failures to disclose or alleged misrepresentations.

## FOURTEENTH AFFIRMATIVE DEFENSE

To the extent that plaintiff challenges discretionary decisions made by State Street, its claims are barred, in whole or in part, because State Street committed no abuse of discretion, and its challenged conduct and activities were lawful and appropriate as a matter of law.

## FIFTEENTH AFFIRMATIVE DEFENSE

No answer is required to the allegations of the Complaint seeking equitable relief under § 502(a)(3) of ERISA because such allegations have been dismissed.

State Street reserves the right to assert additional affirmative defenses.

## COUNTERCLAIM

State Street incorporates paragraphs 1 through 39 above as if fully set forth herein.

Pursuant to Rule 13(a) of the Federal Rules of Civil Procedure, Defendant and Counterclaimant

State Street Bank and Trust Company ("State Street"), for its claims against Plaintiff and

Counterdefendant Prudential Retirement Insurance and Annuity Company ("PRIAC"), alleges as

follows:

## SUMMARY

1.      This counterclaim arises out of PRIAC's failure to satisfy its obligations as a

fiduciary under the Employee Retirement Income Security Act of 1974 ("ERISA") and the false

and misleading statements it made about State Street in its efforts to divert attention away from

itself.  As it repeatedly emphasized in its own marketing materials to its clients, PRIAC was at

all material times a fiduciary with regard to the funds that it offered to its clients, including State

Street's Intermediate Bond Fund and the Government Credit Bond Fund (together, the "Bond

Funds").

2.      As an ERISA fiduciary, PRIAC owed its clients the utmost duties of loyalty and

diligence, including a fundamental obligation to monitor, evaluate, and oversee the funds that it

offered to its clients for investment, as well as a duty to inform itself regarding the funds, and to

confirm that they were suitable and appropriate for its clients' needs.  PRIAC explicitly touted its

Due Diligence Advisor Program in written materials provided to clients, asserting that it applied

a "rigorous, objective analysis" to monitor funds offered by PRIAC, which resulted in an

"ongoing exhaustive examination of offerings."

3.      In fact, PRIAC failed to conduct any meaningful "due diligence" of the Bond

Funds.  For example, PRIAC failed to recognize that the Intermediate Bond Fund was an

actively managed rather than a passive fund; as a result, PRIAC misleadingly marketed the fund

to its clients as the "Passive Intermediate Bond Fund." PRIAC also told its clients after losses were incurred that it had no idea that the Funds were invested in mortgage-related securities and that State Street had concealed the truth when, in fact, State Street had provided PRIAC with monthly and quarterly reports showing that the Funds' allocation to mortgage-related securities was overweighted relative to their benchmark indices.

4.     When losses were incurred and PRIAC's clients began questioning its diligence and bringing its failures to light, PRIAC sought to conceal its breaches of fiduciary duty by making defamatory statements about and pointing the finger at State Street. PRIAC even went so far as to buy off its clients, by paying them $80 million, and thereby secure their silence, so that PRIAC could attempt to control the court of public opinion and continue to accuse State Street of misconduct.

5.     State Street denies any liability to PRIAC for losses experienced by PRIAC clients who were invested in the Bond Funds. If State Street is found liable, however, PRIAC is liable to State Street for contribution and/or indemnification for its own breach of fiduciary duties under ERISA. PRIAC is also liable to State Street under Massachusetts law for its defamatory statements and for engaging in false and deceptive trade practices, in violation of section 2 of Massachusetts General Law, chapter 93A.

**THE PARTIES**

6.     Counterclaimant State Street Bank and Trust Company ("SSBT") is a Massachusetts trust company and wholly owned subsidiary of State Street Corporation with its principal place of business in Boston, Massachusetts. State Street Global Advisors ("SSgA") is the investment management division of SSBT. SSBT and its division SSgA are referred to herein as "State Street."

7.     Counterdefendant PRIAC is a corporation organized under the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut.

## JURISDICTION

8.     This Court has jurisdiction over State Street's counterclaim for contribution or indemnification pursuant to 28 U.S.C. §§ 1331 and 1367 because it arises under ERISA and forms part of the same case or controversy asserted by PRIAC in its Complaint.

