UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE STATE STREET BANK AND TRUST CO. ERISA LITIGATION | : : : : | |
| This document relates to: | : : | No. 07 Civ. 8488 (RJH) |
| No. 07 Civ. 9319 No. 07 Civ. 9687 No. 08 Civ. 0265 | : : : : : | |

**LEAD PLAINTIFFS' MEMORANDUM OF
<u>LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION</u>**

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................1

II. FACTUAL BACKGROUND ...........................................................................................3

    A.    The Parties ..............................................................................................................3

    B.    Summary of Complaint and Relevant Facts Learned Through Discovery to Date ...................................................................................................4

        1.    State Street's Common Portfolio and Risk Management Practices, Its "Cross-Investment" of Assets Between Different Bond Funds, and the LDBF ..........................................................5

        2.    State Street's Disastrous Decision to Significantly  Increase the Bond Funds' Exposure to Subprime Mortgage Risk ...........................7

    C.    State Street Effectively Admits Its Culpability By Firing Its  Senior Fixed Income Personnel and Establishing a $625 Million Litigation Reserve................................................................................................................10

III. ARGUMENT ..................................................................................................................10

    A.    The Requirements for Certification Under Rule 23(a) Are Met...........................11

        1.    Rule 23(a)(1):  The Class Is Sufficiently Numerous .................................12

        2.    Rule 23(a)(2):  Questions of Law and Fact Are Common........................13

        3.    Rule 23(a)(3):  Lead Plaintiffs' Claims Are Typical of the Class.................................................................................................14

        4.    Rule 23(a)(4):  Lead Plaintiffs Are Adequate Class Representatives.............................................................................17

    B.    The Requirements for Certification Under Rule 23(b) Are Met...........................18

        1.    The Class Should be Certified Under Rule 23(b)(3) .................................19

        2.    Certification is Appropriate Under Rule 23(b)(1) .....................................22

        3.    State Street's Assertion of Counterclaims For Contribution and  Indemnity Against a *De Facto* "Counterclaim Defendant Class"  Further Illustrates The Extent to Which Common Issues Predominate........................................................23

    C.    Lead Plaintiffs' Counsel Should Be Appointed Class Counsel............................24

IV. CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alvidres v. Countrywide Fin. Corp.*,
   No. CV 07-5810-RGK, 2008 WL 1766927 (C.D. Cal. Apr. 16, 2008)...................................13

*Babcock v. Computer Assocs. Int'l, Inc.*,
   212 F.R.D. 126 (E.D.N.Y. 2003) .............................................................................12, 18, 22

*Banyai v. Mazur*,
   205 F.R.D. 160 (S.D.N.Y. 2002) .........................................................................2, 12, 13, 21

*Bledsoe v. Emery Worldwide Airlines*,
   258 F. Supp. 2d 780 (S.D. Ohio 2003) ...................................................................................22

*Central States Se. and Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care
   L.L.C.*,
   504 F.3d 229 (2d Cir. 2007)............................................................................................16, 22

*Coan v. Kaufman*,
   457 F.3d 250 (2d Cir. 2006)....................................................................................................11

*Connelly Mgmt. Employee Welfare Benefit Plan v. N. Am. Indem. N.V.*,
   No. 07-cv-0540-LJM-JMS, 2008 WL 1336085 (S.D. Ind. Apr. 8, 2008) ........................17, 23

*Consol. Rail Corp. v. Hyde Park*,
   47 F.3d 473 (2d Cir. 1995)......................................................................................................12

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
   502 F.3d 91 (2d Cir. 2007)......................................................................................................17

*Damassia v. Duane Reade, Inc.*,
   250 F.R.D. 152 (S.D.N.Y. 2008) ......................................................................................13, 18

*Dura-Bilt Corp. v. Chase Manhattan Corp.*,
   89 F.R.D. 87 (S.D.N.Y., 1981) ...............................................................................................17

*East Texas Motor Freight Sys., Inc. v. Rodriguez*,
   431 U.S. 395 (1977)................................................................................................................14

*Fallick v. Nationwide Mut. Ins. Co.*,
   162 F.3d 410 (6th Cir. 1998) ...................................................................................................15

*Finch v. Office of Children and Fam. Servs.*,
   252 F.R.D. 192 (S.D.N.Y. 2008) ............................................................................................13

*Forbush v. J.C. Penney Co.*, Inc.,
   994 F.2d 1101, 1106 (5th Cir. 1993) .................................................................16

*Gen. Tel. Co. of the Sw. v. Falcon*,
   457 U.S. 147 (1982) ...........................................................................................13

*Gruby v. Brady*,
   838 F.Supp. 820 (S.D.N.Y. 1993) ................................................................18, 23

*Hnot v. Willis Group Holdings Ltd.*,
   241 F.R.D. 204 (S.D.N.Y. 2007) .......................................................................12

*In re Agent Orange Prod. Liab. Litig.*,
   818 F.2d 145 (2d Cir. 1987) ...............................................................................13

*In re Citigroup Pension Plan ERISA Litig.*,
   241 F.R.D. 172 (S.D.N.Y. 2006) ............................................................12, 22, 23

*In re Drexel Burnham Lambert Group, Inc.*,
   960 F.2d 285 (2d Cir. 1992) ...............................................................................14

*In re Enron Corp. Sec., Deriv., & ERISA Litig.*,
   No. MDL 1446, Civ. A. H-DI-3913, 2006 WL 1662596 (S. D. Tex. June 7, 2006)...............14

*In re Global Crossing Sec. & ERISA Litig.*,
   225 F.R.D. at 436, 452 (S.D.N.Y. 2004) ........................................................14, 23

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
   191 F.R.D. 457 (E.D. Pa. 2000) .........................................................................15

*In re Initial Pub. Offerings Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006) ............................................................................11, 12

*In re Painewebber Ltd. P'ship Litig.*,
   171 F.R.D. 104(S.D.N.Y. 1997) .........................................................................16

*In re PE Corp. Sec. Litig.*,
   228 F.R.D. 102 (D. Conn. 2005).........................................................................24

*In re Polaroid ERISA Litig.*,
   240 F.R.D. 65 (S.D.N.Y. 2006) .....................................................11, 13, 19, 23

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
   163 F.R.D. 104 (S.D.N.Y. 1995) .......................................................................16

*In re State Street Bank & Trust Co. ERISA Litig.*,
   No. 07-cv-8488 (RJH) (Sept. 22, 2008)..............................................................6

*In re Sumitomo Copper Litig.*,
   182 F.R.D. 85 (S.D.N.Y. 1998) .........................................................................19

*In re Tyco Int'l, Ltd., Multidistrict Litig.*,
  No. 03-CV-1352-PB, 2007 WL 1703067 (D.N.H. June 12, 2007) ........................................18

*In re Tyco Int'l Ltd*,
  No. MD-02-1335-PB, 2006 WL 2349338 (D.N.H. Aug. 15, 2006) ........................................14

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001) ........................................18

*In re Vivendi Universal, S.A. Sec. Litig.*,
  242 F.R.D. 76 (S.D.N.Y. 2007) (Holwell, J.) ........................................12, 14, 20, 21

