**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE STATE STREET BANK AND TRUST CO. ERISA LITIGATION | MDL DOCKET No. 1945 |
| | Master File No. 07-cv-8488 (RJH) |
| This Document Relates To: | |
| No. 07 Civ. 9319 | ECF Case |
| No. 07 Civ. 9687 | |
| No. 08 Civ. 0265 | |

**JOINT DECLARATION OF**
**WILLIAM C. FREDERICKS, DEREK W. LOESER AND PATRICK T. EGAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF**
**CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND**
**COUNSEL'S MOTION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES**

WILLIAM C. FREDERICKS, DEREK W. LOESER and PATRICK T. EGAN, under the

penalties of perjury, declare as follows:

1.      We are partners of the firms Bernstein Litowitz Berger & Grossmann LLP

("Bernstein Litowitz"), Keller Rohrback, L.L.P. ("Keller Rohrback") and Berman DeValerio

("Berman DeValerio"), respectively.    Bernstein Litowitz, Keller Rohrback and Berman

DeValerio are Co-Lead Counsel for Lead Plaintiffs Warren Cohen, as Trustee of the Unisystems,

Inc. Employees Profit Sharing Plan (the "Unisystems Plan"), Alan Kober, as Trustee of the

Andover Companies Employee Savings and Profit Sharing Plan (the "Andover Plan"), and John

L. Patenaude, as a member of the Nashua Corporation Pension Plan Committee on behalf of the

Nashua Corporation Hourly Employees Retirement Plan and the Nashua Corporation Retirement

Plan for Salaried Employees (the "Nashua Plan") (together, "Lead Plaintiffs"), in the above-

captioned class action (the "Action").  We have personal knowledge of the information set forth

herein based on our participation in all aspects of the prosecution and settlement of the claims asserted on behalf of the Class in this Action.

2.      We respectfully submit this Joint Declaration in support of (a) Lead Plaintiffs' motion for final approval of the proposed Settlement with State Street Bank and Trust Co. ("State Street" or "Defendant") and (b) Lead Counsel's application for an award of attorneys' fees and reimbursement of litigation expenses.  Unless otherwise noted, capitalized terms herein have the same meaning ascribed to them in the Stipulation and Agreement of Settlement, dated September 19, 2009 (the "Stipulation").

## I.      INTRODUCTION

3.      Lead Plaintiffs have achieved an outstanding settlement on behalf of the Class, representing a gross recovery of approximately 58.05% of the Capital Losses incurred by the Included Plans in the Funds, and consisting of $83,248,965.66 in cash together with interest accrued thereon (the "Settlement Amount").[1]   Under the proposed Plan of Allocation, the net settlement proceeds will be distributed to the Included Plans that are members of the Class on a *pro rata* basis, in proportion to the Capital Losses incurred by those Plans during the third quarter of 2007.

4.      The proposed Settlement, which will resolve all claims asserted in the three above-captioned consolidated class actions brought under the Employee Retirement Income

---

[1]  The value of the Settlement is approximately 58.05% of all Included Plans' third quarter 2007 losses (losses for the Class would have been slightly lower if they had been calculated based on the entire Class Period).  Assuming that no Included Plans requested exclusion, the value of the Settlement as originally negotiated would have been $89,750,000.  Here, three related Included Plans (sponsored by the same corporate conglomerate, RJR/Reynolds (collectively, "RJR")), representing $11,199,025.57 in Capital Losses, elected to opt-out of the Class.  Accordingly, the Settlement Amount has been reduced in dollar terms by RJR's Allocable Settlement Share, to $83,248,965.66 (plus accrued interest thereon), but the Settlement continues to represent a recovery of approximately 58.05% of each participating Plan's third quarter 2007 losses.

Security Act ("ERISA") (Nos. 07 Civ. 9319, 07 Civ. 9687 and 08 Civ. 0265), is the result of over two years of hard fought litigation.   Indeed, the proposed Settlement was only reached after Lead Counsel had conducted extensive research and discovery regarding the facts and claims in the Action, including:

(a)   Collecting and analyzing publicly available information concerning State Street and its practices with respect to the investment instruments at issue in this Action, including but not limited to State Street's press releases, new articles and analyst reports concerning the Company, and State Street's filings with the U.S. Securities and Exchange Commission ("SEC");

(b)   Obtaining and reviewing more than 13 million pages of additional documents produced in discovery by Defendants and various third parties;

(c)   Deposing 17 current and former State Street officers and employees;

(d)   Defending the depositions of 8 named Plaintiffs and/or other representatives of the Plans on whose behalf they brought suit;

(e)   Consulting extensively with various experts on both liability and damages;

(f)   Researching and briefing numerous motions, including, *inter alia*, Lead Plaintiffs' briefing before the Panel on Multi-District Litigation (the "MDL Panel") to maintain venue in this Court; Lead Plaintiffs' opposition to State Street's separate motion in this Court to transfer this Action to the District of Massachusetts, Lead Plaintiffs' motion to dismiss State Street's counterclaims, Lead Plaintiffs' motion for class certification, and Lead Plaintiffs' motions in connection with numerous disputed discovery issues; and

(g)   Engaging in a protracted settlement negotiation process, which included (i) participating in three separate face-to-face mediation sessions (one of which lasted two days) conducted under the auspices of the Hon. Nicholas H. Politan (U.S.D.J., Ret.); (ii) negotiating a detailed and binding Term Sheet reflecting the detailed terms of the agreement-in-principle that had been reached following the third mediation session in June 2009; (iii) engaging in further protracted negotiations over the terms of the "long-form" settlement documents; and (iv) ultimately initiating contested motion practice to enforce the Settlement and prevent State Street from indefinitely delaying the Settlement approval process.

5.   We respectfully submit that, under the circumstances of this case, a recovery of approximately 58% of the losses incurred by the Class Members is an excellent result,

particularly in light of the risk factors and uncertainties of litigation discussed below. As this Court stated in its October 28, 2009 Memorandum Opinion and Order, the proposed Settlement

> represents about fifty-eight percent of the class members' capital losses, a favorable recovery in light of the substantial time, expense, and risk that litigation to verdict would entail. Furthermore, the agreement springs from intensely adversarial negotiations; both sides are represented by able, reputable counsel, and they reached this settlement through a drawn-out mediation process presided over by Judge Nicholas Politan (U.S.D.J. Ret.). On these facts, the settlement proposal *easily* meets the preliminary approval standard.

Mem. Op. and Order at 5 (emphasis added) (citation omitted). As the Court also stated, the proposed Settlement "appears manifestly 'fair, reasonable, and adequate.'" *Id.*

6. For the reasons summarized above, and for all of the additional reasons detailed below, it is respectfully submitted that the Settlement is fair, reasonable and adequate in all respects, and should therefore be approved. In addition, particularly in light of the nature and amount of work performed and the quality of the result achieved, as detailed below Lead Counsel respectfully submit that their requested 25% fee award (which represents only a modest 1.1 multiple on counsel's lodestar), together with counsel's request for reimbursement of expenses in the amount of $1,544,072.43, should be granted.

