UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE STATE STREET BANK AND TRUST  :
CO. ERISA LITIGATION               :
                                   :
                                   :
                                   :           07 Civ. 8488 (RJH)
                                   :
This document relates to:          :
                                   :
07 Civ. 8488 (*Prudential Retirement Insurance and* :
*Annuity Company v. State Street Bank and Trust*    :
*Company and State Street Global Advisors, Inc.*)   :
                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISSING ALL COUNTERCLAIMS

Edwin G. Schallert
Steven Klugman
Jeremy N. Klatell
Courtney M. Dankworth
Miranda H. Turner
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

Attorneys for Plaintiff Prudential
Retirement Insurance and Annuity Company

Dated: New York, New York
       June 2, 2010

## TABLE OF CONTENTS

**Page**

Summary of Argument ..................................................................................................1

Statement of Facts .......................................................................................................2

    A.    The Parties and the Plans ...........................................................3

        1.    PRIAC and CIGNA Retirement......................................3

        2.    Plans and Beneficiaries .................................................3

        3.    State Street .....................................................................3

    B.    The Bond Funds .........................................................................4

    C.    The Parties' Responsibilities with Respect to the Bond Funds .............................6

        1.    State Street .....................................................................6

        2.    PRIAC ...........................................................................6

    D.    State Street's Communications to PRIAC About the Bond Funds (Before July 2007) .......................................................8

    E.    The "Passive" Name Change ...................................................10

    F.    State Street's Changes in the Investment Strategy of the Bond Funds ...........................................................................11

        1.    Investment in the Limited Duration Bond Fund ..........12

        2.    Concentration in Subprime Mortgage Securities .........13

        3.    Use of Leverage ...........................................................13

    G.    The Bond Funds and the Collapse of the Subprime Bond Market (July-September 2007)...........................................14

    H.    State Street's Communications to PRIAC About the Bond Funds (July-August 2007) .....................................................15

    I.    PRIAC's Requests to State Street for Information About the Bond Funds (July-August 2007)......................................17

    J.    PRIAC's Communications with Its Clients (August-September 2007) ..........................................................18

i

        K.      Communications After the Complaint (October 2007) .......................................22

        L.      Media Reports on State Street and State Street's Response .................................23

The Parties' Claims.............................................................................................................24

        A.      PRIAC's ERISA Claim...............................................................................24

        B.      State Street's Counterclaim for Contribution and Indemnity .................................24

        C.      State Street's Defamation Counterclaim........................................................25

                1.      PRIAC Statements to Its Clients About State Street's Divergence from Its
                        Stated Investment Approach for the Bond Funds *[Statement Nos. 12-13,
                        15-17, 23]*................................................................................................25

                2.      PRIAC Statements to Its Clients About the Erroneous Name Change of
                        the Intermediate Bond Fund  *[Statement Nos. 4-6, 15-16]*.......................26

                3.      PRIAC Statements to Its Clients About State Street's Failure to Provide
                        Information to PRIAC *[Statement Nos. 1-3, 5, 7-15, 17-20, 23]* ..............26

                4.      PRIAC Statements to Its Clients About PRIAC's Loss of Confidence in
                        State Street *[Statement Nos. 18-22]*........................................................27

        D.      State Street's Counterclaim Under the Massachusetts Unfair Trade
                Practices Act .......................................................................................27

Argument ..........................................................................................................................27

I.      Summary Judgment Should Be Granted Dismissing the Contribution and
        Indemnity Counterclaim. ..............................................................................28

        A.      It Is Doubtful That There Is Any Implied Right to Contribution and
                Indemnity Under ERISA.............................................................................28

        B.      State Street Cannot Show That PRIAC's Role Supports a Claim for
                Contribution or Indemnity. .........................................................................29

        C.      State Street Is Not Entitled to Contribution or Indemnity Because
                PRIAC Did Not Violate ERISA. ..................................................................31

                1.      PRIAC's Monitoring...............................................................................32

                2.      PRIAC's Own Disclosures Not Misleading ...............................................33

                        a.      PRIAC's Disclosures Not Knowingly False.......................................34

                        b.      No Duty to Make Additional Disclosures............................................35

ii

D.    If State Street Could Establish That PRIAC Violated ERISA, State Street Would Be "Substantially More at Fault" Than PRIAC..............................38

       1.    Active/Passive Fiduciary ..........................................................38

       2.    State Street Substantially More at Fault....................................39

II.    Summary Judgment Should Be Granted Dismissing the Defamation Counterclaim....................................................................................................41

A.    PRIAC's Statements Are Entitled to a Qualified Privilege, Which State Street Cannot Overcome. *[All Statements]*..................................41

B.    State Street Was a Public Figure, and It Cannot Prove Constitutional Malice. *[All Statements]*................................................44

C.    State Street Cannot Prove That PRIAC's Statements Were False. *[All Statements]* ........................................................................47

       1.    PRIAC Statements to Its Clients About State Street's Divergence from Its Stated Investment Approach for the Bond Funds *[Statement Nos. 12-13, 15-17, 23]*..........................................................47

       2.    PRIAC Statements to Its Clients About the Erroneous Name *[Statement Nos. 4-6, 15-16]* ..........................................................50

       3.    PRIAC Statements to Clients About State Street's Failure to Provide Information *[Statement Nos. 1-3, 5, 7-15, 17-20, 23]* ..............................50

       4.    PRIAC Statements to Clients About PRIAC's Loss of Confidence in State Street *[Statement Nos. 18-22]*..................................................51

D.    Some of PRIAC's Statements Constitute Protected Expressions of Opinion. *[Statement Nos. 1, 2, 7-10, 12-15, 18-22]* ............................51

E.    Some of PRIAC's Statements Were Not "Of and Concerning" State Street. *[Statement Nos. 3, 5, 11, 15, 17, 21-23]*............................52

F.    State Street Cannot Prove Incremental Harm from Any of PRIAC's Statements. *[All Statements]* ................................................53

       1.    The Defamation Claim Is Governed by Connecticut Law.........................53

       2.    State Street Cannot Prove Incremental Harm from Any of PRIAC's Statements...................................................................55

G.    State Street Cannot Prove That It Was Injured by Any of PRIAC's Statements. .................................................................................56

III.    Summary Judgment Should Be Granted Dismissing the Counterclaim Under the
        Massachusetts Unfair Trade Practices Act. ....................................................................57

IV.     Counterclaiming Against PRIAC, Which Is Suing as a Fiduciary, Is Procedurally
        Improper.......................................................................................................................59

Conclusion ...........................................................................................................................60

# TABLE OF AUTHORITIES

CASES                                                                                      Page

*Albright v. Morton,*
    321 F. Supp. 2d 130 (D. Mass. 2004) ...................................................................57

*Allan v. Hartford Courant,*
    No. Civ. 599993S (MKB), 2001 WL 291162 (Conn. Super. Ct. Mar. 8, 2001).....................53

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)..................................................................................27

*AroChem International, Inc. v. Buirkle,*
    968 F.2d 266 (2d Cir. 1992)....................................................................54, 55

*Bio/Basics International Corp. v. Ortho Pharmaceutical Corp.,*
    545 F. Supp. 1106 (S.D.N.Y. 1982)................................................................54

*Blue Ridge Bank v. Veribanc, Inc.,*
    866 F.2d 681 (4th Cir. 1989) ....................................................................45

*Board of Trustees of CWA/ITU Negotiated Pension Plan v. Weinstein,*
    107 F.3d 139 (2d Cir. 1997).....................................................................36

*Boyd v. Nationwide Mutual Insurance Co.,*
    208 F.3d 406 (2d Cir. 2000).................................................................42, 43

*BP Corp. North America Inc. Savings Plan Investment Oversight Committee v.*
    *Northern Trust Investments, N.A.,*
    No. 08 Civ. 6029 (WJH), 2010 U.S. Dist. LEXIS 12379 (N.D. Ill. Feb. 10, 2010)....39, 40, 59

*Bratt v. International Business Machines Corp.,*
    467 N.E.2d 126 (Mass. 1984) ....................................................................42

*Brewer v. Town of West Hartford,*
    No. 3:05 Civ. 849 (SRU), 2007 WL 2904207 (D. Conn. Sept. 28, 2007)..............................51

*Bruno & Stillman, Inc. v. Globe Newspaper Co.,*
    633 F.2d 583 (1st Cir. 1980)....................................................................45

*Chemung Canal Trust Co. v. Sovran Bank/Maryland,*
    939 F.2d 12 (2d Cir. 1991)...............................................................28, 29, 59

*Church of Scientology International v. Behar,*
    238 F.3d 168 (2d Cir. 2001)....................................................................53, 55

*Church of Scientology International v. Time Warner, Inc.*,
   932 F. Supp. 589 (S.D.N.Y. 1996) .........................................................................55

*In re Citigroup ERISA Litigation*,
   No. 07 Civ. 9790 (SHS), 2009 U.S. Dist. LEXIS 78055 (S.D.N.Y. Aug. 31, 2009) .............36

*Condit v. Dunne*,
   317 F. Supp. 2d 344 (S.D.N.Y. 2004).....................................................................54

*Contemporary Mission, Inc. v. New York Times Co.*,
   842 F.2d 612 (2d Cir. 1988)................................................................................45

*Cummins v. Suntrust Capital Markets, Inc.*,
   649 F. Supp. 2d 224 (S.D.N.Y. 2009).................................................................53, 54

*Cweklinsky v. Mobil Chemical Co.*,
   364 F.3d 68 (2d Cir. 2004)................................................................................25

*Davis v. Costa-Gavras*,
   580 F. Supp. 1082 (S.D.N.Y. 1984).......................................................................54

*DeLaurentis v. City of New Haven*,
   597 A.2d 807 (Conn. 1991) ...............................................................................56

*DeVito v. Schwartz*,
   784 A.2d 376 (Conn. App. Ct. 2001).....................................................................57

*Devlin v. Empire Blue Cross & Blue Shield*,
   274 F.3d 76 (2d Cir. 2001).................................................................................36

*Dragonas v. School Committee of Melrose*,
   833 N.E.2d 679 (Mass. App. Ct. 2005) ..................................................................43

*Dulgarian v. Stone*,
   652 N.E.2d 603 (Mass. 1995) .............................................................................57

*Encompass Insurance Co. of Massachusetts v. Giampa*,
   522 F. Supp. 2d 300 (D. Mass. 2007) ....................................................................47

*Eyal v. Helen Broadcasting Corp.*,
   583 N.E.2d 228 (Mass. 1991) .............................................................................52

*Free v. Briody*,
   732 F.2d 1331 (7th Cir. 1984) ........................................................................39, 40

*Friedman v. Boston Broadcasters, Inc.*,
   522 N.E.2d 959 (Mass. 1988) .............................................................................51

*Gallo v. Barile*,
    935 A.2d 103 (Conn. 2007) ..............................................................................43

*Gearren v. McGraw-Hill Cos.*,
    No. 08 Civ. 7890 (RJS), 09 Civ. 5450 (RJS), 2010 U.S. Dist. LEXIS 12041
    (S.D.N.Y. Feb. 10, 2010) .................................................................................36

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) .........................................................................................44

*Ginsberg v. Healey Car & Truck Leasing, Inc.*,
    189 F.3d 268 (2d Cir. 1999) .............................................................................27

*In re Goldstick*,
    177 A.D.2d 225 (N.Y. App. Div. 1992) ...........................................................38

*Goodrich v. Waterbury Republican-American, Inc.*,
    448 A.2d 1317 (Conn. 1982) ......................................................................47, 51

*Great-West Life & Annuity Insurance Co. v. Knudson*,
    534 U.S. 204 (2002) .........................................................................................29

*Hardy v. Saliva Diagnostic Systems Inc.*,
    995 F. Supp. 2d 258 (D. Conn. 1997) ...............................................................43

*Harris Trust & Savings Bank v. John Hancock Mutual Life Insurance Co.*,
    122 F. Supp. 2d 444 (S.D.N.Y. 2000),
    *rev'd in part on other grounds*, 302 F.3d 18 (2d Cir. 2002) ....................30, 39

*Herbert v. Lando*,
    781 F.2d 298 (2d Cir. 1986) .............................................................................53

*HipSaver Co. v. J.T. Posey Co.*,
    490 F. Supp. 2d 55 (D. Mass. 2007) ...........................................................57, 58

*Jackson v. Longcope*,
    476 N.E.2d 617 (Mass. 1985) ...........................................................................57

*Jones v. Globe International Inc.*,
    No. 3:94 Civ. 01468 (AVC) et al., 1995 WL 819177 (D. Conn. Sept. 26, 1985) .................53

*Kim v. Fujikawa*,
    871 F.2d 1427 (9th Cir. 1989) ..........................................................................28

*Kirch v. Liberty Media Corp.*,
    449 F.3d 388 (2d Cir. 2006) .............................................................................52

*Korpacz v. Women's Professional Football League*,
   No. 04 Civ. 10735 (RWZ), 2006 WL 220762 (D. Mass. Jan. 27, 2006)................................58

*Kuwaiti Danish Computer Co. v. Digital Equipment Corp.*,
   781 N.E.2d 787 (Mass. 2003) ................................................................................58

*Lee v. Bankers Trust Co.*,
   166 F.3d 540 (2d Cir. 1999)................................................................................54

*Lee v. Manufacturers & Traders Trust Co.*,
   219 F.R.D. 265 (W.D.N.Y. 2004)................................................................................59

*Leigh v. Engle*,
   727 F.2d 113 (7th Cir. 1984) ................................................................................32

*Lingis v. Motorola, Inc.*,
   649 F. Supp. 2d 861 (N.D. Ill. 2009) ................................................................36

*Liss v. Smith*,
   991 F. Supp. 278 (S.D.N.Y. 1998) ................................................................................32

*LNC Investments, Inc. v. First Fidelity Bank*,
   No. 92 Civ. 7584 (CSH), 2000 WL 1024717 (S.D.N.Y. July 25, 2000) ................................32

*Long v. Cooper*,
   848 F.2d 1202 (11th Cir. 1988) ................................................................................45

*Mandel v. Boston Phoenix, Inc.*,
   456 F.3d 198 (1st Cir. 2006)................................................................................53

*In re Masters Mates & Pilots Pension Plan*,
   957 F.2d 1020 (2d Cir. 1992)................................................................................29

*McAvoy v. Shufrin*,
   518 N.E.2d 513 (Mass. 1988) ................................................................................47

*Mertens v. Hewitt Associates*,
   508 U.S. 248 (1993)................................................................................28, 29

*Miron v. University of New Haven Police Department*,
   931 A.2d 847 (Conn. 2007) ................................................................................42

*National Fire Protection Association, Inc. v. International Code Council, Inc.*,
   No. 03 Civ. 10848 (DPW), 2006 WL 839501 (D. Mass. Mar. 29, 2006) ................................58

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964)................................................................................43, 44

*North Atlantic Instruments, Inc. v. Haber*,
   188 F.3d 38 (2d Cir. 1999)........................................................................53

*Patten v. Northern Trust Co.*,
   No. 08 Civ. 5912 (JHL), 2010 U.S. Dist. LEXIS 21564 (N.D. Ill. Mar. 9, 2010)..................36

*In re Polaroid ERISA Litigation*,
   362 F. Supp. 2d 461 (S.D.N.Y. 2005)........................................................32, 36

*PowerDsine, Inc. v. AMI Semiconductor, Inc.*,
   591 F. Supp. 2d 673 (S.D.N.Y. 2008)............................................................54

*QSP, Inc. v. Aetna Casualty & Surety Co.*,
   773 A.2d 906 (Conn. 2001) ......................................................................52

*Qureshi v. St. Barnabas Hospital Center*,
   430 F. Supp. 2d 279 (S.D.N.Y. 2006)............................................................54

*R.G.J. Associates Inc. v. Stainsafe, Inc.*,
   338 F. Supp. 2d 215 (D. Mass. 2004) ..........................................................58

*Reiner v. Kelley*,
   457 N.E.2d 946 (Ohio Ct. App. 1983)............................................................39

*Reliance Insurance Co. v. Barron's*,
   442 F. Supp. 1341 (S.D.N.Y. 1977)..........................................................44, 45

*Roche v. Royal Bank of Canada*,
   109 F.3d 820 (1st Cir. 1997).....................................................................58

*RSL Communications PLC v. Bildirici*,
   649 F. Supp. 2d 184 (S.D.N.Y. 2009).............................................................31

*Rubin v. Valicenti Advisory Services, Inc.*,
   326 F. Supp. 2d 427 (W.D.N.Y. 2004) ...........................................................59

