UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

─────────────────────────────────────

IN RE STATE STREET BANK AND
TRUST CO. FIXED INCOME FUNDS                    MDL No. 1945
INVESTMENT LITIGATION

─────────────────────────────────────

PRUDENTIAL RETIREMENT INSURANCE
AND ANNUITY COMPANY,

      Plaintiffs,

v.                                              No. 07 Civ. 8488 (RJH)

STATE STREET BANK & TRUST
COMPANY and  STATE STREET GLOBAL
ADVISORS, INC.,

      Defendants.

─────────────────────────────────────

**STATE STREET'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ....................................................................................................3

MATERIAL UNDISPUTED FACTS ..........................................................................5

ARGUMENT .......................................................................................................8

I.    PRIAC'S FIDUCIARY BREACHES PREVENTED THE PLANS FROM
      MITIGATING THEIR DAMAGES, AND STATE STREET CANNOT HAVE
      CAUSED THE PLANS' LATER LOSSES ...........................................................9

      A.    PRIAC's Failure To Provide Information Regarding the Bond Funds, In
            Breach of Its Fiduciary Duties, Prevented The Plans From Mitigating
            Their Damages.........................................................................................10

            1.    PRIAC failed to alert the Plans to the Bond Funds' exposure to subprime-
                  backed ABS despite the developing subprime crisis .....................................14

            2.    PRIAC failed to disclose to the Plans that the Bond Funds' subprime
                  exposure was leveraged, despite State Street's disclosures to PRIAC
                  that the Bond Funds employed significant amounts of leverage .................15

            3.    PRIAC exacerbated its failure to inform the Plans regarding the Bond
                  Funds' subprime exposure by waiting until August 21, 2007 to correct
                  the Plans' misimpression that IBF was a "passive index" fund....................16

      B.    PRIAC Cannot Recover Damages That Were Proximately Caused By Its
            Own Decision to Withhold Material Information Regarding The Bond
            Funds During 2007 ...................................................................................17

II.   PRIAC'S CLAIMS AGAINST SSGA, INC SHOULD BE DISMISSED BECAUSE
      SSGA, INC. WAS INCORRECTLY NAMED AS A DEFENDANT ...........................19

CONCLUSION...................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*American Federal Group, Ltd. v. Rothenberg,*
    136 F.3d 897 (2d Cir. 1998) ................................................................................17

*Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    651 F.2d 615 (9th Cir. 1981) ...............................................................................12

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ..........................................................................................8, 9

*Chemung Canal Trust Co. v. Sovran Bank,*
    939 F.2d 12 (2d Cir. 1991) ...................................................................................11

*Drummond v. Morgan Stanley & Co.,*
    No. 95 Civ. 2011 DC, 1996 ..................................................................................12

*Eddy v. Colonial Life Insurance Co. of America,*
    919 F.2d 747 (D.C. Cir. 1990) .............................................................................13

*In re Fortune Systems Security Litigation,*
    680 F. Supp. 1360 (N.D. Cal. 1987) ...............................................................11, 12

*Glaziers & Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Security, Inc.,*
    93 F.3d 1171 (3d Cir. 1996) .................................................................................13

*Glennie v. Abitibi - Price Corp.,*
    912 F. Supp. 993 (W.D. Mich. 1996) ..............................................................11, 14

*LNC Invs., Inc. v. First Fidelity Bank, N.A. New Jersey,*
    173 F.3d 454 (2d Cir. 1999) .................................................................................17

*M. Golodetz Export Corp. v. S/S Lake Anja,*
    751 F.2d 1103 (2d Cir. 1985) ...............................................................................13

*Matsushita Electric Industry Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ..............................................................................................8

*In re Mutual Funds Investment Litigation,*
    608 F.Supp. 2d 677 (D. Md. 2009) ........................................................................2

*Nordwind v. Rowland,*
    584 F.3d 420 (2d Cir. 2009) .............................................................................17, 18

*Preston v. American Federation of Television and Radio Artists Health Fund,*
    No. 90 Civ. 7094, 2002 WL 1009458 (S.D.N.Y. May 16, 2002) ...........................11

*Scardelletti v. Bobo*,
No. Civ. No. JFM-95-CV-5, 1997 WL 33446689 (D. Md. Sept. 8, 1997)..............................11

*Sheehy v. New Century Mortgage Corp.*,
No. 08-CV-377, 2010 WL 625331 .................................................................................17, 18

*Trustees of the Local 464A United Food and Commercial Workers Union Pension Fund
v. Wachovia Bank, N.A.*, Civ. No. 09-668, 2009 WL 4138516 (D.N.J. Nov. 24, 2009) .........13

*Ulico Casualty Co. v. Clover Capital Management, Inc.*,
146 F. Supp. 2d 163 (N.D.N.Y. 2001) ......................................................................................11

*Van Syckle v. C.L. King & Assocs., Inc.*,
822 F. Supp. 98 (N.D.N.Y. 1993) .............................................................................................11

*Whitfield v. Cohen*,
682 F. Supp. 188 (S.D.N.Y. 1988)............................................................................................13

**OTHER AUTHORITIES**

2 Williston on Contracts § 1353 (1962)..........................................................................................13

Fed. R. Civ. P. 56 ............................................................................................................................1

Retatement (Second) of Torts § 440 (1965) ..................................................................................18

Defendants State Street Bank and Trust Company ("SSBT") and State Street Global Advisors, Inc. ("SSgA, Inc.") (collectively, "State Street") respectfully submit this memorandum in support of their Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and Local Civil Rule 56.1.[1]

## PRELIMINARY STATEMENT

Plaintiff Prudential Retirement Insurance and Annuity Company ("PRIAC") has brought this action under the Employee Retirement Income Security Act ("ERISA") to recover reimbursements it paid to approximately 165 retirement plan clients (the "Plans") for losses sustained in two collective investment trust funds managed by State Street Global Advisors ("SSgA"), the investment division of SSBT[2]: the Intermediate Bond SL Series Fund ("IBF") and the Government Credit Bond Fund ("GCBF") (collectively, the "Bond Funds"). The losses arose from the Bond Funds' exposure to bonds collateralized by subprime mortgages (sometimes referred to as "Asset-Backed Securities" or "ABS"). PRIAC alleges that State Street mismanaged the Bond Funds leading up to the so-called "subprime crisis" in 2007 that foreshadowed the broader financial market collapse in 2008, violating its fiduciary duties under ERISA.

