UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

IN RE STATE STREET BANK AND
TRUST CO. FIXED INCOME FUNDS            MDL No. 1945
INVESTMENT LITIGATION

---

PRUDENTIAL RETIREMENT INSURANCE
AND ANNUITY COMPANY,

      Plaintiffs,

v.                                              No. 07 Civ. 8488 (RJH)

STATE STREET BANK & TRUST
COMPANY and  STATE STREET GLOBAL
ADVISORS, INC.,

      Defendants.

---

**STATE STREET'S MEMORANDUM OF LAW IN OPPOSITION TO PRIAC'S
MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISSING COUNTERCLAIMS
AND IN SUPPORT OF  STATE STREET'S CROSS-MOTION FOR PARTIAL
SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................1

MATERIAL FACTS ............................................................................................3

ARGUMENT .....................................................................................................9

I.    STATE STREET IS ENTITLED TO CONTRIBUTION FROM PRIAC ............................9

      A.    The Second Circuit Recognizes a Right of Contribution. .............................9

      B.    PRIAC Materially and Inaccurately Understates its Role with Regard to the
            Bond Funds, Which Supports A Claim For Contribution. ...........................11

      C.    PRIAC Breached its Duty to Provide Material Information About the Bond
            Funds to its Clients, the Plans........................................................12

            1.    PRIAC Had a Fiduciary Duty to Pass Material Information from State
                  Street to the Plans and to Keep the Plans Informed Regarding their
                  Investments. ...................................................................13

            2.    PRIAC Breached its Fiduciary Duty to Keep the Plans Informed....................16

      D.    State Street was not Substantially More at Fault for the Bond Funds' Losses...........18

II.   STATE STREET IS ENTITLED TO SUMMARY JUDGMENT ON ITS
      CONTRIBUTION COUNTERCLAIM. ...............................................................20

III.  PRIAC'S MOTION FOR SUMMARY JUDGMENT ON STATE STREET'S
      DEFAMATION CLAIM FAILS. ....................................................................22

      A.    PRIAC's Statements Were False and Defamatory. ...................................23

            1.    PRIAC's Statements that State Street Changed its Stated Investment
                  Approach for the Bond Funds And Failed To Inform PRIAC Of Fund
                  Characteristics Were False.....................................................23

            2.    PRIAC's Statements Regarding The Information It Received From
                  State Street Were False. .......................................................24

            3.    PRIAC's Statements to its Clients About the Use of the Terms
                  "Passive" and "Index" in the Name of IBF were False. ..................................25

      B.    PRIAC's Defamatory Statements are not Shielded by the Qualified Privilege
            Doctrine because PRIAC Shared no Common Interest with its Clients in
            Shifting Blame to State Street..........................................................26

            1.    PRIAC's interest in avoiding client lawsuits was a "base ulterior
                  motive" that defeats any applicable qualified privilege...................................27

        2.      PRIAC Knowingly Made the Defamatory Statements and Therefore has Lost any Applicable Qualified Privilege. ...................................28

    C.     PRIAC Cannot Meet Its Burden to Show that the "Actual Malice" Standard Applies by Virtue of State Street's Purported Public Figure Status. .........................30

         1.      State Street is not a General Purpose Public Figure..........................31

         2.      State Street is not a Limited Purpose Public Figure because it was not Involved in a Preexisting Public Controversy....................................35

         3.      PRIAC was Negligent in Making the Defamatory Statements. ........................37

    D.     PRIAC's Statements Consist of Assertions of Fact or are Defamatory Mixes of Fact and Opinion. ...................................................................38

    E.     PRIAC's Statements Were "Of and Concerning" its Relationship with State Street. .......................................................................................39

    F.     Connecticut's "Incremental Harm" Doctrine Is Inapplicable, As Massachusetts Law Governs State Street's Defamation Claim.................................39

    G.     State Street was Damaged by PRIAC's Defamatory Statements. ............................41

IV.   PRIAC'S MOTION FOR SUMMARY JUDGMENT ON STATE STREET'S 93A CLAIM SHOULD BE DENIED BECAUSE THE CONDUCT AT ISSUE OCCURRED PRIMARILY AND SUBSTANTIALLY IN MASSACHUSETTS.............42

CONCLUSION...................................................................................................44

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

107 F.3d 139 (2d Cir. 1997)................................................................................13

*Agway, Inc. Employees' 401(k) Thrift Invest. Plan v. Magnuson,*
    409 F.Supp. 2d 136 (N.D.N.Y. 2005)..................................................................10

*Am. Hardware Mfrs. Ass'n. v. Reed Elsevier, Inc.,*
    No. 03 CV 9421, 2010 WL 55657 (N.D. Ill. Jan. 4, 2010)....................................33

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986).........................................................................................9

*Andreucci v. Foresteire,*
    No. 957183, 1998 WL 1184151 (Mass. Super. Ct. Jan. 6, 1998)...........................41

*Appleby v. Daily Hampshire Gazette*
    478 N.E.2d 721 (Mass. 1985) ...........................................................................38

*Bank of Or. v. Indep. News, Inc.,*
    693 P.2d 35 (Or. 1985) ...............................................................................34, 35

*Bixler v. Cent. Pa. Teamsters Health & Welfare Fund,*
    12 F.3d 1292 (3d Cir. 1993)..............................................................................15

*Blue Ridge Bank v. Veribanc, Inc.,*
    866 F.2d 681 (4th Cir. 1989) ................................................31, 32, 34, 35, 36

*Board of Trustees of CWA/ITU Negotiated Pension Plan v. Weinstein,*
    107 F.3d 139 (2d Cir. 1997)..............................................................................13

*Bose Corp. v. Consumers Union,*
    692 F.2d 189 (1st Cir. 1982)........................................................................28, 34

*Bruno & Stillman, Inc. v. Globe Newspaper Co.,*
    663 F.2d 583 (1st Cir. 1980)..............................................................................32

*Calvin Klein Trademark Trust v. Wachner,*
    129 F. Supp. 2d 248 (S.D.N.Y. 2001)................................................................37

*Celle v. Filipino Reporter Enters. Inc.,*
    209 F.3d 163 (2d Cir. 2000)........................................................................28, 40

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986).................................................................................................9

*Chemung Canal Trust Co. v. Sovran Bank/Maryland,*
    939 F.2d 12 (2nd Cir. 1993).............................................10, 11, 20, 21, 43, 44

*Computer Aid, Inc. v. Hewlett-Packard Co.,*
    56 F. Supp. 2d 526 (E.D. Pa. 1999) ...............................................................32, 33

*Condit v. Dunne,*
    317 F. Supp. 2d 344 (S.D.N.Y 2004)................................................................40

*Cummins v. Suntrust Capital Markets, Inc.,*
    649 F. Supp. 2d 224 (S.D.N.Y. 2009)...........................................................36, 37

*Dexter's Hearthside Restaurant, Inc. v. Whitehall Co.,*
    508 N.E.2d 113 (Mass. App. Ct. 1987) ...............................................................27

*Diversified Mgmt., Inc. v. Denver Post, Inc.,*
    653 P.2d 1103 (Colo. 1982)...................................................................................34

*Dragonas v. School Committee of Melrose,*
    833 N.E.2d 679 (Mass. App. Ct. 2005) ...............................................................27

*Encompass Ins. Co. v. Giampa,*
    522 F. Supp. 2d 300 (D. Mass 2007) ...................................................................42

*Eyal v. Helen Broadcasting Corp.,*
    583 N.E.2d 228 ........................................................................................................39

*Foretich v. Capital Cities/ABC, Inc.,*
    37 F.3d 1541 (4th Cir. 1994) .................................................................................30

*Free v. Briody,*
    732 F.2d 1331 (7th Cir. 1984) ...............................................................................19

*Gearren v. McGraw-Hill Cos.,*
    690 F. Supp. 2d 254 ...............................................................................................14

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974)..........................................................................................31, 32

*Great-West Life & Annuity Co. v. Kudson,*
    534 U.S. 204 (2002)..........................................................................................10, 11

*Haddock v. Nationwide Fin. Servs. Inc.,*
    570 F.Supp.2d 355 (S.D.N.Y. 2008).............................................................10, 11

*Harris Trust & Savings Bank v. John Hancock Mutual Life Insurance Co.,*
    122 F. Supp. 2d at 459-460, 464 ...........................................................................12

*Harris Trust and Sav. Bank v. John Hancock Mutual Life Ins. Co*.,
    302 F.3d 18, 29 (2d Cir. 2002).....................................................................................14

*Herbert v. Lando*,
    441 U.S. 153 (1979)......................................................................................................28

*Hotchner v. Castillo-Puche*,
    404 F. Supp. 1041 (S.D.N.Y. 1975) .............................................................................28

*Hutchinson v. Proxmire*,
    443 U.S. 111 (1979)..........................................................................................28, 34, 35

*In re Citigroup ERISA Litig.*,
    No. 07 Civ. 9790 (SHS), 2009 U.S. Dist. LEXIS 78055 (S.D.N.Y. Aug. 31, 2009) .............14

*In re Morgan Stanley ERISA Litigation*,
    No. 07 Civ. 11285(Rws), -- F. Supp. 2d -- , 2009 WL 5947139 (S.D.N.Y. Dec. 9,
    2009) ..............................................................................................................15, 16, 17

*In re WorldCom,*
    263 F. Supp. at 765 .......................................................................................................16

*In re WorldCom, Inc. ERISA Litig*.,
    263 F. Supp 2d 745 (S.D.N.Y. 2003)............................................................................15

*In re Worldcom Inc. ERISA Litig.*,
    339 F.Supp.2d 561 (S.D.N.Y. 2004)........................................................................10, 16

*Israel Travel Advisory Serv. v. Israel Identity Tours*,
    61 F.3d 1250 (7th. Cir. 1995) ......................................................................................41

*Korpacz v. Women's Professional Football League*,
    No. Civ.A 014-10735-RWZ, 2006 WL 220762 (D. Mass. Jan. 27, 2006)......................42, 43

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp*,
    781 N.E.2d 787,798 (Mass. 2003) ...............................................................................42

*Lee v. Bankers Trust Co.*,
    166 F.3d 540 (2d Cir. 1999)....................................................................................39, 40

*Lee v. Manufacturers & Traders Trust Co.*,
    219 F.R.D. 265 (W.D.N.Y. 2004).................................................................................44

*Lerman v. Flynt Distrib. Co., Inc.*,
    745 F.2d 123 (2d Cir. 1984)..............................................................................31, 35, 36

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)........................................................................................................9

*Mertens v. Hewitt Associates*,
　508 U.S. 248 (1993) ..................................................................................10, 11

*Miller v. Tope*,
　C.A. NO. 02-11151-DPW, 2003 U.S. Dist. LEXIS 21211 (D. Mass. Nov. 3, 2003) ........28, 29

*Noonan v. Staples Inc.*,
　No. 09-11605-WGY, 2010 WL 1416466 (D. Mass April 5, 2010) ........................................40

*North Shore Pharmacy Services, Inc. v. Breslin Assocs. Consulting, LLC*,
　491 F.Supp.2d 111 (D. Mass. 2007) ..................................................................38, 41

*Ravnikar v. Bogojavlensky*,
　782 N.E.2d 508 (Mass. 2003) ..........................................................................22, 41

*Rebozo v. Washington Post Co.*,
　637 F.2d 375 (5th Cir. 1981) ...............................................................................31

*Reeves v. American Broad Co.*,
　719 F.2d 602 (2d Cir. 1983) .................................................................................40

*Reliance Ins. Co. v. Barron's*,
　442 F. Supp. 1341 (S.D.N.Y. 1977) ..............................................................30, 33, 36

*Rubin v. Valicenti Advisory Services, Inc.*,
　326 F. Supp. 2d 427 (W.D.N.Y. 2004) .....................................................................44

*Scalp & Blade, Inc. v. Advest, Inc.*,
　300 A.D.2d 1068 (N.Y. App. Div. 2002) ..................................................................19

*Sharratt v. Housing Innovations, Inc.*,
　365 Mass. 141 ....................................................................................................41

*St. Amant v. Thompson*,
　390 U.S. 727 (1968) ...........................................................................................28

*Stanton v. Metro Corp.*,
　438 F.3d 119 (1st Cir. 2006) ................................................................................39

*Stone v. Essex County Newspapers, Inc.*
　330 N.E.2d 161 (Mass. 1975) ..........................................................................28, 37

*Sunderlin v. First Reliance Standard Life Ins. Co.*,
　235 F. Supp 2d 222 (W.D.N.Y. 2002) .............................................12, 21, 33, 34, 35, 36

*Tavoulareas v. Piro*,
　817 F.2d 762 (D.C. Cir. 1987) ..............................................................................32

