UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE STATE STREET BANK AND TRUST             :
CO. ERISA LITIGATION                          :
                                              :
                                              :
This document relates to:                     :          07 Civ. 8488 (RJH)
                                              :
07 Civ. 8488 (*Prudential Retirement Insurance and* :    ECF Case
*Annuity Company v. State Street Bank and Trust*    :
*Company and State Street Global Advisors, Inc.*)   :
                                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO STATE STREET'S MOTION FOR SUMMARY JUDGMENT

Edwin G. Schallert
Steven Klugman
Jeremy N. Klatell
Courtney M. Dankworth
Miranda H. Turner
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

Attorneys for Plaintiff Prudential
Retirement Insurance and Annuity Company

Dated: New York, New York
       July 2, 2010

# TABLE OF CONTENTS

**Page**

Summary of Argument ........................................................................................1

Argument ............................................................................................................3

I.    State Street's Defenses to ERISA  Liability Fail as a Matter of Law................3

    A.    PRIAC's Conduct Cannot Diminish State Street's Liability to the
        Plans Under ERISA §§ 404 and 409.........................................................3

    B.    As a Matter of Law, State Street Has No "Mitigation Prevention"
        Defense. .....................................................................................................6

        1.    No Pleading of Mitigation Prevention ......................................7

        2.    No "Mitigation Prevention" Defense.........................................8

        3.    No Duty of the Plans to Mitigate Under ERISA.........................8

        4.    State Street's Ability to Avoid Damages..................................11

    C.    As a Matter of Law, State Street Has No Defense Based on
        Superseding Cause. ..................................................................................12

        1.    No Pleading of Superseding Cause...........................................12

        2.    Superseding Cause Not a Defense Under ERISA.....................13

        3.    PRIAC's Alleged Misconduct Not a Superseding Cause ..........14

    D.    Partial Summary Judgment Should Be Entered in Favor of PRIAC. ...................18

II.    State Street's Motion Should Be Denied Because It Relies on Facts That Are
    Disputed. ............................................................................................................19

    A.    State Street Bears the Burden of Demonstrating an Absence of
        Material Disputed Facts Pertaining to Its Defenses.................................19

    B.    The Facts About PRIAC's Conduct Are Disputed. .................................20

        1.    PRIAC's Role in Monitoring the Bond Funds...........................20

        2.    The Incorrect Name for the IBF.................................................22

        3.    No Breach of PRIAC's Duty .....................................................23

i

C.    The Facts About the Information That State Street Provided to PRIAC Are Disputed. ..........................................................24

  1.    Leverage...........................................................................26

  2.    Subprime Exposure...........................................................30

D.    The Facts About What the Plans Would Have Done If They Had Additional Information Are Disputed. ...................................32

E.    The Information State Street Sent to PRIAC Was Misleading............................36

  1.    Goal to Triple the Business...............................................37

  2.    Changes in Strategy for the Bond Funds ...................................38

    a.    Increase in Return Targets ..........................................38

    b.    Subprime and Leverage ..............................................38

  3.    Violation of Risk Policies ...............................................38

F.    The Facts About the Amount of the Plans' Damages Are Disputed. ...................40

III.    PRIAC Agrees to the Dismissal of the State Street Subsidiary. ........................................42

Conclusion ..........................................................................................................43

## TABLE OF AUTHORITIES

CASES

*Air Et Chaleur, S.A. v. Janeway*,
  757 F.2d 489 (2d Cir. 1985).................................................................................6

*Algarin v. New York City Department of Correction*,
  460 F. Supp. 2d 469 (S.D.N.Y. 2008)...............................................................18

*American Automobile Insurance Co. v. Advest, Inc.*,
  No. 08 Civ. 6488 (LAK), 2009 WL 3490060 (S.D.N.Y. Oct. 28, 2009) ...............20

*Brady v. Town of Colchester*,
  863 F.2d 205 (2d Cir. 1988)...............................................................................19

*California Ironworkers Field Pension Trust v. Loomis, Sayles & Co.*,
  No. CV 964036 (CAS) (JGX), 1999 WL 1457226 (C.D. Cal. Mar. 26, 1999)......41

*Carson v. Dudley*,
  25 A.D.3d 983 (N.Y. App. Div. 2006) ................................................................32

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...........................................................................................19

*Chao v. Wheeler*,
  No. 3:05 CV 763 (RM), 2007 WL 4233464 (N.D. Ind. Nov. 28, 2007) ...................8

*Chemung Canal Trust Co. v. Sovran Bank/Maryland*,
  939 F.2d 12 (2d Cir. 1991)...................................................................8, 9, 10, 13

*Dardaganis v. Grace Capital Inc.*,
  889 F.2d 1237 (2d Cir. 1989)...............................................................................4

*Derdiarian v. Felix Contracting Corp.*,
  414 N.E.2d 666 (N.Y. 1980)...............................................................................17

*Donovan v. Bierwirth*,
  754 F.2d 1049 (2d Cir. 1985).....................................................................4, 40, 41

*Ebbert v. Nassau County*,
  No. 05-CV-5445 (FB) (AKT), 2009 WL 935812 (E.D.N.Y. Mar. 31, 2009) ...........19

*Funk v. F & K Supply, Inc.*,
  43 F. Supp. 2d 205 (N.D.N.Y. 1999)....................................................................8

*Gerbino v. Tinseltown USA*,
  13 A.D.3d 1068 (N.Y. App. Div. 2004) ...............................................................12

*Ginsberg v. Healey Car & Truck Leasing, Inc.*,
  189 F.3d 268 (2d Cir. 1999)................................................................................20

*Gordon v. Eastern Railway Supply*,
  626 N.E.2d 912 (N.Y. 1993)................................................................................16

*Haven Associates v. Donro Realty Corp.*,
  121 A.D.2d 504 (N.Y. App. Div. 1986) ..............................................................13

*Higazy v. Templeton*,
  505 F.3d 161 (2d Cir. 2007)..........................................................................17, 36

*Hunt v. Magnell*,
  758 F. Supp. 1292 (D. Minn. 1991) ....................................................................13

*Katz Communications, Inc. v. Evening News Association*,
  705 F.2d 20 (2d Cir. 1983)..................................................................................32

*Kush v. City of Buffalo*,
  449 N.E.2d 725 (N.Y. 1983)................................................................................17

*Lee v. Manufacturers & Traders Trust Co.*,
  219 F.R.D. 265 (W.D.N.Y. 2004)..........................................................................5

*Levine v. NL Industries, Inc.*,
  926 F.2d 199 (2d Cir. 1991)..................................................................................7

*Lewis v. Babcock Industries, Inc.*,
  No. 88 Civ. 1120 (JMC), 1992 WL142751 (S.D.N.Y. June 8, 1992) ...................19

*LNC Investments, Inc. v. First Fidelity Bank, N.A. New Jersey*,
  173 F.3d 454 (2d Cir. 1999)................................................................................14

*Moothart v. Bell*,
  21 F.3d 1499 (10th Cir. 1994) ............................................................................10

*National Market Share, Inc. v. Sterling National Bank*,
  392 F.3d 520 (2d Cir. 2004)................................................................................13

*Nordwind v. Rowland*,
  584 F.3d 420 (2d Cir. 2009)................................................................................14

*Preston v. American Federation of Television & Radio Artists Health Fund*,
  No. 90 Civ. 7094 (RJW), 2002 WL 1009458 (S.D.N.Y. May 16, 2002) ........10, 11

*Project Release v. Prevost*,
  722 F.2d 960 (2d Cir 1983)................................................................................18

*Schleibaum v. Kmart Corp.*,
   153 F.3d 496 (7th Cir. 1998) ...................................................................10

*Schoenholtz v. Doniger*,
   657 F. Supp. 899 (S.D.N.Y. 1987) ...........................................................40

*Smith v. Stone & Webster Engineering Corp.*,
   No. 86 CIV. 5627 (PKL), 1988 WL 32928 (S.D.N.Y. Apr. 4, 1988)....................29

*In re State Street Bank & Trust Co. ERISA Litigation*,
   579 F. Supp. 2d 512 (S.D.N.Y. 2008)........................................................4

*Travelers Indemnity Co. v. Maho Machinery Tool Corp.*,
   952 F.2d 26 (2d Cir. 1991).......................................................................11

*Travellers International, A.G. v. Trans World Airlines, Inc.*,
   41 F.3d 1570 (2d Cir. 1994)...................................................................6, 7

*Trustees of the Automobile Mechanics Local No. 701 Pension & Welfare Funds v.
   Union Bank of California*,
   630 F. Supp. 2d 951 (N.D. Ill. 2009) ........................................................5

*Trustees of the Local 464A United Food & Commercial Workers Union Pension
   Fund v. Wachovia Bank, N.A.*,
   Civ. No. 09-668 (WJM), 2009 WL 4138516 (D.N.J. Nov. 24, 2009)..................5, 9

*United States v. Hooker Chemicals & Plastics Corp.*,
   722 F. Supp. 960 (W.D.N.Y. 1989) ..........................................................12

*Westwood Pharmaceuticals, Inc. v. National Fuel Gas Distribution Corp.*,
   737 F. Supp. 1272 (W.D.N.Y. 1990) ........................................................12

*Williams v. Provident Investment Counsel, Inc.*,
   279 F. Supp. 2d 894 (N.D. Ohio 2003).....................................................9, 10

## STATUTES

29 U.S.C. § 1104.............................................................................................3

29 U.S.C. § 1109........................................................................................1, 13

29 U.S.C. § 1132(g)(1) ..................................................................................40

**OTHER AUTHORITIES**

Charles Alan Wright & Arthur R. Miller,
    *Federal Practice and Procedure* (3d ed. 2010) .....................................................7, 18

Federal Rule of Civil Procedure 8(c) ...............................................................7

Restatement (Second) of Contracts (1981) .......................................................6

Restatement (Second) of Torts....................................................6, 12, 13, 15, 16, 17, 32

Restatement (Second) of Trusts (1959) .............................................................8, 10, 13

PRIAC submits this memorandum in opposition to State Street's motion for summary judgment.[1]  The motion should be denied because the purported defenses on which it is based are, as a matter of law, unavailable to State Street.  Among other things, these defenses cannot be used to reduce the damages claimed in this case under ERISA.

## Summary of Argument

State Street's motion does not challenge the claim that it is liable under Section 404 of ERISA for violating its fiduciary duties to the Plans, on whose behalf PRIAC is suing under Section 409 of ERISA, 29 U.S.C. § 1109.  PRIAC will demonstrate at trial that State Street's imprudent management of the Bond Funds caused injury to the Plans and will prove damages to the Plans, under the governing legal standard, in the amount of $76.7 million, plus interest and attorneys' fees.  State Street's motion attempts to use PRIAC's alleged misconduct to reduce its own ERISA liability to the Plans.  That attempt fails as a matter of law.

