UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE STATE STREET BANK AND TRUST CO. FIXED INCOME FUNDS INVESTMENT LITIGATION | MDL No. 1945 |

| | |
|---|---|
| PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY CO., | |
| Plaintiff, | |
| -against- | 07 Civ. 8488 (RJH) |
| STATE STREET BANK AND TRUST COMPANY, et al., | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | |

Richard J. Holwell, District Judge:

Plaintiff Prudential Retirement Insurance and Annuity Co. ("PRIAC"), brought this

action pursuant to sections 409(a) and 502(a)(2) and (3) of the Employee Retirement Income

Security Act of 1974 ("ERISA")[1] against defendants State Street Bank and Trust Company

---

[1] 29 U.S.C. § 1132(a), also known as ERISA Section 502(a)(2), provides that a civil action may be brought "by the Secretary [of Labor], or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title."  This opinion uses both names to refer to that section.  29 U.S.C. § 1109(a), also known as ERISA Section 409(a), provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

("State Street") and State Street Global Advisors, Inc. ("SSgA, Inc.") on October 1, 2007.[2] PRIAC commenced this suit as an ERISA fiduciary on behalf of nearly 200 retirement plans (the "Plans") that invested, through PRIAC, in two collective bank trusts managed by State Street— the Government Credit Bond Fund ("GCBF") and the Intermediate Bond Fund ("IBF") (collectively, the "Bond Funds").  In a previous opinion, the Court rejected State Street's challenge to the Plans' standing (and thereby PRIAC's) to bring this suit; denied State Street's motion for partial summary judgment, which argued that certain loans PRIAC made to the Plans would offset any damages awarded in this action; and dismissed PRIAC's claims for restitution, disgorgement, and permanent injunctive relief.  *See generally In re State Street Bank and Trust Co. ERISA Litig.*, 579 F. Supp. 2d 512 (S.D.N.Y. 2008).  State Street filed its answer on October 27, 2008, bringing common-law counterclaims for contribution or indemnification and for defamation, and another counterclaim under the Massachusetts Unfair Trade Practices Act, Mass. Gen. Laws. ch. 93A, §§ 2, 11.  Now before the Court are (1) State Street's motion for summary judgment based on a failure to mitigate damages and on the doctrine of superseding cause; (2) PRIAC's motion for partial summary judgment on State Street's contribution and indemnity, defamation, and Massachusetts Chapter 93A counterclaims; (3) State Street's cross-motion for partial summary judgment on its contribution counterclaim; and (4) State Street's motion to strike portions of the expert rebuttal report of Dennis E. Logue.  The issue at the core of PRIAC's single cause of action—whether State Street breached a fiduciary duty under ERISA—is not addressed by the summary judgment motions.  For the reasons that follow, State Street's motion and cross-motion for summary judgment are DENIED; PRIAC's motion for

---

29 U.S.C. § 1109(a).  Section 502(a)(3) allows a fiduciary to bring a claim for equitable relief, but as discussed below, the Court previously dismissed PRIAC's claims for equitable relief and this provision is therefore irrelevant to this action.

[2] In its papers, PRIAC has agreed to dismissal of its claim against SSgA, Inc.  (Pl.'s Opp'n at 42.)  Accordingly, defendant SSgA, Inc. is DISMISSED from this action.

partial summary judgment is GRANTED as to the Massachusetts Chapter 93A counterclaim and DENIED as to the contribution and defamation counterclaims; and State Street's motion to strike sections of the expert report of Dennis E. Logue is DENIED.

## BACKGROUND

### I. The Parties

Plaintiff was established in 2004 when Prudential Financial, Inc. ("Prudential") acquired CIGNA Retirement & Investment Services ("CRIS") and renamed it PRIAC.  (Pl.'s Rule 56.1 Stmt. ¶ 1; Def.'s Rule 56.1 Stmt. in Support of Motion for Summary Judgment ("Def.'s SJ Rule 56.1 Stmt") ¶ 6.)  PRIAC provides investment options to defined benefit and defined contribution retirement plans; it provides these options to over 7,000 organizations and three million participants and beneficiaries.  (Pl.'s Rule 56.1 Stmt. ¶¶ 1-3.)  Plaintiff commenced this suit on behalf of the Plans, who invested in the Bond Funds through ERISA separate accounts (the "Separate Accounts") that PRIAC maintained.  (Pl.'s Rule 56.1 Stmt. ¶ 4.)  PRIAC's role with respect to the transactions at issue in this litigation was to serve as an intermediary between State Street and the Plans.  (Def.'s SJ Rule 56.1 Stmt. ¶ 9.)

Defendant State Street, as trustee, established the IBF and the GCBF as unregistered collective trust funds.  (Def.'s SJ Rule 56.1 Stmt. ¶ 5.)   State Street's investment arm, State Street Global Advisors ("SSgA"),[3] a large institutional asset manager, managed the Bond Funds at issue in this case.  (Pl.'s Rule 56.1 Stmt. ¶¶ 7-9; Def.'s SJ Rule 56.1 Stmt ¶ 3.)  The Fixed Income Group within SSgA played a central role in the investment management of the Bond Funds.  (*See* PA 602 Wands.)[4]   State Street is a recognized name among institutional asset

---

[3] SSgA is unrelated to SSgA, Inc., the dismissed party in this action.  (Def.'s Mem. at 19-20; Pl.'s Opp'n at 42.)
[4] Citations in the format (PA #, <Name>) refer to the deposition testimony of <Name>.

managers and is regulated by state authorities, the Securities and Exchange Commission ("SEC"), and the Department of Labor.  (Pl.'s Rule 56.1 Stmt. ¶¶ 12, 14, 15.)

## II.  The Bond Funds in PRIAC's "Manager of Managers" Program

The relationship between the parties reaches back to 1996, when CRIS offered the Bond Funds to its retirement plan clients.  (Def.'s SJ Rule 56.1 Stmt. ¶ 5.)  After Prudential acquired CRIS, PRIAC continued to offer the Bond Funds as part of its "Manager of Managers" ("MOM") program.[5]  (Def.'s SJ Rule 56.1 Stmt. ¶ 6.)  The MOM program was "specifically designed to help [defined contribution and defined benefit] plan sponsors manage their responsibilities in selecting and monitoring investments."  (Palmer Decl. Ex. 5 at 1.)  MOM had two major components: the Multi-Manager Matrix and the Prudential Due Diligence Advisor Program (the "DDA Program").  (*Id.* at 5.)

### A.  Institutional Sub-Advised and Alliance Funds in the Multi-Manager Matrix

The first component of the MOM program, the "Multi-Manager Matrix," classified funds so that plan sponsors could choose from "a comprehensive array of asset classes and fund offerings covering the full spectrum of risk and return objectives," which included hundreds of funds in various asset classes.  (Palmer Decl. Ex. 5 at 6; Pl.'s Rule 56.1 Stmt. ¶ 32.)  Each asset class contained two "primary types" of fund offerings: Institutional Sub-Advised and Alliance.  (Palmer Decl. Ex. 5 at 6.)  PRIAC took a more passive role with the latter category than it did with the former.  With Institutional Sub-Advised Funds, PRIAC agreed on an investment strategy with the fund's investment manager and monitored the funds for the degree to which the manager adhered to the stated process and objective.  (Pl.'s Rule 56.1 Stmt. ¶ 55.)  PRIAC also

---

[5] PRIAC's clients include trustees of defined benefit plans ("Plan Sponsors") and participants in defined contribution plans ("Plan Participants").  (*See, e.g.*, Pl.'s Rule 56.1 Stmt. ¶ 5.)

had the authority to replace the investment manager of an Institutional Sub-Advised Fund.  (*Id.* ¶ 56.)

With Alliance Funds, however, PRIAC advised clients that it could not "control the investment process in any way and cannot ensure style consistency."  (Palmer Decl. Ex. 5 at 6.) PRIAC acknowledged that it was an ERISA fiduciary "for the selection, monitoring, and, if necessary, the deselection of the investment manager" for the Institutional Sub-Advised Funds, but only one for "selection and monitoring" for the Alliance Funds.  (*Id.*)  Although generally deselection was at the plan sponsor's discretion, "in extenuating circumstances," PRIAC could terminate an Alliance Fund "as a measure of last resort."  (*See id*. at 6, 20.)  PRIAC negotiated the investment strategy of an Institutional Sub-Advised Fund, but "the outside manager . . . controlled the investment process" of an Alliance Fund; that is, PRIAC had no input as to an outside manager's investment management, risk assessments, and investment decisions for an Alliance Fund.  (Palms ¶ 11, PA 3;[6] *see also* Pl.'s Rule 56.1 Stmt. ¶ 10.)  Furthermore, although PRIAC selected the funds comprising the menu of Alliance Funds from which plan sponsors and participants could choose, the plan sponsors and participants directed the investments of their plans within that menu.  (*See* PA 2220.)

The separate accounts invested solely in the Bond Funds were Alliance Funds, in which PRIAC had the authority to discontinue investments only in extenuating circumstances as a measure of last resort.  (Pl.'s Rule 56.1 Stmt. ¶ 37; *see also* Palmer Decl. Ex. 5 at 6.)  PRIAC also had two "Balanced Funds," the Balanced Turner Fund and the Balanced Wellington Fund. (Pl.'s Rule 56.1 Stmt. ¶ 57.)  These funds were Institutional Sub-Advised Funds, with 40% of the fund invested in the IBF, and the remainder managed by Turner or Wellington.  (*Id.* ¶ 58.)  For

---

[6] Citations in the form (<Name> ¶ #, PA #) refer to a paragraph in <Name>'s sworn declaration.  This citation, for example, refers to the Palms Declaration, paragraph 11, found at PA 3.  PRIAC has organized its exhibits to have sequential page numbers that begin with "PA."

these funds, PRIAC had the authority to discontinue investments in the IBF, even without

extenuating circumstances.  (*See id.* ¶ 56.)

### B.  The DDA Program

The second component of the MOM program, the DDA Program, was "the cornerstone

of [PRIAC's] investment offerings, . . . [and] employ[ed] a disciplined process . . . for

identifying, evaluating and selecting leading investment managers across asset classes."  (Palmer

Decl. Ex. 5 at 5.)  PRIAC monitored the Bond Funds through the DDA Program, which

purported to provide reporting and rigorous and objective analysis on funds.  (*See* Pl.'s Rule 56.1

Stmt. ¶ 33, 44; Def.'s SJ Rule 56.1 Stmt. ¶ 12.)  The MOM Program monitored funds "on an

ongoing basis with the understanding that performance goals may not be met quarter to quarter,

but are to be achieved over the longer term," (Palmer Decl. Ex. 5 at 13.), and the DDA Program

used a "DDA Score," a composite score of a fund's past performance that weighted the longer

term periods more heavily than shorter term periods, to monitor funds.  (Palms ¶ 15, PA 4-5.)

The DDA Program also produced quarterly "DDA Reports" for each fund PRIAC

offered, which were made available to clients.  (Palms ¶ 14, PA 4.)  The DDA Reports contained

an explanation of the DDA Program, a summary of activity for each fund on the platform, a

market review, fund performance and peer group rankings, and a page of data specific to each

fund, such as the ten largest bond holdings of the fund, the fund's net asset value, and

commentary on the fund's performance for each quarter.  (Pl.'s Rule 56.1 Stmt. ¶ 54; Palms

¶¶ 14, 17, PA 4-5.)  For each Alliance Fund, PRIAC defined a "peer group" for that fund using

certain criteria.  (Pl.'s Rule 56.1 Stmt. ¶ 51.)  PRIAC then calculated the DDA Score for the

Alliance Fund and for each peer fund, ranked the Alliance Fund among its peer funds, and

included that peer ranking in the DDA Report.  (*Id.* ¶ 52.)  The DDA Reports contained data and commentary for 100 to 250 funds, and each report was 200 to 300 pages long.  (*Id.* ¶ 62.)

In addition to information provided through the DDA Program, PRIAC provided "Fund Fact Sheets" to the Plans quarterly.  These documents provided information about a fund's objectives, guidelines, and certain fund characteristics.  (Palms ¶ 22, PA 6.)  The Plans could also access daily performance and other information about the Bond Funds on PRIAC's Plan Sponsor and Plan Participant websites.[7]  (*Id.* ¶ 24, PA 7.)

### C.  PRIAC's Use of Information Provided by State Street

PRIAC had a policy of not providing the names of its clients to anyone, including State Street.  (Def.'s SJ Rule 56.1 Stmt ¶ 17.)  State Street asked PRIAC for a list of investors in the Bond Funds in September 2007, but PRIAC refused.  (*Id.*)  For the Plans, then, PRIAC served as the primary conduit of information about the Bond Funds, although the Plans could access other publicly available information, such as the sector weights of benchmarks against which Funds were measured.  (*See* Pl.'s Rule 56.1 Stmt. ¶ 65.)  State Street provided to PRIAC monthly account summaries that reported on the performance of the Bond Funds and their benchmarks as well as quarterly qualitative and quantitative data reports that included additional information, such as the ten largest bond holdings of the fund, average coupon, average maturity, and a quarterly fund commentary.  (Frascona ¶¶ 16, 18, PA 18-19.)  PRIAC, in turn, would use this information in composing its DDA Reports and Fund Fact Sheets.  (*Id.* ¶ 18.)  PRIAC did not relay the information verbatim, but instead used its judgment to convey to its clients the information it deemed appropriate, which did not always include all the information State Street

---

[7] In its response to PRIAC's Local Rule 56.1 Statement, State Street disputed this, on the grounds that PRIAC's expert has never seen the website.  (*See* Def.'s Resp. to Pl.'s Rule 56.1 Stmt. ¶ 49.)  But just because one person has not seen the website does not mean it did not exist.  State Street's only other ground for disputing the existence of the website is challenging the Palms Declaration's sufficiency as evidence of its existence, but State Street provides no evidence that the website did not exist or did not provide daily performance data.

conveyed to it.  (*See* Palms ¶¶ 14, 15, 17, 18, 22, PA 4-6.)  State Street's monthly reports, for example, compared the sector allocations of the Bond Funds with those of their benchmarks, whereas the DDA Reports did not.  (PA 825; Def.'s SJ Rule 56.1 Stmt. ¶ 29.)  Instead, the DDA reports displayed a three-year average asset weighting for the funds' benchmarks.  (Def.'s SJ Rule 56.1 Stmt. ¶ 29.)

### D.  The Watch List

PRIAC could alert its clients about the performance of an Alliance Fund via a quarterly "Watch List."  Placement on the Watch List was a means of informing Plan Sponsors that PRIAC had concerns about the fund's performance or its investment manager.  (Pl.'s Rule 56.1 Stmt. ¶ 43.)  PRIAC compiled the Watch List after the end of each calendar quarter.  (*Id.*)  Typically, PRIAC's Investment Products team would identify Alliance Funds with which they had concerns at the end of each quarter, and submit this list to PRIAC's Separate Account Committee, who would decide ultimately whether to place the fund on the Watch List.  (Palms ¶ 25, PA 7.)

### III. The Bond Funds

### A.  Benchmarks

As mentioned above, the Plans, through PRIAC, invested in two particular funds at issue in this litigation, the GCBF and the IBF.  Each of the Bond Funds used a Lehman Brothers Index as a benchmark by which the fund's performance could be measured; the GCBF used the Lehman Brothers Government Credit Bond Index, and the IBF used the Lehman Brothers Intermediate Government Credit Bond Index.  (Pl.'s Rule 56.1 Stmt. ¶ 18.)  The investment objective of the Bond Funds was to match or exceed the performance of the index by which they

were measured.  (*See, e.g.*, PA 1432 ("The Investment Objective of the Fund shall be to match or

exceed the return of the Lehman Brothers Intermediate Government Credit Bond Index . . . .").)

**B.  "Enhanced Index" vs. "Active" Funds**

There is some dispute about how State Street categorized the Bond Funds.  PRIAC

asserts that State Street used three categories for their funds: "Passive" funds would closely track

a benchmark index, "Active" funds sought more aggressive returns, and "Enhanced Index" funds

would modestly outperform a benchmark index while mirroring its risk profile.  (Pl.'s Rule 56.1

Stmt. ¶ 16.)  Indeed, several State Street presentations depict "Enhanced Index" as a category

between "Active" and "Passive."  (*E.g.*, PA 1908, 1943; PA 2119.)  State Street, however,

disputes that the "Enhanced Index" characterization had any consistent meaning, and emphasizes

that the term has no accepted industry-wide meaning.  (*See* Maher Decl. Ex. 8 at 238:9-238:23,

Ex. 68 at 31:24-32:8; Def's SJ Rule 56.1 Stmt. ¶ 23.)[8]  State Street maintains, therefore, that the

Bond Funds are "Active" funds.  It is undisputed that "enhanced index," to the extent the term is

meaningful, would imply at least some "active management qualities."  (Def.'s SJ Rule 56.1

Stmt. ¶ 24.)