9.     This Court has supplemental jurisdiction over State Street's state law claims pursuant to 28 U.S.C. § 1367.

10.    This Court also has diversity jurisdiction over this counterclaim under 28 U.S.C. § 1332, the amount in controversy being in excess of $75,000.

## PRIAC'S ROLE AS A PROVIDER OF RETIREMENT PRODUCTS AND SERVICES

11.    PRIAC markets itself as a "leader" in the retirement marketplace, offering "innovative" and "state-of-the-art" products and services to ERISA plans and their participants.

12.    State Street also provides a range of retirement products and services to ERISA plans, and PRIAC and State Street are therefore competitors.

13.    Among the products that PRIAC offers its clients are "Alliance Funds."

14.    At all relevant times, the Bond Funds – among other State Street funds – were offered to PRIAC clients as Alliance Funds pursuant to various Investment Management Agreements entered into between State Street and PRIAC and its predecessor, CIGNA Retirement & Investment Services ("CIGNA"), which PRIAC acquired effective April 1, 2004.

15.    At all relevant times, PRIAC clients across the United States – including clients located in the Commonwealth of Massachusetts – invested in the Bond Funds.

## PRIAC'S FIDUCIARY DUTY TO INVESTORS IN THE BOND FUNDS

16.     At all relevant times, PRIAC owed and expressly acknowledged a fiduciary duty under ERISA to investors in the Bond Funds.

17.     For instance, PRIAC marketing materials stated that it "acts as a 'fiduciary' within the meaning of [ERISA]," with respect to Alliance Funds.  PRIAC promised its clients, among other things, that it would act prudently and diligently in selecting, overseeing, and monitoring all Alliance Funds, and further agreed to indemnify plan sponsors in the event it breached any of these duties.

18.     As one PRIAC employee expressly acknowledged, "Prudential absolutely has a responsibility to monitor all funds on our platform."

19.     PRIAC also touted as part of its retirement offerings a program denominated the Due Diligence Advisor Program, which promised to "ensure a quality selection of best-in-class financial options" to plan sponsors.

20.     At all relevant times, the Alliance Funds – including the Bond Funds – fell under the Due Diligence Advisor Program.

21.     According to PRIAC's marketing materials, the Due Diligence Advisor Program "selects, monitors and reports those [investment vehicles] that represent best-in-class choices." PRIAC boasted that the Program used "the best evaluation and decision-support tools possible," which produce "ongoing exhaustive examination" of the funds offered.  In particular, PRIAC purported to monitor fixed income funds using a "rigorous and comprehensive methodology."

22.     As an ERISA fiduciary that promised clients that it would select and oversee fund offerings pursuant to the highest standards of fiduciary responsibility and loyalty, PRIAC owed its clients a duty of care and diligence with respect to the oversight, analysis and evaluation of,

and communications about, their investments in the Bond Funds. Here, PRIAC did not even

know that the Intermediate Bond Fund was an actively managed, and not a passive, fund.

23.     Pursuant to ERISA, PRIAC was required to discharge its responsibilities with the

care, skill, prudence and diligence that a prudent person acting in a like capacity and familiar

with such matters would use in the conduct of an enterprise of like character and with like aims.

At a minimum, this included an obligation to understand the strategies and nature of the Funds,

and an obligation accurately to describe them in its communications with clients and their

consultants – responsibilities that PRIAC utterly failed to discharge.

## PRIAC'S FAILURE TO MONITOR THE BOND FUNDS

24.     Before PRIAC acquired CIGNA, the Bond Funds were made available to

retirement plans through CIGNA.

25.     Upon information and belief, before the PRIAC acquisition, CIGNA engaged in

regular due diligence of the Bond Funds. Although it promised to rigorously evaluate and

monitor the Bond Funds, however, PRIAC discontinued all regular due diligence soon after

acquiring CIGNA.

26.     For example, before the acquisition, CIGNA asked PRIAC to review Fact Sheets

for the funds each quarter.

27.     PRIAC, however, did not continue CIGNA's practice of seeking review of its

Fact Sheets from State Street. In June 2005, PRIAC asked State Street to review the Q1 2005

Fact Sheets for the Bond Funds. For the next two years – until July 2007 – PRIAC did not

request *any* additional reviews of its Fact Sheets, which it nevertheless continued disseminating

to clients. Indeed, PRIAC only requested a review of its July 2007 Fact Sheet when PRIAC

realized that it was disseminating incorrect information in its Fact Sheets to its clients.