*Jeffries v. Pension Trust Fund of the Pension, Hospitalization and Benefit Plan of the*
  *Elec. Indus.*,
  No. 99 Civ. 4174 (LMM), 2007 WL 2454111 (S.D.N.Y. Aug. 20, 2007) ........................22

*Krueger v. New York Tel. Co.*,
  163 F.R.D. 433 (S.D.N.Y. 1995) ........................................24

*LaRue v. DeWolff, Boberg & Assoc., Inc.*,
  128 S.Ct. 1020 (2008) ........................................11

*Marisol A. v. Guiliani*,
  126 F.3d 372 (2d Cir. 1997) ........................................13, 14

*Maywalt v. Parker & Parsley Petroleum Co.*,
  417 F.R.D. 51 (S.D.N.Y. 1993) ........................................16

*Mass. Mut. Life Ins. Co. v. Russell*,
  473 U.S. 134 (1985) ........................................11

*McDaniel v. N. Am. Indem. N.V.*,
  No. IP-02-C-0422 M/S, 2003 WL 260704 (S.D. Ind. Jan. 27, 2003) ........................16

*New Castle v. Yonkers Contracting Co.*,
  131 F.R.D. 38 (S.D.N.Y. 1990) ........................................12

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993) ........................................12, 14

*Tedesco v. Mishkin*,
  689 F. Supp. 1327 (S.D.N.Y. 1988) ........................................16

*Trautz v. Weisman*,
  846 F. Supp. 1160 (S.D.N.Y. 1994) ........................................15

*Vengurlekar v. HSBC Bank*,
  No. 03 Civ. 0243(LTS)(DFE), 2007 WL 1498326 (S.D.N.Y. May 22, 2007) ..............2, 21, 22

**STATUTES**

29 U.S.C. §§1109, 1132(a)(2) ........................................................................................11

ERISA §409(a) .............................................................................................................11

ERISA §502(a)(2) .........................................................................................................11

**OTHER AUTHORITIES**

Alba Conte and Herbert B. Newberg, Newberg on Class Actions § 3:10 (4th ed. 2008) .....13, 15

5 Moore's Federal Practice § 23.23[2] (3d ed. 2008) ....................................................13

Fed. R. Civ. P. 23 .................................................................................................. *passim*

## I.  INTRODUCTION

Lead Plaintiffs,[1] representatives of plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA") that invested in purportedly conservative fixed income bond funds exclusively managed by State Street Bank and Trust Company ("State Street Bank") and its investment management arm, State Street Global Advisors, Inc. ("SSgA") (collectively, "State Street"), submit this brief in support of their motion to certify a Class, pursuant to Fed. R. Civ. P. 23(a), 23(b)(3) and 23(b)(1), consisting of:

> All qualified ERISA plans, and the participants, beneficiaries, and named fiduciaries of those plans, that, between January 1, 2007 and December 31, 2007 (the "Class Period"), invested directly or indirectly in the State Street Limited Duration Bond Fund, or any other unregistered State Street fund that suffered losses as a result of direct or indirect investment in mortgage-related securities or mortgage-related derivatives (collectively, the "Bond Funds"[2]).  Excluded from the Class are Defendants and any firm, trust, corporation, or other entity in which a Defendant has a controlling interest or that is related to or affiliated with the Defendants, and the officers, directors, legal representatives, agents, affiliates and assigns of any such excluded entity, other than qualified ERISA plans offered by State Street or its affiliates to their employees.

Lead Plaintiffs also seek an order, pursuant to Fed. R. Civ. P. 23(g), appointing the law firms of Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz"), Keller Rohrback LLP ("Keller Rohrback") and Berman DeValerio Pease Tabacco Burt & Pucillo ("Berman DeValerio") (collectively "Class Counsel") as counsel for the proposed Class.

Lead Plaintiffs bring this class action to seek redress for State Street's failures, in breach of its fiduciary duties under ERISA, to prudently manage the retirement savings and other

---

[1] Lead Plaintiffs are:  Warren Cohen as Trustee of the Unisystems, Inc. Employees' Profit Sharing Plan; Alan Kober as Trustee of The Andover Companies Employees' Savings and Profit Sharing Plan; and John L. Patenaude as a member of the Nashua Corporation Pension Plan Committee on behalf of the Nashua Corporation Hourly Employees Retirement Plan and the Nashua Corporation Retirement Plan for Salaried Employees.

[2] A list of the Bond Funds, as established by the discovery and related analysis conducted by Lead Plaintiffs to date, is submitted herewith as Appendix A.

employee benefit assets of the Class that were invested in the State Street-managed Bond Funds. As alleged in the Consolidated Amended Complaint ("Complaint") [Docket No. 83, filed 8/22/08], although the Bond Funds were meant to be fixed income investments of low to moderate risk, designed to meet or only modestly exceed the returns of established bond market benchmark indexes, starting in 2006 State Street embarked on an imprudent and highly risky strategy of vastly increasing the Bond Funds' investments in subprime mortgage-backed securities and other exotic, high-risk financial instruments.  As mortgage markets suffered sharp declines in the first quarter of 2007, with rapidly escalating defaults in the subprime market, State Street compounded its imprudent (if not reckless) conduct by *increasing* its exposure to subprime mortgages.  When the market for subprime mortgage-backed securities collapsed in the summer of 2007, the Bond Funds – and the Class members – suffered devastating losses.

As this Court has repeatedly recognized, breach of fiduciary duty actions under ERISA are ideally suited for class treatment.  *See, e.g., Banyai v. Mazur*, 205 F.R.D. 160, 165 (S.D.N.Y. 2002) ("Class actions are generally well-suited to litigation brought pursuant to ERISA"); *see also Vengurlekar v. HSBC Bank*, No. 03 Civ. 0243(LTS)(DFE), 2007 WL 1498326, at *7-9 (S.D.N.Y. May 22, 2007) (certifying ERISA class under Rule 23(b)(3)).  This case is no exception.  The members of the Class share the same legal claims for imprudent investing under ERISA against the same two corporate defendants.  Moreover, the Class' claims will be proven with common evidence concerning State Street's defective portfolio and risk management practices, its common (and disastrous) investment decision to increase the Bond Funds' exposure to subprime mortgage-backed securities and other exotic instruments, and the related imprudent conduct of a common, limited group of State Street investment officers with respect to the Bond Funds, which caused Lead Plaintiffs and the Class to suffer common injuries.  Indeed, as State Street's lead counsel has previously admitted:

> [T]he allegations all boil down to that ***State Street was investing in subprime mortgages and that by virtue of investing unduly in subprime mortgages, that caused losses in what were supposed to have been conservatively managed bond funds. So there's no question that here there are common questions of fact.  Absolutely none.***

*In re State Street Fixed Income Funds Investment Litig.,* MDL No. 1945, Transcript of Argument before Judicial Panel on Multidistr. Litig. (5/29/2008) ("MDL Tr.") at 4:11-17 (emphasis added), attached to accompanying Decl. of Jonathan Harris dated 12/01/08 ("Harris Decl.") as Ex. 1.