7. Pursuant to the October 28, 2009 Order Preliminarily Approving Settlement And Confirming Final Settlement Hearing ("Preliminary Approval Order"), the Court-approved Notice of the terms of the Settlement was sent to Class Members.[2] *See* Declaration of Jennifer

---

[2] In its Preliminary Approval Order, the Court preliminarily certified the following Class for settlement purposes:

> All ERISA plans that, based on State Street's books and records, (a) invested in any State Street fund listed in Schedule A attached to the Stipulation (the "Funds") during the period from January 1, 2007 through and including December 31, 2007 (the "Class Period") and (b) incurred losses on their investments in the 3d calendar quarter of 2007 (the "Included Plans"), and the named fiduciaries of those Included Plans. Excluded from the Class will be (i) ERISA plans with whom State Street has previously (as of June 8, 2009) executed a binding settlement agreement releasing any and all claims relating to the facts of this litigation, and their named fiduciaries, (ii)

M. Keough Regarding Notice Dissemination and Publication, dated January 22, 2010 ("Keough Decl."), at ¶¶3-6, attached hereto as Exhibit A. The Notice advised Class Members (including the named fiduciaries of the Included Plans) of the material terms of the Settlement, as well as (i) their right to exclude themselves from the Class; and (ii) their right to object to any aspect of the Settlement, including Lead Counsel's request for attorneys' fees and reimbursement of expenses.

8. The reaction of the Class also supports approval of the Settlement. Only three related Plans (each of which is represented by the same fiduciaries and sponsored by the same corporate conglomerate – RJR) elected to "opt out." Further, although the deadline for submitting objections to the Settlement is not until February 10, 2010, to date we have received **no objections** to approval of the Settlement, nor to Lead Counsel's request (as disclosed in the Notice) for an award of attorneys' fee of 25% of the Gross Settlement Fund and for reimbursement of litigation expenses.

## II.    HISTORY OF THE LITIGATION

### A.    Initial Complaints, Consolidation And Appointment Of Lead Plaintiffs

9. On October 17, 2007, the Unisystems Plan filed a putative class action against State Street and certain of its related parties, captioned *Unisystems, Inc., et. al. v. State Street Bank and Trust Co., et al.,* No. 07-Civ-9319 (RJH) (S.D.N.Y.) (the "Unisystems Action"),

---

the Apogee Enterprises, Inc. 401(k) Retirement Plan ("Apogee") and its named fiduciaries (as to which Apogee filed a Complaint dated January 26, 2009, captioned *Apogee Enterprises, Inc. v. State Street Bank and Trust Company et al.*, in the District of Minnesota, 0:09-cv-00170-DSD-FLN, Docket #1); (iii) the ERISA plans as to which the Prudential Retirement Insurance and Annuity Company ("PRIAC") filed a Complaint dated October 1, 2007 captioned *Prudential Retirement Insurance and Annuity Company v. State Street Bank and Trust Company, et al.*, 07 Civ 8488 (S.D.N.Y) and their named fiduciaries; (iv) the Federal National Mortgage Association Retirement Plan for Employees Not Covered Under Civil Service Retirement Law ("Fannie Mae") and its named fiduciaries; and (v) any ERISA plan sponsored by State Street and any of its parents, subsidiaries, or affiliates and its named fiduciaries. For the sake of clarity, the term "Funds" does not include any investment portfolio of SSgA Funds, a series mutual fund registered under the Investment Company Act of 1940, as amended.

alleging that State Street's management of certain of its purportedly conservative fixed income bond funds was imprudent and otherwise violated ERISA.

10. Shortly thereafter, the Andover and Nashua Plans filed similar ERISA class actions against State Street, captioned *The Andover Companies Employees Savings and Profit Sharing Plans v. State Street Bank and Trust Co., et. al.,* No. 07-Civ-9687 (RJH) (S.D.N.Y.) (the "Andover Action") and *The Nashua Corporation Composite Pension Trust, et. al. v. State Street Bank and Trust Co., et. al,* No. 08-Civ-0265 (RJH) (S.D.N.Y.) (the "Nashua Action"), respectively.[3]

11. All Plaintiffs allege, among other things, that State Street was a fiduciary of the Included Plans and that it violated its fiduciary duties under ERISA by, *inter alia*, causing the Funds, in which the various Included Plans had invested and which State Street managed, to make imprudent investments in subprime asset backed securities and other inappropriate derivative instruments. Plaintiffs sought to recover from State Street the losses that the Plans suffered when the value of the Funds' investments in these securities (and hence the value of the Included Plans' investments in the Funds) declined in 2007.

12. On November 13, 2007, the Court consolidated the *Unisystems* and *Andover* actions for pre-trial purposes with an individual action that had been filed on October 1, 2007, by the Prudential Retirement Insurance and Annuity Company (the "Prudential Action").[4] By Order dated January 31, 2008, the Court similarly consolidated the *Nashua* Action with the previously

---

[3] The Nashua Action was originally filed in the District of Massachusetts on October 24, 2008, but was thereafter voluntarily dismissed and re-filed in this Court on January 14, 2009.

[4] The ERISA class actions and the Prudential Action were not otherwise consolidated, and this Settlement does not resolve or have any other effect on the Prudential Action.

filed Actions, and also (a) appointed Messrs. Cohen, Kober and Patenaude, in their capacities as fiduciaries of the Unisystems, Andover and Nashua Plans, respectively, as Lead Plaintiffs, and (b) appointed Bernstein Litowitz, Keller Rohrback and Berman DeValerio as co-lead counsel and interim class counsel.

13.   The Parties participated in an initial pre-trial Rule 26(f) scheduling conference before the Court on January 4, 2008.  After considering the Parties' proposed case management plans, the Court entered its Joint Pre-Trial Scheduling Order on February 7, 2008.

### B.   Defendant's Motion To Transfer And The Contested MDL Proceedings

14.   Meanwhile, on February 2, 2008, State Street (which is headquartered in Boston) filed a Motion to Transfer this Action to the District of Massachusetts, arguing, *inter alia,* that most of the relevant documents were located in that District, and that Massachusetts would be a more convenient forum for party and non-party witnesses if this Action went to trial.  Plaintiffs prepared and filed their papers in Opposition to Defendants' Motion to Transfer on March 10, 2008, and State Street filed its Reply on March 27, 2008.

15.   In addition, on February 25, 2008, State Street filed a motion (the "MDL Motion") with the MDL Panel to (a) consolidate the ERISA Class Actions and the Prudential Action with certain other actions that had also been filed against State Street, and (b) transfer these cases (and any other  related actions) to the District of Massachusetts.  Lead Plaintiffs submitted comprehensive briefs and supporting declarations (filed March 23, 2008) opposing that portion of State Street's motion that sought to transfer the Action to the District of Massachusetts.

16.   Plaintiffs presented oral argument on the MDL Motion before the MDL Panel on May 29, 2008.  Notwithstanding the MDL Panel's usual practice of granting motions to transfer related actions to the District where the main corporate defendant is headquartered, by Order

dated June 16, 2008, the MDL Panel rejected State Street's transfer request, and instead ordered all pre-trial proceedings in the related actions be held in this Court.

17.     Thereafter, by Order dated August 8, 2008, this Court also denied State Street's earlier, original motion to transfer, which it had filed in this Court prior to initiating proceedings before the MDL Panel.