*Scalp & Blade, Inc. v. Advest, Inc.*,
   300 A.D.2d 1068 (N.Y. App. Div. 2002) .....................................................40, 41

*Smith v. Local 819 I.B.T. Pension Plan*,
   291 F.3d 236 (2d Cir. 2002)......................................................................31

*St. Amant v. Thompson*,
   390 U.S. 727 (1968)..............................................................................43

*Stanton v. Metro Corp.*,
   438 F.3d 119 (1st Cir. 2006).....................................................................25

*Stephens v. American Home Assurance Co.*,
   No. 91 Civ. 2898 (JSM) (KAR), 1995 WL 230333 (S.D.N.Y. Apr. 17, 1995)......................54

*Stockalert, Inc. v. Nasdaq Stock Market, Inc.*,
   No. 95 Civ. 9335 (JFK), 1998 WL 556036 (S.D.N.Y. Sept. 1, 1998)....................................54

*Strada v. Connecticut Newspapers, Inc.*,
   477 A.2d 1005 (Conn. 1984) ........................................................................................47, 50

*Sunderlin v. First Reliance Standard Life Insurance Co.*,
   235 F. Supp. 2d 222 (W.D.N.Y. 2002) ................................................................................31

*Sunward Corp. v. Dun & Bradstreet, Inc.*,
   811 F.2d 511 (10th Cir. 1987) .............................................................................................56

*Travelers Casualty & Surety Co. of America v. IADA Services, Inc.*,
   497 F.3d 862 (8th Cir. 2007) ...............................................................................................29

*Trustees of the Automobile Mechanics Local No. 701 Pension & Welfare Funds v.
   Union Bank of California*,
   630 F. Supp. 2d 951 (N.D. Ill. 2009) ...................................................................................59

*Varity Corp. v. Howe*,
   516 U.S. 489 (1996)..............................................................................................................34

*Visnick v. Caulfield*,
   901 N.E.2d 1261 (Mass. App. Ct. 2009) .............................................................................56

*Waldbaum v. Fairchild Publications, Inc.*,
   627 F.2d 1287 (D.C. Cir. 1980).........................................................................................45

*World Boxing Council v. Cosell*,
   715 F. Supp. 1259 (S.D.N.Y. 1989)....................................................................................51

*In re WorldCom, Inc. ERISA Litigation*,
   263 F. Supp. 2d 745 (S.D.N.Y. 2003)..................................................................................34

*In re Xerox Corp. ERISA Litigation*,
   483 F. Supp. 2d 206 (D. Conn. 2007)..................................................................................32

STATUTES AND REGULATIONS

29 C.F.R. § 2509.75-8 (2010).................................................................................................32

29 U.S.C. § 1024(b)(4) (2006)................................................................................................35

29 U.S.C. § 1104(a)(1) (2006)................................................................................................24

29 U.S.C. § 1132(a)(2) (2006) ................................................................................28, 59

29 U.S.C. § 1132(a)(3) (2006) ........................................................................................29

Federal Rule of Civil Procedure 30(b)(6) .....................................................................16

Federal Rule of Civil Procedure 56(b).............................................................................1

Local Rule 56.1(a) ............................................................................................................2

Mass. Gen. Laws ch. 93A, § 2 (2006) ..........................................................................57

Mass. Gen. Laws ch. 93A, § 11 (2006) ........................................................................57

## OTHER AUTHORITIES

Bogert, *The Law of Trusts and Trustees* (2d ed. rev. 1995)..........................................38

First Amendment ......................................................................................................45, 51

Restatement (Second) of Torts (1977) ......................................................41, 42, 52, 53

Restatement (Second) of Trusts (1959) ...............................................29, 30, 31, 39, 40

Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems*
    (3d ed. 2008) ...............................................................................................42, 45, 56

Plaintiff Prudential Retirement Insurance and Annuity Company ("PRIAC") submits this memorandum in support of its motion, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, for partial summary judgment dismissing all counterclaims by defendant State Street Bank and Trust Company ("State Street").

## Summary of Argument

PRIAC is suing on behalf of retirement plans that made investments in two bond funds managed by State Street (the "Bond Funds"). State Street had described the Bond Funds as enhanced index funds, meaning that they were intended to outperform a defined index of bonds by a modest amount and to incur moderate levels of risk. State Street's management and the performance of the Bond Funds were consistent with that description from 1996 until 2006. Then, State Street, as part of its business strategy, decided it would take on more investment risk to achieve higher returns. Without advising PRIAC, State Street significantly boosted the returns it targeted for the Bond Funds, highly leveraged them, and invested large portions of their assets in subprime mortgage securities. When the subprime bond markets declined in 2007, PRIAC's clients lost tens of millions of dollars. On their behalf, PRIAC asserts that State Street's management of the Bond Funds was imprudent and that State Street violated Section 404 the Employee Retirement Income Security Act of 1974 ("ERISA").

State Street's attempts to pass on its liabilities through counterclaims have no merit, and summary judgment should be granted dismissing them. State Street's first counterclaim seeks contribution or indemnity under ERISA for, essentially, PRIAC not realizing sooner and not informing its clients sooner that State Street was mismanaging the Bond Funds. Even if there is a right of contribution or indemnity under ERISA, the undisputed facts establish that State Street has no such right against PRIAC under the principles that would govern that claim. No facts support a claim that PRIAC acted in concert with State Street in violating ERISA, or that PRIAC

violated ERISA at all. Even if there were a triable issue with regard to PRIAC's ERISA liability, State Street would be unable to recover in contribution or indemnity since State Street's fault was substantially greater than any fault of PRIAC's and since any alleged misconduct of PRIAC was passive while State Street's was active.

State Street's second counterclaim is based on alleged defamation in 24 statements that PRIAC made to retirement plans and participants about the Bond Funds. PRIAC shared with its clients information and its opinions about various subjects relating to the Bond Funds, and about State Street. State Street has a high burden to prove defamation, both because PRIAC's communications with its clients were conditionally privileged and because State Street was a public figure. As a matter of law, State Street cannot meet that burden. In addition, State Street cannot establish the required elements of a defamation claim. It also cannot prove any compensatory damages from the allegedly defamatory statements.

State Street's third counterclaim seeks relief under Massachusetts' unfair trade practices statute. That counterclaim fails as a matter of law because it is based solely on the deficient defamation claim, and because PRIAC's conduct did not take place primarily in Massachusetts.

## Statement of Facts

The undisputed facts on which PRIAC's motion is based are set forth in PRIAC's accompanying statement pursuant to Local Rule 56.1(a). The underlying sources for these facts are presented in the declarations of George L. Palms, Jr., Robert F. Frascona, Matthew Dingee, Marshall E. Blume, Ph.D., and Jeremy N. Klatell, and in the deposition testimony and documents attached to those declarations. All these materials are collected in the accompanying Appendix, which is cited as "PA" followed by the page number or numbers in that appendix. Names that accompany the "PA" citations in this memorandum identify deponents or declarants.

PRIAC believes the following facts are not subject to genuine dispute.

2

A.    **The Parties and the Plans**

1.    **PRIAC and CIGNA Retirement**

In 2004, Prudential Financial, Inc. ("Prudential") acquired CIGNA Corp.'s retirement division ("CIGNA Retirement"), and renamed that business PRIAC, which became a Prudential subsidiary.  (Palms ¶ 3, PA 1.)  Many of CIGNA Retirement's key personnel joined PRIAC, including Mr. Palms as Senior Vice President of Advisory Services and head of the Products Division, and Mr. Frascona as Vice President of Investment Products and Advisory Services. (Palms ¶ 4, PA 1; Frascona ¶¶ 4, 5, PA 15-16.)

Through its annuity products, PRIAC provides investment options to defined benefit and defined contribution retirement plans.  (Palms ¶ 5, PA 2.)  As of 2007, PRIAC provided those services to more than 7,000 organizations and three million participants and beneficiaries.  (*Id.*)

2.    **Plans and Beneficiaries**

PRIAC commenced this suit in October 2007 on behalf of nearly 200 defined benefit and defined contribution retirement plans (the "Plans") that had invested in the Bond Funds, the State Street Intermediate Bond Fund and the State Street Government Credit Bond Fund.  The Plans invested in the Bond Funds through ERISA separate accounts maintained by PRIAC.  (Palms ¶ 8, PA 2; *see also* Mem. & Order, dated Sept. 30, 2008, at 10.)  Investments by defined benefit Plans were directed by the trustees for those Plans ("Plan Sponsors"), and investments by defined contribution Plans were directed by individual plan participants.  (Palms ¶ 8, PA 3.)

3.    **State Street**

State Street Global Advisors ("SSgA") is the investment management division of State Street, a wholly-owned subsidiary of State Street Corporation, a publicly-traded corporation. (PA 2400.)  SSgA was a leading institutional asset manager, with almost 3,000 institutional clients and $1.9 trillion in assets under management.  (*Id.*)  The group within SSgA that was

responsible for the management of the Bond Funds was the active fixed income bond group (the "Fixed Income Group").  (PA 602 Wands.)

**B.    The Bond Funds**

From 1996 to 2006, State Street categorized its bond funds as (i) "Passive" funds that attempted to track closely a benchmark index, (ii) "Enhanced Index" funds that sought to outperform a benchmark while mirroring its risk profile, or (iii) "Active" funds that sought more aggressive returns.  (PA 445-47 Dalis; PA 488-89 Hunt; PA 533-35 Pickett; PA 558-59 Reigel; PA 603-04 Wands.)  In presentations to investors, State Street depicted Enhanced Index funds as having less risk and lower return objectives than Active Funds.  (*E.g.*, PA 1895, at 1908; PA 1937, at 1953.)

Each Bond Fund had as its benchmark a Lehman Brothers index consisting of government and investment-grade corporate bonds.[1]  In materials that State Street reviewed and approved before PRIAC sent them to its clients, PRIAC described the Bond Funds as enhanced index funds.  (PA 1057.)  In a 2003 meeting with PRIAC, State Street described its investment strategy for the Bond Funds as a "risk-controlled process [that] ensures consistent, steady performance."  (PA 2028, at 2050; Frascona ¶ 8, PA 16.)  State Street targeted 30-40 basis points (0.3-0.4%)[2] of excess return over the benchmark's return with "[t]arget predicted tracking error," a measure of the deviation of a fund's performance from that of its benchmark, of 40-50 basis points (0.4-0.5%).  (PA 2028, at 2050.)  State Street charged management fees for each of the "enhanced bond funds" that recognized "the role of enhanced funds between active and passive

---

[1]    The benchmark for the Intermediate Bond Fund was the Lehman Brothers Intermediate Government Credit Bond Index.  The benchmark for the Government Credit Bond Fund was the Lehman Brothers Government Credit Bond Index.  (PA 1057; *see also* PA 1428.)

[2]    A basis point is equal to 0.01%, or 0.0001.

strategies." (PA 1650; *see also* PA 2136.) State Street knew that PRIAC made the Bond Funds "available for selection if plan sponsors choose the particular style offered by the strategies – low tracking error fixed income." (PA 2026.) In early 2005, State Street told PRIAC that the Government Credit Bond Fund's return target was 40-60 basis points above its benchmark, with a tracking error of 50-75 basis points. (PA 986.)

PRIAC understood that the Bond Funds were enhanced index funds that "combine[] the usually predictable strength of passive management with the repeatable aspects of active management to seek to provide a stable pattern of incremental returns." (PA 927; PA 1057.) From 1996 to 2007, PRIAC's fact sheets for the Bond Funds ("Fund Fact Sheets"), which were one- or two-page descriptions of each fund provided to clients quarterly, described State Street's management style as "enhanced." (Palms ¶ 22, PA 6; PA 927; PA 1057.) State Street approved that description on numerous occasions, including as late as August 1, 2007. (PA 927; *see also* PA 1355.) State Street told PRIAC in September 2005 and again in August 2007 that there had been no change in strategy for the Bond Funds. (PA 666; PA 1355.)

From 1996 through March 2007, each Bond Fund closely tracked the performance of its benchmark index. In internal documents, State Street described their performance as showing "[c]onsistent long-term tracking versus the benchmark." (PA 1071; PA 1077.) Annualized returns for the ten years ending March 31, 2007 showed a difference of only 7 basis points for the Intermediate Bond Fund and 6 basis points for the Government Credit Bond Fund. (PA 1071; PA 1077.) In the summer of 2007, the performance of the Bond Funds departed dramatically from their benchmarks. The Intermediate Bond Fund declined by 16.9% while its benchmark index increased by 2.2% – a 1,910 basis point departure. (PA 62.) The Government Credit Bond Fund declined by 23.9% while its benchmark index increased by 2.1% – a 2,600

basis point deviation. (PA 63.) From June 1, 2007 through September 5, 2007, PRIAC's clients that had invested in the Bond Funds lost nearly $80 million relative to their benchmarks.

## C.    The Parties' Responsibilities with Respect to the Bond Funds

### 1.    State Street

State Street was the investment manager of the Bond Funds, with sole investment discretion over the assets in the Bond Funds. (Palms ¶ 11, PA 3.) State Street was PRIAC's sole source of information about the Bond Funds, and it provided regular reports on their performance and other characteristics to PRIAC. (*Id.* ¶ 13, PA 4.)

### 2.    PRIAC

PRIAC made available to its clients hundreds of funds in various asset classes that retirement plans could invest in. (Palms ¶ 5, PA 2.) PRIAC provided monitoring services for those retirement plans. (*Id.* ¶ 9, PA 3.) PRIAC drew a distinction between two categories of funds on its platform: Alliance Funds and Institutional Sub-advised Funds. (*Id.*) In the Investment Policy Statement made available to clients, PRIAC described the differing scope of its role and obligations for those categories of funds. (*Id.*)

Alliance Funds included mutual funds and commingled trusts run by well-known outside managers like State Street. (Palms ¶ 9, PA 3.) The Bond Funds were Alliance Funds. (*Id.* ¶ 13, PA 4.) The outside manager for each Alliance Fund controlled its investment process. (*Id.* ¶ 11, PA 3.) PRIAC did not have access to portfolio holdings on a daily basis and could not ensure that the fund was managed consistent with its stated style. (*Id.* ¶ 11, PA 3-4.) For Alliance Funds, PRIAC monitored past performance and aspects of risk based on past performance, emphasizing historical performance for one-, three-, and five-year periods. (*Id.* ¶¶ 11, 15, PA 4.) The decision to continue investing in an Alliance Fund or withdraw from that fund was left to the discretion of the Plans. (*Id.* ¶ 12, PA 4.) PRIAC could place an Alliance Fund on its quarterly

Watch List as a means of alerting Plan Sponsors to PRIAC's concerns about the fund's performance or about its investment manager. (*Id.* ¶ 25, PA 7.)

PRIAC monitored Alliance Funds through its Due Diligence Advisor ("DDA") Program. (Palms ¶ 14, PA 4.)  Each quarter, PRIAC produced a Defined Benefit and a Defined Contribution DDA Report for each fund on its platform, including the Alliance Funds (the "DDA Reports").  (*Id.*)  Each DDA Report contained an explanation of the DDA Program, a summary of activity over the past quarter for each fund on the platform, a market review, fund performance and peer group rankings, and a page of data specific to each fund.  (*Id.*)  PRIAC also created quarterly Fund Fact Sheets, with two versions of each, one for Plan Sponsors and the other for Plan Participants and Plans with fewer than 120 participants.  (*Id.* ¶ 22, PA 6.)  PRIAC sent the DDA Reports to its clients each quarter.  (*Id.* ¶ 17, PA 5.)  PRIAC's clients could obtain at any time daily performance and other information about their investments on PRIAC's Plan Sponsor and Plan Participant websites.  (*Id.* ¶ 24, PA 7.)

The primary measure by which PRIAC assessed Alliance Funds' performance was the "DDA score," a composite of four objective performance-based criteria, weighted over one-year, three-year, and five-year periods.  (Palms ¶ 15, PA 4.)  For each Alliance Fund, PRIAC defined a peer group based on a group of funds that performed similarly to that fund, as determined by a statistical regression analysis.  (*Id.* ¶ 15, PA 5.)  PRIAC calculated a DDA score for each Alliance Fund and for each peer fund, and ranked the Alliance Fund among its peer funds.  (*Id.*)  The DDA Reports showed each Alliance Fund's ranking for that quarter.  (*Id.*)  In 2006 and 2007, PRIAC engaged an outside consultant to evaluate this peer ranking methodology.  (*Id.* ¶ 16, PA 5.)  The DDA Reports also had information on each Alliance Fund's performance over multiple periods, from quarterly to five years, percentages of assets invested in various bond

7

categories or "sectors," various fund characteristics, and facts such as net asset value, benchmark, and the ten largest bond holdings, as well as commentary on performance for each quarter. (*Id.* ¶ 17, PA 5.)