As a matter of law, PRIAC is not entitled to anything more than it has already received through a Fair Fund payment in connection with State Street's recent settlement with the

---

[1] Pursuant to Local Civil Rule 56.1, State Street submits herewith a statement of undisputed material facts. Copies of documents referred to in the R. 56.1 Stmt. or herein are found in a separately-submitted volume of exhibits to the accompanying declaration of Lila A. Palmer, dated June 2, 2010 ("Palmer Declaration").

[2] PRIAC has incorrectly named SSgA, Inc., as a defendant. *See* Section II, *infra*.

Securities and Exchange Commission ("SEC") and other regulators.[3]  This payment represents 62% of the Plans' losses, according to PRIAC's calculations.  The undisputed evidence shows that PRIAC breached its own fiduciary duties to the Plans under ERISA by failing to respond or even pass along to investors timely, material information provided by State Street about the Bond Funds' investments.

In particular, State Street has submitted uncontroverted evidence that: (i) PRIAC served as an intermediary between the Plans and State Street and had its own fiduciary duties to keep the Plans informed about the Bond Funds' exposures and strategies, and was indeed the only conduit of information from State Street to the Plans; (ii) by July 18, 2007 at the latest, State Street had informed PRIAC that the Bond Funds were experiencing significant underperformance as a result of a leveraged exposure to asset-backed securities collateralized by subprime mortgages; State Street continued to provide additional information about the Bond Funds and their increasing underperformance due to subprime throughout the period from late July through mid-August 2007; (iii) PRIAC withheld that information from the Plans until late August 2007, by which time the funds had sharply deteriorated in performance; (iv) other State Street investors (not with PRIAC) to whom State Street was able to provide the same information *directly* elected to redeem their investments in late July and early August 2007, thus

---

[3]  In February 2010, State Street entered into a settlement agreement with the SEC and state regulators pursuant to which a Fair Fund was established and distributed to affected investors in these strategies.  Through the Fair Fund, PRIAC received $52,552,696.77.  R. 56.1 Stmt ¶ 69. As has been held in similar cases, of that $52.5 million dollar payment, State Street is entitled to a $48,590,223 credit against any damages that PRIAC may eventually recover.  *See In re Mut. Funds Inv. Litig.*, 608 F.Supp. 2d 677, 679 (D. Md. 2009) (granting summary judgment to defendants because any damages caused by market timing in benefit plans were "fully offset by the restitution paid by defendants [through a Fair Fund] pursuant to regulatory settlements").  State Street does not seek an offset for the civil penalty portion of the total compensation it paid to investors in the affected funds.  R. 56.1 Stmt ¶ 69.  The $50,000,000 penalty paid by State Street constitutes 7.54% of the $663,191,540 in total compensation paid to investors. *See* R. 56.1 Stmt ¶ 70. Thus, of the $52,552,696.77 payment made to PRIAC, $48,590,223 (or 92.46%) is not attributable to the civil penalty portion of the total compensation paid to investors.  *Id.*

materially mitigating their potential losses; and (v) PRIAC has already received $48.5 million

from an SEC Fair Fund, a sum equal to the Plans' losses in the Bond Funds through mid-August,

2007.

## **BACKGROUND**

PRIAC serves as an intermediary between its employee benefit plan clients and asset

managers like State Street that offer ERISA-qualified investment funds.  R. 56.1 Stmt ¶¶ 9-10.

From 1996 until 2007, PRIAC and its predecessor[4] offered their clients, among other investment

opportunities, investments in PRIAC separate accounts invested in the State Street Bond Funds,

as part of PRIAC's "Manager of Managers" program ("MOM Program").  R. 56.1 Stmt ¶¶ 5-6.

State Street and PRIAC both served as fiduciaries to the Plans.  *See* R. 56.1 Stmt ¶¶ 8-9.  As an

asset manager, State Street managed the Bond Funds, providing PRIAC with monthly reports,

quarterly commentary, quarterly investment characteristics, website access, and other *ad hoc*

reporting that reflected the Bond Funds' performance, risk characteristics, compositions, and

strategies.  R. 56.1 Stmt. ¶¶ 25-27.

For its part, PRIAC "served as the intermediary between State Street and the Plans, and

had its own fiduciary duties."  R. 56.1 Stmt. ¶¶ 8-9.  Specifically, PRIAC had the duty, among

others, to timely "convey information about the funds from the investment managers to the Plans

and assist the Plan Sponsors in their due diligence activities."  R. 56.1 Stmt. ¶ 10.  As a matter of

PRIAC policy, State Street was not told who the PRIAC clients were that invested in the Bond

Funds.  R. 56.1 Stmt. ¶ 17.  Because the Bond Funds were unregistered commingled trusts (and

not publicly registered mutual funds), information was not otherwise available to investors

unless PRIAC provided it.  R. 56.1 Stmt. ¶¶ 5, 17.  Under PRIAC's MOM Program, information

---

[4] On January 1, 2004, PRIAC acquired the business assets of CIGNA Retirement Services from
CIGNA Corporation ("CIGNA").

about the Bond Funds was designed to flow from State Street to PRIAC to the Plans.  R. 56.1 Stmt. ¶ 9.

PRIAC bundled its reporting services into its "Due Diligence Advisor" program (the "DDA Program"), through which PRIAC analyzed and reported on the Bond Funds sold within its MOM Program.  R. 56.1 Stmt. ¶¶ 8-13.  PRIAC classified the Bond Funds as "Alliance Funds" within the MOM Program.  R. 56.1 Stmt. ¶ 7.  Although PRIAC gave the Plans the freedom to deselect Alliance Funds, it reserved the right to deselect them itself under "extenuating circumstances."  R. 56.1 Stmt. ¶ 14.