*Time, Inc. v. Firestone*,
　424 U.S. 448 (1976) ...........................................................................................36

*Travelers Casualty & Surety Co. of America v. IADA Services, Inc,*
    497 F.3d 862 (8th Cir. 2007) ...................................................11

*Trs. of the Auto. Mech. Local No. 701 Pension and Welfare Fund v. Union Bank of Cal.,*
    630 F. Supp. 2d 951 (N.D. Ill. 2009) ...................................................10

*Ulico Cas. Co. v. Clover Capital Mgmt., Inc.,*
    146 F. Supp. 2d 163 (N.D.N.Y. 2001) ...................................................21

*Waldbaum v. Fairchild Publ'ns, Inc.,*
    627 F.2d 1287 (D.C. Cir. 1980) ...................................................32, 36

## STATUTES

Massachusetts General Laws Chapter 93A ...................................................9, 42, 43

## OTHER AUTHORITIES

Restatement (Second) of the Conflict of Laws (1971), § 150(3) ...................................................40

Restatement (Second) of Torts § 566 ...................................................38

Robert D. Sack, *Sack on Defamation* § 1.5, at 1-34 (3d ed. 2009) ...................................................30

*Sack on Defamation*, § 10.5.1, 10-37 ...................................................41

Defendants State Street Bank and Trust Company ("SSBT") and State Street Global Advisors, Inc. ("SSgA, Inc.") (collectively, "State Street") respectfully submit this memorandum in opposition to the Motion for Partial Summary Judgment filed by Plaintiff/Counterclaim Defendant Prudential Retirement Insurance and Annuity Company ("PRIAC") and in support of State Street's Cross-Motion for Partial Summary Judgment being filed concurrently, pursuant to Fed. R. Civ. P. 56 and Local Civil Rule 56.1.[1]

## **PRELIMINARY STATEMENT**

PRIAC requests dismissal of State Street's counterclaims for contribution, defamation, and violations of the Massachusetts consumer protection statute. PRIAC's motion is meritless as to all three of State Street's counterclaims. Moreover, admissions in PRIAC's motion papers, together with the undisputed record evidence, warrant summary judgment in favor of State Street on its contribution counterclaim.

In its motion, PRIAC attempts to downplay its primary responsibility for losses suffered by PRIAC's retirement plan clients (the "Plans") who invested in State Street's Intermediate Bond Fund ("IBF") and the Government Credit Bond Fund ("GCBF") (collectively, the "Bond Funds"). But PRIAC's role as intermediary between State Street and the Plans was much more than the passive monitoring role PRIAC suggests, as reflected in the fact that the fee for its services was roughly three times State Street's fee for actively managing the Funds. Among other things, PRIAC undertook as part of its fiduciary duties to analyze the Bond Funds regularly

---

[1] Pursuant to Local Civil Rule 56.1, State Street submits herewith a statement of undisputed material facts in support of its Cross-Motion for Summary Judgment. Copies of documents referred to in the R. 56.1 Statement or herein are found in a separately submitted volume of exhibits to the accompanying declaration of Daniel J. Maher, dated July 2, 2010 ("Maher Declaration"). State Street separately submits herewith a response to the statement of material undisputed facts relied upon by PRIAC in its Motion for Summary Judgment.

and report to the Plans on significant developments.  In this role, PRIAC was the Plans' *only* source of information regarding the Bond Funds.  Leading up to the so-called "subprime crisis" of 2007, PRIAC withheld from its clients important information that State Street provided regarding the Plans' exposure to bonds collateralized by subprime mortgages.  Consequently, the Plans were unable to make informed decisions regarding their investments, and suffered far greater losses than would otherwise have been the case.  After its clients loudly complained, PRIAC avoided suit by reimbursing client losses through non-repayable "loans," falsely accusing State Street of not providing sufficient, timely information, and then bringing this action.

PRIAC's arguments that State Street's contribution counterclaim is barred as a matter of law all fall short.  Contrary to PRIAC's assertion that the viability of ERISA contribution claims is "doubtful," Second Circuit precedent establishes that a right to contribution exists in ERISA cases in this jurisdiction.  Moreover, PRIAC's assertions that it complied with its fiduciary duties and that State Street is substantially more at fault are at odds with: (i) State Street's evidence that PRIAC had the duty, *inter alia*, to analyze and pass material information on a timely basis from State Street to the Plans, but withheld that material information from all Plans but CIGNA, particularly in June, July, and August 2007; and (ii) PRIAC's admission in its summary judgment papers that based on that information, CIGNA decided on July 30, 2007 to start the process of redeeming its investment in IBF.  Indeed, CIGNA's actions establish indisputably the materiality of the information PRIAC withheld, entitling State Street to judgment in its favor on contribution.

PRIAC's arguments regarding State Street's defamation claim misconstrue the law and ignore the record evidence of PRIAC's inappropriate motivations for making the defamatory statements.  PRIAC made the statements in order to pass blame for its own failings on to State

Street and deflect the anger of its clients – thereby avoiding potential liability of its own – not in furtherance of any shared business interest with those clients.  Nor can PRIAC satisfy its burden of showing that the "actual malice" standard applies here, based on State Street's supposed status as a "public figure" under First Amendment jurisprudence.  The acts on which PRIAC premises State Street's purported "public figure" status are nothing more than regular business and marketing practices.  At any rate, State Street has submitted ample evidence that PRIAC made the statements at issue with malice, that the statements were defamatory, and that they damaged State Street's business and reputation.  At the very least, this evidence raises disputed issues of material fact requiring a trial on the defamation claim.

Finally, PRIAC's arguments against State Street's claim under the Massachusetts consumer protection statute also fail for the reasons stated above, and because the "center of gravity" of State Street's claim is Massachusetts.

## MATERIAL FACTS

PRIAC's motion mischaracterizes the material facts supporting State Street's counterclaims.  What follows are the key material facts that warrant denial of PRIAC's motion for partial summary judgment ("Pl's Br."), and upon which State Street's cross-motion for summary judgment should be granted.  State Street submits herewith a separate statement of undisputed material facts in support of its cross-motion, as required by Local Rule 56.1 (" Cross Mot. R. 56.1 Stmt."), with supporting documentation.  State Street also submits a separate response to the statement of material facts relied upon by PRIAC in its Motion for Partial Summary Judgment ("Opp. R. 56.1 Stmt.").

In its motion for partial summary judgment, PRIAC severely understates its role with regard to the Bond Funds.  PRIAC contends that it undertook to do nothing more than provide its clients with limited "monitoring services" and oversight of State Street, supplemental to that

3

provided by the trustees of its retirement plan clients.  In truth, PRIAC, with State Street, undertook to provide the Plans with a full package of investment services, including robust analysis and reporting on the Bond Funds.  These promised services are itemized in the "program documents" that, according to PRIAC's own expert witness, spelled out the scope of PRIAC's fiduciary duties.  Opp. R. 56.1 Stmt. at ¶¶ 31, 35.  PRIAC's responsibilities are reflected in the fact that it charged the Plans a standard 35 basis point fee for its services, as compared with State Street's fee of only 6 to 10 basis points for actively managing the Bond Funds.  Opp. R. 56.1 Stmt. at ¶ 22.  PRIAC fails to mention that, as a matter of policy, it did not tell State Street who the PRIAC clients were that invested in the Bond Funds and State Street was not given access to PRIAC clients.  Opp. R. 56.1 Stmt. ¶¶ 12, 31, 35.  PRIAC was thus the sole possible conduit of information from State Street to the Plans.

PRIAC asserts that, prior to 2007, State Street did not disclose the Bond Funds' active management strategies, but instead represented the Bond Funds as low-risk "enhanced index" funds.  But PRIAC fails to point out State Street's regular disclosures to PRIAC show that the Bond Funds were actively managed, that the Bond Funds sought substantial returns above those of their benchmarks, and that the Bond Funds were increasingly (and heavily) concentrated in asset-backed securities ("ABS").  Opp. R. 56.1 Stmt. ¶¶ 71, 108.  State Street also disclosed that the Bond Funds utilized leverage to capture additional investment returns.  Opp. R. 56.1 Stmt. ¶ 71.  Furthermore, State Street disclosed to PRIAC that it had increased the return targets for both Bond Funds based on market conditions.  Opp. R. 56.1 Stmt. ¶ 21.

Not surprisingly, PRIAC downplays the significance of information that State Street provided to PRIAC in the weeks preceding the mid-2007 subprime crisis.  In the summer of 2007, the subprime mortgage market experienced an unprecedented liquidity crisis that caused

sharp drops in ABS prices, and the Bond Funds' performance followed suit.  Opp. R. 56.1 Stmt. ¶ 98.  As a result, State Street timely provided clients – including PRIAC – with additional material information to assist them in making informed decisions regarding their investments. Opp. R. 56.1 Stmt. ¶¶ 71, 132, 144, 164, 198.

In particular, State Street sent PRIAC characteristics, commentaries, status reports, and underlying security holdings that disclosed and commented upon the Bond Funds' active management and subprime-driven underperformance.  PRIAC fails to mention that State Street sent PRIAC commentary as early as April 11, 2007, attributing the material underperformance of the Bond Funds in the first part of 2007 to ABS subprime mortgage exposure and describing both Bond Funds as "active."  Opp. R. 56.1 Stmt. at ¶ 132.  State Street provided additional commentary on July 6, 2007, disclosing that extreme volatility and illiquidity in the subprime market continued to affect the Bond Funds, but that State Street nonetheless intended to continue to maintain its ABS exposure.  Opp. R. 56.1 Stmt. ¶ 164.  PRIAC's assertion that the commentary did not mention the Bond Funds by name is a makeweight; the commentary applied, on its face, to the Bond Funds.  *Id.*  Indeed, that is why State Street sent the commentary to PRIAC.  On July 12, 2007, State Street confirmed to PRIAC that its use of "passive" and "index" in the name of IBF in communications to PRIAC's clients was incorrect (as State Street's prior commentaries to PRIAC indicated in any event by referring to the funds as actively managed).[2]

---

[2] Previously in 2005, an employee at State Street had erroneously informed PRIAC that the name of IBF included the words "passive" and "index."  Opp. R. 56.1 Stmt. ¶ 79.  PRIAC had included the terms "passive" and "index" in the name of the fund, despite knowing all along that it was not a passive index fund.  Opp. R. 56.1 Stmt. ¶ 68.  Indeed, apart from sending commentaries to PRIAC – such as that provided on April 11, 2007 – describing the funds as actively managed, State Street sent monthly reports showing a sharp deviation between what the funds invested in and what the benchmark invested in, clearly indicating the funds were actively managed.  Opp. R. 56.1 Stmt. ¶¶ 133, 40.  However, PRIAC did not provide this information to its clients.  Opp. R. 56.1 Stmt. ¶ 46.

Opp. R. 56.1 Stmt. at ¶ 196.  State Street also provided detailed IBF holdings to PRIAC in mid-July 2007, along with ABS portfolio characteristics.  Opp. R. 56.1 Stmt. ¶ 71.  PRIAC claims that it did not find the holdings useful, and that it required more information to interpret the spreadsheet.  Pl's Br. at 16.  But that is not what its senior Investment Strategist Dean Molinaro[3] said when he testified that the spreadsheets showed, among other things, 4 to 1 leverage and substantial home-equity-related derivative securities in IBF.  Opp. R. 56.1 Stmt. ¶ 71.

Tellingly, PRIAC fails to mention that it provided this information to its largest client, CIGNA, and no one else.  Opp. R. 56.1 Stmt. ¶ 209.  The information prompted CIGNA to request a conference call directly with State Street, which was held immediately with one of the State Street portfolio managers on July 18, 2007.  Opp. R. 56.1 Stmt. ¶¶ 71, 141.  PRIAC omits the important information discussed on the call, including IBF's concentration in ABS backed by subprime mortgages, use of 4 to 1 leverage and home-equity related derivatives, and active management style (and correct name).  Opp. R. 56.1 Stmt. ¶ 71.  State Street also reemphasized that these exposures were causing dramatic underperformance.  *Id.*  As PRIAC concedes, CIGNA decided on July 30, 2007 to redeem its investment from IBF as a result of the information that State Street provided through the end of July 2007.[4]  Pl's Br. at 20 n. 6.  PRIAC neglects to mention that, had all Plans redeemed by that date, they would have avoided virtually all the losses of principal in their Bond Fund investments.  Opp. R. 56.1 Stmt. ¶ 162.

---

[3] Dean Molinaro was a Senior Investment Strategist at PRIAC who dealt specifically with the State Street Bond Funds at issue in this litigation.  In addition to participating in the July 18, 2007 phone call among PRIAC, CIGNA, and State Street, Mr. Molinaro was one of CIGNA's primary contacts regarding IBF throughout June, July, and August 2007.