State Street contends that two purported defenses entitle it to summary judgment even if it did violate Section 404.  State Street asserts that (a) because PRIAC allegedly breached its fiduciary obligations to the Plans, the Plans failed to mitigate their damages by selling their interests in the Bond Funds earlier, and (b) PRIAC's wrongful conduct was a superseding cause of some of the Plans' damages.  State Street contends that these defenses reduce the amount that the Plans can recover from it under ERISA to an amount that is less than the credit to which it is entitled on account of distributions for the benefit of the Plans from the Fair Fund established by State Street's settlement with the SEC.

The motion should be denied on several grounds.  First, State Street waived both these defenses by failing to plead them in its answer.  Second, the "mitigation prevention" defense that

---

[1]    In this memorandum, PRIAC uses capitalized terms as they are defined by State Street in its Memorandum of Law in Support of Motion for Summary Judgment ("State Street Mem.").

State Street advances does not exist, and even if it did it would be unavailable, as a matter of law, as a defense to the ERISA claim against it. Third, the doctrine of superseding cause likewise does not apply to that ERISA claim. It would be inconsistent with both the statutory language and ERISA's purpose to permit these doctrines to reduce recoveries under Sections 404 and 409. Because State Street cannot possibly prevail on these supposed ERISA defenses, partial summary judgment should be entered in favor of PRIAC with respect to them.

Even if the Court does not determine that these defenses are inapplicable as a matter of law, the motion should be denied because State Street has not satisfied the requirements of Rule 56. State Street has not presented the facts in support of its purported defenses completely, in context or in the light most favorable to the non-moving party. There are, at a minimum, disputed facts concerning PRIAC's role and the information that State Street provided to PRIAC, and a factfinder could determine that PRIAC acted appropriately in seeking more information from State Street before passing it on to the Plans. In addition, State Street cannot prove an essential element of its purported defenses: that if PRIAC had given the Plans the information that State Street provided to it in the summer of 2007, the Plans would have redeemed their investments in the Bond Funds sooner, reducing their losses. There is no evidence to support State Street's assumption that each of the nearly 200 Plans would have acted in that way. State Street points to 36 other investors, mostly invested in other bond funds, that redeemed earlier than the Plans. It does not show that these investors had the same information as PRIAC. In fact, although in late July 2007 State Street advised some of those investors to redeem, it gave no such advice to PRIAC or the Plans. To the contrary, in late August it warned them about the "downside" of selling and asserted that "judicious investors" would retain their positions.

**Argument**

**I.      State Street's Defenses to ERISA
           Liability Fail as a Matter of Law.**

State Street virtually ignores the fact that the only claim in this case is an ERISA claim,

and the consequence that the legal issues must be decided under ERISA.  As a matter of law, the

purported defenses on which State Street relies are unavailable to an ERISA violator seeking to

avoid or reduce its liability for damages.  Partial summary judgment as to these defenses should

be granted in favor of PRIAC.

**A.      PRIAC's Conduct Cannot Diminish State Street's
           Liability to the Plans Under ERISA §§ 404 and 409.**

PRIAC will establish that State Street breached its fiduciary obligations to the Plans

under Section 404 of ERISA, 29 U.S.C. § 1104, which provides in part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the
> interest of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of . . . providing benefits to participants and
> their beneficiaries; . . .
>
> (B) with the care, skill, prudence, and diligence under the circumstances
> then prevailing that a prudent man acting in a like capacity and familiar
> with such matters would use in the conduct of an enterprise of a like
> character and with like aims . . . .

On behalf of the Plans, PRIAC is pursuing this claim pursuant to Section 409 of ERISA,

which provides that "[a]ny person who is a fiduciary with respect to a plan who breaches any of

the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be

personally liable to make good to such plan any losses to the plan resulting from each such

breach . . . ."  The statute unequivocally obligates State Street to pay to the Plans "any losses" resulting from its breach.[2]

PRIAC will prove that State Street's breach exposed the Plans to an excessive and inappropriate risk of losses and that its decision to do so placed its own interests ahead of the Plans' interests.  PRIAC also will establish that the Plans' losses resulted from State Street's breach for purposes of Section 409, and will prove the Plans' damages under the rule prescribed by *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985):  by presenting an expert who will compare "what the Plan actually earned . . . with what the Plan would have earned had the funds been available for other Plan purposes" from June 1 through September 5, 2007, when the value of the Bond Funds fell sharply.  Under this rule, "[w]here several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these."  *Id.*; *Dardaganis v. Grace Capital Inc.*, 889 F.2d 1237, 1244 (2d Cir. 1989); *In re State Street Bank & Trust Co. ERISA Litig.*, 579 F. Supp. 2d 512, 518 n.3 (S.D.N.Y. 2008) ("9/30/08 Opinion").  That amount represents the damages for which State Street is liable under Sections 404 and 409 of ERISA.

While denying that it mismanaged the Bond Funds, State Street asserts that, if it did, some of the Plans' losses are attributable to PRIAC's alleged misconduct in failing to alert the Plans in a timely fashion to facts about the Bond Funds.  State Street has counterclaimed for

---

[2]     State Street mischaracterizes PRIAC's lawsuit as an attempt "to recover reimbursements it paid to approximately 165 retirement plan clients," a reference to the loans that PRIAC made to most of the Plans.  State Street Mem. 1.  This Court rejected a similar characterization that State Street made in its motion to dismiss and held, *inter alia*, that the Plans had a legally cognizable injury notwithstanding any compensation covered by the "collateral source rule."  9/30/08 Opinion at 6-8.  As in its motion to dismiss, State Street continues to question the nature of the non-recourse, non-interest bearing loans, State Street Mem. 7, even though those features of the loans were necessitated by exemptions from ERISA's "prohibited transaction" rules.

indemnity and contribution in respect of any ERISA liability it incurs.  If that claim is successful, the amount of State Street's ERISA liability will not be affected, but it will be able to recover from PRIAC some portion of that amount.[3]

In this motion, State Street goes a step further – a step that ERISA does not permit.  State Street asserts that under two legal doctrines, mitigation and superseding cause, PRIAC's alleged misconduct *reduces* the amount that the Plans can recover from State Street under Section 409. ERISA itself does not mention or remotely hint at these defenses, and there is no basis for incorporating either into ERISA.  To recognize these doctrines as part of ERISA would enable an ERISA violator to reduce beneficiaries' recoveries against it by pointing to other purported reasons for the Plans' losses.  That result would directly undercut the requirement of Section 409 that violators "make good to such plan any losses to the plan resulting from each such breach" and would be inconsistent with the basic policy of ERISA to provide full and complete compensation for losses suffered at the hands of ERISA violators.  *Lee v. Mfrs. & Traders Trust Co.*, 219 F.R.D. 265, 266 (W.D.N.Y. 2004); *accord Trs. of the Auto. Mechs. Local No. 701 Pension & Welfare Funds v. Union Bank of Cal.*, 630 F. Supp. 2d 951, 952 (N.D. Ill. 2009); *Trs. of the Local 464A United Food & Commercial Workers Union Pension Fund v. Wachovia Bank, N.A.*, Civ. No. 09-668 (WJM), 2009 WL 4138516, at *3 (D.N.J. Nov. 24, 2009).  State Street's brief barely mentions ERISA and never refers to Section 404 or Section 409.  Its position that it can reduce its statutory liability by importing from other areas of law common-law concepts that reduce liabilities is wrong as a matter of law.  The Court should decide now that neither of these

---

[3]     As PRIAC has explained in its Memorandum of Law in Support of Motion for Partial Summary Judgment Dismissing All Counterclaims ("PRIAC SJ Mem."), State Street does not have a viable claim for contribution or indemnity.

purported defenses is available to reduce State Street's liability to the Plans under ERISA §§ 404 and 409.

**B.      As a Matter of Law, State Street Has
        No "Mitigation Prevention" Defense.**

Under the doctrine of mitigation, a defendant's liability for breach of contract or a tort can be reduced if the injured party could have taken action to avoid losses from the defendant's wrongdoing. Restatement (Second) of Contracts § 350 (1981) ("[D]amages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation."); Restatement (Second) of Torts § 918 (1979) ("[O]ne injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort."). The defendant has the burden of pleading and proving a failure to mitigate. *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580 (2d Cir. 1994); *Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985).

The generality of State Street's discussion, State Street Mem. 11-13, cannot hide the fact that the mitigation defense that it asserts is not the same as the defense described in the Restatements or in any case of which PRIAC is aware. A mitigation defense would be based on the conduct of the injured parties – the Plans – in failing to act in a way that would have avoided some or all of their injury. State Street is not saying that the Plans are accountable for failing to take reasonable actions to reduce their losses. Rather, State Street's defense is targeted at PRIAC's alleged misconduct in "prevent[ing] the Plans from mitigating [the Plans'] damages" by failing to convey information to the Plans about the Bond Funds. State Street Mem. 9.

State Street claims that the damages recoverable by *the Plans* – on whose behalf PRIAC is suing – should be reduced due to *PRIAC's* alleged failure to convey this information to the Plans. Its defense is one of "mitigation prevention" – not that the Plans breached an injured

party's duty to mitigate, but that PRIAC's misconduct precluded them from taking action to mitigate those damages.  State Street cites no authority recognizing or defining this apparently unprecedented defense.  PRIAC believes the elements of the defense posited by State Street would be:  (a) a duty on the part of PRIAC to provide information to the Plans, (b) a breach of that duty by PRIAC, (c) a duty of the Plans to mitigate their damages, if PRIAC had disclosed information to them, by redeeming their investments in the Bond Funds, and (d) damages to the Plans that could have been avoided if PRIAC had not breached its duty *and* the Plans had redeemed their investments in the Bond Funds earlier.

### 1.        No Pleading of Mitigation Prevention

State Street's answer, dated October 27, 2008, included an affirmative defense that "plaintiff" – PRIAC, not the Plans – "failed, refused and/or neglected to mitigate or avoid damages."  Answer & Countercl. at 8.  State Street failed to plead as an affirmative defense that PRIAC's actions "prevent[ed] the Plans from mitigating," the defense that it urges this Court to adopt as a basis for summary judgment.