Descriptions of the Bond Funds within a single document lend support for both

interpretations of their categorization.  One State Street presentation, for example, describes the

"investment philosophy" of the Bond Funds as a "risk-controlled process [that] ensures

consistent, steady performance," implying that the Bond Funds lie between Active and Passive,

but elsewhere describes the Bond Funds' "active core bond strategy."  (*Compare* PA 2050 *with*

PA 2092-94.)  The confusion exists elsewhere.  An e-mail from Robert Frascona, Vice President

of Investment Product Management for PRIAC, acknowledges that "SSgA characterizes the

---

[8] In the same deposition testimony that State Street uses to show that there is no industry-wide meaning for
"Enhanced Index," PRIAC's expert, Marshall E. Blume, testified that "within an organization," the term would
"usually" have a consistent meaning.  (Maher Decl. Ex. 68 at 95:21-96:3.)

[GCBF] and [IBF] strategies as actively managed," but also says that "they truly fall between passive management . . . and active management." (Maher Decl. Ex. 72 at 334233.) A State Street employee described the fee paid to State Street for the Bond Funds as "recogniz[ing] the role of enhanced funds between active and passive strategies." (PA 1651.)

Regardless of whether State Street intended to distinguish the Bond Funds from Active Funds by describing them as "Enhanced Index" on some occasions, PRIAC described the Bond Funds as "enhanced index" funds in certain materials that it sent to its clients in early 2005. (*See* PA 1057-58, 1061.) PRIAC also stated that the Bond Funds "combine[] the usually predictable strength of passive management with the repeatable aspects of active management to seek to provide a stable pattern of incremental returns" in its Fund Fact Sheets. (Pl.'s Rule 56.1 Stmt. ¶ 26.) The Fact Fund Sheets also described State Street's management style as "enhanced" from 1996 through 2007. (*Id.* ¶ 25.) State Street reviewed Fact Fund Sheets containing the language described above on March 30, 2005 and August 1, 2007 and generally found them to be accurate, though it did not specifically comment on the relevant language. (PA 1057, 1355.) Until July 2005, PRIAC had sent Fund Fact Sheets to State Street for its review and approval each quarter, but PRIAC stopped this practice in mid-2005 to speed up the production and delivery to clients of the Fund Fact Sheets. (Pl.'s Rule 56.1 Stmt. ¶¶ 84, 85.)

**C. Targeted Excess Returns and Predicted Tracking Error**

Related to the categorization of "Active" or "Enhanced Index" are the Bond Funds' targeted excess returns and predicted tracking error as compared to their benchmarks. Both of these characteristics are measured in "basis points." Each basis point represents a 0.01% deviation from the benchmark. The points for targeted excess returns represent the margin by

which the Bond Funds strove to outperform their benchmark; the predicted tracking error measured the anticipated deviation from the benchmark.

In 2003, in a presentation to PRIAC's predecessor, State Street stated that the Bond Funds' targeted excess return was 30 to 40 basis points (0.3-0.4%), and its target predicted tracking error was 40 to 50 basis points. (PA 2050.) CIGNA informed State Street that the Bond Funds were available for selection if Plan Sponsors chose the "particular style offered by the strategies—low tracking error fixed income." (PA 2027.) In February 2005, State Street informed PRIAC that the Bond Funds' excess returns target was 40 to 60 basis points and that their targeted predicted tracking error was 50 to 75 basis points. (Pl.'s Rule 56.1 Stmt. ¶ 24; Maher Decl. Ex. 8 at 564:9-565:9.)

In early 2006, State Street increased the excess returns target for the Bond Funds to 70 to 80 basis points. (Pl.'s Rule 56.1 Stmt. ¶ 96.) State Street never specifically disclosed this to PRIAC. (*Compare* PA 1574 *with* Frascona ¶ 9, PA 17; *see also* PA 2145 ("Our fee structure may very well suggest that our strategy is 'only' enhanced . . . .").) State Street informed PRIAC that there had been no changes in its investment strategy for the Bond Funds in September 2005 and August 2007—a statement that State Street contends is true because its view is that the Bond Funds were "Active" all along. (Pl.'s Rule 56.1 Stmt. ¶ 28.)

## IV. Investment Strategy for the Bond Funds from 2005 to 2007

### A. Active Management

The overall investment philosophy of State Street's Fixed Income Group provides a backdrop to the increase in the excess return targets for the Bond Funds from 2005 to 2007. At the end of 2005, State Street's chief executive officer set for the Fixed Income Group a goal of tripling the group's revenues and assets under management within three years. (Pl.'s Rule 56.1

Stmt. ¶ 91.)  Typically State Street set its fees at 20-25% of a fund's excess return target, so the fee for an active fund would be higher than that for a passive fund.  (PA 498 Kelly.)  Although State Street had primarily been known as a passive fund manager in the past, State Street's executive group wanted the fixed income team's active fixed-income capabilities to be more widely known in 2006.  (PA 466-69 Greff;  PA 490-91 Hunt; PA 606-07 Wands.)  In that year, State Street had eight "global strategy initiatives," known as the G-8, the third of which was "Leveraging Fixed Income."  (PA 2153.)  As part of implementing these initiatives, the Fixed Income Group decided to "take more active risk" in its bond investments and to "[g]enerate higher returns for clients in existing products."  (Pl.'s Rule 56.1 Stmt. ¶ 95.)  By early 2006, State Street had increased the return targets for the Bond Funds to 70 to 80 basis points above their respective benchmarks, a target consistent with an active fund.  (*Id.* ¶ 96; PA 544-46 Pickett.)

### B.  The Limited Duration Bond Fund

State Street also invested the Bond Funds in the Limited Duration Bond Fund ("LDBF"), a "portable alpha" fund State Street managed and in which other State Street-managed funds invested.  (*See* Pl.'s Rule 56.1 Stmt. ¶¶ 101, 102, 107.)  Portable alpha refers to a strategy in which a number of funds invest in one "alpha-seeking" fund; alpha refers to the excess return on an investment over its benchmark.  (*Id.* ¶¶ 102, 103.)  In 2006 and 2007, the LDBF invested in home equity asset-backed securities ("ABS"), and by early 2007, virtually all of the LDBF's assets were invested in subprime mortgage-related securities.[9]  (*Id.* ¶¶ 104, 105.)

---

[9] Subprime refers to ABS backed by home equity loans to borrowers with impaired credit histories.  (Pl.'s Rule 56.1 Stmt. ¶ 105.)

### C. Leverage

Between 2005 and 2007, State Street increased its use of leverage in the IBF and the GCBF.  "Leverage" involves the use of financial instruments or debt to increase exposure to an investment beyond the cash invested.  (Pl.'s Rule 56.1 Stmt. ¶ 72.)  Specifically, State Street increased the leverage in the IBF from 1.28 in September 2005 to 4.56 at the end of July 2007, and in the GCBF from 1.35 in September 2005 to 6.1 at the end of July 2007.  (*Id.* ¶ 117.)

### V. Disclosures Regarding the Bond Funds Between 2005 and 2007

### A. The "Passive" Name Change for the IBF

On September 19, 2005, State Street advised PRIAC that it had made changes to certain funds to create operational efficiencies, including minor name changes.  (Pl.'s Rule 56.1 Stmt. ¶ 78.)  Sonya Hughes, State Street's "relationship manager" for PRIAC at the time, sent PRIAC an e-mail that mistakenly indicated that the name of the IBF had changed to the "Passive Intermediate Bond Index Securities Lending Series Fund."  (Def.'s SJ Rule 56.1 Stmt. ¶ 18.)  A fund declaration also included "passive" and "index" in the IBF's name.  (Pl.'s Rule 56.1 Stmt. ¶ 79.)  PRIAC requested a conference call to speak with State Street generally about the September 19, 2005 changes to the funds, though not specifically one to discuss the name change.  (*Id.* ¶ 80.)  After that call, Hughes sent a document to PRIAC confirming that the name of the IBF had been changed to include the words "passive" and "index."  (*See id.* ¶ 81; PA 669.)  The document also indicated that the investment objectives of the funds listed, including the IBF, had not changed.  (PA 669.)  Following this, PRIAC used the new name for the IBF in its communications with the Plans from October 2005 to July 2007, and its materials referred to the IBF as the Passive Intermediate Bond Index Fund during that time.  (*Id.* ¶ 82.)

During this time, PRIAC employees responsible for monitoring the IBF believed that the IBF, despite its name, was an enhanced index fund.  (Def.'s SJ Rule 56.1 Stmt. ¶ 19.)  As noted, an enhanced index fund, to the extent the term has meaning, is not the same as a passive or index fund because of certain active management qualities.  (Def.'s SJ Rule 56.1 Stmt. ¶ 24.)  PRIAC continued, however, to use the new name for the IBF after State Street had advised PRIAC twice regarding the name change.

In late June 2007, PRIAC asked State Street about the accuracy of the IBF's name.  (Pl.'s Rule 56.1 Stmt. ¶ 86.)  Specifically, Matthew Dingee, a PRIAC investment analyst responsible for monitoring the IBF, forwarded Sonya Hughes's September 2005 e-mail regarding the name change to Mark Flinn, the new relationship manager for PRIAC at State Street, and stated that PRIAC was "confused as to why the fund's performance matches what SSgA considers to be the Active Intermediate Bond Fund (i.e., in the Q1 SSgA Investment commentary . . . )."  (Palmer Ex. 21 at 529728.)   On July 12, 2007, Flinn e-mailed Robert Frascona of PRIAC to confirm that State Street had mistakenly provided PRIAC with an incorrect name for the IBF and attached a document indicating the correct name for the IBF and that the IBF was an actively managed fund.  (Pl.'s Rule 56.1 Stmt. ¶ 87; Def.'s SJ Rule 56.1 Stmt. ¶ 46.)  State Street reiterated these points on a July 18, 2007 conference call with CIGNA, PRIAC, and State Street.  (Def.'s SJ Rule 56.1 Stmt. ¶ 47.)

On July 27, 2007, Frascona internally forwarded to Dingee an IBF fact sheet that Dingee was to ask State Street to review for accuracy.  (Def.'s SJ Rule 56.1 Stmt. ¶ 48.)  Dingee did so, forwarding that fact sheet to Flinn at State Street on July 30, 2007.  (*Id.* ¶ 49; Pl.'s Rule 56.1 Stmt. ¶ 88.)  Because PRIAC had stopped regularly sending fact sheets to investment managers for quarterly review in mid-2005, this was the first time State Street had reviewed the IBF fact

sheet since that time.  (*See* Pl.'s Rule 56.1 Stmt. ¶¶ 84, 85.)  On August 1, 2007, State Street responded that the name of the IBF was inaccurate on the Fund Fact Sheet.  (*Id.* ¶ 89.)  That same day, Frascona e-mailed co-workers at PRIAC to inform them that because they had "recently" been advised by State Street that they were using an incorrect name for the IBF, they were "immediately" changing the name of the fund.  (Def.'s SJ Rule 56.1 Stmt. ¶ 52.)  PRIAC updated its websites that day and began the process of correcting in-production reports to reflect the IBF's corrected name.  (Pl.'s Rule 56.1 Stmt. ¶ 90.)  PRIAC ultimately notified its clients (other than CIGNA, who was already aware) of the name change by a method other than its website on August 20, 2007.  (Maher Decl. Ex. 51, at Answer to Interrogatory No. 8.)

## B.   Leverage Disclosure

In the fourth quarter 2004 report for the GCBF, State Street showed sector allocations totaling 116%; the 2004 report for the IBF showed sector allocations totaling 100%.  (Pl.'s Rule 56.1 Stmt. ¶ 73.)  When PRIAC asked State Street why the total for the GCBF was over 100%, State Street explained that 116% included the GCBF's leverage component which might hold "a future or a swap."  (*Id.*)  PRIAC was therefore aware that the funds could use, and at least in GCBF's case, had previously used, moderate leverage to achieve returns above those of their benchmarks.  (*Id.* ¶ 77.)  In early 2005, State Street made an internal decision to "normalize" sector weights in its reports so that the weights would total 100%, even if the amount of invested assets exceeded the amount invested in a fund because of leverage.  (*Id.* ¶ 75.)  Subsequent reports did not disclose negative cash or sector exposures of more than 100%.  (*See* PA 1047; PA 1082; PA 2161-63.)  State Street's monthly and quarterly reports to PRIAC after this decision therefore did not show leverage in the Bond Funds.  (Pl.'s Rule 56.1 Stmt ¶ 118.)

On July 12, 2007, PRIAC received from State Street a spreadsheet showing portfolio holdings of the IBF and a breakdown of the components of the IBF's ABS exposure.  (Pl.'s Rule 56.1 Stmt. ¶ 136.)  The spreadsheet listed the over 2,600 individual holdings of the IBF, associating each one with an alphanumeric identifier, a notional amount, and a description such as "US TREASURY BONDS," "CSX CORP," or "IRSwap USD 4.0 L1BOR 2Y."  (*See* PA 689-776.)  Although it was possible to divine the amount of leverage (namely, 4 to 1) in the IBF from this spreadsheet and other available information, PRIAC employees who received it at the time either did not conduct a detailed enough review to reveal that leverage or could not understand it.  (*See* PA 516 Kinney; Dingee ¶ 6, PA 24; Palmer Decl. Ex. 18 ("Molinaro Dep.") at 105:21-107:6.)

## C.  Other Disclosures

### i.  Performance of the Bond Funds Compared with Their Benchmarks

State Street sent monthly reports to PRIAC that reported the Bond Funds' investment in various sectors by percentages as well as supplemental quantitative and qualitative information that reported other characteristics of the Bond Funds, such as their ten largest bond holdings, average coupon, average maturity, and a quarterly fund commentary.  (Pl.'s Rule 56.1 Stmt. ¶¶ 69-70.)  The reports showed that the performance of the Bond Funds, at times, varied from their benchmarks.  In December 2006, for example, the IBF outperformed its benchmark by 69 basis points for the month, and by 27 basis points over a five year period; the GCBF outperformed its benchmark by 8 basis points that month, and by 23 points over a five year period.  (Palmer Decl. Ex. 31 at 8182.)  Performance in individual months would vary.  In June 2006, both Bond Funds underperformed, the GCBF by 3 basis points, and the IBF by 2 basis points.  (PA 2706.)  And by March 31, 2007, the long-term performance of the Bond Funds

showed less of a variance from their benchmarks than they did in December 2006.  At that point, the IBF outperformed its benchmark by 10 basis points over a five-year period and just 6 points over a ten-year period; the GCBF outperformed its benchmark by 6 basis points over a five-year period and actually underperformed relative to its benchmark by 6 basis points over a ten-year period.  (PA 1078; PA 1073.)

### ii. Investment Strategy

State Street never specifically disclosed to PRIAC that the Bond Funds' target was 70 to 80 basis points above their benchmarks.  (*Compare* PA 1574 *with* Frascona ¶ 9, PA 17; *see also* PA 2145 ("Our fee structure may very well suggest that our strategy is 'only' enhanced . . . .").)  In February 2005, State Street did disclose that "[t]he strategy's goal is to generate excess returns of 40-60 bps [basis points], while targeted predicted tracking error is 50-75 bps.  More recently we have generated less excess return than our goal, but we have also had a lower predicted tracking error. . . .  We have started to increase both the tracking error and hopefully the excess returns."  (PA 987.)  In its commentaries for the fourth quarter of 2006 and the first quarter of 2007 on the Bond Funds, State Street also used the word "active" in the name of each fund, as opposed to its use of the word "passive" in the IBF's name in 2005.  (Maher Decl. Ex. 27 at 7411; Ex. 28 at 274915; *see also* Pl.'s Rule 56.1 Stmt. ¶ 79.)  Also, State Street's commentary for the first quarter of 2006 on the GCBF mentioned that "[o]verweight positions to the long triple B securitized debt sector" made a "[c]ontribution to excess return in our strategy" and that the GCBF would "maintain our existing triple B home equity exposure," although it did not explain those statements beyond that.  (Palmer Decl. Ex. 40 at 6247.)  PRIAC reviewed this commentary and used portions of it in its DDA Reports.  (Def.'s SJ Rule 56.1 Stmt. ¶ 27.)