28.     PRIAC's failure to seek review of the Fact Sheets resulted in one of its most egregious fiduciary failures.  Beginning in the fall of 2005, PRIAC began distributing Fact Sheets to clients referring to the Intermediate Bond Fund, which was an actively managed fixed income fund, as the "Passive Intermediate Bond Fund."  A passive fund is an index fund designed to match the performance of its benchmark index.  By contrast, an actively managed fund is intended to match *or exceed* the performance of its benchmark and thus bears more risk than a passive fund.  Despite this basic difference, the Fact Sheet continued to refer inconsistently to the "unique active fixed income strategy" and "active management" techniques employed by State Street in managing the fund.  PRIAC, however, failed to notice either its error or the inconsistencies in its own Fact Sheets – a far cry from the "rigorous analysis" it promised its clients.

29.     As described further below, PRIAC's failure to fulfill its duty to monitor the Bond Funds is further apparent from the events of the summer and fall of 2007, when underperformance in the Bond Funds revealed how little PRIAC knew and how much information it had falsely communicated or failed to communicate to clients about the Bond Funds, and how flagrantly PRIAC disregarded the information regularly provided by State Street about the Bond Funds and their investment strategies.

## PRIAC'S FALSE AND MISLEADING STATEMENTS

30.     In the summer of 2007, PRIAC clients and their consultants began raising questions about underperformance in both of the Bond Funds.

31.     Several clients and consultants specifically asked why the "Passive Intermediate Bond Fund" was underperforming its index, given that passive index funds usually track their benchmarks.

32.     These questions, and PRIAC's answers, revealed PRIAC's ignorance regarding the Bond Funds and its failure to fulfill its promises to evaluate and monitor the Funds' strategies and performance.

33.     In response to these questions, PRIAC embarked on an effort to conceal its fiduciary failures and to disclaim any responsibility.  Instead, PRIAC sought to cast blame on State Street through defamatory statements and to buy off its clients by paying them $80 million.

34.     In numerous communications disseminated to PRIAC clients invested in the Alliance Funds, as well as those clients' consultants, PRIAC deliberately made a number of false and disparaging statements of fact about State Street, telling clients that State Street had failed to provide adequate and complete information.  PRIAC made these statements knowing them to be false and/or with reckless disregard as to their truth.

35.     Contrary to PRIAC's accusations, State Street had in fact made full and accurate disclosures to PRIAC about the Bond Funds.  PRIAC's misrepresentations were nothing more than a blatant attempt to hide its own fiduciary shortcomings and to cast itself as "doing the right thing."

**I.      The "Passive" Intermediate Bond Fund**

36.     The most egregious example of PRIAC's fiduciary shortcomings was its error in referring to the actively managed Intermediate Bond Fund as a "passive" fund in its client communications and marketing materials, which it began doing as early as the fall of 2005. PRIAC failed to recognize this mistake for nearly two years.

37.     In fact, PRIAC did not realize that it had erroneously referred to the Fund as a passive fund until one of its clients brought the issue to PRIAC's attention in the summer of 2007.

38.     That client wrote to PRIAC that its "nomenclature" and "marketing materials" for the Intermediate Bond Fund "appear[s] to grossly understate the risks being taken."  The client further complained that it was "having great difficulty" in getting "timely performance explanations [from PRIAC] which made any sense" and had instead turned directly to State Street for assistance.

39.     A consultant for another client pointed out that PRIAC had in "extensive communications . . . . characterized this fund in your reports as an index fund," even though the fund was "despite Pru's reports – an active fund."

40.     When PRIAC's mistake became apparent, it sought to deflect blame by castigating State Street in communications disseminated to clients and third-party consultants, including clients located in Massachusetts.  PRIAC blamed State Street for its own mistake and claimed that PRIAC could not have known that the fund name was incorrect.  These communications stated, for example, that:

    a.      "SSgA informed us *just this quarter* that they had earlier 'misnamed' the Intermediate Bond [F]und" (emphasis added);

    b.      "Because the fund was characterized by SSgA as an 'enhanced index fund' and its performance tracking had been in line with that of an enhanced index fund, the word 'passive' gave no rise to suspicion that it was wrong";

    c.      "[After July 2007], SSgA notified us that they had mistakenly added 'Passive' to the fund name given to us in September 2005."