These indisputably common issues, and others discussed below, form a common and predominating nucleus of law and fact.  Lead Plaintiffs' ERISA claims are also typical of those of the numerous members of the Class, as Lead Plaintiffs, like the absent Class members, all suffered losses as a result of the same imprudent investments resulting from State Street's common breaches of duty under ERISA.  Lead Plaintiffs and their counsel, who have vigorously pursued the litigation to date and have no conflicts with the interests of absent Class members, are adequate representatives of the proposed Class.  Moreover, a class action is the superior method for adjudicating the legal claims of the Class, whose numerous members share the same fundamental claims that are predicated on the same predominant legal and factual issues.  Accordingly, Lead Plaintiffs respectfully request their motion be granted, and the proposed Class be certified under Rule 23.

## II.  FACTUAL BACKGROUND

### A.  The Parties

Lead Plaintiffs are trustees of ERISA plans that invested in one or more of the Bond Funds, and in that capacity have brought claims under ERISA on behalf of their own ERISA plans and the Class.  ¶¶1, 11, 16-35.[3]  Lead Plaintiffs (like the Class members) exercised no control over the management or investment decisions of the Bond Funds.  ¶76.  Each Lead

---

[3] Citations in the form of "¶_" are to paragraphs of the Consolidated Amended Complaint.

Plaintiff is familiar with this action, and has attested to his willingness to continue to serve the Class as a court-appointed Class representative.  *See* Harris Decl. Exs. 2-4 (attaching declarations of Messrs. Kober, Cohen and Patenaude).

Defendant State Street Bank, through its SSgA operating unit, holds itself out as the world's largest institutional asset manager.  ¶¶36-37.  During the Class Period, State Street offered a variety of fixed income investment products – notably its proprietary commingled Bond Funds – to pension and other employee benefit plans.  ¶¶1, 41, 81.  The Bond Funds were created under a series of collective trusts, over which State Street exercised "***exclusive*** management and control." ¶61 (emphasis added).  As persons or entities who had discretionary authority and control over the assets of the ERISA Plans invested in the Bond Funds, it is undisputed that State Street owed fiduciary duties to all members of the Class under ERISA (*see also* ¶¶10, 71-75).  Moreover, State Street functioned as the investment manager of the Bond Funds, with ***the exclusive authority to make all decisions with respect to the investment and management of all Plan*** assets that were invested in those Funds.  ¶¶37, 63, 73.

Each of the Bond Funds was managed and controlled by State Street through a small group of individuals.  ¶70.  Indeed, State Street's own Rule 26(a) disclosures  ("State Street's Rule 26(a) Disclosures," Harris Decl. Ex. 5) identify only twenty current and former State Street employees as witnesses pursuant to Rule 26(a)(1)(A)(i) who have information concerning the subject matter of the Complaint's class-wide allegations.

## B.   Summary of Complaint and Relevant Facts Learned Through Discovery to Date

The common facts at issue are relatively straightforward.  As the Complaint alleges, the Bond Funds were intended to be conservative fixed income investment vehicles that were designed to meet or only modestly exceed established fixed income benchmark indexes.  ¶76. Historically, State Street sought to accomplish these goals by investing in a diversified portfolio

of fixed income assets, and by using State Street's purportedly sophisticated risk and portfolio management capabilities.  However, beginning in 2006, State Street instead deviated from its prior practices by vastly increasing the Bond Funds' investments in subprime mortgage-backed securities and other exotic instruments, as alleged in the Complaint (at ¶¶1-4, 76-93) and confirmed by documentary evidence obtained to date.[4]

1.    **State Street's Common Portfolio and Risk Management Practices, Its "Cross-Investment" of Assets Between Different Bond Funds, and the LDBF**

Each of the Bond Funds was centrally managed by State Street's Fixed Income Division in Boston.  The Bond Funds' portfolios were managed by a small group of portfolio managers using common data, risk management and compliance systems.  These portfolio managers reported to a common group of senior State Street Fixed Income executives, and were subject to a common group of internal oversight and policy committees (e.g. SSgA's "Investment Committee," "Impaired Asset Valuation Committee," etc.).  Indeed, as State Street's own counsel has explained to this Court:

> With regard to these various cases, ***I think it's important to note, your Honor, that the cases all involve the same funds [and] the same … fund managers.***  They all work as a group, determining together, often discussing at least often what they would invest in, ***the same relationship managers*** all spread throughout, ***the same people communicating***….

---

[4] Lead Counsel have vigorously pursued discovery, and to date have reviewed approximately 7 million pages of documents produced by State Street.  However, pursuant to the operative Scheduling Order (Docket No. 89, filed Oct. 6, 2008), Lead Plaintiffs have **not** yet had the opportunity to conduct any fact depositions which are scheduled to commence in January 2009. Lead Plaintiffs respectfully submit that deposition discovery (as well as additional document discovery) will produce significant additional evidence supporting class certification and, in accordance with the Court's remarks at the September 22, 2008 scheduling conference, Lead Plaintiffs reserve their rights to supplement their evidentiary submissions in support of this Motion following the completion of additional discovery.

Transcript of Oral Argument at 8:2-7, *In re State Street Bank & Trust Co. ERISA Litig.*, No. 07-cv-8488 (RJH) (Sept. 22, 2008) (Harris Decl. Ex. 6) (emphasis added).[5]

The extent to which each Bond Fund was managed pursuant to common strategies implemented by a small group of State Street employees is further reflected in State Street's practice of (a) acquiring large interests in particular tranches of certain fixed income investments (such as large pieces of a particular tranche of mortgage-backed securities) and allocating interests in such investments to multiple Bond Funds; and (b) causing Bond Funds to invest in other Bond Funds. *See, e.g.,* Harris Decl. Ex. 1 at 13:15-25. As a result, not only were the Bond Funds exposed to common risks arising from imprudent general investment policy decisions, and common deficiencies in State Street's central portfolio management and compliance systems, but investors in Bond Fund A could be (and often were) directly exposed to the risks of having invested in Bond Funds B and C.

One Bond Fund in particular, SSgA's Limited Duration Bond Fund ("LDBF"), played a central role in spreading a devastating contagion of toxic investments to the other Bond Funds. On paper, LDBF was a conservative, ultra-short term fixed income fund whose goal was to modestly exceed the returns of the JP Morgan One-Month U.S. Dollar LIBOR Index by investing in a "diversified portfolio" of "highly rated" fixed income securities, while maintaining a "maximum effective duration" (a key measure of risk for any bond fund) of no more than one year. *See* Harris Decl. Exs. 7-8 LDBF "Fact Sheets," dated 3/31/06 and 6/30/07, at SSgA-CIV000328932, SS003897498. Although some Class members invested directly in LDBF, many

---

[5] Similarly, State Street's Rule 26(a) Disclosures identify only (1) *nine* persons who "may have information regarding the investment decisions made in connection with portfolio management of the [Bond Funds]"; (2) *two* persons who "may have information regarding risk and credit analysis in connection with the [Bond Funds]"; and (3) *two* persons who "may have information regarding State Street's practices in relation to performance analysis and communication of investment strategies to [Class members]." *See* Harris Decl. Ex. 5 at 3-4.

more were indirect investors in it, as State Street's investment strategy caused most of its other Bond Funds to invest up to 25% of their assets in LDBF.  As State Street's own counsel has admitted:

> [T]he way the State Street worked it, the [Bond Funds] were all invested to one degree or another, a large degree, in one fund that was called Limited Duration Bond Fund.