18.     Following these Orders, Class Counsel negotiated a proposed Joint Revised Pretrial Scheduling Stipulation And Order with counsel for all parties in the MDL-coordinated actions, which this Court approved on October 6, 2008.

### C.     Preparation Of The Consolidated Amended Complaint

19.     By motion dated March 27, 2008, Lead Plaintiffs sought leave to file an amended complaint, which the Court granted.   Thereafter, on August 22, 2008, Plaintiffs filed a 125-paragraph Consolidated Amended Complaint (the "Complaint"), which (a) further expanded upon and refined Plaintiffs' claims, and (b) added four additional named plaintiffs.[5]

20.     This revised and expanded Complaint was a product of Lead Counsel's continuing investigations, and set forth detailed allegations concerning State Street's mismanagement of the subject Funds, in breach of its fiduciary duties under ERISA.   For example, the Complaint alleged how State Street breached its duties to the participants in violation of ERISA § 404(a), by, *inter alia,* (a) making imprudent decisions to sharply increase the Bond Funds' exposure to exceptionally high risk "toxic" subprime-mortgage backed securities and derivatives and other exotic high risk investment vehicles, while reducing their

---

[5] The additional named plaintiffs added in this complaint were Glenn Kingsbury (as Trustee of the New England Electrical Workers Benefit Fund) ("NEEW"); Alan Gordon (as Trustee of the AGMA Retirement Plan and AGMA Health Fund) ("AGMA"); Albert Massaro (a participant in the Eastman Kodak Employee Savings & Investment Plan); and William Keye (a participant in the Waste Management Retirement Savings Plan).

exposure to the types of relatively stable and conservative fixed income investments that were appropriate for the Funds; (b) altering the Fund's investment strategy to include investments fundamentally inconsistent with the stated purposes of the Funds; (c) exposing the Funds to excessive levels of risk through inappropriate leverage; (d) failing to maintain sufficient diversification in the investments held by the Funds in light of their stated objectives; and (e) generally failing to invest and manage the assets of the Funds in the manner of a reasonably prudent fiduciary acting under similar circumstances (the "prudent fiduciary" standard).  The Complaint further alleged that as a consequence of State Street's breaches of its fiduciary duties, the Funds suffered significant losses.

       **D.**        **State Street's Counterclaims And Plaintiffs' Motion To Dismiss Them**

21.      On October 17, 2008, approximately one year into this litigation, State Street counter-sued the named plaintiff Plan trustees.  In essence, State Street alleged that the trustees had effectively breached their obligations as fiduciaries under ERISA by allowing their Plans to invest with State Street, and by failing to adequately monitor State Street's investment of their Plans' assets during the Class Period.

22.      In response to the efforts of State Street (a professional investment firm) to blame the lay plaintiff-trustees for the losses suffered as a result of State Street's management of the Funds, Plaintiffs' Counsel retained one of the country's foremost trust law and ERISA experts, Professor John Langbein of Yale Law School, to provide expert testimony concerning the validity of State Street's purported counterclaims.  Thereafter, in an effort to avoid unnecessary motion practice, Plaintiffs (a) sent State Street a copy of Prof. Langbein's written analysis, which explained in detail why State Street's counterclaim was "without foundation," and (b) requested that the counterclaim be withdrawn.

23.     State Street refused Plaintiffs' request, and instead filed an Amended Answer and Counterclaims (the "Amended Counterclaims") on December 22, 2008 – apparently in an attempt to try to correct some of the numerous deficiencies that Plaintiffs' analysis of the original counterclaim had identified for State Street.

24.     In response, on March 3, 2009, Plaintiffs filed a Motion to Dismiss State Street's Counterclaims, together with a supporting memorandum of law and declaration (which included Prof. Langbein's analysis).  As Plaintiffs' motion papers explained, State Street's Amended Counterclaims were barred by, *inter alia,* Second Circuit precedent adopting the "substantially more at fault" doctrine of §258 of the Restatement (2d) of Trusts, which precludes claims for contribution or indemnity brought by a fiduciary (such as a professional investment manager) for investment losses against co-fiduciaries (such as lay plan trustees) who, at most, are responsible only for monitoring the investment activities of the other fiduciary.

25.     Thereafter, the motion was fully briefed, with Plaintiffs filing their Reply on April 24, 2009, but was ultimately not decided in light of the Parties advising the Court in early July 2009 that they had reached a settlement.

### E.     Discovery

26.     During the pendency of State Street's various motions to transfer and subsequent motion practice relating to the pleadings, Plaintiffs conducted extensive fact discovery – supplemented by extensive consultation with their experts on mortgage-related securities, prudent investment management practices and damages – to develop their case.   These discovery efforts included:  (a) obtaining and reviewing over *13 million pages* of documents from State Street and various third parties; (b) preparing for and taking 17 depositions of current and former State Street personnel; and (c) reviewing and producing Plaintiffs' documents (and defending 8 depositions of various named plaintiffs).   State Street vigorously defended this

action throughout, resisting production of various categories of important documents and seeking to impose limits on deposition discovery, which required Plaintiffs to (a) engage in repeated discovery negotiations with State Street and, when negotiations were unsuccessful, and (b) engage in 5 motions to compel on discovery-related matters before Magistrate Judge Eaton. Plaintiffs and State Street also repeatedly sparred over the appropriate extent of document and deposition discovery that State Street sought to obtain from Plaintiffs.  At all times, Lead Counsel carefully divided up assignments to the extent possible to avoid unnecessary duplication of efforts.

27.     The often contentious discovery process extended for nearly a year and a half before the proposed Settlement was reached.  In sum, as further described below, this Action was settled only after the Plaintiffs had acquired a comprehensive understanding of the strengths and weaknesses of their case, as revealed in both motion practice and discovery.

### 1.     Document Discovery

28.     Following the Parties' exchange of Initial Disclosures on February 1, 2008, document discovery in this Action began in earnest on February 8, 2008, when Plaintiffs served Defendants with their First Request for Production of Documents.

29.     On March 19, 2008, State Street served its Objections and Responses to those document requests, in which it objected to a significant portion of Plaintiffs' Requests on grounds of relevance, overbreadth or undue burden,  State Street also sought to rely on its own unilaterally determined "Protocol for Reviewing Communications," which sought to (a) limit which custodians with potentially responsive documents would be searched, (b) define what the search criteria would be, and (c) establish the order in which they would be searched and produced.  Plaintiffs were therefore forced to engage in extensive negotiations with State Street

concerning both its specific objections to Plaintiffs' document requests and the content of State Street's document review "protocols."

30.     As Plaintiffs identified gaps or new issues in the course of their ongoing review of documents produced in response to their initial requests, Plaintiffs served their second and third sets of document requests on State Street in August and September 2008, respectively.

31.     In response to Plaintiffs' document requests, State Street produced over 13 million pages of documents.  The mammoth process of reviewing, organizing and analyzing this substantial document production was undertaken in a coordinated effort between the three Lead Plaintiffs' firms.