Institutional Sub-advised Funds were funds for which PRIAC agreed on an investment strategy with the fund's investment manager. (Palms ¶ 9, PA 3.) PRIAC monitored these funds for style consistency, defined as the correlation to managers investing in similar mandates. (*Id.* ¶ 19, PA 5.) If a Sub-advised Fund deviated from its style, PRIAC had the authority to replace the investment manager. (*Id.*)

In addition to direct investments in the Bond Funds, PRIAC offered the Intermediate Bond Fund as an indirect investment through two investment funds, the Balanced Turner Fund and Balanced Wellington Fund (the "Balanced Funds"). (Palms ¶ 26, PA 7.) In each Balanced Fund, the Intermediate Bond Fund constituted 40% of the fund's assets, with the remaining 60% managed by Turner or Wellington. (*Id.*) PRIAC did not have access to the daily holdings of the Intermediate Bond Fund in which the Balanced Funds invested. (*Id.* ¶ 26, PA 7-8.) PRIAC provided Fund Fact Sheets and DDA Reports for the Balanced Funds, and clients could access daily performance and other information about their Balanced Fund investments on PRIAC's Plan Sponsor and Plan Participant websites. (*Id.* ¶ 26, PA 8.)

**D.    State Street's Communications to PRIAC**
**About the Bond Funds (Before July 2007)**

State Street sent Monthly Account Summaries to PRIAC that reported on the performance of each of the Bond Funds and its respective benchmark. (Frascona ¶ 16, PA 18.) The Monthly Account Summaries showed the Bond Funds' investment in various sectors, such as government bonds, corporate bonds, and asset-backed securities ("ABS"). (*Id.* ¶ 16, PA 18-19.) PRIAC requested and received from State Street supplemental quantitative and qualitative

8

data to use in its DDA Reports and Fund Fact Sheets. (*Id.* ¶ 18, PA 19.) This additional information included fund characteristics that were not part of State Street's regular monthly reporting, such as the ten largest bond holdings of the fund, average coupon, average maturity, and a quarterly fund commentary. (*Id.*) From time to time, PRIAC asked State Street questions about the Bond Funds' performance. (*Id.* ¶ 23, PA 20.)

State Street's reports did not disclose the Bond Funds' leverage. (Frascona ¶ 21, PA 19.) (Leverage involves the use of financial instruments or debt to increase exposure to an investment beyond the cash invested. (*Id.* ¶ 19, PA 19.)) State Street's fourth quarter 2004 report for the Government Credit Bond Fund showed sector allocations totaling 116%. (PA 1609.)[3] When PRIAC asked why the allocations exceeded 100%, State Street explained that the 116% included a leverage component, which might be "a future or a swap." (*Id.*) After the fourth quarter 2004, the sector allocations in all State Street's quarterly reports to PRIAC for both Bond Funds totaled 100%. (Frascona ¶ 21, PA 19.)

In early 2005, State Street made an internal decision to "normalize" the sector percentages in its reports to investors so that they would total 100%, even if the amount of invested assets exceeded the amount invested in a fund because of leverage. (PA 1047; PA 1082; PA 2161.) State Street client-facing personnel advocated providing two sets of sector weights to clients, one reflecting a negative cash balance to indicate that the amount invested in the portfolio was less than the amount invested by the portfolio, and one reflecting "normalized" sector weights that would total 100% regardless of leverage. (PA 580-81 Saarinen; PA 829.)

---

[3]     In that report, the Intermediate Bond Fund's sector allocations totaled 100%. (PA 1609.)

**E.**    **The "Passive" Name Change**

On September 19, 2005, State Street advised PRIAC that it had made changes to certain funds to create operational efficiencies, including minor name changes. (PA 1086.) State Street made two mistakes in documents that it sent to PRIAC providing the new name for the Intermediate Bond Fund: it listed the name as the Passive Intermediate Bond Index Securities Lending Series Fund – Class A; and in a fund declaration, it included "passive" and "index" in that fund's name. (PA 448-49 Dalis; PA 454-55 Flinn; PA 484-85 Hughes; PA 585 Saarinen; PA 1054; PA 1459.) PRIAC requested a conference call to ask State Street about these changes. (PA 1086.) After that call, State Street again told PRIAC that the name of the Intermediate Bond Fund had been changed to the Passive Intermediate Bond Index Fund. (PA 666.) Following State Street's direction, PRIAC used the new name in materials it provided to clients. (Frascona ¶ 12, PA 17.) From October 2005 to July 2007, PRIAC's materials referred to the fund as the Passive Intermediate Bond Index Fund. (*Id.*)

Until July 2005, PRIAC sent Fund Fact Sheets to outside investment managers for their review and approval each quarter. (Palms ¶ 23, PA 6.) In an effort to speed up the production and delivery to clients of Fund Fact Sheets, PRIAC stopped that practice in mid-2005. (*Id.*) PRIAC did not ask State Street to review its Fund Fact Sheets for any State Street-managed funds from July 2005 until July 2007, and State Street did not review them during that period. (Frascona ¶ 13, PA 18.)

In late June 2007, PRIAC asked State Street about the Intermediate Bond Fund's name. (PA 1330.) In July, State Street advised PRIAC that it had mistakenly provided an incorrect name. (PA 448 Dalis; PA 454-55 Flinn; PA 484 Hughes; PA 585 Saarinen; PA 784; PA 1054; PA 1428.) On July 30, PRIAC requested that State Street review a Fund Fact Sheet for the Intermediate Bond Fund. (PA 623-24 Dingee; PA 927.) On August 1, State Street confirmed

10

that the name of the fund and the name of State Street's portfolio manager were the only inaccuracies in that Fund Fact Sheet.  (PA 1355.)  That day, PRIAC updated its websites and began the process of correcting second-quarter reports that were still in production to reflect the Intermediate Bond Fund's corrected name.  (PA 645-46 Ortiz; PA 816; PA 1041; PA 2354.)

## F.    State Street's Changes in the Investment Strategy of the Bond Funds

At the end of 2005, State Street's CEO set for the Fixed Income Group an aggressive goal of tripling the group's revenues and assets under management within three years.  (PA 582-84 Saarinen; PA 605 Wands.)  Gaining recognition as a leader in active fixed income was viewed as "crucial" to achieving significant revenue growth.  (PA 2152.)  Senior executives in the Fixed Income Group perceived State Street's reputation as a passive and enhanced index fund manager as a hindrance to such growth.  (PA 466-69 Greff; PA 472-73 Greff; PA 480-81 Hopkins; PA 490-91 Hunt; PA 529-30 O'Hara; PA 567-68 Roberts; PA 606-07 Wands; PA 2107, at 2119; PA 2152.)  In addition, State Street's fees for active funds were materially higher than for enhanced index and passive funds, and State Street typically set its management fees at 20-25% of a fund's excess return target.  (PA 498 Kelly.)

The Fixed Income Group implemented an initiative in 2006 known as "Leveraging Fixed Income."  (PA 582-84 Saarinen; PA 1361; PA 1417; PA 2152.)  Senior Management of the Group set its "[m]ission" as "to gain recognition as a leader in Active Fixed Income in order to compliment [sic] [its] current role as a leader in Passive Fixed Income."  (PA 2152, at 2153.)  To achieve this goal, the Fixed Income Group resolved to "[t]ake more active risk" in its bond investments and to "[g]enerate higher returns for clients in existing products."  (*Id.*; *see also* PA 2145.)  These efforts would show, as one senior executive stated, "we are not your grandfather's fixed income department."  (PA 2152, at 2153.)

11

By early 2006, State Street had increased the return targets for both Bond Funds to 70-80 basis points above their benchmarks. (PA 536-43 Pickett; PA 1573; PA 1652.) A portfolio manager for the Bond Funds in 2006 and 2007 was unaware that they had been described as Enhanced Index funds, and he did not believe the targets of 70-80 basis points were consistent with the risk and return of an Enhanced Index fund. (PA 544-46 Pickett.) Both Bond Funds made increasingly leveraged investments concentrated in an array of subprime securities in an attempt to outperform their benchmarks. (PA 59-60; PA 547-55 Pickett; PA 608-10 Wands; PA 2156.) (Subprime refers to ABS backed by home equity loans to borrowers with impaired credit histories. (PA 398-99.)) Although State Street changed the management of the Bond Funds, increasing the risk to the Plans and Plan beneficiaries, it did not inform PRIAC of any change in the Bond Funds' investment strategy. (PA 2145; PA 2152; Frascona ¶ 9, PA 17; *id.* ¶ 28, PA 21.)

### 1.    Investment in the Limited Duration Bond Fund

State Street's Fixed Income Group managed another fund, the Limited Duration Bond Fund (the "LDBF"), whose benchmark was the one-month London Interbank Offered Rate ("LIBOR"), an interest rate index. In 2003, State Street began to use LDBF as a "portable alpha" fund in which other State Street–managed funds invested. (PA 527-28 O'Hara.) (Alpha referred to the excess return on an investment over its benchmark.) Portable alpha refers to a strategy whereby a number of funds invest in a single alpha-seeking fund. (PA 494-95 Johnson.) In 2006 and 2007, the LDBF invested aggressively in home equity asset-backed securities. (PA 385-86 Carron; PA 441-42 Armstrong.) By early 2007, virtually all the LDBF's assets were invested in subprime mortgage-related securities. (PA 476-77 Hopkins; PA 1603; PA 1608.) PRIAC did not offer the LDBF to its clients as an investment option. (Frascona ¶ 22, PA 20.) The Bond Funds invested in the LDBF throughout 2006 and 2007. (PA 411-30.) State Street

12

did not inform PRIAC of the Bond Funds' investments in the LDBF until July 2007.  (Frascona ¶ 22, PA 20; PA 457-58 Flinn.)

### 2.    Concentration in Subprime Mortgage Securities

PRIAC was aware that State Street's investment strategy for the Bond Funds involved some "off-index bets" to generate returns over the benchmarks.  (PA 627-28 Frascona.)  State Street's Monthly Account Summaries sent to PRIAC showed the sector exposures of each Bond Fund by percentage, compared those percentage exposures to the relevant benchmark sectors, and reported returns by sector.  (*E.g.*, PA 817.)  One of the sectors was ABS.  (Frascona ¶ 16, PA 18-19.)  Unlike the Bond Funds, neither of their respective benchmarks invested in the ABS sector.  (*Id.*)

State Street's reports did not identify the kinds of securities within the ABS sector that the Bond Funds held.  (Frascona ¶ 17, PA 19.)  As of May 31, 2007, 99% of the Intermediate Bond Fund's investments in the ABS sector were in subprime securities, and 96% of the Government Credit Bond Fund's ABS investments were in subprime securities.  (PA 61.)  By contrast, a leading Lehman Brothers index of ABS consisted of 39% home equity, 39% credit card, 7% auto loan, and 15% other.  (*Id.*)

### 3.    Use of Leverage

In 2006 and 2007, State Street dramatically increased the leverage in the Bond Funds: the Intermediate Bond Fund from 1.28 leverage in September 2005 to 4.56 as of the end of July 2007, and the Government Credit Bond Fund from 1.35 leverage in September 2005 to 6.1 as of the end of July 2007.  (PA 608-10 Wands; PA 2156.)  In other words, as of July 31, 2007, the Bond Funds held investments with market values that totaled 4.56 and 6.1 times the net asset values of their respective portfolios.  State Street used leverage to have the Bond Funds increase its bets on subprime securities.  (PA 59-60.)  As of May 31, 2007, State Street reported to PRIAC

13

a 32.1% ABS sector allocation for the Intermediate Bond Fund.  Internal State Street

spreadsheets showed that, with leverage, the fund's actual exposure to ABS was 143.1% of its

net asset value.  (PA 59.)  For the Government Credit Bond Fund, State Street reported to PRIAC

a 32.0% ABS sector allocation, and with leverage the actual exposure was 151.1% of the fund's

net asset value.  (PA 60.)  Virtually all the Bond Funds' ABS investments were subprime

mortgage securities.  Because of State Street's decision to normalize sector weights, its monthly

reports to PRIAC did not show any leverage in the Bond Funds, much less the dramatic increase

in or uses of leverage.  (PA 1047; PA 1082; PA 2161.)

G.     **The Bond Funds and the Collapse of the**
       **Subprime Bond Market (July-September 2007)**

Both Bond Funds slightly underperformed their respective benchmarks in the first quarter

of 2007.  The Intermediate Bond Fund gained 62 fewer basis points than its benchmark, and the

Government Credit Bond Fund gained 57 fewer basis points than its benchmark.  (PA 840, at

842.)  State Street said that this underperformance was driven by poor performance in some

ABX positions the funds held.  (PA 1843.)  The ABX was an index composed of credit default

swaps on twenty subprime mortgage-backed securities, in which the Bond Funds invested.  (PA

590-91 Tai.)

In April and May 2007, State Street increased the LDBF's and the Bond Funds'

investments in the ABX index.  (PA 1600.)  The Bond Funds rebounded temporarily.  (*Id.*)

Beginning in late July 2007, the Bond Funds' performance declined significantly.  (PA 984; PA

2171, at 2172.)  The Intermediate Bond Fund lost 16.9% of its net asset value from May 31 to

August 31, while its benchmark increased by 2.2%.  The Government Credit Bond Fund lost

23.9% of its net asset value in that period, while its benchmark gained 2.1%.  (PA 62-63.)

PRIAC requested redemption of the Plans' investments in the Bond Funds on August 29.  (Palms ¶ 40,  PA 12.)  State Street closed the Bond Funds a few days later.  (*Id.*; PA 1459; PA 2195.)

**H.     State Street's Communications to PRIAC**
**       About the Bond Funds (July-August 2007)**

In April and May 2007, PRIAC asked State Street to explain the Bond Funds' first quarter performance.  (PA 458-59 Flinn; PA 1440; PA 1459; Dingee ¶ 4, PA 23-24.)  State Street sent to some of its clients in February 2007 a Client-At-Risk Alert and in mid-April a "client-friendly" letter, attributing the first quarter underperformance to investments in subprime mortgage securities.  (PA 456-57 Flinn; PA 594-95 Thornton; PA 1435; PA 1592; PA 1843.)  The April client letter addressed in part PRIAC's questions about first quarter performance and disclosed State Street's decision to increase its funds' exposures to the subprime sector.  (PA 596-99 Thornton; PA 1843.)  Neither document was sent to PRIAC.  (Frascona ¶ 24, PA 20.)  State Street could not explain why it did not send PRIAC the documents.  (PA 457 Flinn; PA 597-99 Thornton.)

In late May 2007, CIGNA, which was the Plan with the largest investment in the Bond Funds (about $174 million), asked PRIAC for additional information because it was considering increasing its investment in the Intermediate Bond Fund.  (PA 631-32 Gorman; PA 635-37 Molinaro; PA 664.)  In July, at PRIAC's request, State Street provided characteristics reports for CIGNA for May and June 2007.  (PA 671; PA 2273.)  On July 6, PRIAC received and forwarded to CIGNA a State Street market commentary describing subprime bond exposure in State Street's active fixed income funds generally, which did not mention the Bond Funds.  (PA 674; PA 680.)

On July 12, PRIAC received from State Street and forwarded to CIGNA a spreadsheet showing portfolio holdings of the Intermediate Bond Fund and a breakdown of the components

of its ABS exposure, including the subprime bond exposure. (PA 683.) The spreadsheet was a truncated version of a State Street document.[4] PRIAC did not find the holdings spreadsheet usable. (Dingee ¶ 6, PA 24.) Dean Molinaro, the PRIAC investment strategist for the CIGNA account, reviewed it briefly when PRIAC received it. (PA 641 Molinaro.) At his deposition, when State Street's counsel directed him to the ratio in the ABS spreadsheet of cash bonds to total ABS exposure, Mr. Molinaro agreed that it might indicate leverage of 4 to 1 in the Intermediate Bond Fund as of March 30, 2007. (PA 638-40 Molinaro.) There is no evidence that Mr. Molinaro, or anyone else at PRIAC, made any such inference in July 2007. State Street's Rule 30(b)(6) witness on the topic of portfolio management and its expert witness, Dr. Andrew Carron, both testified that they would need additional information to interpret the holdings spreadsheet. (PA 509-17 Kinney 30(b)(6); PA 391-92 Carron.)