PRIAC knew that the Bond Funds were actively managed and sought to outperform their respective benchmarks, and received information from State Street showing that the Bond Funds were increasingly concentrated in asset-backed securities.  R. 56.1 Stmt. ¶¶ 25-28, 33-37.  State Street also disclosed that the Bond Funds utilized leverage to capture additional investment returns.  R. 56.1 Stmt. ¶¶ 28, 37, 42.  Until 2007, the strategy benefited PRIAC and the Plans – the Bond Funds consistently outperformed their benchmarks.  R. 56.1 Stmt. ¶ 26.  But when the subprime mortgage market experienced an unprecedented liquidity crisis in the summer of 2007 that caused sharp drops in ABS prices, the Bond Funds' performance followed suit, resulting in substantial losses for investors.

In the late spring and early summer of 2007, State Street communicated information to PRIAC about, *inter alia*, the material underperformance arising from the ABS backed by subprime mortgages in which the Bond Funds concentrated, the ensuing illiquidity in the bonds, and the leverage being used.  R. 56.1 Stmt. ¶¶ 30-44, 55-57.  State Street also told PRIAC that PRIAC was miscommunicating to its clients that the IBF was "passive" and an "index" fund when in fact it was actively managed.  R. 56.1 Stmt. ¶¶ 45-54.

By July 18, 2007 PRIAC knew sufficient information about the Bond Funds' situation to appreciate that the information should have been promptly transmitted to its clients so they could determine whether to remain invested. State Street continued to provide additional information in late July through mid-August 2007 to PRIAC about the Bond Funds, which showed a deteriorating performance over time. R. 56.1 Stmt. ¶¶ 55-57. Notwithstanding these disclosures, PRIAC kept this information from the Plans by not passing it along and did nothing until the end of August. R. 56.1 Stmt. ¶¶ 55-60. PRIAC finally sought to redeem the Plans from the Bond Funds on August 29, 2007. R. 56.1 Stmt. ¶¶ 61-63. PRIAC went on to reimburse the Plans for over $80 million in alleged collective losses in exchange for the authority to bring this suit against State Street.[5]

PRIAC has already been compensated in an amount well beyond PRIAC's clients' investment losses in the Bond Funds through mid-August, as part of State Street's resolution of regulatory investigations. R. 56.1 Stmt. ¶¶ 69-75. Having breached its own fiduciary obligations in response to material information provided by State Street through July 18 and then with respect to additional information through mid-August 2007, PRIAC is barred as a matter of law from recovering for investment losses incurred thereafter.

## MATERIAL UNDISPUTED FACTS

State Street submits herewith a separate statement of material undisputed facts, as required by Local Rule 56.1 ("R. 56.1 Stmt."), with supporting documentation. Following are the key material undisputed facts upon which this motion is premised:

- State Street disclosed to PRIAC that the Bond Funds were actively managed in repeated disclosures between 2005 and 2007. R. 56.1 Stmt. ¶¶ 27-28.

---

[5] In the face of sharp criticism and mounting complaints from many clients about PRIAC's misinforming them that IBF was a passive index fund and the absence of other information about the Bond Funds, PRIAC brought the crescendo of complaints to a screeching halt by reimbursing the losses of its clients through non-repayable "loans." R. 56.1 Stmt. ¶¶ 66-67.

- State Street disclosed that the Bond Funds were becoming more heavily concentrated in ABS and increasingly were deviating from the underlying benchmark indices, which had no such investments at all. R. 56.1 Stmt. ¶ 26.

- The month-end performance reports sent by State Street to PRIAC showed GCBF's concentrations of ABS increasing from 22.88% on December 31, 2006, to 32% on May 31, 2007, to 38.72% on June 30, 2007 – while the ABS concentration of its benchmark index remained at 0% throughout the period.    R. 56.1 Stmt. ¶ 26.  Similarly, the reported ABS concentrations in IBF on these same dates increased from 17.18% on December 31, to 32.14% on May 31, to 35.75% on June 30 – again as compared to a 0% concentration in IBF's benchmark index.  R. 56.1 Stmt. ¶ 26.

- On March 2, 2005, State Street explained to PRIAC the reason the sector allocation of GCBF exceeded 100% in a State Street characteristics report, stating: "This is an Active portfolio. The Sector weightings includes the leverage component of the fund in which we may hold a future or a swap." R. 56.1 Stmt. ¶ 28.

- On April 11, 2007, State Street sent PRIAC commentary disclosing the material underperformance of the Bond Funds in the first part of 2007 and attributing the underperformance to ABS subprime exposure, while disclosing State Street's intent to "continue to hold our asset-backed exposure."  The commentary also described both Bond Funds as "active" (*i.e.*, actively managed). R. 56.1 Stmt. ¶ 30.

- On July 6, 2007, State Street sent PRIAC additional investment commentary explaining that: (i) State Street's Bond Funds had experienced underperformance due to subprime exposure as of June 2007; (ii) the subprime market was continuing to experience extreme volatility and illiquidity; and (iii) nonetheless, State Street intended to continue to maintain its ABS exposure. R. 56.1 Stmt. ¶ 35.  CIGNA stated in an email that the commentary "was very good in terms of understanding the [IBF's] investing philosophy." R. 56.1 Stmt. ¶ 35.

- On July 12, 2007, State Street informed PRIAC that PRIAC was incorrectly marketing IBF as a passively managed fund by calling IBF the "Passive Intermediate Bond Index Fund." R. 56.1 Stmt. ¶ 46.  Previously in 2005, an employee at State Street had erroneously informed PRIAC that the name of IBF included the words "passive" and "index."[6] R. 56.1 Stmt. ¶ 18.  PRIAC failed to affirmatively notify clients of the incorrect name until after August 20, and before then, only changed the name of IBF on PRIAC's website on August 2.  R. 56.1 Stmt. ¶¶ 52-54.

- Also on July 12, 2007, State Street sent additional ABS portfolio characteristics and holdings to PRIAC.  PRIAC forwarded the characteristics and holdings to CIGNA but to no other Plan.  R. 56.1 Stmt. ¶ 34.

---

[6] Although a State Street employee had passed along the incorrect name in 2005, PRIAC did not adhere to its "process for managers to regularly review [] fact sheets" from June 2005 through July 2007. R. 56.1 Stmt. at 49.  As a result, State Street was unaware of the incorrect name being used until CIGNA and then PRIAC raised the issue in July of 2007.