[4] CIGNA did not ultimately complete the redemption of its investment from IBF until August 20, 2007.  As PRIAC acknowledged internally at the time, CIGNA did not exit IBF earlier only because of CIGNA's "dragging its feet."  Opp. R. 56. 1 Stmt. ¶ 162.  But the fact remains that the information State Street provided CIGNA and PRIAC by July 30, 2007 was sufficiently material that CIGNA decided by then to redeem its investment – demonstrating the materiality of that information to investors.

State Street continued to provide PRIAC with material additional information through mid-August.  On August 2, 2007, State Street provided PRIAC a status report discussing "downward pressure on valuations in the subprime mortgage market" and stating that, as a result, IBF had underperformed by 550 basis points year-to-date, an extraordinary loss for a fund of this type.  Opp. R. 56.1 Stmt. ¶ 144.  The letter presented a stark picture, indicating that the market for the ABS backed by subprime mortgages in which the Bond Funds concentrated had seized up, forcing State Street to sell a significant number of AAA bonds just to maintain liquidity.  *Id*. Yet almost a week after receiving the update, PRIAC was still debating whether to bring the information to CIGNA's attention, circulating it internally only "in case the Cigna team inquir[ed] about it."  *Id*.  And there was no debate as to whether PRIAC would bring the letter to the attention of its other, less-favored clients; PRIAC simply never did so.  *Id*.  PRIAC again protests that the commentary did not mention the Bond Funds specifically.  But that is why, of course, State Street sent the report to PRIAC and, in any event, the report did specifically identify IBF, on its face.  *Id*.

PRIAC complains that State Street failed to respond to all of its questions in August 2007.  Pl's Br. at 17-18.  But State Street continued to provide PRIAC with additional information through mid-August.  Opp. R. 56.1 Stmt. ¶¶ 70, 189.  And more to the point, State Street had already provided PRIAC with all the information its clients needed to decide whether to redeem their investments, including the Bond Funds' material underperformance arising from the ABS backed by subprime mortgages in which the Bond Funds concentrated, the ensuing illiquidity in the bonds, the active nature (and correct name) of the funds, and the significant leverage being used.  Opp. R. 56.1 Stmt. ¶¶ 71, 132, 144, 164, 198.  Notwithstanding the obvious materiality of the information that State Street provided to PRIAC through late July, as

punctuated by CIGNA's July 30 redemption decision, PRIAC kept this information from its other clients.  Opp. R. 56.1 Stmt. ¶ 209.  In fact, PRIAC reached out to no clients until the end of August.  Opp. R. 56.1 Stmt. ¶ 162.

Once PRIAC finally did disclose to the Plans in late August 2007 the information it received from State Street weeks earlier, PRIAC received sharp criticism and mounting complaints from clients about the previous absence of information (and misinformation) about the Bond Funds.  Opp. R. 56.1 Stmt. ¶ 184.  PRIAC brought the crescendo of complaints to a halt by falsely accusing State Street in mass communications to clients of not providing sufficient, timely information, and then by fully reimbursing its clients' losses through non-repayable "loans" in exchange for the authority to bring this suit against State Street.  Opp. R. 56.1 Stmt. ¶ 175.  PRIAC also fails to mention that senior PRIAC personnel have admitted they knew State Street had provided them with information fully explaining the Bond Funds' underperformance before PRIAC released its false statements.  Opp. R. 56.1 Stmt. ¶ 165.  Indeed, PRIAC set up its false contention that State Street did not provide timely responses to its requests by sending State Street in mid-August dozens of detailed questions with many subparts that asked for volumes of irrelevant minutiae going back five or more years – knowing that State Street was in the middle of responding to a subprime meltdown.  PRIAC carefully kept track of the timing of State Street's responses, then told its clients that State Street had provided only partial answers and was uncooperative – a pretextual canard.  Opp. R. 56.1 Stmt. ¶¶ 146-161, 189.

PRIAC finally sought to redeem the Plans from the Bond Funds on August 29, 2007.  Opp. R. 56.1 Stmt. ¶¶ 128, 185.  PRIAC champions its efforts to protect its clients.  But by that point it was too late.  The Plans had suffered their losses, and State Street was already closing the

funds.  Opp. R. 56.1 Stmt. ¶ 129.

<u>**ARGUMENT**</u>

Summary judgment is warranted where the record evidence demonstrates "that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (internal quotation marks omitted).  In order to win on summary judgment, the moving party must show "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The non-moving party then "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original; internal quotation marks omitted).

Here, State Street has submitted evidence that PRIAC breached its fiduciary duties to its clients by failing to keep them informed regarding their investments leading up to the mid-2007 subprime crisis.  As a result, PRIAC's clients were not in a position to make informed decisions about their investments, and thus were unable to avoid significant losses.  State Street has also submitted evidence that PRIAC defamed State Street in mass client communications in an effort to pass blame for the Plans' lack of information (and misinformation) regarding their investments.  State Street's business and reputation suffered damage as a result.  Thus, PRIAC's motion against State Street's counterclaims for contribution, defamation, and violations of Chapter 93A should be denied, and State Street's cross motion for summary judgment in favor of its counterclaim for contribution should be granted.

**I.     STATE STREET IS ENTITLED TO CONTRIBUTION FROM PRIAC**

**A.     The Second Circuit Recognizes a Right of Contribution.**

PRIAC asserts that the availability of contribution between ERISA co-fiduciaries in the

Second Circuit is "doubtful."  Pl's Br. at 28-29.  This is incorrect.  The Second Circuit explicitly recognizes such a right of contribution.  In *Chemung Canal Trust Co. v. Sovran Bank/Maryland*, 939 F.2d 12, 16 (2nd Cir. 1993), the Second Circuit held that "the traditional trust law right to contribution must also be recognized as a part of ERISA."  PRIAC argues that two subsequent Supreme Court decisions indirectly overruled *Chemung*, citing the Supreme Court's "unwillingness to infer causes of action in the ERISA context . . . ."  *Mertens v. Hewitt Associates*, 508 U.S. 248, 258-59 (1993) (citing *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146-147 (1985); *Great-West Life & Annuity Co. v. Kudson*, 534 U.S. 204, 209 (2002) (observing that the court has been "reluctant to tamper with the enforcement scheme embodied in the [ERISA] statute. . .") (quoting *Russell*, 473 U.S. at 147)).

No court in the Second Circuit has adopted PRIAC's stance that "*Chemung* effectively has been overruled."  To the contrary, as PRIAC acknowledges and the cases demonstrate, courts in the Second Circuit have continued to apply *Chemung* after *Mertens* and *Great-West* were decided.  *See e.g., Haddock v. Nationwide Fin. Servs. Inc.,* 570 F.Supp.2d 355, 360 (S.D.N.Y. 2008) (holding that defendant in ERISA action "is not precluded as a matter of law from asserting contribution" claim, and rejecting plaintiff's argument that *Chemung* has been overruled); *Agway, Inc. Employees' 401(k) Thrift Invest. Plan v. Magnuson*, 409 F.Supp. 2d 136, 143 n.6 (N.D.N.Y. 2005) ("Indemnity and contribution can be sought in an ERISA action. . . ."); *In re Worldcom Inc. ERISA Litig.*, 339 F.Supp.2d 561, 569 (S.D.N.Y. 2004) (noting that contribution exists under ERISA);  *see also Trs. of the Auto. Mech. Local No. 701 Pension and Welfare Fund v. Union Bank of Cal.,* 630 F. Supp. 2d 951, 953 (N.D. Ill. 2009) (holding that a right of contribution existed in light of the special circumstances of the case).

In fact, the *Chemung* court considered and rejected PRIAC's contention that to infer a

right to contribution under ERISA would require creating a new cause of action where Congress

intended otherwise:

> Here, we are not dealing with the usual "right of action", and it would be misleading to so characterize a defendant's right of contribution. A plaintiff who brings an action does not care whether the defendant has a right of contribution against others, as long as the plaintiff recovers the amount to which he is entitled. Contribution deals with allocating obligations among co-defendants and/or third parties. The "right of action" for contribution is no more than a procedural device for equitably distributing responsibility for plaintiff's losses proportionally among those responsible for the losses, and without regard to which particular persons plaintiff chose to sue in the first instance.

*Chemung*, 939 F.2d at 15-16.  PRIAC cites the Eighth Circuit case of *Travelers Casualty &*

*Surety Co. of America v. IADA Services, Inc,* 497 F.3d 862 (8th Cir. 2007), which relied on

*Mertens* and *Great-West* in holding that there is no right to contribution under ERISA.  But the

*Travelers* court applied the same logic that *Chemung* rejected, as described above.  *Id.* at 866.

Furthermore, Courts in this Circuit have continued to reject PRIAC's logic since *Travelers* was

decided.  *See e.g., Haddock,* 570 F.Supp.2d at 360 (S.D.N.Y. 2008) (citing *Chemung*, 939 F.2d at

15-16 in finding a right to contribution in the ERISA context, and reasoning that doing so did not

amount to inferring "new judicially created liabilities.") Accordingly, a right to contribution

undeniably exists in this jurisdiction.

### B.   PRIAC Materially and Inaccurately Understates its Role with Regard to the Bond Funds, Which Supports A Claim For Contribution.

PRIAC's responsibilities with regard to the Bond Funds were substantial, and its role

supports a claim for contribution here.  PRIAC claims that it had no role in the alleged

misconduct described in its complaint, and so it cannot be liable for contribution.  Pl's Br. at 29-

31.  But the undisputed evidence shows that PRIAC had a fiduciary duty and in fact was the

Plans' only source of information regarding the Bond Funds.  PRIAC has alleged that State

Street, among other things, failed to keep the Plans informed about their investments.  Compl. ¶¶

2-3, 18-20, 22-23, 25-26.  However, it was PRIAC who failed to pass along to the Plans material information regarding the Funds' composition and performance in the crucial summer months of 2007 and before.  Thus, PRIAC cannot pin the Plans' professed ignorance on State Street, as it attempts to do here.

The two cases that PRIAC cites in support of its argument are inapposite.  Both *Harris Trust & Savings Bank v. John Hancock Mutual Life Insurance Co.* (*Harris Trust I*), 122 F. Supp 2d 444, 464 (S.D.N.Y. 2000) *modified,* 137 F. Supp. 2d 351 (S.D.N.Y. 2001), *vacated,* 302 F.3d 18 (2d Cir. 2002), and *Sunderlin v. First Reliance Standard Life Ins. Co.*, 235 F. Supp 2d 222, 237 (W.D.N.Y. 2002), stand only for the proposition that a counterclaim defendant is not liable for contribution unless it was bound, along with the counterclaim plaintiff, to perform fiduciary duties alleged in the original complaint.  In *Harris Trust I,* the court held that the contribution counterclaim defendants had no role in altering plan terms and allocating plan assets, as the defendant had failed to do in the plan's best interest.  *Harris Trust I*, 122 F. Supp. 2d at 459-460, 464.  Likewise, in *Sunderlin*, the court held that the breach at issue – the plan sponsor's failure to provide a summary plan description – was not the duty of the defendant insurer.  *Sunderlin*, 235 F. Supp. 2d at 237.

Here, by contrast, State Street's counterclaim is premised on the fact that PRIAC *did* have a fiduciary duty to keep the Plans regularly informed about material information concerning their investments, and breached that duty by failing to do so at the height of the subprime crisis in 2007.  PRIAC's arguments to the contrary are meritless.

### C.   PRIAC Breached its Duty to Provide Material Information About the Bond Funds to its Clients, the Plans.

PRIAC next argues that the evidence establishes no breach of fiduciary duty by PRIAC under ERISA.  Pl's Br. at 31-38.  This argument is largely based on misdirection, as PRIAC's

brief mischaracterizes both the bases for State Street's counterclaim and the breadth of PRIAC's own responsibilities to its clients.  State Street's counterclaim is not, as PRIAC suggests, premised on PRIAC's failure to "monitor" State Street.  Nor is State Street's claim premised exclusively on shortcomings in PRIAC's Fact Sheets, PRIAC's use of the terms "passive" and "index" in the name of IBF, or errors in PRIAC's DDA Reports.  State Street has submitted evidence that PRIAC knowingly or recklessly provided inaccurate and insufficient information in its regular reporting.  Opp. R. 56.1 Stmt. ¶¶ 63, 67-68.  Those breaches exacerbated PRIAC's later breaches, including in particular its failure to correct its clients' misimpression that IBF was a passive index fund.  And, an important part of State Street's counterclaim is that PRIAC withheld and failed to analyze material information provided by State Street regarding the Funds' subprime exposure in the crucial period leading up to the onset of the subprime crisis – in direct contravention of the duties PRIAC has conceded it owed the Plans.