Federal Rule of Civil Procedure 8(c) mandates that an answer "must affirmatively state any avoidance or affirmative defense."  "Failure to mitigate damages is an affirmative defense and therefore must be pleaded."  *Travellers Int'l*, 41 F.3d at 1580.  State Street has waived the affirmative defense that PRIAC prevented the Plans from mitigating their losses by not pleading that defense.  *Id.*; *Levine v. NL Indus., Inc.*, 926 F.2d 199, 201 (2d Cir. 1991); *see also* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1278 (3d ed. 2010).  Allowing State Street to proceed with this defense, without pleading it or otherwise giving notice of it, would be prejudicial to PRIAC because State Street's failure to plead it has deprived PRIAC the opportunity to conduct relevant discovery as to Plans' decision-making, their potential duties to mitigate, and efforts to mitigate (which may well have varied from Plan to

Plan).  *See Funk v. F & K Supply, Inc.*, 43 F. Supp. 2d 205, 221-22 (N.D.N.Y. 1999) (finding

affirmative defense raised in motion filed more than two years into case waived).

### 2.       No "Mitigation Prevention" Defense

State Street does not even try to justify the legal legitimacy of a "mitigation prevention"

defense.  This defense appears to be without legal precedent.  It surely is not "an integral and

universally-recognized part of trust doctrine" that the courts can read into the federal common

law under ERISA.  *Chemung Canal Trust Co. v. Sovran Bank/Md.*, 939 F.2d 12, 16 (2d Cir.

1991).  There is no authority for the courts to use ERISA cases as a laboratory for creating novel

legal concepts.  That would be emphatically inappropriate where, as here, the purpose of a newly

invented defense would be to undercut the language of the statute and of ERISA's policy to fully

compensate plans.

### 3.       No Duty of the Plans to Mitigate Under ERISA

State Street's mitigation prevention defense fails for the additional reason that, as a

matter of law, the Plans had no duty to mitigate under ERISA.  "The mitigation of damages

doctrine traditionally applies only to suits in tort or contract law, and [the defendant] has cited no

authority recognizing the doctrine's application to ERISA actions."  *Chao v. Wheeler*, No. 3:05

CV 763 (RM), 2007 WL 4233464, at *9 (N.D. Ind. Nov. 28, 2007).

Courts look to the common law of trusts to inform the federal common law under ERISA.

*Chemung*, 939 F.2d at 16.  In this instance, the common-law analogue is a trust beneficiary's

claim for breach of fiduciary duty against a trustee.  PRIAC has found no precedent for even a

conventional mitigation defense in the common law of trusts.  State Street does not cite any, and

does not suggest that there is any authority that recognizes mitigation as a defense to either a

claim under Sections 404 and 409 or a claim for breach of a trustee's common-law duty.  Neither

the Restatement (Second) of Trusts, Scott on Trusts, nor Bogert Trusts and Trustees mentions

mitigation.  It cannot be said – and State Street does not argue – that a mitigation defense is "an integral and universally-recognized part of trust doctrine."  *Id.*

While State Street does not cite any case permitting even a conventional mitigation defense to an ERISA claim, it does cite an ERISA case *rejecting* an investment manager's attempt to assert mitigation as an affirmative defense against a pension plan, *Wachovia*, 2009 WL 4138516, at *3.  State Street Mem. 13 n.9.  The pension plan sued under ERISA § 409, alleging that the investment manager injured the plan by investing its assets in mortgage-backed securities and collateralized mortgage obligations.  The court struck the investment manager's mitigation defense on the ground that mitigation "appears antithetical to the provisions of ERISA which tailor fiduciary liability to fit particular breaches" and "does not comport with th[e] statutory mandate of individualized liability."  *Wachovia*, 2009 WL 4138516, at *3-4 (internal quotation marks omitted).  State Street tries to distinguish *Wachovia* on the basis that the investment manager was asserting a mitigation defense against the plan, while State Street asserts it against a third party.  That difference reflects the fact that State Street has taken mitigation another step by trying to use it in an unconventional way.  The reasoning of the *Wachovia* court in rejecting a conventional mitigation defense is applicable here:  "Plaintiffs' breach of their duties would not absolve Defendants of liability for their breaches to the Plan.  If anything, it could simply give rise to a cause of action to be asserted on behalf of the Plan against Plaintiffs."  *Id.* at *4.

Other courts have reached the same conclusion as *Wachovia*.  In *Williams v. Provident Investment Counsel, Inc.*, 279 F. Supp. 2d 894, 909 (N.D. Ohio 2003), the court refused to permit a mitigation defense in an action under Section 409 by trustees of a pension plan against an investment manager for violating the plan's investment guidelines.  The court reasoned that

because "any recovery under § 409 goes to the Plan, not the trustees, and the Plan's participants should not be punished for the acts of the trustees," a defendant is "not allowed to reduce or eliminate its liability to the Plan on the defense that other fiduciaries breached their fiduciary duties." *Id.*  In *Schleibaum v. Kmart Corp.*, 153 F.3d 496, 502 (7th Cir. 1998), an action under ERISA § 503 for failure by an employer to provide information about an employee's life insurance policy, the Seventh Circuit reached the same conclusion.  "[T]he focus of [the relevant statute] is on the plan's actions, and not on the plan participant," and mitigation would be "inconsistent with the primary purpose of ERISA, which is to protect the interests of plan beneficiaries." *Id.*; *accord Moothart v. Bell*, 21 F.3d 1499, 1506-07 (10th Cir. 1994) (rejecting mitigation as a defense to a claim under ERISA § 502).

State Street's citation of *Preston v. American Federation of Television & Radio Artists Health Fund*, No. 90 Civ. 7094 (RJW), 2002 WL 1009458, at *3 (S.D.N.Y. May 16, 2002), does not support its use of a mitigation defense in this case.  State Street Mem. 11.  In *Preston*, the court stated that equitable defenses generally, and laches in particular, apply in ERISA cases seeking recovery of benefits, because such claims "are equitable in nature."  2002 WL 1009458, at *3.  The court's analysis was flawed because it did not look to the common law of trusts to flesh out federal common law, but in any event it does not suggest that even a conventional mitigation defense would apply to the claim against State Street.[4]  This Court previously held that PRIAC's claims for "monetary relief are legal, not equitable," 9/30/08 Opinion at 11, and dismissed PRIAC's claims for equitable relief other than prejudgment interest, *id.* at 11-12 n.4.

---

[4]   *Preston*'s holding that laches is a defense to an equitable ERISA claim, 2002 WL 1009458, at *3, is correct, but for a different reason:  laches is part of the common law of trusts.  *See* Restatement (Second) of Trusts § 219 (1959), entitled "Laches of the Beneficiary."  There is no comparable mitigation defense in "the principles of traditional trust law" that guide federal courts interpreting ERISA.  *Chemung*, 939 F.2d at 16.

*Preston* does not support applying a mitigation defense – let alone the novel defense of mitigation prevention – to a legal claim under Section 409 for the damages from State Street's violation of Section 404.

State Street attempts to analogize ERISA cases to securities fraud cases and contract cases that recognize failure to mitigate as a defense.  State Street Mem. 11-13.  State Street's assumption that such cases support the application of mitigation to this ERISA claim ignores the nature of the claim and the appropriate sources for construing ERISA.  The elements that define ERISA law come from the statute and from the common law of trusts, not securities law or general principles of tort and contract law.

### 4.    State Street's Ability to Avoid Damages

Even if mitigation did exist as a defense to an ERISA claim, the facts of this case do not support its application.  Mitigation is available only where the injured party is in a unique position to avoid damages from the wrongdoer's breach.  Thus, "the victim of a breach of contract need not make expenditures to mitigate damages where the breaching party had the same opportunity to prevent damages." *Travelers Indem. Co. v. Maho Mach. Tool Corp.*, 952 F.2d 26, 31 (2d Cir. 1991).  State Street, the investment manager of the Bond Funds, had the same opportunity, before, on and after July 18, 2007, to avoid continuing damages to the Plans by disposing of the Bond Funds' leveraged investments in subprime securities.  Because State Street had by far the most knowledge of the underlying risks created by those continuing investments, it was *better* positioned than any other party to avoid those additional damages.  As a result, the Plans would have had no duty to mitigate no matter what they were told by PRIAC.

**C.      As a Matter of Law, State Street Has
         No Defense Based on Superseding Cause.**

State Street argues that it is relieved from liability for most of the Plans' losses because
PRIAC's conduct in allegedly failing to make timely disclosures to the Plans was a "superseding
cause of [those] damages."  State Street Mem. 18.  This defense fails as a matter of law because
(a) State Street did not plead it, (b) the doctrine of superseding cause is not available to violators
of ERISA, and (c) PRIAC's alleged misconduct was, as a matter of law, not a superseding cause
of the Plans' losses from the diminution in the value of the Bond Funds.

In its cursory argument on superseding cause, State Street never explains what this
doctrine is or what facts it would need to prove for PRIAC's alleged misconduct to be a
superseding cause of a portion of the Plans' injury.  It does not cite a single case that even
mentions superseding cause.  State Street Mem. 17-19.  State Street does cite Section 440 of the
Restatement (Second) of Torts, which states the effect of a superseding cause.  *Id.* at 18 n.11.
The succeeding thirteen sections of the Restatement define the requirements for a superseding
cause.  At its most basic level, it is "an act of a third person [here, PRIAC] which by its
intervention prevents the actor [State Street] from being liable for harm to another which his
antecedent negligence is a substantial factor in bringing about."  Restatement (Second) of Torts
§ 440 (1965).

**1.      No Pleading of Superseding Cause**

Superseding cause is an affirmative defense.  *Westwood Pharm., Inc. v. Nat'l Fuel Gas
Distribution Corp.*, 737 F. Supp. 1272, 1286-87 (W.D.N.Y. 1990); *United States v. Hooker
Chems. & Plastics Corp.*, 722 F. Supp. 960, 968 (W.D.N.Y. 1989); *Gerbino v. Tinseltown USA*,

13 A.D.3d 1068, 1071 (N.Y. App. Div. 2004).[5]  Because it was not pleaded in State Street's

answer, it has been waived.  *See* pages 7-8, *supra*.

### 2.    Superseding Cause Not a Defense Under ERISA

As a matter of law, superseding cause is not applicable to a claim under Section 409 of

ERISA.  There is no reference to this doctrine in ERISA.  The inconsistency between this tort-

law doctrine and the statutory underpinning for the claim against State Street is clear:  Section

409 makes a violator of Section 404 "personally liable to make good to such plan any losses to

the plan resulting from each such breach," while superseding cause "relieves the [wrongdoer]

from liability, irrespective of whether his antecedent negligence was or was not a substantial

factor in bringing about the harm."  Restatement (Second) of Torts § 440, quoted in State Street

Mem. 18 n.11.  It would make no sense, as a matter of statutory construction, to read into a

provision that requires a violator to pay "any losses . . . resulting from" its breach a common-

law tort doctrine that excuses wrongdoers from payment of some of those losses.  29 U.S.C. § 1109.