PRIAC knew in 2006 and 2007 that State Street's investment strategy for the Bond Funds involved making some investments in sectors in which their benchmarks did not invest to generate returns above those of the benchmarks.  (Pl.'s Rule 56.1 Stmt. ¶ 109.)  PRIAC also knew during that time that some of the Bond Funds' ABS holdings were backed by the home equity market.  (*Id.* ¶ 114.)  State Street's monthly reports did not detail the specific types of ABS exposure or break down by type the Bond Funds' ABS investments, although some quarterly commentaries alluded to subprime exposure, as discussed above.  (Frascona ¶ 17, PA 19.)  State Street did not inform PRIAC of the Bond Fund's investments in the LDBF until July 2007.  (Pl.'s Rule 56.1 Stmt. ¶ 108.)

### iii. Sector Composition

The reports also indicated that the Bond Funds invested in certain sectors, including asset-backed securities, that their benchmarks did not.  (Def.'s SJ Rule 56.1 Stmt. ¶ 25.)  The reported ABS holdings of the Bond Funds fluctuated during 2006 and 2007, as shown in the graphs below:



(PA 2595; PA 2617; PA 2639; PA 2668; PA 2690; PA 2712; PA 2742; PA 2764; PA 2785; PA

2817; PA 2839; PA 2861; PA 2892; Palmer Decl. Ex. 35 at 527898; Palmer Decl. Ex. 36 at

534579; PA 2914.)



(PA 2597; PA 2619; PA 2641; PA 2670; PA 2692; PA 2714; PA 2744; PA 2766; PA 2787; PA

2819; PA 2841; PA 2863; PA 2894; Palmer Decl. Ex. 35 at 527900; Palmer Decl. Ex. 36 at

534581; PA 2916.)  Over this period, the State Street reports also indicated that the Bond Funds'

benchmarks held 0% ABS exposure.  (Def.'s SJ Rule 56.1 Stmt. ¶ 26.)

## VI. The End of the Bond Funds

### A.  Decline in Performance, the Watch List, and Redemption

In the first quarter of 2007, the IBF gained 62 fewer basis points than its benchmark, and

the GCBF gained 57 fewer basis points than its benchmark.  (Pl.'s Rule 56.1 Stmt. ¶ 122.)  In

April and May 2007, the performance of the Bond Funds improved relative to the first quarter of

2007.  (*Id.* ¶¶ 124, 125.)  Beginning in late July 2007, the Bond Funds' performance declined

significantly.  (*Id.* ¶ 126.)  From May 31 to August 31, 2007, the IBF lost 16.9% of its net asset

value while its benchmark increased in value by 2.2%; during that period, the GCBF lost 23.9% of its net asset value while its benchmark increased in value by 2.1%. (*Id.* ¶ 127.)

On August 20, 2007, PRIAC placed the Bond Funds on its Watch List and notified its clients of that fact via e-mail, without waiting for the end of the third quarter, and redeemed the Balanced Funds' investments in the IBF, pursuant to its authority to discontinue investments made by an Institutional Sub-Advised Fund. (Pl.'s Rule 56.1 Stmt. ¶ 162; Def.'s SJ Rule 56.1 Stmt. ¶ 58.) The client notification did not mention that CIGNA had redeemed its investment in the IBF earlier that day or that PRIAC had redeemed the Balanced Funds' investments. (Def.'s SJ Rule 56.1 Stmt. ¶ 59.) On August 23, 2007, PRIAC sent to its client-facing personnel a packet of documents to assist them in explaining to the Plans the situation involving the Bond Funds. (Pl.'s Rule 56.1 Stmt. ¶ 166.)

On August 28, 2007, PRIAC implemented a "negative election" process for the Plans, under which the Plans would redeem their investments in the Bond Funds unless they instructed PRIAC otherwise. (Pl.'s Rule 56.1 Stmt. ¶ 167.) As a result, 179 of the 180 plans did not object to the redemption of their investments in the Bond Funds, and the one objecting Plan requested redemption shortly thereafter. (Def.'s SJ Rule 56.1 Stmt. ¶ 62.) That day, PRIAC also sent letters to the Plans in which it stated that "State Street is not providing sufficient information to allow us to monitor" each Fund. (Pl.'s Rule 56.1 Stmt. ¶ 168.) PRIAC personnel were instructed to provide that letter to affected clients and their investment consultants, along with three documents provided by State Street: the SSgA Q&A, the SSgA Characteristics Report through July 31, 2007, and the SSgA Weekly Fund Update through August 24, 2007. (*Id.* ¶ 169.)

PRIAC requested that State Street redeem the Plans' investments in the Bond Funds on August 29, 2007, and State Street closed the Bond Funds a few days later.  (Pl.'s Rule 56.1 Stmt. ¶¶ 128, 129.)  PRIAC sent various documents to its personnel for their use in updating the Plans about the Bond Funds on September 4 and 5, 2007.  (*Id.* ¶¶ 170, 171.)

### B.  PRIAC and CIGNA's Concerns About Underperformance

Leading up to the eventual redemption of the Bond Funds, in April and May 2007, PRIAC asked State Street for an explanation of the Bond Funds' first-quarter underperformance. (Pl.'s Rule 56.1 Stmt. ¶ 130.)  State Street had sent a "Client-At-Risk Alert" in February 2007 to some clients and a "client-friendly" letter to some clients in mid-April 2007 that attributed its fixed income funds' underperformance to investments in subprime mortgage securities, but sent neither of these to PRIAC.  (*Id.* ¶¶ 131-133.)  The Client-At-Risk Alert notified State Street clients that "[m]any of our active portfolios, whether they be benchmark-oriented or Libor-oriented, are exposed to the triple B ABX sector," and explained that the decline in that sector was causing a decline in value in the portfolios as well.  (PA 1598.)  The ABX index was an index composed of credit default swaps on twenty subprime mortgage-backed securities.  (Pl.'s Rule 56.1 Stmt. ¶ 123.)  The Client-At-Risk Alert contained quantitative data on the decline in the ABX, as well as a qualitative description of the subprime mortgage crisis.  (PA 1596-99.) State Street offers no particular reason why PRIAC did not receive this alert and the April 2007 letter.  (PA 457 Flinn; PA 597-99 Thornton.)

On April 11, 2007, State Street did provide commentary on the Bond Funds' performance in the first quarter of 2007 to PRIAC, which stated:

> The Active Core U.S. Government/Credit Fund under-performed the return of its benchmark by 56 basis points for the quarter, posting a return of 0.90%. The Active Intermediate Bond Fund under-performed its benchmark for the quarter by 62 basis points, posting a return of 0.97%. . . .

The bond market in the past few weeks has reversed most of the sell-off that occurred during the end of the fourth quarter of 2006.  This move reflects some recent economic data that has been somewhat weaker than the trend of recent months.  It also reflects the impact of the turmoil that has occurred in the sub-prime mortgage industry, as several companies in that business have filed for bankruptcy and others are feeling a great deal of financial stress. This has caused the treasury market to see bond yields decline about 30 basis points in the five-year area as the market has experienced a classic "flight to quality" move.  This move into treasuries has caused spreads to widen in corporate sector and lower-quality mortgage bonds.  It has even affected the agency market as spreads have widened from about 25 basis points to 32 basis points in the five-year maturity area.  Another factor in the bond market rally has been the recent decline in the stock market, which has resulted in cash flowing out of stocks and into bonds.

. . .

The strategies' under-performance was primarily driven by exposure in the triple B asset-backed securities market.  The sub-prime housing market has been plagued by negative headlines in the media.  The hedge fund community seized upon these negative reports and began to use this Index as a means of expressing a negative view (i.e. shorting) on the U. S. housing market.  A combination of thin volume and one-way hedge fund activity has led to extreme market volatility that has paralyzed value-oriented investors from entering the market.  This has lead to extreme illiquidity in the market, which has translated into unprecedented transactions costs.  Although we respect the technicals surrounding this issue, we are comfortable and confident in our analysis of the fundamentals and continue to hold this exposure. . . .

Looking forward, we will continue to hold our asset-backed exposure. Our analysts remain confident in the fundamentals of these securities within the portfolio.

(Maher Decl. Ex. 28 at 274915.)  The commentary contained the qualitative description of the

subprime mortgage crisis, although not the quantitative data contained in the Client-At-Risk

Alert, or any mention of the ABX.  (*Compare id. with* PA 1596-99.)

In May and June 2007, CIGNA, one of PRIAC's clients, was considering transferring

more money to the IBF, and on June 21, Dean Molinaro of PRIAC forwarded the April 11 State

Street commentary to Tracy Labonte of CIGNA in response to questions she had posed about the

IBF.  (Def.'s SJ Rule 56.1 Stmt. ¶ 31.)  In June and July, PRIAC asked State Street several

questions about the Bond Funds on behalf of CIGNA.  (Palmer Decl. Ex. 18 at 85:9-85:16; PA 671; PA 777-78.)  On June 29, PRIAC received from State Street characteristics data as of May 31, 2007 and forwarded it to CIGNA that same day.  (Def.'s SJ Rule 56.1 Stmt. ¶ 34.)

On July 6, 2007, State Street e-mailed commentary to PRIAC discussing the subprime impact on State Street's "active" funds in the first quarter and June of 2007, although the commentary did not specifically mention the Bond Funds by name.  (*See* PA 674-77.)  The commentary also noted that the subprime market was continuing to experience extreme volatility and illiquidity, and that State Street was planning to maintain its subprime exposure.  (Def.'s SJ Rule 56.1 Stmt. ¶ 35.)  PRIAC forwarded the commentary to CIGNA that same day.  (*Id.*)

On July 9, 2007, CIGNA e-mailed PRIAC noting that "[t]he writeup was very good in terms of understanding the investing philosophy and recent market developments" but that it "did not cover some things such as how much exposure to these subprime markets there was over time and how much there is currently, and what [specifically] the exposure is."  (Palmer Decl. Ex. 56.)  That day, PRIAC e-mailed State Street asking for a holdings report as of June 30, a breakout of quality ratings and holdings type for the ABS holdings of the IBF for the past four quarters, and an indication of the amount and type of IBF's exposure to the subprime market.  (Palmer Decl. Ex. 57 at 8764.)  On July 12, 2007, PRIAC received from State Street and forwarded to CIGNA a spreadsheet with this information.  (Pl.'s Rule 56.1 Stmt. ¶ 136.)  The spreadsheet was similar to one used within State Street, but lacked certain data in that sheet, such as market value data.  (*Compare* Palmer Decl. Ex. 57 to PA 1655.)

On July 17, 2007, CIGNA e-mailed PRIAC stating that CIGNA "may need to talk with someone from State Street about strategy, leverage, etc. eventually," and CIGNA and PRIAC requested a conference call with State Street to ask about, among other things, leverage in the

IBF.  (Def.'s SJ Rule 56.1 Stmt. ¶ 39; Pl's Rule 56.1 Stmt. ¶ 140.)  The conference call took

place on July 18, 2007; on the line were Tracy Labonte and Marguerite Boslaugh from CIGNA,

Dean Molinaro and Matthew Dingee from PRIAC, and Michael Wands, Mark Flinn, and Jim

Hopkins from State Street.  (Def.'s SJ Rule 56.1 Stmt. ¶ 41.)  The conference call generated

follow-up requests for information from PRIAC.  (*See* PA 2391; PA 2394.)  State Street did not

respond to these requests.  (Dingee ¶ 8, PA 25; *see also* PA 2391; PA 2394.)  On July 31, 2007,

CIGNA indicated that it wished to begin the process of exiting the IBF.  (Def.'s SJ Rule 56.1

Stmt. ¶ 50.)  CIGNA redeemed its investment in the IBF on August 20, 2007.  (*Id.* ¶ 59.)

### C.  Other Exchanges Between PRIAC and State Street About the Bond Funds

Apart from the questions it sent to State Street on behalf of CIGNA, PRIAC asked its

own questions of State Street about the Bond Funds.  On July 26, 2007, Matthew Dingee asked

State Street whether a characteristics report PRIAC had received for the IBF reflected leverage.

(Dingee ¶ 8, PA 25.)  On August 8, Dingee asked for an updated data set reflecting the notional

principal on the IBF's swaps and also asked for second quarter 2007 characteristics and

commentary for the Bond Funds.  (*Id.* ¶¶ 11, 12.)  State Street responded the next day with

commentary for the IBF only.  (*Id.* ¶ 12.)  On August 13, Dingee asked for the percentage of the

IBF that was exposed to the subprime market.  (*Id.* ¶ 13, PA 26.)  In late July or early August,

Robert Frascona asked State Street for portfolio characteristics for the IBF.  (*See* Frascona ¶ 26,

PA 20.)  State Street responded to that request two weeks later, on August 15, showing 4 to 1

leverage in the IBF as of July 31, 2007.  (*Id.*)  And after an August 16 conference call, Frascona

emailed State Street with additional questions about the IBF's leverage, including how it was

used and how long it had existed.  (*Id.* ¶ 27, PA 21.)  State Street did provide PRIAC with a

document entitled "How State Street Looks at and Uses Leverage," which detailed State Street's

general philosophy about leverage, but did not otherwise answer these questions.  (*See id.*; Maher Decl. Ex. 100.)  Except as noted, State Street did not respond to the preceding requests for information.

On August 2, 2007, State Street sent an e-mail to PRIAC with the subject line "IMPORTANT: SSgA Subprime Update."  (Def.'s SJ Rule 56.1 Stmt. ¶ 56.)  The e-mail recapped the recent events surrounding the subprime mortgage market.  (PA 984.)  The e-mail went on to detail the "impact on your investments with SSgA" stemming from the "problems in the subprime mortgage market."  (*Id.*)  With respect to the IBF, the e-mail reflected that it had returned -3.11% year-to-date versus the benchmark, which had performed at 2.40%—an underperformance of approximately 550 basis points, and PRIAC was aware that a similar loss had occurred in the GCBF.  (Def.'s SJ Rule 56.1 Stmt. ¶ 56.)  The e-mail also stated that State Street had sold a "significant amount" of AAA-rated bonds held by the LDBF, and expressed confidence that State Street would "weather[]" the "storm."  (PA 985.)  Matthew Dingee, the recipient of the August 2 e-mail, forwarded it internally within PRIAC, but PRIAC did not forward the e-mail in its entirety to any of the PRIAC clients invested in the Bond Funds. (Def.'s SJ Rule 56.1 Stmt. ¶ 57.)

On August 23, 2007, PRIAC asked State Street about the management style and investment guidelines of the Funds, and requested that State Street respond by August 27.  (Pl.'s Rule 56.1 Stmt. ¶ 154.)  State Street did not respond by August 27, and when it did, its responses were incomplete.  (*Id.* ¶ 155.)

## VII.   Filing of the Complaint and Actions Thereafter

### A.  Exclusion of Other State Street-Managed Funds

PRIAC commenced this action on October 1, 2007.  On that date, PRIAC distributed talking points to its personnel for use in conversations with affected clients and their investment consultants about this action.  (Pl.'s Rule 56.1 Stmt. ¶ 172.)  The next day, PRIAC advised its clients that, due to its "loss of confidence" in State Street, its "concerns now extend[ed] to the other products on our platform that SSgA manages," and placed the other State Street-managed funds on the Watch List.  (*Id.* ¶ 173.)  On October 26, 2007, PRIAC announced that it would no longer make available to its clients other State Street-managed funds.  (*Id.* ¶ 174.)

### B.  PRIAC's Loans to the Plans

Shortly after filing this lawsuit, PRIAC sent plans formerly invested in the Bond Funds a "Formal Plan Authorization" document by which Plans acknowledged that PRIAC was a fiduciary of the Plan and authorized PRIAC to prosecute this action on behalf of the Plan. (Def.'s SJ Rule 56.1 Stmt. ¶ 66.)  In return for this authorization, PRIAC made a "Special Loan Payment" to each Plan.  (*Id.* ¶ 67.)  The payment consisted of an amount equal to what the Plan would have earned had the return of the Bond Funds equaled that of their benchmarks for a specified period and a portion of the legal fees and expenses incurred in prosecuting the lawsuit. (*Id.*)  The Formal Plan Authorization noted that the Plans were "not obligated to repay the Special Loan Payment . . . except to the extent that the Plan (or a Plan participant) receives any Lawsuit Proceeds."  (Palmer Decl. Ex. 88 at 2066721.)  In February 2008, PRIAC sent a set of talking points to affected clients in which it explained its actions regarding the Bond Funds and the non-recourse loans to affected Plans.  (Pl.'s Rule 56.1 Stmt. ¶ 176.)