41.     These statements were deliberately and intentionally false and misleading.  PRIAC made these statements in order to evade blame for its own mistake and to cause damage to State Street's business interests and reputation.

42.     In fact, PRIAC had ample information between 2005 and 2007 indicating that the Intermediate Bond Fund was not a "passive" index fund.  This information should have made abundantly clear to a sophisticated investment manager like PRIAC, which regularly touted its "rigorous" diligence, that the Intermediate Bond Fund was not a "passive" fund.  For example:

a.      State Street employees directly informed PRIAC employees on at least two occasions, in 2005 and May 2007, that PRIAC was invested in an actively managed fund;

b.      On the latter occasion, a PRIAC employee asked "why [the Fund] underperformed the index by a wide margin in Q1 [2007]," apparently failing to recognize that "wide" deviation from the benchmark was inconsistent with a "passive" fund;

c.      PRIAC received monthly performance reports that showed considerable underperformance and overperformance by the Intermediate Bond Fund, again reflecting deviation from the benchmark associated with active funds and not associated with passive funds;

d.      PRIAC received from State Street quarterly investment commentary that (i) explicitly referred to the Fund as the "Active Intermediate Bond Fund"; (ii) expressly referred to the Fund's "active exposures" and its "overweights" in non-benchmark sectors such as mortgage-related securities; and (iii) discussed differences in the Intermediate Bond Fund's performance versus its benchmark as well as the reasons for those differences;

e.      When the Intermediate Bond Fund underperformed its benchmark in the first quarter of 2007, a number of consultants and clients asked PRIAC

why the Fund was not tracking its index.  PRIAC responded by sending those consultants and clients State Street commentary referring to the Fund's "[a]ctive exposures" to asset-backed securities, but apparently failed to recognize that the Fund was not "passive";

f.    On more than one occasion between 2005 and 2007, clients or their consultants asked PRIAC why they were paying high fees for a "passive" fund, when such fees were typically charged only for actively managed funds.  As one consultant reminded PRIAC in August 2007, "You may recall that I . . . protested at paying 35 BPS for an index fund." Despite such inquiries, and despite charging fees normally associated with active funds, PRIAC failed to recognize that the Fund was not "passive";

g.    The Fact Sheets that PRIAC itself prepared and distributed to clients – while referring to the Fund as the "Passive Intermediate Bond Index SL Series Fund" in the caption – described the "unique, active fixed income trading strategy" and "active sector and issue selection techniques" employed by State Street in managing the Fund.

43.    The stark contrast between PRIAC's misleading statements to clients and the information it actually received demonstrate its stunning fiduciary failures.

44.    Given the range of information PRIAC regularly received from State Street concerning the active nature of the Intermediate Bond Fund, its failure to perceive – for a period of two years – its own error in referring to the Fund as "passive" constituted a grave breach of its duty to monitor the Fund.

45.    As a result of its failure to monitor the Fund, PRIAC misled its clients as to the nature of the Fund, thereby further breaching its fiduciary duties.

46.     The stark contrast between PRIAC's misleading statements about State Street and the extensive disclosures State Street actually made further highlight PRIAC's defamatory intent in making those statements.

47.     PRIAC's statements about State Street were deliberately false and deceptive in claiming (i) that PRIAC did not know and could not have known about its error in referring to the Intermediate Bond Fund as passive until the third quarter of 2007, and (ii) that State Street had not informed PRIAC of its "mistake" until that time.  PRIAC made these statements knowing them to be false and/or with reckless disregard as to their truth, thereby causing harm to the reputation and business interests of State Street, a competitor.

## II.     The Bond Funds' Investment Strategies

48.     During the summer of 2007, clients and their consultants began questioning PRIAC about the Bond Funds' underperformance.

49.     One client, for example, complained that PRIAC had failed in any of its investment reviews to identify the Government Credit Bond Fund's exposure to "non benchmark related investment sectors."  That client complained about the "minimal" information that PRIAC had provided.