Harris Decl. Ex. 1 (MDL Tr. at 13:17-20).

### 2. State Street's Disastrous Decision to Significantly Increase the Bond Funds' Exposure to Subprime Mortgage Risk

In 2006, State Street concluded that its existing "fixed income strategies" for the Bond Funds were not generating sufficient returns.  In an attempt to increase returns, State Street made the deliberate and imprudent decision to increase the level of risk in its Bond Funds, and to transform them from relatively conservative fixed income funds into high risk, inadequately diversified and significantly leveraged investment vehicles that had greatly increased exposure to the subprime mortgage market.  ¶¶1-4, 65, 67, 82-86; *see also, e.g.,* Harris Decl. Exs. 9- 11 (attaching State Street internal emails).

As a result of State Street's deliberate decisions to increase risk – primarily through increased subprime mortgage exposure – the LDBF underwent what can only be described as a radical metamorphosis.  Specifically, far from being a diversified, low-risk fund designed to track or slightly exceed LIBOR, by the summer of 2007, LDBF (i) was invested **95% or more in subprime securities,** (ii) was **leveraged over 3.3 to 1**, and (iii) **had a duration (as admitted in State Street documents) of over 3 years**. (Harris Decl. Ex. 12).  State Street's other Bond Funds similarly "loaded up" on leverage and risky subprime mortgage-backed and other "exotic" securities during 2006 and 2007, either directly by buying such securities for their own account, or indirectly through the LDBF.  ¶¶1-2, 65, 90.  For example, the Short Term Bond Fund was "99% invested in Home Equity/Subprime" by the end of June 2007.  Harris Decl. Ex. 13.

Incredibly, State Street caused its Bond Funds to take on much of their dramatically increased exposure to subprime mortgage-backed securities *after* the market for such securities had already begun to plummet in the first quarter of 2007 as a result of a rapid rise in defaults of underlying subprime mortgages.  ¶¶86-87.  The severe downturn in the mortgage market and the increasing interest rate spreads between subprime mortgage-backed securities and more conservative benchmark bonds (such as Treasuries) were bright "red flag" warnings to any prudent, conservative investor to reduce their exposure to the subprime sector.  ¶87.  However, instead of paring its Funds' losses, State Street chose to recklessly "double down" on its gamble with investors' pensions with exceptionally volatile and risky securities.  ¶¶82-87.

State Street's seemingly inexplicable decision to sharply increase the Bond Funds' exposure to subprime mortgage-backed and other exotic securities in the first half of 2007 – and to significantly increase the leverage in many of its Funds – may be partly explained by State Street's deficient portfolio and risk management systems.  For example, it appears that State Street's portfolio managers were operating with systems that could not (or did not) accurately calculate security values, basic measures of portfolio risk (such as effective duration) or portfolio asset allocations.  ¶¶88-94.[6]  Indeed, the extent to which State Street's accounting and portfolio

---

[6]  *See also* internal State Street emails at Harris Decl. Ex. 14 (internal 6/29/07 email, SS 000488767, to senior SSgA management reporting that:  "In May [2007] during my first week at SSgA we found that some of the EBRD derivatives were not being captured in the accounting system and therefore not being reflected in the performance reporting....  The accounts ...  are still not reconciled and have swaps that have not been booked or accounted for since April.  This will mean the previous two months performance will have to be restated.  This is clearly not acceptable on many business fronts"); Harris Decl. Ex. 15 (6/20/07 internal email, SS005845231, copied to senior SSgA personnel discussing inadequacies in State Street's pricing practices, and stating "the reason I bring this up is that the attached bonds are grossly mispriced"); Harris Decl. Ex. 16 (May 2006 email from a portfolio manager to a senior SSgA officer that raised concerns about mispricing issues that were so severe that "we were not able to run our Fund for three whole days," that referred to the "scary" SSgA practice of "rolling" the Funds' futures positions by hand, and that noted that "it is extremely difficult to manage the amount of active risk in our portfolios when we have little confidence in our analytics)."

management systems were in disarray is perhaps best exemplified by the fact that State Street – a year into this litigation – has **_still_** been unable to locate and produce copies of basic documents sufficient to describe the terms of over 250 complex derivatives (in the form of trade confirmations, prospectuses, or data maintained on State Street's computer systems).  To put this in perspective, the absence of such documentation means that State Street **_cannot_** produce sufficient information to permit adequate third party evaluation of the portfolio composition and risk features of a material portion (as much as 35% to 65%) of various Bond Funds' investment holdings.  Indeed, without such information, State Street itself could not have conducted a reasonable analysis of the true value or true risk levels in its portfolios (_see, e.g.,_ November 11, 2008 letter from J. Harris to Hon. Richard J. Holwell, Harris Decl. Ex. 17), which no doubt helps explain why the Bond Funds ultimately failed in such spectacular fashion.

Evidence to date similarly confirms gross derelictions and deficiencies in State Street's vaunted "risk management" practices.  Redacted Pursuant to Defendants' Request

Redacted Pursuant to Defendants' Request

In the summer of 2007, the already depressed market for subprime mortgage-backed securities collapsed and State Street was forced to dramatically write down the value of the Bond Funds.  ¶¶86-87.  For example, Redacted Pursuant to Defendants' Request

Redacted Pursuant to Defendants' Request

Redacted Pursuant to Defendants' Request.  (Harris Decl. Ex. 19, at p. 23).  Not surprisingly, the shocking

underperformance of State Street's Bond Funds, and its baffling concentration of subprime mortgage and other exotic investments in the Bond Funds, have also led to investigations by numerous government entities, including [Redacted Pursuant to Defendants' Request], the U.S. Securities and Exchange Commission, and [Redacted Pursuant to Defendants' Request]. *See, e.g.,* Harris Decl. Ex. 19 at pp. 19- 20; Ex. 1 at 14:10-14.

**C.    State Street Effectively Admits Its Culpability By Firing Its Senior Fixed Income Personnel and Establishing a $625 Million Litigation Reserve**

In the wake of this debacle, SSgA's CEO and the core group of senior State Street executives who were responsible for creating, implementing and overseeing its disastrous fixed income strategy have been fired.  As State Street put it in January 2008, "[w]e have made changes to the investment teams to address underperformance experienced in the active fixed income strategies exposed to sub-prime mortgages."  Harris Decl. Ex. 20 (1/3/08 press release).[7] Shortly thereafter, in further tacit recognition of its liability for grossly mismanaging the Bond Funds, State Street announced that it had set aside a $625 million litigation reserve towards its anticipated legal exposure.  ¶8.