32.     Plaintiffs also engaged in relevant third party document discovery.  For example, Plaintiffs served *subpoenae duces tecum* and negotiated document productions from Cutter Associates (consultants hired by State Street to review its fixed income systems and procedures) and PriceWaterhouseCoopers LLP (the State Street Bond Funds' outside auditors).  Plaintiffs also monitored, and reviewed where appropriate, document productions obtained by other parties pursuant to subpoena from additional third parties.

33.     In addition to organizing and analyzing the massive number of documents produced in this litigation, Plaintiffs also responded to State Street's document requests, which consisted of approximately 60 separate requests.  Responding to these requests required Plaintiffs and their counsel to go through numerous emails and hard copy documents that had been preserved, including various materials that were archived in off-site storage facilities.

## 2.    Requests For Admission And Interrogatories

34.     During the course of the Action, Plaintiffs also propounded four sets of interrogatories and two sets of requests for admission, in addition to responding to a set of interrogatories and a set of admissions propounded by State Street.

### 3.   **Depositions**

35.     Given the complexity of the matters at issue in this litigation, Plaintiffs in the various related actions against State Street initially prepared a coordinated deposition plan to take well over 50 depositions, several of which Lead Plaintiffs concluded would require multiple days of testimony in order to allow all parties an adequate opportunity to question them.  State Street opposed this plan, and sought to significantly limit all plaintiffs' ability to conduct deposition discovery.   All Parties, including Lead Plaintiffs, were therefore forced to spend a very substantial amount of time (a) negotiating with State Street the number and length of offensive depositions to be taken, and (b) coordinating the efficient allocation of time and areas of questioning as among the various plaintiffs.

36.     Ultimately, Plaintiffs prepared for and took the depositions of seventeen State Street witnesses, of which approximately seven lasted two or three days.  Moreover, at the time the Parties reached an agreement to settle this litigation, Plaintiffs had also noticed, and had prepared for or begun to prepare for, numerous additional depositions of State Street officers and other personnel.

37.     For their part, State Street conducted eight depositions of Lead Plaintiffs, the additional named plaintiffs, or other fiduciaries of these plaintiffs' ERISA plans.  Lead Counsel prepared each of these witnesses for, and subsequently defended them at these depositions.

### 4.   **Discovery Disputes And Related Motion Practice**

38.     The parties engaged in numerous contested discovery disputes concerning, *inter alia*, (a) the scope of the parties' productions, (b) the adequacy of the parties' responses and objections to interrogatories and requests to admit, (c) the specific electronic format of the parties' productions, (d) privilege issues, (e) Plaintiffs' rights to copies of SEC deposition

transcripts, (f) whether personal hard drives, taped phone recordings, and Bloomberg-based instant messages were to be produced, and (g) the number, timing and scope of depositions.

39.     Plaintiffs' primary disputes with State Street centered upon State Street's efforts to avoid its discovery obligations by producing to Plaintiffs only the same materials that it had produced to government investigators.  Plaintiffs repeatedly argued that there was a meaningful difference between the documents Plaintiffs requested in this case and those that State Street had produced to the government, and that State Street was improperly "hiding behind" its production to the government to avoid producing additional relevant documents requested by Plaintiffs.

40.     For example, as a result of Plaintiffs' careful review of State Street's initial document production, Plaintiffs identified various significant gaps in State Street's document production, including (a) State Street's failure to explain a sharp drop-off in the frequency of email communications for the key executives and portfolio managers during the critical third quarter 2007 time period; (b) its failure to produce trade confirmations as well as pricing and other information relating to some 250 swap transactions (which were critical to analyzing the various Bond Fund portfolio's value and risk profile); (c) its failure to produce local hard drives for key document custodians; (d) its failure to produce audiotapes for certain key witnesses employed on State Street's trading desk; (e) its failure to produce instant messages from the Bloomberg Messaging service used by State Street traders and portfolio managers stored on State Street's Bloomberg system; and (f) its failure to produce any documents from the files of certain relevant custodians.

41.     Accordingly, far from simply relying on what State Street had been willing to produce to others, Plaintiffs repeatedly fought with considerable success to obtain additional important categories of documents.  For example, after numerous rounds of meet and confer

conferences and failed attempts at compromise, Plaintiffs were forced to raise many of these issues with Judge Eaton in a joint letter motion (with Prudential) dated January 30, 2009.  As a result of that motion and Judge Eaton's subsequent April 2, 2009 discovery Order, State Street was ordered to search the records of four additional custodians, and the Court permitted discovery of a robust set of hard drives, audio recordings and Bloomberg messages on a "sampling" basis, without prejudice to Plaintiffs' ability to obtain additional documents based on their examination of the initial sample sets.

42.     Plaintiffs were also required to resort to motion practice to obtain copies of the transcripts of deposition testimony provided by current and former State Street personnel to the SEC or other government regulators in connection with their ongoing investigations of State Street.  State Street had initially refused to produce these transcripts, arguing that they did not have actual possession or control over them.  Accordingly, Plaintiffs submitted comprehensive letter briefing on the issue to Magistrate Judge Eaton in March and April 2009.  The Court ultimately granted Plaintiffs' request for an Order that compelled State Street to use its best efforts to procure the transcripts (by requesting them from the SEC and then producing them to Plaintiffs), and to provide Plaintiffs with the names of all State Street employees who had been deposed by any regulators on any issues relating to the subject matters of this Action.

43.     Plaintiffs' Lead Counsel were also required to defend their clients against State Street's zealous discovery demands.  For example, notwithstanding numerous efforts to resolve differences through meet and confers in 2008 and early 2009 – and notwithstanding Plaintiffs' diligent search for records and production of all relevant documents – in March 2009 State Street filed its own letter briefs seeking to compel additional discovery from Plaintiffs (such as additional documents relating to investments by Class Plaintiffs' ERISA plans in wholly

unrelated fixed income funds managed by wholly unrelated fixed income asset managers).  By Order issued March 31, 2009, Judge Eaton rejected the bulk of State Street's arguments, finding that its requests were "overly broad" and sought predominantly irrelevant information.  Instead, Judge Eaton required Plaintiffs' to produce only a few discrete categories of documents – most of which Plaintiffs had already produced to State Street in their original production.

### 5.    Retention of Experts

44.    Early in the litigation, Lead Plaintiffs engaged two highly experienced experts to help analyze the discovery they had obtained from State Street, and to assist Lead Plaintiffs in building their cases on both liability and damages.  For example, Lead Plaintiffs consulted extensively with these experts on, *inter alia,* matters related to (a) the valuation of subprime asset-backed securities and other complex instruments at issue in this Action; (b) the appropriate methodologies for monitoring and limiting risk in portfolios containing significant exposure to esoteric subprime asset-backed and related derivative instruments; (c) the adequacy of the kinds of portfolio and risk management systems employed by State Street during the relevant time period; (d) the adequacy of the internal policies and procedures that State Street used to manage the highly complex portfolios at issue in this Action; and (e) the quantification of Plaintiffs' and the Class's damages.

### F.    Class Certification

45.    Class certification issues were also vigorously litigated.   After conducting extensive discovery of the plaintiffs as detailed above (which included taking eight depositions of Plaintiffs or other representatives of their Plans), and after Plaintiffs filed their opening class certification motion on December 8, 2008, State Street filed its Memorandum in Opposition to Class Certification (the "Opposition") on March 25, 2009.