After receiving the truncated holdings spreadsheet, CIGNA and PRIAC requested a conference call with State Street to ask about, among other items, leverage in the Intermediate Bond Fund. (PA 777.) During that call, on July 18, State Street described the investment strategy of the Intermediate Bond Fund, including its investment in the LDBF and its use of derivatives. (PA 462-63 Flinn; PA 979.) The call generated follow-up requests to State Street for information about leverage. (*E.g.*, PA 779; PA 2391; PA 2394.) State Street did not respond to these requests. (Dingee ¶ 8, PA 25.)

---

[4]  Michael Wands, Head of North American Fixed Income at SSgA, sent an email on July 11, 2007, to the Fixed Income Group directing that all responses to inquiries about subprime exposure be subject to his prior review to "make sure that we're reporting accurate and consistent information." (PA 2164.) He attached a sample spreadsheet of home equity exposure in a fund. When PRIAC requested information about the Intermediate Bond Fund's subprime exposure, State Street's Risk Management Group produced a detailed spreadsheet similar to Mr. Wands's model. State Street then stripped the spreadsheet of categories of data, including market value data, and sent it to PRIAC on the day after Mr. Wands's cautionary email, without his approval. (PA 520-24 Lindner; PA 613-15 Wands; PA 1654.)

On July 27, 2007, State Street sent a letter to investors in its fixed income funds that attributed the funds' underperformance to subprime investments. (PA 2384.) The letter was not sent to PRIAC. (Frascona ¶ 24, PA 20.) On August 2, 2007, with the net asset value of the Bond Funds dropping, State Street sent a letter to PRIAC that described problems in the LDBF's investments but expressed confidence that it would "weather[]" the "storm." (PA 984.) The letter's only reference to the Intermediate Bond Fund noted its underperformance of around 550 basis points in the first seven months of 2007. (*Id.*) In an August 14, 2007 letter to clients, including PRIAC, State Street's Chief Investment Officer expressed the opinion that "judicious investors will hold the positions [in State Street funds] in anticipation of greater liquidity in the months to come." (PA 1352.)

I.    **PRIAC's Requests to State Street for Information About the Bond Funds (July-August 2007)**

PRIAC continued to ask State Street questions about the Bond Funds in late July and August 2007. (Frascona ¶¶ 26-27, PA 20-21; Dingee ¶¶ 8-13, PA 25-26.) State Street responded to these questions slowly, or not at all. (Frascona ¶¶ 26-27, PA 20-21; Dingee ¶¶ 8-13, PA 25-26.) PRIAC asked whether characteristics it had received for the Bond Funds reflected leverage, asked for characteristics on the Intermediate Bond Fund reflecting any leverage, and requested the percentage of the Intermediate Bond Fund's exposures to subprime. (Dingee ¶¶ 10, 11, 13, PA 25-26; PA 27; PA 31; PA 39.) State Street never responded. (Dingee ¶¶ 10, 11, 13, PA 25-26.)[5]

PRIAC had not received any of the quantitative information about leverage for the Intermediate Bond Fund it had requested, and did not know how much leverage there was in the

_____

[5]    One of State Street's experts, Daniel Strachman, acknowledged that these questions were reasonable and that State Street should have answered them. (PA 432-38 Strachman.)

fund, until August 15, 2007. (Frascona ¶ 26, PA 20; Dingee ¶¶ 10-11, PA 25; PA 1580.) After a

call with State Street representatives on August 16, PRIAC asked additional questions about that

fund's leverage, including how it was used and how long it had existed. (Frascona ¶ 27, PA 21;

PA 1831.) State Street never responded. (Frascona ¶ 27, PA 21.) State Street first sent PRIAC

information about leverage in the Government Credit Bond Fund on August 28. (*Id.*)

Basic characteristics for the Bond Funds for the second quarter of 2007 were still not

available on August 9 because, according to Mark Flinn, the State Street Relationship Manager

responsible for PRIAC, State Street was "making sure that they answer more questions than they

raise." (PA 1422.) On August 14, Mr. Flinn apologized for the delays: "It's actually been well

over 14 days since we promised you that we would get proper characteristics for the Fund and

we have failed to deliver." (PA 1442.) On August 23, 2007, PRIAC asked State Street for

information about the management style and investment guidelines of the Bond Funds, and it

requested a response by August 27. (PA 1455.) State Street missed that deadline, and its

responses were, by its own admission, incomplete. (PA 935; PA 1459.)

In August 2007, State Street had its "hands full" with client requests, and it found the

volume of those requests "overwhelming." (PA 460-61 Flinn; PA 1336; PA 1442.) The Chair of

SSgA's Investment Committee reported to the 80-member Senior Management Group that the

"[r]eporting process for portfolios was unable to adjust to tailored requests for Home Equity

exposure." (PA 1620, at 1626.) State Street acknowledged that PRIAC's account did not

receive "the appropriate level of urgency and thoroughness." (PA 451 Dalis; PA 1467, at 1523.)

**J.      PRIAC's Communications with Its Clients (August-September 2007)**

By mid-August, PRIAC's concerns about the Bond Funds and State Street's non-

responsiveness had escalated. (Frascona ¶ 28, PA 21; Dingee ¶ 14, PA 26.) PRIAC had

received information suggesting leverage of over 4 to 1 in the Intermediate Bond Fund, and

18

performance was dropping precipitously.  (Frascona ¶¶ 25, 26, 28, PA 20-21.)  As it struggled with State Street's slow and inadequate responses, PRIAC concluded that State Street's client service team was "basically at a standstill."  (Dingee ¶ 15, PA 4; PA 2170; *see also* PA 2160.)

On August 20, PRIAC placed the Bond Funds on its Watch List, without waiting for the end of the third quarter and, in its investment discretion over the Sub-advised Balanced Funds, redeemed those funds' investments from the Intermediate Bond Fund.  (Palms ¶¶ 29-30, PA 8-9.)  Placing an Alliance Fund on its Watch List mid-quarter was an extremely unusual step.  (*Id.*)  In an August 20 letter, PRIAC announced these decisions to Plans invested in the Bond Funds, including the Balanced Funds that held shares of the Intermediate Bond Fund (the "Watch List Announcement").  (PA 110.)  The Watch List Announcement explained that PRIAC's decision was based on (a) the "disappointing" underperformance of the Bond Funds, (b) undisclosed amounts of subprime investments causing the underperformance, and (c) State Street's lack of responsiveness.  (*Id.*)  Describing its futile efforts to obtain fund characteristics and a detailed accounting of the underperformance, PRIAC told clients that "[o]btaining this information was more difficult than ordinary and the timing of delivery fell far short of expectations," and that State Street's "failure to respond on a timely basis to our direct requests was troubling."  (*Id.*)

On August 22, 2007, Mr. Palms led a conference call among representatives of PRIAC and State Street, including Mr. Wands.  (Palms ¶ 31, PA 9.)  Mr. Wands discussed aspects of the Intermediate Bond Fund's leverage, including the fact that it had $1 billion in total return swaps (financial contracts in which one party makes payments based on a set rate and the other based on the return of an underlying asset).  (*Id.*)  Although State Street had referred to leverage in the Intermediate Bond Fund in discussions with others at PRIAC in mid-July and early August, and some of those PRIAC employees testified that they may have told Mr. Palms of those references,

Mr. Palms believed this to be State Street's first confirmation of leverage in the Intermediate Bond Fund.  (PA 649-51 Palms; Palms ¶ 32, PA 9.)

On August 23, 2007, PRIAC sent to its client-facing personnel a packet of documents to assist them in explaining the State Street situation to the Plans.  One was a document prepared by PRIAC, the SSgA Intermediate Bond Fund Naming Convention (the "Naming Convention").  The other three documents were supplied by State Street: Background – Limited Duration Bond Strategy Fund; the SSgA Limited Duration Bond Strategy Q&A; and the SSgA Intermediate Bond Fund Characteristics (together, the "August 23 Communications").  (PA 154.)

On or about August 28, 2007, PRIAC implemented a "negative election" process for the Plans, under which the Plans would redeem their investments in the Bond Funds unless they instructed PRIAC otherwise.  (Palms ¶ 39, PA 11.)[6]  PRIAC sent letters to Plans with investments in the Bond Funds (the "August 28 Client Letters") in which it stated that "State Street is not providing sufficient information to allow us to monitor" each fund.  (Palms ¶ 39, PA 11-12; PA 196.)  In the August 28 Client Letters, PRIAC told clients that it had "written letters and placed phone calls at all levels of [State Street's] organization, and ha[d] not received the information" it requested.  (PA 196.)  When PRIAC received additional information from State Street that evening, it revised the August 28 Client Letters to reflect that information.  (PA 213.)

PRIAC's personnel were instructed to provide the revised letters to affected clients and investment consultants, along with three documents provided by State Street: the SSgA Q&A, the SSgA Characteristics Report through July 31, 2007, and the SSgA Weekly Fund Update

---

[6]     On July 30, 2007, CIGNA decided to begin moving money out of the Intermediate Bond Fund.  (PA 981.)  At CIGNA's request, PRIAC asked State Street about potential alternatives for CIGNA.  (Frascona ¶ 31, PA 22.)  After the Intermediate Bond Fund's significant underperformance through July, CIGNA expedited its redemption.  (PA 1004; PA 2167.)  CIGNA withdrew from the Intermediate Bond Fund on August 20, 2007.  (Frascona ¶ 32, PA 22.).

through August 24, 2007 (together, the "August 29 Materials").  The August 29 Materials said that State Street's "investment approach does not comport with what we were previously led to believe."  (PA 1005.)  PRIAC added that many of its questions remained "unanswered or only partially answered, resulting in an overall response that is in our view insufficient," and that "the lack of information provided by [State Street] to assess the investment strategy, holdings, liquidity demands and other issues associated with this fund is of great concern."  (*Id.*)

On September 4, 2007, PRIAC sent to its personnel a Q&A to update the Plans.  The Q&A reviewed the name change, provided information on "the fund's extensive leverage and broad exposure to sectors outside its stated benchmark strategy," and said that PRIAC had learned "'after the fact' about SSgA's actual investment strategy and holdings [that] did not at all comport with what we had been led to believe," comprising "both undisclosed leverage and a large exposure to the sub-prime market."  (PA 235.)  PRIAC said that State Street was "providing inadequate information about the portfolio's holding and risk levels" and responding to requests with "limited answers after significant delays."  (*Id.*)  PRIAC cited the "cumulative effect of these and other factors, and the general lack of cooperation" as reasons for placing the Bond Funds on the Watch List.  (*Id.*)

On September 5, 2007, PRIAC sent additional documents to its personnel for their use in updating clients: a Status Update on the Intermediate Bond Fund, drafted by PRIAC; a Q&A on the Intermediate Bond Fund, drafted by PRIAC; an email to clients invested in the Government Credit Bond Fund, drafted by PRIAC; and State Street's letter announcing the closing of the Government Credit Bond Fund.  (PA 247.)  The Status Update stated that State Street had informed PRIAC for the first time on August 22 that the Intermediate Bond Fund "was leveraged and had broad exposure to sectors outside its stated benchmark strategy," that "[e]arlier this

21

quarter" State Street had advised PRIAC "that the State Street [Intermediate Bond] Fund was not

correctly named," and that PRIAC's "ongoing monitoring procedures" involved "periodically []

ask[ing] the asset managers of the underlying investment funds in our Alliance Funds program to

update the [quarterly] Fund Fact Sheets," which State Street had done on August 1.  (*Id.*)

**K.    Communications After the Complaint (October 2007)**

PRIAC filed the Complaint on October 1, 2007.  That day, it distributed talking points to

PRIAC personnel for use with clients (the "Talking Points").  (PA 256.)  The Talking Points

reiterated PRIAC's belief that "State Street did not disclose important relevant information about

these funds," including "off-[index] investment strategies and practices" and "the fund's

extensive leveraged sector concentration," which was not explained "until a call with the head of

SSgA's North American Fixed Income division, in mid-August," and that State Street's

responses to "numerous inquiries" were "not satisfactory."  (*Id.*)  PRIAC attributed the Watch

List decision to the Bond Funds' deteriorating performance and State Street's "inability to

provide timely and complete responses to our inquiries."  (*Id.*)

PRIAC had made available on its platform two other Alliance Funds managed by State

Street (the "Other Funds").  On October 2, 2007, PRIAC advised its clients that, due to its "loss

of confidence" in State Street, its "concerns now extend[ed] to the other products on our platform

that SSgA manages."  (PA 278.)  PRIAC stated that its concerns were based on State Street's

failure to provide "the level of transparency we would expect with respect to the investment

process or results" and on State Street's "incomplete, unsatisfactory responses" to PRIAC's

inquiries.  (*Id.*)  On October 2, PRIAC advised its clients that it had placed the Other Funds on

the Watch List.  (*Id.*)  On October 26, citing its "ongoing and broad reservations about SSgA,"

PRIAC announced that it had removed those funds from PRIAC's investment platform.  (PA

287.)

22

After filing this lawsuit, PRIAC initiated a process through which it provided the affected Plans with non-recourse loans equal to the amount of their estimated losses at that time. In February 2008, it sent a set of talking points to clients in which it explained the loan and the background for it. (PA 322.) PRIAC reiterated that State Street "did not explain the fund's extensive leveraged sector concentration until a call with the head of SSgA's North American Fixed Income division, in mid-August," and that "even after multiple requests and repeated follow-ups, [State Street] failed to provide satisfactory information." (*Id.*) PRIAC said that the "cumulative effect of these and other factors, and the general lack of cooperation from SSgA" had led it to take actions. (*Id.*)

PRIAC prepared all these communications to assist the Plans in making investment decisions in light of the significant losses incurred by the Plans. (Palms ¶ 43, PA 12.) Constrained by the incompleteness of the information from State Street, PRIAC senior personnel led by Mr. Palms did their best to communicate quickly and responsibly with affected clients and their advisors. (*Id.*) In all these communications to its clients, PRIAC tried to be complete and accurate. (*Id.* ¶ 44, PA 13.) It prepared these communications in good faith, for the purpose of protecting the interests of the Plans and their beneficiaries, in accordance with PRIAC's obligations as a fiduciary. (*Id.*) They were not used for any other purpose, and were distributed only to affected clients and their investment advisors. (*Id.* ¶¶ 43, 51, PA 12, 14.)

## L.    Media Reports on State Street and State Street's Response

Beginning in July 2007, State Street was the subject of extensive media reports about the "terrible" performance of its bond funds generally and the LDBF in particular. (PA 571-72 Roberts; PA 1783.) The first negative article about the underperformance of State Street's bond funds appeared on July 25, 2007. (PA 1618.) There were "a lot of negative articles" about State Street's bond funds throughout summer and fall 2007. (PA 577 Roberts.) State Street's public

relations group collected a 43-page compilation of media reports on State Street from July 30 to August 29.  (PA 573-76 Roberts; PA 1785.)

**The Parties' Claims**

**A.      PRIAC's ERISA Claim**

PRIAC claims that State Street acted imprudently by managing the Bond Funds to incur risks that were significantly greater than their Enhanced Index fund descriptions indicated, and it imprudently concentrated the Bond Funds' investments in highly leveraged subprime mortgage related securities.  State Street changed to a more aggressive investment strategy, without informing PRIAC, to further its business strategy of enhancing its reputation as an active manager.  By managing the Bond Funds in a manner that was inconsistent with the Bond Funds' stated investment strategies and risk profile, and by not serving the exclusive benefit of plan beneficiaries, State Street violated its fiduciary duties, and is liable under Section 404 of ERISA.  (PA 351-52.)[7]

**B.      State Street's Counterclaim for Contribution and Indemnity**

State Street alleges that, in the event State Street is liable to the Plans, PRIAC is liable in contribution and indemnity.  (PA 379.)  State Street contends that PRIAC did not adequately monitor State Street's management of the Bond Funds, and that it made inadequate and misleading disclosures to the Plans about the Bond Funds.  (PA 364-65.)

---

[7]      ERISA Section 404 provides, in part, that: "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and . . . (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1).

C.    **State Street's Defamation Counterclaim**

In interrogatory answers, State Street identified 28 allegedly defamatory statements by PRIAC, later reduced to 24.  (PA 82; PA 91.)  One of the 24 statements was not communicated outside of PRIAC.[8]  The remaining 23 allegedly defamatory statements were made only to PRIAC's clients and their investment consultants.  Twenty of the 23 statements were contained in PRIAC's mass communications with its clients that are described above.  The other three were made to an investment consultant to one of the Plans.