- After reviewing the portfolio holdings and characteristics, CIGNA indicated to PRIAC on July 17, 2007 that it had questions and wanted to talk with State Street "about strategy, leverage, etc." R. 56.1 Stmt. ¶ 39.  As a result, State Street held a conference call with PRIAC and CIGNA on July 18, 2007.  R. 56.1 Stmt. ¶¶ 39-44.  On the call, State Street again disclosed IBF's leveraged exposure to ABS backed by subprime mortgages and IBF's resulting underperformance.  R. 56.1 Stmt. ¶ 42.  Dean Molinaro, a senior PRIAC employee who participated in the call,[7] acknowledged in his testimony that, following the call, PRIAC and CIGNA were "completely aware of the Intermediate Bond Fund, its holdings, how it ran, how it operated, that it was invested materially in sub-prime and that it had a significant leveraged position . . . ."  R. 56.1 Stmt. ¶ 44.

- The record evidence shows that PRIAC did not pass along the substance of *any* of the June and July disclosures described above to the other Plans.  R. 56.1 Stmt. ¶¶ 34-35, 38.

- On August 2, 2007, State Street sent PRIAC a status report titled "IMPORTANT: Subprime Update," describing severe underperformance in State Street's active bond funds as a result of subprime exposure.  R. 56.1 Stmt. ¶¶ 56-57.  The letter noted that "downward pressure on valuations in the subprime mortgage market have resulted in varying degrees of negative performance in several of SSgA's active fixed income strategies. . . ."  The update added that IBF had underperformed by 550 basis points year-to-date as a result, an extraordinary loss for a fund of this type.  The letter further indicated that State Street had sold large quantities of AAA-rated bonds.  R. 56.1 Stmt. ¶ 56.  PRIAC failed to pass this letter on to its client Plans.  R. 56.1 Stmt. ¶ 57.

- On or after August 20, 2007, PRIAC contacted *all* the Plans regarding the extent of the Bond Funds' underperformance due to subprime exposure *for the first time* by sending out a notification that the Bond Funds had been added to PRIAC's DDA Program "Watch List."  R. 56.1 Stmt. ¶¶ 58-59.

- On August 29, 2007, PRIAC requested liquidation of its investments in the Bond Funds via a "negative consent" process, through which PRIAC notified the Plans that they had a single day to indicate whether they wished to remain invested in the Bond Funds, or else PRIAC would redeem their investments.  R. 56.1 Stmt. ¶¶ 61-63.  No Plan ultimately chose to remain invested in the Bond Funds, and PRIAC redeemed the entire value of its separate accounts' investments.  R. 56.1 Stmt. ¶¶ 61-65.

- On October 1, 2007, PRIAC sued State Street.  R. 56.1 Stmt. ¶ 66. Subsequently, PRIAC offered to make the Plans whole for the losses PRIAC determined the Plans incurred by investing in the Bond Funds.  *See* R. 56.1 Stmt. ¶¶ 66-67.  Plans accepting this offer agreed to let PRIAC "loan" the separate accounts a sum of money.  R. 56.1 Stmt. ¶¶ 66-67.  This "loan" did not need to be repaid, and PRIAC agreed not to charge interest.  R. 56.1 Stmt. ¶¶ 66-67.  In exchange, the participating Plans agreed not to sue PRIAC and to

---

[7] Dean Molinaro was a Senior Investment Strategist at PRIAC who dealt specifically with the State Street Bond Funds at issue in this litigation.  In addition to participating in the July 18, 2007 phone call among PRIAC, CIGNA, and State Street, Mr. Molinaro was one of CIGNA's primary contacts regarding IBF throughout June, July, and August 2007.

authorize PRIAC to keep any compensatory damages collected in a suit against State Street on their behalf, up to the amount of the PRIAC "loans."   R. 56.1 Stmt. ¶¶ 66-67.

- In February 2010, as part of a settlement State Street reached with the SEC and state regulators, PRIAC received a payment from a Fair Fund in the amount of $52,552.696.77. R. 56.1 Stmt. ¶¶ 69-71.

- The following table summarizes the Plans' collective investment losses had they redeemed out of the Bond Funds on certain of the relevant dates described above, utilizing the methodology employed by PRIAC's purported damages expert Daniel R. Fischel.  R. 56.1 Stmt. ¶¶ 72-75.  The investment losses would have been less than $48 million had they redeemed by August 16, 2007:

| Date | Event | PRIAC Losses Under Fischel Methodology |
|---|---|---|
| 7/18/2007 | State Street conducts a conference call with PRIAC and CIGNA regarding IBF's leverage and subprime exposure.  R. 56.1 Stmt. ¶¶ 40-44. | ($11,139,229) |
| 7/26/2007 | State Street sends IBF investment characteristics to PRIAC for June, 2007.  R. 56.1 Stmt. ¶ 25. | ($12,448,643) |
| 7/31/2007 | CIGNA informs PRIAC that it wishes to begin the process of exiting IBF.  R. 56.1 Stmt. ¶ 50. | ($24,053,222) |
| 8/2/2007 | State Street sends status update to PRIAC describing State Street Bond Funds' underperformance as a result of subprime exposure. R. 56.1 Stmt. ¶ 50-56. | ($25,727505) |
| 8/9/2007 | State Street provides IBF Commentary for 2Q07 to PRIAC.  R. 56.1 Stmt. ¶ 57. | ($36,579,963) |
| 8/15/2007 | State Street sends portfolio characteristics to PRIAC as of June 30 and July 31.  R. 56.1 Stmt. ¶ 57. | ($47,815,752) |
| 8/16/2007 | State Street sends IBF performance attribution to PRIAC as of the end of July.  R. 56.1 Stmt. ¶ 57. | ($46,804,387) |

## ARGUMENT

Because plaintiffs bear the burden to prove all the elements of their claims, a defendant is entitled to summary judgment where it demonstrates "that there is an absence of evidence to support [plaintiffs'] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Plaintiffs then "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original; citation and internal quotation marks omitted).  Plaintiffs must make a "showing

sufficient to establish the existence of [every] element essential to [their] case, and on which [they] will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