> **1.     PRIAC Had a Fiduciary Duty to Pass Material Information from State Street to the Plans and to Keep the Plans Informed Regarding their Investments.**

PRIAC attempts to pass off its intermediary role as being no more than a passive "monitor" of State Street and the Bond Funds.  But this is far different from what PRIAC told its clients it would do for them – in return for a substantial fee.  Both PRIAC's own "fundamental" program documents and well-established ERISA fiduciary standards dictate that PRIAC owed duties to the Plans to actively analyze the Bond Funds and timely disclose material information such as the information State Street provided in April, June, July, and August 2007.

PRIAC supports its supposedly narrow fiduciary role by pointing to inapposite case law. *Board of Trustees of CWA/ITU Negotiated Pension Plan v. Weinstein*, cited by PRIAC, held that an employee retirement plan administrator's duties to employee investors in its company stock fund were limited to disclosing information about providing benefits.  *See* 107 F.3d 139 (2d Cir.

1997); *see also Gearren v. McGraw-Hill Cos.,* 690 F. Supp. 2d 254, 271 (same); *In re Citigroup ERISA Litig.,* No. 07 Civ. 9790 (SHS), 2009 U.S. Dist. LEXIS 78055, at *66 (S.D.N.Y. Aug. 31, 2009) (same).  But these cases are irrelevant, because PRIAC's intermediary role with regard to the Bond Funds was very different from that of a mere plan administrator, sponsor, or committee.  PRIAC represented to its clients – in what PRIAC's own expert deems the "fundamental" program documents – that it would provide analytical and reporting services, in exchange for a sizeable fee.  Specifically, PRIAC represented that it would timely "convey information about the funds from the investment managers to the Plans and assist the Plan Sponsors in their due diligence activities."  Opp. R. 56.1 Stmt. ¶¶ 31, 35.  PRIAC further undertook to provide "defined types of reporting" through its DDA Program, including "[b]oth regular reports and updates, along with interim reports on important developments. . . ."  *Id.*  PRIAC pledged to: (i) "monitor the performance, risk, and style of [the Bond Funds]"; (ii) "provide comprehensive quarterly due diligence reports to assist plan sponsors in making informed decisions regarding these funds with their plans"; (iii) provide "interim reports on important developments"; and (iv) to "deselect an Alliance Fund" under "extenuating circumstances."  *Id.*

PRIAC had a duty to comply with the representations it made in program documents, and thus to timely disclose material information that State Street provided regarding the Bond Funds.  PRIAC's own expert witness testified that these program documents defined the scope of PRIAC's fiduciary duties to its clients.  *Id*; *see Harris Trust and Sav. Bank v. John Hancock Mutual Life Ins. Co*. (*Harris Trust III*), 302 F.3d 18, 29 (2d Cir. 2002) (construing the scope of an insurer's ERISA fiduciary obligations in light of the insurer's contractual agreement).

Moreover, Second Circuit precedent confirms that PRIAC had a duty to make disclosures

where it knew its silence might harm the Plans.  PRIAC suggests that courts have only imposed

such a duty on fiduciaries who knew their silence would be misleading, such as where necessary

to correct a previous misstatement.  Pl's Br. at 36.  But, as the cases demonstrate, the duty is not

so narrow.  Courts in the Second Circuit have imposed a duty on plan fiduciaries to disclose

information about underlying investments wherever there is reason to know that silence "might"

be harmful.  *See In re WorldCom, Inc. ERISA Litig*., 263 F. Supp 2d 745, 765 (S.D.N.Y. 2003)

(holding that 401(k) plan investors in company stock fund stated ERISA claim against company

officer for failing to disclose deteriorating financial condition of company); *see also In re*

*Morgan Stanley ERISA Litigation*, No. 07 Civ. 11285(Rws), -- F. Supp. 2d -- , 2009 WL

5947139, at *12 (S.D.N.Y. Dec. 9, 2009) (acknowledging that ERISA fiduciaries have '"an

affirmative duty to inform when the [fiduciary] knows that silence might be harmful"') (quoting

*Adams v. Freedom Forge Corp.,* 204 F.3d 475, 492 (3d Cir.2000)); *Bixler v. Cent. Pa. Teamsters*

*Health & Welfare Fund,* 12 F.3d 1292, 1300 (3d Cir. 1993) (same).

        This principle is particularly salient here, where PRIAC was the Plans' only source of

information regarding the Bond Funds.  Given that fact, together with the information State

Street provided PRIAC regarding the Bond Funds' subprime exposure, the turmoil in the

subprime market, and CIGNA's reaction to the information, PRIAC cannot credibly assert that it

did not know its failure to disclose "might" harm the Plans.  *See In re Morgan Stanley*, 2009 WL

5947139 at *12.  Regardless, and more importantly, PRIAC held out to its clients that it would

analyze the funds and provide relevant information in a timely manner.  Therefore, under both

PRIAC's own program documents and general ERISA fiduciary principles, PRIAC owed a

concrete duty to the Plans to timely analyze and pass on the information State Street provided.

## 2.    PRIAC Breached its Fiduciary Duty to Keep the Plans Informed.

PRIAC breached the duties described above by failing to pass along material information regarding the Bond Funds' subprime exposure and leverage while the Bond Funds deteriorated and the Plans' losses mounted.  Fundamentally, PRIAC's timely receipt from State Street of material information regarding the Bond Funds' subprime problems and exposure triggered, at the very least, PRIAC's duty to issue an "interim report[] on important developments" under both its program documents and Second Circuit ERISA precedent.  Opp. R. 56.1 Stmt. ¶¶ 31, 35; *see In re WorldCom,* 263 F. Supp. at 765 (requiring disclosure of deteriorating financial condition of public company to retirement plan investors in company stock fund).  In fact, PRIAC's breach here is far more egregious than in *Worldcom*, because the Bond Funds were unregistered trusts whose information was not publicly available, as opposed to the public company involved in that case.  Opp. R. 56.1 Stmt. ¶ 12.

Despite PRIAC's fiduciary duty to "inform when the [fiduciary] knows that silence might be harmful," PRIAC failed repeatedly to alert the Plans to the subprime exposures that caused the Bond Funds' losses in July and August 2007.  *See In re Morgan Stanley*, 2009 WL 5947139 at *12.  State Street sent PRIAC, among other things, commentaries and status reports that disclosed the Bond Funds' active management and subprime-driven underperformance.  The commentaries provided on April 11 and July 6, 2007 disclosed the negative impact of the subprime market on both Bond Funds.  Opp. R. 56.1 Stmt. ¶ 133.  Monthly reports showed the Bond Funds' increasing concentrations in ABS and deviation from the benchmarks.  Opp. R. 56.1 Stmt. ¶ 108.  State Street provided detailed holdings and ABS characteristics showing 4 to 1 leverage in mid-July 2007.  Opp. R. 56.1 Stmt. ¶ 71.  The August 2, 2007 status report discussed the severe and ongoing negative impact of the subprime market on State Street's active Bond

Funds, and told investors that State Street had sold substantially all of the AAA bonds.  Opp. R. 56.1 Stmt. ¶ 144.

PRIAC further breached its duty to "assist plan sponsors in making informed decisions" by failing to pass on material information to the Plans regarding the Bond Funds' use of leverage to gain additional exposure to ABS.  Leading up to the conference call among State Street, PRIAC, and CIGNA on July 18, 2007, State Street made PRIAC aware that IBF employed material amounts of leverage as part of its investment strategy.  Opp. R. 56.1 Stmt. ¶ 71.  The list of holdings provided by State Street to PRIAC indicated, as PRIAC's Mr. Molinaro testified, that the fund's ABS exposure was leveraged at a ratio of roughly 4 to 1.  *Id*.  On the subsequent call among CIGNA, State Street and PRIAC, State Street discussed IBF's use of leverage and derivatives, the Fund's concentration in ABS backed by subprime mortgages, and its active management style.  Opp. R. 56.1 Stmt. ¶ 146.  Again, PRIAC shared none of this with its other clients.

PRIAC exacerbated its failure to pass along this material information by failing to inform its clients that IBF was mislabeled as a "passive" index fund.  On July 12, 2007, State Street definitively confirmed to PRIAC that the use of "passive" and "index" in the name of IBF in communications to PRIAC's clients was incorrect – a fact that PRIAC concedes it actually knew all along.  Opp. R. 56.1 Stmt. ¶¶ 68, 196.  On July 18, State Street reiterated this correction on a conference call with CIGNA and PRIAC.  Opp. R. 56.1 Stmt. ¶ 140.  Upon receiving final confirmation of the naming error on July 12, and again on July 18, senior PRIAC product manager Robert Frascona stressed that PRIAC needed to immediately correct it.  Opp. 56.1 Stmt. ¶ 195.  Indeed, it is hard to imagine a more fundamental piece of misinformation than telling a client that a fund is a passive index fund when it actually is actively managed.  However, PRIAC

took no affirmative action to notify the Plans of the error, or to correct any false impressions about the investment style of IBF until late August 2007.  Opp. R. 56.1 Stmt. ¶ 196.

The significance of PRIAC's breach is exemplified by its clients' surprise and anger in discovering in late August that the fund was not a passive index fund as advertised.  For example, PRIAC client Gannett Fleming's investment consultant complained in an August 23 email that "We have extensive communications from [PRIAC] in which the fund Gannett's DB Plan is invested is characterized as an index fund.  We now receive information – several days after Pru apparently received it from the manager[5] – indicating that the fund is actually an 'enhanced index' or alternatively 'active' fund which now has a very heavy concentration in sub-prime mortgage backed securities."  Opp. R. 56.1 Stmt. ¶ 6.

As Gannett Fleming's complaint reflects, PRIAC breached its fiduciary duties by blocking the flow of material information to the Plans regarding the Bond Funds' status at the height of the mid-2007 subprime crisis.  As a result, the Plans suffered substantial losses far in excess of what they otherwise would have sustained.

>    **D.      State Street was not Substantially More at Fault for the Bond Funds' Losses.**

The Plans suffered substantial losses because PRIAC prevented them from making informed decisions regarding their investments.  PRIAC argues that summary judgment against State Street's contribution claims is warranted because PRIAC's role with regard to the management of the Bond Funds was passive, and that State Street is substantially more at fault. Pl's Br. at 38-41.  But PRIAC had affirmative, active duties to analyze and pass material information from State Street to the Plans.  Indeed, PRIAC, not State Street, was the fiduciary responsible for keeping the Plans informed regarding their investments; State Street did not even

---

[5] Actually, PRIAC was fully aware of this information well before that, as set forth above.

know who PRIAC's clients were.  In point of fact, PRIAC's failure to timely pass along information to its clients and allow them to redeem caused far more losses for a much longer time than State Street's management ever did.  None of the cases PRIAC cites deal with such a situation.

Rather, every case that PRIAC cites concerns an action for contribution against a plan trustee or committee who failed to "catch" his co-fiduciary in the act of breaching.  So, for example, in *Free v. Briody*, 732 F.2d 1331 (7th Cir. 1984), the court found that a trustee could not be liable for his co-trustee's breach, because his simple failure to exercise control over his co-trustee did not contribute substantially to the retirement plan losses at issue.  *See id.* at 1337-38.  In *Scalp & Blade, Inc. v. Advest, Inc.*, 300 A.D.2d 1068 (N.Y. App. Div. 2002), the court similarly held that a trustee's failure to monitor its co-fiduciary's actions did not contribute substantially to the trust's losses.  *See id.* at 1069.  Neither case dealt with a situation such as the one here, where an investment professional such as PRIAC made promises to its clients to provide important services for a substantial fee, and State Street's contribution claim is not premised on a simple failure to monitor.

Instead, State Street's contribution counterclaim is based on PRIAC's failure to perform the important and fundamental role it carved out for itself in the relationship among State Street, PRIAC, and the Plans.  PRIAC, with State Street, had a primary role in providing the Plans with a package of investment services, including investment management, analysis, and reporting.  PRIAC agreed to serve the latter two functions, in exchange for a fee whose size reflected that fact.  As noted above, PRIAC asserted exclusive control over the Plan reporting function,

because PRIAC would not even inform State Street who its clients were.[6]

PRIAC alleges that State Street breached its fiduciary duties by failing to inform PRIAC about the Plans' investments.  Yet when State Street provided PRIAC with important information regarding the Bond Funds in April, June, July, and August 2007, PRIAC failed to analyze and report that information to the Plans.  Indeed, when State Street informed PRIAC in mid-July in no uncertain terms that the name PRIAC had been using for IBF was incorrect and implied a passive index fund whereas the Funds were actively managed with significant subprime exposure and leverage, PRIAC failed to reach out to any of its Plan clients to report this information.  The Plans suffered almost all their losses after State Street had fully informed PRIAC regarding the Plans' investments.  PRIAC is responsible for those losses.  This case, unlike those that PRIAC cites, warrants distributing losses "proportionally among those responsible . . . without regard to which particular persons plaintiff chose to sue in the first instance."  *Chemung*, 939 F.2d at 15-16.  There is no basis for entry of summary judgment dismissing State Street's contribution counterclaim.