Superseding cause is not part of the common law of trusts that might be imported into

federal common law for purposes of ERISA claims.  *See Chemung*, 939 F.2d at 16.  There is no

reference to it in the Restatement (Second) of Trusts or in the principal treatises, Scott on Trusts

or Bogert Trusts and Trustees.  The court in *Hunt v. Magnell*, 758 F. Supp. 1292, 1300 (D. Minn.

---

[5]    Requiring State Street to plead superseding cause as a defense is consistent with the Second Circuit's treatment of intervening cause as an element of plaintiff's *prima facie* case in *National Market Share, Inc. v. Sterling National Bank*, 392 F.3d 520, 526-27 (2d Cir. 2004). In *National Market Share*, a non-ERISA case, the Court of Appeals reasoned that the facts for the plaintiffs' proof of proximate cause for their breach of duty claim were identical to those required to rebut the intervening cause defense.  The court distinguished *Haven Associates v. Donro Realty Corp.*, 121 A.D.2d 504, 508 (N.Y. App. Div. 1986), where, because the plaintiff established proximate cause, the defendant had the burden of proving the defense of intervening cause.  To establish State Street's liability under ERISA, PRIAC does not need to prove the facts that would rebut State Street's purported defense of superseding cause.  Those facts are part of State Street's case (if they are part of this case at all), and State Street must plead superseding cause as an affirmative defense.

1991), rejecting the defendants' contention that plaintiffs' negligence and fraud could be superseding causes that would absolve them from liability for violating Section 404, observed: "Defendants have not cited, and the court is unable to find, authority applying the principle of superseding cause to an ERISA case." Almost twenty years later, the absence of authority for the use of this doctrine to reduce recoveries under Section 404 appears to be unchanged.

In arguing the applicability of superseding cause, State Street cites no ERISA cases and no cases on superseding cause. It represents that two Second Circuit cases, *LNC Investments, Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 465 (2d Cir. 1999), and *Nordwind v. Rowland*, 584 F.3d 420, 433 (2d Cir. 2009), are ERISA cases. State Street Mem. 17. They are not. *LNC Investments* involved claims for breach of contract and breach of fiduciary duty (not breaches by ERISA fiduciaries), and in *Nordwind* the plaintiff was suing a lawyer for malpractice, breach of fiduciary duty, and unjust enrichment. Neither mentions ERISA or superseding cause. These and the other cases cited by State Street show only that courts have applied the tort law concept of proximate cause in some common-law contexts not involving either ERISA or trust law. They do not remotely suggest that a related but distinct tort law doctrine, superseding cause, can be used to undercut Section 409 and ERISA policy by limiting State Street's liability to the Plans.

### 3.     PRIAC's Alleged Misconduct Not a Superseding Cause

State Street seems to assume that the doctrine of superseding cause enables any fiduciary that violated its obligations under ERISA to reduce its liability for damages by showing that another ERISA violator also caused a portion of those damages. Even if this doctrine applied to ERISA, it could not operate that broadly. The defense of superseding cause is limited to circumstances that, as a matter of law, cannot be shown to exist here, even if State Street's allegations about PRIAC's failure to provide information to the Plans are taken at face value.

14

As State Street's quotation from Restatement (Second) of Torts § 440 notes, the doctrine applies to those who have committed "antecedent" negligence. State Street Mem. 18 n.11. That requirement is the focus of the next provision, Section 441, which states that a superseding cause must be "one which actively operates in producing harm to another *after* the actor's negligent act or omission has been committed." Restatement (Second) of Torts § 441 (1965) (emphasis added). Comment a explains that a superseding cause must "first operate[] after the actor has lost control of the situation." State Street's mismanagement of the Bond Funds continued throughout that period, as did PRIAC's efforts to obtain information about the Bond Funds from State Street. State Street remained, at all times, the sole decision-maker about the Bond Funds' investments; it never "lost control of the situation." *Id.*, cmt. a. If PRIAC acted improperly, its misconduct occurred simultaneously with, and not after, State Street's violation of Section 404.

The next Restatement provision, Section 442, sets forth general criteria to be applied in determining whether there was a superseding cause. These criteria are whether the subsequent act (a) resulted in a harm different than that caused by the original actor, (b) is extraordinary in view of the circumstances existing at the time, (c) operated independently from the original actor's negligence, (d) is due to a third person's act, (e) subjects the third person to liability, and (f) was committed wrongfully. These factors confirm that PRIAC's alleged wrongdoing cannot be a superseding cause of the Plans' losses from diminished value of the Bond Fund. While the purported superseding cause was the action of a third person, and State Street contends that PRIAC's conduct was wrongful and subjected it to liability, that cannot be enough. If it were, every defendant in every case (including every ERISA case) that could point to another wrongdoer with liability to the same plaintiff could reduce its liability. That is not how the doctrine of superseding cause works, and it certainly is not how liability under ERISA works.

15

The New York Court of Appeals discussed the limited nature of this doctrine in *Gordon v. Eastern Railway Supply, Inc.*, 626 N.E.2d 912 (N.Y. 1993). The plaintiff sued his employer for injuries suffered when he fell from a ladder while he was using a sandblaster, and the defendants argued that a defect in the sandblaster was a superseding cause of the injuries. *Id.* at 913. The Court of Appeals rejected that argument:

> [D]efendants' failure to provide plaintiff with a safe scaffold or ladder while he sandblasted the railroad car was a substantial cause leading to his fall and the injuries he sustained. Injury was a foreseeable result of cleaning railroad cars from an elevated position, and a fall and injury occasioned by an allegedly defective sandblaster used in the process is not of such an "extraordinary nature" that defendants' responsibility for the injury should be severed. If it were, recovery . . . would be foreclosed in every case in which a worker was using a tool while working in an elevated position, fell and was injured by the tool.

*Id.* at 916.

The other three criteria set forth in Restatement (Second) of Torts § 442 show that PRIAC's alleged wrongdoing cannot be a superseding cause of the Plans' losses. State Street does not mention any of the three, and none of them is present under State Street's allegations:

- The harm that State Street claims was caused by PRIAC's actions – losses to the Plans from declining value of the Bond Funds – is exactly the same as the harm caused by State Street's violations of Section 404.

- That PRIAC exercised judgment in what information it disseminated to the Plans – sending State Street's responses to CIGNA's questions only to CIGNA and not to every Plan invested in the IBF – during a period when PRIAC was asking questions to (and waiting for answers from) State Street, was not "extraordinary." State Street recognized that decisions about what information to send to investors and when to send it were matters of judgment. (PA 2947, at 2994; PA 2431

16

Dalis; PA 2438 Reardon.)[6]  It does not assert that there was anything extraordinary or unforeseeable about PRIAC's conduct.

- PRIAC's disclosures to the Plans about State Street's management of the Bond Funds did not operate independently from the situation created by State Street's management of the funds, which precipitated the Plans investment losses.  *See* Restatement (Second) of Torts § 442, cmt. d.

The critical role of the first criterion in Section 442 was confirmed in *Derdiarian v. Felix Contracting Corp.*, 414 N.E.2d 666, 671 (N.Y. 1980), where the Court of Appeals held that a driver's negligence was not a superseding cause insulating the defendant contractor from liability for maintaining an unsafe work environment.  The court explained:

> An intervening act may not serve as a superseding cause, and relieve an actor of responsibility, where the risk of the intervening act occurring is the very same risk which renders the actor negligent. . . .  That defendant could not anticipate the precise manner of the accident or the exact extent of the injuries, however, does not preclude liability as a matter of law where the general risk and character of injuries are foreseeable.

*Id.*  As for the second criterion, the Second Circuit in *Higazy v. Templeton*, 505 F.3d 161, 177 (2d Cir. 2007), explained that "it is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in" harm.  State Street does not even assert that it could not reasonably foresee PRIAC's decisions concerning the sending of information to the Plans about State Street's mismanagement of the Bond Funds.  In *Kush v. City of Buffalo*, 449 N.E.2d 725, 835 (N.Y. 1983), the Court of Appeals held that student employees' theft of

---

[6]   In this memorandum, PRIAC relies on the documents and testimony in its Appendix. Citations to "PA" refer to page numbers in the Appendix.  Pages PA 1 through PA 2403 of the Appendix were submitted with PRIAC's motion for partial summary judgment, and pages PA 2404 through PA 3092 are being submitted with this memorandum.  Names that accompany the "PA" citations identify deponents or declarants.

chemicals from a school's unlocked laboratory and secretion of them outside, where a minor discovered the chemicals and was injured playing with them, was not so extraordinary to remove liability from the school for failing to lock the laboratory.

Any harm resulting from PRIAC's non-disclosure to the Plans was the exact same harm as that caused by State Street's mismanagement of the Bond Funds.  The risks posed by the conduct of State Street and PRIAC were identical:  the Plans would hold interests in the Bond Funds that decreased in value.  As a matter of law, even if superseding cause could be a defense to liability under ERISA §§ 404 and 409, PRIAC's alleged misconduct could not break the causal link between State Street's mismanagement of the Bond Funds and the Plans' losses.

**D.     Partial Summary Judgment Should
        Be Entered in Favor of PRIAC.**

The mitigation prevention defense that State Street is relying on does not exist, and even if it did it would be unavailable as a defense to the ERISA claim against State Street.  The doctrine of superseding cause that State Street presents also is inapplicable to PRIAC's ERISA claim.  Even if it could apply, the most basic facts about the way in which the Plans were injured make it clear that the doctrine cannot apply to this situation.  Therefore, State Street cannot prevail on either defense.

Each of the foregoing statements stands as a matter of law, and will not be changed by evidence that State Street might adduce at trial.  A court has the authority to grant summary judgment to the non-moving party.  *Project Release v. Prevost*, 722 F.2d 960, 969 (2d Cir 1983); *Algarin v. N.Y. City Dep't of Corr.*, 460 F. Supp. 2d 469, 478 (S.D.N.Y. 2008).  *See generally* 10A *Federal Practice and Procedure* § 2727 & n.24 (3d ed. 2010).  The Court should enter an order granting partial summary judgment in favor of PRIAC and against State Street on State

Street's mitigation prevention and superseding cause defenses, and barring the presentation at trial of evidence to support those defenses.