### C. The "Fair Fund" from State Street's Settlement with the SEC

In February 2010, State Street entered into a settlement with the SEC and state regulators to resolve their investigations into losses incurred by some of State Street's active fixed-income strategies during 2007 and earlier periods.  (Def.'s SJ Rule 56.1 Stmt. ¶ 69.)  A Fair Fund was established and distributed to affected investors in these strategies, and PRIAC received $52,552,696.77 through the Fair Fund, a portion of which serves as a credit against damages in this action.  (*Id.*)

DISCUSSION

## I.  Standard of Review

Summary judgment is proper if the moving party shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party."  *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The moving party must demonstrate that no genuine issue exists as to any material fact.  *Celotex*, 477 U.S. at 323–25.  As to an issue on which the non-moving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325 (rejecting a construction of Rule 56(c) that would require the party moving for summary judgment to produce evidence affirmatively

establishing the absence of a genuine issue of material fact with respect to an issue on which the nonmoving party bears the burden of proof).

If the moving party makes such a showing, the "non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial." *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996); *Celotex*, 477 U.S. at 322–23.  In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.  *See Anderson*, 477 U.S. at 256–57; *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002).

## II.  Motions Relating to PRIAC's Alleged Failure to Relate Information to the Plans

State Street has not moved for summary judgment on the claim that is at the core of this litigation, PRIAC's allegation that State Street breached its fiduciary duties to the Plans.  Rather, State Street has taken aim at PRIAC's conduct, which, according to State Street, renders the question of whether State Street breached its fiduciary duties unnecessary to reach.  The factual core of State Street's argument begins with its assertion that PRIAC was fully aware of the leverage and subprime exposure in the Bond Funds by mid-July 2007.  According to State Street, PRIAC had a duty to pass on that information to the Plans at that time, but failed to do so until late August 2007.  If PRIAC had passed on that information in July, State Street surmises that the Plans would then have redeemed their interests in the Bond Funds.  If the Plans had done so in mid-July instead of late August 2007, their losses would have been substantially less than that which is claimed in this litigation; notably, they would have been less than the amount State Street has already paid to PRIAC in its Fair Fund settlement with the SEC.  State Street argues

that therefore no possible damages can be claimed in this action, and there is no need to proceed to trial.

State Street clothes this factual argument in the raiment of three legal theories: (1) an affirmative defense based on a failure to mitigate damages; (2) the doctrine of superseding cause; and (3) a counterclaim for contribution.  State Street has moved for summary judgment on all three theories.  PRIAC has moved for partial summary judgment on State Street's contribution counterclaim, and suggests that partial summary judgment be entered on the first two theories. The Court addresses these theories in turn.

**A.  Mitigation of Damages**

State Street's mitigation-of-damages theory is this: PRIAC breached fiduciary duties by failing to provide material information to the Plans about the Bond Funds that State Street had provided to PRIAC.  PRIAC's breach caused the Plans not to redeem their interests in the Bond Funds earlier, which would have allowed them to lose less money in the Funds.   If the Plans had redeemed at an earlier date, their losses would have been less than the amount PRIAC received in the Fair Fund payout.  Therefore, no amount is recoverable in this action because PRIAC's breach resulted in a failure by the Plans to mitigate damages and any damage recoverable is less than what PRIAC has already received.

PRIAC argues that State Street's mitigation-of-damages defense is not a traditional mitigation-of-damages defense, but a "mitigation prevention" doctrine that is without legal precedent and that was not pled properly in State Street's answer.  State Street's answer pled as its tenth affirmative defense that "[t]he Complaint is barred, in whole or in part, because plaintiff has failed, refused and/or neglected to mitigate or avoid damages it allegedly incurred as a result of State Street's alleged breaches of fiduciary duty."  (Def.'s Answer & Countercl. at 8.)  PRIAC

29

argues that the defense on which State Street's motion for summary judgment is based is not that which was pled, but a different "mitigation prevention" theory of law—a defense based on allegations that PRIAC's actions prevented the Plans from mitigating damages, not a defense that PRIAC's actions failed to mitigate its own damages. State Street argues that PRIAC's labeling of its affirmative defense as "mitigation prevention" is "nothing more than a sleight of hand." (Def.'s Opp'n at 6.) According to State Street, its motion "is based on *PRIAC's own* failure to do its part to mitigate the investment losses that PRIAC—the plaintiff—now seeks to recover *for itself*." (*Id.* (emphasis in original).) Presumably, State Street's argument is based on the non-recourse loans that PRIAC made to the Plans to cover most of the Plans' losses and the provision in the associated loan agreements allows PRIAC to recover loan proceeds from the outcome of this litigation. According to State Street, any damages recovered in this lawsuit are in reality PRIAC's damages, and therefore its pleading of a traditional mitigation-of-damages affirmative defense covers this case.

The Court, however, has dealt with this argument before, albeit in different form. *See In re State Street Bank and Trust Co. ERISA Litig.*, 579 F. Supp. 2d at 518-19. In its motion to dismiss, State Street argued that the Plans lacked standing because the Complaint requested that relief be paid to the Separate Accounts, not to the Plans; therefore, according to State Street, this action sought recovery for PRIAC, not for the Plans. *Id.* The Court rejected this argument, noting that "[t]he limited evidence indicates that the Plans retain an interest in the Separate Accounts." *Id.* at 519. The evidence at that time indicated that the Plans retained an interest in the Separate Accounts and that any lawsuit proceeds in excess of the loan amount plus legal fees would be allocated to the Plans. *Id.* The Court therefore found that the Separate Accounts were assets of the Plans and that therefore the Plans had standing to sue. *Id.*

State Street contends that the earlier ruling "does not address the issue presented on summary judgment, namely, whether PRIAC can shield itself from affirmative defenses and counterclaims based on its own conduct by bringing claims 'on behalf of' the Plans, where any recovery would go to PRIAC." (Def.'s Reply at 3 n.2.)  Even if that were true, however, other binding case law would still compel a conclusion that the damages in this action are the Plans' damages, not PRIAC's damages. *See Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985) ("[R]ecovery for a violation of § 409 inures to the benefit of the plan as a whole.  We find this contention supported by the text of § 409, by the statutory provisions defining the duties of a fiduciary, and by the provisions defining the rights of a beneficiary."); *see also Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir. 1993) (noting that plaintiffs are "bar[red] . . . from suing under Section 502(a)(2)" when they "are seeking damages on their own behalf, not on behalf of the Plan").

State Street's legal theory, then, cannot be that PRIAC failed to mitigate its own damages, which are not at issue in this action, but must instead be that PRIAC's actions caused the Plans to fail to mitigate their own damages.  This is not a traditional mitigation-of-damages defense.  *Compare* Restatement (Second) of Torts § 918(1) ("[O]ne injured by the tort of another is not entitled to recover damages for any harm that *he* could have avoided by the use of reasonable effort or expenditure after the commission of the tort." (emphasis added)).  Even assuming that State Street had pled such a defense, State Street cites to no case recognizing such a defense in any context, let alone in the context of ERISA.  Among the cases cited by both parties, the one that appears to be most on point is *Trustees of the Local 464A United Food and Commercial Workers Union Pension Fund v. Wachovia Bank, N.A.*, Civ. No. 09-668 (WJM), 2009 WL 4138516 (D.N.J. Nov. 24, 2009).  In *Wachovia*, the defendants, who were investment

31

managers to the pension plan, attempted to assert an affirmative defense based on the "breaches of fiduciary duties by some or all of the Plaintiffs," who were trustees of the relevant pension plan.  2009 WL 4138516, at *3.  The defendants argued that "equity dictates that they be able to assert Plaintiffs' purported fiduciary breaches in order to mitigate or negate its own potential liability."  *Id.*  The court, however, found that "such a proposition appears 'antithetical to the provisions of ERISA which tailor fiduciary liability to fit particular breaches'" because the proposed affirmative defense did not comport with the "statutory mandate of individualized liability" wherein "a fiduciary is held liable for those losses resulting from each breach of his fiduciary duties" in ERISA section 409.  *Id.* at *3-4 (quoting *Openshaw v. Cohen, Klingenstein & Marks, Inc.*, 320 F. Supp. 2d 357, 364 (D. Md. 2004)).  The court further noted that "any fiduciary duty owed by Plaintiffs with regard to the management of the Plans' assets was to the Plans themselves and their beneficiaries—not to Defendants."  *Id.* at *4.  As such, "Plaintiffs' breach of their duties would not absolve Defendants of liability for their breaches to the Plan."  *Id.*  Instead, "[i]f anything, it could simply give rise to a cause of action to be asserted on behalf of the Plan against Plaintiffs."  *Id.*  Therefore, the court struck the affirmative defense.

The Court agrees with the reasoning in *Wachovia*.  Because the true plaintiffs here are the Plans, it would defeat the purposes of ERISA to allow State Street to use another fiduciary's actions as a shield against awarding damages to the Plans.  Furthermore, as the Court finds that no issue of material fact exists with respect to this defense, summary judgment in PRIAC's favor is appropriate as to this defense.  *See Project Release v. Prevost*, 722 F.2d 960, 969 (2d Cir. 1983) ("[A] district judge may grant summary judgment to a non-moving party, if no genuine issues of material fact have been shown."); *Algarin v. New York City Dep't of Corr.*, 460 F. Supp. 2d 469, 478 (S.D.N.Y. 2006) (same).

**B. Superseding Cause**

State Street next seeks summary judgment on the grounds that PRIAC decided to withhold material information about the Bond Funds from the Plans, and that this decision constitutes a superseding cause.  PRIAC makes several arguments opposing summary judgment in State Street's favor.

**i. Pleading**

PRIAC first argues that superseding cause is an affirmative defense that State Street failed to plead.  In support, PRIAC cites two federal cases and one state case from New York. But all of these cases merely note that the defendants in those cases pled superseding cause as an affirmative defense, not that it must always be so pled.  *See Westwood Pharm., Inc. v. Nat'l Fuel Gas Distrib. Corp.*, 737 F. Supp. 1272, 1286-87 (W.D.N.Y. 1990) (noting that defendant had pled as an affirmative defense that "recovery is precluded because any violations alleged in the complaint either were not proximately caused by [defendant] or resulted from a superseding cause beyond [defendant's] control"); *United States v. Hooker Chems. & Plastics Corp.*, 722 F. Supp. 960, 967 n.3 (W.D.N.Y. 1989) (same); *Gerbino v. Tinseltown USA*, 13 A.D.3d 1068, 1071 (N.Y. App. Div. 2004) (noting only that "because the criminal actions of third parties were a normal and foreseeable consequence of Cinemark's negligence, there was no basis to instruct the jury on the defense of superseding causes").  State Street argues correctly that superseding cause is merely part of the doctrine of proximate cause, and where proximate cause is an element of the claim, the defendants need not have separately pleaded superseding cause as a defense.  *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 526-27 (2d Cir. 2004) ("The impact of Goldberg's act of November 6, the 'intervening cause,' which the district court found had broken the causal link between Sterling's breach and the complained-of damages, was an integral part of

the proximate cause analysis. Seen in context, the intervening cause was not an affirmative defense that Sterling had to plead."); *see also Zahrey v. City of New York*, Civ. No. 98-4546 (DCP)(JCF), 2009 WL 54495, at *24 (S.D.N.Y. Jan. 7, 2009) ("Defendants need not prove the existence of an intervening cause as an affirmative defense.").

### ii.  Proximate Cause and ERISA

Neither party cites a case affirmatively holding that the concept of superseding cause in an ERISA case does or does not exist, and the Court's search of the case law has not revealed a case compelling either conclusion.  The only case either party cites mentioning the concept in an ERISA context noted that "[d]efendants have not cited, and the court is unable to find, authority applying the principle of superseding cause to an ERISA case. "  *Hunt v. Magnell*, 758 F. Supp. 1292, 1300 (D. Minn. 1991).[10]  As noted, however, the doctrine of superseding cause is related to the common-law concept of proximate cause.  *See Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 836-39 (1996) (noting that "the superseding cause doctrine . . . is one facet of the proximate causation requirement").  State Street argues that PRIAC "must establish proximate causation as a material element of its ERISA claim," and that therefore the doctrine of superseding cause is incorporated in that claim.[11]  (Def.'s Reply at 13.)

The relevant statutory provision, 29 U.S.C. § 1109(a), provides:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary,

---

[10] The court in that case nevertheless assumed that the principle existed in an ERISA context and denied summary judgment on the merits.

[11] The Court notes that it is possible that the doctrine of superseding cause is incorporated in a causation standard that does not fully import the tort-law idea of proximate causation, but because the Court denies summary judgment even assuming that proximate cause is the relevant standard, and because State Street does not argue that some other standard applies, resolution of that issue is unnecessary.

> and shall be subject to such other equitable or remedial relief as the court may
> deem appropriate, including removal of such fiduciary.

The Second Circuit has not offered much guidance regarding the causation element of this

provision apart from its decision in *Silverman v. Mutual Benefit Life Insurance Co.*, 138 F.3d 98

(2d Cir. 1998). There, Judge Jacobs's concurring opinion noted that "[c]ausation of damages

is . . . an element of the [ERISA § 409(a)] claim, and the plaintiff bears the burden of proving it."

138 F.3d at 105.[12] Plaintiff and the Department of Labor argued that "once a plaintiff has shown

a breach [of fiduciary duty as defined in ERISA] and a related loss, the defendant must prove

that the loss was *not* caused by its breach of fiduciary duty." *Id.* at 105-06 (internal quotation

marks omitted) (emphasis in original). Judge Jacobs acknowledged that "[t]his argument is

derived from the common law of trusts, under which a defaulting fiduciary bears the burden of

disproving causation." *Id.* at 106. The opinion further noted that the Supreme Court "has

cautioned that 'the law of trusts often will inform, but will not necessarily determine the outcome

of, an effort to interpret ERISA's fiduciary duties.'" *Id.* (quoting *Varity Corp. v. Howe*, 516 U.S.

489, 497 (1996)). With respect to causation, then, Judge Jacobs found that Congress had

departed from the common law of trusts by "plac[ing] the burden of proving causation on the

*plaintiff* by requiring him to prove that the losses 'result[ed] from' the defendant's inaction." *Id.*

(quoting 29 U.S.C. § 1109(a)) (emphasis in original). *Silverman*, however, did not discuss the

standard of causation plaintiff was required to prove, noting only that a plaintiff in an ERISA

case "must show some causal link between the alleged breach of . . . dut[y] and the loss plaintiff

seeks to recover." *Id.* at 104.[13] Thus, *Silverman* does not address the question of what causation

standard governs an ERISA plaintiff's case.

---

[12] Judge Leval authored the opinion. Judge Jacobs authored a concurring opinion in which Judge Leval did not join, but Judge Meskill did, so a majority of the panel joined in the concurrence.
[13] This language appears in Judge Leval's opinion, in which all members of the panel joined.

The decisions of federal courts outside our Circuit also fail to illuminate the standard clearly. The Eleventh Circuit noted in dicta that "[s]ection 409 of ERISA establishes that an action exists to recover losses that 'resulted' from the breach of a fiduciary duty; thus, the statute does require that the breach of the fiduciary duty be the proximate cause of the losses claimed by plaintiffs-appellees," but did not squarely address the issue of what causation standard applies. *Willett v. Blue Cross and Blue Shield of Ala.*, 953 F.2d 1335, 1343 (11th Cir. 1992) (quoting 29 U.S.C. § 1109). The Third Circuit appears to require that the breach be both a "cause-in-fact" and "a substantial contributing factor in bringing about the loss incurred." *See In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 445 (3d Cir. 1996) (interpreting "results from" in ERISA section 404(c), 29 U.S.C. § 1104(c)). Other circuits have treated the language in the same manner as *Silverman*, holding that it requires that the plaintiff show some "causal connection" between the breach and the loss suffered without further elaboration as to how strong a causal connection must be shown. *See Ferrer v. Chevron Corp.*, 484 F.3d 776, 781 & n.21 (5th Cir. 2007) (noting that "even if the plaintiffs were able to prove all the allegations in their respective Amended Complaints, they have not stated a cause of action" because "[t]he plaintiffs' alleged loss of benefits did not 'result[ ] from' any of the misrepresentations that the plaintiffs contend [defendant] made" (citing *Willett*, 953 F.2d at 1343)); *Allison v. Bank One-Denver*, 289 F.3d 1223, 1239 (10th Cir. 2002) ("The phrase 'resulting from' indicates that there must be a showing of 'some causal link between the alleged breach . . . and the loss plaintiff seeks to recover.'" (quoting *Silverman*, 138 F.3d at 104)); *Brandt v. Grounds*, 687 F.2d 895, 898 (7th Cir. 1982) (noting that the language of section 409 "clearly indicates that a causal connection is required between the breach of fiduciary duty and the losses incurred by the plan"); *see also Friend v.*

*Sanwa Bank Cal.*, 35 F.3d 466, 469 (9th Cir. 1994) ("ERISA holds a trustee liable for a breach of fiduciary duty only to the extent that losses to the plan result from the breach.").[14]

The case law, then, does not provide a definitive answer on the issue.  But it is also unnecessary for the Court to do so.  Even assuming that the proximate causation is the standard of causation in ERISA, the Court would still deny summary judgment on the issue.