50.     In response, PRIAC again told clients and consultants that it had only recently learned about the Funds' investment strategies and blamed State Street for failing to provide adequate information earlier.  For example, PRIAC told clients that:

> a.     It "did not learn about the fund's extensive leverage and broad exposure to sectors outside its stated benchmark strategy until a call with the head of SSgA's North American Fixed Income division, on August 22. . . . [W]hat we learned 'after the fact' about SSgA's actual investment strategy and holdings did not at all comport with what we had been led to believe."

b.   "SSgA's reporting on this fund did not clearly indicate a widespread concentration of assets outside the sectors identified as part of the fund's investment benchmark nor the use of leverage."

c.   "On August 22, the head of SSgA's North American Fixed Income division stated for the first time that the State Street Fund was leveraged and had broad exposure to sectors outside its stated benchmark strategy."

51.   Again, however, PRIAC's false and deceptive statements were merely an attempt to blame State Street and deflect responsibility.  In fact, reports and commentary that PRIAC regularly received – and even disseminated to its own clients – set forth the Funds' investment strategies and out-of-benchmark sector weights.

52.   Although Prudential told its clients and the press that the investment losses were in funds whose underlying investments had been misrepresented by State Street, in fact, State Street had told Prudential well before the summer of 2007 that losses in the Bond Funds' during the first quarter of 2007:

> was primarily drive by exposure in the triple B asset-backed securities market. The sub-prime housing market has been plagued by negative headlines in the media. . . .  Although we respect the technicals surrounding this issue, we are comfortable and confident in our analysis of the fundamentals and continue to hold this exposure. . . .  Looking forward, we will continue to hold our asset-backed exposure.  Our analysts remain confident in the fundamentals of these securities within the portfolio.

Prudential not only received these disclosures from State Street regarding the Bond Funds' underlying investments, it disseminated this information to its own clients in the spring of 2007.

53.   As another example, investment commentary on the Bond Funds that PRIAC received each quarter discussed the Funds' overweighted and underweighted sector exposures, as well as State Street's ongoing commitment to asset-backed securities – a sector not represented in the Funds' respective benchmarks.  Statements that appeared in the commentary included:

a.      A reference to "our virtually perpetual overweight to the Commercial Mortgage Backed sector" and "an overweight position to the Mortgage sector" in the Q4 2004 commentary;

b.      A reference to "[o]verweight positions to the CMBS sector," as well as overweights and underweights to different mortgage-backed sectors in the Q1 2005 commentary;

c.      A reference to "being long triple B securitized debt" and "overweight position to securitied products (Asset Backed and Commercial Mortgage Backed securities)" in the Q2 2005 commentary;

d.      A reference to "our overweight exposure to the triple B securitized credit sector" as the source of underperformance" and to another "significant active position[]" being "an overweight to the asset backed sector" in the Q4 2005 commentary;

e.      A reference to "[o]verweight positions to the long triple B securitized debt sector" and efforts "to increase our exposure here" in the Q1 2006 commentary;

f.      A reference to "[o]ur various overweights to the home-equity market, both high quality as well as triple Bs" and to "still lik[ing] the high quality asset-backed sector" and "active exposures" in Q2 2006 commentary;

g.      A reference to "[l]ong home-equity exposure in the asset backed sector," and to "hold[ing] overweight exposures to the securitized debt markets" as one of "[o]ur two best ideas" in Q3 2006 commentary; and

h.      A reference to "exposure in the triple B asset-backed securities market" in the Q1 2007 commentary.

54.   As these disclosures demonstrate, State Street regularly advised PRIAC of the active strategies and out-of-benchmark sector weights being employed by the Funds, including allocations to residential mortgage-backed securities.  Moreover, many of these strategies produced positive returns for years prior to the third quarter of 2007.  PRIAC never complained about or even questioned these investment strategies until losses were incurred.

55.   In addition to investment commentary describing the Bond Funds' investment strategies, PRIAC also received monthly performance reports that clearly signaled – well before the third quarter of 2007 – that the Funds' sector weights came nowhere close to matching their respective benchmarks.