### III.  ARGUMENT

This action is well suited for class-wide resolution due to the predominance of common issues stemming from State Street's common course of misconduct that caused the Class members' losses, and because individual actions by thousands of Class members on behalf of each Plan – each of which would seek to recover losses from the same Defendants, for the same

---

[7] Those fired employees included the following key witnesses, whose misconduct with respect to Defendants' Bond Fund-wide portfolio, risk management and compliance practices will be center-stage in the trial of this matter:  William Hunt, former SSgA President and CEO; Sean Flannery, former SSgA Chief Investment Officer; Paul Greff, former SSgA Director of Global Fixed Income; Michael Wands, former SSgA Director of North American Fixed Income; Michael O'Hara, former SSgA Director of Active U.S. Fixed Income; and Frank Gianatasio, former Head of Global Structured Products.

fiduciary breaches, under the same law and based on the same underlying imprudent investment practices of the same core group of State Street employees employing common (and inadequate) portfolio and risk management systems – would be inefficient, wasteful, and unnecessary.  In addition, such individual actions would create obvious risks of inconsistent adjudications that would prejudice absent class members.  As such, class-wide resolution of the ERISA claims asserted in this action is entirely appropriate.  *See, e.g., In re Polaroid ERISA Litig.,* 240 F.R.D. 65, 75  (S.D.N.Y. 2006).

ERISA breach of fiduciary duty actions are by statutory design "representative" actions, ideally suited for class certification.  ERISA §§409(a) and 502(a)(2) (29 U.S.C. §§1109, 1132(a)(2)), authorize ERISA plan participants, beneficiaries, and fiduciaries (such as Lead Plaintiffs here) to sue in a representative capacity on behalf of ERISA-governed employee benefit plans for losses suffered by such plans as a result of a breach of fiduciary duty.  Because the text of §409(a) focuses exclusively on the "relationship between the fiduciary and the plan as an entity," actions pursuant to §502(a)(2) are "brought in a representative capacity on behalf of the plan as a whole."  *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 141-142, n.9 (1985); *accord LaRue v. DeWolff, Boberg & Assoc., Inc.*, 128 S.Ct. 1020, 1024 (2008); *Coan v. Kaufman*, 457 F.3d 250, 257 (2d Cir. 2006).  Thus, as further detailed below, an action for breach of fiduciary duty under ERISA is properly pursued as a representative claim, and is appropriately brought as a class action.

## A.    The Requirements for Certification Under Rule 23(a) Are Met

To be certified, a class must satisfy four basic prerequisites of Rule 23(a):  (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  Fed. R. Civ. P. 23(a); *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 33 (2d Cir. 2006).  In reviewing these criteria, the Court may assess the merits of the case only to the extent they bear on the Rule 23

requirements, and the Court has "ample discretion" to limit proceedings in connection with a Rule 23 determination to prevent them from becoming a trial on the merits. *Id.* at 41; *see also Hnot v. Willis Group Holdings Ltd.*, 241 F.R.D. 204, 209 (S.D.N.Y. 2007); *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007) (Holwell, J.).

### 1.      Rule 23(a)(1):  The Class Is Sufficiently Numerous

Rule 23(a)(1) calls for certification if "the class is so numerous that joinder of all members is impracticable."  *See also Banyai*, 205 F.R.D. at 163 (certification is appropriate when "the number of class members is sufficiently large so that joinder of all members would make litigation needlessly complicated and inefficient.").  In this Circuit, a class is presumed sufficiently numerous to warrant certification when over forty class members are involved. *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *see also New Castle v. Yonkers Contracting Co.*, 131 F.R.D. 38, 41 (S.D.N.Y. 1990) (certifying class of 36 potential class members).  Plaintiffs need not show the exact class size, or identify all class members, to demonstrate numerosity.  *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).

Numerosity is invariably found in ERISA cases.  *See, e.g., In re Citigroup Pension Plan ERISA Litig.*, 241 F.R.D. 172, 178 (S.D.N.Y. 2006) (certifying class of an estimated "thousands" of members in one ERISA plan, even though the exact identity and number of class members was unknown); *Babcock v. Computer Assocs. Int'l, Inc.*, 212 F.R.D. 126, 129-30 (E.D.N.Y. 2003) (finding that 655 participants in one ERISA plan satisfied numerosity requirement).

Here, the proposed Class, which includes all ERISA plans that invested in State Street's Bond Funds during the Class Period, is estimated to consist of over 100 Plans – and many of these Plans in turn likely have thousands of participants and beneficiaries (each of whom is also entitled to sue under ERISA).  The proposed Class clearly meets the numerosity requirement.

### 2.    Rule 23(a)(2):  Questions of Law and Fact Are Common

Class certification is "'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and 'turn on questions of law applicable in the same manner to each [class] member.'"  *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982).  Courts liberally construe the commonality requirement.  *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156 (S.D.N.Y. 2008); *see also* Alba Conte and Herbert B. Newberg, Newberg on Class Actions § 3:10 (4th ed. 2008) ("this requirement is easily met in most cases"); 5 Moore's Federal Practice § 23.23[2] (3d ed. 2008) (same).  Thus, certification is proper when the grievances of the named plaintiffs and the proposed class "share a common question of law or of fact" – the focus being on one common question, not on every question or element.  *Marisol A. v. Guiliani*, 126 F.3d 372, 376 (2d Cir. 1997); *see also In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 166-67 (2d Cir. 1987); *Finch v. Office of Children and Fam. Servs.*, 252 F.R.D. 192, 197 (S.D.N.Y. 2008).

Liability for breach of ERISA fiduciary duties generally presents multiple common issues of both law and fact.  *Banyai,* 205 F.R.D. at 163 ("in general, the question of defendants' liability for ERISA violations is common to all class members because a breach of fiduciary duty affects all participants and beneficiaries."); s*ee also In re Polaroid,* 240 F.R.D. at 74-75 (finding that allegations of breach of fiduciary duty under ERISA raise common questions of fact and law); *Alvidres v. Countrywide Fin. Corp.*, No. CV 07-5810-RGK, 2008 WL 1766927, at *2 (C.D. Cal. Apr. 16, 2008).

Here, as set forth above and in §III.B.1.a, below, the legal claims alleged on behalf of all Class members are the same, and readily meet the requirements of Rule 23(a)(2).  Lead Plaintiffs allege that State Street served as a fiduciary with full investment authority over the Bond Funds that the Class members had invested in, and breached the same fiduciary duties of prudence that

State Street owed to all of the Class members as a result of Defendants' common course of conduct, including their common (and grossly imprudent) decision to increase the Bond Funds' exposure to subprime mortgage-backed and other risky assets, and their reliance on defective portfolio and risk management systems and practices.  Commonality could not be clearer.

Indeed, as quoted above, lead counsel for State Street has already admitted commonality in arguing before the Judicial Panel on Multidistrict Litigation:

> [T]he allegations all boil down to that State Street was investing in subprime mortgages and that by virtue of investing unduly in subprime mortgages, that caused losses in what were supposed to have been conservatively managed bond funds. *So there's no question that here there are common questions of fact.  Absolutely none.*

Harris Decl. Ex. 1 at 4:11-17 (emphasis added).

### 3.    Rule 23(a)(3):  Lead Plaintiffs' Claims Are Typical of the Class

The typicality requirement of Rule 23(a)(3) is satisfied where the proposed class representatives have the same interests and seek a remedy for the same injuries as absent class members.  *East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977); *In re Vivendi*, 242 F.R.D. at 85 (Holwell, J.) (finding that the typicality requirement is satisfied when "the same practice or course of conduct" by the defendant "gives rise to the claims of the proposed class members" and the named plaintiffs' claims); *In re Global Crossing Sec. & ERISA Litig.,*  225 F.R.D. at 436, 452 (S.D.N.Y. 2004).