46.     Because State Street's Opposition raised certain factual issues which warranted further discovery to enable adjudication on an appropriately developed record, State Street's Opposition resulted in additional negotiations with State Street to extend the class certification briefing certification and rearrange the sequencing of certain discovery (including certain depositions).   While these class certification-related depositions (and other depositions) were being taken, and while Plaintiffs were proceeding with the drafting of comprehensive reply papers in support of class certification, the Parties began to make some progress towards settlement.

### G.     The Negotiation Of The Settlement

47.     The Settlement in this Action was reached only after nearly a year and half of active discovery and related litigation, and came only after a protracted, arm's-length mediation process conducted under the auspices of Judge Politan – a highly experienced mediator of complex class action cases.

48.     The mediation and negotiation process itself lasted over nine months.  The Parties engaged in an initial two-day mediation session with Judge Politan in October 2008.   In connection with that initial mediation, Plaintiffs prepared a detailed Mediation Statement with supporting documentary materials that set forth the plaintiffs' legal and factual arguments and assessment of damages.  During the course of this two-day mediation session, it became clear that the parties were far apart, and accordingly the Parties promptly resumed vigorous litigation of the Action.

49.     In early May 2009, with the benefit of the additional extensive discovery (particularly deposition discovery) that had been conducted in the intervening seven months, the Parties agreed to resume the mediation process under Judge Politan.  In connection with this second round of mediation (which was held in New York on May 19, 2009), Lead Plaintiffs

submitted a detailed Supplemental Mediation Statement, which included a summary of (and excerpts from) the additional evidence that had been obtained in recent discovery.

50.     During the May 2009 face-to-face mediation session, the Parties re-argued the merits of each side's respective strengths and weaknesses before Judge Politan, and exchanged various revised settlement proposals.  However, no settlement was reached.

51.     Nonetheless, with the encouragement of Judge Politan, the parties agreed to a *third* round of face-to-face mediation, which was held in New York on June 8, 2009.  This mediation resulted in a "handshake" deal to settle this Action for $89.75 million.

52.     However, the Parties' "handshake" deal was not the end of the settlement process.  First, numerous "secondary" issues still needed to be resolved, and the parties continued to actively negotiate these issues through telephone conferences and to exchange detailed drafts of proposed term sheets.  Accordingly, it was not until June 26, 2009, that the parties concluded the negotiation of – and duly executed – a detailed and binding 15-page Term Sheet (together with accompanying schedules and exhibits).

53.     In a July 2, 2009 joint letter, the Parties informed the Court that a Settlement had been reached, that the Parties had executed a binding term sheet, and that they were preparing the customary "long form" Stipulation of Settlement and related papers which they hoped to be able to present to the Court for preliminary approval by the end of July.

54.     After further protracted negotiations and exchange of numerous drafts, the Parties finally agreed to the terms of the Stipulation and related exhibits (collectively, the "Long Form Settlement Documents") on August 18, 2009.  On August 19, 2009, Lead Plaintiffs' Counsel forwarded Defendant's Counsel copies of the Long-Form Settlement Documents that were fully executed on behalf of Lead Plaintiffs, and requested that State Street execute them forthwith.

18

However, despite having agreed to the terms of the Settlement, during the latter part of the summer, State Street sought to indefinitely delay the implementation of the proposed Settlement on the grounds that it would be preferable to hold off on consummating the Settlement until such time (if any) that State Street might also be able to conclude a settlement with the SEC of certain claims that the SEC had been separately investigating since 2007. Accordingly, Plaintiffs were again required to seek judicial assistance to allow the settlement process to proceed.

> **H.      Motion For Preliminary Approval Of Settlement**

55.      On September 18, 2009, in accordance with the Court's instructions, Lead Plaintiffs filed their motion for preliminary approval of the Settlement. Thereafter, State Street again sought to delay consummation of the Settlement because of SEC settlement talks.

56.      On October 28, 2009, this Court rejected State Street's "novel" objections to proceeding with the Settlement and issued its Preliminary Approval Order, which preliminarily approved the Settlement, conditionally certified the proposed settlement class, approved the proposed notice program and set a date for the final approval hearing.

## III.      SETTLEMENT NOTICE AND RESPONSE

57.      The Preliminary Approval Order required that the long-form Notice (the "Notice") be disseminated to the Class Members (*i.e.*, the Included Plans and their named fiduciaries), and required that named fiduciaries who wished to exclude themselves and their Included Plans from the Class do so by January 8, 2010. The Order further directed anyone who wished to object to the Settlement, the Plan of Allocation or Lead Counsel's Fee and Expense Application to do so no later than February 10, 2010. Additionally, pursuant to the Preliminary Approval Order (as amended by Order dated November 9, 2009), the Court extended the time for Included Plans to post the Summary Notice on their website (or to otherwise provide the contents of the Summary Notice to their Plan's beneficiaries or participants) to January 19, 2010.

58.     Pursuant to the Preliminary Approval Order, Lead Counsel instructed the Court-appointed settlement administrator, The Garden City Group, Inc. ("GCG"), to begin disseminating copies of the Notice by mail and to publish the Summary Notice.  The Notice contains a thorough description of the Settlement, the Plan of Allocation and Class Members' rights to: (i) participate in the Settlement; (ii) object to the Settlement, the Plan of Allocation or Lead Counsel's Fee and Expense Application; or (iii) exclude themselves from the Class.  The Notice also informed Class Members of Lead Counsel's intention to apply for an award of attorneys' fees in an amount up to 25% of the Gross Settlement Fund and for reimbursement of litigation expenses in an amount not to exceed $3,000,000.

59.     In addition to the Notice, each mailing to Class Members (*i.e.*, the Included Plans and their named fiduciaries) contained a cover letter that notified them of their Plan's estimated *pro rata* share of the Net Settlement Fund based on the Included Plan's Capital Loss, in accordance with the Plan of Allocation described below.  Keough Decl. ¶4.

60.     To disseminate the Notice, Lead Counsel obtained the names and addresses of each Included Plan and their respective named fiduciaries from State Street.   On November 12, 2009, GCG mailed 131 copies of the Notice to the Included Plans and/or their named fiduciaries.  Keough Decl. ¶¶5-6.

61.     The Court's Preliminary Approval Order also directed that the Publication Notice be published in the national edition of *The Wall Street Journal* and on the *PR Newswire* no later than seven (7) days after mailing of the Notice.  On November 16, 2009, GCG caused the Publication Notice to be published in the national edition of *The Wall Street Journal* and disseminated over the *PR Newswire*.  Keough Decl. ¶7.

62.     In order to provide ready access to the Notice and other information relating to this Action and the proposed Settlement, Lead Plaintiffs established and the claims administrator administered a website dedicated to information about the Action and the Settlement.  Anyone can look up information about the Action online at:   www.statestreetERISAsettlement.com.   The website provides key case documents and other information of possible interest to the fiduciaries, participants or beneficiaries of an Included Plan.