In an effort to make the Court's review more manageable, PRIAC has numbered these statements from 1 to 23 and has put them in four categories based on their subject matter.  Appendix A to this memorandum sets forth the text of the 23 statements and the number that PRIAC has assigned to each.  The four categories are as follows:

1.    **PRIAC Statements to Its Clients About State Street's Divergence from Its Stated Investment Approach for the Bond Funds**
    **_[Statement Nos. 12-13, 15-17, 23]_**

In explaining why it was taking actions with respect to the Bond Funds, PRIAC told the Plans that the funds "behaved well outside of expectations," Statement Nos. 15, 16, and "appeared to be inconsistent with disclosures SSgA had reviewed," Statement No. 16.  PRIAC said that it learned "after the fact" that "SSgA's actual investment strategy and holdings did not at all comport with what [PRIAC] had been led to believe."  Statement Nos. 15, 17, 23.  It referred to concerns about the "broad" off-index exposure of the Bond Funds to sectors outside the stated benchmarks, which it said State Street did not disclose until August 22, Statement Nos.

---

[8]    This statement appears only in one internal PRIAC document that is described as "a very rough draft of talking points."  (PA 334.)  There is no reason to believe that publication, a requirement for any defamation claim, can be satisfied with respect to this statement.  _Stanton v. Metro Corp._, 438 F.3d 119, 124 (1st Cir. 2006); _Cweklinsky v. Mobil Chem. Co._, 364 F.3d 68, 73 (2d Cir. 2004).

15, 16, and explained that before then State Street "did not clearly indicate a widespread concentration of assets outside the sectors identified as part of the fund's investment benchmark," Statement No. 15.  PRIAC added that it was concerned by the "extensive leveraged sector concentration," which it said State Street did not disclose until mid-August.  Statement Nos. 17, 23.

### 2. PRIAC Statements to Its Clients About the Erroneous Name Change of the Intermediate Bond Fund *[Statement Nos. 4-6, 15-16]*

PRIAC told its clients that State Street had "mistakenly added 'Passive' to the fund name" for the Intermediate Bond Fund, Statement Nos. 4, 6, that State Street advised PRIAC "just this quarter," and that State Street "had earlier 'misnamed'" the fund, Statement No. 15.

### 3. PRIAC Statements to Its Clients About State Street's Failure to Provide Information to PRIAC *[Statement Nos. 1-3, 5, 7-15, 17-20, 23]*

PRIAC told its clients about the delays and inadequacies in State Street's responses to inquiries, which it said contributed to the Watch List decision.  It said that obtaining information from State Street "was more difficult than ordinary and the timing of delivery fell far short of expectations."  Statement Nos. 1, 2, 7.  PRIAC said that despite its repeated requests of State Street, "[m]any questions remain[ed] unanswered or only partially answered," Statement Nos. 12, 13, and that PRIAC was concerned with its "inability to provide timely" and complete responses to inquiries, Statement Nos. 15, 17, 23.  PRIAC said there had been a "general lack of cooperation" from State Street.  Statement Nos. 15, 17, 23.

4.    **PRIAC Statements to Its Clients About PRIAC's Loss of Confidence in State Street** *[Statement Nos. 18-22]*

When PRIAC removed the Other Funds from its platform, PRIAC said it had "ongoing and broad reservations" about State Street, Statement Nos. 21, 22, and had experienced a "loss of confidence" in the organization, Statement Nos. 18, 19, 20.

D.    **State Street's Counterclaim Under the Massachusetts Unfair Trade Practices Act**

State Street alleges that PRIAC, by its defamatory statements, violated the Massachusetts Unfair Trade Practices Act, Mass. Gen. Laws ch. 93A.  This counterclaim is based solely on PRIAC's allegedly defamatory statements to its clients.

**Argument**

PRIAC's motion for summary judgment should be granted because, as to each counterclaim, facts that are not in genuine dispute establish that State Street cannot prove the required elements, even when those facts are viewed in the light most favorable to State Street. *See Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 270 (2d Cir. 1999) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

- State Street cannot prevail on its counterclaim for contribution and indemnity (if such a claim exists) because undisputed facts show that State Street alone controlled the Bond Funds' investments, that PRIAC did not violate ERISA, and that if PRIAC did violate ERISA its violation was passive and State Street's fault was substantially greater.

- State Street cannot prevail on its defamation counterclaim because undisputed facts show that State Street cannot overcome PRIAC's conditional privilege by proving actual malice, and it cannot prove other required elements.

27

- State Street cannot prevail on its unfair trade practices counterclaim because the predicate defamation claim fails and undisputed facts show that PRIAC's conduct occurred in Connecticut.

**I.    Summary Judgment Should Be
Granted Dismissing the Contribution
and Indemnity Counterclaim.**

State Street denies that it imprudently managed the Bond Funds and violated ERISA. But if it did violate ERISA, State Street asserts, the financial burden of its liability should be absorbed, in whole or in part, by PRIAC. Based on undisputed facts, State Street's attempt to use contribution or indemnity fails as a matter of law.

**A.    It Is Doubtful That There Is Any Implied Right
to Contribution and Indemnity Under ERISA.**

ERISA does not provide that a fiduciary held liable for breaching its obligations has a claim for contribution or indemnity against a co-fiduciary. In *Chemung Canal Trust Co. v. Sovran Bank/Maryland*, the Second Circuit recognized a right to contribution and indemnity between ERISA fiduciaries, based on the role of the courts in developing federal common law under ERISA and the right to contribution under the common law of trusts. 939 F.2d 12, 16 (2d Cir. 1991). *Chemung* conflicted with a prior Ninth Circuit decision, *Kim v. Fujikawa*, 871 F.2d 1427, 1432-33 (9th Cir. 1989).

Since *Chemung*, two Supreme Court decisions have cast considerable doubt on the viability of that decision. In *Mertens v. Hewitt Associates*, the Supreme Court held that ERISA plan participants could not recover money damages under Section 502(a)(2), 29 U.S.C. § 1132(a)(2), from nonfiduciaries who knowingly participate in a fiduciary's breach. 508 U.S. 248, 258-59 (1993). The Court was emphatic about its "unwillingness to infer causes of action in the ERISA context, since that statute's carefully crafted and detailed enforcement scheme

28

provides strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." *Id.* at 254 (internal quotation marks omitted).  In *Great-West Life & Annuity Insurance Co. v. Knudson*, the Court held that Section 502(a)(3), 29 U.S.C. § 1132(a)(3), permits only traditional equitable relief, not specific performance or restitution. 534 U.S. 204, 221 (2002).  The Court reiterated that it had "been especially reluctant to tamper with the enforcement scheme embodied in the [ERISA] statute by extending remedies not specifically authorized by its text."  *Id.* at 209 (internal quotation marks omitted).

The most recent Court of Appeals decision on this issue, *Travelers Casualty & Surety Co. of America v. IADA Services, Inc.*, relied on *Mertens* and *Great-West* in holding that there is no claim for contribution under ERISA.  497 F.3d 862, 865 (8th Cir. 2007).  The Eighth Circuit recognized that the reasoning of *Chemung* cannot survive the Supreme Court's pronouncements about the courts' proper role under ERISA.  *Id.* at 866.  *Chemung* effectively has been overruled, and this Court should decline to imply an unwritten cause of action into Congress's "carefully crafted and detailed enforcement scheme."  *Mertens*, 508 U.S. at 254.

## B.    State Street Cannot Show That PRIAC's Role Supports a Claim for Contribution or Indemnity.

In *Chemung*, the Court of Appeals explained that "federal courts have been authorized to develop a federal common law under ERISA, and in doing so, are to be guided by the principles of traditional trust law."  939 F.2d at 16.  Therefore, any rights of contribution and indemnity under ERISA are limited to the rights that trustees have against co-trustees under the common law of trusts.  Those limits are defined in Section 258 of the Restatement (Second) of Trusts (1959) ("Restatement"), as well as in the case law.  *Id.*; *In re Masters Mates & Pilots Pension Plan*, 957 F.2d 1020, 1032 (2d Cir. 1992).

Restatement § 258 (1) provides, in relevant part, as follows:

> [W]here two trustees are liable to the beneficiary for a breach of trust, each of
> them is entitled to contribution from the other, except that (a) if one of them is
> substantially more at fault than the other, he is not entitled to contribution from
> the other but the other is entitled to indemnity from him . . . .

Comment (a) to Section 258 defines the circumstances in which there can be a right of
contribution or indemnity against a co-trustee: "Where several trustees are liable for a breach of
trust committed by them jointly or for a breach of trust committed by one of them for which the
others are liable under the rule stated in § 224, they are jointly and severally liable to the
beneficiary for the breach of trust."  Restatement § 224(2) states that a trustee is liable for a co-
trustee's breach of trust only if it participates in that breach, or approves or acquiesces in or
conceals the breach, or enables the breach by a failure to exercise reasonable care.  In light of the
undisputed facts concerning State Street's and PRIAC's respective roles and PRIAC's conduct,
State Street cannot obtain contribution or indemnity from PRIAC.

A trustee can obtain contribution or indemnity only against a co-trustee that acted with it
in a way that makes it jointly responsible for the breach of trust committed by the trustee seeking
contribution or indemnity.  Section 258 is premised on a single breach of trust with multiple
breaching parties.  The singular "a breach of trust" is used in subsections 1, 1(b), and 2 of
Section 258, and it appears repeatedly in the comments.  Thus, under ERISA, there can be
contribution or indemnification only where co-fiduciaries acted together to violate a single
ERISA obligation to plans or plan beneficiaries.  The court applied that limitation in *Harris Trust
& Savings Bank v. John Hancock Mutual Life Insurance Co.*, 122 F. Supp. 2d 444, 464
(S.D.N.Y. 2000), *rev'd in part on other grounds*, 302 F.3d 18 (2d Cir. 2002).  The defendant, the
holder of the plan's assets and a fiduciary, was held liable for improperly treating plan assets and
imposing charges on those assets, and it sought contribution from its co-fiduciaries, the plan's
trustees.  Citing Restatement § 258, the court dismissed the contribution claims, noting that the

asset holder "has failed to prove that [the trustees] played any role in the actions that resulted in a breach of [the asset holder's] fiduciary obligations." *Id.* Similarly, in *Sunderlin v. First Reliance Standard Life Insurance Co.*, the court dismissed a claim for contribution or indemnification brought by a plan sponsor against an insurer, noting that liability flowed from the plan sponsor's failure to provide a summary plan description, which was not the responsibility of the insurer. 235 F. Supp. 2d 222, 237 (W.D.N.Y. 2002).

PRIAC's ERISA claim on behalf of the Plans is based on State Street's imprudent management of the Bond Funds, which exposed the Plans and Plan beneficiaries to excessive risk, and on State Street's undisclosed change to an investment strategy that served its own business interests rather than the exclusive benefit of the Plans. The undisputed facts make it clear that PRIAC did not act jointly with State Street in that conduct. PRIAC had no input in State Street's management of the Bond Funds, in its assessment of the risks being incurred, or in State Street's investment decisions for the Bond Funds, including boosting the return targets, taking on large subprime mortgage exposures, and leveraging the funds. PRIAC had no knowledge or information that State Street was acting in pursuit of its own self-interest. Since as a matter of law State Street and PRIAC were not "two [fiduciaries who] are liable to the beneficiary for a breach of trust," this situation cannot be brought within Restatement § 258(1), and there can be no claim for contribution or indemnity under that common-law rule.

**C.     State Street Is Not Entitled to Contribution or Indemnity
        Because PRIAC Did Not Violate ERISA.**

Moreover, to prevail on a claim for contribution or indemnity, State Street must show that PRIAC violated ERISA. *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 241 (2d Cir. 2002). Expert testimony is ordinarily required to assist the trier of fact in evaluating whether the conduct of a fiduciary was imprudent. *RSL Commc'ns PLC v. Bildirici*, 649 F. Supp. 2d 184,

211 (S.D.N.Y. 2009); *LNC Invs., Inc. v. First Fid. Bank*, No. 92 Civ. 7584 (CSH), 2000 WL

1024717, at *3 (S.D.N.Y. July 25, 2000); *Liss v. Smith*, 991 F. Supp. 278, 301 (S.D.N.Y. 1998).

### 1.    PRIAC's Monitoring

ERISA imposes a duty to reasonably monitor on a fiduciary that appoints another

fiduciary, as PRIAC did here.  *In re Xerox Corp. ERISA Litig.*, 483 F. Supp. 2d 206, 215 (D.

Conn. 2007).  The nature and level of the monitoring required of a fiduciary vary according to

the circumstances.  *Id.*  According to the Department of Labor:

> At reasonable intervals the performance of trustees and other fiduciaries should be
> reviewed by the appointing fiduciary in such manner as may be reasonably
> expected to ensure that their performance has been in compliance with the terms
> of the plan and statutory standards, and satisfies the needs of the plan.  No single
> procedure will be appropriate in all cases; the procedure adopted may vary in
> accordance with the nature of the plan and other facts and circumstances relevant
> to the choice of the procedure.

29 C.F.R. § 2509.75-8 (2010), at FR-17.  A monitoring fiduciary has a duty to take appropriate

action within its conferred authority *upon its discovery* that the appointed fiduciary is not

performing properly.  *Liss*, 991 F. Supp. at 311.  PRIAC had a duty to take "'prudent and

reasonable action'" to monitor State Street's management of the Bond Funds, but was "'not

obliged to examine every action taken'" by State Street.  *In re Polaroid ERISA Litig.*, 362 F.

Supp. 2d 461, 477 (S.D.N.Y. 2005) (quoting *Leigh v. Engle*, 727 F.2d 113, 135 (7th Cir. 1984)).

The scope and vigor of PRIAC's monitoring exceeded the obligations imposed by ERISA

and the Department of Labor's guidelines.  PRIAC had in place, and followed, a comprehensive

approach to monitoring Alliance Funds.  As PRIAC made clear in publications that were

available to its clients, PRIAC's monitoring of Alliance Funds like the Bond Funds focused on

past performance and performance-based risk through its DDA Program.  (Palms ¶ 11, PA 3-4.)

PRIAC said that it would *not* monitor Alliance Funds for style consistency.  (PA 2198; Palms

¶ 11, PA 3-4.)  PRIAC's monitoring was reasonable in light of the stated investment strategies of

the Bond Funds and the information that State Street made available to PRIAC.  PRIAC designed and followed a procedure, evaluated and approved by an outside consultant, that reasonably monitored State Street's management of the Bond Funds.  Neither of State Street's experts has expressed an opinion that PRIAC's monitoring program was imprudent.

PRIAC did not merely monitor performance and report on it to the Plans.  PRIAC went beyond that.  The undisputed facts show that State Street did not tell PRIAC about important changes in the Bond Funds – increasing the return targets, the extensive and increasing use of leverage, the concentration on subprime exposures – until long after they were implemented. None of these changes was revealed in State Street's regular reporting to PRIAC.  PRIAC learned about them – and eventually about State Street's mismanagement – because it asked questions outside the monitoring process.  State Street was often slow to respond, or did not respond at all.  (Dingee ¶¶ 8-13, PA 25-26; Frascona ¶¶ 26-27, PA 20-21.)  PRIAC pressed State Street for additional information and then, when it began to discover State Street was acting imprudently, it took appropriate action.  On August 20, 2007, in response to the still-incomplete information that was provided by State Street, PRIAC took the unusual step of putting the Bond Funds on its Watch List mid-quarter.  (Palms ¶ 29, PA 8-9.)  On August 29, after more troubling information about the Bond Funds came to light, PRIAC instituted the negative election process and assisted the Plans in exiting the Bond Funds.  (*Id.* ¶¶ 39-40, PA 11-12.)

## 2.    PRIAC's Own Disclosures Not Misleading

State Street's experts have opined that PRIAC's disclosures about the Bond Funds were deficient because PRIAC (1) did not provide certain information to the Plans and Plan participants, (2) misled the Plans and Plan participants by using an incorrect name for the Intermediate Bond Fund, or (3) provided three DDA Reports to the Plans and Plan participants that contained errors.  State Street's experts further opined that PRIAC violated disclosure

33

obligations by not immediately informing the Plans and Plan participants when it obtained

information about the Bond Funds in July 2007.