PRIAC has alleged a single cause of action against State Street for violation of its duties as an investment manager under ERISA. Summary judgment should be granted in favor of State Street in light of PRIAC's responsibility for investment losses the Plans incurred due to PRIAC's failure to pass along the material information in its possession by July 18, 2007 or at any time through August 16, 2007 regarding the Bond Funds' exposure to developing subprime market turmoil. Other State Street investors who received the same information directly from State Street redeemed their investments, and thus avoided the continued detrimental effects of the subprime meltdown. R. 56.1 Stmt. ¶ 68. The over $48 million PRIAC received through the Fair Fund easily exceeds the investment losses the Plans experienced by July 18, 2007. In fact, even if the Plans had redeemed within two weeks after PRIAC's receipt of the August 2, 2007 status report regarding subprime-related underperformance in the funds, the Plans' losses would have been below the $48 million already paid. As a matter of law, PRIAC breached its fiduciary duties to the Plans, and any responsibility for the Plans' losses after July 18, and certainly by August 16, 2007, falls to PRIAC. Thus, PRIAC cannot establish that State Street was the cause of any losses after these dates, and summary judgment is appropriate against PRIAC because PRIAC recovered its prior losses.

## I. PRIAC'S FIDUCIARY BREACHES PREVENTED THE PLANS FROM MITIGATING THEIR DAMAGES, AND STATE STREET CANNOT HAVE CAUSED THE PLANS' LATER LOSSES

State Street in no way concedes the validity of any of PRIAC's allegations of imprudent management of the Bond Funds. State Street will vigorously dispute these assertions if there is a trial. A trial on these issues is unnecessary, however, because PRIAC cannot legally recover any damages in addition to the more than $48 million it has already recovered. This sum easily

exceeds the investment losses that the Plans incurred through July 18, 2007, by which time PRIAC had indisputably been fully informed by State Street of the Bond Funds' subprime mortgage exposure, leverage, and the negative impact that exposure was having on the Bond Funds' performance in the growing subprime market liquidity crisis.  PRIAC was aware of the importance of this information, as reflected in the fact that the client to whom the information *was* passed along, CIGNA, promptly indicated its desire to redeem.  But PRIAC failed, in breach of its fiduciary duties under ERISA, to provide the material information received from State Street to its client Plans until late August, 2007.  The more than $48 million already received by PRIAC exceeds the Plans' losses in the Bond Funds not only through July 18, 2007, but in fact through August 16, 2007, a full two weeks after PRIAC received the August 2 status report regarding subprime-related underperformance.  R. 56.1 Stmt. ¶ 56.

PRIAC's claim against State Street should be dismissed on two independent legal bases. First, State Street made important disclosures both to PRIAC and the one PRIAC client to whom State Street was given access, CIGNA, in June, July, and August 2007.  But PRIAC did not pass that information on to the other Plans until late August, preventing the Plans from mitigating additional losses.  Second, PRIAC's business decision to keep its clients in the dark about the Bond Funds constitutes an intervening cause that breaks the causal connection between State Street's investment decisions and the Plans' losses.  Because those additional losses exceed the unpaid portion of PRIAC's alleged damages, PRIAC cannot show it is entitled to anything further.

### A. PRIAC's Failure To Provide Information Regarding the Bond Funds, In Breach of Its Fiduciary Duties, Prevented The Plans From Mitigating Their Damages

PRIAC's own fiduciary breaches, including its failure to pass on material information to the Plans regarding the Bond Funds, prevented the Plans and their sponsors from meeting their

legal obligation to mitigate their losses. *See Preston v. Am. Fed. of Television and Radio Artists Health Fund*, No. 90 Civ. 7094, 2002 WL 1009458 at *3 (S.D.N.Y. May 16, 2002) (holding that under Second Circuit law, ERISA claims are "equitable in nature" and therefore "are subject to equitable defenses"); *Glennie v. Abitibi-Price Corp.*, 912 F. Supp. 993, 1004 (W.D. Mich. 1996) ("When a fiduciary does receive negative information regarding a particular investment in an ERISA plan, it is that fiduciary's duty to act prudently to protect, to the extent possible, the plan from loss."); *Scardelletti v. Bobo*, No. Civ. No. JFM-95-CV-5, 1997 WL 33446689, at *11 (D. Md. Sept. 8, 1997) (holding that current trustees of a union retirement plan could not hold former trustees liable under ERISA for damages incurred after "the time that plaintiffs by reasonable investigation could have determined" that the former trustees' actions were imprudent and taken steps to reverse them). PRIAC cannot recover for the remaining losses of the Plans, when PRIAC's own fiduciary breaches prevented the Plans from taking steps to avoid those losses.[8]

Analogous securities law cases recognize the same mitigation principles. "A party cannot recover the part of their loss caused by their own failure to take reasonable steps to avoid further harm once they had reason to know of the wrongdoing." *Van Syckle v. C.L. King & Assocs., Inc.*, 822 F. Supp. 98, 102 (N.D.N.Y. 1993). "A plaintiff is thus obligated to mitigate his damages as soon as 'the nature of the danger of holding [the] securities . . . [becomes] apparent,'" and may not recover "that part of their loss caused by their own failure, once they had reason to know of the wrongdoing, to take reasonable steps to avoid further harm." *In re*

---

[8] The same facts that give rise to State Street's mitigation defense also support State Street's counterclaim for contribution against PRIAC. *See Chemung Canal Trust Co. v. Sovran Bank*, 939 F.2d 12, 15 (2d Cir. 1991) (holding that a fiduciary may seek contribution from a co-fiduciary); *see also Ulico Cas. Co. v. Clover Capital Mgmt., Inc.*, 146 F. Supp. 2d 163, 168 (N.D.N.Y. 2001) (holding that contribution may be available if a co-fiduciary's breach of its own fiduciary duties "increas[ed] the amount of harm" caused by the defendant-fiduciary's initial breach). Under either legal theory, the result is the same: PRIAC breached its fiduciary duties to the Plans, causing them to incur additional losses as the market continued to deteriorate.

*Fortune Systems Sec. Litig.*, 680 F. Supp. 1360, 1370 (N.D. Cal. 1987) (granting partial summary judgment with respect to plaintiffs' failure to mitigate) (quoting *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 620 (9th Cir. 1981)).