## II.     STATE STREET IS ENTITLED TO SUMMARY JUDGMENT ON ITS CONTRIBUTION COUNTERCLAIM.

The undisputed facts set forth above and in PRIAC's own papers not only doom PRIAC's motion for summary judgment, but also entitle State Street to the granting of its cross motion for summary judgment on its contribution counterclaim.  There is no material dispute of fact regarding the information that was provided by State Street to PRIAC, PRIAC's failure to provide that information to its clients, the materiality of that information to the investment decisions of the Plans, and the losses incurred by the Plans during the period in which PRIAC sat

---

[6] Even during the subprime crisis, when State Street pushed for permission to provide information directly to clients, PRIAC refused.  Opp. R. 56.1 Stmt ¶ 221.

on the information.  Notably, PRIAC concedes in its motion papers that CIGNA decided "on

July 30, 2007" to "begin moving money out of the Intermediate Bond Fund" – after receiving

information directly from State Street.  *See* Pl's Br. at 20 n.6; *Chemung*, 939 F.2d at 16.  This

concession by PRIAC regarding its client's reaction to the information State Street provided

establishes beyond cavil that:

- State Street disclosed material information to PRIAC and CIGNA regarding the Funds' exposure to the ongoing subprime market crisis;

- PRIAC failed to pass on the material information State Street provided to clients other than CIGNA;

- CIGNA – the only PRIAC client who did receive the information provided by State Street – decided on July 30, 2007 to act on this information; and

- Had PRIAC enabled its other clients to act on July 30, 2007 to redeem out of the Bond Funds, their total market losses would have been substantially less than State Street has already reimbursed PRIAC through the regulatory settlement.  Cross Mot. R. 56.1 Stmt. ¶¶ 10-21, 23; Pl's Br. at 20 n.6.

These undisputed facts show that PRIAC's failure to timely inform its client Plans of the

information State Street provided substantially contributed to the losses alleged.  As the Second

Circuit has held, "there is no reason why a single fiduciary who is only partially responsible for a

loss should bear its full brunt." *Chemung*, 939 F.2d at 16; *see also Ulico Cas. Co. v. Clover

Capital Mgmt., Inc.*, 146 F. Supp. 2d 163, 168 (N.D.N.Y. 2001) (holding that contribution may

be available if a co-fiduciary's breach of its own fiduciary duties was "increasing the amount of

harm" caused by the defendant-fiduciary's initial breach in investing in a questioned investment).

Summary judgment in favor of State Street is warranted because no material dispute of

fact exists regarding any element of State Street's counterclaim, and State Street has established

that it is entitled to judgment as matter of law.  First, PRIAC's own expert agrees that PRIAC

owed the Plans a fiduciary duty to report – both regularly and on an "ad hoc" basis – important

market developments affecting the Funds.  Cross Mot. R. 56.1 Stmt. ¶ 5.  Indeed, given the

significant fees PRIAC charged its clients for its services, it cannot seriously contend that its

duties did not include passing along the material information it received from State Street.

Second, PRIAC concedes, as it must, that State Street provided information in April, June, July

and early August regarding subprime exposure, leverage, and performance problems affecting

the Bond Funds.  Opp. R. 56.1 Stmt. ¶¶ 133, 136, 140, 144.  That material information led

CIGNA to initiate its redemption process on July 30, nearly a month before PRIAC issued its

belated disclosures to its other client Plans.  *See* Pl's Br. at 20 n.6.  CIGNA's actions extinguish

any doubt about the materiality of the information State Street provided to PRIAC, or about

PRIAC's primary responsibility for its client Plans' losses by withholding that information from

them.

## III.    PRIAC'S MOTION FOR SUMMARY JUDGMENT ON STATE STREET'S DEFAMATION CLAIM FAILS.

The elements of a defamation claim are well established: (i) the defendant made a

statement concerning the plaintiff to a third party; (ii) the statement could damage the plaintiff's

reputation in the community; (iii) the statement was false, and the defendant was at fault in

making the statement; and (iv) the statement either caused the plaintiff economic loss or is

actionable without proof of economic loss.  *Ravnikar v. Bogojavlensky*, 782 N.E.2d 508, 510-11

(Mass. 2003).  A statement that a "plaintiff lacks a necessary characteristic of the profession" is

actionable without proof of economic loss.  *Id.* at 511.  PRIAC's defamatory statements,

designed to deflect attention from its own lapses, mistakes and breaches of fiduciary duty, meet

each of these criteria.  As discussed below, each of PRIAC's arguments that it has no defamation

liability as a matter of law, or that State Street faces a higher standard of proof, are legally

incorrect.  At the very least, the ample evidence put forth by State Street regarding the falsity of

the statements at issue and PRIAC's motivations for making them, create disputed issues of material fact requiring a trial of the defamation claim.

### A.     PRIAC's Statements Were False and Defamatory.

In each of the statements at issue, PRIAC sought to explain away its responsibility for its clients' losses by creating the false impression that State Street failed to communicate information about the Bond Funds until late August.  PRIAC accused State Street of acting dishonestly and concealing information that State Street actually had timely provided to PRIAC, but that PRIAC had failed to pass along to its clients.

### 1.     PRIAC's Statements that State Street Changed its Stated Investment Approach for the Bond Funds And Failed To Inform PRIAC Of Fund Characteristics Were False.

State Street consistently disclosed that the Bond Funds held substantial amounts of ABS backed by subprime mortgages and disclosed that the Bond Funds' underlying benchmarks did not contain these securities.  In several of the Statements, PRIAC accuses State Street of dishonesty by claiming that State Street "did not clearly indicate a widespread concentration of assets outside the sectors identified as part of the fund."  Yet each month, State Street disclosed that the Bond Funds held substantial concentrations in ABS that were not held in the Bond Funds' respective benchmarks.  Moreover, throughout 2006 and 2007, State Street disclosed that the Bond Funds were exposed to the subprime mortgage market.

PRIAC specifically misstated to its clients when it learned the Bond Funds used leverage. State Street disclosed the use of leverage in the Bond Funds in 2005, explaining that the Bond Funds had a "leverage component."  Opp. R. 56.1 Stmt. ¶ 73.  The IBF holdings report provided

to PRIAC indicated a roughly 4 to 1 leverage ratio.[7]  Opp. R. 56.1 Stmt. ¶ 71.  Moreover, after

the mid-July conference call, PRIAC concedes that it was "completely aware of the Intermediate

Bond Fund, its holdings, how it ran, how it operated, that it was invested materially in sub-prime

and that it had a significant leveraged position . . . ."  Opp. R. 56.1 Stmt. ¶ 140.

     In light of this evidence, PRIAC now concedes that it was aware that the Bond Funds

could and did use leverage, that the Bond Funds were invested in ABS securities backed by

subprime mortgages, and that the Bond Funds' underlying benchmarks did not contain such

securities.  Pl's Br. at 48-49.  Yet, in late August and September 2007, PRIAC told its clients that:

- "SSgA's reporting on this fund did not clearly indicate a widespread concentration of assets outside the sectors identified as part of the fund's investment benchmark";

- "We did not learn about the fund's extensive leverage and broad exposure to sectors outside its stated benchmark strategy until a call with the head of SSgA's North American Fixed Income division, on August 22";

- "On August 22, during a call we made to SSgA as part of a series of inquiries about the State Street Fund's index-lagging performance, the head of SSgA's North American Fixed Income division stated for the first time that the State Street Fund was leveraged and had broad exposure to sectors outside its stated benchmark strategy."; and

- "SSgA also did not disclose these off-strategy investment strategies and practices to Prudential Retirement, to plan sponsors, or to individual plan participants[8] – even after weeks of receiving questions from Prudential."  Pl's Br. App. A.

These statements were all false.

       **2.**     **PRIAC's Statements Regarding The Information It Received From State Street Were False.**

     PRIAC's statements to its clients claiming that State Street deliberately hid the ball by

---

[7] PRIAC's proffered expert Dr. Dennis Logue admitted that a 4 to 1 leverage ratio was consistent with a so-called "enhanced index strategy," particularly if the leverage, as here, was due to swap exposure.  Opp. R. 56.1 Stmt. ¶ 211.

[8] Of course, State Street could not make disclosures directly to plan sponsors or individual plan participants, as PRIAC well knows, because PRIAC would not tell State Street who they were – yet PRIAC falsely criticized State Street for not communicating information to them.

not responding to its requests for information were false.  The record shows that State Street responded to numerous requests from PRIAC in a timely manner throughout the summer of 2007.  State Street provided commentary, characteristics, holdings, and pricing information, and conducted a July 18 conference call with the portfolio management team, all within a few days or less of PRIAC's requests.  Opp. R. 56.1 Stmt. ¶ 189.  Notably, PRIAC did not provide any of the disclosures State Street made, but then criticized State Street to the Plans for supposed failures to respond to follow-up requests in August.  PRIAC has never told its clients – even to this day – that State Street actively provided substantial amounts of information to PRIAC about the Bond Funds' subprime issues up through July, 2007.  Even now, PRIAC does not explain what material information, if any, it requested that State Street failed to provide – in particular, what additional information it required to take quicker action in the face of mounting losses in the Bond Funds.  PRIAC's subsequent claims that State Street was not providing information, or that PRIAC was quickly communicating information received from State Street to its clients, were false.[9]

### 3.  PRIAC's Statements to its Clients About the Use of the Terms "Passive" and "Index" in the Name of IBF were False.

PRIAC's statements to its clients accusing State Street of concealing IBF's correct name were false.  In 2005, an employee at State Street had erroneously informed PRIAC that the name of IBF included the words "passive" and "index."  Also, starting in 2005, PRIAC stopped following its "process for managers to regularly review [] fact sheets."  Opp. R. 56.1 Stmt. ¶ 219.  Thus, IBF fact sheets distributed by PRIAC to the Plans for the ensuing two years used the incorrect name for IBF, and State Street admittedly was not shown the fact sheets.  Opp. R. 56.1

---

[9] For example, as noted previously, PRIAC until the end of August after receiving the August 2, 2007 status report to fully update its clients about IBF's July underperformance.  Opp. R. 56.1 Stmt. ¶ 163.

Stmt. ¶¶25, 219.  On July 12, 2007, State Street informed PRIAC that PRIAC was incorrectly marketing IBF as a passively-managed fund by calling IBF the "Passive Intermediate Bond Index Fund."  Opp. R. 56.1 Stmt. ¶ 200.  Despite being given this information on July 12, PRIAC failed to affirmatively notify clients of the incorrect name until after August 20.  Opp. R. 56.1 Stmt. ¶ 90, 195.  Yet, PRIAC told its clients that when it found out about the correct name, it took "immediate action to rename the fund" and that it had "periodically [asked] the asset managers of the underlying investment funds in our Alliance Funds program to update the Fund Fact Sheets we provide quarterly to plan sponsors and participants."  Each of these statements was patently false.  PRIAC followed that by stating, "[o]n August 1, [2007] SSgA reviewed and approved the Fund Fact Sheet. . . ." Opp. R. 56.1 Stmt. ¶ 219.  PRIAC thus created the false impression that PRIAC had been providing the IBF fact sheets to State Street periodically, but that State Street never changed the incorrect name – an inference PRIAC knew was completely untrue.  *Id.*

> **B.** **PRIAC's Defamatory Statements are not Shielded by the Qualified Privilege Doctrine because PRIAC Shared no Common Interest with its Clients in Shifting Blame to State Street.**

PRIAC asserts that all its defamatory statements are protected by the qualified privilege doctrine because its defamatory statements were allegedly made in furtherance of a business relationship.  Pl's Br. at 41-44.  This argument fails, however, because the record demonstrates that PRIAC's defamatory statements were not made in furtherance of a good faith business interest, but rather were made to shift the spotlight away from PRIAC's own failings to unfairly place the blame on State Street.  Thus, PRIAC's statements are not entitled to protection under the qualified privilege doctrine.