## II.   State Street's Motion Should Be Denied Because It Relies on Facts That Are Disputed.

Even if the Court should determine that State Street's defenses of mitigation prevention and superseding cause are available in ERISA cases, factual disputes would preclude a grant of summary judgment in favor of State Street. State Street erroneously places the burden of proving its defenses on PRIAC, relies on disputed facts regarding its communications to PRIAC, and inappropriately draws inferences in its favor. State Street also omits facts regarding its own conduct and PRIAC's repeated efforts to obtain information about the Bond Funds in July and August 2007. The facts offered by State Street cannot support summary judgment in its favor.

## A.   State Street Bears the Burden of Demonstrating an Absence of Material Disputed Facts Pertaining to Its Defenses.

State Street describes incorrectly the burden of proof with respect to its motion for summary judgment based on its affirmative defenses. State Street Mem. 8-9. The moving party must demonstrate the absence of a genuine issue of material fact as to the elements of a claim or defense that it bears the burden of establishing at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Brady v. Town of Colchester*, 863 F.2d 205, 210-11 (2d Cir. 1988). Because State Street has the burden of proving the elements of these defenses, it has the burden of showing conclusively that there is no genuine issue of material fact as to every element of those affirmative defenses. *Ebbert v. Nassau County*, No. 05 CV 5445 (FB) (AKT), 2009 WL 935812, at *5 (E.D.N.Y. Mar. 31, 2009); *Lewis v. Babcock Indus., Inc.*, No. 88 Civ. 1120 (JMC), 1992 WL142751, at *3-4 (S.D.N.Y. June 8, 1992).

In determining whether State Street has met its burden, the Court must view the summary judgment record in the light most favorable to PRIAC as the non-moving party. *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 270 (2d Cir. 1999); *Am. Auto. Ins. Co. v. Advest, Inc.*, No. 08 Civ. 6488 (LAK), 2009 WL 3490060, at *2 (S.D.N.Y. Oct. 28, 2009).

**B.     The Facts About PRIAC's
        Conduct Are Disputed.**

State Street's defenses of mitigation prevention and superseding cause are based on PRIAC's alleged breach of its fiduciary duties in "fail[ing] to pass on material information to the Plans regarding the Bond Funds."  State Street Mem. 10.  To prove its novel mitigation prevention defense, State Street would have to show that PRIAC had a duty to provide information that it did not provide to the Plans.  State Street is silent as to what provision of ERISA PRIAC violated or how its conduct violated that unspecified provision.  To prove its superseding cause defense, State Street must show that PRIAC's actions in not providing the information were unforeseeable or extraordinary in view of the circumstances.  State Street cannot establish any of these elements when the disputed facts are viewed in the light most favorable to PRIAC.

**1.     PRIAC's Role in Monitoring the Bond Funds**

State Street's incomplete factual presentation omits important facts that are relevant to the nature and scope of PRIAC's monitoring of the Bond Funds.  Those facts rebut State Street's contention that PRIAC breached any duty to the Plans under ERISA.  At a minimum, these facts, when viewed in a light most favorable to PRIAC, give rise to disputes that must be resolved by the factfinder in order to determine PRIAC's role and whether it acted in a manner consistent with its obligations.

PRIAC provided monitoring services for hundreds of funds in various asset classes that retirement plans could invest in. (Palms ¶¶ 5, 9, PA 2-3.) Because State Street alone controlled the investment process for the Bond Funds, PRIAC did not have access to portfolio holdings and could not ensure that the fund was managed consistent with its stated style. (*Id.* ¶ 11, PA 3-4.)

PRIAC monitored the Bond Funds through its DDA Program. (Palms ¶ 14, PA 4.) The primary measure by which PRIAC assessed fund performance was the "DDA score," a composite of four objective performance-based criteria that emphasized historical (one to five years') performance. (*Id.* ¶ 15, PA 4-5.) The DDA Reports showed each fund's ranking for that quarter against a group of selected comparable funds, performance over multiple periods, from quarterly to five years, percentages of assets invested in various bond categories or "sectors," various fund characteristics, and facts such as the fund's net asset value, benchmark, and ten largest bond holdings, as well as commentary on performance for each quarter. (*Id.* ¶ 17, PA 5.) PRIAC made the DDA Reports available to its clients each quarter. (*Id.*)

PRIAC also created quarterly Fund Fact Sheets for the Bond Funds, which described their investment strategies as those of an enhanced index fund seeking to add consistent value over their respective benchmarks. (Palms ¶ 22, PA 6; PA 928; PA 1061; PA 1067.) PRIAC's clients could obtain at any time daily performance and other information about their investments on PRIAC's Plan Sponsor and Plan Participant websites. (Palms ¶ 24, PA 7.)

When construed in PRIAC's favor, the facts show that PRIAC's role was to monitor the Bond Funds for performance over time, and to analyze the performance of the Bond Funds against a peer group of similar funds, and that PRIAC fully satisfied that role by its regular reports to the Plans of information about fund characteristics and performance and by providing daily performance data to the Plans via its websites. In light of these facts, State Street cannot

establish as a matter of law that PRIAC had any duty to the Plans that it failed to meet, and summary judgment should not be granted in favor of State Street.

### 2.     The Incorrect Name for the IBF

State Street argues that PRIAC "exacerbated" its breach of fiduciary duty to the Plans by not correcting more quickly its erroneous use of the "passive" and "index" in the name of the IBF before late August.  State Street Mem. 16.  In presenting its version of the facts, State Street improperly selects facts that it finds favorable and omits others, and skews the selected facts against PRIAC, the non-moving party.

The following are among the omitted or downplayed facts.  On September 19, 2005, State Street told PRIAC that it had changed the name for the IBF to the Passive Intermediate Bond Index Securities Lending Series Fund – Class A.  (PA 1086.)  PRIAC requested a conference call to ask State Street about the change.  (*Id.*)  After that call, State Street confirmed to PRIAC that the name of the IBF had been changed to the Passive Intermediate Bond Index Fund.  (PA 666.)  Following State Street's direction, PRIAC used the new name in materials it provided to clients.  (Frascona ¶ 12, PA 17.)  From October 2005 to July 2007, PRIAC's materials referred to the fund as the Passive Intermediate Bond Index Fund.  (*Id.*)  Thus, when State Street told PRIAC to use a name that State Street now says was erroneous, PRIAC followed up, but State Street reiterated that the name should be changed to the Passive Intermediate Bond Index Fund.

Until July 2005, PRIAC sent Fund Fact Sheets to outside investment managers for their review and approval each quarter.  (Palms ¶ 23, PA 6.)  In an effort to speed up the production and delivery to clients of Fund Fact Sheets, PRIAC stopped that practice in mid-2005.  (*Id.*)  State Street improperly construes PRIAC's cessation of this practice against PRIAC by arguing that it failed to "adhere" to its process for reviewing fact sheets – a process that PRIAC

discontinued in an effort to improve its performance in an area for which State Street castigates it: getting information to the Plans more expeditiously.  State Street Mem. 6 n.6.

In late June 2007, PRIAC asked State Street about the IBF's name.  (PA 1330.)  In July, State Street advised PRIAC that it had mistakenly provided an incorrect name.  (PA 448 Dalis; PA 454-55 Flinn; PA 484 Hughes; PA 585 Saarinen; PA 784; PA 1054; PA 1428.)  On July 30, PRIAC requested that State Street review a Fund Fact Sheet for the IBF.  (PA 623-24 Dingee; PA 927.)  On August 1, State Street confirmed that the name of the fund and the name of State Street's portfolio manager were the only inaccuracies in that Fund Fact Sheet.  (PA 1355.)  That day, PRIAC corrected the name on its websites and began the process of correcting second-quarter reports that were still in production to reflect the IBF's corrected name.  (PA 645-46 Ortiz; PA 816; PA 1041; PA 2354.)

When all the facts are considered and construed in favor of PRIAC, they show that PRIAC believed that State Street provided PRIAC with the name for the IBF that State Street intended PRIAC to use, that PRIAC used that name in good faith, and that in 2007 PRIAC conducted a reasonable investigation into the incorrect name provided by State Street, including an effort to identify any other errors on the Fund Fact Sheet, and when State Street confirmed its error corrected the name system-wide.  That argument is not appropriate for summary judgment.

### 3.    No Breach of PRIAC's Duty

When the facts are construed in the light most favorable to PRIAC, they support a finding that PRIAC did not withhold from the Plans any facts whose non-disclosure PRIAC believed would mislead them, and that it had no duty to disclose to the Plans any additional information.  *See* PRIAC SJ Mem. 35-38.  PRIAC had a duty to reasonably monitor State Street's management of the Bond Funds, but it was not obliged to examine every action taken by State Street.  PRIAC complied with its duty to monitor under ERISA.  *See id.* 32-33.

**C.   The Facts About the Information That
State Street Provided to PRIAC Are Disputed.**

State Street's mitigation prevention and superseding cause defenses are premised on its
claim that PRIAC was "fully informed by State Street of the Bond Funds' subprime mortgage
exposure, leverage, and the negative impact [of] that exposure" on performance on or before July
18 or, alternatively, on or before August 16.  State Street Mem. 10.  PRIAC disputes that factual
conclusion, which State Street attempts to support through a presentation of facts that are neither
undisputed nor construed in the light most favorable to PRIAC.

State Street asserts that it told PRIAC about leverage in the GCBF in March 2005, and
about leverage in the IBF in July 2007.  State Street Mem. 6-7.  PRIAC disputes State Street's
characterizations of those alleged disclosures.  Moreover, State Street never provided a complete
explanation of the amount of the leverage, the nature of the leverage, or how the leverage was
employed in either Bond Fund, and State Street failed to answer a number of PRIAC's requests
about more information with respect to leverage.  (Dingee ¶¶ 10-11, PA 25.)

State Street also asserts that it informed PRIAC that the Bond Funds had invested in
subprime bonds and had underperformed due to those investments.  State Street Mem. 7, 10.
PRIAC again disputes that characterization, and maintains that State Street did not explain to it
that the Bond Funds' ABS investments were concentrated almost exclusively in subprime
holdings or that the underperformance of the Bond Funds was attributed to their concentration in
subprime investments.  In addition, State Street's claim that PRIAC was "fully informed" of the
nature of the Bond Funds conflates the IBF – about which PRIAC received some information
from State Street in June and July – and the GCBF – about which State Street provided no
additional information until August 28, 2007.  At all times, State Street had superior access to
information regarding the Bond Funds' investments.