### iii.  Standard for Superseding Cause

Both parties appear to assume that the Restatement (Second) of Torts defines the standard for superseding cause to the extent the doctrine applies.[15]  According to the Restatement, "[a] superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about."  Restatement (Second) of Torts § 440.  The doctrine "operates to cut off the liability of an admittedly negligent defendant."  *Exxon*, 517 U.S. at 837.  The Restatement

---

[14] State Street attempts to use non-ERISA cases to demonstrate that the proximate causation standard is appropriate for use in the ERISA Section 409 causation analysis.  According to State Street, these cases are "instructive with regard to ERISA claims because the law of trusts informs courts' opinions regarding the federal common law of ERISA."  (State Street Reply at 15 n.6.)  First, in *LNC Investments, Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454 (2d Cir. 1999), the Second Circuit held that it was not error for the district court to give a proximate-cause instruction in a breach of fiduciary duty case under New York law, finding that where a plaintiff seeks damages based on a breach of fiduciary duty, proximate causation was the appropriate standard.  173 F.3d at 464-66.  *Nordwind v. Rowland*, 584 F.3d 420 (2d Cir. 2009), recited *LNC Investments*'s holding on the causation standard for a breach of fiduciary duty under New York law in holding that the plaintiffs' claims for legal malpractice and breach of fiduciary duty were redundant in that case.  584 F.3d at 432-34.  These cases, however, appear to be particular to New York law and vary according to the relief sought.  *See LNC*, 173  F.3d at 465 ("More recently, however, we have observed that under New York law, the level of causation required in breach of fiduciary duty and breach of contract cases depends on the type of remedy sought. ").  Even if they have probative value in illustrating the law of trusts more generally, the Second Circuit's decision in *Silverman* cautions against drawing too much upon the law of trusts for the causation analysis in ERISA.  *See Silverman*, 138 F.3d at 106. ("This argument is derived from the common law of trusts . . . [b]ut the Supreme Court has cautioned that the law of trusts often will inform, but will not necessarily determine the outcome of, an effort to interpret ERISA's fiduciary duties." (internal citation and quotation marks omitted)) (Jacobs, J., concurring).

[15] State Street also briefly suggests that two cases from the Eighth Circuit, *Harris v. Am. Inv. Co.*, 523 F.2d 220 (8th Cir. 1975) and *Nye v. Blyth Eastman Dillon & Co., Inc.*, 588 F.2d 1189 (8th Cir. 1978), should supply the standard for superseding cause because "loss causation principles in the securities context" are "more instructive than the [tort-law superseding cause] cases cited by PRIAC."  (Def.'s Reply at 19.)  State Street's suggestion is curious, however, given that neither decision even purports to be applying the common-law doctrine of superseding cause.

lists factors to consider in determining "whether an intervening force is a superseding cause of

harm to another:"

> (a) the fact that its intervention brings about harm different in kind from that
> which would otherwise have resulted from the actor's negligence;
> (b) the fact that its operation or the consequences thereof appear after the event to
> be extraordinary rather than normal in view of the circumstances existing at the
> time of its operation;
> (c) the fact that the intervening force is operating independently of any situation
> created by the actor's negligence, or, on the other hand, is or is not a normal result
> of such a situation;
> (d) the fact that the operation of the intervening force is due to a third person's act
> or to his failure to act;
> (e) the fact that the intervening force is due to an act of a third person which is
> wrongful toward the other and as such subjects the third person to liability to him;
> (f) the degree of culpability of a wrongful act of a third person which sets the
> intervening force in motion.

Restatement (Second) of Torts § 442.  An "intervening force" is "one which actively operates in

producing harm to another after the actor's negligent act or omission has been committed."  *Id.*

§ 441.

### iv. Application

Applying the standard to this case, the Court finds that summary judgment in favor of

State Street is inappropriate.  Admittedly, factor (d) is uncontested in this case, as State Street's

argument is based on PRIAC's failure to act, and PRIAC is a third party as to the Plans and State

Street.  But even assuming that PRIAC's decision not to pass on information to the Plans was

wrongful and that therefore factor (e) weighs in State Street's favor as well, those two factors

alone does not establish a superseding cause as a matter of law.  On the remaining factors, State

Street's factual bases are either disputed or questionable.

For example, State Street contends that "the losses caused by PRIAC's breaches were of

a different nature than those allegedly caused by State Street's investment decisions."  (Def.'s

Reply at 18.)  According to State Street, although its "management of the Bond Funds exposed

38

the Plans' investments to ordinary market risks . . . , PRIAC's prolonged withholding of

information regarding the developing subprime turmoil affecting the Bond Funds subjected the

Plans to the full force of an unprecedented market dislocation of an entirely different nature."

(*Id.*)  In contrast, PRIAC argues that "[t]he harm that State Street claims was caused by PRIAC's

actions—losses to the Plans from declining value of the Bond Funds—is exactly the same as the

harm caused by State Street's violations of Section 404."  (Pl.'s Opp'n at 16.)  Neither party cites

any authority for either position.  But State Street's argument seems less directed to showing that

the harm the Plans suffered from PRIAC's actions is one "different in kind" than it is to showing

that the harm suffered is different in degree.  It is true that in some extreme cases that a

difference in degree can constitute a difference in kind.  The Restatement, for example,

illustrates the difference by comparing "expectable winds" and an "extraordinary cyclone."

Restatement (Second) of Torts § 451, cmt. a.  But in this case, in which both the losses leading

up to July 18, 2007, and the losses thereafter, are in some measure caused by the subprime

mortgage crisis, it seems unwarranted to label the post-July 18 losses as ones that are different in

kind from the losses suffered before that date.

State Street also claims that factor (c) weighs in its favor because "nothing State Street

did precipitated PRIAC's withholding of information from the Plans or forced PRIAC to act as it

did."  (Def.'s Reply at 18.)  But State Street misapprehends the meaning of this factor.  "The

words 'situation created by the actor's negligence' are used to denote the fact that the actor's

negligent conduct is a substantial factor in bringing about the situation and that, therefore, the

actor would be liable for creating the situation if the situation were in itself a legal injury."

Restatement (Second) of Torts § 442, cmt. d.  Certainly State Street's conduct in managing the

Bond Funds (if indeed culpable) was a "substantial factor" in bringing about the situation in

which the Bond Funds' losses occurred, and PRIAC's decisions on what information it would share with its clients cannot be said to be independent of that situation.  State Street itself argues that "[n]ever could there have been a time when PRIAC's duty to keep the plans informed was more important: the height of the subprime crisis."  (Def.'s Reply at 17.)  That time was important, of course, not only because the subprime crisis was occurring, but because State Street had invested the Bond Funds in securities greatly affected by that crisis.  PRIAC's conduct cannot be said to be "operating independently" of the situation surrounding the Bond Funds' losses.

The Court, therefore, finds that summary judgment for State Street would be inappropriate on this issue.  The two factors above would be sufficient reason to deny summary judgment.  But more fundamentally, State Street appears to be using superseding cause to modify the amount of damages recoverable in this case, when the doctrine is one about liability, not damages.  Importantly, State Street does not argue that the Plans did not suffer damage by July 18, 2007 or that if the Court were to accept its argument that it would not be liable for any damages suffered by the Plans.  Instead, State Street argues only that PRIAC's actions failed to stem the tide of damages in this case.  State Street does argue that the doctrine would absolve their liability in this case, but that is only because it argues that it should *reduce* the amount of damages to an amount below its Fair Fund payment; it does not argue that PRIAC's actions absent this Fair Fund would have absolved State Street of liability entirely without that payment.  Moreover, PRIAC's actions cannot be said to have "caused" the Plans' losses absent State Street's actions, including its investment decisions and disclosures to PRIAC; both parties' actions are bound up together in the causation inquiry with respect to the Plans' losses.

State Street's argument, then, purports to be about superseding cause, but in reality seeks to apportion fault, a position State Street reiterated at oral argument.  (*See* Oral Argument Tr. at 37:23-38:2.)  This is not the purpose of the superseding cause doctrine, which cuts off the liability of a negligent defendant.  It does not limit the damages of a plaintiff, which is how State Street seeks to use the doctrine here.  In superseding-cause cases, "there is properly no apportionment of comparative fault."  *Exxon*, 517 U.S. at 837.  This is because the actor whose actions are the superseding cause are deemed the "sole proximate cause" of the injury at stake.[16]  *Id.* at 840.  Thus the Supreme Court in *Exxon* contrasted the doctrine of superseding cause with the system of comparative negligence, because the former doctrine operated to absolve on actor of causation and therefore liability entirely, whereas the latter system sought only to apportion fault among those who were at least in part liable.[17]  *Id.* at 837-38.  It is a system in the latter mold that State Street attempts to graft onto the mold of superseding cause, but it is a mismatch of fact to law, and the Court denies State Street's motion for summary judgment on this issue.[18]

## C. Contribution

State Street's third legal theory is contribution.  PRIAC has moved for partial summary judgment on State Street's contribution counterclaims on several grounds: (1) ERISA does not imply a right to contribution and indemnity; (2) PRIAC's role does not support a claim for contribution; (3) State Street cannot show that PRIAC violated ERISA; and (4) even if State

---

[16] Assuming, of course, that only the original actor and the superseding-cause actor's actions are at stake.

[17] Although *Exxon* was a case in admiralty, its holdings regarding the proximate-cause doctrine have been applied in other contexts as well.  *See, e.g.*, *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192 (2011) (quoting *Exxon*, 517 U.S. at 837, for the proposition that "[a] cause can be thought 'superseding' only if it is a 'cause of independent origin that was not foreseeable'").

[18] PRIAC suggests that partial summary judgment should be granted on the issue of the doctrine of superseding cause.  (Pl.'s Opp'n at 18-19.)  But because superseding cause is just one part of the proximate causation doctrine and not an affirmative defense, partial summary judgment in PRIAC's favor would be inappropriate on this issue, as causation is just one element of State Street's liability in this case.  *SEC v. Thrasher*, 152 F. Supp. 2d 291, 295 (S.D.N.Y. 2001) ("The plain language of Federal Rule of Civil Procedure 56 indicates that it is not appropriate to use summary judgment as a vehicle for fragmented adjudication of non-determinative issues.").

Street could establish that PRIAC violated ERISA, State Street was substantially more at fault than PRIAC.  State Street has cross-moved for summary judgment on the contribution counterclaim.

### i.   Whether Contribution and Indemnity Exist Under ERISA

The Second Circuit's decision in *Chemung Canal Trust Co. v. Sovran Bank/Maryland*, 939 F.2d 12 (2d Cir. 1991), recognized a right of contribution and indemnity under ERISA.  In *Chemung*, third-party defendant Fairway Spring Company, Inc. ("Fairway") appointed Glen Dawson as the first trustee of a retirement plan for Fairway employees.  939 F.2d at 13.  Dawson made imprudent investments improper under ERISA.  *Id.*  Fairway removed Dawson as trustee and replaced him with defendant Sovran Bank/Maryland ("Sovran"), and eventually replaced Sovran with plaintiff Chemung Canal Trust Company ("Chemung").  *Id.*  Chemung sued Sovran for a lack of prudence and due diligence with respect to some of the original investments made by Dawson as well as two questionable investments made by Sovran itself.  *Id.* at 13-14.  Sovran filed a third-party complaint against Fairway, alleging that it failed to monitor Dawson's activities and to disclose them to Sovran.  Fairway moved to dismiss the third-party complaint, arguing, *inter alia*, that ERISA did not allow claims for contribution or indemnity.

The court found that ERISA did permit a claim for contribution or indemnity.  The court first found that the methodology of *Cort v. Ash*, 422 U.S. 66 (1975), for determining whether a private right of action should be implied from a statute, was an "inappropriate tool for analyzing this case," as its analysis was "too simplistic . . . for the problem before us."  *Chemung*, 939 F.2d at 15.  Next, the court turned to the question of whether federal courts have power to fashion a federal common law under ERISA and found that the Supreme Court's decision in *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989), "left no doubt that 'courts are to

develop a federal common law of rights and obligations under ERISA-regulated plans.'"
*Chemung*, 939 F.2d at 16.  Examining the legislative history of ERISA, the court found that
ERISA's fiduciary responsibility provisions "codify and make applicable to ERISA fiduciaries
certain principles developed in the evolution of the law of trusts." *Id.*  The court therefore held
that "federal courts have been authorized to develop a federal common law under ERISA, and in
doing so, are to be guided by the principles of traditional trust law." *Id. Chemung* emphasized
that "we are not creating a right from whole cloth," but rather "are simply following the
legislative directive to fashion . . . a federal common law for ERISA by incorporating what has
long been embedded in traditional trust law and equity jurisprudence." *Id.*

In holding that a cause of action for contribution and indemnity exists under ERISA, the
Second Circuit found that two lines of Supreme Court precedent did not preclude such a cause of
action from being recognized.  First, the court rejected the argument that *Texas Industries, Inc. v.
Radcliff Materials, Inc.*, 451 U.S. 630 (1981), and *Northwest Airlines, Inc. v. Transport Workers
Union of America, AFL-CIO*, 451 U.S. 77 (1981), applied because although they "rejected the
authority of the federal courts to develop a federal common law under the antitrust laws, Title
VII, and the Equal Pay Act, the Supreme Court drew a sharp contrast with other areas of the
law . . . where our power to fashion rules of federal common law is well established." *Chemung*,
939 F.2d at 17.  ERISA, according to the court, was one of those "well-established" areas. *Id.*
Second, the court rejected an argument based on *Massachusetts Mutual Life Ins. Co. v. Russell*,
473 U.S. 134, 146 (1985), that Congress's omission of a contribution and indemnity remedy was
deliberate and that therefore the court should decline such a remedy. *Id.* at 17-18.  The court
reasoned that "[a]lthough this silence on the contribution issue might be argued to mean that
ERISA allows only those claims that directly benefit the plan or a participant, and intentionally

bars relief in all other situations, there is nothing but silence to support this conclusion." *Id.* at

18.  Instead, "[a] more likely inference is that when it came to remedies under ERISA, congress

simply did not focus its attention beyond the welfare of the plan's participants and beneficiaries."

*Id.*

      PRIAC contends that two Supreme Court decisions following *Chemung* have cast that

decision into doubt.  First, in *Mertens v. Hewitt Associates*, 508 U.S. 248 (1993), a class of plan

participants sued, among others, the plan's actuary, alleging that the actuary had knowingly

participated in the plan fiduciaries' breach of their fiduciary duties.  508 U.S. at 250-51.  The

Supreme Court considered the question of whether, under ERISA, a nonfiduciary who

knowingly participates in a breach of fiduciary duty is liable for losses that an employee benefit

plan suffers as a result of the breach.  In considering that question, the Court began by noting that

"ERISA is . . . a 'comprehensive and reticulated statute,' the product of a decade of

congressional study of the Nation's private employee benefit system." *Id.* at 251 (quoting

*Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980)).  The Court also

expressed doubt on the initial question of whether section 502(a)(3) authorized suits against

nonfiduciaries.   In that discussion, the Court quoted its previous decision in *Russell* and

reiterated its "unwillingness to infer causes of action in the ERISA context, since that statute's

carefully crafted and detailed enforcement scheme provides 'strong evidence that Congress did

*not* intend to authorize other remedies that it simply forgot to incorporate expressly.'" *Id.* at 254

(quoting *Russell*, 473 U.S. at 146-47) (emphasis in original).  Assuming that section 502(a)(3)

did authorize such suits, the Court held that the "equitable relief" authorized by that section was

limited to "those categories of relief that were *typically* available in equity (such as injunction,

mandamus, and restitution, but not compensatory damages)." *Id.* at 256 (emphasis in original).