56.   Specifically, State Street's disclosures to PRIAC regularly included comparisons of the sector allocations of the relevant benchmarks with the Funds' sector allocations on a market-value basis.  As a result, PRIAC knew or should have known that the compositions of the Funds and their benchmarks differed substantially.  For example:

   a.   The monthly report for October 2006 showed a 57.48% exposure to asset-backed securities ("ABS") in the Government Credit Bond Fund, and a 67.02% exposure to ABS in the Intermediate Bond Fund, versus 0% exposure in both Funds' benchmarks; and

   b.   The monthly reports for November 2006 showed a 52.85% exposure to ABS in the Government Credit Bond Fund, and a 58.75% exposure to ABS in the Intermediate Bond Fund, versus 0% exposure in both Funds' benchmarks.

57.   PRIAC also received multiple disclosures well before August 2007 indicating that the Bond Funds' strategies included the use of leverage.

a.     In 2005, for example, State Street employees repeatedly responded to PRIAC questions about Fund allocation by referring to "the leverage component of the fund" and explaining the concept of notional exposure.

b.     PRIAC received characteristics reports before the third quarter of 2007, including a characteristics report for May 2007, which it passed on to a client, which indicated that the Fund used leverage.

58.    Again, PRIAC's fiduciary failure is apparent from the glaring difference between what it told its clients, and what it knew or should have known.  Although PRIAC claimed it did not learn about the Bond Funds' out-of-benchmark sector weights until August 2007, in fact, PRIAC regularly received from State Street detailed commentary and reports that emphasized the Funds' allocation to non-benchmark sectors.  Indeed, State Street expressly highlighted its commitment to housing-related asset-backed securities through multiple quarters.  State Street further explained the use of leverage directly to PRIAC employees on more than one occasion.

59.    PRIAC's utter failure to meaningfully review, comprehend, or communicate this information to its clients was a grave breach of its duties as an ERISA fiduciary, and of its promises to its clients to conduct "rigorous" and "ongoing exhaustive examination" of the Bond Funds.

60.    Instead of accepting responsibility for its fiduciary failures, as PRIAC's marketing materials promised to do, PRIAC deliberately sought to cast blame on State Street through a series of false and disparaging statements, knowing them to be false and/or with reckless disregard as to their truth, thereby willfully and deliberately causing harm to the reputation and business interests of State Street, a competitor.

## FIRST COUNTERCLAIM
### (Contribution and/or Indemnification)

61.     State Street repeats and realleges each of the allegations contained in paragraphs numbered 1 through 60.

62.     State Street denies the material allegations of the Complaint.  Nevertheless, if there is any finding of liability on the part of State Street to PRIAC or to its clients for restitution or for any of their alleged damages, then under the facts alleged herein, PRIAC's violations of fiduciary duty make it substantially more at fault than State Street for any harm to those clients. PRIAC is therefore liable to State Street for complete indemnification for any liability suffered by State Street, including fees and costs, on the claims asserted in PRIAC's Complaint.

63.     Even if State Street and PRIAC are jointly liable by virtue of their status as fiduciaries within the meaning of ERISA, both are obligated to contribute to the payment or repayment of any damages or restitution according to their respective shares of fault.  State Street will therefore suffer damages to the extent it is required to pay more than its proportionate share of liability on the claims asserted in PRIAC's Complaint.

64.     Accordingly, PRIAC is liable to State Street for contribution and/or indemnification in the amount of any payment by State Street in excess of its share of liability, including fees and costs, on the claims asserted in Prudential's Complaint.

        WHEREFORE, State Street demands judgment against PRIAC and requests that the Court enter an order granting State Street

        i.      complete indemnification for any liability suffered by State Street, including fees and costs, on the claims asserted in the Complaint; or

       ii.      contribution and/or indemnification in the amount of any payment by State Street in excess of its share of liability, including fees and costs, on the claims asserted in the Complaint; and

       iii.     such additional relief as the Court may deem just and appropriate.

## SECOND COUNTERCLAIM
### (Defamation)

65.     State Street repeats and realleges each of the allegations contained in paragraphs numbered 1 through 64.

66.     PRIAC's statements about State Street were false and misleading, as alleged herein.

67.     PRIAC made such statements while knowing them to be false, or with reckless disregard as to their truth.

68.     PRIAC published and disseminated said statements to third parties, including clients and their consultants, for whose business State Street and PRIAC compete.