As with commonality, the test for typicality is not demanding.  *In re Tyco Int'l Ltd*, No. MD-02-1335-PB, 2006 WL 2349338, at *5 (D.N.H. Aug. 15, 2006); *In re Enron Corp. Sec., Deriv., & ERISA Litig.,* No. MDL 1446, Civ. A. H-DI-3913, 2006 WL 1662596, at *10 (S. D. Tex. June 7, 2006).  "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936-37; *see also Marisol A.*, 126 F.3d at 376-77; *In re*

*Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 191 F.R.D. 457, 463 (E.D. Pa. 2000) ("Even quite significant factual differences will not defeat typicality so long as the legal theory upon which plaintiffs seek redress is the same as those they seek to represent."). Neither will differences in damages among Class members prevent a finding of typicality. *Trautz v. Weisman*, 846 F. Supp. 1160, 1167 (S.D.N.Y. 1994); Newberg on Class Actions § 3:16 (4th ed. 2008).

Lead Plaintiffs' claims are typical of those of the proposed Class. As set forth above, Lead Plaintiffs' ERISA plans and every other plan in the Class possess the same legal claim for the same breach of fiduciary duty by State Street. All of the Class members invested in the Bond Funds, which were supposed to be low to moderate risk fixed income funds suitable for ERISA Plans. All of the Class members paid State Street to function as the Investment Manager for the Plans' investment in the Bond Funds. State Street exclusively managed the assets of the Bond Funds and made all investment decisions regarding the Bond Funds. The Bond Funds shared a pool of assets – either by investing in one another or by directly owning shares of the underlying assets – and the very same assets caused losses to all of the Bond Funds. The losses suffered by Lead Plaintiffs and the Class all stem from the same misconduct; namely State Street's common breaches of its fiduciary duties to each Class member as a result of overexposing the Bond Funds to mortgage-backed and other exotic securities at the worst possible time, and converting the Bond Funds from low to moderate risk fixed income investment vehicles to highly speculative, risky and ultimately disastrous vehicles. Lead Plaintiffs have the same interests as the absent Class members, and seek one core remedy for Defendants' breaches of fiduciary duty.

Abundant case law explicitly recognizes the ability under Rule 23 of fiduciaries or participants of one plan to bring suit on behalf of other plans if the defendant's basic conduct applies to the other plans as well. *See, e.g., Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410,

422 (6th Cir. 1998) (reversing district court's dismissal of proposed class action brought by one ERISA plan participant, for breach of fiduciary duty to all of Defendant's plans, noting that an ERISA plaintiff can represent participants in other plans "if the gravamen of the plaintiff's challenge is to the general practices which affect all of the plans"); *Forbush v. J.C. Penney Co.*, *Inc.*, 994 F.2d 1101, 1106 (5th Cir. 1993) (holding that employee covered by one health insurance plan was proper representative of class of all employees covered by all of its health insurance plans, where plaintiff's challenge was to employer's general practice in all plans); *McDaniel v. N. Am. Indem. N.V.*, No. IP-02-C-0422 M/S, 2003 WL 260704, at *4 (S.D. Ind. Jan. 27, 2003) (certifying class of participants in various welfare benefit plans where common defendants' breaches affected all of the plans).

These authorities are consistent with well-established precedents in this Circuit, which hold that an investor in one particular investment trust (or other investment vehicle) may bring a class action on behalf of investors in similar vehicles where the proposed class members were all injured as a result of a common course of misconduct by the same defendant(s).[8] Indeed, the Second Circuit and other courts have affirmed the viability of ERISA class action suits brought on behalf of a class of plans. *Central States Se. and Sw. Areas Health & Welfare Fund v. Merck-*

---

[8] *See, e.g., In re Painewebber Ltd. P'ship Litig.*, 171 F.R.D. 104, 123 (S.D.N.Y. 1997) (holding that investors in 20 of 70 limited partnerships could represent investors in all 70 partnerships); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 208 (S.D.N.Y. 1995) (typicality did not require named plaintiffs to have invested in each of 700 related partnerships); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 56-57 (S.D.N.Y. 1993) (claims of named plaintiffs who invested in 3 of 5 oil and gas partnerships typical of claims of investors in the other two vehicles, where complaint alleged "the same or similar injury" resulting from the "same course of conduct" based on "identical legal theories"); *Tedesco v. Mishkin*, 689 F. Supp. 1327, 1334-35 (S.D.N.Y. 1988) (investors in 5 of 15 separate "trust funds" managed by the same defendants could represent investors in all funds; based on a "pragmatic evaluation of the interests of the class members and litigation economies," plaintiffs adequately alleged all funds "were part of a common course of fraudulent conduct, rather than distinct entities engaged in disparate acts of fraud," and named plaintiffs' claims were thus typical of all class members).

*Medco Managed Care L.L.C.*, 504 F.3d 229, 234 (2d Cir. 2007) (affirming class certification of a class of plans where "all members of the class share a common interest in establishing that Medco violated ERISA … "); s*ee also, e.g.*, *Connelly Mgmt. Employee Welfare Benefit Plan v. N. Am. Indem. N.V.*, No. 07-cv-0540-LJM-JMS, 2008 WL 1336085, at *1 (S.D. Ind. Apr. 8, 2008) (affirming certification of a plaintiff class consisting of several hundred ERISA welfare benefit plan sponsors on breach of fiduciary claim).

Here, State Street functioned in the same fiduciary capacity for each member of the Class, with sole responsibility for managing the ERISA plan assets invested in its Bond Funds – the result of which ultimately was enormous losses to the Class.  Thus, the gravamen of Lead Plaintiffs' Complaint is Defendants' common course of imprudent management of the Bond Funds which has affected all of the Class, and Lead Plaintiffs' pursuit of their claims will simultaneously advance the interests of all Class members.  *See Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y., 1981) ("By advancing their own interests, plaintiffs will advance the interest of the class"). Accordingly, the Lead Plaintiffs satisfy the typicality requirement and may properly seek redress for them in this action.

### 4.     Rule 23(a)(4):  Lead Plaintiffs Are Adequate Class Representatives

The Lead Plaintiffs "will fairly and adequately protect the interests of the class," as there are no conflicts between them and the proposed Class members and because their counsel are capable of adequately prosecuting the action. Fed. R. Civ. P. 23(a)(4);  *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) ("Determination of adequacy typically 'entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation'") (citation omitted).  A conflict between a class representative and class members must be fundamental, and not merely hypothetical or speculative, to defeat the

finding of adequacy of a class representative.  *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001); *Gruby v. Brady*, 838 F.Supp. 820, 826-27 (S.D.N.Y. 1993).