63.     The Court-established deadline for the Included Plans and their named fiduciaries that make up the Class to request exclusion from the Class was January 8, 2010.  Only three (3) related Plans, each of which is sponsored by the same corporate conglomerate (RJR), filed timely requests for exclusion.[6]

64.     The Court-established deadline for Class Members to file any objections to the Settlement, Plan of Allocation or the Fee and Expense Application is February 10, 2010.  To date, there have been no objections to any aspect of the Settlement.

## IV.     THE PLAN OF ALLOCATION

65.     Pursuant to the Preliminary Approval Order, in November 2009 State Street deposited $89.75 million into an interest bearing escrow account.  This amount, plus any interest earned thereon, less the *pro rata* share of the settlement proceeds that would have otherwise been

---

[6] The request for exclusion submitted by RJR appears to be the product of unique circumstances pertaining only to it.  As noted in the Stipulation of Settlement, State Street represented that it had a claim against RJR for repayment of money that State Street alleges it inadvertently overpaid them in September 2007 in connection with the redemption of RJR's investment in one or more of State Street's Bond Funds.  *See* Stipulation, ¶1.39.  In light of this circumstance, the Stipulation also contained a special provision, applicable only to RJR, that provided that "no distribution shall be made to RJR of any settlement proceeds to which RJR would otherwise be entitled under the Plan of Allocation, absent an order of the Court expressly authorizing such distribution," and providing that pending such an order "RJR's share of the net settlement proceeds, if any, shall be held in the Escrow Account."  *Id.* at ¶9.5.  Rather than electing to have this dispute decided pursuant to an "expedited disposition" in connection with this Settlement (*id.*), RJR, it appears, has elected to address its disputes with State Street outside the context of this Settlement.

allocable to RJR, will comprise the Gross Settlement Fund.  The Settlement further provides that the net Settlement Fund (consisting of the Gross Settlement Fund less taxes, costs of notice and administration, and Court-approved attorneys' fees and expenses) will be distributed to the Included Plans according to the Plan of Allocation.

66.     If approved, the Plan of Allocation will govern how the Net Settlement Fund will be distributed among Class Members.  The Plan of Allocation is designed to achieve an equitable distribution of the Net Settlement Fund.  It is the product of Lead Counsel's investigation and discovery, consultation with their experts, and careful review of documents and other information contained in State Street's books and records.  Lead Counsel believe that the Plan of Allocation sets forth a fair, adequate and reasonable method to allocate the Net Settlement Fund among Included Plans.  To date, no Included Plan has objected to the Plan.

67.     The Plan of Allocation provides for the allocation of the Net Settlement Fund among the Included Plans on a *pro rata* basis, based on each such Included Plan's respective "Capital Losses," that is, the losses that it suffered on its capital investments in the respective Bond Funds during the third quarter of 2007.[7]  Under the Plan of Allocation, each Included Plan will receive approximately 58.05% of its total third quarter Capital Losses, less that Plan's *pro rata* share of (i) taxes on interest earned on the Gross Settlement Fund, (ii) costs of notice and administration, and (iii) Court-awarded attorneys' fees and expenses.

68.     Each transmittal letter that accompanied the copies of the Notice that have been mailed to the named fiduciaries sets forth the calculation of each respective Plan's total Capital

---

[7] On an aggregate basis the total Capital Losses suffered by the Included Plans on their investments in State Street-managed Bond Funds were higher when calculated based only on investment performance for the third quarter of 2007, as compared to what they would have been if calculated based on investment performance over the entire Class Period.

Losses based on State Street's books and records.  Each Included Plan had the right to submit evidence that its actual Capital Loss, calculated based on account statements provided to it by State Street, is higher than the number provided to it by GCG, and to submit any such challenge to binding arbitration by Judge Politan (Ret.).  The deadline for submitting any challenges to the Capital Loss calculation passed on December 29, 2009.

69.     A total of three (3) challenges were lodged to the correctness of any Included Plan's Capital Loss as calculated based on State Street's books and records.  Lead Counsel contacted the challengers to discuss their concerns.  Based on discussion to date, one challenger has reevaluated its records and determined that its Capital Loss calculation was accurately stated in the transmittal letter.  Another challenger is evaluating additional information provided to it regarding the applicable Capital Loss calculation.  Lead Counsel will continue to work with them to explain the basis of the Capital Loss calculation.  With regard to the third challenger, Lead Counsel has engaged in extensive communications with counsel both separately, and in conference calls in which State Street counsel, State Street consultants, and the challenger's consultants have conferred regarding the challenge.  State Street has confirmed that the Capital Loss calculation for that challenger was performed in exactly the same manner as the calculation for every other Plan in the Class, and that there are no errors in the calculation.  The challenger does not dispute this, but has performed the calculation in a different manner that it believes is permissible under the terms of the Settlement Agreement.  The challenger is still evaluating whether it intends to pursue its challenge further following Final Approval through the binding arbitration process (under the auspice of Judge Politan) as expressly provided for under ¶5.5 of the Stipulation.

70.     Lead Counsel note that the challenges to the Capital Loss calculations do not require that the Court delay Final Approval.  The challenges are not objections to any aspect of the Settlement, and instead are based solely on the Capital Loss calculations as confirmed by State Street for the Plans at issue.  Pursuant to paragraph 5.5 of the Stipulation, the binding arbitration process, if invoked by the challengers, can occur promptly after Final Approval and before distribution of the Settlement proceeds.

71.     In sum, the proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of this Settlement among the Included Plans based upon their respective *pro rata* Capital Losses, and should be approved.

## V.     SUMMARY OF LITIGATION RISKS FACED BY PLAINTIFFS

72.     As a result of the extensive legal research and factual discovery conducted by Lead Counsel, as supplemented by the Parties' protracted discussions in the course of the mediation process, it is respectfully submitted that Lead Counsel had a thorough understanding of the strengths and weaknesses of their claims at the time the agreement to settle this Action was reached.

73.     As with any litigation, the Parties would face an uncertain outcome if this Action were to continue.  Continued litigation of this Action against State Street could result in a judgment or verdict that is greater or less than the recovery under the Settlement Agreement – and could also result in no recovery at all.

74.     This litigation has been vigorously contested from the outset.  State Street has denied, and continues to deny, the material allegations in the Complaint.  For example, State Street has always maintained that its personnel acted prudently at all material times in managing the Funds, that the losses suffered by the Funds (and the Plans that invested in them) were caused by sudden and severe changes in market conditions for subprime asset-backed securities that

could not have been reasonably foreseen, that State Street employed adequate risk management and portfolio management systems and procedures, and that the Plans and their fiduciaries were at all times adequately informed of the risks of investing in the State Street-managed Funds.  At trial, proof of State Street's allegedly imprudent management of the Funds, which were heavily invested in exceptionally complex subprime asset-backed securities and related derivative instruments, would have been complicated, and would have likely resulted in a lengthy and expensive "battle of the experts."   This in turn would have involved detailed offers of proof concerning not only State Street's conduct, but also relevant industry standards in the investment management business with respect to the management of these types of highly sophisticated investment portfolios.  Although Lead Plaintiffs believed in their ability to succeed on the merits, an ultimate finding of liability was by no means certain.