### a.    PRIAC's Disclosures Not Knowingly False

PRIAC's provision of insufficient or inaccurate information about the Bond Funds would

not give rise to a violation of ERISA unless PRIAC acted knowingly. *In re WorldCom, Inc.*

*ERISA Litig.*, 263 F. Supp. 2d 745, 766 (S.D.N.Y. 2003). The knowledge requirement is based

on the principle that "lying is inconsistent with the duty of loyalty owed by all fiduciaries and

codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996)

(internal quotation marks omitted). There are no facts to support any inference that PRIAC knew

that any of its disclosures to the Plans was knowingly false or misleading.

**Additional information**. State Street's expert, Dr. Carron, asserts that PRIAC's Fund

Fact Sheets and DDA Reports materially misrepresented the Bond Funds' exposure to "ABS and

to the housing market beyond the amounts of the respective benchmarks." (PA 400; *see also* PA

401.) His position is that, although the Fund Fact Sheets and DDA Reports showed each Bond

Fund's sector weights for each quarter, PRIAC misled the Plans by not presenting each Bond

Fund's sector weights side-by-side with the sector weights of its benchmark. (PA 400.)

PRIAC's choice about how to display data for its clients did not violate ERISA. PRIAC

developed the format for its standard reports to clients in an effort to disclose relevant

information about the Bond Funds in a consistent, user-friendly format. (Palms ¶ 14, PA 4.)

There is no evidence that PRIAC knew or believed its reporting of sector weights was

misleading or deficient. State Street reviewed and approved the format and content of PRIAC's

fact sheets for the Bond Funds through mid-2005, and for the Intermediate Bond Fund again on

August 1, 2007, without comment on PRIAC's display of sector weights. (PA 927; PA 972; PA

1057.) The benchmark sector weights were publicly available, and the composition of the

benchmarks was described in a glossary section of each DDA Report.  (Palms ¶ 18, PA 5; PA 389-90 Carron.)  State Street created fact sheets for the Bond Funds that did not show the benchmarks' sector weights.  (PA 924; PA 2382.)

**Incorrect name.**  Dr. Carron asserts that PRIAC misled the Plans by including "passive" in the name of the Intermediate Bond Fund.  (PA 406-09.)  In 2005, State Street provided PRIAC with the new name for the fund, and it confirmed that new name when PRIAC followed up.  PRIAC changed the Intermediate Bond Fund's name on its reports to clients because it believed that State Street had provided proper information.  (Frascona ¶ 12, PA 17.)

**Errors in reports.**  Dr. Carron asserts that PRIAC misled investors because three DDA Reports contained errors.  (PA 405.)[9]  Each quarter, PRIAC's DDA Reports contained data and commentary for 100 to 250 funds, and were 200 to 300 pages long.  (Frascona ¶ 7, PA 16; PA 1125.)  It is not materially misleading for a few of the thousands of data presentations in these reports to include errors.  (PA 387-88 Carron.)  PRIAC did not know that the three DDA Reports contained errors when it provided them to the Plans.  (Frascona ¶ 7, PA 16.)

### b.     No Duty to Make Additional Disclosures

State Street's contention that PRIAC violated ERISA by not disclosing to the Plans additional information about the Bond Funds' investments fails as a matter of law.  ERISA § 104(b)(4) sets forth a list of documents that plan administrators are required to provide upon written request by any beneficiary.  29 U.S.C. § 1024(b)(4) (2006).  In rejecting the notion that the fiduciary duties of loyalty and prudence detailed in ERISA § 404 create a general duty to disclose, the Second Circuit has stated:  "Since we have concluded that Congress intentionally fashioned § 104(b)(4) to limit the categories of documents that administrators' [sic] must

---

[9]     In two instances, pie charts showing the Bond Funds' sector weights were inaccurate.  The third one was an allegedly inaccurate description of the Intermediate Bond Fund's strategy.

disclose on demand of plan participants, we think it inappropriate to infer an unlimited disclosure obligation on the basis of general provisions that say nothing about disclosure." *Bd. of Trs. of CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 147 (2d Cir. 1997).  The Second Circuit has recognized an affirmative disclosure duty extending beyond Section 104(b)(4) only with regard to information about providing benefits under a retirement plan.  *See Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 88 (2d Cir. 2001).  That duty derives from a fiduciary's obligations to discharge its duties for the exclusive purpose of providing benefits to participants.  *Gearren v. McGraw-Hill Cos.*, No. 08 Civ. 7890 (RJS), 09 Civ. 5450 (RJS), 2010 U.S. Dist. LEXIS 12041, at *45-46 (S.D.N.Y. Feb. 10, 2010).

Courts have declined to impose on ERISA fiduciaries a broader duty to disclose information regarding plan investments, as opposed to benefits.  *See, e.g.*, *In re Citigroup ERISA Litig.*, No. 07 Civ. 9790 (SHS), 2009 U.S. Dist. LEXIS 78055, at *67-68 (S.D.N.Y. Aug. 31, 2009).  "[T]here is an important distinction between an ERISA fiduciary's obligation to disclose information about plan *benefits* and his obligation to disclose information about the financial status of plan *investments*."  *Gearren*, 2010 U.S. Dist. LEXIS 12041, at *45 (internal quotation marks omitted) (emphasis original).  There is no statutory basis for the latter duty, and imposing such a duty would be inconsistent with the Second Circuit's decision in *Weinstein*.  *Id.* at *45-46; *accord Patten v. N. Trust Co.*, No. 08 Civ. 5912 (JHL), 2010 U.S. Dist. LEXIS 21564, at *35-37 (N.D. Ill. Mar. 9, 2010); *Lingis v. Motorola, Inc.*, 649 F. Supp. 2d 861, 876 (N.D. Ill. 2009).

Some courts have imposed a duty on employers and their officers and directors to disclose facts about employee stock option plans, but only where the fiduciary knew that its silence was misleading to beneficiaries.  *E.g.*, *In re Polaroid*, 362 F. Supp. 2d at 478.  It is not clear that this duty extends to fiduciaries other than employers, but even if it does the undisputed

36

facts cannot support an inference that PRIAC knew that its statements were misleading to beneficiaries in July or August 2007.

State Street's position seems to be that in July 2007 PRIAC received from State Street sufficient facts to enable it to deduce that State Street had changed its investment strategy for the Bond Funds, exposing PRIAC's clients to substantially greater risk.  Those facts include the monthly reports that disclosed ABS exposures, the July 6 and August 2 generic commentaries about subprime exposures, the truncated holdings spreadsheet, and statements made during the July 18 conference call.  But there is no dispute that in July and the first half of August, PRIAC did not conclude that State Street had changed the Bond Funds' strategy, and therefore did not believe it or the Plans were being misled.  (Frascona ¶ 9, PA 17; *id.* ¶¶ 28-29, PA 21; Dingee ¶¶ 5-6, 9, PA 24-25.)  After exhaustive discovery, State Street has come up with no documents or testimony to the contrary.

Nor is there any genuine dispute about what occurred in July and early August:

- Beginning in July 2007, PRIAC obtained certain information about the Bond Funds that gave rise to concerns about State Street's management.

- In July and August, PRIAC tried to obtain from State Street facts that would enable it to evaluate the Bond Funds and State Street's management.

- In July and August, State Street responded slowly, incompletely, or not at all to PRIAC's requests for information, much of which never was provided.

There is also no genuine dispute that by August 20, 2007, two things had occurred.  First, PRIAC had obtained some of the additional information it sought, and inferred from those facts that it was very likely State Street had switched to a riskier, and undisclosed, strategy in managing the Bond Funds.  (Palms ¶ 34, PA 10; Frascona ¶ 28, PA 21.)  Second, PRIAC decided that, in light of the Bond Funds' deteriorating performance, the information that it had about State Street's management, and State Street's failure to provide it with basic facts, it should take

37

action and should prepare mass communications to the Plans. On August 20, PRIAC put the

Bond Funds on the Watch List and began to prepare the August 23 Communications. (Palms

¶¶ 36-37, PA 11.)

Based on these undisputed facts, PRIAC did not violate ERISA. There is no evidence

that PRIAC withheld from the Plans any facts whose non-disclosure PRIAC believed would

mislead them. To the contrary, PRIAC sought to *avoid* misleading the Plans by getting the facts

first and then deciding whether to communicate with the Plans. (Frascona ¶ 29, PA 21.) When

PRIAC concluded that there was no way to know when – or whether – State Street would

provide it with complete information about the Bond Funds, it acted to protect the interests of the

Plans.

**D.    If State Street Could Establish That PRIAC Violated ERISA, State Street Would Be "Substantially More at Fault" Than PRIAC.**

**1.    Active/Passive Fiduciary**

Courts applying the common law of trusts have not embraced the proposition that every

joint and severally liable trustee is entitled to contribution or indemnity. Instead, courts have

considered fiduciaries' respective roles in the breach: "If one trustee was solely or principally

*active* in the commission of the breach, and the other trustee was *passive* or only nominally a

participant, the court, in the exercise of its discretion, may grant the latter a right of indemnity

against the former and throw the entire burden on the party most blameworthy." Bogert, *The*

*Law of Trusts and Trustees* § 862 (2d ed. rev. 1995) (emphasis added).

Courts have applied this active/passive distinction in holding that a trustee charged with

active wrongdoing cannot obtain contribution or indemnity from a trustee charged with a non-

active role in the breach, or with mere nonfeasance. *See In re Goldstick*, 177 A.D.2d 225, 239

(N.Y. App. Div. 1992) (differentiating between actively malfeasant and passively negligent

trustees); *Reiner v. Kelley*, 457 N.E.2d 946, 952 (Ohio Ct. App. 1983) (trustee liable for all

losses where co-trustees "neither participated in, authorized, nor ratified" the breach).  The

Seventh Circuit applied this distinction in an ERISA case, *Free v. Briody*, 732 F.2d 1331, 1338

(7th Cir. 1984).  A fiduciary entrusted his co-fiduciary with exclusive control over the plan's

assets.  The court held that the fiduciary who actively breached his duty in mismanaging the plan

should bear the full burden of the plan's losses, and the "nominal trustee whose fault was

nonfeasance" was entitled to indemnity from him.  *Id.*; *see also Harris Trust*, 122 F. Supp. 2d at

464; *BP Corp. N. Am. Inc. Sav. Plan Inv. Oversight Comm. v. N. Trust Invs., N.A.*, No. 08 Civ.

6029 (WJH), 2010 U.S. Dist. LEXIS 12379, at *15-16 (N.D. Ill. Feb. 10, 2010) (dismissing

investment manager's claim for indemnity against co-fiduciaries based on their alleged breach of

duty to monitor).

This distinction between active and passive co-fiduciaries limits the scope of contribution

or indemnity under ERISA.  State Street, as the sole investment manager, actively mismanaged

the Bond Funds, and any ERISA liability of PRIAC would be limited to what these cases view as

"passive."  It follows that State Street has no right of contribution or indemnity.

### 2.    State Street Substantially More at Fault

Under Restatement § 258(a)(1), "if one of [the participating co-trustees] is substantially

more at fault than the other, he is not entitled to contribution from the other but the other is

entitled to indemnity from him."  Comment d to Section 258 explains that "[w]here a breach of

trust is committed and one of two trustees is substantially more at fault than the other, although

both are liable to the beneficiary for the breach of trust, the loss should ultimately be borne by

the trustee who is more at fault."  Comment d lists four factors to be considered in determining

whether one fiduciary is "substantially more at fault":

(1) whether he fraudulently induced the other to join in the breach of trust; (2) *whether he intentionally committed a breach of trust and the other was at most guilty of negligence*; (3) whether because of his greater experience he controlled the conduct of the other, as in the case where he was an attorney and the other was a person without business experience who was accustomed to rely upon his judgment; (4) *whether he alone committed the breach of trust and the other is liable only because of an improper delegation, or failure to exercise reasonable care to prevent him from committing a breach of trust, or neglect to take proper steps to compel him to redress the breach of trust.*

Restatement § 258(a)(1), cmt. d (emphasis added).

The second and fourth factors, which are italicized above, militate strongly in favor of denying State Street a contribution or indemnity claim against PRIAC: (1) State Street is alleged to have acted intentionally and in its own interest in exposing the Bond Funds to excessive risk. If PRIAC breached a fiduciary obligation, it acted with no higher degree of culpability than negligence; (2) if State Street is held liable, it will be for a breach of its ERISA obligations that it alone committed. State Street alone had the authority to control the Bond Funds' investment decisions. PRIAC never made any investment decisions or provided any investment advice; its function was merely one of monitoring and reporting. (Palms ¶¶ 11-12, PA 3-4.) Any breach by PRIAC would be a failure to exercise reasonable care to prevent the breach by warning the Plans about State Street's misconduct.

In cases involving investment imprudence, courts have rejected claims for contribution or indemnity by the investment decision-maker because the fiduciary that made the imprudent investment decisions is "substantially more at fault" than a fiduciary guilty of mere nonfeasance. *See, e.g.*, *Scalp & Blade, Inc. v. Advest, Inc.*, 300 A.D.2d 1068, 1069 (N.Y. App. Div. 2002); *Free*, 732 F.2d at 1338; *BP Corp.*, 2010 U.S. Dist. LEXIS 12379, at *15-16. In *Scalp & Blade*, full investment decision-making authority for a trust had been delegated to an investment advisor whose imprudent decisions caused losses to the trust. 300 A.D.2d at 1069. The defendant asserted a claim for contribution against the trust. The Appellate Division affirmed the dismissal

40

of the contribution claim, holding that the investment manager had no right of contribution because he was substantially more at fault for the losses.  *Id.*  The Court should reach an analogous conclusion here.

**II.    Summary Judgment Should Be Granted
Dismissing the Defamation Counterclaim.**

While contending that PRIAC should have advised its clients much earlier about State Street's imprudent management of the Bond Funds, State Street also says that when PRIAC *did* communicate with its clients, it defamed State Street.  Summary judgment dismissing the defamation counterclaim should be granted for several reasons:

- PRIAC's communications with its clients are protected by the qualified privilege for statements between parties sharing a common interest in their subject matter. State Street cannot prove the element of actual malice that is required to overcome this privilege.

- State Street, as a public figure, would have to establish actual malice to prevail on its defamation claims, and it cannot do that.

- State Street cannot establish one or more elements of a defamation claim.[10]

- State Street cannot show that it was injured, at a time when it faced extensive media publicity over the large losses in its funds, by PRIAC's statements.

**A.    PRIAC's Statements Are Entitled to a Qualified Privilege,
Which State Street Cannot Overcome.  *[All Statements]***

All the allegedly defamatory statements are protected by a qualified privilege accorded communications in furtherance of a business relationship.  *See* Restatement (Second) of Torts

---

[10]    PRIAC believes Connecticut law governs State Street's defamation claim.  State Street asserts that Massachusetts law governs.  (PA 365.)  Connecticut and Massachusetts law are similar in most relevant respects.  There is a potential conflict with regard to one legal doctrine relied on by PRIAC, incremental harm.  *See* pages 53-55, *infra*.

41

§§ 594-96 (1977); *Miron v. Univ. of New Haven Police Dep't*, 931 A.2d 847, 854 (Conn. 2007);

*Bratt v. Int'l Bus. Machs. Corp.*, 467 N.E.2d 126, 131 (Mass. 1984).  "Good faith

communications of a party having an interest in the subject, or a moral or societal duty to speak,

are protected by a qualified privilege if made to a party having a corresponding interest or duty."

*Boyd v. Nationwide Mut. Ins. Co.*, 208 F.3d 406, 409-10 (2d Cir. 2000) (internal quotation marks

omitted).  This privilege is intended to promote beneficial communications between parties and

discourage them from failing to communicate, due to liability concerns, about matters of

common interest.  *Miron*, 931 A.2d at 854.

PRIAC and the Plans had a business relationship that gave rise to a common interest in

the Bond Funds and State Street's management of them.  PRIAC, an ERISA fiduciary, made the

statements at issue in an effort to inform the Plans (and their respective advisors) about

developments affecting their investments in the Bond Funds.  (Palms ¶ 44, PA 13.)  Under

Section 595 of the Restatement (Second) of Torts, the conditional privilege applies if "there is

information that affects a sufficiently important interest of the recipient or a third person" and

"the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter

or is a person to whom its publication is otherwise within the generally accepted standards of

decent conduct."  Restatement (Second) of Torts § 595; *see id.* cmt. f ("[T]he rule stated in this

Section is applicable to persons in fiduciary relationships who act honestly and reasonably for

the purpose of discharging the duties that arise from the relationships."); 1 Robert D. Sack, *Sack

on Defamation: Libel, Slander, and Related Problems* ("*Sack on Defamation*") § 9.1 (3d ed.