So, for example, in *Drummond v. Morgan Stanley & Co.*, No. 95 Civ. 2011 DC, 1996 WL 631723, at *2-3 (S.D.N.Y. Oct. 31, 1996), the plaintiff, a "sophisticated investor," held bonds that were declining in value at the time the defendant rescinded a transaction involving the bonds. *Id.* At summary judgment, Judge Chin noted that the plaintiff could have mitigated his damages by accepting a third party's bid for the bonds, made only "one to three days after the cancellation," but instead waited six months while the bonds' value continued to decline. *Id.* Because "a reasonable fact finder could only conclude that plaintiff failed to make reasonable efforts to mitigate damages," the court ordered on summary judgment that the damages recoverable by plaintiff be limited by his failure to mitigate. *Id.*

PRIAC has acknowledged that it was a fiduciary as defined by ERISA. R. 56.1 Stmt. ¶ 8. As an intermediary between State Street and the Plans, and thus the Plans' source of information regarding the Bond Funds, PRIAC pledged to: (i) "monitor the performance, risk, and style of [the Bond Funds]"; (ii) "provide comprehensive quarterly due diligence reports to assist plan sponsors in making informed decisions regarding these funds with their plans"; (iii) provide "interim reports on important developments"; and (iv) to "deselect an Alliance Fund" under "extreme circumstances." R. 56.1 Stmt. ¶ 11. Indeed, were it otherwise, the Plans and their participants would have had no ability to get any information about their investments, since the asset managers like State Street did not know who they were.

Thus, PRIAC assumed duties to the Plans over and above a basic obligation to monitor the Bond Funds' investments and provide quarterly reports. Rather, PRIAC opted into *affirmative* analysis and disclosure obligations, and so had the utmost duties of loyalty and

diligence in keeping the Plans informed regarding the Bond Funds' exposure to developing subprime market turmoil in the summer of 2007. *See Eddy v. Colonial Life Ins. Co. of Am.,* 919 F.2d 747, 750 (D.C. Cir. 1990) (holding that "[t]he duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA"); *Glaziers & Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec., Inc.*, 93 F.3d 1171, 1182 (3d Cir. 1996) (ruling that a fiduciary has a duty to disclose "material facts, known to the fiduciary but unknown to the beneficiary, which the beneficiary must know for its own protection"); *see also Whitfield v. Cohen*, 682 F. Supp. 188, 196 (S.D.N.Y. 1988) (holding that defendant had a duty to withdraw a plan's investment from third-party manager's fund if fund was no longer proper for the plan).

PRIAC breached these duties by failing to pass along material information regarding the Bond Funds' exposure to market turmoil for weeks while the Bond Funds deteriorated and the Plans' losses mounted. As the Plans' source of information regarding the Bond Funds, PRIAC effectively blocked the steps that the plan sponsors should have taken to avoid additional losses. A defendant is not liable for those damages which the plaintiff could have reasonably avoided under the circumstances. *See M. Golodetz Export Corp. v. S/S Lake Anja*, 751 F.2d 1103, 1112 (2d Cir. 1985) ("The venerable rule that requires a plaintiff to mitigate his damages has been explained by the principle that 'damages which the plaintiff might have avoided with reasonable effort . . . are . . . not caused by the defendant's wrong . . . and therefore, are not to be charged against him.'") (quoting 2 Williston on Contracts § 1353 at 274 (1962)).[9]

---

[9] The recent decision of the District of New Jersey in *Trustees of the Local 464A United Food and Commercial Workers Union Pension Fund v. Wachovia Bank, N.A.*, Civ. No. 09-668, 2009 WL 4138516 (D.N.J. Nov. 24, 2009) is inapposite. There, the court granted the motion of the plaintiffs, ERISA plan trustees, to strike an investment manager's affirmative defense that "Plaintiffs' claims are barred, in whole or in part, by breaches of fiduciary duties by some or all of the Plaintiffs." *Id.* At *3-4. The defendant's theory of fiduciary breach by plaintiffs was "that the investments in the complaint were executed at Plaintiffs' direction." *Id.* That case did not

**1.    PRIAC failed to alert the Plans to the Bond Funds' exposure to subprime-backed ABS despite the developing subprime crisis**

Despite PRIAC's fiduciary duty "to act prudently to protect, to the extent possible, the plan[s] from loss," PRIAC failed repeatedly to alert the Plans to the very subprime exposures that caused the Bond Funds' losses in July and August 2007. *Glennie*, 912 F. Supp. at 1004.

State Street sent PRIAC, among other things, commentaries and status reports that disclosed the Bond Funds' active management and subprime-driven underperformance. The commentaries provided on April 11 and July 6, 2007 disclosed the negative impact of the subprime market on both Bond Funds. R. 56.1 Stmt. ¶¶ 27, 30, 33, 35, 55-57. Monthly reports showed the Bond Funds' increasing concentrations in ABS. R. 56.1 Stmt. ¶ 26. State Street provided detailed holdings in mid-July 2007. R. 56.1 Stmt. ¶ 37. The August 2, 2007 status report discussed the impact of the subprime market on State Street's active bond funds. R. 56.1 Stmt. ¶¶ 55-57.

Yet PRIAC failed to pass this information along to its clients who, with the exception of CIGNA, were left completely in the dark. R. 56.1 Stmt. ¶¶ 34, 35, 38, 55, 57. PRIAC thus breached its fiduciary duties to "assist plan sponsors in making informed decisions" and provide "interim reports on important developments," by blocking the flow of material information to the Plans regarding the Bond Funds' status at the height of the mid-2007 subprime crisis. R. 56.1 Stmt. ¶¶ 10-11.

---

involve a third-party intermediary like PRIAC, which served as the sole conduit of information to the Plans regarding their investments, effectively blocking the flow of information that would have allowed the Plans to mitigate its losses.