The qualified privilege protects the publication of otherwise defamatory statements if "the recipient is one to whom the publisher is under a legal duty to publish . . . the matter

claimed to be defamatory." *Dexter's Hearthside Restaurant, Inc. v. Whitehall Co.*, 508 N.E.2d 113, 117 (Mass. App. Ct. 1987) (quoting Restatement (Second) of Torts § 595(1)(b), internal quotation marks omitted).  However, the qualified privilege is lost if the defendant knowingly or recklessly published the information, or if the defendant recklessly acted out of "some base ulterior motive." *Dexter's*, 508 N.E.2d at 117 (holding that privilege does not shield words "spoken on a privileged occasion, [that] were not spoken pursuant to the right and duty which created the privilege but were spoken out of some base ulterior motive"); *Dragonas v. School Committee of Melrose*, 833 N.E.2d 679, 687-688 (Mass. App. Ct. 2005) (denying summary judgment on defamation claim).  A base ulterior motive may include an intention to injure another or an "intent to abuse the occasion [giving rise to the privilege] by resorting to it 'as a pretense.' . . ."  *See Dragonas*, 833 N.E.2d at 687 (quoting *Ezekiel v. Jones Motor Co.,* 372 N.E.2d 1281, 1287 (Mass. 1978)).  Summary judgment is not appropriate where there is both a "privileged" and "unprivileged" explanation for a statement.  *See Dragonas*, 833 N.E.2d at 688 (holding that summary judgment was not appropriate where motive for principal's comments about fitness of teacher were susceptible to privileged explanation and unprivileged explanation).

1.     **PRIAC's interest in avoiding client lawsuits was a "base ulterior motive" that defeats any applicable qualified privilege.**

PRIAC acted out of a "base ulterior motive" in publishing the defamatory statements. PRIAC's clients demanded to be made whole for their losses, and stridently expressed complaints that PRIAC had violated its fiduciary duties to the Plans.  *See* Opp. R. 56.1 Stmt. ¶ 184.  With this knowledge in mind, PRIAC made the statements at issue, falsely accusing State Street of being untruthful and thereby defaming State Street for the purpose of masking its own culpability.  Moreover, several of the defamatory statements were made after PRIAC liquidated its clients' investments in the Bond Funds.  These *ex post* actions were completely self-motivated.

### 2.   PRIAC Knowingly Made the Defamatory Statements and Therefore has Lost any Applicable Qualified Privilege.

PRIAC published the information contained in the statements with actual malice.  In support of its argument that no reasonable juror could find that PRIAC acted with actual malice, PRIAC relies on deposition testimony and affidavits.  However, actual malice may be proven by inference, as it would be rare for a defendant to admit serious doubts as to the truth of a statement.  *Bose Corp. v. Consumers Union*, 692 F.2d 189, 196 (1st Cir. 1982) (citing *Stone v. Essex County Newspapers, Inc.* 330 N.E.2d 161, 173 (Mass. 1975)).  Accordingly, a defendant cannot "insure a favorable verdict by testifying that he published with a belief that the statements were true."  *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *Hotchner v. Castillo-Puche*, 404 F. Supp. 1041, 1049 (S.D.N.Y. 1975), *rev'd on other grounds*, 551 F.2d 910 (2d Cir. 1997) ("A defendant in a defamation action cannot automatically escape liability by submitting affidavits which attest to the fact that the publication was made with a belief that the statements therein contained were true.").  The bare assertion by a defamation defendant that he did not doubt the truth of the false statements he uttered is not worth much in the face of circumstances that belie it, for "it would be rare for a defendant to admit such doubts."  *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) (quoting *Bose,* 692 F.2d at 196).  Indeed, a defamation plaintiff would "rarely be successful in proving awareness of falsehood from the mouth of the defendant himself."  *Herbert v. Lando*, 441 U.S. 153, 170 (1979).

In any event, "proof of 'actual malice' calls a defendant's state of mind into question, and does not readily lend itself to summary disposition." *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979) (citations omitted).  "[W]hile the issue of malice is not automatically a jury question, the plaintiff is entitled to a jury trial if there is some indication from which an inference of malice could be drawn." *Miller v. Tope*, C.A. No. 02-11151-DPW, 2003 U.S. Dist. LEXIS 21211, *48

n. 32 (D. Mass. Nov. 3, 2003) (internal citations omitted) (denying motion for summary judgment and finding issue of fact existed concerning actual malice).

PRIAC told its investors and the rest of the world that it was not until late August that State Street informed PRIAC about subprime, or leverage, or that the Bond Funds were actively managed, thus tarring State Street with hiding the ball – all the while knowing that State Street had communicated all this information to PRIAC no later than mid-July, before the substantial losses even occurred.  PRIAC claims that George Palms was "responsible for preparing" most of the defamatory statements and that he did not know they were false. [10]  But PRIAC nowhere discloses that Palms' direct report, Mr. Molinaro, testified that he knew the statements were false.  Opp. R. 56.1 Stmt. ¶ 165.  Specifically, Mr. Molinaro knew that State Street had disclosed the IBF's use of leverage and concentrated exposures outside the indices well before August 22, 2007, knew that PRIAC had not taken "immediate action" to rename IBF, and knew that IBF had heavy exposure to subprime ABS.[11]  *Id.*

---

[10] In arguing that State Street cannot show actual malice, PRIAC relies entirely on Mr. Palms' alleged ignorance of the false statements' accuracy, claiming that he was the one responsible for preparing the statements.  But Mr. Palms' role in creating the defamatory statements is a material fact in dispute.  Mr. Palms' role in creating the statements was "more of a review function than a drafting function."  Opp. R. 56.1 Stmt. ¶ 187.  Mr. Palms, Robert Frascona, Jim Mallozzi, Matthew Dingee, Laura Stern, and Ronald Hurt all worked on, drafted or edited the defamatory statements.  *Id.*  Mr. Frascona and Mr. Dingee were fully informed about the relevant material facts.  Opp. R. 56.1 Stmt. ¶ 190.  Thus, PRIAC argument is nothing more than an attempt to gloss over an important factual issue.

[11] For example, Mr. Molinaro testified as follows:

> **Q.** This report to clients says that on August 22 was the first time that State Street had indicated that the Intermediate Bond Fund had leverage, correct?
> **A.** Correct.
> **Q.** That is not true. They had indicated way back in the first couple of weeks of July 2007 that the Intermediate Bond Fund had leverage, correct?
> **A.** Correct.

Moreover, Mr. Molinaro testified that he kept George Palms "apprised" of the information he learned about IBF during June and July of 2007.  Opp R. 56.1 Stmt. ¶¶ 165, 188 ("Q. So you kept Mr. Palms advised of what you [were] learning about the Intermediate Bond Fund and passing it on to CIGNA back in June and July, you kept him apprised of that?  A. Yes").  Mr. Molinaro specifically recalled briefing Mr. Palms on the July 18 conference call with State Street and CIGNA.  Opp. R. 56.1 Stmt. ¶ 188.  So, Mr. Palms was at least reckless in making these statements, by not asking his subordinates if they were true.  At a minimum, it is a factual matter in dispute whether Mr. Palms knowingly made these false statements, or was reckless.[12]

### C.   PRIAC Cannot Meet Its Burden to Show that the "Actual Malice" Standard Applies by Virtue of State Street's Purported Public Figure Status.

PRIAC argues that State Street's defamation claim should be governed by the constitutional "actual malice" standard because State Street is a "public figure."  Pl's Br. at 44-47.  The burden of demonstrating this lies with PRIAC.  *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1346 (S.D.N.Y. 1977) ("Whether one is a public figure presents a mixed question of fact and law as to which defendants have the burden of persuasion."); *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1553 (4th Cir. 1994) (same).  Recognizing the substantial state interests in protecting the reputations of those harmed by defamation, the Supreme Court has adopted a "comparatively restrictive view" on who is a "public figure."  *See* Robert D. Sack, *Sack on Defamation* § 1.5, at 1-34 (3d ed. 2009).

---

Opp. R. 56.1 Stmt. ¶ 165 (objections to form omitted).

[12] Mr. Palms also admitted to being made aware that State Street had previously provided data to PRIAC that purported to show leverage being used in the IBF "in September [of 2007] when we were preparing for litigation."  Opp. R. 56.1 Stmt. ¶ 188.  Yet, on October 1, PRIAC stated that "SSgA did not explain the fund's extensive leveraged sector concentration until a call with the head of SSgA's North American Fixed Income division, in mid-August."  Opp. R. 56.1 Stmt. ¶ 221.

The Supreme Court has defined two classes of public figures.  A "general purpose" public figure is one who "achieve[s] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).  The more common "limited purpose" public figure is one who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues."  *Id.*  Both such persons "assume special prominence in the resolution of public questions."  *Id.*

While the determination of public figure status is a matter of law, summary judgment is not appropriate where "conflicting inferences may be drawn from the record in the case." *Rebozo v. Washington Post Co.*, 637 F.2d 375, 379 (5th Cir. 1981).  PRIAC identifies certain factors that purportedly render State Street a public figure and subject to the "actual malice" standard of proof, although it does not distinguish which of these factors is relevant to a general purpose or limited purpose public figure analysis.  What PRIAC's argument boils down to, however, is an assertion that because State Street is a subsidiary of a large, publicly traded corporation subject to regulation, and because certain groups of people may "recogniz[e]" its name, State Street must somehow be a "public figure" in the context of this case.  Pl's Br. at 44-45.  This rationale fails to sustain PRIAC's burden of persuasion on this issue under either line of authority.

### 1.    State Street is not a General Purpose Public Figure.

The Supreme Court has laid out a strict evidentiary standard for showing that a defamation plaintiff is a general purpose public figure.  *See Blue Ridge Bank v. Veribanc, Inc.*, 866 F.2d 681, 687 (4th Cir. 1989); *Lerman v. Flynt Distrib. Co., Inc.*, 745 F.2d 123, 137 (2d Cir. 1984) (general purpose public figure a "rare person").  "[A]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual

should not be deemed a public personality for all aspects of his life."[13]  *Gertz,* 418 U.S. at 352.

A party must "occupy positions of such persuasive power and influence that they are deemed

public figures for all purposes."  *Id.* at 345; *see also Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C.

Cir. 1987) (stating that general purpose public figures "are frequently so famous that they may be

able to transfer their recognition and influence from one field to another" (internal quotation

marks omitted)).  For these reasons, courts generally consider plaintiffs to be general purpose

public figures only when they reach "celebrity" status, or where they are "household word[s]

whose ideas and actions the public in fact follows with great interest."  *Waldbaum v. Fairchild

Publ'ns, Inc.*, 627 F.2d 1287, 1292 (D.C. Cir. 1980) (internal quotation marks omitted).  PRIAC

has failed to demonstrate that State Street is one of the "rare persons" that is properly classified

as a general purpose public figure.

   First, PRIAC fails to show that State Street occupies a position of "pervasive power and

influence" or that it plays a major role in shaping public opinion.  Nor has PRIAC asserted that

State Street has assumed a "special prominence in the resolution of public questions . . . in the

affairs of society."  *Gertz* 418 U.S. at 351.  Instead,  PRIAC merely submits that State Street is a

subsidiary of a relatively large publicly-traded company.  Such *ipse dixit* cannot suffice as the

"clear evidence" required by the Supreme Court to prove that State Street is a general purpose

public figure.  *See id.* at 345; *Blue Ridge*, 866 F.2d at 687  (holding that the bank was not a

general purpose public figure, despite the fact that it was one of only two banks in the county and

"occupies a position of considerable importance in the economy of Floyd County"); *Computer

Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 2d 526, 535 (E.D. Pa. 1999) ("[W]e do not believe

---

[13] The Supreme Court has made no distinction between corporations and natural persons for the
purposes of public figure analysis.  *See, e.g.*, *Bruno & Stillman, Inc. v. Globe Newspaper Co.*,
663 F.2d 583, 589 (1st Cir. 1980).

that Hewlett-Packard has such pervasive fame or notoriety to be deemed a general purpose public figure.").

Second, apart from its assertion that State Street is a "recognizable name" among institutional investors, Pl's Br. at 46, PRIAC has made no showing that SSBT is a "household name" or has reached the level of fame that constitutes "celebrity" status.  PRIAC relies solely on the testimony of Arlene Roberts, a member of State Street's public relations staff, for the proposition that many people in the investment world had "heard of" State Street.  But the test for a general purpose public figure is not whether a select subset of people have "heard of" a person; rather, it is whether the party is well known to the general public at large.  *See, e.g.*, *Am. Hardware Mfrs. Ass'n. v. Reed Elsevier, Inc.*, No. 03 CV 9421, 2010 WL 55657, at *9 (N.D. Ill. Jan. 4, 2010) ("Evidence that Reed and Freeman were well-regarded within the trade show industry does not establish that they were also well-regarded or well-known to the public").  More relevant is Ms. Roberts' statement, not cited by PRIAC, that "most people have never – a lot of people have never heard of State Street."  Opp. R. 56.1 Stmt. ¶ 14.