24

Summary judgment would be improper because State Street dwells on isolated portions of the record without considering them in any context, much less one that construes the facts in a light most favorable to PRIAC. PRIAC is claiming that State Street exposed the Plans to increased risk by changing the investment strategies of the Bond Funds in 2006 and 2007, that these risks were not appropriate for investors in enhanced index funds like the Bond Funds, and that in making these changes State Street put its own interests above those of the Plans. State Street never revealed to PRIAC that it had altered its investment strategy or that it was exposing the Plans to greater risk. To the contrary, in August 2007 State Street falsely told PRIAC, in writing, that the investment strategy for the Bond Funds had not changed since at least 2002. (PA 1355.) State Street, cobbling together bits and pieces of information that it did pass on to PRIAC, now argues that PRIAC should have figured out in July 2007 that State Street had changed that investment strategy significantly, in a way that heightened the Plans' risk.

There is ample evidence that, although State Street changed drastically the way in which it managed the Bond Funds, PRIAC did not deduce that change until mid- to late August 2007. (Frascona ¶¶ 8-9, 28, PA 16-17, 21.) A factfinder easily could determine that what PRIAC did was, especially without the benefit of hindsight, both responsible and consistent with its obligations to the Plans. PRIAC did not, on the basis of limited information, leap to the conclusion that State Street had changed the Bond Funds' investment strategy without telling PRIAC, substantially increasing the risk to the Plans to advance its own agenda, and on that sketchy basis tell nearly 200 Plans that State Street appeared to have changed the investment strategy of the IBF to their detriment and might have changed the policy of the GCBF, too. Instead, in July, PRIAC asked State Street a series of questions in an effort to determine the facts about its investment strategy for the Bond Funds. (*Id.* ¶¶ 26-27, PA 20-21; Dingee ¶¶ 9-13, PA

25-26; PA 27-46.)  Many of PRIAC's questions went unanswered.  (Frascona ¶ 27, PA 21; Dingee ¶¶ 9-11, PA 25.)  In August, after noting the poor performance of the Bond Funds in July, PRIAC accelerated its inquiries.  (Frascona ¶¶ 25-27, PA 20-21.)  State Street failed to provide much of that information, and was slow in providing the rest.  (*Id.* ¶¶ 26-27, PA 20-21; Dingee ¶¶ 8-13, PA 25-26.)

In the parties' correspondence from July through September 2007, when PRIAC was requesting basic information about the Bond Funds, State Street never said that PRIAC had all the information it needed to understand State Street's management of the Bond Funds.  Instead, State Street acknowledged in those discussions that its disclosures did not adequately tell PRIAC about changes in its management of the Bond Funds.  (Frascona ¶ 30, PA 21-22; PA 2472, at 2476; PA 2480, at 2493.)  The assertion that PRIAC was "fully informed" of the salient facts by July 18 was invented by State Street's lawyers.  A factfinder readily could reject it.

### 1. Leverage

On March 2, 2005, State Street sent PRIAC an email in response to a question PRIAC raised about the percentages of the sectors invested in by the GCBF, which, as shown in State Street's report to PRIAC, totaled 116% at the end of the fourth quarter of 2004.  (PA 1609.)  State Street's response referenced the "leverage component" of the GCBF, in which State Street might "hold a future or a swap."  (*Id.*)

That was the last such disclosure of leverage that State Street made to PRIAC.  In early 2005, State Street decided to "normalize" the sector percentages in its reports to investors so that they would total 100%, even if the amount of invested assets exceeded the amount invested in a fund because of leverage.  (PA 1047; PA 1082; PA 2161.)  State Street's client-facing personnel advocated providing two sets of sector weights to clients, one of which would reveal leverage to investors, but they were overruled.  (PA 580-81 Saarinen; PA 825.)  State Street senior managers

criticized normalizing sector percentages without reporting negative cash in reports to investors

as indefensible and misrepresenting a fund's true exposures.  (PA 1047.)  PRIAC never received

a report with sector weights reflecting a negative cash balance, and after the fourth quarter of

2004, the sector weights for the Bond Funds that State Street provided always totaled 100%.

State Street's reports to PRIAC did not disclose the leverage of either of the Bond Funds.

(Frascona ¶ 21, PA 19.)

       PRIAC received no further information about leverage in the GCBF until August 28,

2007.  (Frascona ¶ 27, PA 7.)

       On July 12, 2007, State Street sent PRIAC spreadsheets showing portfolio holdings of the

IBF as of June 28, 2007, and a breakdown of the components of its ABS exposure, including the

subprime bond exposure.  (PA 683.)[7]  There are factual disputes as to both what the spreadsheets

showed and what PRIAC in fact gleaned from the spreadsheets.  State Street says that the

spreadsheets contained complete and accurate information about the fund's subprime ABS

exposure, and use of leverage.  State Street Mem. 7.

       State Street omits the following facts.  The spreadsheets that State Street sent were

truncated versions.  On July 11, Michael Wands of State Street, Head of North American Fixed

Income at SSgA, had sent an email directing that all responses to inquiries about subprime

exposure be subject to his review, and he attached a sample spreadsheet.  (PA 2164.)  When

PRIAC requested information about the IBF, State Street generated detailed spreadsheets similar

to Mr. Wands's sample, but it stripped the spreadsheets of categories of data, including market

value data, before sending them to PRIAC on July 12, without Mr. Wands's approval.  (PA 520-

24 Lindner; PA 613-15 Wands; PA 1654.)  The truncated version of the spreadsheets sent to

---

[7]   PRIAC never received any analogous documents or information for the GCBF.

PRIAC showed that 81.94% of the IBF's investments were in the ABS sector as of March 31, 2007, compared to 45.5% as of June 30, 2007, suggesting that State Street had substantially *reduced* the IBF's investments in ABS. The full spreadsheets – which State Street generated but never sent to PRIAC – showed a large increase in the market value of ABS exposure, from $1.4 billion to $1.8 billion, between March and June 2007. (PA 1654, at 1655, 1719.) That is, the truncated spreadsheets PRIAC received make it appear that in the second quarter of 2007 State Street had cut the IBF's ABS exposure in half, when in fact that exposure had increased by more than 25%. When these facts are construed in the light most favorable to PRIAC, they show that the truncated spreadsheets did not reveal the nature or effect of the IBF's leverage, and that the spreadsheets prescribed by Mr. Wands were altered to provide misleading information about the effects on the fund's subprime exposure.

There also are disputes as to what PRIAC inferred from its review of the truncated spreadsheets. State Street Mem. 15-16. State Street relies on deposition testimony from Dean Molinaro of PRIAC, who reviewed the truncated spreadsheets briefly when PRIAC received them. (PA 641 Molinaro.) When counsel directed him to the ratio in the ABS spreadsheet of cash bonds to total ABS exposure, Mr. Molinaro agreed that it might indicate leverage of 4 to 1 in the IBF as of March 30, 2007. (PA 638-40 Molinaro.) There is no evidence that Mr. Molinaro, or anyone else at PRIAC, made any such inference about leverage in July 2007.

State Street argues that a July 18, 2007 conference call among State Street, PRIAC and CIGNA, made PRIAC "completely aware" of a "significant leveraged position" in the IBF. State Street Mem. 7. The facts do not support that argument. None of the participants in the call has testified to a detailed recollection of what was said. (PA 2454 Molinaro; PA 2446-47 Dingee; PA 2437 Hopkins; PA 2435 Flinn.) State Street again relies on Mr. Molinaro's

testimony.  State Street Mem. 15-16.  Mr. Molinaro was not asked about what *he* understood at the end of the call.  Instead, State Street presents his testimony about what *CIGNA* understood from the call, with no foundation that would show Mr. Molinaro's ability to testify about CIGNA's understanding.  Because this testimony represents Mr. Molinaro's inadmissible speculation about CIGNA's state of mind, it is not properly considered on a motion for summary judgment.  *See Smith v. Stone & Webster Eng'g Corp.*, No. 86 CIV. 5627 (PKL), 1988 WL 32928, at *4 (S.D.N.Y. Apr. 4, 1988).  Matthew Dingee of PRIAC, who was on the same call, came to no such conclusion.  (Dingee ¶ 9, PA 25.)

In late July and August 2007, PRIAC asked State Street questions about the Bond Funds. (Frascona ¶ 27, PA 21; Dingee ¶¶ 8-13, PA 25-26.)  PRIAC asked whether a report that it had received for the Bond Funds reflected leverage, asked for characteristics on the IBF reflecting any leverage, and requested the percentage of the IBF's exposures to subprime.  (Dingee ¶¶ 10-11, 13, PA 25-26; PA 27; PA 31; PA 45.)  State Street never responded to these requests. (Dingee ¶¶ 10-11, 13, PA 25-26.)  PRIAC's futile questioning, along with the disputed facts about what was communicated to PRIAC about the true nature and amount of leverage in the Bond Funds, created serious doubt as to whether State Street had made PRIAC "completely aware" of the IBF as of July 18, 2007.  State Street Mem. 7.  In fact, during an August 22, 2007 conference call, State Street admitted to PRIAC that its reporting to PRIAC had not been transparent in revealing the use or amount of leverage in the Bond Funds.  (Frascona ¶ 30, PA 21-22; PA 2472, at 2476; PA 2480, at 2493.)

When the full factual record is viewed in the light most favorable to PRIAC, it shows that PRIAC did not have sufficient information as of July 18 to deduce the nature and amount of leverage in the IBF.

2.      **Subprime Exposure**

There is, at a minimum, a factual dispute over whether State Street disclosed to PRIAC the very high concentration of the Bond Funds' investments in subprime securities. State Street sent Monthly Account Summaries to PRIAC that showed the Bond Funds' investments in various bond sectors, such as government bonds, corporate bonds, and ABS. (Frascona ¶ 16, PA 18.) The ABS sector includes securities whose value derives from a specified pool of underlying assets, such as credit card receivables, auto loans, student loans, and subprime mortgage backed securities. (*Id.* ¶ 17, PA 19.) As of May 31, 2007, 99% of the IBF's investments in the ABS sector were in subprime securities, and 96% of the GCBF's ABS investments were in subprime securities. (PA 61.) State Street never told PRIAC what portion of the Bond Funds' investments in the ABS sector was composed of subprime securities. (Frascona ¶ 17, PA 19.) In addition, State Street used leverage to increase the size of the Bond Funds' bets on subprime securities. (PA 59-60.) As of May 31, 2007, State Street reported to PRIAC a 32.1% ABS sector allocation for the IBF. Internal State Street spreadsheets showed that, with leverage, the fund's actual exposure to ABS was 143.1% of its net asset value. (PA 59.) For the GCBF, State Street reported to PRIAC a 32.0% ABS sector allocation, but with leverage the actual exposure was 151.1% of the fund's net asset value. (PA 60.) These facts were not revealed to PRIAC. (Palms ¶¶ 31-32, PA 9; Frascona ¶ 21, PA 19; *id.* ¶ 27, PA 21.)