In so holding, the Court rejected a construction of "equitable relief" that would have interpreted that phrase as authorizing any relief available in the courts of equity, in which trust beneficiaries, under the common law of trusts, could sue for relief akin to money damages because that construction "would limit the relief *not at all*." *Id.* at 255-57 (emphasis in original).

Second, in *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002), an insurer of an employee benefit plan sought injunctive and declaratory relief under section 502(a)(3).  The plan included a reimbursement provision that gave the plan the right to recover from beneficiaries any payment for benefits paid by the plan that the beneficiary is entitled to recover from a third party.  534 U.S. at 207.  The plan assigned the right to litigate such claims to the insurer.  *Id.*  The Court again began its analysis with its observation that ERISA is a comprehensive statute and reiterated its reluctance to tamper with the enforcement scheme of ERISA by extending remedies not specifically authorized by the statute's text.  *Id.* at 209.  The Court then held that the type of relief the insurer sought did not come within the ambit of section 502(a)(3) because the relief sought was not an equitable, but a legal remedy.  *Id.* at 211, 214.  As in *Mertens*, the Court rejected an argument based on the remedies that the common law of trusts made available in equity.  *Id.* at 219-20.

PRIAC contends that these cases, along with the Eighth Circuit's decision in *Travelers Casualty & Surety Co. of America v. IADA Services, Inc.*, 497 F.3d 862 (8th Cir. 2007), compel a conclusion that *Chemung* has been implicitly overruled.  (Pl.'s Mem. at 28-29.)  *Travelers* noted that "[s]ince the Second Circuit's decision in *Chemung* . . . , the Supreme Court has reiterated more than once its admonition that notwithstanding the authority to fashion certain rules of federal common law under ERISA, the statute's 'carefully crafted and detailed enforcement scheme provides strong evidence that Congress did *not* intend to authorize other remedies that it

simply forgot to incorporate expressly.'"  497 F.3d at 866 (quoting *Great-West*, 534 U.S. at 209).

Accordingly, the Eighth Circuit expressed the view that the dissent in *Chemung* espoused "the

better view."  *Id.*  Some commentators have also expressed that view.  *See, e.g.*, George Lee

Flint, Jr. and Philip W. Moore, Jr., *ERISA: A Co-Fiduciary Has No Right to Contribution and

Indemnity*, 48 S.D. L. Rev. 7 (2003).

But the view of other circuits or commentators on our Circuit's jurisprudence does not

constitute sufficient reason for this Court to discard binding precedent.  Nor do the Supreme

Court's decisions in *Mertens* and *Great-West* compel that conclusion.  Although both decisions

reiterated *Russell*'s statement of reluctance to tamper with the enforcement scheme embodied in

ERISA by departing from its text, both decisions were specifically focused on the "equitable

relief" of section 502(a)(3).  Moreover, the Second Circuit specifically considered and rejected a

*Russell*-based argument in *Chemung*, making it unlikely that subsequent decisions of the

Supreme Court that quote the same language used to make that argument would implicitly

overrule *Chemung*.  Also, as State Street correctly points out, courts in this Circuit as well as the

Circuit itself have continued to apply *Chemung* after *Mertens* and *Great-West* were decided.  *See

Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240-42 (2d Cir. 2002) (applying *Chemung*

four months after *Great-West* was decided); *see also Haddock v. Nationwide Fin. Servs., Inc.*,

570 F. Supp. 2d 355, 360 (D. Conn. 2008) ("Indeed, several district courts within the Second

Circuit that have addressed the latter issue, have continued to follow *Chemung*'s holding since

both *Mertens* and *Gerosa* [*v. Savasta & Co.*, 329 F.3d 317 (2d Cir. 2003)].").  The Court holds,

therefore, that *Chemung* remains the law of this Circuit, and a right to contribution and

indemnity does exist under ERISA.

### ii.  PRIAC's Role

PRIAC next argues that partial summary judgment on the contribution counterclaims is warranted because its role cannot support a claim for contribution under Restatement (Second) of Trusts § 258(1), which provides in part that "where two trustees are liable to the beneficiary for a breach of trust, each of them is entitled to contribution from the other."  PRIAC argues that this limits the right of contribution or indemnity in the common law of trusts to claims "against a co-trustee that acted with it in a way that makes it jointly responsible for the breach of trust committed by the trustee seeking contribution or indemnity."  (Pl.'s Mem. at 30.)  Because its "claim on behalf of the Plans is based on State Street's imprudent management of the Bond Funds" and "PRIAC did not act jointly with State Street in that conduct," according to PRIAC, "this situation cannot be brought within Restatement § 258(1)."[19]  (*Id.* at 31.)  Although *Chemung* held that contribution was available under ERISA, it did not define the standard to be used for that cause of action.  *In re Masters Mates & Pilots Pension Plan*, 957 F.2d 1020, 1029 (2d Cir. 1992) ("Because the case did not require us to do so . . . we did not set forth the scope of indemnity and contribution under ERISA [in *Chemung*] . . . .").  Since *Chemung*, the Second Circuit has not specifically delineated the extent to which a fiduciary can seek contribution against a co-fiduciary, although it has appeared to assume that (1) the entity against which contribution is sought must be a fiduciary and (2) a violation of ERISA by that fiduciary must be alleged.  *See Smith*, 291 F.3d at 241-42.

---

[19] One of the comments to Restatement (Second) of Trusts § 258 instructs that section 258 governs contribution not only between trustees who act jointly, but also between those who are jointly and severally liable based on the co-trustee liability provision of the Restatement, section 224.  Restatement (Second) of Trusts § 258, cmt. a ("Where several trustees are liable for a breach of trust committed by them jointly or for a breach of trust committed by one of them for which the others are liable under the rule stated in § 224, they are jointly and severally liable to the beneficiary for the breach of trust.  Although the beneficiary can compel any one or more of them to make good the breach of trust, yet as between the trustees the ultimate liability is determined by the rules stated in this Section.").  State Street has not made an argument based on section 224, and therefore the Court does not consider it.

PRIAC relies on two district cases to support its argument that it must act jointly with State Street in order for State Street to be able to assert contribution against it. First, in *Harris Trust and Savings v. John Hancock Mutual Life Insurance Co.* ("*Harris Trust I*"), 122 F. Supp. 2d 444 (S.D.N.Y. 2000), *modified in part*, 137 F. Supp. 2d 351, *vacated on other grounds*, 302 F.3d 18 (2d Cir. 2002), the court found that defendant John Hancock Mutual Life Insurance Co. ("Hancock"), a fiduciary of the retirement plan at issue in the case, breached its obligations under ERISA by using certain assets of the plan for its own cash flow needs.[20] 122 F. Supp. 2d at 459-60. Hancock brought counterclaims and third-party claims against a former trustee of the plan, the sponsor of the plan, and a named fiduciary of the plan for contribution. *Id.* at 463. The court dismissed Hancock's counterclaims and third-party claims, holding that "Hancock was substantially more at fault than its co-fiduciaries; it therefore is not entitled to contribution." *Id.* at 464 (citing Restatement (Second) of Torts § 258). The court also noted that "Hancock has failed to prove that [the co-fiduciaries] played any role in the actions that resulted in a breach of Hancock's fiduciary obligations." *Id.*

Second, in *Sunderlin v. First Reliance Standard Life Insurance Co.*, 235 F. Supp. 2d 222 (W.D.N.Y. 2002), the plaintiff sued one defendant, ENI Technology, Inc. ("ENI"), for its failure to provide a summary plan description for a long-term disability benefit plan. ENI cross-claimed against another defendant, First Reliance Standard Life Insurance Company ("First Reliance"), for contribution and indemnity. 235 F. Supp. 2d at 236. The court found that ENI had failed to state a claim. After quoting Restatement (Second) of Trusts § 258, the court noted that "ENI's only liability for damages to plaintiff comes as a result of ENI's own failure to provide a [summary plan document]. Therefore, ENI has not pled a claim for common law

---

[20] The Second Circuit vacated some of the district court's findings relating to Hancock's breach of fiduciary duties. 302 F.3d at 34-35.

indemnification or contribution under ERISA, since it does not claim that [the other defendant] is at fault for failing to provide plaintiff with a [summary plan document]." *Id.* at 237.  Because the "responsibility to provide a summary plan description" lied solely with ENI, and not with other plan fiduciaries, the court held that the contribution cross-claim had to be dismissed. *Id.*  The court also noted that there was no "merit to ENI's argument that, but for First Reliance's breach of a separate fiduciary duty, i.e., the duty to pay benefits, plaintiff would not have requested the [summary plan document], and ENI would not now be liable under 29 U.S.C. § 1132(c)(1)." *Id.*

PRIAC interprets these cases to show that "under ERISA, there can be contribution or indemnification only where co-fiduciaries acted together to violate a single ERISA obligation to plans or plan beneficiaries." (Pl.'s Mem. at 30.)  PRIAC interprets the "single ERISA obligation" to be State Street's duty to manage the Plans' assets prudently. (Pl.'s Mem. at 31; Pl.'s Reply at 2-4.)  In particular, PRIAC points to *Sunderlin* in arguing that "State Street's assertions of PRIAC's 'breach of a separate fiduciary duty' of disclosure are not sufficient to support an ERISA contribution claim." (Pl.'s Reply at 4 (quoting *Sunderlin*, 235 F. Supp. 2d at 237).)

But PRIAC's argument attempts to draw a bright line through a field of gray.  Although it might be appealing in this case to separate the duties of "prudent management" and "reporting" neatly in this case, and to say that State Street alone owed the former and PRIAC the latter, this distinction fades when the breach is viewed from the perspective of the Plans, whom ERISA was enacted to protect.  *See* 29 U.S.C. § 1001(b) ("It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct,

49

responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts."); *Retirement Plan of the UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 285 (2d Cir. 2010) ("ERISA was enacted to protect the interests of employee retirement benefit plan participants and their beneficiaries.").  From the Plans' perspective, the simple facts underlying the breach of fiduciary duty in this case are that their investments were steered without their knowledge into risky investments and that by the time they were informed of these investments, they had already incurred massive losses.  Although the duties of State Street and PRIAC are not coextensive, they overlap, and PRIAC's claim of mismanagement by State Street also encompasses an element of nondisclosure to the Plans.  The set of duties owed by State Street and PRIAC, therefore, could intersect at nondisclosure, and it understates their respective roles to bar a claim for contribution based solely on the idea that they owed wholly separate duties.

At oral argument, PRIAC made two arguments defending its distinction.  First, PRIAC suggested that in every mismanagement claim, an element of disclosure can be identified.  (Oral Argument Tr. at 7:19-8:13.)  To read a joint breach of a nondisclosure duty in this case, then, would give rise to converting all mismanagement claims into nondisclosure claims as well.  But the Court's finding in this case is based on the unique facts herein—this is not simply a case in which State Street allegedly hid the ball from the Plans while mismanaging plan funds.  Instead, here PRIAC functioned as an intermediary between State Street and the Plans and to the extent an element of the claim relies on information not reaching the Plans, it walks too fine a line to carve out PRIAC's piece of the nondisclosure chain from the Plans' claim against State Street.  Second, PRIAC argued that *Sunderlin*'s statement that "[n]or is there any merit to ENI's argument that, but for First Reliance's breach of a separate fiduciary duty, i.e., the duty to pay

benefits, plaintiff would not have requested the [summary plan document], and ENI would not now be liable under [ERISA]" applies to this case. (Oral Argument Tr. at 6:10-23); *Sunderlin*, 235 F. Supp. 2d at 237. But *Sunderlin* is distinguishable from this case. There, ENI's argument was based on First Reliance's denial of plaintiff's benefits, which happened before plaintiff asked for a summary plan document and triggered that inquiry. First Reliance's role in ENI's breach, therefore, could be said to be a but-for cause of plaintiff's request for a summary plan document, but could hardly support a claim that First Reliance and ENI shared the duty of providing a summary plan document. Here, State Street was dependent upon PRIAC to deliver information to the Plans that State Street provided to PRIAC. In this case, the conduct with respect to nondisclosure is much more intertwined than that present in *Sunderlin*.

### iii. Whether PRIAC's Duties Encompass a Duty To Disclose Under ERISA

PRIAC argues that even if it is found on the facts of this case to share some obligation to the Plans with State Street, under ERISA, no part of its fiduciary duties encompasses disclosure to the Plans and therefore no claim for contribution can lie.

PRIAC's argument relies principally on three cases. First, in *Bd. of Trustees of the CWA/ITU v. Weinstein*, 107 F.3d 139 (2d Cir. 1997), the Second Circuit rejected a claim that plan administrators owed a duty to disclose actuarial valuation reports to plan participants. The court first dismissed an argument that the actuarial valuation reports fell within the ambit of section 104(b)(4) of ERISA, 29 U.S.C. § 1024(b)(4), which provides in relevant part:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

The court held that the term "instruments" referred to "formal legal documents that govern or confine a plan's operations, rather than the routine documents with which or by means of which

a plan conducts its operations." *Weinstein*, 107 F.3d at 142.  The court then held that actuarial

valuation reports did not fit this category.  *Id.* at 144-46.  More important for this case, the court

then rejected an argument that "the Administrators were required to provide [the requester] with

copies of the actuarial valuation reports pursuant to their general fiduciary duties of loyalty and

prudence, set out in ERISA §§ 404(a)(1)(A)-(D)."[21]  *Id.* at 146.  The court reasoned that "[s]ince

we have concluded that Congress intentionally fashioned § 104(b)(4) to limit the categories of

documents that administrators' [sic] must disclose on demand of plan participants, we think it

inappropriate to infer an unlimited disclosure obligation on the basis of general provisions that

say nothing about disclosure."  *Id.* at 147.

Second, in *In re Citigroup ERISA Litig.*, No. 07 Civ. 9790, 2009 WL 2762708 (S.D.N.Y.

Aug. 31, 2009), the court, relying on *Weinstein* and the Third Circuit's decision in *Edgar v.*

*Avaya, Inc.*, 503 F.3d 340 (3d Cir. 2007), found that the defendants had no affirmative duty to

disclose information about Citigroup's financial condition to 401(k) plan participants to whom

Citigroup stock was offered as part of an "employee stock ownership plan" ("ESOP").  Although

it was "clear that *if* an ERISA fiduciary communicates information to plan participants, the

fiduciary must be truthful, . . . the Second Circuit has not ruled directly on whether an ERISA

fiduciary has an affirmative duty to inform plan participants about non-public corporate

---

[21] Those sections provide:

> **(1)** Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>> **(A)** for the exclusive purpose of:
>>> **(i)** providing benefits to participants and their beneficiaries; and
>>> **(ii)** defraying reasonable expenses of administering the plan;
>> **(B)** with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>> **(C)** by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>> **(D)** in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104(a).

developments that might affect the value of employer stock." *Citigroup*, 2009 WL 2762708, at

*20.  The court found that *Weinstein*'s comment about how "inappropriate" it would be to "infer

an unlimited disclosure obligation" based on the general provisions setting out a fiduciary's

duties of loyalty and prudence applied in the case.  *Id.* at *21.  The court also distinguished

several cases recognizing that "an ERISA fiduciary faces 'an affirmative duty to inform when the

[fiduciary] knows that silence might be harmful'" on the grounds that they "involved information

about plan *benefits*, not information about the financial status of plan *investments*."  *Id.*

(emphasis in original) (quoting *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 478 (S.D.N.Y.

2005)) (internal quotation marks omitted).  As to the former category, "[a] fiduciary's duty to

volunteer information about plan benefits derives straightforwardly from the fiduciary's

obligation to 'discharge his duties . . . for the exclusive purpose of providing *benefits* to them.'"

*Id.* at *22 (quoting *Devlin v. Empire Blue Cross and Blue Shield*, 274 F.3d 76, 88 (2d Cir. 2001))

(internal quotation marks omitted).  But requiring fiduciaries to "volunteer financial information

about companies in which participants may invest . . . would transform fiduciaries into

investment advisors, and as the Third Circuit has written, fiduciaries do 'not have a duty to give

investment advice or to opine on the stock's condition.'"  *Id.* (quoting *Avaya*, 503 F.3d at 350)

(internal quotation marks omitted).