69.     PRIAC purposefully and intentionally made such false statements to third parties in order to harm State Street's business interests and reputation.

70.     PRIAC's statements had the effect of defaming State Street and of discrediting State Street in the minds of a respectable and considerable segment of the community and of State Street's client base (both current and prospective), and tended to hold State Street up to scorn, embarrassment, and ridicule, and irreparably harmed State Street's reputation and good will.

71.     As a direct and proximate result of PRIAC's said wrongful conduct, State Street was injured, including without limitation suffering lost business, lost profits, loss of good will, loss of reputation and other losses.

WHEREFORE, State Street demands judgment against PRIAC and requests that the Court enter an order:

     i.     Awarding damages and costs in an amount to be determined at trial, including punitive damages;

    ii.     Enjoining PRIAC from making disparaging and/or defamatory comments concerning State Street; and

   iii.     Awarding such other relief as the Court deems just and appropriate.

### THIRD COUNTERCLAIM
### (Unfair and Deceptive Trade Practices, M.G.L. c. 93A, §§ 2 and 11)

72.    State Street repeats and realleges each of the allegations contained in paragraphs numbered 1 through 71.

73.    PRIAC intentionally and willfully made false and defamatory statements about State Street, as alleged herein.

74.    PRIAC engaged in such conduct while doing business within the Commonwealth of Massachusetts.

75.    PRIAC deliberately and willfully made these false and defamatory statements in order to cause harm to State Street's business interests and its reputation.

76.    PRIAC's willful and knowing conduct constituted unfair and deceptive trade practices in violation of M.G.L. c. 93A, §§ 2 and 11.

77.    As a direct and proximate result of PRIAC's wrongful conduct, State Street was injured, including without limitation suffering lost business, lost profits, loss of good will, loss of reputation and other losses.

WHEREFORE, State Street demands judgment against PRIAC and requests that the Court enter an order:

i.      Awarding damages and costs in an amount to be determined

at trial, including without limitation reasonable attorneys' fees and

trebled damages;

ii.     Enjoining PRIAC from making disparaging and/or defamatory

comments concerning State Street; and

iii.    Awarding such other relief as the Court deems just and

appropriate.

State Street demands a jury trial on Counts II and III.

Dated: October 27, 2008

Respectfully submitted,

ROPES & GRAY LLP

By: /s/ Harvey J. Wolkoff
Harvey J. Wolkoff
Robert A. Skinner
Olivia S. Choe
One International Place
Boston, MA  02110
Tel: (617) 951-7000
Fax: (617) 951-7050
harvey.wolkoff@ropesgray.com
robert.skinner@ropesgray.com
olivia.choe@ropesgray.com

*Attorneys for Defendants State Street
Bank and Trust Company and State
Street Global Advisors, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2008, I caused a true and correct copy of the foregoing document to be served upon all registered users through the Court's Electronic Case Filing system and upon the following counsel of record by e-mail.

Edwin G. Schallert
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022

Derek W. Loeser
KELLER ROHRBACK LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101

William C. Fredericks
BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019

Jeffrey C. Block
BERMAN DEVALERIO PEASE TABACCO
BURT & PUCILLO
One Liberty Square
Boston, MA 02109

Richard B. Walsh, Jr.
LEWIS, RICE, FINGERSH LC
500 N. Broadway, Suite 2000
St. Louis, MO 63102

Samuel H. Rudman
COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY 11747

Robert R. Burford
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, TX 77002

John R. Nelson
LOCKE LORD BISSELL & LIDDELL LLP
100 Congress, Suite 300
Austin, TX 78701

George M. Gowen III
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103

Michele S. Bryant
BAMBERGER, FOREMAN, OSWALD AND
HAHN LLP
20 N.W. 4th Street, 7th Floor
Evansville, IN 47704

Douglas K. Spaulding
REED SMITH LLP
1301 K Street NW
Suite 1100 - East Tower
Washington, DC 20005

Peter Simshauser
SKADDEN, ARPS, SLATE, MEAGHER, &
FLOM LLP
1 Beacon Street
Boston, MA 02108

/s/ Olivia S. Choe
Olivia S. Choe