The Lead Plaintiffs have suffered the same injury and loss due to Defendants' breach of fiduciary duties as have been suffered by the proposed Class, and their interests are wholly aligned with the interest of the Class.  *See Damassia*, 250 F.R.D. at 158 ("The fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiffs' claims will vindicate those of the class").  Lead Plaintiffs have also demonstrated their commitment to having this Court decide the issues set forth in the Complaint, by retaining counsel and initiating this litigation, and by participating in discovery (they are scheduled to be deposed in January).  In sum, there can be no doubt that Lead Plaintiffs are ready, willing and able to serve the Class as its representatives. *See* Harris Decl. Exs. 2-4.

## B.    The Requirements for Certification Under Rule 23(b) Are Met

In addition to meeting the requirements of Rule 23(a), class actions must also meet one of the three subdivisions of Rule 23(b), which permit a class to be certified where "(1) separate actions would create a risk of inconsistent adjudications; (2) injunctive or declaratory relief is sought; *or* (3) common questions of law or fact predominate over individual questions." *Babcock*, 212 F.R.D. at 131 (emphasis added).

Here, Lead Plaintiffs seek to have this class certified pursuant to Rule 23(b)(3), which permits certification of cases "in which a class action would be 'convenient and desirable,' including those involving large-scale, complex litigation for money damage."  *In re Tyco Int'l, Ltd., Multidistrict Litig.*, No. 03-CV-1352-PB, 2007 WL 1703067, at *2 (D.N.H. June 12, 2007) (citation and internal quotations omitted).  Lead Plaintiffs also request certification under Rule 23(b)(1), which is appropriate where in the absence of certification there is a risk of "varying

adjudications" that would create incompatible standards of conduct for defendants, and as a practical matter would be dispositive of the interests of the absent class members.  Fed. R. Civ. P. 23(b)(1)(A)&(B); *In re Polaroid,* 240 F.R.D. at 78 (listing ERISA cases certified under 23(b)(1)).

### 1.      The Class Should be Certified Under Rule 23(b)(3)

#### a.      Common Issues of Law and Fact Predominate

Rule 23(b)(3) permits class certification if "the court finds that the questions of law or fact common to the class members predominate over any questions affecting only individual members . . . ."  Fed. R. Civ. P. 23(b)(3).

The predominance requirement is a more rigorous version of Rule 23(a)'s commonality requirement.  Generally, the liability issue controls the court's predominance calculus: "if the liability issue is common to the class, common questions are held to predominate over individual questions."  *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 91 (S.D.N.Y. 1998) (internal quotations omitted).

Here, common legal and factual issues plainly predominate over any individual ones.  For example, among the many common issues of law and fact that predominate here are:

- Whether State Street was a fiduciary under ERISA which exercised exclusive authority and control over the assets of the Bond Funds;

- Whether State Street breached its fiduciary duties by mismanaging the assets of the Bond Funds by exposing the Bond Funds to undue levels of risk and loss;

- Whether State Street ignored "red flags" and acted imprudently in violation of ERISA by further increasing the Bond Funds' exposure to subprime mortgage-backed securities in the first half of 2007, after events of early 2007 had confirmed the exceptional volatility of this sector;

- Whether State Street imprudently relied on defective or otherwise inadequate valuation methodologies in assessing portfolio values and asset allocations, and whether it imprudently relied on incorrect calculations of portfolio duration and leverage;

- Whether State Street breached its fiduciary duties by relying on portfolio and risk management systems that were inadequate, and that did not capture all of the Bond Funds' trades and holdings in exotic securities;

- Whether State Street breached its fiduciary duties by failing to monitor its employees to ensure that they were discharging their responsibilities under ERISA; and

- Whether Defendants' breaches of duty caused losses to the Class.

Tellingly, State Street itself has repeatedly emphasized that this case basically boils down to a "common core" of key factual and legal issues.  For example, in MDL briefing and statements to the MDL Panel, State Street stressed that all the actions they sought to have consolidated (including those in the present action) "share a common factual core."  State Street's brief in support of its Motion for Transfer (filed Feb. 25, 2008) (Harris Decl. Ex. 21) at 4.  As State Street has further argued, "all of the Related Actions arise from State Street's management of active fixed income funds, specifically, State Street's attempt to accomplish its investment objectives for those funds through exposure to asset-backed securities, including securities backed by allegedly 'risky' subprime mortgages."  *Id.*  Defendants have similarly acknowledged that the same core team managed all of the Bond Funds at issue here.  *Id.* at 5; *see also* State Street's Rule 26(a) Disclosures (Harris Decl. Ex. 5) at pages 3-4.

Here, Lead Plaintiffs, on their own behalf and on behalf of the Class, will prove State Street's liability by focusing on a core body of evidence – which further establishes predominance.  *In re Vivendi*, 242 F.R.D. at 90 (finding predominance when all plaintiffs would "rely on the same or substantially similar documents, statements, and legal theories to prove defendants' liability").  Indeed, State Street itself has effectively conceded that most of the Bond Funds suffered losses in a precisely ***identical*** fashion as a result of having all invested in State Street's LDBF Fund.  MDL Tr., Harris Decl. Ex. 1, at 14:1-9 (admission by State Street's counsel that "[w]e're going to be litigating the question of, why would the portfolio managers be investing in this way?  What were they doing?  Why were they making these decisions?  ***It's the***

*same fund ... The Limited Duration Bond Fund that's provided and involved in all of them* ...
there are tremendous efficiencies [to litigating this action in one forum].") (emphasis added).

State Street's common course of conduct (including its inadequate portfolio and risk
management practices and systems) comprise an overarching common question of fact that
should be appropriately examined and resolved in a single class action proceeding.  Similarly,
the core issues of liability highlighted above plainly predominate among the members of the
Class.  *See Banyai*, 205 F.R.D. at 163 ("the question of defendants' liability for ERISA
violations is common to all class members because a breach of a fiduciary duty affects all
participants and beneficiaries.")  While often articulated in the context of a single ERISA plan,
this same principle applies here because State Street owed the same legal duty to all of the plans
comprising the Class – to prudently manage the Bond Funds in which the Class invested – and
breached its duty in the same way, by overexposing the Class to highly speculative subprime
investments and failing to implement and follow prudent risk management procedures.  Thus,
State Street's breaches of fiduciary duty affected all Class members, thereby unifying the class
around a common nucleus of operative facts.  *In re Vivendi*, 242 F.R.D. at 90 ("'Class-wide
issues predominate if resolution of some of the legal or factual questions ... can be achieved
through generalized proof'" and these questions "'are more substantial than the issues subject
only to individualized proof.'" (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d
Cir. 2002)).

Finally, although the amount of loss suffered by each Class member may vary, it is well-
established that differences in damage calculations will not defeat predominance.  *See, e.g.,*
*Vengurlekar,* 2007 WL 1498326, at *7 (certifying Rule 23(b)(3) ERISA class and stating that
"the common questions involving Defendants' liability under ERISA [and other laws] rather than

the class members' individual claims for damages, predominate at this threshold stage of the litigation.").