75.     In addition, Lead Plaintiffs also faced risks relating to their ability to maintain this Action as a Class Action through trial.  Although Lead Counsel believe that the common course of (mis)conduct alleged made this Action entirely appropriate for class certification, State Street opposed class certification as unwieldy, arguing that the case involved investments in 40 different Funds with different portfolio managers, risk profiles, objectives and returns.  Moreover, State Street argued that certain Class Members had differing investment objectives and responded differently to relevant events during the Class Period, thereby potentially raising individual issues of proof.   Because the proposed Settlement eliminates the risk that class certification might be denied or reconsidered during or after trial, this factor also weighs in favor of Settlement.

76.     Moreover, even if Plaintiffs were successful in proving liability and certifying a class, the amount of damages suffered by Class Members would have been hotly contested at

trial.  Plaintiffs would have had to prove that State Street's actions in managing the Funds did in fact constitute breaches of State Street's fiduciary duties to the Included Plans, and that those breaches of fiduciary duty caused the Included Plans actual harm.  Lead Plaintiffs would have also had to establish and quantify the Class's damages. State Street would have maintained, likely supported by its own experts' testimony, that the decline in the performance of its Funds was not due to mismanagement on State Street's part, but was a result of an unprecedented and unexpected housing market meltdown that was far beyond its control.  This too would have involved an extensive (and expensive) battle of the experts, with no guarantee that the ultimate recovery (if any) would have exceeded the approximately 58% share of each Plans' Capital Loss recovered under the proposed Settlement.

77.     Finally, although Lead Counsel believed that State Street's Counterclaims were devoid of merit, the fact remains that (a) each of the plaintiff Plan trustees was named as a Counterclaim defendant by State Street, (b) State Street would have attempted to prove that any losses suffered by the Included Plans were primarily due to the failure of those Plan's trustees to adequately monitor their investments in breach of their fiduciary duties (and/or due to breaches of duty committed by the Included Plans other fiduciaries, such as their investment consultants or others that arguably had some role with respect to monitoring the Included Plans' investments).  If successful on their counterclaims for contribution or indemnity, Defendants would no doubt have pressed their argument that the Counterclaims raised individual issues that would have made class certification inappropriate, and that would have heightened the risk of protracted "spin-off" litigation.  Plaintiffs vigorously disputed any contention that the Counterclaims were valid, or that they posed a genuine risk to class certification, but acknowledge that Defendants offered a different view.

78.     Finally, even if Plaintiffs had prevailed at trial on both liability and damages, post-verdict motions and appeals would likely have been inevitable, raising the risk of additional months and possibly years of delay in getting any relief for the Included Plans even if they ultimately prevailed on appeal.  Given all of these factors, the 58% recovery represented by the Settlement clearly represents a most significant "bird in the hand" when compared to the risks (and related additional costs) of potentially taking this case through trial, post-verdict motions and likely appeals.

## VI.     LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES

79.     Lead Counsel have respectfully requested an attorneys' fee award of 25% of the Gross Settlement Fund (the "Fee Application").  As discussed below, the requested fee represents only a very modest multiplier of approximately 1.1 on Lead Counsel's combined lodestar of $18,838.851.35.  The legal authorities supporting the requested fee are set forth in Lead Counsel's separate memorandum of law being filed contemporaneously herewith.  We summarize below the primary factual bases for Lead Counsel's requested fee.

### A.     The Work And Experience Of Counsel

80.     Attached hereto as Exhibits B-D are declarations from each of the respective Lead Counsel firms in support of the request for an award of attorneys' fees and reimbursement of litigation expenses.  Included as part of each Lead Counsel's declaration are schedules that summarize the lodestar of each firm, as well as the expenses incurred by category (the "Fee and Expense Schedules").  Lead Counsel's attached declarations and their accompanying Fee and Expense Schedules set forth the amount of time spent by each attorney and professional staff member employed by each respective Lead Counsel firm, and the lodestar calculations based on their current billing rates.  As attested in each declaration, the declarations were prepared from contemporaneous daily time records regularly prepared and

maintained by the respective firms, and which are available at the request of the Court.  The hourly rates for attorneys and professional staff members included in these schedules are commensurate with the hourly rates charged by attorneys and professional staff members performing similar services in complex class action litigation.  For attorneys or professional staff members who are no longer employed by Lead Counsel, the lodestar calculations are based upon the billing rates for such person in his or her final year of employment at the firm.

81.    In the aggregate, Lead Counsel have expended 54,532.66 hours in the prosecution and investigation of this Action.  The resulting lodestar is $18,838,851.35.  The requested 25% fee of the Gross Settlement Fund (which is equal to $20,812,241.41, plus interest), would therefore result in only a very modest multiple of about 1.1 on Lead Counsel's lodestar.

82.    Lead Counsel are highly experienced in prosecuting ERISA and securities class actions, and worked diligently and efficiently in prosecuting this Action.  Counsel's experience and track record in complex class action litigation are summarized in the firm resumes attached to their respective declarations.  Lead Counsel allocated the work on this case among their respective firms, and worked to avoid duplication of effort and ensure efficient prosecution of this Action.

## B.     Standing And Caliber Of Defense Counsel

83.    The quality of the work performed by Lead Counsel in obtaining the Settlement should also be evaluated in light of the quality of opposing counsel.  State Street was represented by Ropes & Gray LLP, who vigorously defended this action from the outset.  In the face of this formidable and well-financed opposition, Lead Counsel were nonetheless able to

develop a case that was sufficiently strong to persuade State Street to settle the case on terms favorable to the Class.

### C.   The Risks Of Litigation And The Need To Ensure Availability Of Competent Counsel In High-Risk Contingent ERISA Cases

84.   This prosecution was undertaken by Lead Counsel entirely on a contingent-fee basis.   The risks assumed by Lead Counsel in bringing these claims to a successful conclusion are summarized above, as well as in the accompanying brief in support of the Settlement.   Those risks are also relevant to an award of attorneys' fees.   Here, the risks assumed by Lead Counsel, and the time and expenses incurred without any payment, were extensive.

85.   From the outset, Lead Counsel understood that they were embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.   In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of this Action, and that funds were available to compensate staff and to cover the considerable out-of-pocket costs – including hundreds of thousands of dollars in expert fees – that a case such as this requires.   With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.   Indeed, Lead Counsel have received no compensation to date for their work in vigorously litigating this Action, while simultaneously incurring – also without any compensation or reimbursement – $1,544,072.43 in out-of-pocket-expenses in prosecuting this Action for the benefit of the Class.

86.   Lead Counsel also bore the risk that no recovery would be achieved.   As discussed herein, from the outset this case presented a number of risks and uncertainties that

could have prevented any recovery whatsoever.  Despite the most vigorous and best of efforts, success in contingent-fee litigation, such as this, is never assured.

87.    Courts have repeatedly recognized that it is in the public interest to have experienced and able counsel to enforce ERISA laws and regulations pertaining to the duties of ERISA fiduciaries.  If this important public policy is to be carried out, the courts should award fees that adequately compensate Lead Counsel, taking into account the risks undertaken in prosecuting a securities class action.