2008) ("[I]f the speaker has a legal duty to furnish information to others, the recognition of the

defense of privilege for defamatory statements made in good faith is a matter of necessity.

Otherwise, the fear of liability would severely limit communications pursuant to a legal duty.").

Because PRIAC's statements were shared only with clients with which PRIAC had a common interest, they were privileged as a matter of law.

The common interest privilege is conditional. The privilege is lost where a speaker abuses it by making a statement with actual malice as defined by the Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and subsequent cases. *See Boyd*, 208 F.3d at 410. To overcome the privilege, State Street must prove that PRIAC made a statement with "deliberate falsification" or "with a high degree of awareness of probable falsity." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (internal quotation marks omitted). The test is subjective. "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* State Street has the burden of overcoming the qualified privilege by proving with "convincing clarity" that PRIAC published the statements with actual malice. *N.Y. Times Co.*, 376 U.S. at 285-86; *Hardy v. Saliva Diagnostic Sys., Inc.*, 995 F. Supp. 258, 267 (D. Conn. 1997).[11]

State Street cannot meet this burden. The PRIAC personnel responsible for preparing the allegedly defamatory communications to PRIAC clients beginning in August 2007 were: (a) Mr. Palms, who was responsible for preparing the 20 standard communications to affected clients; (b) Laura Stern, PRIAC's Vice President of Investment Strategy, who made Statement No. 11 to the investment consultant to a single PRIAC client, and advised others about Statement Nos. 3 and 5 to that consultant; and (c) Bruce Beckmann, a PRIAC Relationship Manager, who made Statement Nos. 3 and 5 to the same consultant. Each of these persons believed everything in

---

[11]    State Street could overcome this burden by showing, alternatively, that PRIAC acted with "malice in fact," meaning it made the statements with an "improper and unjustifiable motive." *Gallo v. Barile*, 935 A.2d 103, 106 n.6 (Conn. 2007); *Dragonas v. Sch. Comm. of Melrose*, 833 N.E.2d 679, 687-88 (Mass. App. Ct. 2005) (statements made "out of some base ulterior motive" not entitled to conditional privilege). There is no evidence that PRIAC published any of the statements with an improper motive.

these statements was true. (Palms ¶¶ 44-45, PA 13; PA 618-20 Beckmann; PA 654-62 Stern.)

State Street, which deposed each of them, cannot present any proof, much less prove with

convincing clarity, that PRIAC made a statement with knowledge that it was false or with

reckless disregard for the truth. PRIAC made each statement in a good-faith effort to

communicate essential information to the Plans in furtherance of their common business

interests, and they are privileged.

**B.      State Street Was a Public Figure, and It Cannot
         Prove Constitutional Malice.  *[All Statements]***

A public figure must prove actual malice in order to prevail on a defamation claim. *N.Y.*

*Times Co.*, 376 U.S. at 279-80. State Street was both a general purpose public figure and a

limited purpose public figure with respect to its investment management of and the performance

of its fixed income bond funds. The court in *Reliance Insurance Co. v. Barron's*, summarized

the two types of public figures:

> "For the most part those who attain this status have assumed roles of especial
> prominence in the affairs of society. Some occupy positions of such persuasive
> power and influence that they are deemed public figures for all purposes. More
> commonly, those classed as public figures have thrust themselves to the forefront
> of particular public controversies in order to influence the resolution of the issues
> involved. In either event, they invite attention and comment."

442 F. Supp. 1341, 1347 (S.D.N.Y. 1977) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323,

345 (1974)).

Corporations can be public figures. *Reliance*, 442 F. Supp. at 1348. In *Reliance*, the

court held that an insurance company suing for libel was a general purpose public figure. The

court noted that the plaintiff was a large corporation with more than a billion dollars in assets,

and that nearly all its stock was owned by "a publicly held company whose shares [we]re traded

on the New York Stock Exchange." *Id.* It also deemed it relevant that the plaintiff was subject

to government regulation: "[its] business is in a field subject to close state regulation, and the

44

company files periodic reports with the SEC and the New York and Pennsylvania Departments of Insurance." *Id.* Although some courts outside the Second Circuit have disagreed with this result,[12] *Reliance*'s holding that a publicly-held corporation is a general purpose public figure "is consistent with both First Amendment policy and the aims of federal and state securities laws that commentary on such entities be encouraged and protected." 1 *Sack on Defamation* § 5.3.7. It should be followed here.

Limited purpose public figures are those who have sought "to have, or realistically can be expected to have, a major impact on the resolution of a specific public dispute that has foreseeable and substantial ramifications for persons beyond its immediate participants." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1292 (D.C. Cir. 1980). The Second Circuit has set forth a four-part test for limited purpose public figures:

> A defendant must show the plaintiff has: (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

*Contemporary Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 617 (2d Cir. 1988) (internal quotation marks omitted). In *Reliance*, the court found that the plaintiff corporation became a limited purpose public figure when it offered to sell its securities to the public. 442 F. Supp. at 1348.

State Street is a subsidiary of State Street Corporation, a publicly held company with almost 500 million shares outstanding that touted itself as "a world leader in financial services" with $1.9 trillion in assets under management. (PA 2398.) State Street operated in the highly

---

[12]    *See, e.g.*, *Blue Ridge Bank v. Veribanc, Inc.*, 866 F.2d 681, 688-89 (4th Cir. 1989); *see also Long v. Cooper*, 848 F.2d 1202, 1205-06 (11th Cir. 1988); *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 589 (1st Cir. 1980).

regulated industry of investment management for pension plans.  State Street was subject to regulation by state authorities, the Securities and Exchange Commission, and by the Department of Labor.  In fact, the SEC, Massachusetts Attorney General, and Massachusetts Department of State extensively investigated State Street's Fixed Income Group, including its management of the Bond Funds.  (PA 2402.)

State Street successfully invited public attention to its views, including its views on the management of its active fixed income funds, before PRIAC's statements to its clients in late August 2007.  State Street had made extensive efforts to increase its media exposure, in order to share its "opinions on things that our clients and prospects are interested in in the industry," and its efforts to inject itself into the discussion about investments had made it a "recognizable name" in the "institutional space."  (PA 562-66 Roberts.)  According to State Street's Public Relations group: "The people that we want to know about State Street, most of them have at least heard of State Street."  (PA 563 Roberts.)

In July and August 2007, State Street was prominent in the public discussion of its active fixed income bond funds.  The first article relating to the underperformance of State Street's active fixed income bond funds appeared in *Money Management Letter* on July 25, 2007.  (PA 1618 (reporting losses in the Limited Duration Bond Fund attributable to subprime investments).)[13]  The "negative news coverage" continued throughout August 2007.  (PA 569-70 Roberts; *see, e.g.*, PA 1783 (negative article in August 6, 2007 *Money Management Newsletter*); PA 1785 (listing negative news articles on July 30, July 31, August 6, August 13, August 15,

---

[13]   Even at this point, almost a month before the first of PRIAC's allegedly defamatory statements, SSgA CEO Bill Hunt reported to State Street CEO Ron Logue that the bond fund losses would harm State Street's reputation.  (PA 1618 ("This will not be w[ith]o[ut] some pain – client and media.").)  By mid-July 2007, State Street's reputation had been severely damaged by the performance of its active fixed income bond funds, and it recognized that such damage might last for years.  (PA 499-506 Kelly.)

August 16, and August 17, 2007, among others).)  According to a representative of State Street's Public Relations group, "I would simply say that I think that there were a lot of negative articles being written about SSgA in the summer of 2007."  (PA 577 Roberts.)

State Street's position as a highly-regulated, publicly held corporation with $1.9 trillion in assets under management, its status as a "recognizable name" among institutional investors, and the media attention focused on the losses from its fixed income funds, prior to PRIAC's allegedly defamatory statements, made State Street a public figure.  As discussed above, State Street cannot meet its burden of showing with convincing clarity that PRIAC acted with actual malice.

**C.**     **State Street Cannot Prove That PRIAC's Statements Were False.**  *[All Statements]*

To be actionable as defamation, a statement must be false.  *Strada v. Conn. Newspapers, Inc.*, 477 A.2d 1005, 1007 (Conn. 1984); *McAvoy v. Shufrin*, 518 N.E.2d 513, 517 (Mass. 1988). Statements that are substantially true are not defamatory.  *Goodrich v. Waterbury Republican-Am., Inc.*, 448 A.2d 1317, 1322 (Conn. 1982); *Encompass Ins. Co. of Mass. v. Giampa*, 522 F. Supp. 2d 300, 312-13 (D. Mass. 2007).  If the "main charge, or gist" of the statement is true, inaccuracies that add nothing to the "sting of the charge" are not defamatory.  *Goodrich*, 448 A.2d at 1322 (internal quotation marks omitted).  As shown below, PRIAC's statements were true as a matter of law.

**1.**     **PRIAC Statements to Its Clients About State Street's Divergence from Its Stated Investment Approach for the Bond Funds** *[Statement Nos. 12-13, 15-17, 23]*

The gist of PRIAC's statements about State Street changing its investment strategy was true.  PRIAC understood that the Bond Funds were Enhanced Index funds based on information provided by State Street (PA 2103), and the management fees that it charged.  (PA 1650; *see*

47

*also* PA 2136.)  PRIAC had this understanding until the summer of 2007.  (Frascona ¶ 9, PA 17.)

But in 2006, without telling PRIAC, State Street increased the excess return target for the Bond

Funds (PA 536-43 Pickett; PA 1573; PA 1652), dramatically increased their leverage (PA 608-

10 Wands; PA 2156), and concentrated their investments in subprime mortgage bonds. (PA 476-

77 Hopkins; PA 411-30; PA 1603; PA 1608.)  The strategy that State Street was pursuing for the

Bond Funds in 2007 was much riskier than the strategy PRIAC understood was being used.

(Frascona ¶ 28, PA 21.)  The gist of PRIAC's statements was true.

        In late August 2007, when PRIAC provided its clients with information it had obtained in

July and August about State Street's investment strategy, PRIAC stated that it had recently

learned of "broad" and "widespread" off-index exposure and the use of leverage in the Bond

Funds.  State Street's counterclaim suggests that its commentaries, monthly performance reports,

and additional disclosures sent to PRIAC apprised it of the off-index exposure before August 22.

(PA 375-76.)  The fact is that State Street's own disclosures were incomplete and misleading.

Because the then recently-revealed facts about the Bond Funds that PRIAC referred to went far

beyond the facts previously disclosed by State Street, the gist of these statements was true.

        State Street sent PRIAC bar graphs that compared the sector exposures of the Bond

Funds, including the ABS exposure, to the exposures in the relevant benchmarks.  (*E.g.*, PA

817.)  In 2005, State Street employees made references to "the leverage component of the fund"

(PA 377-78), and "financing opportunities" (PA 402-04).[14]  PRIAC was aware that the Bond

Funds' benchmarks did not have investments in the ABS sector, and that State Street used off-

index "bets" to generate returns over the benchmark returns.  (*See, e.g.*, PA 627-28 Frascona.)

---

[14]   The documents refer variously to the Intermediate Bond Fund and the Government Credit
       Bond Fund.  There is no document that notifies PRIAC of the full nature of the leverage of
       both funds.

PRIAC knew in 2006 and 2007 that some of the Bond Funds' ABS holdings were backed by the home equity market. (PA 375-76.) PRIAC knew that the funds could use, and in the case of the Government Credit Bond Fund in late 2004 had used, moderate leverage as a means of gaining an enhancement over their respective benchmarks. (Frascona ¶ 20, PA 19.)

What PRIAC did *not* know was that the Bond Funds' ABS investments were almost exclusively subprime securities, or that the ABS exposures were heavily leveraged, increasing their notional exposure to the ABS sector. PRIAC learned those things about State Street's change in strategy, without the details it requested, in mid-August 2007. Even then, notwithstanding PRIAC's repeated requests, State Street did not provide the details of the Bond Funds' subprime exposure or leverage. (Frascona ¶¶ 27-29, PA 21.)

State Street maintains that the truncated spreadsheet it sent to PRIAC on July 12, 2007, coupled with the conference call on July 18, disclosed the leverage in the Intermediate Bond Fund. (PA 683.)[15] State Street's internal documents showed an increase in home equity ABS exposure from March to June 2007 from $1.4 billion to $1.8 billion (PA 547-55 Pickett; PA 1719; PA 1752), but the truncated spreadsheet showed a significant percentage decrease in ABS exposure during that period. (PA 520-24 Lindner; PA 613-15 Wands; PA 1654.) The statements during the July 18 call informed PRIAC that the Intermediate Bond Fund was leveraged, but did not inform it that the fund was using leverage to increase its exposure to subprime mortgage-backed securities, let alone the extent to which that was occurring. (*See* Frascona ¶ 27, PA 21; Dingee ¶ 7, PA 24.) The July 18 call generated follow-up requests and questions, including a request for State Street's guidelines for leverage at the sector level. (*E.g.*, PA 779; PA 2391; PA 2394.) State Street never responded. (Dingee ¶ 8, PA 14.) In late July and early August, State

---

[15]    PRIAC never received a comparable spreadsheet for the Government Credit Bond Fund, and that fund was not discussed on the call.

Street failed to respond to repeated requests for information about leverage.  (Dingee ¶¶ 10, 11, 13, PA 25-26; Frascona ¶ 27, PA 21; PA 27; PA 31; PA 1831.)  In mid-August, PRIAC still did not know the nature or amount of leverage in the Intermediate Bond Fund, and it had no information about the leverage in the Government Credit Bond Fund.

PRIAC's statements to its clients about its lack of knowledge about the Bond Funds' leveraged ABS positions omitted the detail set forth above but were accurate generalizations. *See Strada*, 477 A.2d at 1007-08.

### 2.    PRIAC Statements to Its Clients About the Erroneous Name [Statement Nos. 4-6, 15-16]

PRIAC's statements to its clients regarding the erroneous name for the Intermediate Bond Fund were true.  PRIAC explained in the Naming Convention that was part of the August 23 Communications, and in subsequent communications, that State Street "had mistakenly added 'Passive' to the fund name" in September 2005, and that PRIAC renamed the fund upon learning of the mistake.  That is what happened.  The truth of PRIAC's statements was confirmed by Mr. Flinn of State Street, who told PRIAC in a July 18 email that State Street had "inadvertently added 'Passive' in the name" of the fund in 2005.  (PA 784; PA 1428.)

### 3.    PRIAC Statements to Clients About State Street's Failure to Provide Information [Statement Nos. 1-3, 5, 7-15, 17-20, 23]

PRIAC's statements to its clients that State Street did not timely and completely respond to PRIAC's requests for information were true.  The undisputed facts show that.  State Street acknowledged that PRIAC did not receive "the appropriate level of urgency and thoroughness." (PA 451 Dalis; PA 1467, at 1523.)  Mr. Flinn apologized for State Street's persistent delays in providing basic fund information to PRIAC.  (PA 1442.)  Mr. Flinn's supervisor believes Mr. Flinn should have escalated PRIAC's requests sooner and should have been more thorough in responding to them.  (PA 586-87 Saarinen.)  Mr. Flinn's "consistent pattern of missing details

and inadequate communication" led to significant delays in getting its questions answered during July and August 2007. (PA 450-51 Dalis; PA 586 Saarinen; PA 1467, at 1523.) PRIAC's reports of those delays to clients were true.

> ### 4. PRIAC Statements to Clients About PRIAC's Loss of Confidence in State Street *[Statement Nos. 18-22]*

PRIAC's statements to its clients that it had lost confidence in State Street as a manager were true. PRIAC lost confidence in State Street because of its lack of transparency and failure to respond to pertinent questions in a timely manner, and that is what it said happened. (Palms ¶ 49, PA 14.) There is no evidence to the contrary.