>   **2.      PRIAC failed to disclose to the Plans that the Bond Funds' subprime exposure was leveraged, despite State Street's disclosures to PRIAC that the Bond Funds employed significant amounts of leverage**

PRIAC further breached its duty to "assist plan sponsors in making informed decisions" and precluded mitigation opportunities by failing to pass on material information to the Plans regarding the Bond Funds' use of leverage to gain additional exposure to ABS.  R. 56.1 Stmt. ¶ 10.  Leading up to the meeting by conference call among State Street, PRIAC, and CIGNA on July 18, 2007, State Street made PRIAC aware that IBF employed material amounts of leverage as part of its investment strategy.  R. 56.1 Stmt. ¶¶ 28, 37, 42.  The list of holdings provided by State Street to PRIAC indicated that, as Mr. Molinaro testified he knew, IBF's ABS exposure was leveraged at a ratio of roughly 4 to 1.  R. 56.1 Stmt. ¶ 37. On the subsequent call between CIGNA, State Street and PRIAC, State Street discussed IBF's use of leverage, concentration in asset backed securities, and active management style.  R. 56.1 Stmt. ¶¶ 39-44.  According to the testimony of Mr. Molinaro, a senior PRIAC representative who participated in the July 18 phone call, PRIAC (and CIGNA) were informed about IBF's leverage and subprime exposure:

>   **Q.** So you recall that Tracy LaBonte [of CIGNA] talked about a concern about leverage in the Intermediate Bond Fund in this phone call, correct?
>
>   **A.** I do.
>
>   **Q.** And Mr. Wands from State Street explained to her that the Intermediate Bond Fund was leveraged and how it was leveraged in this phone call, correct?
>
>   **A.** Correct.
>   ...
>   **Q.** You would agree that CIGNA understood that the Intermediate Bond Fund as of the conclusion of this call was invested in sub-prime, had significant sub-prime exposure, correct?
>
>   **A.** Correct.
>
>   **Q.** You would agree that they understood that the Intermediate Bond Fund was leveraged in a material amount?

>    **A.** It was leveraged in the 4 to 1 ratio . . . .
>    . . .
>    **Q.** In fact, your understanding at the conclusion of this phone call on July
>    18, 2007 was that CIGNA was completely aware of the Intermediate Bond
>    Fund, its holdings, how it ran, how it operated, that it was invested
>    materially in sub-prime and that it had a significant leveraged position?
>
>    **A.** Yes.

R. 56.1 Stmt. ¶¶ 41-42.  (objections to form omitted).  PRIAC's claim that State Street told

PRIAC "for the first time [on August 22] that the State Street Fund was leveraged and had broad

exposures to sectors outside of its stated benchmark strategy," is simply not so and, if anything,

underscores PRIAC's recognition of the materiality of that information.  R. 56.1 Stmt. ¶ 44.

> **3.**    **PRIAC exacerbated its failure to inform the Plans regarding the Bond
>            Funds' subprime exposure by waiting until August 21, 2007 to correct
>            the Plans' misimpression that IBF was a "passive index" fund**

On July 12, 2007, State Street definitively informed PRIAC that the use of "passive" and

"index" in the name of IBF in communications to PRIAC's clients was incorrect – a fact that

PRIAC actually knew all along.  R. 56.1 Stmt. ¶¶ 20, 46.  On July 18, State Street reiterated this

correction, with CIGNA and PRIAC on a conference call.  R. 56.1 Stmt. ¶ 42.  PRIAC waited

until August 2 before correcting the fund name on its client-facing website.  R. 56.1 Stmt. ¶ 52.

However, PRIAC took no affirmative action to notify the Plans of the error, or to correct any

false impressions about the investment style of IBF until late August 2007.  R. 56.1 Stmt. ¶ 54.

PRIAC recognized the importance of making the name change, saying that "[t]he reason

we are effecting the name change so rapidly is that the word 'Passive' in the name implies 'index

fund'."  R. 56.1 Stmt. ¶ 52.  Yet, apart from the change on PRIAC's website, no Plan (except

CIGNA) was affirmatively advised of the incorrect name until late August.

Of course, the Plans were surprised to discover in late August that IBF was not a passive

index fund.  CIGNA, the first Plan to learn of the correct name, noted that: "On the most basic

level, the use of the terms "passive" and "index" in the Fund's name misled investors . . . into

believing that the Fund's approach would be to generally mirror the practices of its benchmark bond index fund." R. 56.1 Stmt. ¶ 21. Similarly, PRIAC client Gannett Fleming's investment consultant stated in an August 23 email:

> We have extensive communications from [PRIAC] in which the fund Gannett's DB Plan is invested is characterized as an index fund. We now receive information – several days after Pru apparently received it from the manager[10] – indicating that the fund is actually an "enhanced index" or alternatively "active" fund which now has a very heavy concentration in sub-prime mortgage backed securities. R. 56.1 Stmt. ¶ 22.

Fundamentally, the fact that IBF was not a passive index fund triggered PRIAC's duty to issue an "interim report[] on important developments," as PRIAC's own expert, Dennis Logue, conceded. R. 56.1 Stmt. ¶ 11. PRIAC's failure to notify the Plans of IBF's correct name in a timely fashion, and to correct the Plans' misimpression that IBF was a passive index fund, exacerbated PRIAC's breach of its fiduciary duties in not disclosing other material information, such as the Bond Funds' use of leverage and concentration in ABS backed by subprime mortgages.

### B.    PRIAC Cannot Recover Damages That Were Proximately Caused By Its Own Decision to Withhold Material Information Regarding The Bond Funds During 2007

A fiduciary plaintiff may not recover for losses that it cannot show were caused by the defendant's conduct, due to a superseding proximate cause. *See LNC Invs., Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 465 (2d Cir. 1999) (confirming that in an ERISA case "plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability") (quoting *Am. Fed. Group, Ltd. v. Rothenberg*, 136 F.3d 897, 907 n. 7 (2d Cir. 1998)); *Nordwind v. Rowland*, 584 F.3d 420, 433 (2d Cir. 2009) (same); *Sheehy v. New Century Mortg. Corp.*, No. 08-CV-377, 2010 WL 625331, at *10 n.12 (E.D.N.Y. Feb. 19, 2010) (stating

---

[10] Actually, PRIAC was fully aware of this information by no later than mid-July 2007, as set forth above.

that in seeking compensatory damages, "the plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability") (quoting *Nordwind*, 584 F.3d at 433.). It is hornbook law that a superseding cause of a plaintiff's damages relieves the defendant of liability for subsequent losses.[11]