PRIAC cites just one case to support its claim that State Street is a general purpose public figure: *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341 (S.D.N.Y. 1977).  The persuasive effect of this case, however, is negligible at best.  As conceded by PRIAC, in the over thirty years since the decision, several courts of appeal have disagreed with *Reliance*'s outcome and its reasoning. Pl's Br. at 45 n. 12 (citing cases).  In fact, State Street has located no case that has cited this reasoning from *Reliance* for the proposition that a corporation – or any plaintiff, for that matter – was a general purpose public figure.[14]  Courts have noted, though, that two of the cases cited by

---

[14] Notably, some courts have limited *Reliance*'s holding to its determination that the plaintiff was a limited purpose public figure, impliedly reading the statement about the plaintiff's status as a public figure generally as dicta.  *Computer Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 2d 526,

the *Reliance* court to support its holding that the plaintiff was a general purpose public figure have since been reversed by the Supreme Court. *See Bank of Or. v. Indep. News, Inc.*, 693 P.2d 35, 42 (Or. 1985) (noting that *Reliance*'s holding "ha[s] been impliedly renounced by the Supreme Court's decisions in *Hutchinson* and *Wolston*"); *Diversified Mgmt., Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1107-08 (Colo. 1982) (criticizing *Reliance* because it "d[id] not seem consistent with [the Supreme Court's decision in] *Hutchinson*).[15]

The Fourth Circuit's repudiation of *Reliance* is particularly instructive. In *Blue Ridge,* 866 F.2d at 681, the court reversed the district court and held that the plaintiff was not a general purpose public figure. The district court had found that Blue Ridge Bank was a general public figure based on four factors similar to those observed in *Reliance*: (i) it was one of only two financial institutions in Floyd County, Virginia; (ii) it had "thrust itself into the public eye" by converting from a savings and loan association into a bank; (iii) it was part of a heavily-regulated industry of importance to the public, and (iv) it had demonstrated access to the media. *Id.* at 686. Reversing, the Fourth Circuit recognized that although "Blue Ridge "occupie[d] a position of considerable importance in the economy of Floyd County," it did not enjoy the "widespread power or pervasive influence necessary to affect the resolution of public issues in a manner which elevates it to a general purpose public figure." *Id.* at 687. Addressing *Reliance*, *Blue Ridge* declared that "[w]e cannot accept the proposition, tacitly adopted in some jurisdictions, that a business enterprise loses much of the protection afforded by the traditional law of

---

535 (E.D. Pa. 1999); *Bose Corp. v. Consumers Unions of U.S., Inc*., 508 F. Supp. 1249, 1272 n.37 (D. Mass. 1981), *rev'd on other grounds*, 692 F.2d 189 (1st Cir. 1982).

[15] In *Hutchinson*, the Supreme Court reversed the decisions of the district court and court of appeals, holding that an individual was not a public figure. The district court had found that "[g]iven Dr. Hutchinson's long involvement with publicly-funded research, his active solicitation of federal and state grants, the local press coverage of his research, and the public interest in the expenditure of public funds on the precise activities in which he voluntarily participated, . . . that he is a public figure for the purposes of this suit." 431 F. Supp. 1311, 1327 (W.D. Wis. 1977).

defamation simply as a result of being subject to pervasive governmental regulation." *Id.* at 688.[16]   The court continued:

> We do not believe that the existence of an ongoing public interest in the stability of society's financial institutions and markets, or in the supervision of the gaming industry, or in the regulation of utilities automatically elevates every member of the regulated class to public figure status.   Such an approach would effectively collapse the Court's dual inquiry, prescribed in *Gertz* regarding the subject matter of the publication (*i.e.*, whether it is a matter of public concern) and the status of the defamed entity into a single consideration:   a result which has been rejected by the [Supreme] Court in decisions following *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29 (1971).

*Id.*

Because PRIAC has not sufficiently demonstrated that State Street has gained notoriety among the general public or that it "enjoys pervasive influence in the affairs of society," it has failed to meet its burden to prove that State Street is a general purpose public figure.

### 2.   State Street is not a Limited Purpose Public Figure because it was not Involved in a Preexisting Public Controversy.

To find that a defamation plaintiff is a "limited purpose" public figure, a defendant must show the plaintiff has (i) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (ii) voluntarily injected himself into a public controversy related to the subject of the litigation; (iii) assumed a position of prominence in the public controversy; and (iv) maintained regular and continuing access to the media.   *Flynt Distributing*, 745 F.2d at 136-37.   Because State Street was not involved in any preexisting "public controversy" surrounding the subject matter of the defamatory statements,

---

[16] Other courts have similarly turned away from the reasoning in *Reliance*.   *See, e.g.*, *Bank of Or.*, 693 P.2d at 41-42 (Or. 1985) ("Merely opening one's doors to the public, offering stock for public sale, advertising, etc., even if considered a thrusting of one's self into matters of public interest, is not sufficient to establish that a corporation is a public figure," and "[c]ases holding the opposite have been impliedly renounced by the Supreme Court's decisions in *Hutchinson* and *Wolston*." (citing *Reliance*)).

PRIAC cannot meet the first through third prongs of this test.[17]

"A public 'controversy' is any topic upon which sizeable segments of society have different, strongly held views." *Cummins v. Suntrust Capital Markets, Inc*., 649 F. Supp. 2d 224, 241 (S.D.N.Y. 2009) (*Flynt Distrib.*, 745 F.2d at 138).   A private dispute does not become a public controversy merely because third parties learn of it; rather, a public controversy is "a specific public dispute that has foreseeable and substantial ramifications for persons beyond its immediate participants." *Waldbaum*, 627 F.2d at 1292.   Thus, "[t]o determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons actually were discussing some specific question.   A general concern or interest will not suffice." *Id.* at 1297; *see also Time, Inc. v. Firestone,* 424 U.S. 448 (1976) (holding that matters of mere newsworthiness do not qualify as public controversies).

PRIAC alleges that "State Street was prominent in the public discussion of its active fixed income funds" and that State Street had previously shared its "opinions on things that [its] clients and prospects are interested in in the industry."  Pl's Br. at 46.   However, PRIAC offers no direct relationship between any promotional message and any subsequent defamation. *See Blue Ridge*, 866 F.2d at 687 (noting that "a direct relationship between the promotional message and the subsequent defamation [indicates] plaintiff's pre-existing involvement in the particular matter of public concern and controversy").   Such broad generalizations do not constitute a specific "public controversy." *See Waldbaum*, 627 F.2d 1292 (public controversy must be a

---

[17] PRIAC states that "[i]n *Reliance*, the court found that the plaintiff corporation became a limited purpose public figure when it offered to sell its securities to the public."  Pl's Br. at 45 (citing 442 F. Supp. at 1348).  This misconstrues *Reliance*.  In fact, the *Reliance* court stated that "[plaintiff] was, at the time of libel, offering to sell its stock to the public, thereby voluntarily thrusting itself into the public arena, *at least as to all issues affecting that proposed stock sale*."  442 F. Supp. at 1348 (emphasis added).  The Court did not issue a blanket statement that all publicly-traded corporations were *per se* limited purpose public figures. *Id.*

"specific public dispute"); *see also Cummins*, 649 F. Supp. 2d at 242 ("Finding the plaintiff to be a public figure on the basis of a broad public controversy about stock option practices, assuming such a controversy existed at the time, would effectively require finding that every executive receiving stock options was a public figure for purposes of critical comment concerning those options.") (citing *Hutchinson*, 443 U.S. at 134-36).

PRIAC's only other "evidence" that a public controversy existed prior to its defamatory statements is additional testimony of Arlene Roberts, in which Ms. Roberts recalls that, "I think there were a lot of negative articles being written about SSgA in the summer of 2007." *See* Pl's Br. at 47. Yet, this isolated and imprecise recollection cannot serve to satisfy PRIAC's burden here. Moreover, PRIAC makes no showing that the subject matter of these "negative news articles" bore any relation to the defamatory statements made by PRIAC, which portrayed State Street as a dishonest manager who hid the facts from its investors. *See Cummins*, 649 F. Supp. 2d at 241; *see also Calvin Klein Trademark Trust v. Wachner*, 129 F. Supp. 2d 248, 252 (S.D.N.Y. 2001) (framing public controversy inquiry in terms of whether there was public controversy specifically concerning defamation counterclaimant's conduct, rather than whether any controversy existed generally about conduct of that nature).

Accordingly, PRIAC has failed to show that State Street is either a general purpose or a limited purpose public figure, and the Court should consider State Street to be a "private figure" for the purposes of its defamation claim.

### 3.      PRIAC was Negligent in Making the Defamatory Statements.

Private persons or corporations, as distinguished from public officials and public figures, may recover compensation on proof of negligent publication of a defamatory falsehood. *See Stone v. Essex County Newspapers, Inc.*, 330 N.E.2d 161, 168 (Mass. 1975). "Under the negligence standard . . . the defendants are required to act "reasonably in checking on the truth or

falsity . . . of the communication before publishing it." *Appleby v. Daily Hampshire Gazette*, 478

N.E.2d 721, 724 (Mass. 1985) (quoting Restatement (Second) of Torts § 580B comment g).[18]

PRIAC was in receipt of information disclosing, among other things, that the Bond Funds were

materially invested in ABS backed by subprime mortgages, were severely impacted by the

subprime crisis, and that the IBF employed a 4 to 1 leverage ratio.  The PRIAC employees who

made the defamatory statements failed to reasonably investigate their statements, and in fact

made no investigation at all.  Opp. R. 56.1 Stmt. ¶¶ 71, 189-190.

### D.  PRIAC's Statements Consist of Assertions of Fact or are Defamatory Mixes of Fact and Opinion.

PRIAC maintains that some of its statements constitute opinions that are entitled to

protection under the Constitution.[19]  Pl's Br. at 51-52.  An expression of opinion that implies a

false assertion of fact is not entitled to protection.  *North Shore Pharmacy Services, Inc. v.*

*Breslin Assocs. Consulting, LLC,* 491 F.Supp.2d 111, 126 (D. Mass. 2007) (denying motion for

summary judgment on defamation claim); Restatement (Second) of Torts § 566 ("A defamatory

communication may consist of a statement in the form of an opinion, but a statement of this

nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis

for the opinion.").  PRIAC's statements consist of defamatory facts capable of being proven false,

or imply undisclosed defamatory facts as the basis for the statements.  For example, PRIAC

states that State Street "failed to respond" or that "many questions remain unanswered."  These

statements state facts that are false.  State Street provided PRIAC with all the material

information that investors needed to know to decide whether to redeem out of the Bond Funds.

---

[18] Moreover, PRIAC's actions also meet the requirements of the "actual malice" standard.  The PRIAC employees responsible for creating the standardized client communications, at a minimum, recklessly disregarded whether the statements they caused PRIAC to make were false. *See* Part III.B.2, *supra.*

[19] PRIAC does not claim that Statements 3, 4, 5, 6, 11, 16 or 17 constitute opinion.

*See* Opp. R. 56.1 Stmt. ¶¶ 136, 140-141, 189.  Moreover, PRIAC does not present the underlying facts to support these so-called opinions – the reader of the statement is left to infer that State Street acted inappropriately.

**E.      PRIAC's Statements Were "Of and Concerning" its Relationship with State Street.**

PRIAC contends that several of its defamatory statements were not "of and concerning" State Street.  Pl's Br. at 52-53.  A "statement need not explicitly refer to the plaintiff to constitute defamation." *Stanton v. Metro Corp.*, 438 F.3d 119, 128 (1st Cir. 2006).  A plaintiff can prove that a defendant's words were "of and concerning" him by showing either that the defendant intended its words to refer to the plaintiff and that they were so understood, *or* that the defendant's words reasonably could be interpreted to refer to the plaintiff and that the defendant was negligent in publishing them in such a way that they could be so understood.  *Eyal v. Helen Broadcasting Corp.,* 583 N.E.2d 228 at 230.

PRIAC intended that the Plans interpret its defamatory statements as referring to State Street.  All of the defamatory statements mention State Street explicitly, and are facially "of and concerning" State Street and State Street's relationship with PRIAC.