State Street points to three documents that it sent to PRIAC dated April 11, July 6, and August 2, 2007. State Street Mem. 14. There are factual disputes about what each of these communications disclosed to PRIAC.

- State Street's April 11, 2007 quarterly commentary about the Bond Funds discussed negative headlines plaguing the subprime housing market generally. Based on this commentary, PRIAC included in its first quarter 2007 DDA Reports

30

to the Plans a discussion of the problems in the subprime residential mortgage market.  (PA 1321.)  The State Street commentary also noted underperformance in several market sectors in addition to ABS, including credit and agency.  (Palmer Decl. Ex. 43.)  The commentary did not disclose the Bond Funds' investment in subprime mortgage securities, let alone the amount or nature of those investments.  (*Id.*)  When this vague communication is read in a light most favorable to PRIAC, without the benefit of hindsight, it informed PRIAC only that the Bond Funds underperformed in the first quarter of 2007.

- State Street's July 6, 2007 commentary referred generically to State Street's active bond funds.  (PA 674.)  It did not identify the Bond Funds, by name or otherwise.  (*Id.*)  The facts omitted by State Street show that PRIAC did not understand the July 6, 2007 commentary to pertain to the investment strategy or holdings of the Bond Funds.  (Dingee ¶ 5, PA 24.)  When read in the light most favorable to PRIAC, this commentary informed PRIAC only that unidentified State Street bond funds had underperformed.

- The August 2, 2007 status report focused on State Street's Limited Duration Bond Fund.  (PA 984.)  It did not disclose that the Bond Funds had investments in subprime securities, much less how large those investments were.  (*Id.*)  The status report listed the January-July 2007 performance for the IBF, but not the GCBF.  (*Id.*)  The status report made no other mention of the IBF.  (*Id.*)  PRIAC disputes that the August 2, 2007 status report informed it of the Bond Funds' investments in subprime and resulting underperformance.  Construed in the light most favorable to PRIAC, this status report provided PRIAC with information

31

only about the performance of the IBF, which PRIAC made available to its clients on its websites.

State Street cannot establish the absence of disputed issues as to whether it informed PRIAC, through these three communications or otherwise, that the Bond Funds had large subprime exposures or that such large exposures caused their underperformance.

**D.    The Facts About What the Plans Would Have Done If They Had Additional Information Are Disputed.**

As PRIAC understands it, State Street's mitigation prevention defense would require it to establish that, if the Plans had received further information from PRIAC about the Bond Funds earlier in the summer of 2007, the Plans would have redeemed – and would have been obligated to redeem – their investments from the Bond Funds earlier. *Katz Commc'ns, Inc. v. Evening News Ass'n*, 705 F.2d 20, 26 (2d Cir. 1983) ("[T]he burden is on the appellants to prove any potential item in mitigation of damages inasmuch as it is *pro tanto* a defense to the claim of the wronged party.").[8] State Street's superseding cause defense similarly would obligate it to prove that, if PRIAC had provided information to the Plans, they would have redeemed their interests earlier. *Carson v. Dudley*, 25 A.D.3d 983, 984 (N.Y. App. Div. 2006)

However, State Street has presented no evidence showing what *any* of the approximately 200 Plans, let alone all of them, would have done even if PRIAC had passed along instantaneously every piece of information about the Bond Funds as it received that information. State Street's motion is not supported by documentary evidence, deposition testimony, or expert opinion that any of the 200 Plans would have redeemed their investments from the Bond Funds

---

[8]    The tort-law principle of mitigation requires the defendant to prove causation. Restatement (Second) of Torts § 918 cmt. c (1979) ("[T]he plaintiff's failure to take reasonable steps must be a legally contributing cause of the resulting harm if his failure to act is to diminish his recovery.").

earlier than it did.  Instead, State Street simply assumes that would have happened.  State Street

Mem. 18-19.  Its expert, Dr. Carron, assumed that, if PRIAC provided to each of the Plans the

information it had received from State Street on the same day it received that information, then

each of the Plans would have sold its interests in the Bond Funds (including interests in the

GCBF, about which PRIAC had received no new information) on a range of days from July 18

through August 16, 2007, with all of the Plans selling their interests on the very same day under

each assumption.  (Palmer Decl. Ex. 12 at ¶¶ 205, 211.)  That assumption is absurd, but more

importantly it is sheer speculation.  There is no evidence to support it.

The only evidence about the conduct of a real-world Plan belies the factual assumption

on which State Street's motion depends.  CIGNA, the Plan with the largest holding in the Bond

Funds, about $175 million, began in June 2007 to ask questions about the IBF, based on its

interest in potentially increasing its investment in that fund.  (PA 2449 Gorman; PA 2452

Molinaro.)  CIGNA received the truncated spreadsheets on July 13, 2007 and participated in the

July 18, 2007 conference call on which State Street relies as principal sources of PRIAC's

knowledge about the Bond Funds.  (Dingee ¶ 7, PA 24; PA 2273.)  As a result, CIGNA was just

as "fully informed," State Street Mem. 10, as PRIAC about the IBF's investment strategy.

Although CIGNA decided, over the next couple of weeks, to move its money out of the IBF

(Palms ¶¶ 31-32, PA 22), it did not redeem its interest in the IBF until August 20, 2007 – 32 days

after it had become "fully informed" according to State Street.  (*Id.* ¶ 32, PA 22.)  The fact that

the Plan with the largest stake in the Bond Funds redeemed on August 20, having conducted its

own inquiry that made it "fully informed" about State Street's strategy for the IBF, undercuts

State Street's position that Plans with smaller investments would have redeemed earlier if they had received similar information.[9]

In the absence of evidence about what the Plans would have done if provided additional information, State Street bases its factual argument on the actions of *other* investors, who had nothing whatsoever to do with the Plans.  State Street Mem. 18.  State Street asserts, through its expert, Dr. Carron, that 36 investors redeemed their interests in twelve State Street-managed fixed income funds from July 30 to August 16, 2007.  It follows, State Street argues, that if the Plans had received the information that PRIAC had, they would have redeemed between July 18 and August 16, 2007.  State Street Mem. 18-19.  State Street's use of the actions of these 36 investors to establish facts about the assumed conduct of the nearly 200 Plans is defective for a number of reasons, including the following:

1.  Most of these 36 investors had invested in funds other than the Bond Funds.  Only four had invested in the IBF, and none in the GCBF.  (Palmer Decl. Ex. 12 at Ex. 24.)  The remaining 32 had invested in other fixed income funds that State Street managed (*id.*), and State Street offers no information that would allow a factfinder to use these decisions by different investors in other funds to draw inferences about the Plans' decisions to redeem their interests in the Bond Funds.

2.  State Street does not provide any information that would enable a factfinder to begin to understand the significance of the purported fact that 36 investors withdrew their money from

---

[9]    State Street deposed a representative of CIGNA and the financial advisor to another Plan with a large investment in the IBF.  State Street does not cite the testimony of either to support its contention that PRIAC's provision of information to them sooner would have caused the Plans to redeem earlier.  The CIGNA representative said only that that it was "conceivable" CIGNA would have withdrawn from the IBF sooner had it received information earlier about the fund's performance through July 2007 (PA 2462 Forde) – even though that information was available to CIGNA, on a daily basis, on PRIAC's website.

State Street bond funds from July 11 through August 16, 2007.  There were more than 280 investors in State Street bond funds that underperformed due to investments in subprime securities in 2007.  (PA 2947, at 2962.)  State Street does not say how many of these investors retained their investments in these funds after August 16, 2007.  Nor does it try to show why some investors redeemed in July, why others redeemed in early August, and why still others did not redeem until later.  The bare facts that State Street presents about these 36 investors, standing alone, provides no basis for determining what portion – if any – of the Plans might have redeemed if they had received additional information about the Bond Funds.

   3.  State Street asserts that these investors "received disclosures similar to those State Street provided to PRIAC."  State Street Mem. 18; *see id.* n.12.  State Street offers no factual support for that assertion.  It does not reveal what information – including information about leverage and subprime – these 36 investors had received before deciding to redeem.  PRIAC cannot determine what information was provided to each of its clients in or before July 2007, and apparently neither can State Street.  (PA 2947, at 2994.)  At least some of them received in or before July 2007 information that PRIAC *never* received.  Six were clients of State Street's institutional advisory services groups, Charitable Asset Management ("CAM"), Global Asset Allocation ("GAA"), and the Office of Fiduciary Advisor ("OFA").  (PA 2515; PA 2542; PA 3009.)  These groups recommended to their clients in July 2007 that they terminate their investments in these active fixed income strategies.  (PA 2942.)  There is no evidence that PRIAC received any such recommendation, or that it was told that State Street was making this recommendation to its clients.  At least 29 of these 36 investors received a July 26, 2007 letter, advising clients of State Street's opinion that the performance of its bond funds would not

recover in the next 18 months.  (PA 2384; PA 3068.)  PRIAC did not receive that letter, and it was not advised of State Street's opinion.  (Frascona ¶ 24, PA 20.)

4.  To the contrary, PRIAC received an August 14 letter from SSgA's Chief Investment Officer warning against "the downside of forced selling in this chaotic and illiquid market," and stating his purported belief that "judicious investors" would retain their investments in the Bond Funds.  (PA 1352.)  Indeed, the President and CEO of SSgA repeated this advice to clients as late as October 2007 and asserted that "panicked selling" by PRIAC had contributed to negative returns in the Bond Funds, a position that is the opposite of State Street's belated litigation defense.  (PA 2570.)

These facts do not support the causation showing that State Street would be required to make if either of its defenses were legally viable.  Without evidence about whether or when the Plans would have redeemed their investments from the Bond Funds had they received the same information as PRIAC, and without an evidentiary basis for a specific date on which the Plans' purported duty to mitigate was triggered, State Street cannot meet that burden.  At a minimum, when the facts are construed in the light most favorable to PRIAC, a factfinder could reject this showing as inadequate to establish the effects of a failure to mitigate or a superseding cause, so that summary judgment cannot be granted in favor of State Street.

**E.     The Information State Street**
        **Sent to PRIAC Was Misleading.**

State Street cannot show that PRIAC's conduct was a superseding cause if its communications about the Bond Funds misled PRIAC.  *Higazy*, 505 F.3d at 177.  State Street's communications to PRIAC in July and August 2007 misled PRIAC by failing to disclose critical information about State Street's management of the Bond Funds and its internal motivations for managing the funds in that way.