   Third, PRIAC relies on *Gearren v. McGraw-Hill Cos., Inc.*, 690 F. Supp. 2d 254, 271-72

(S.D.N.Y. 2010), which largely recites the holding of *Citigroup* in finding that the defendants in

that case also owed no affirmative duty to disclose information about the company's financial

condition to plan participants.

   But insofar as *Gearren* and *Citigroup* rely on *Avaya*, they are distinguishable, as an

examination of *Avaya*'s reasoning reveals.  There, the Third Circuit reasoned:

> The Summary Plan Descriptions inform Plan participants that their investments are tied to the market performance of the funds; that each fund carries different risks and potential returns; that participants are responsible for investigating the investment options; and that, in doing so, they might consider seeking the advice of a personal financial advisor.  In addition, the Plan Descriptions explicitly warn participants that there are particular risks associated with investing in a non-diversified fund. . . .  These disclosures were sufficient to satisfy defendants' obligation not to misinform participants about the risks associated with investment in the Avaya Stock Fund.  Under Third Circuit law, they did not have a duty to "give investment advice" or "to opine on" the stock's condition.  Rather, the information provided Plan participants the opportunity to make their own informed investment choice.

*Avaya*, 503 F.3d at 350 (internal citation omitted).  Here, however, the disclosures to the Plans regarding the leverage and subprime exposures in the Bond Funds would not serve the exclusive purpose of giving "investment advice" or "opining on" the Bond Funds' condition.  Rather, these disclosures would have alerted the Plans to the risks of investing in the Bond Funds, and without this information, the Plans could have been misled into thinking that their investments were less risky than they actually were.  Unlike in *Avaya*, then, the disclosures PRIAC and State Street (through PRIAC) conveyed to the Plans by July 2007 cannot be said as a matter of law to be "sufficient to satisfy defendants' obligation not to misinform participants about the risks associated with investment in the" Bond Funds.  *Id.  Citigroup* and *Gearret* are therefore distinguishable, as they relied on *Avaya*'s finding that fiduciaries need not render investment advice.  Here, the disclosures or lack thereof related to the Plans' ability to make "their own informed investment choice"; without a proper assessment of the Bond Funds' use of leverage and subprime exposure (*i.e.*, what the Bond Funds' investments actually were), it is difficult to say that the Plans' choices regarding their investments in the Bond Funds were "informed."  *Id.*

The Court notes that in so holding, it is not inferring an "an unlimited disclosure obligation" and is not in conflict with *Weinstein*.  Rather, the disclosure obligation here is limited and specific to the facts of this case, where the Plans' reliance on previous documents sent by

PRIAC incorporating information from State Street may have misled the Plans into believing

that the risk profile of their investments differed from the actual risk profile.  In such a case, an

affirmative duty to disclose merely serves to correct the misleading disclosures already in

existence, and is consistent with the duties of loyalty and prudence for ERISA fiduciaries.  *See*

*Avaya*, 503 F.3d at 350 ("Indeed, the 'duty to inform is a constant thread in the relationship

between beneficiary and trustee; it is not only a negative duty not to misinform, but also an

affirmative duty to inform when the trustee knows that silence might be harmful.'" (quoting *In re*

*Unisys Sav. Plan Litig.*, 74 F.3d at 440) (internal quotation marks omitted)); *see also Polaroid*,

362 F. Supp. 2d at 478 ("This Court agrees with those decisions holding that an ERISA fiduciary

has both a duty not to make misrepresentations to plan participants, and 'an affirmative duty to

inform when the [fiduciary] knows that silence might be harmful.'" (quoting *Bixler v. Cent. Pa.*

*Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993))); *cf.* Restatement

(Second) of Trusts § 173, cmt. d (noting that a trustee "is under a duty to communicate to the

beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary

does not know and which the beneficiary needs to know for his protection in dealing with a third

person with respect to his interest").[22]  Since the Court has found that the duties shared by State

Street and PRIAC in this case encompass an obligation to disclose information to the Plans, and

because State Street and PRIAC may have failed jointly to fulfill that obligation, contribution is

available to State Street.

### iv. Factual Issues Regarding Contribution

Having found that contribution is available, the Court turns to State Street's argument

that summary judgment on the claim is warranted in its favor.  State Street relies on the

---

[22] Because the Court finds that PRIAC does owe a duty implied from ERISA's general provisions, it is unnecessary to consider whether its program documents set forth fiduciary duties it was obligated to follow.

following factual allegations: (1) State Street sent PRIAC commentaries and status reports that disclosed the Bond Funds' active management and subprime-driven underperformance on April 11 and July 6, 2007; (2) "[m]onthly reports showed the Bond Funds' active management and subprime-driven underperformance"; (3) "State Street provided detailed holdings and ABS characteristics showing 4 to 1 leverage in mid-July 2007"; (4) an "August 2, 2007 status report discussed the severe and ongoing negative impact of the subprime market on State Street's active Bond Funds"; (5) on a July 18, 2007 conference call, "State Street made PRIAC aware that IBF employed material amounts of leverage as part of its investment strategy"; (6) State Street confirmed to PRIAC that the IBF was incorrectly labeled as passive on July 12, 2007; and (7) PRIAC did not pass on these pieces of information to its clients other than CIGNA until late August 2007.  (Def.'s Opp'n at 16-18.)  But many of these facts or their import are disputed.

For example, State Street relies heavily on the deposition testimony of Dean Molinaro of PRIAC in which he is asked whether "your understanding at the conclusion of this phone call on July 18, 2007 was that CIGNA was completely aware of the Intermediate Bond Fund, its holdings, how it ran, how it operated, that it was invested materially in sub-prime and that it had a significant leveraged position."  (Palmer Decl. Ex. 18 at 150:18-24.)  Molinaro answered in the affirmative.  (*Id.* at 151:3.)  Using this testimony to establish that PRIAC knew of State Street's breach, however, is problematic for several reasons.[23]  First, it is questionable whether the deposition testimony is admissible evidence, as it calls for Molinaro to speculate as to CIGNA's state of mind.  *See Smith v. Stone & Webster Eng'g Corp.*, No. 86 Civ. 5627 (PKL), 1988 WL 32928, at *4 (S.D.N.Y. Apr. 4, 1988) ("The relevant deposition testimony . . . consists only of hearsay statements made by employees that Smith could not even identify.  Even if this

_____

[23] Assuming, of course, that State Street's use of leverage and exposure to subprime securities does indeed constitute a breach.

testimony were somehow admissible under an exception to the hearsay rule, the out of court declarants were Smith's fellow employees—not his employer.  They were in no position to possess first hand knowledge of Hartman's state of mind when he gave Smith the assignment.").[24]  Even if the testimony were admissible, however, there would still be issues of material fact as to the extent of PRIAC's knowledge of State Street's investment strategy for the Bond Funds on July 18, 2007.  Molinaro's testimony addresses CIGNA's knowledge and not PRIAC's directly.  Although one might draw the inference that because PRIAC representatives were on the same call that they also had the same knowledge, the other PRIAC representative on the call, Matthew Dingee, claimed no such knowledge, and instead characterized State Street's disclosures as "unclear or incomplete" in his affidavit.  (*See* Dingee ¶ 9, PA 25.)[25]  Other senior PRIAC executives' affidavits assert that they did not know fully of State Street's use of leverage until late August 2007.  (*See* Palms ¶ 32, PA 9; Frascona ¶ 27, PA 21.)  PRIAC also continued to ask questions of State Street in the period following the July 18 conference call regarding leverage and subprime exposure, which would seem to be a pointless endeavor if PRIAC was fully informed by July 18.  (*See* Frascona ¶ 27, PA 21; Dingee ¶¶ 10-13, PA 25-26.)  Based on the foregoing, a reasonable jury could conclude that PRIAC was not fully aware of State Street's leverage and subprime holdings on July 18.[26]

State Street also relies on Molinaro's testimony regarding the July 12 spreadsheet it sent to PRIAC.  After going through the spreadsheet in detail at his deposition, Molinaro testified that it did appear to show "a leveraged position 4 to 1" in State Street's holdings in the IBF.  (*See*

---

[24] The foundational basis for the question posed to Molinaro is unclear from the excerpted testimony.

[25] State Street argues that the Court should disregard Dingee's affidavit as it relates to the July 18 conference call because his testimony differs from Molinaro's as to whether he could hear the conference call.  (Def.'s Reply at 25.) But "[r]esolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment."  *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994).

[26] Additionally, the questions that CIGNA posed and therefore the information received all related to the IBF, not the GCBF.

Palmer Decl. Ex. 18 at 102:3-106:14.)  However, Molinaro also testified that he did "not recall looking at this exhibit and going through in my mind this level of detail as we're going through right now."  (*Id.* at 105:21-106:5.)  Dingee also asserts in his affidavit that he "was unable to interpret the holdings spreadsheet because it did not contain complete information identifying the securities held by the Intermediate Bond Fund of the sort I would expect to be included in a holdings report."  (Dingee ¶ 6, PA 24.)  Additionally, the additional questions PRIAC sent to State Street regarding leverage weaken the inference that PRIAC was fully aware of the leverage in State Street's holdings based on the spreadsheet.

As for the April 11 and July 6 reports, although they indicated some exposure of the Bond Funds to the subprime market, PRIAC included information regarding the Bond Funds' exposure to the subprime market in its quarterly DDA Report.  (*Compare* Maher Decl. Ex. 28 at 274915 *and* PA 676-77 *with* PA 1147-48, 1320-21.)  Furthermore, when CIGNA saw the July 6 report, it noted that the report "did not cover some things such as how much exposure to these subprime markets there was over time and how much there is currently, and what [specifically] the exposure is."  (Palmer Decl. Ex. 56.)

The monthly reports, contrary to State Street's argument, show varying concentrations of ABS over the relevant time period, not "increasing concentrations in ABS," as shown by the graphs above.

As for the August 2 report disclosing that the IBF had underperformed its benchmark by over 550 basis points at the end of July 2007, questions remain as to the reasonableness of PRIAC's conduct during the period between August 2 and August 20, when PRIAC put the Bond Funds on the Watch List and began providing extensive information about the Bond Funds to the Plans.  During that time, PRIAC continued to ask questions of State Street, and a

reasonable jury could find that PRIAC's efforts to gather more complete information before updating its clients were reasonable under the circumstances, especially given State Street's slow response time.  Further undermining State Street's argument for summary judgment are certain statements of Mark Flinn, the State Street relationship manager responsible for the PRIAC account in 2007.  Flinn told PRIAC on August 14, 2007, "It's actually been well over 14 days since we promised you that we would get proper characteristics for the Fund and we have failed to deliver."  (PA 1447.)  Flinn's manager also wrote in his evaluation of Flinn that PRIAC's account did not receive "the appropriate level of urgency and thoroughness."  (PA 1523.) Although State Street disagrees with that assessment of PRIAC's account, (*see* Def.'s Rule 56.1 Response ¶ 158), that speaks even more to the inappropriateness of summary judgment.

Many of the facts on which State Street relies, then, are subject to a reasonable interpretation that finds that PRIAC violated a duty of disclosure in July 2007 and one that finds that it did not.  The only remaining undisputed fact is that State Street informed PRIAC of the incorrect name for the IBF on July 12, which does not on its own establish PRIAC's violation of the duty.  Summary judgment, then, is inappropriate for both PRIAC and for State Street based on the facts underlying the contribution claim.

### v. Substantially More at Fault

PRIAC's final argument supporting its motion for summary judgment on the contribution counterclaim is based on its contention that State Street was "substantially more at fault" than PRIAC.  Comment d to Restatement (Second) of Trusts § 258 provides that "[w]here a breach of trust is committed and one of two trustees is substantially more at fault than the other, although both are liable to the beneficiary for the breach of trust, the loss should ultimately be borne by the trustee who is more at fault."  It further instructs:

> In determining whether one trustee is so substantially more at fault that he should bear the whole of the loss resulting from a breach of trust, the following factors are to be considered: (1) whether he fraudulently induced the other to join in the breach of trust; (2) whether he intentionally committed a breach of trust and the other was at most guilty of negligence; (3) whether because of his greater experience he controlled the conduct of the other, as in the case where he was an attorney and the other was a person without business experience who was accustomed to rely upon his judgment; (4) whether he alone committed the breach of trust and the other is liable only because of an improper delegation, or failure to exercise reasonable care to prevent him from committing a breach of trust, or neglect to take proper steps to compel him to redress the breach of trust.

*Id.* PRIAC argues that its role was passive compared to State Street's active role in the breach of fiduciary duty and that therefore State Street was substantially more at fault. State Street argues that PRIAC prevented the Plans from making informed decisions about their investments, and so State Street was not substantially more at fault.

In support of its argument that its "passive" role warrants summary judgment on the contribution claim, PRIAC cites three cases. First, in *Free v. Briody*, 732 F.2d 1331, 1338 (7th Cir. 1984), the Seventh Circuit held that a trustee who was "a nominal trustee whose fault was nonfeasance" could seek indemnity against a breaching co-trustee. Second, in *BP Corp. North America Inc. Savings Plan Investment Oversight Committee v. Northern Trust Investments, N.A.*, 692 F. Supp. 2d 980, 985 (N.D. Ill. 2010), the court, citing *Free*, found that indemnity could not be invoked when it was sought against fiduciaries who "merely failed to monitor [the breaching fiduciary's] activities or acquire sufficient information to make their decisions." Third, in *Scalp & Blade, Inc. v. Advest, Inc.*, 300 A.D.2d 1068, 1069 (N.Y. App. Div. 2002), the Appellate Division cited N.Y. Est. Powers & Trusts Law § 11-2.3(c)(1), which allows trustees to exercise "care, skill and caution" to delegate the investment or management functions of the trust, in finding that a trustee who served as an investment advisor could not seek contribution from his fellow trustees. In all of these cases, however, the trustee or fiduciary had a more passive role

60

than PRIAC is alleged to have in this litigation.  *Free*, *BP Corp.*, and *Scalp & Blade* do not involve a fiduciary who served as the conduit of information between investment manager and benefit plans and are therefore distinguishable.  PRIAC contends that this is a distinction without a difference because "the most [State Street] would be able to show . . . , in support of a claim for contribution against PRIAC, is that PRIAC was too slow to catch on and to warn the Plans." (Pl.'s Reply at 12.)   But this misstates PRIAC's role when the facts, as they must be on PRIAC's motion for summary judgment, are construed in the light most favorable to State Street.  In that light, PRIAC could be seen to have had control over information that State Street gave it.  If it knew that State Street had breached its fiduciary duties by July 18, its failure to take corrective action at that point could have exacerbated the Plans' losses significantly beyond those incurred up until that point.  The Court cannot say definitively at this stage of the litigation that State Street was substantially more at fault for the Plans' losses than PRIAC to the extent that a contribution claim would fail as a matter of law.

### III. Defamation

PRIAC has also moved for partial summary judgment on State Street's counterclaims for defamation.  State Street opposes on several grounds.

### A. The Allegedly Defamatory Statements

State Street has identified twenty-four allegedly defamatory statements by PRIAC.  (Pl.'s Rule 56.1 Stmt. ¶ 180.)  One of these twenty-four statements was not communicated outside of PRIAC.  (*Id.* ¶ 181.)  Twenty of the twenty-three remaining statements were standard client communications.  (*Id.* ¶ 183.)   Of the three other statements, one was sent to an investment consultant to one of the Plans, (*see* PA 211), and the other two were sent to members of a investment consulting firm as well as to the Plan that the firm represented, (*see* PA 139, 169).

The twenty-three statements are included as Appendix A to this opinion, are taken from PRIAC's Memorandum of Law in Support of Motion for Partial Summary Judgment, and were adequately quoted therein.  (Pl.'s Rule 56.1 Stmt. ¶ 182.)