### b.    A Class Action Is Superior to Other Case Management Tools

To satisfy Rule 23(b)(3), a class action must also be superior to other case management tools.  Fed. R. Civ. P. 23(b)(3).  Here, the Class is comprised of over one hundred Plans, with likely thousands of beneficiaries, whose ERISA claims can be resolved efficiently in this single proceeding.  Given the vigorous defense mounted by State Street so far, and the burdens of potentially thousands of actions all presenting the same common issues, a certified Class offers the only practical way to assert claims for obtaining relief for all of the members of the Class.  In this case, class certification is superior to all other alternatives.  *Central States*, 504 F.3d at 245; *see also, e.g., Vengurlekar*, 2007 WL 1498326, at *7;  No. 99 Civ. 4174 (LMM), 2007 WL 2454111, at *16 (S.D.N.Y. Aug. 20, 2007);  *Bledsoe v. Emery Worldwide Airlines*, 258 F. Supp. 2d 780 (S.D. Ohio 2003) (certifying (b)(3) class); *Babcock*, 212 F.R.D. at 131-32 (certifying ERISA class under (b)(3) and (b)(1)).

### 2.    Certification is Appropriate Under Rule 23(b)(1)

Rule 23(b)(1) permits certification of a class if individual class member's inconsistent or varying adjudications would establish inconsistent standards of conduct for the party opposing the class; or would effectively be dispositive of the interests of other members who are not parties, or impair their ability to protect their own interests.  Fed. R. Civ. P. 23(b)(1)(A), (B). "The language of [Rule 23] (b)(1)(A), addressing the risk of 'inconsistent adjudications,' speaks directly to ERISA suits, because the defendants have a statutory obligation, as well as a fiduciary responsibility, to 'treat the members of the class alike.'"  *In re Citigroup*, 241 F.R.D. at 179 (internal citation omitted).

Numerous courts have certified ERISA classes pursuant to Rule 23(b)(1), noting that ERISA litigation brought in a representative capacity pursuant to ERISA § 502(a)(2) presents a "paradigmatic example of a (b)(1) class."  *See, e.g., In re Polaroid*, 240 F.R.D. at 78; *In re Citigroup*, 241 F.R.D. at 179-80; *In re Global Crossing*, 225 F.R.D. at 453; *Gruby*, 838 F. Supp. at 828.  Moreover, Rule 23(b)(1) ERISA classes have been certified for classes of ERISA plans where the defendant breached its duties to all of the plans in the same basic way.  *See Connelly*, 2008 WL 1336085, at *1 (action asserting claims against one defendant on behalf of a class of 409 ERISA plan sponsors certified as a class action).

Here, Plaintiffs allege that State Street's imprudence constituted a breach of duty to a class of similarly affected class members.  The relevant legal standard should be applied in a uniform manner to all of the ERISA Plans comprising the Class.  Accordingly, as a matter of law and basic fairness, a single adjudication resolving the entire Class' claims in a uniform manner is appropriate, and the proposed Class should also be certified under Rule 23(b)(1).

### 3. State Street's Assertion of Counterclaims For Contribution and Indemnity Against a *De Facto* "Counterclaim Defendant Class" Further Illustrates The Extent to Which Common Issues Predominate

State Street has recently sought to shift some or all of the liability for its own wrongful conduct by asserting a counterclaim for contribution and indemnity against Lead Plaintiffs and the trustees of all of the unnamed Class member ERISA plans (the "Plan Trustees").  This counterclaim asserts that – assuming State Street is found liable to the Class – the counterclaim defendant Plan Trustees are liable to State Street in contribution or indemnity for failing to adequately supervise State Street's deficient investment decisions and practices.

For reasons already provided to the Court in Lead Plaintiffs' November 26, 2008 pre-motion conference letter, State Street's counterclaim fails to state a cause of action under ERISA because it violates the hornbook rule (incorporated into ERISA under Second Circuit precedent)

that bars a fiduciary (such as State Street) whose conduct is the direct cause of a beneficiary's loss from recovering against a co-fiduciary (such as the Plan Trustees) whose misconduct amounts at most to a failure to supervise the other fiduciary.   Nonetheless, State Street's counterclaim is telling in that it apparently seeks to assert a counterclaim against a *de facto* defendant class of Plan Trustees.   State Street's actions in asserting such a broad counterclaim, that it apparently believes would apply to the Trustees of all the ERISA plans that are included in the Class, only confirms the extent to which both the claims ***and any defenses*** to State Street's liability involve common, predominant issues.  *See, e.g., Krueger v. New York Tel. Co.*, 163 F.R.D. 433, 441 (S.D.N.Y. 1995) (ruling in ERISA case that "[m]any of the defendants' arguments present common defenses which may be asserted against nearly all members of the class, and these are common legal questions that would support a class action certification rather than argue against it."); *see also In re PE Corp. Sec. Litig.*, 228 F.R.D. 102, 111 (D. Conn. 2005) (holding that defenses generally asserted against class representatives and class members tend to show that "common questions and common defenses will predominate.").

## C.     Lead Plaintiffs' Counsel Should Be Appointed Class Counsel

The fundamental requirement for appointment as class counsel is that such counsel must fairly and adequately represent the interests of the class.  Fed. R. Civ. P. 23(g)(1)(B). In appointing class counsel, the court should consider the following factors: (1) the work counsel has performed in identifying or investigating the claims at issue; (2) counsel's experience in handling complex litigation and/or claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class.  Fed. R. Civ. P. 23(g)(1)(A).

Plaintiffs respectfully submit that the undersigned proposed Class Counsel, who were appointed by this Court as co-Lead and Interim Class Counsel on February 7, 2008 [Docket No.

32], have vigorously litigated this matter before the MDL and this Court.   The undersigned counsel have undertaken substantial document discovery (reviewing over seven million pages produced to date), retained and consulted extensively with experts in subprime mortgage-backed and similarly complex securities, have briefed numerous matters, all on behalf of the Class, and are about to begin depositions in accordance with the Court's scheduling order.   Further, as set forth in the attached resumes, each proposed Class Counsel firm is highly experienced in ERISA and/or other complex class action litigation.   *See* Harris Decl. Exs. 22-24.   Finally, Class Counsel have the resources to litigate this case vigorously.   Accordingly, the appointment of the proposed Class Counsel under Rule 23(g) is warranted.

## IV.  CONCLUSION

For the foregoing reasons, the Lead Plaintiffs respectfully request that the Court (i) certify this Action as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(3) and 23(b)(1); (ii) appoint Lead Plaintiffs as representatives of the proposed Class; (iii) appoint the undersigned counsel as Class Counsel pursuant to Fed. R. Civ. P. 23(g); and (iv) grant such other and further relief as the Court deems just and proper.

Dated: December 1, 2008

Respectfully submitted,

By:

Jerald D. Bien-Willner
(On behalf of all Lead Counsel, with
permission)

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
William C. Fredericks (WF-1576)
Jonathan Harris (JH-3047)
Jerald D. Bien-Willner (*pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

**KELLER ROHRBACK LLP**
Lynn L. Sarko (LS-3700)
Derek W. Loeser (DL-6712)
Karin B. Swope (KS-3369)
Laura R. Gerber
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

**BERMAN, DEVALERIO PEASE
TABACCO BURT & PUCILLO**
Jeffrey C. Block (JCB 0387)
Patrick T. Egan
Kristen D. Tremble
One Liberty Square
Boston, Massachusetts 02109
Telephone:  (617) 542-8300
Facsimile:  (617) 542-1194

*Co-Lead Counsel and Proposed Class Counsel*