### D.    The Reaction Of Lead Plaintiffs And The Class To Lead Counsel's Fee Application

88.    Lead Plaintiffs – which consist of multi-million dollar retirement plans and their named fiduciaries – have reviewed and approved Lead Counsel's fee request, and have concluded that it is fair, reasonable and appropriate.  In coming to this conclusion, Lead Plaintiffs evaluated Lead Counsel's prosecution of this Action, the negotiation of the Settlement, and the significant recovery obtained despite the risks in this case.  That these experienced ERISA fiduciaries support Lead Counsel's request also weighs in favor of approving the requested 25% fee.

89.    The reaction of the other members of the Class (which similarly consist of large ERISA plans and their named fiduciaries) further confirms the reasonableness of the requested 25% fee.  Consistent with the Notice, 131 Notice Packets were mailed to the named fiduciaries of each of the Included Plans that are members of the Class, which advised them of the amount of attorneys' fees that Lead Counsel would request.  *See* Keough Decl. ¶6. Additionally, on November 16, 2009 the Summary Notice was published in the national edition of *The Wall Street Journal* and over the *PR Newswire*, *see* Keough Decl. ¶7, and the Settlement documents have also been available on the website maintained by GCG.  *Id.*

¶19.  All notices stated that Lead Counsel would apply for a fee of up to 25% of the Gross Settlement Fund, and that the deadline for objecting to this anticipated fee request is February 10, 2010.  To date, no objections to the requested fee have been received.

90.     Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Class.  Given, *inter alia,* (a) the excellent result achieved, (b) the nature, quality and extent of Lead Counsel's work, (c) the complexity of the litigation and the vigorous opposition presented throughout by opposing counsel, (d) the very modest lodestar multiplier represented by the requested fee, (e) Lead Plaintiffs' concurrence in the reasonableness of Lead Counsel's fee request, and (f) all of the other reasons set forth above and Lead Counsel's accompanying memorandum of law, it is respectfully submitted that the requested fee of 25% of the Gross Settlement Fund is fair, reasonable and appropriate, and should be approved.

## VII.   REIMBURSEMENT OF THE REQUESTED LITIGATION EXPENSES IS FAIR AND REASONABLE

91.     Lead Counsel also seek reimbursement of $1,544,072.43 in litigation expenses reasonably and actually incurred by Lead Counsel in connection with commencing and prosecuting the litigation.

92.     From the beginning of the case, Lead Counsel were aware that they might not recover any of their expenses.  Lead Counsel also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of the funds advanced by them to prosecute this Action.  Thus, Lead Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous prosecution of the case.

93.     The litigation expenses incurred by Lead Counsel are reflected on their respective firm's books and records, which are prepared from expense vouchers, check records and other source materials, and are an accurate record of the expenses incurred.  Lead Counsel's expenses are set forth in detail in each firm's declaration, each of which identifies the specific category of expense, *e.g.*, on-line or computerized research, experts' fees, costs of mediation, out-of-town travel costs, photocopying, telephone, fax and postage expenses, and other costs actually incurred for which Lead Counsel seek reimbursement.  These expense items are billed separately by Lead Counsel, and such charges are not duplicated in the respective firms' billing rates.

94.     Of the total amount of expenses, approximately 42%, was expended on experts.  To assist in the prosecution of this, Lead Counsel retained experts with expertise in, *inter alia,* (a)  subprime asset-backed securities and related derivatives of the type managed by State Street; (b) appropriate risk management practices and systems for managing portfolios of the type maintained by the Funds; (c) fiduciary duty standards under ERISA; and (d) damages.  Lead Counsel consulted extensively with their experts from the outset of discovery in this litigation.

95.     Another large component of the litigation expenses, approximately 7%, involved the cost of deposition transcripts and court reporter services in connection with the 25 depositions Lead Counsel either took or defended.

96.     In addition, approximately 18% of costs incurred related to costs of copying, coding and electronically managing various portions of the enormous document productions that were made in this Action, including Plaintiffs' share of the costs for conversion of

documents, as well as the costs for the "webseats" and licensing associated with extensive document review through a web-based document review database.[8]

97.     Lead Counsel also incurred mediation fees assessed by Judge Politan in connection with the three separate face-to-face mediations that he supervised, and in connection with other assistance he provided in connection with efforts to resolve this litigation.

98.     The other expenses for which Lead Counsel seeks reimbursement are the types of expenses that are customarily incurred in litigation and routinely charged to clients that are billed by the hour as appropriate and reasonably necessary expenses. These expenses include, among others, court fees, costs of out-of-town travel for depositions and court hearings, long distance telephone and facsimile charges, and postage and delivery expenses, on-line and computerized legal and factual research, and miscellaneous photocopying expenses.

99.     All of the litigation expenses incurred were reasonably necessary to the successful prosecution and resolution of the Action. In addition, although the Notice apprised potential Class Members that Lead Counsel would be seeking reimbursement of expenses in an amount not to exceed $3,000,000.00, the amount of expenses that Lead Counsel are now actually seeking reimbursement for is $1,544,072.43 (plus modest accrued interest) – or roughly *half* of the amount stated in the Notice. The Court deadline for objecting to the fee and expense application expires on February 10, 2010, and to date, there have been no objections to an award of expenses as high as $3 million; *a fortiori,* it is reasonable to assume that the Class would also

---

[8]  Based on review of the costs and features of different document database applications, Lead Counsel selected Concordance, which allows the uploading and review of all documents on in-house maintained servers. In connection with the Concordance application, Lead Counsel incurred costs in the amount of $198,709.06, comprised of set-up, document up-loading, monthly maintenance, and "Web Seat" and license fees based on the number of authorized users.

have no objection to the significantly lower expense reimbursement that Lead Counsel have actually submitted.

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

100.    In view of the complex nature of this Action, the expenses incurred were reasonable and necessary to pursue the interests of the Class.  Accordingly, Lead Counsel respectfully submit that the expenses incurred by Lead Counsel should be reimbursed in full.

## VIII.   CONCLUSION

101.    In view of the excellent recovery to the Class, the substantial risks of litigation, the nature, extent and quality of the work performed, the contingent nature of the fee, the complexity of the case and the very modest lodestar represented by Lead Counsel's 25% fee request, Lead Counsel respectfully submit that:  (i) the Settlement and Plan of Allocation should be approved as fair, reasonable and adequate; (ii) the requested 25% fee should be awarded; and (c) Plaintiffs' Counsel's litigation expenses in the amount of $1,544,072.43 should be reimbursed in full.

Signed under the penalties of perjury this 27th day of January, 2010.

/s/William C. Fredericks
William C. Fredericks          Derek W. Loeser          Patrick T. Egan

35

## TABLE OF CONTENTS TO EXHIBITS

| EXHIBIT | TITLE |
|---------|-------|
| A | Declaration of Jennifer M. Keough Regarding Notice Dissemination and Publication |
| B | Declaration of William C. Fredericks in Support of Petition for Attorneys' Fees and Reimbursement of Expenses Filed on Behalf of Bernstein Litowitz Berger & Grossmann LLP |
| C | Declaration of Derek W. Loeser Filed on Behalf of Keller Rohrback L.L.P. in Support of Application for Award of Attorneys' Fees and Expenses |
| D | Declaration of Patrick T. Egan Filed on Behalf of Lead Plaintiffs in Support of Application for Award of Attorneys' Fees and Expenses |