### D. Some of PRIAC's Statements Constitute Protected Expressions of Opinion. *[Statement Nos. 1, 2, 7-10, 12-15, 18-22]*

To support a claim for defamation, a statement must express a statement of fact, not an opinion. "It is axiomatic that an expression of opinion, no matter how vituperative, polemical, or obnoxious, is entitled to constitutional protection under the first amendment." *World Boxing Council v. Cosell*, 715 F. Supp. 1259, 1261 (S.D.N.Y. 1989); *see Brewer v. Town of W. Hartford*, No. 3:05 Civ. 849 (SRU), 2007 WL 2904207, at *5 (D. Conn. Sept. 28, 2007) (finding an expression of concern based on established facts to be an opinion); *Goodrich*, 448 A.2d at 1321 ("An opinion . . . is a personal *comment* about another's conduct, qualifications or character that has some basis in fact." (emphasis in original)); *Friedman v. Boston Broadcasters, Inc.*, 522 N.E.2d 959, 962 (Mass. 1988) ("[A] defendant in a defamation action is entitled to summary judgment with respect to challenged statements that reasonably cannot be construed as statements of fact."). "[W]hether a statement constitutes fact or opinion is a question of law for the court." *World Boxing Council*, 715 F. Supp. at 1261. "The court's inquiry must be made from the perspective of an 'ordinary' reader of the statement." *Id.*

PRIAC's statements expressed several opinions: that it was not receiving sufficient information about the Bond Funds, that State Street's responses were unsatisfactory, that new information PRIAC received was "troubling," Statement Nos. 1, 2, 7, that it had concluded it could no longer properly meet its obligation to monitor the Bond Funds, Statement Nos. 8, 9, 10, 12, 13, 14, 15, that it had "ongoing and broad reservations" about State Street, Statement Nos. 21, 22, and that it had lost confidence in State Street, Statement Nos. 18, 19, 20.  Viewed from the perspective of an "ordinary reader," these statements were, as a matter of law, non-actionable statements of opinion.

**E.**    **Some of PRIAC's Statements Were Not "Of and Concerning" State Street.**
         *[Statement Nos. 3, 5, 11, 15, 17, 21-23]*

To support a defamation claim, a statement must be "of and concerning" the claimant. *QSP, Inc. v. Aetna Cas. & Sur. Co.*, 773 A.2d 906, 916 (Conn. 2001); *Eyal v. Helen Broad. Corp.*, 583 N.E.2d 228, 230 (Mass. 1991).  To satisfy this element, State Street must show that PRIAC's statements caused the Plans to understand that it was speaking about State Street. Restatement (Second) of Torts § 564.  "The 'of and concerning' requirement stands as a significant limitation on the universe of those who may seek a legal remedy for communications they think to be false and defamatory and to have injured them."  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 399-400 (2d Cir. 2006).  The Connecticut Supreme Court treats this requirement as a federal constitutional prerequisite, as well as an element of defamation that a claimant must prove.  *QSP, Inc.*, 773 A.2d at 916 & n.14.

Statement Nos. 3 and 11, and portions of Statement Nos. 5, 15, 17, 21, 22, and 23, are about PRIAC, and are not "of and concerning" State Street.  State Street can offer no evidence that any of the Plans interpreted these statements to be about State Street.  *See* Restatement

(Second) Torts § 564, cmt. a ("It is necessary that the recipient of the defamatory communication understand it as intended to refer to the plaintiff.").

## F. State Street Cannot Prove Incremental Harm from Any of PRIAC's Statements.
### [All Statements]

The doctrine of incremental harm requires the Court to isolate "the incremental harm inflicted by the challenged statements beyond the harm imposed by the rest of the publication. If that harm is determined to be nominal or nonexistent, the statements are dismissed as not actionable." *Herbert v. Lando*, 781 F.2d 298, 311 (2d Cir. 1986); *see Church of Scientology Int'l v. Behar*, 238 F.3d 168, 176 (2d Cir. 2001) ("[W]hen unchallenged or non-actionable parts of a publication are damaging, an additional statement, even if maliciously false, might be non-actionable because it causes no appreciable additional harm.").

### 1. The Defamation Claim Is Governed by Connecticut Law.

If the Court reaches this defense, it will need to resolve a conflict between Connecticut and Massachusetts law. Connecticut courts have adopted the incremental harm doctrine to promote a policy of protecting from liability complicated, detailed speech with minor inaccuracies. *Allan v. Hartford Courant*, No. Civ. 599993S (MKB), 2001 WL 291162, at *2 (Conn. Super. Ct. Mar. 8, 2001); *see also Jones v. Globe Int'l Inc.*, No. 3:94 Civ. 01468 (AVC) et al., 1995 WL 819177, at *9-10 (D. Conn. Sept. 26, 1985). Whether Massachusetts law recognizes this doctrine is uncertain. *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 210 n.6 (1st Cir. 2006). Because the Court has supplemental jurisdiction over the defamation counterclaim, the forum's choice of law rules apply. *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43 (2d Cir. 1999); PA 366. Under New York's choice of law rules, defamation laws are viewed as conduct-regulating rules, and the law of the jurisdiction where the tort occurred generally applies. *Cummins v. Suntrust Capital Mkts., Inc.*, 649 F. Supp. 2d 224, 237 (S.D.N.Y. 2009).

53

The rule that the tort occurred in the place of the plaintiff's domicile does not necessarily apply in defamation cases. *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999); *Cummins*, 649 F. Supp. 2d at 237. When allegedly defamatory statements are widely disseminated, New York courts consider additional factors. *Condit v. Dunne*, 317 F. Supp. 2d 344, 353-54 (S.D.N.Y. 2004); *see Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F. Supp. 2d 279, 286 n.3 (S.D.N.Y. 2006). The plaintiff's domicile is not determinative where, "with respect to the particular issue, some other state has a more significant relationship to the issue or the parties." *Stockalert, Inc. v. Nasdaq Stock Mkt., Inc.*, No. 95 Civ. 9335 (JFK), 1998 WL 556036, at *14 (S.D.N.Y. Sept. 1, 1998). New York gives deference to laws reflecting states' policy choices, such as rules protecting speech from liability. *See AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270-71 (2d Cir. 1992); *PowerDsine, Inc. v. AMI Semiconductor, Inc.*, 591 F. Supp. 2d 673, 680 (S.D.N.Y. 2008); *Stephens v. Am. Home Assurance Co.*, No. 91 Civ. 2898 (JSM) (KAR), 1995 WL 230333, at *7 (S.D.N.Y. Apr. 17, 1995). Here, Connecticut's policy of protecting its citizens from defamation claims, where their statements inflict only incremental harm, is entitled to considerable weight. *See Bio/Basics Int'l Corp. v. Ortho Pharm. Corp.*, 545 F. Supp. 1106, 1113-14 (S.D.N.Y. 1982).

The Court should apply Connecticut law. The significant events underlying this counterclaim occurred in Connecticut. *See Condit*, 317 F. Supp. 2d at 353-54; *Qureshi*, 430 F. Supp. 2d at 286 n.3; *see also Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1091 (S.D.N.Y. 1984). The alleged defamation occurred in statements that were prepared by PRIAC in Connecticut and were sent from Connecticut (Palms ¶ 33, PA 10), to clients in over 27 states and the District of Columbia. (*See* PA 2339.) Connecticut has the predominant "interest in affecting the conduct of

54

those who act within the jurisdiction and [] a reliance interest on the part of the actors whose conduct is at issue." *AroChem*, 968 F.2d at 270.

>    **2.    State Street Cannot Prove Incremental
>            Harm from Any of PRIAC's Statements.**

The 23 statements on which State Street bases its counterclaim were parts of communications by PRIAC to its clients totaling more than 200 pages. (PA 110-333.) The central message of these communications was that the Bond Funds had seriously underperformed due to State Street's undisclosed and inappropriate decision to invest in heavily leveraged subprime positions. In statements that State Street does not assert are actionable, PRIAC described the "unusual losses" (PA 196, at 197) in the Bond Funds as "disappointing" (PA 110, at 124), "dramatic[]" (*id.*), and "precipitous[]" (PA 235, at 239). These communications expressed PRIAC's belief that based on State Street's lack of transparency and responsiveness to questions, "it was impossible for anyone to understand the true risks of [the Bond Funds'] holdings" (*id.*), and that PRIAC would continue to ask State Street for "information only it has that can provide answers to the questions we are asking on behalf of our clients" (PA 139).

State Street cannot establish that any allegedly defamatory statement caused additional harm to State Street beyond the harm from the other statements in the same communications. *See Church of Scientology Int'l v. Time Warner, Inc.*, 932 F. Supp. 589, 593 (S.D.N.Y. 1996), *aff'd sub nom. Church of Scientology Int'l v. Behar*, 238 F.3d 168 (2d Cir. 2001). Each of the 23 statements that the Court finds non-defamatory supports the conclusion that no statement caused State Street any incremental harm. As a result, the allegedly defamatory statements are non-actionable as a matter of law. *Id.*[16]

---

[16]    Six of the 23 statements identified by State Street were made after PRIAC filed the Complaint on October 1, 2007. Each expressed PRIAC's opinion that it lost confidence in State Street as an investment manager and updated the Plans on the pending litigation.

**G.    State Street Cannot Prove That It Was
        Injured by Any of PRIAC's Statements.**

State Street cannot prove any compensatory damages from the alleged defamation.  State

Street alleged damages from "lost business, lost profits, loss of good will, loss of reputation, and

other losses."  (PA 380-81.)  It asserted in interrogatory responses that the allegedly defamatory

statements caused "material harm to State Street's business reputation and materially diminished

State Street's earnings by causing existing clients to withdraw from State Street funds, including

funds unaffected by the credit market dislocation, and by deterring clients and prospective clients

from entering into or building upon existing investments with State Street."  (PA 91.)

Where a claim for damages for defamation is premised on the assertion that the

defamatory statements affected third parties' decisions about doing business with the party

asserting the claim, the party asserting the defamation claim bears the burden of showing that the

defamatory statements caused it to lose business:  "the issue is whether the false statement has

resulted in damage which is distinct from that caused by true negative statements also contained

in the same report."  1 *Sack on Defamation* § 10.5.3 (internal quotation marks omitted).  To

ensure that this element of damages is established satisfactorily, "courts have required that the

plaintiff produce testimony of the third parties to establish that the publication did indeed cause

the loss."  *Id.*  In the absence of such testimony linking third parties' business decisions to the

defamatory statements, the element of causation is missing, and "absent proof of causation it is

not permissible to suggest the loss of specific customers, orders, profits or other specific

pecuniary loss."  *Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 539 (10th Cir. 1987).

---

These statements could not have caused additional harm to State Street beyond that caused
by the allegations in the Complaint, which are absolutely privileged.  *DeLaurentis v. City of
New Haven*, 597 A.2d 807, 826 (Conn. 1991); *Visnick v. Caulfield*, 901 N.E.2d 1261, 1263
(Mass. App. Ct. 2009).

State Street has not specified any instances or provided any facts to support its damage claim.  It has not named any investors who withdrew from or were deterred from investing in State Street funds due to defamatory statements.  It has not identified evidence of loss of earnings.  In discovery, State Street did not ask any of the Plans whether they based investment decisions on the allegedly defamatory statements by PRIAC – let alone obtain any such evidence.  With no proof of compensatory damages, State Street can, as a matter of law, recover only nominal damages.  *See DeVito v. Schwartz*, 784 A.2d 376, 381-82 (Conn. App. Ct. 2001); *Jackson v. Longcope*, 476 N.E.2d 617, 619-20 (Mass. 1985).  If the Court does not grant summary judgment on the defamation counterclaim, it should enter an order that State Street cannot recover compensatory damages for defamation.

### III.    Summary Judgment Should Be Granted Dismissing the Counterclaim Under the Massachusetts Unfair Trade Practices Act.

The Massachusetts Unfair Trade Practices Act prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2 (2006).  Where, as here, the "allegedly defamatory statements do not support a cause of action for defamation, they also do not support a cause of action under G.L. c. 93A." *Dulgarian v. Stone*, 652 N.E.2d 603, 609 (Mass. 1995); *see also Albright v. Morton*, 321 F. Supp. 2d 130, 141-42 (D. Mass. 2004).  If the Court dismisses State Street's defamation counterclaim, the chapter 93A counterclaim must be dismissed as well.

In addition, Chapter 93A applies only where "the actions and transactions constituting the alleged . . . unfair or deceptive act or practice occurred primarily and substantially within the commonwealth [of Massachusetts]."  Mass. Gen. Laws ch. 93A, § 11.  That requirement is not met by the claim of a plaintiff domiciled in Massachusetts that it was injured there.  As the court noted in *HipSaver Co.  v. J.T. Posey Co.*, "[i]f the place of injury were the only test, practically

no case involving a Massachusetts plaintiff would be exempt from c. 93A status." 490 F. Supp. 2d 55, 71 (D. Mass. 2007) (internal quotation marks omitted). In determining whether the alleged misconduct occurred "primarily and substantially" within Massachusetts, "courts engage in a holistic, fact-based analysis focused upon 'whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth [of Massachusetts].'" *Korpacz v. Women's Prof'l Football League*, No. 04 Civ. 10735 (RWZ), 2006 WL 220762, at *5 (D. Mass. Jan. 27, 2006) (quoting *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 799 (Mass. 2003)); *see also Nat'l Fire Prot. Assoc., Inc. v. Int'l Code Council, Inc.*, No. 03 Civ. 10848 (DPW), 2006 WL 839501, at *6-7 (D. Mass. Mar. 29, 2006).[17] The inquiry looks to the allegedly actionable conduct. *R.G.J. Assocs. Inc. v. Stainsafe, Inc.*, 338 F. Supp. 2d 215, 233-34 (D. Mass. 2004).

PRIAC's alleged misconduct was the making of allegedly defamatory statements in Connecticut to clients in 27 states. In similar situations, "where the relevant deceptive conduct involves communications between a defendant and third parties," courts have found that the "'center of gravity' lies in the state in which the communications occurred (*i.e.*, were 'published')." *HipSaver Co.*, 490 F. Supp. 2d at 71. Here, as in *Korpacz*, the challenged conduct did not occur "primarily and substantially" in Massachusetts, even though State Street was domiciled there, because "defendants' conduct occurred outside of the state." 2006 WL 220762, at *5. As a result, Chapter 93A by its terms does not apply.

---

[17] This test is distinct from the choice of law analysis. *Roche v. Royal Bank of Can.*, 109 F.3d 820, 827 n.7 (1st Cir. 1997).

### IV.    Counterclaiming Against PRIAC, Which Is Suing as a Fiduciary, Is Procedurally Improper.

PRIAC brought this action and is pursuing claims under ERISA on behalf of the Plans, not in its individual capacity.  PRIAC, as a fiduciary to the Plans, is authorized by Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), to pursue this action on the Plans' behalf.  Mem. & Order, dated Sept. 30, 2008.  State Street is being sued, and brings its counterclaims, in its individual capacity, not on behalf of the Plans.[18]  By pursuing counterclaims against PRIAC in its fiduciary capacity, State Street effectively is suing the Plans, and a judgment in favor of State Street could reduce the recovery by the Plans.

When a similar situation was presented in *Lee v. Manufacturers & Traders Trust Co.*, the court held that counterclaiming against trustees of a retirement plan suing fiduciaries on behalf of that plan was improper:

> It appears that the pleaded counterclaims are asserted against the wrong party. The Trustees commenced this action as representatives of the Plan.  It is the Plan, therefore, not the Trustees individually, that seeks relief and recovery from M & T Bank for the alleged breach of the bank's fiduciary obligations.

219 F.R.D. 265, 266 (W.D.N.Y. 2004); *accord Rubin v. Valicenti Advisory Servs., Inc.*, 326 F. Supp. 2d 427, 428 (W.D.N.Y. 2004); *Trs. of the Auto. Mechs. Local No. 701 Pension & Welfare Funds v. Union Bank of Cal.*, 630 F. Supp. 2d 951, 952 (N.D. Ill. 2009).  The court held that the counterclaiming bank, like State Street here, had no right to pursue claims against the Plan's trustees, who were suing in their capacities as representatives of the Plan.  *Lee*, 219 F.R.D. at 266.  Where a judgment would reduce the amounts of ERISA plans' recovery, "[c]learly, ERISA prohibits such a remedy."  *BP Corp.*, 2010 U.S. Dist. LEXIS 12379, at *16.  The improper counterclaims against PRIAC in its fiduciary capacity should be dismissed.

---

[18]    As a former fiduciary of the Plans, State Street lacks standing to bring claims on their behalf.  *Chemung*, 939 F.2d at 14-15.

**Conclusion**

For the foregoing reasons, the Court should grant PRIAC's motion for partial summary judgment and direct the entry of order dismissing, with prejudice, State Street's counterclaims.

Dated: New York, New York
        June 2, 2010

                        Respectfully submitted,

                        DEBEVOISE & PLIMPTON LLP


                        By: /s/ Edwin G. Schallert_____
                            Edwin G. Schallert
                            Steven Klugman
                            Jeremy N. Klatell
                            Courtney M. Dankworth
                            Miranda H. Turner
                        919 Third Avenue
                        New York, New York 10022
                        (212) 909-6000

                        Attorneys for Plaintiff Prudential
                        Retirement Insurance and Annuity Company