Not a single PRIAC expert has refuted Dr. Carron's opinion that PRIAC's actions caused over 50% of the Bond Funds' losses based on State Street's disclosures that were not passed along. R. 56.1 Stmt. ¶ 16. The actions of State Street's other clients, who received disclosures similar to those State Street provided to PRIAC and then promptly redeemed, establish both the materiality of those disclosures and the fact that PRIAC's breaches caused the Plans' additional damages. For example, thirty-six clients who received subprime-related disclosures from State Street chose to liquidate a total of $487.2 million from State Street's subprime-affected funds during the period July 26, 2007 to August 16, 2007, over a seven-fold increase in client redemption activity.[12] R. 56.1 Stmt. ¶ 68. PRIAC cannot rebut this compelling evidence of the materiality of this information that PRIAC failed to pass along. Even using the methodology proposed by PRIAC's proposed expert, Mr. Fischel, the Plans experienced only $11.1 million of

---

[11] As set forth in the Restatement (Second) of Torts:

> A superseding cause relieves the actor from liability, irrespective of whether his antecedent negligence was or was not a substantial factor in bringing about the harm. Therefore, if in looking back from the harm and tracing the sequence of events by which it was produced, it is found that a superseding cause has operated, there is no need of determining whether the actor's antecedent conduct was or was not a substantial factor in bringing about the harm.

Restatement (Second) of Torts § 440 (1965).

[12] Exhibit 24 to the Expert Report of Andrew Carron illustrates just how much in losses was avoided by State Street clients who received similar information and then liquidated their investments in late July and early August 2007. R. 56.1 Stmt. at 16. (These figures exclude any clients of State Street's investment advising services (GAA, CAM and OFA) who were advised to redeem.)

their $79.49 million in alleged losses as of July 18, 2007.[13]  Exhibit A to Declaration of Andrew

Carron, dated June 2, 2010, ("Carron Decl.").

On August 2, 2007 PRIAC received a further communication from State Street about the

impact of the subprime market on the Bond Funds.  R. 56.1 Stmt. ¶ 56.  PRIAC withheld this

communication from its clients, again preventing them from making an informed decision

whether to maintain or terminate their investments in the Bond Funds, precluding the Plans from

taking action to avoid further losses.  Using Mr. Fischel's methodology, PRIAC suffered $25.7

million in alleged losses as of August 2, 2007.  Carron Decl. Ex. A.

Had the Plans redeemed a week after the August 2 communication, by August 9, 2007,

their cumulative losses would have been $36.5 million[14] – still far less than the $48 million that

PRIAC has already received from the Fair Fund.  The same is true two weeks after the August 2

communication, up through August 16, 2007.  Carron Decl. Ex. A.  Thus PRIAC has already

received 62% of its total claimed losses.  For the reasons set forth above, PRIAC cannot now

show that it is entitled to any additional compensation from State Street, and State Street is

entitled to summary judgment on PRIAC's claim.

## II.    PRIAC'S CLAIMS AGAINST SSGA, INC SHOULD BE DISMISSED BECAUSE SSGA, INC. WAS INCORRECTLY NAMED AS A DEFENDANT

As State Street has explained to PRIAC's counsel from and after the outset of the case –

supported by affidavit – SSgA, Inc. is incorrectly named as a defendant in this action.  SSgA, Inc.

is a separately incorporated holding company that is a wholly-owned subsidiary of SSBT's

parent company, State Street Corporation, but has no connection to the facts of this case.  SSgA,

Inc. performs no investment management services of any kind, is party to no agreement in this

---

[13] Using Dr. Carron's methodology, the Plans had not suffered *any* losses on their investment as of July 18, 2007.

[14] Using Dr. Carron's methodology, the Plans had incurred only $36,579,963 million in losses as of August 9, 2007.

case, and had no involvement in the management of the Bond Funds or any other investment strategy.  Despite notice to the contrary, Plaintiffs continue to confuse SSgA, Inc. with SSgA, the unincorporated investment *division* of SSBT, which did manage the Bond Funds.  R. 56.1 Stmt. ¶¶ 1-4.  No evidence has been adduced in discovery linking SSgA, Inc. to the facts of this case in any fashion.  Accordingly, SSgA, Inc. should be dismissed as a party to the case for all purposes.

<u>**CONCLUSION**</u>

For the reasons set forth herein, in State Street's Rule 56.1 Statement, and in the Palmer Declaration, State Street respectfully requests that the Court grant summary judgment dismissing the Causes of Action against State Street in PRIAC's Complaint.

Dated:  June 2, 2010                          ROPES & GRAY LLP


By: /s/ Harvey J. Wolkoff
Harvey J. Wolkoff
Robert A. Skinner
Daniel J. Maher
One International Place
Boston, MA  02110
Tel: (617) 951-7000
Fax: (617) 951-7050
harvey.wolkoff@ropesgray.com
robert.skinner@ropesgray.com
daniel.maher@ropesgray.com

*Attorneys for Defendant State Street Bank and Trust Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 2, 2010, I caused a true and correct copy of the foregoing document to be served upon the following counsel of record by e-mail.


<u>/s/ Lila A. Palmer</u>

Lila A. Palmer

## SERVICE LIST

Edwin G. Schallert
Jeremy Klatell
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022

Caren S. Sweetland
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, TX 77002

John J. Butts, Esq.
Steven Cherry
Felicia Ellsworth
Kevin Prussia
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109

Lewis R. Clayton
Jonathan Hurwitz
Aliza Balog
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON
1285 Avenue of the Americas
New York, NY  10019-6064

David E. Lurie
Thomas Lent
LURIE & KRUPP, LLP
One McKinley Square
Boston, MA 02109

John R. Nelson
LOCKE LORD BISSELL & LIDDELL LLP
100 Congress, Suite 300
Austin, TX 78701

Robert Burford
BURFORD & MANEY PC
700 Louisiana, Suite 4600
Houston, TX 77002

Thomas J. Dougherty
Peter Simshauser
Michael S. Hines
SKADDEN ARPS SLATE MEAGHER &
FLOM LLP
One Beacon Street
Boston, Massachusetts  02108

Steven L. Severson
Justin Krypel
Debbie Ellingboe
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402

Samuel H. Rudman
David A. Rosenfeld
Evan J. Kaufman
Carolina Torres
Mark Reich
ROBBINS GELLER RUDMAN & DOWD
LLP
58 S. Service Road, Ste. 200
Melville, NY 11747