**F.      Connecticut's "Incremental Harm" Doctrine Is Inapplicable, As Massachusetts Law Governs State Street's Defamation Claim.**

PRIAC argues that Connecticut law governs State Street's claim, and thus the "incremental harm" doctrine applies.  Pl's Br. at 53-55.  PRIAC is incorrect on both points, as State Street's defamation claim is governed by Massachusetts law, which does not recognize the "incremental harm" doctrine.  Under New York choice-of-law rules, when examining defamation claims, the court "applies the law of the state with the most significant interest in the litigation." *Lee v. Bankers Trust Co.,* 166 F.3d 540, 545 (2d Cir. 1999).  "[T]he state of the plaintiff's domicile will usually have the most significant relationship to the case, and its law will

therefore govern." *Id.* (quoting *Reeves v. American Broad Co.*, 719 F.2d 602, 605 (2d Cir. 1983) (internal quotations omitted)).  Massachusetts has the most significant relationship to the case because State Street's principal place of business is in Massachusetts, and because State Street has suffered the most damage to its reputation.  *See Celle,* 209 F.3d at 175 ("[I]n libel actions, New York assumes that the state of the plaintiff's domicile will usually have the most significant interest in the case"); Restatement (Second) of the Conflict of Laws (1971), § 150(3) ("When a corporation. . . . claims that it has been defamed by aggregate communication, the state of most significant relationship will usually be the state where the corporation . . . had its principal place of business at the time, if the matter complained of was published in that state.").

Any interest Connecticut has in protecting its citizens from defamation claims is offset by the interests of Massachusetts in protecting its citizens from defamation.  *Condit v. Dunne,* 317 F. Supp. 2d 344, 355 (S.D.N.Y 2004) (noting California "has an interest in this case in having its defamation laws applied to protect the plaintiff, its resident, from allegedly defamatory statements of outsiders") *see also Reeves,* 719 F.2d at 605 (upholding a decision to apply California law to a defamation claim based on the factual determination that the plaintiff, a resident of California, "would suffer the most damage to his reputation in his home state").[20]

No Massachusetts state court has ever adopted the incremental harm doctrine.  *Noonan v. Staples Inc.*, No. 09-11605-WGY, 2010 WL 1416466, *4 (D. Mass April 5, 2010), and thus the

---

[20] The fact that Connecticut courts have adopted the incremental harm doctrine should have no bearing on the choice-of-law analysis; in *Condit* and *Reeves,* California was chosen by New York courts as the jurisdiction with the most significant relationship to the case, despite being a state that "does not extend greater protection to the media or to opinions."  *Condit*, 317 F. Supp. 2d at 355.  Accordingly, Massachusetts, as the jurisdiction representing State Street's principal place of business and where the greatest injury was felt, and as one of the jurisdictions where PRIAC published the defamatory materials, should be the jurisdiction that governs the defamation claim.

doctrine is inapplicable here.

**G.    State Street was Damaged by PRIAC's Defamatory Statements.**

State Street may recover any economic losses attributable to PRIAC's defamatory

statements as well as damage to reputation.[21]  *Ravnikar*, 782 N.E.2d at 511 (holding that a false

statement that a physician is terminally ill may prejudice the physician's practice is therefore

actionable without proof of any economic damage); *North Shore Pharmacy Services, Inc. v.*

*Breslin Associates Consulting, LLC.,* 491 F.Supp.2d 111, 128 (D. Mass. 2007).  "General

damages are available where it is clear that injury, however unquantifiable, resulted from the

publication of the defamatory statement."  *Sack on Defamation*, § 10.5.1, 10-37; *see also Israel*

*Travel Advisory Serv. v. Israel Identity Tours*, 61 F.3d 1250, 1255-56 (7th. Cir. 1995) ("ITAS

was able to prove that lies had been told, but the extent of their effect was bound to be

problematic.  That's why general damages are available in the law of defamation.").

State Street is not required to prove actual harm to reputation, because it is presumed.

*Andreucci v. Foresteire,* No. 957183, 1998 WL 1184151, at *3  (Mass. Super. Ct. Jan. 6, 1998)

("By definition, if a statement is defamatory, then it has harmed a person's reputation.  In a

defamation action, the natural consequences of the false statement are assumed, including

damage to reputation and mental anguish."); *see also Sharratt v. Housing Innovations, Inc.,* 365

Mass. 141, 148 ("These elements of recovery are based on the harm which the law assumes is

done by the defamatory words.").  Finally, the issue of actual harm and damages to State Street's

business reputation, "is a material issue of fact to be determined by the trier of fact and not by the

court on summary judgment."  *Andreucci,* 1998 WL 1184151, at *3.

As a result of PRIAC's defamatory statements, PRIAC clients liquidated their investment

---

[21] As PRIAC acknowledges, State Street would also be entitled to recover nominal damages in
an action for defamation.  Pl's Br. at 57.

in State Street funds unrelated to the present action.  *See* Opp. R. 56.1 Stmt. at ¶ 240.  State

Street lost thousands of dollars of fees a year as a result of these terminations.

Moreover, PRIAC's defamatory statements damaged State Street's reputation among the

consultants and retirement plans that received PRIAC's statements.  PRIAC did not limit its false

statements to investment capabilities, but accused State Street of dishonestly hiding information

that State Street actually had provided to PRIAC.  PRIAC published the statements at issue to a

wide swath of the "community" of ERISA trustees and their paid consultants.  The statements

were also published to important pension consulting firms such as Aon, New England Pension

Consultants, Hunter Advisors, Mercer, and DiMeo Schneider.  Opp. R. 56.1 Stmt. ¶ 166.  State

Street's reputation among these consulting firms was damaged by PRIAC's false statements.

## IV.   PRIAC'S MOTION FOR SUMMARY JUDGMENT ON STATE STREET'S 93A CLAIM SHOULD BE DENIED BECAUSE THE CONDUCT AT ISSUE OCCURRED PRIMARILY AND SUBSTANTIALLY IN MASSACHUSETTS.

In Massachusetts, defamatory statements can constitute unfair and deceptive acts or

practices in violation of Massachusetts General Laws Chapter 93A.  *See Encompass Ins. Co. v.*

*Giampa*, 522 F. Supp. 2d 300, 315-16 (D. Mass 2007).  Chapter 93A requires that the conduct

complained of occurred "primarily and substantially" in Massachusetts.  *See* Mass. G.L. c. 93A,

§ 11.  The burden of proving that this prerequisite is *not* satisfied rests on the defendant.  *See id.*

Whether the actions constituting a Section 11 claim occurred primarily and substantially within

Massachusetts is not a determination that can be reduced to any precise formula.  *See Kuwaiti*

*Danish Computer Co. v. Digital Equip. Corp*, 781 N.E.2d 787,798 (Mass. 2003).  "Courts

engage in a holistic, fact-based analysis focused upon whether the center of gravity of the

circumstances that give rise to the claim is primarily and substantially within the

Commonwealth."  *Korpacz v. Women's Professional Football League*,  No. Civ.A 014-10735-

RWZ, 2006 WL 220762, *5 (D. Mass. Jan. 27, 2006) (citing *Kuwaiti Danish Computer Co. v.*

*Digital Equipment Corp.,* 781 N.E.2d 787 (Mass. 2003) (internal quotations omitted).

PRIAC cites to *Korpacz* as support for its argument that PRIAC's conduct did not occur primarily and substantially in Massachusetts.  In *Korpacz*, the plaintiff brought a defamation-based Chapter 93A claim against a professional association on the basis of several emails and a press release concerning the plaintiff's expulsion from the professional group.  The court held that the "center of gravity" in that case was "the plaintiffs' March 2004 expulsion from the WPFL, which took place in Arizona at a meeting of the WPFL." *Id.*  This expulsion formed the basis for the subsequent statements.  The court also noted that none of the communications at issue were sent to Massachusetts.  *See id.*

Here, as in *Korpacz*, the center of gravity occurred in the state where the underlying conduct described took place.  The Bond Funds were Massachusetts trusts, managed by a Massachusetts bank.  The factual allegations in the statements concern conduct that occurred in Massachusetts.  Information transmitted to PRIAC about the composition and performance of the Bond Funds originated in Massachusetts.  Moreover, PRIAC transmitted the defamatory statements to Massachusetts clients and consultants.  Opp. R. 56.1 Stmt. ¶ 166.  Finally, the injury to State Street occurred in Massachusetts.  In sum, PRIAC has not met its burden in proving that its actions did not occur "primarily and substantially" in Massachusetts.  At a minimum, material factual issues exist and must be decided at a trial, not on summary judgment.[22]

---

[22]PRIAC also argues that State Street's counterclaims against PRIAC are procedurally improper insofar as they seek recovery from PRIAC in its individual, rather than fiduciary capacity.  Pl's Br. At 59.  But PRIAC named itself as the plaintiff in this action, without seeking to appear only in a representative capacity, so all of State Street's counterclaims are procedurally proper.  Furthermore, with respect to State Street's contribution counterclaim, *Chemung* established that the right of contribution is not a true cause of action.  Instead, it is "no more than a procedural device for equitably distributing responsibility for plaintiff's losses proportionally

## CONCLUSION

For the reasons set forth herein, State Street respectfully requests that the Court deny PRIAC's Partial Motion for Summary Judgment.  State Street also requests that the Court grant summary judgment in favor of State Street regarding State Street's counterclaim for contribution against PRIAC.

Dated:  July 2, 2010                         ROPES & GRAY LLP

                                             /s/ Harvey J. Wolkoff
                                             Harvey J. Wolkoff
                                             Robert A. Skinner
                                             Daniel J. Maher
                                             One International Place
                                             Boston, MA  02110
                                             Tel: (617) 951-7000
                                             Fax: (617) 951-7050
                                             harvey.wolkoff@ropesgray.com
                                             robert.skinner@ropesgray.com
                                             daniel.maher@ropesgray.com

                                             *Attorneys for Defendant State Street Bank and Trust Company*

---

among those responsible for the losses, and without regard to which particular persons plaintiff chose to sue in the first instance."  *Chemung*, 939 F.2d at 15-16.  Thus, State Street's contribution counterclaim against PRIAC is also procedurally proper as a mechanism to apportion liability among co-fiduciaries under *Chemung*.  Ultimately, PRIAC's argument amounts to nothing more than an assertion that State Street's counterclaim should be styled as a third-party action against PRIAC rather than a counterclaim.  So, alternatively, the proper remedy for such an alleged procedural defect would be to allow State Street to simply amend its Answer and Counterclaims to re-designate them as third-party actions.  *See Rubin v. Valicenti Advisory Services, Inc.*, 326 F. Supp. 2d 427 (W.D.N.Y. 2004); (allowing defendant to amend answer and re-designate counterclaim as third-party claim); *Lee v. Manufacturers & Traders Trust Co.*, 219 F.R.D. 265 (W.D.N.Y. 2004) (same).  Whether State Street's claims are styled as counterclaims or third-party party actions is of no moment for purposes of the present motion, as the arguments and evidence herein apply with equal force to third-party claims.

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on July 2, 2010, I caused a true and correct copy of State Street's Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment Dismissing Counterclaims and in Support of State Street's Cross-Motion for Partial Summary Judgment, State Street's Cross-Motion for Partial Summary Judgment, State Street's Response to Plaintiffs' Local Rule 56.1 Statement of Material Facts in Support of Motion for Partial Summary Judgment Dismissing Counterclaims, State Street's Local Rule 56.1 Statement of Material Facts in Support of Cross-Motion for Partial Summary Judgment, Declaration of Daniel J. Maher dated July 2, 2010, and Exhibits to the Declaration of Daniel J. Maher to be served upon the following counsel of record by e-mail.

<u>/s/ Allison M. Boscarine</u>
Allison M. Boscarine

Edwin G. Schallert
Jeremy Klatell
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022

Caren S. Sweetland
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, TX 77002

John J. Butts, Esq.
Steven Cherry
Felicia Ellsworth
Kevin Prussia
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109

Lewis R. Clayton
Jonathan Hurwitz
Aliza Balog
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON
1285 Avenue of the Americas
New York, NY 10019-6064

David E. Lurie
Thomas Lent
LURIE & KRUPP, LLP
One McKinley Square
Boston, MA 02109

John R. Nelson
LOCKE LORD BISSELL & LIDDELL LLP
100 Congress, Suite 300
Austin, TX 78701

Robert Burford
BURFORD & MANEY PC
700 Louisiana, Suite 4600
Houston, TX 77002

Thomas J. Dougherty
Peter Simshauser
Michael S. Hines
SKADDEN ARPS SLATE MEAGHER &
FLOM LLP
One Beacon Street
Boston, Massachusetts 02108

Steven L. Severson
Justin Krypel
Debbie Ellingboe
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402

Samuel H. Rudman
David A. Rosenfeld
Evan J. Kaufman
Carolina Torres
Mark Reich

45

ROBBINS GELLER RUDMAN & DOWD
LLP
58 S. Service Road, Ste. 200
Melville, NY 11747