36

### 1.      Goal to Triple the Business

At the end of 2005, State Street's CEO set for the fixed income group an aggressive goal of tripling the group's revenues and assets under management within three years.  (PA 582-84 Saarinen; PA 605 Wands.)  Gaining recognition as a leader in active fixed income was viewed as "crucial" to achieving significant revenue growth.  (PA 2152.)  Senior executives in the fixed income group perceived State Street's reputation in the industry as a passive and enhanced index fund manager as a hindrance to such growth.  (PA 466-69 Greff; PA 472-73 Greff; PA 480-81 Hopkins; PA 490-91 Hunt; PA 529-30 O'Hara; PA 567-68 Roberts; PA 606-07 Wands; PA 2107, at 2119; PA 2152.)  Also, State Street's fees for active funds were materially higher than for enhanced index and passive funds, and State Street typically set its management fees at 20-25% of a fund's excess return target.  (PA 498 Kelly.)

In 2006, the fixed income group implemented an initiative known as "Leveraging Fixed Income."  (PA 582-84 Saarinen; PA 1361; PA 1417; PA 2152.)  Senior management of the group set its "[m]ission" as "to gain recognition as a leader in Active Fixed Income in order to compliment [sic] [its] current role as a leader in Passive Fixed Income."  (PA 2152, at 2153.)  To achieve this goal, the fixed income group resolved to "[t]ake more active risk" in its bond investments and to "[g]enerate higher returns for clients in existing products."  (*Id.*; *see also* PA 2145.)  These efforts would show, as one senior executive stated, that "we are not your grandfather's fixed income department."  (PA 2152, at 2153.)  The implementation of this policy led State Street, in its management of the Bond Funds, to put its own self-interest ahead of the Plans' interests.  State Street never told PRIAC about its pursuit of its own interests rather than those of the Plans.

### 2.      Changes in Strategy for the Bond Funds

In 2006, State Street changed the investment strategy of the Bond Funds in an effort to meet its goal of tripling its fixed income business and altering its reputation as a manager of passive funds.  State Street dramatically increased the return targets for the Bond Funds, and began taking more active risks for those funds through the increased us of leverage and high concentration of investments in subprime securities.

### a.      Increase in Return Targets

In 2003, State Street represented to PRIAC that the goals of the funds were to outperform their benchmarks by 30-40 basis points.  (PA 2028, at 2050; PA 2103.)  By early 2006, State Street had increased the return targets for both Bond Funds to 70-80 basis points above their benchmarks, without informing PRIAC of the increases.  (Frascona ¶ 9, PA 17; *id.* ¶ 28, PA 21; PA 536-43 Pickett; PA 1573; PA 1652; PA 2145; PA 2152.)  On August 1, 2007, State Street continued to mislead PRIAC when it said that the investment strategy for the Bond Funds had not changed since at least 2002.  (PA 1355.)

### b.      Subprime and Leverage

As described above, State Street's communications to PRIAC in July and August misled PRIAC as to the amount of the Bond Funds' subprime investments and the degree to which those investments were leveraged.  *See* pages 26-32, *supra*.  With regard to leverage, State Street made a decision in 2005 not to disclose leverage to PRIAC and other investors, and then, when the Bond Funds' leverage increased dramatically in 2006, it stuck by that decision not to disclose what became a significant component of an excessively risky investment strategy.

### 3.      Violation of Risk Policies

The Bond Funds' investments in subprime securities violated State Street's own risk management policies and procedures, exposing the Plans to excessive risks.

State Street's fixed income group was required to follow two risk management policies set forth in its procedure manual:  the stop-loss policy and the Active Trade Template ("ATT"). (PA 2575.)  State Street quantified the risks of its investments using value at risk ("VaR") and conditional value at risk ("CVaR").  (Palmer Decl. Ex. 12 at ¶ 85.)  VaR represented a risk limit for an investment equal to 95% of its expected loss.  (PA 2513.)  CVaR equaled the average loss possible if the investment VaR were exceeded.  (*Id.*)  The stop-loss policy defined an investment's "soft stop" as its VaR, and its "hard stop" as its CVaR.  (*Id.*)  When the value of an investment fell below the soft stop, the stop-loss policy required a discussion with the portfolio management team to determine whether to terminate or to continue with the investment.  (*Id.*)  Once the hard stop level was reached, fixed income senior management was to assume sole responsibility for the decision to terminate or continue the investment.  (*Id.*)  The ATT required that a standardized form containing pertinent information about an investment, including stop-loss levels, be completed and distributed to all Global Fixed Income personnel prior to making that investment.  (PA 2575.)  In July 2007, State Street senior management concluded that both the stop-loss policy and the ATT had been violated for subprime investments held by the Bond Funds.  (PA 2581.)

Another aspect of State Street's risk management system was the risk budget, which assigns a target amount of risk to a fund based on its investment objectives and expected return target.  (PA 2547.)  State Street's risk management group provided the portfolio managers with a risk budgeting database showing the amount of a given fund's risk budget that had been "spent" through the fund's investments.  (PA 2430 Armstrong; PA 3007.)  The Bond Funds were managed in excess of their risk budgets from November 2006 until the Bond Funds were closed in September 2007.  (PA 2413.)

39

State Street never informed PRIAC that the Bond Funds' subprime investments had caused them to violate State Street's internal risk management procedures, and they continued to be in violation of those procedures for months.

**F.     The Facts About the Amount of
        the Plans' Damages Are Disputed.**

State Street's motion relies on its demonstrating that, as a matter of law, the maximum amount of damages for which it can be held liable under ERISA is less than the credit against damages to which State Street is entitled as a result of payments for the benefit of the Plans from the Fair Fund.  State Street says the first amount is 0 to $46.8 million, and that the second amount is $48 million.  State Street Mem. 8, 19.  State Street is wrong about both amounts.  At a minimum, there is a dispute over both amounts that precludes summary judgment.

PRIAC's damages expert, Mr. Fischel,  will offer proof of the Plans' damages by determining the Plans' losses from investing in the Bond Funds, rather than in other enhanced index funds that used the same benchmark indexes as the Bond Funds, from June 1, 2007, through the dates on which the Plans redeemed their interests in the Bond Funds.  (PA 2425-26 Fischel.)  That is the damage measure prescribed by the Second Circuit in *Bierwirth*, 754 F.2d at 1056, and it leads to damages of $76.7 million, before prejudgment interest (and attorneys' fees under Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1)).

Dr. Carron's analysis diverges from the measure of damages in ERISA cases mandated by the Second Circuit.  First, Dr. Carron ignores the dates on which the Plans sold their interests, and instead relies on the assumption that all the Plans redeemed their interests on the same day, ranging from July 18 to August 16.  State Street Mem. 8, 18-19.  There is no factual basis for those assumptions.  *See* pages 32-36, *supra*.  ERISA "damages may not be determined by mere speculation or guess."  *Schoenholtz v. Doniger*, 657 F. Supp. 899, 908 (S.D.N.Y. 1987).  Here,

the only ending dates that can be established non-speculatively are the dates on which the Plans redeemed their interests.  State Street's use of earlier, assumed redemption dates runs afoul of the rule that "once a breach of trust is established, uncertainties in fixing damages will be resolved against the wrongdoer."  *Bierwirth*, 754 F.2d at 1056.  Second, Dr. Carron did not include compensation for the Plans' loss of investment income through an alternative investment, as *Bierwith* requires.  *Id.*  Dr. Carron ignored this element of ERISA damages even though he recognized that "in cases of this type it may be appropriate to consider a but-for or alternative investment" as part of damages.  (PA 2423 Carron.)  Third, Dr. Carron's damage calculation reduces the Plans' losses by gains in prior periods.  Dr. Carron has improperly used gains to reduce ERISA damages before, even though *Bierwith* precludes the use of such offsets.  754 F.2d at 1053-54.[10]  Because it is so plainly inconsistent with the law in this Circuit, Dr. Carron's analysis is legally irrelevant.  PRIAC's experts have not "refuted Dr. Carron's opinion" on the Plans' damages, State Street Mem. 18, because the flaws in that opinion are legal errors that should lead the Court to reject it.

There also is a dispute over the amount of the credit to which State Street is entitled as a result of the $52.553 million payment for the benefit of the Plans from the Fair Fund.  State Street's settlement agreement with the SEC precludes it from using any portion of the civil penalty to reduce compensatory damages in this case.  (PA 3027 ¶ 3.)  State Street paid a total of $313.59 million into the Fair Fund, $50 million of which was a civil penalty.  (*Id.* ¶ 2(c)(i).)  The penalty portion represented 15.94% of the Fair Fund payments.  ($50 million ÷ $313,590,653 =

---

[10]    In *California Ironworkers Field Pension Trust v. Loomis, Sayles & Co.*, No. CV 964036 (CAS) (JGX), 1999 WL 1457226, at *14-15 (C.D. Cal. Mar. 26, 1999), the court rejected Dr. Carron's damages analysis for offsetting gains in calculating ERISA damages:  "it would not be appropriate to offset gains obtained from appropriate investments against losses caused by investments in [inappropriate investments]."

0.1594.)  If that percentage is applied uniformly to all Fair Fund payments, 15.94% of the

$52.553 million payment to PRIAC, or $8.377 million, represents the penalty portion (0.1594 x

$52.5 million = $8.377 million.)  The credit to which State Street is entitled is $44.176 million.

($52.553 million - $8.377 million = $44.176 million.)  That is almost $4 million less than the

amount State Street calculated by improperly taking the $50 million penalty as a percentage of

the "total compensation paid to investors," rather than as a percentage of its payments into the

Fair Fund.  State Street Mem. 2 n.3.

### III.   PRIAC Agrees to the Dismissal of the State Street Subsidiary.

State Street explains that (a) State Street Global Advisors is a division of State Street, and

(b) State Street Global Advisors, Inc. is a subsidiary of State Street, has no connection with the

State Street division that has the same name, and was not involved in the Bond Funds.  On that

basis, PRIAC agrees to the dismissal of its claim against the subsidiary.

**Conclusion**

For the foregoing reasons, the Court should deny State Street's motion for summary

judgment, and should grant summary judgment to PRIAC as to State Street's mitigation

prevention and superseding cause defenses.

Dated: New York, New York
      July 2, 2010

                                             Respectfully submitted,

                                             DEBEVOISE & PLIMPTON LLP

                                             By:   /s/ Edwin G. Schallert_____
                                                Edwin G. Schallert
                                              Steven Klugman
                                                Jeremy N. Klatell
                                                Courtney M. Dankworth
                                                Miranda H. Turner
                                          919 Third Avenue
                                          New York, New York 10022
                                          (212) 909-6000
                                          egschall@debevoise.com

                                          Attorneys for Plaintiff Prudential
                                          Retirement Insurance and Annuity Company