## B.  Choice of Law

The parties disagree as to which state's law governs the defamation claim.  PRIAC claims that Connecticut law governs, while State Street claims that Massachusetts law controls.  The parties agree that New York choice-of-law principles apply, since the Court is exercising supplemental jurisdiction over the defamation counterclaim.  *See N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43 (2d Cir. 1999).  The states' laws differ in that Connecticut recognizes the "incremental harm" doctrine, whereas Massachusetts may not.  *Compare Allan v. Hartford Courant*, No. CV000599993S, 2001 WL 291162, at *2 (Conn. Super. Ct. Mar. 8, 2001) ("[T]his court finds that the incremental harm doctrine has vitality under the facts of this case and is a proper defense.") *with Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 210 n.6 (1st Cir. 2006) (noting the "(apparently open) question of whether the incremental harm doctrine is part and parcel of Massachusetts law") *and Noonan v. Staples Inc.*, 707 F. Supp. 2d 85, 90 (D. Mass. 2010) ("Since no court in the Commonwealth has ever recognized the doctrine of incremental harm, this Court refrains from doing so here.").

"In tort cases like this, New York applies the law of the state with the most significant interest in the litigation."  *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999).  New York distinguishes between "conduct regulating" and "loss allocating rules," and "[d]iscouraging defamation is a conduct regulating rule" for which "New York law usually applies the law of the place of the tort."  *Id.*  "[I]n defamation cases 'the state of the plaintiff's domicile will usually have the most significant relationship to the case,' and its law will therefore govern."  *Id.*

(quoting *Reeves v. American Broad. Co.*, 719 F.2d 602, 605 (2d Cir. 1983)).  But "[w]hen the publication is made nationwide, the tort essentially lacks a locus, but rather injures plaintiff everywhere at once."  *Condit v. Dunne*, 317 F. Supp. 2d 344, 353 (S.D.N.Y. 2004).  In this case, PRIAC's communications were sent to its clients, located in twenty-seven states and the District of Columbia, so the Court applies a more comprehensive, multi-factor test to determine which state's law applies.  *See Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F. Supp. 2d 279, 286 n.3 (S.D.N.Y. 2006) ("In cases where, as here, publication of the allegedly defamatory material has occurred in multiple states, courts have applied a multi-factor test to determine the place of the tort."); *see also Condit*, 317 F. Supp. 2d at 353 ("In such cases, determining which state has the most significant relationship to the litigation requires a more comprehensive analysis.").  Relevant factors include "where plaintiff suffered the greatest injury; where the statements emanated and were broadcast; where the activities to which the allegedly defamatory statements refer took place; and the policy interests of the states whose law might apply."  *Condit*, 317 F. Supp. 2d at 353 (internal citations omitted).

Applying these factors to this case, the Court finds that Massachusetts law should apply to the defamation claims.  To the extent it suffered injury, State Street suffered its greatest injury in Massachusetts, its principal place of business.  The policy interests of the states balance each other out; Massachusetts has an interest in protecting its citizens from defamation, while Connecticut has an interest in protecting its citizens from defamation claims.  *Condit*, 317 F. Supp. 2d at 355 (finding that "the policy interests of New York and California in having their respective laws applied essentially offset" because "New York has an interest here in applying its laws to the speaker, and California has an interest here in applying its laws to the target").  Although the communications originated in Connecticut, where they were prepared by PRIAC,

they concern activities that occurred in Massachusetts.  It is true that portions of the statements refer to Connecticut-based activity (namely, those portions that describe PRIAC's attempts to get information from State Street), but their defamatory character (if it is such) stems from their description of State Street's actions or lack thereof, which happened in Massachusetts.  In short, the allegedly defamatory statements originate in Connecticut, but concern a Massachusetts entity's Massachusetts-based actions.

### C.  Substantive Standards for Defamation

Under Massachusetts law, the elements of defamation are: "(a) The defendant made a statement, concerning the plaintiff, to a third party . . .  (b) [t]he statement could damage the plaintiff's reputation in the community . . .  (c) [t]he defendant was at fault in making the statement. . . . [and] (d) [t]he statement either caused the plaintiff economic loss (traditionally referred to as 'special damages' or 'special harm'), or is actionable without proof of economic loss."  *Ravnikar v. Bogojavlensky*, 782 N.E.2d 508, 510-11 (Mass. 2003).  "[S]tatements that may prejudice the plaintiff's profession or business" are among those actionable without a showing of economic loss.  *Id.* at 511.

Apart from the issue of economic loss, PRIAC does not challenge State Street's right to make a showing on these elements at trial.  Rather, PRIAC makes three sets of arguments that purport to demonstrate that even if State Street could make that showing, PRIAC is nevertheless entitled to summary judgment.  First, PRIAC argues that it is entitled to a qualified privilege that State Street cannot overcome.  Second, PRIAC contends that State Street is a public figure and cannot show constitutional malice on PRIAC's part.  And third, PRIAC argues that its statements are substantially true and are therefore entitled to a complete defense.

### i.   The Common Interest Privilege

"[T]here is a qualified, or conditional, privilege 'where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it.'" *Bratt v. Int'l Bus. Machs. Corp.*, 467 N.E.2d 126, 131 n.8 (Mass. 1984) (quoting *Sheehan v. Tobin*, 93 N.E.2d 524, 528 (Mass. 1950)).  The privilege "immunizes a defendant from liability unless he or she acted with actual malice, or unless there is 'unnecessary, unreasonable or excessive publication,' and the plaintiff establishes that the defendant published the defamatory information recklessly." *Mulgrew v. City of Taunton*, 574 N.E.2d 389, 391 (Mass. 1991) (quoting *Bratt*, 467 N.E.2d at 129) (internal citation omitted).  State Street does not argue that there was unnecessary, unreasonable, or excessive publication, and therefore the Court considers only the "actual malice" prong of the test.  A statement is made with actual malice if made with  "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *see also Tosti v. Ayik*, 437 N.E.2d 1062, 1064-65 (Mass. 1982).  Actual malice must be proved by "clear and convincing proof." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974).  The proof must stand for the proposition that the utterer or publisher acted with a "high degree of awareness of probable falsity." *Id.* at 332.  Actual malice may also be shown by proving that "'defamatory words, although spoken on a privileged occasion, were not spoken pursuant to the right and duty which created the privilege but were spoken out of some base ulterior motive.'" *Dragonas v. Sch. Comm. of Melrose*, 833 N.E.2d 679, 687 (Mass. App. Ct. 2005) (quoting *Dexter's Hearthside Rest., Inc. v. Whitehall Co.*, 508 N.E.2d 113, 117 (Mass. App. Ct. 1987)).  Regardless of the method chosen to attempt a defeat of the privilege, "[t]he burden of proving abuse of the

privilege is on the plaintiff." *Id.* "Simple negligence, want of sound judgment, or hasty action will not cause loss of the privilege." *Dexter's*, 508 N.E.2d at 117.

PRIAC moves for summary judgment on the defamation counterclaims as to all statements based on this privilege. It argues that its privilege arises from its "business relationship" with the plans "that gave rise to a common interest in the Bond Funds and State Street's management of them." (Pl.'s Mem. at 42.) State Street does not take issue with that characterization of the source of PRIAC's privilege, and the Court finds that PRIAC and the Plans did share a common business interest. Instead, State Street contends that PRIAC abused its privilege by (1) having a base ulterior motive in avoiding client lawsuits and (2) making the defamatory statements knowingly or recklessly. (*See* Def.'s Opp'n at 27-30.)

In support of the former contention, State Street points to certain documents indicating that PRIAC's clients complained in late August and in September about PRIAC's role with respect to the Bond Funds. (*See* Maher Decl. Ex. 9 at 5280254 (dated September 14, 2007); Ex. 10 at 11572 (August 29, 2007); Ex. 107 at 4051712 (August 22, 2007).) In September, some of PRIAC's clients began threatening suit. (*See id.* Ex. 9 at 5280254; Ex. 110 at 5269059; Ex. 111 at 4683052.) But where a plaintiff seeks to defeat the conditional privilege by showing a base ulterior motive under Massachusetts law, he must show that "the publication is not made *chiefly* for the purpose of furthering the interest which is entitled to protection." *Dragonas*, 833 N.E.2d at 439 (emphasis in original). State Street's evidence is insufficient to create a triable issue of fact under that test. Given that the allegedly defamatory statements began on August 21, 2007, and the first piece of evidence to which State Street points is an August 22, 2007 communication, the inference that these communications indicate an ulterior motive so strong such that the

publication was not made chiefly in furtherance of the privileged interest is too attenuated to create a triable issue of fact based on this argument.

Turning to the argument about recklessness, State Street, in support of the argument, cites Molinaro's deposition testimony, in which he testified that he kept George Palms, the author of many of the allegedly defamatory statements, "apprised of what [he was] learning about the Intermediate Bond Fund . . . in June and July." (*See* Maher Decl. Ex. 7 at 266:10-14.)  The information of which Molinaro kept Palms apprised may have included CIGNA's concerns about leverage in the IBF.  (*Id.* at 267:16-268:5.)  Molinaro also testified that he briefed Palms that the July 18 conference call "took place," (*id.* at 419:12-15), although he further explained that he did not "recall getting into the specifics of the conference call."  (*Id.* at 419:16-19.)  State Street argues that this testimony shows that Palms was aware of the leverage and subprime exposure in July 2007, and that therefore his statements about learning about the "change" in the Bond Funds' strategy for the first time on August 22, 2007, were made recklessly or with knowledge that they were false.  Palms, for his part, says in his affidavit that he believed all the allegedly defamatory statements were true.  (Palms ¶ 32, 44-45, PA 9, 13.)

Whether the publisher of an allegedly defamatory statement "entertained serious doubts as to the truth of the statement may be proved by inference, as it would be rare for a defendant to admit such doubts."  *Bose Corp. v. Consumers Union of U.S., Inc.*, 692 F.2d 189, 196 (1st Cir. 1982) (citing *Stone v. Essex Cnty. Newspapers, Inc.*, 330 N.E.2d 161, 173 (Mass. 1975)).  Although Massachusetts courts "favor the use of summary judgment procedures in cases where defamation is alleged," this does not relieve a defamation defendant from having to prove the absence of disputed issues of material fact.  *Mulgrew*, 574 N.E.2d at 390.  Here, although the evidence does not necessarily compel a conclusion that Palms had a "high degree of awareness

of probable falsity," Molinaro's testimony about keeping Palms "apprised" does serve to create an triable issue of fact as to Palms's state of mind.[27]  *See Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979) ("The proof of 'actual malice' calls a defendant's state of mind into question, and does not readily lend itself to summary disposition." (internal citation omitted)).[28]

### ii. Truth

PRIAC argues that its statements, which declare that State Street's "investment approach does not comport with what we were previously lead [sic] to believe," and that it did not learn about the Bond Funds' "off-strategy" leverage and subprime exposure until August 2007, are substantially true and that therefore a defamation claim based on these statements cannot lie.  But for many of the same reasons that material issues of fact remain with respect to the contribution claim, issues of fact remain with respect to the truth of these statements as well.  Molinaro's testimony about the July 18 conference call and July 12 spreadsheet create an issue of fact as to whether State Street had informed PRIAC of the leverage and subprime exposure of the Bond Funds by those dates.[29]  Therefore, State Street's claim for defamation, although a thin one, survives.

### IV. Massachusetts Unfair Trade Practices Act

PRIAC also moves for summary judgment on State Street's Massachusetts Unfair Trade Practices Act (the "Act") claim, which is based on the allegedly defamatory statements.  The Act applies only where "the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within

---

[27] However, not all of the allegedly defamatory statements relate to State Street's investment strategy.  A triable issue of fact as to actual malice remains only on those that do, namely Statements 12, 13, 15, 16, 17, and 23.

[28] Because a triable issue of fact remains as to actual malice, consideration of whether State Street is a public figure is unnecessary.

[29] PRIAC also argues that the Court should grant summary judgment "with respect to State Street's recovery of non-nominal damages," but this is an improper subject for summary judgment.  *Thrasher*, 152 F. Supp. 2d at 295.

[Massachusetts]."  Mass. Gen. Laws. ch. 93A, § 11.  That inquiry is distinct from a choice-of-law analysis.  *Roche v. Royal Bank of Canada*, 109 F.3d 820, 826 n.7 (1st Cir. 1997) ("The choice of law test and the 'primarily and substantially' test, though similar in many respects, are not identical.  That a judge should reach opposite results in applying these two tests in a single case is no sign of error.").  "No particular set of factors controls this inquiry; rather, courts engage in a holistic, fact-based analysis focused upon 'whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within [Massachusetts].'"  *Korpacz v. Women's Prof'l Football League*, No. Civ. A. 04-10735-RWZ, 2006 WL 220762, at *5 (D. Mass. Jan. 27, 2006) (quoting *Kuwaiti Danish Computer Co. v. Digital Equip. Co.*, 781 N.E.2d 787, 799 (Mass. 2003)).  "To defeat a claim, the defendant bears the burden of demonstrating that the relevant conduct took place elsewhere."  *HipSaver Co., Inc. v. J.T. Posey Co.*, 490 F. Supp. 2d 55, 71 (D. Mass. 2007).

PRIAC argues that because its "alleged misconduct was the making of allegedly defamatory statements in Connecticut to clients in 27 states," the center of gravity in this case is not primarily and substantially in Massachusetts.  State Street argues that the statements concern a Massachusetts entity and conduct that occurred in Massachusetts.  But "where the relevant deceptive conduct involves communications between a defendant and third parties, courts have said that the 'center of gravity' lies in the state in which the communications occurred (*i.e.,* were 'published')."  *HipSaver*, 490 F. Supp. 2d at 71.  And "in undertaking this inquiry, courts have focused more on the location of the wrongful conduct than on the location where the plaintiff

suffered injury." *Id.* Accordingly, the Court agrees with PRIAC and finds that the conduct of which State Street complains here did not occur primarily and substantially in Massachusetts.[30]

## V. Counterclaiming Against PRIAC

PRIAC also argues that counterclaiming against it is procedurally improper as it could reduce the Plans' recovery, as PRIAC is suing on behalf of the Plans, so the counterclaims should be dismissed. State Street argues that "PRIAC named itself as the plaintiff in this action . . . , so all of State Street's counterclaims are procedurally proper." (Def.'s Opp'n at 43 n.22.) State Street further argues that even if PRIAC's argument is correct, they amount to "nothing more than an assertion that State Street's counterclaim should be styled as a third-party action against PRIAC rather than a counterclaim." (*Id.*) The proper remedy in that case, according to State Street, is to allow it amend its Answer to re-designate the counterclaims as third-party actions. The Court agrees with the latter argument, which PRIAC does not oppose in its reply. *See Rubin v. Valicenti Advisory Servs.*, 326 F. Supp. 2d 427, 428-29 (W.D.N.Y. 2004) (finding that "[t]he so-called counterclaims seek contribution and indemnity, not against the Plan itself, but against Rubin, the trustee, for his alleged breach of his own fiduciary obligations," that therefore "[t]he proper mechanism to seek such relief is by way of a third-party complaint against Rubin individually," but granting leave to amend the answer).

## VI. Expert Report

State Street has moved to strike portions of PRIAC's expert, Dennis E. Logue. Given that this will be a bench trial, the Court has "greater flexibility in satisfying its gatekeeping function vis a vis expert testimony . . . given the absence of the need to protect juries from dubious expert evidence." *Chitayat v. Vanderbilt Assocs.*, Civ. No. 03-5314 (DRH)(MLO), 2007

---

[30] State Street also suggests that "material factual issues exist and must be decided at a trial, not on summary judgment" with respect to its Chapter 93A claim. (Def.'s Opp'n at 43.) But "[w]hether or not conduct took place primarily and substantially within the Commonwealth is a question of law." *Korpacz*, 2006 WL 220762, at *5.

WL 2890248, at *2 (E.D.N.Y. Sept. 27, 2007).  In this case, the Court defers ruling on the

motion to strike portions of Dr. Logue's report until trial, when "the motion is placed in the

appropriate factual context."  *SEC v. U.S. Envtl., Inc.*, No. 94 Civ. 6608 (PKL)(AJP), 2002 WL

31323832, at *2 (S.D.N.Y. Oct. 16, 2002).

## CONCLUSION

For the foregoing reasons, the Court DENIES State Street's motion for summary judgment [212] and its cross-motion for summary judgment on its contribution counterclaim [229]. PRIAC's motions for partial summary judgment [209] is GRANTED in part and DENIED in part. State Street's Massachusetts Chapter 93A claim is dismissed, but the claims for contribution and defamation survive. Additionally, the Court grants State Street leave to amend its Answer to style its counterclaims as third-party claims. State Street's motion to strike portions of the expert report of Dennis E. Logue [217] is administratively denied without prejudice to renewal at trial.

SO ORDERED.

Dated: New York, New York
      March 28, 2011

                                    Richard J. Holwell
                              United States District Judge