UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE STATE STREET BANK AND TRUST          :
CO. ERISA LITIGATION                       :
                                           :
                                           :          07 Civ. 8488 (RJH)
This document relates to:                  :
                                           :
07 Civ. 8488 (*Prudential Retirement Insurance and* :
*Annuity Company v. State Street Bank and Trust*    :
*Company and State Street Global Advisors, Inc.*)   :
                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# PRIAC'S POST-TRIAL MEMORANDUM


Edwin G. Schallert
Steven Klugman
Jeremy N. Klatell
Courtney M. Dankworth
Kerith D. Knechtel
Miranda H. Turner
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Attorneys for Plaintiff and Third-Party
Defendant Prudential Retirement
Insurance and Annuity Company*


Dated: New York, New York
        November 18, 2011

# TABLE OF CONTENTS

Page

Introduction ......................................................................................................................1

I.  The Evidence at Trial Reinforced State Street's Multiple Violations of Section
    404 of ERISA ...........................................................................................................3

    A.  State Street Presented the Bond Funds as Enhanced Index Bond Funds ...............3

        1.  Fact Testimony ...........................................................................................3

        2.  Expert Testimony .......................................................................................5

        3.  State Street's Assertions ............................................................................5

    B.  State Street Exposed the Bond Funds to Increased Risk in Order to
        Advance Its Own Interests. .............................................................................7

    C.  State Street's Investment Management Imprudently Exposed the Bond
        Funds to Undue Risk .......................................................................................9

        1.  Increasing Alpha Targets and Risk ............................................................9

        2.  Large Bets on Risky Subprime Securities ...............................................10

        3.  Exposure to Risky Derivatives .................................................................12

        4.  Non-Diversified Risk ................................................................................15

        5.  Increasing Risk Through Leverage ...........................................................15

        6.  Liquidity Risk ............................................................................................16

    D.  State Street Persisted in the Face of Known Dangers ......................................16

    E.  State Street's Management of the Bond Funds Violated Its Written Risk
        Control Policies ..............................................................................................19

    F.  State Street's Disclosures Obscured Risks to Investors ...................................21

    G.  State Street's Admissions Reinforce Its Imprudence .......................................21

    H.  State Street's Process-Based Defense Is Flawed. ...........................................22

i

## TABLE OF CONTENTS
(continued)

Page

II.    The Plans' Losses Resulted from State Street's Breaches of Its Fiduciary
       Obligations to the Plans. ...................................................................................22

III.   PRIAC Is Entitled to Recover $76,733,879 Under Section 409 for the Plans'
       Losses...............................................................................................................25

       A.    Professor Fischel Properly Calculated the Losses to the Plans............................25

       B.    PRIAC Did Not Have to Prove Losses from Specific Investment
             Decisions..........................................................................................27

       C.    Prejudgment Interest .........................................................................29

       D.    Credit for Fair Fund Payments...........................................................29

Conclusion ........................................................................................................30

## TABLE OF AUTHORITIES

CASES

*California Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, No.
CV964036CASJGX, 1999 WL 1457226 (C.D. Cal. Mar. 26, 1999) .................................27

*California Ironworkers Field Pension Trust v. Loomis Sayles & Co.*,
259 F.3d 1036 (9th Cir. 2001) ...............................................................................27

*Chao v. Merino*, 452 F.3d 174 (2d Cir. 2006) ........................................................25

*Dardaganis v. Grace Capital Inc.*, 889 F.2d 1237 (2d Cir. 1989)...............25, 26, 27, 28

*Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985).........................25, 26, 27, 28, 30

*In re State Street Bank & Trust Co. Fixed Income Funds Investment
Litigation*, 772 F. Supp. 2d 519 (S.D.N.Y. 2011)...............................................23

*In re Unisys Savings Plan Litigation*, No. 91-3067, 1997 WL 732473
(E.D. Pa. Nov. 24, 1997)........................................................................................28

*Liss v. Smith*, 991 F. Supp. 278 (S.D.N.Y. 1998) ..................................................28

*Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71 (2d Cir. 2000)....................................2

OTHER AUTHORITIES

29 C.F.R. § 2550.404a-1 ....................................................................................11, 12

Restatement (Second) of Trusts § 205 .....................................................................27

Restatement (Third) of Trusts § 213 ........................................................................27

Federal Rule of Civil Procedure 52 .........................................................................27

**Introduction**

PRIAC submits this post-trial memorandum in support of its claim on behalf of 196 retirement plans that State Street violated Section 404 of ERISA, resulting in losses of $76.73 million to the Plans.  The evidence presented at trial confirmed and reinforced the detailed facts set forth in PRIAC's proposed findings of fact ("FOF") and in its opening statement (Trial Transcript ("Tr.") 2-24), and contradicted or left holes in many of State Street's proposed findings and its opening statement.[1]

PRIAC presented much of its case through deposition testimony of State Street witnesses and accompanying exhibits.  At trial, PRIAC supplemented that evidence in the following ways:

- PRIAC's fact witnesses (Kalamarides, Hatfield, Frascona, and Dingee) explained how State Street presented the Bond Funds to PRIAC from their inception through their demise in 2007.

- Professor Blume opined that State Street's investment strategies for the Bond Funds were inappropriate for an enhanced index bond fund and resulted in sizable losses to the Plans.  Dr. Culp opined on the deficiencies in State Street's risk management.  Professor Fischel quantified the Plans' losses from their investments in the Bond Funds.

- The testimony of State Street's witnesses often supported, or established their inability to rebut, facts set forth in PRIAC's proposed findings.

In its opening, State Street told the Court that "State Street's investment professionals will testify.  They are going to be here.  They are going to testify as to the reasons behind their investment judgments at the time."  (Tr. 26.)  However, State Street did not call any of the senior fixed income managers who created the subprime-dominated investment strategy for the Bond

---

[1]    This memorandum uses the same defined terms used in the FOF.

Funds and the LDBF – the Head of Active Fixed Income (O'Hara), the Director of North

America Fixed Income (Wands), the Director of Global Fixed Income (Greff) and the Head of

Structured Credit Products (Gianatasio) (PX 120; PX 364) – even though all four were on its live

witness list.  State Street neither listed nor called Robert Pickett, the portfolio manager for the

IBF and the LDBF.  Their absence supports the impropriety of State Street's management of the

Bond Funds.  *See Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 81-82 (2d Cir. 2000) ("It is

well-settled that a party's failure to call a witness may permissibly support an inference that that

witness's testimony would have been adverse.").

Instead, State Street's trial witnesses were:

- Sean Flannery, former Chief Investment Officer.  Flannery had responsibility for eight business units "across all assets classes." (Tr. 542 Flannery.)  He had no involvement in the investment management of the Bond Funds.  For instance, he said that specific types of subprime investments were "not the level of detail I was involved in." (Tr. 623.)  He was ignorant of rudimentary facts such as whether U.S. treasury securities are rated (Tr. 668); they are (Tr. 824 Reigel).

- Susan Reigel, the portfolio manager for the GCBF.  Reigel, who was the only witness with personal knowledge about investment decisions for the Bond Funds, confirmed several of PRIAC's proposed findings.

- Patrick Armstrong, the head of Risk Management.  Armstrong admitted that portfolio managers disregarded risk warnings in pursuing subprime investments. His efforts to rewrite the contemporaneous record of State Street's violations of its own risk policies were not credible.

- Dr. Andrew Carron, an expert witness.  Carron's testimony was in many respects not credible.  He showed a lack of familiarity with important facts, had to rely on the expert report he signed in 2010 as an aid, presented opinions based on misleading charts, and could not justify his presentation of the Plans' "losses." (Tr. 1210-13, 1202-04, 1228-29.)[2]

---

[2]    State Street also called Steven Sanchez, whose testimony was limited to State Street's client website.  (Tr. 1047-66.)

I.    **The Evidence at Trial Reinforced State Street's Multiple Violations of Section 404 of ERISA.**

The trial testimony and exhibits confirmed State Street's violations of Section 404 of ERISA detailed in PRIAC's FOF and in its proposed conclusions of law ("COL").

A.    **State Street Presented the Bond Funds as Enhanced Index Bond Funds.**

State Street described the Bond Funds to PRIAC as enhanced index funds, and knew that PRIAC described them as such to the Plans.  (*See* FOF ¶¶ 11-34.)  This characterization provides important context for assessing State Street's conduct because an ERISA fiduciary must give "appropriate consideration" to the particular role an investment plays in a Plan's portfolio and because prudence is assessed in light of an investment manager "of a like character and with like aims."  (COL ¶¶ 7, 11.)

1.    **Fact Testimony**

PRIAC's fact witnesses testified about communications with State Street in which the Bond Funds were repeatedly referred to as enhanced index funds.  No State Street witness disputed any of these facts.

Hatfield recounted that CIGNA's retirement business[3] had sought out State Street in 1996 as a potential manager of index funds.  (Tr. 223-25.)  State Street explained to her that it employed an enhanced index approach for fixed income funds.  (Tr. 225-26.)  It described both Bond Funds as "enhanced" with "very low" tracking error.  (PX 82; Tr. 227-28.)  The trust declarations stated that the objective of each Bond Fund was to "match or exceed" its benchmark

---

[3]    In April 2004, Prudential Financial purchased CIGNA's retirement business, which became PRIAC.  (Tr. 218 Hatfield.)

(PX 60; PX 637), "the generally accepted definition of what an enhanced index fund is."  (Tr. 460 Fischel.)

In 2002, PRIAC fired an enhanced index equity manager for departing from its stated investment strategy.  In approaching State Street about a substitute fund, Kalamarides stressed the importance of investment managers' adherence to investment guidelines.  (Tr. 201-02.) Hatfield and Frascona testified about a September 2003 meeting with senior State Street representatives about the Bond Funds.  (Tr. 228-29 Hatfield; Tr. 268-69 Frascona; PX 48.)  State Street said that the "[t]arget predicted tracking error" of the Bond Funds was 40-50 bps (PX 63) – between the tracking error for passive and active strategies (PX 48).  State Street's summary of this meeting noted that PRIAC offered the Bond Funds "in an enhanced bond category" for plans that chose "the particular style offered by the strategies – low tracking error fixed income."  (PX 635.)

Frascona described his 2005 email exchange with Kallie Hapgood of State Street in which he raised questions about State Street's enhanced index strategy.  (Tr. 278-281; PX 54.) She quantified a range for targeted predicted tracking error of 50-75 bps.  (PX 54.)  This target was consistent with the maximum of 75 bps in a State Street publication from the 1990s that CIGNA had (PX 61; Tr. 257-59 Frascona) and with PRIAC's view of enhanced index funds (PX 48; Tr. 269 Frascona).  Through mid-2005, State Street reviewed and approved Fact Sheets describing the "guidelines" for each of the Bond Funds as following an "enhanced index strategy."  (Tr. 290-92 Frascona; PX 77.)  Frascona and Dingee testified that State Street did not advise them of any change in the Bond Funds' investment strategy through 2007.  (Tr. 294 Frascona; Tr. 354 Dingee.)  In July 2007, State Street confirmed that there had been no material

change in the management of the Bond Funds and again approved a Fact Sheet description of the Bond Funds' "enhanced index" strategy.  (Tr. 345-46, 348 Frascona; DX 95.)

### 2.      Expert Testimony

Blume explained the generally understood meaning of "enhanced index" using a graph that State Street prepared for a 2006 client presentation, which showed enhanced strategies between active and passive strategies with regard to target return and risk measured by tracking error.  (Tr. 63-66; PX 461.)  The common understanding that enhanced index strategies involve "low risk" appears in a leading treatise, and a standard reference work states that enhanced index strategies have targeted tracking error up to 75 bps.  (Tr. 66-67 Blume.)

Carron testified that some investment professionals use enhanced indexing to refer to a strategy seeking "to modestly outperform the benchmark while taking on minimal additional risk" and that "low tracking error" is consistent with that usage.  (Tr. 1187-88; PX 10.)  He described target tracking error and alpha as risk and return parameters for an enhanced index strategy.  (Tr. 1188; PX 10.)  He also opined that the fees charged for managing a fund provide insight into its nature.  (Tr. 1190.)  In 2002, State Street explained its fee for managing the Bond Funds by presenting them as enhanced index funds.  (PX 46.)

### 3.      State Street's Assertions

State Street contended that the meaning of "enhanced index" can vary and that "[w]hat is important instead of the label" is "investment metrics."  (Tr. 35 Opening.)  But the evidence established that "enhanced index" had a clear if inexact meaning and that the metrics of tracking error and alpha targets that State Street provided to CIGNA and PRIAC were fully consistent with an enhanced index strategy.

5

Although it criticized the use of labels, State Street nonetheless pointed to its intermittent references to "active" terminology in describing the Bond Funds.  (Tr. 35 Opening.)  While any enhanced index fund has some active management (PX 48), State Street understood that PRIAC included the Bond Funds in an "enhanced bond category."  (PX 635.)  State Street continued to use "enhanced" in referring to the Bond Funds in 2007.  (*E.g.*, PX 456; PX 279.)

State Street tried to distort Hapgood's 2005 email to argue that "State Street told Prudential . . . that they were going to be increasing risk" and that "Prudential had complained about the lack of alpha."  (Tr. 26 Opening.)  When Hapgood wrote that State Street was "increasing the risk of the portfolio," she was discussing a mutual fund that had been managed in a "passive style" from 2002 to 2004.  (DX 147, p. 4.)  Frascona commented that three years seemed like a "long time for an ENHANCED INDEX FUND to be trying to track the index" (*Id.*, p. 3), so any "complaint" was about a strategy that sought *no* alpha.

State Street pointed to a line on its Client's Corner website showing an alpha target for the Bond Funds of 50-75 bps and to the fact that a PRIAC back office employee accessed the website in March 2007.  (Tr. 1056-58 Sanchez.)  (Frascona and Dingee did not use the website since they had other means of getting the information on it.  (Tr. 315 Frascona; Tr. 369 Dingee.))  Because enhanced index funds have high information ratios (PX 10), a 50-75 bps alpha target would not necessarily have implied a change in the tracking error target that State Street had disclosed to PRIAC in 2005.  The website did not mention a target tracking error for the Bond Funds.  The highest tracking error that State Street provided to PRIAC was 50-75 bps.  (Tr. 1198 Carron.)

**B.      State Street Exposed the Bond Funds to Increased Risk in Order to Advance
         Its Own Interests.**

In 2006, in order to increase revenues and profits rapidly, State Street pursued an

initiative to gain recognition as an active fixed income manager that involved "tak[ing] more

active risk" and "generat[ing] higher returns for clients in existing products."  (FOF ¶¶ 35-40.)

As part of this initiative, State Street focused on "showcase products" like the LDBF and CDOs,

which were tied to subprime securities.  (FOF ¶¶ 41-58.)  Also in 2006, State Street increased the

Bond Funds' alpha targets from 50 bps to 70-80 bps, ramped up their leverage, and intensified

their focus on subprime securities.  (*E.g.*, Tr. 816 Reigel; PX 142; PX 608; PX 18, Ex. 27; PX

18, Exs. 13A, 14A.)  PRIAC believes the inference is inescapable that the Bond Funds' strategy

was changed in 2006 as part of State Street's business initiative.

Although Reigel asserted that State Street's business strategy had no impact on her

decision-making (Tr. 807-08), she testified that in 2006 O'Hara told her that the alpha targets for

the Bond Funds were increasing from 50 bps to 70-80 bps (Tr. 816).  O'Hara was one of the

senior managers who orchestrated the "leveraging fixed income" initiative.  (PX 141; PX 725.)

Reigel acknowledged that in 2006 "there was an initiative at State Street to be considered a more

active player in the fixed income world."  (Tr. 816.)

Flannery also asserted that the fixed income initiative "didn't have anything to do with

existing strategies."  (Tr. 594.)  However, he was generally unfamiliar with the 2006 business

plan that senior fixed income managers had prepared (Tr. 628) and with the presentation by those

managers that was posted on State Street's internal website (Tr. 631-32).  Flannery did not

remember documents sent to him in early 2006 about the business plan (PX 468; Tr. 624; PX

545; Tr. 625-27), nor did he remember that the CEO of SSgA had given the fixed income group

the goal of tripling its business in three years.  (Tr. 628-29.)[4]  Flannery claimed that "generating

higher returns for clients in existing products" did not "necessarily mean taking more risk" (Tr.

634), even though State Street's expert testified that there is "a well-established principle in

finance that in order to get incremental return you have to take on more risk."  (Tr. 1091 Carron.)

The trial evidence confirmed that State Street's emphasis on "showcase" subprime

products skewed its management of the Bond Funds.  For example, the same "skill sets" in

managing the LDBF and CDOs, which were viewed as "the most profitable," were used to

generate alpha for "traditional benchmark strategies," like the Bond Funds.  (PX 468; Tr. 620-22

Flannery.)  When Flannery expressed concern in mid-2006 about "exposure to risk" in the

housing market (PX 143), he received a presentation prepared by the managers of the CDO

business (Tr. 639-40 Flannery), which relied on lower-rated tranches of subprime ABS.  (PX

393; Tr. 619 Flannery; PX 697; Tr. 675 Flannery.)  To the extent credit analysts reviewed

subprime bonds, they did so as part of the CDO business (PX 327; Tr. 1217-18 Carron), and they

reported to Gianatasio, the head of the CDO initiative.  (Tr. 545, 624 Flannery.)  State Street's

independent Credit Research Team performed no analyses for the Bond Funds.  (Tr. 703-08

Flannery.)

Neither depositions nor trial testimony contained any suggestion that State Street changed

the Bond Funds' investment strategy because of the interests of the Plans – most of which had

---

[4]   Flannery did remember there were "certainly plans to increase the CDO business and the
      suite of absolute return strategies." (Tr. 626.)  He acknowledged that investment
      professionals were asked to meet "aggressive growth targets." (PX 545; Tr. 627-28.)

invested in the Bond Funds before 2006.  (DX 351, Ex. 23.)  Instead, State Street pursued increased risk and "showcase products" to advance its own interests.  It did not act "solely in the interest of" Plan participants and beneficiaries and for the "exclusive purpose" of providing them benefits – a clear violation of Section 404(a)(1)(A) of ERISA.  (*See* COL ¶¶ 25-28.)

### C.    State Street's Investment Management Imprudently Exposed the Bond Funds to Undue Risk.

Trial evidence reinforced State Street's imprudent management of the Bond Funds that in numerous ways created risks disproportionate to an enhanced index bond fund, in violation of Section 404(a)(1)(B) of ERISA.  (FOF ¶¶ 70-116; COL ¶¶ 5-24.)

### 1.    Increasing Alpha Targets and Risk

State Street increased the alpha targets of the Bond Funds to 70-80 bps in 2006 and 75 bps in 2007.  (PX 142; PX 608; Tr. 812-14 Reigel.)  Reigel testified that an active portfolio with an alpha target of 75 bps would have a predicted tracking error of 150 bps (Tr. 817) – double the maximum target tracking error for an enhanced index fund and double the high end of the range to which Hapgood referred in 2005.  By 2007, both Bond Funds had tracking errors in excess of an enhanced index fund's (PX 18, Ex. 17; Tr. 101-02 Blume), with huge deviations in the summer of 2007 (PX 18, Ex. 30; Tr. 103 Blume).

Echoing Pickett's and Wands' deposition testimony (FOF ¶ 73), Reigel testified that she would not have used "enhanced" to describe the Bond Funds.  (Tr. 810.)  She was not aware that State Street had referred to the Bond Funds as "enhanced" or that PRIAC's Fact Sheets described them as using an "enhanced bond indexing strategy."  (Tr. 811-12.)  State Street investment managers could not have met the prudence requirement that they give "appropriate

consideration" to the role of the Bond Funds in Plans' portfolios because they did not know how the Bond Funds had been described to Plans.  (COL ¶ 8.)

### 2. Large Bets on Risky Subprime Securities

State Street made enormous subprime bets in both Bond Funds.  Many of its subprime exposures resulted from investments in the LDBF.  (PX 612; Tr. 828-29 Reigel.)  The LDBF's risk tolerance and volatility were completely different from the Bond Funds'.  (Tr. 853-54 Reigel.)  By 2006, State Street had raised from 20% to 25% its internal limit on the percentage of each Bond Fund's value that could be invested in the LDBF (FOF ¶ 77), and each Fund approached that higher limit in 2007.  (PX 16, Exs. 3, 4.)  The limit was driven by the risk management process (Tr. 856-57 Reigel), but by looking to holdings on a market-value basis, it was virtually meaningless as a curb on risk.[5]  In 2007, each Bond Fund's notional exposure to the LDBF exceeded 100% of its market value.  (Tr. 856 Reigel.)  Each Bond Fund also had direct holdings in the same subprime securities held by the LDBF.  (Tr. 851-52 Reigel.)

By the end of May 2007, the IBF and the GCBF had exposure to ABS totaling 143% and 151% of their net asset values, respectively, virtually all of which was subprime.  (PX 18, Exs. 13A, 14A; Tr. 86-88 Blume.)  These huge off-index exposures created a very significant risk of tracking error as well as substantial "model risk," the potential that small errors in risk models would translate into large amounts of tracking error.  (Tr. 89-91 Blume.)  Because subprime

---

[5]     As Reigel testified, if the LDBF had added $1 billion of subprime TRS, it would not have counted against the limit even though the Bond Funds would have added a *pro rata* share to their notional subprime exposure.  (Tr. 857.)

investments were nearly 150% of each Bond Fund's market value, even a small amount of model

risk created a potential for very large increases in tracking error.  (Tr. 91 Blume.)

At trial, State Street tried to understate these exposures by repeatedly citing notional data

that "two-thirds of the funds, 65 percent, were not invested in subprime," while "35 percent were

in ABS bonds backed by subprime."  (Tr. 27, 38 Opening.)  As of May 31, 2007, the GCBF was

leveraged by 4.3 to 1, making its notional subprime exposure 4.3 times 35% – 150% of the

fund's market value.  (Tr. 821 Riegel.)  References to the 35% figure are misleading because

they obscure the added risk to investors of subprime exposure created by leverage.

State Street attempted to justify the Bond Funds' reliance on subprime by asserting that it

was the only strategy that would enable them to achieve their alpha targets.  (Tr. 1079 Carron.)

The evidence at trial exposed numerous flaws in this argument:

- The argument is premised on the false assumption by Carron "that the investments had to meet a rate of return objective."  (*Id.*)  There was no such imperative to meet alpha targets.  For ten years, the Bond Funds had closely tracked their benchmarks, with average annual alpha of 6-7 bps.  (PX 617; PX 618.)  The objective of the Bond Funds was that they "match or exceed" their benchmarks.  (PX 60; DX 648; *see* Tr. 1196 Carron (objective of a bond mutual fund is often defined without reference to any alpha target).)

- State Street's argument depicted the "objective" of the Bond Funds solely in terms of their alpha targets.  (Tr. 25 Opening.)  However, the objective of a fund is also defined by its risk target.  (Tr. 1193-94 Carron.)  Blume explained that, because "[t]he item that an investment manager can control is the risk[] characteristic" of a fund, his analysis focused on tracking error targets rather than alpha targets.  (Tr. 99.)  ERISA requires that an investment course of action must take into account not merely the opportunity for gain but also "the risk of loss."  (COL ¶ 8; 29 C.F.R. § 2550.404a-1(b)(2).)

- Home equity ABS was riskier than other types of comparably rated ABS and much riskier than comparably rated government and investment-grade corporate bonds that comprised the benchmark indices for the two Bond Funds.  (PX 18, Exs. 6, 7; Tr. 75-77 Blume.)  State Street as a fiduciary was required to give

"appropriate consideration" to this risk in light of the enhanced index nature of the Bond Funds.  (COL ¶¶ 7-8; 29 C.F.R. § 2550.404a-1(b)(1).)

- Although Reigel and Carron both asserted that the subprime-focused LDBF was a "well-performing active fund" (Tr. 755 Reigel), the facts belied that justification. The LDBF's five-year annualized returns through March 2007 put it in the *bottom* 6th percentile of 128 peer funds, *not* the top 6th percentile as Reigel mistakenly supposed.  (Tr. 850-51; PX 856.)  Carron testified about the LDBF's "uniformly positive returns" until February 2007 (Tr. 1152), but his testimony misleadingly ignored that those returns were only slightly above LIBOR, the "risk-free interest rate" that was the LDBF's benchmark.   (Tr. 1210-11 Carron; PX 487.)

- As State Street's Head of Fixed Income Trading and the Head of its Cash Desk both observed, State Street did not have the "toolbox" and "all the tool sets" to run an active bond fund.  (PX 589; PX 593.)  That limited capacity, rather than any careful assessment of all available tools, led investment managers to "quadruple up in structured products" and take "an oversized bet" on subprime. (PX 593; PX 594.)  Indeed, by April 2007, State Street bond funds in total held a staggering $12.7 billion in subprime.  (Tr. 674 Flannery; PX 697.)

### 3.    Exposure to Risky Derivatives

The Bond Funds invested heavily in risky subprime derivatives.  (FOF ¶¶ 81-94.)  The

evidence at trial confirmed the novelty and high risk of both TRS on the Lehman Brothers

Floating-Rate ABS Home Equity AAA and AA Indices, which were created in 2005, and the

ABX Index, which was created in 2006.  By June 2007, the Bond Funds held $1.7 billion in TRS

and nearly $150 million in ABX.  (DX 862; PX 823; PX 824.)  These instruments lacked

historical data needed to create reliable risk modeling.  (Tr. 78-79, 81, 91 Blume.)  Indeed, the

market for subprime mortgages itself was small until the late 1990s and had grown during a

period of rising housing prices.  (Tr. 69, 72, 75 Blume; PX 18, Exs. 1, 2.)

Although State Street claimed that "it was the AAA and AA bonds that . . . were

responsible for almost all of the losses in the funds" (Tr. 31 Opening; *see also* Tr. 51 Opening),

subprime derivatives – not bonds – caused the bulk of the losses in the Bond Funds.  State

Street's own attribution analysis for the GCBF's losses in July 2007 showed that the TRS accounted for 45.5% of subprime losses, ABX for 23.5%, and cash bonds for the remaining 31%. (DX 846; Tr. 837-38 Reigel.)  TRS accounted for 38% of the IBF's subprime losses in July 2007, ABX for 22%, and cash bonds for the remaining 40%.  (DX 846; Tr. 838-39 Reigel.)

State Street made the misleading assertion that "almost 91 percent of the [Bond Funds'] portfolios . . . [was] in AAA and AA rated securities, rated by independent agencies."  (Tr. 27 Opening; *see also* Tr. 36 Opening (92%).)  These percentages treated derivatives like rated instruments.  But the evidence showed that the subprime derivatives were not rated by "independent rating agencies"; only their reference assets were.  (Tr. 79-80 Blume; Tr. 848 Reigel.)  The ABX Index was several steps removed from reference assets since it was a derivative based on CDS.  (Tr. 80-81 Blume.)  The TRS were subject to additional risk because they were issued by a Lehman Brothers affiliate that had only an A-minus rating.  (Tr. 79-80 Blume.)  Applying ratings to TRS and ABX mischaracterizes the facts and understates the risks of those investments.  The credit rating data presented by State Street are further skewed because they include unrated futures and interest rate swaps.  (Tr. 847-48 Reigel; PX 823.)  An analysis by State Street's expert based on market values showed that AAA and AA-rated positions represented 65-70% of the Bond Funds' holdings as of June 30, 2007.  (Tr. 1101-02 Carron.)

Flannery maintained that "a AAA rated subprime security is viewed by the ratings agency who assigned that rating to it as having the same risk as a corporate bond."  (Tr. 668 Flannery.)  However, the ratings refer only to credit risk.  When all types of risk are considered, even Carron conceded that subprime ABS had a "higher risk" than other comparably rated ABS.

(Tr. 1096-97, 1199.)  That is consistent with the view of State Street managers that any subprime rated less than AAA was equivalent to a "distressed" security.  (FOF ¶ 92.)

At trial, State Street tried to recast the Bond Funds' investment strategy by repeatedly asserting that they held derivatives that were "hedges against the subprime."  (Tr. 40 Opening; *see* Tr. 29 Opening.)  That contention was a surprise since neither State Street's Proposed Findings of Fact nor its Pre-Trial Memorandum hinted at a hedging strategy.  The evidence at trial belied State Street's hedging assertion:

- Because home equity ABS are floating-rate instruments, they have virtually no interest rate risk.  (Tr. 832 Reigel.)  By contrast, interest rate swaps protect against interest rate movements.  (Tr. 832-33 Reigel.)  They were not a meaningful "hedge against subprime."  (Tr. 188-89, 170 Blume.)

- A State Street summary showed that, for July 2007, all the purported "hedge" trades accounted for only 9 bps of gains in the GCBF, compared to 470 bps of subprime losses, and 7 bps of gain for the IBF, compared to 467 bps of subprime losses.  (DX 846; Tr. 840 Reigel.)  The "hedges" were inconsequential.

- The senior portfolio manager for "Interest Rate Strategies," who formulated the swap trades, did not describe them as a hedge against subprime.  (DX 556; Tr. 833 Reigel.)  One portfolio manager disagreed that they were a "hedge for the subprime exposure."  (Tr. 835 (Kinney: "that's too narrow a view").)

- The interest rate swaps had very high notional amounts but disproportionately low risk.  For example, $440 million of notional amount of interest rate swaps had an expected shortfall of 3 bps.  (DX 653; Tr. 826-27 Reigel.)  By contrast, $79 million of AA ABX positions had an expected shortfall more than ten times that amount (DX 653; Tr. 827 Reigel), and $46 million of BBB ABX had an expected shortfall about 600 times higher (DX 653; Tr. 828 Reigel).  The interest rate swap trades were sufficiently immaterial that State Street omitted them from internal summaries of the LDBF's holdings.  (PX 612; Tr. 829 Reigel.)

- Straightforward ways to hedge against the Bond Funds' subprime exposures were available.  (Tr. 841 Reigel.)  In July 2007, a handful of State Street bond funds belatedly placed a few trades shorting ABX Indices.  (PX 477.)  The Bond Funds and the LDBF did not do so.  (*Id.*)

14

### 4.    Non-Diversified Risk

State Street concentrated the Bond Funds' investments in subprime securities.  (FOF ¶¶ 95-106.)  By the end of May 2007, 96% of the GCBF's ABS exposure and 99% of the IBF's ABS exposure were in subprime ABS, even though home equity ABS constituted just 39% of the Lehman Brothers Floating Rate ABS Index.  (PX 18, Ex. 15; Tr. 96-97 Blume.)  State Street's ABS investments for its own account were diversified among sectors, and in 2006 and early 2007 State Street Bank reduced its subprime holdings.  (PX 687; Tr. 679-82 Flannery.)

State Street asserted that there was geographical diversification in the home equity collateral in subprime bonds.  (Tr. 1133 Carron.)  However, geographical diversity does not protect investors from the effects of a broad decline in housing prices.  (Tr. 71-74 Blume.)  Moreover, California alone accounted for about 25% of the home equity collateral in the LDBF, and four states accounted for half of that collateral.  (Tr. 1216 Carron.)  Even though State Street internally had expressed concern about home equity loans in California, Florida, and the Rust Belt, those states accounted for half of all mortgages underlying the subprime instruments in the LDBF.  (Tr. 1216-17 Carron; Tr. 692 Flannery.)

Section 404(a)(1)(C) requires an investment manager to diversify investments "so as to minimize the risk of large losses."  (COL ¶¶ 29-39.)  State Street did not minimize the palpable risk of loss created by the Bond Funds' enormous subprime concentrations.

### 5.    Increasing Risk Through Leverage

State Street compounded the subprime exposures of the Bond Funds through leverage. (FOF ¶¶ 107-12.)  The use of substantial leverage as part of the Bond Funds' investment strategy beginning in 2006 and increasing in 2007 is undisputed.  (PX 18, Ex. 27.)  While some of this

leverage resulted from swaps that added little risk, substantial leverage resulted from subprime

derivatives, which increased risk materially.  (Tr. 87-88 Blume.)  State Street's October 2006

Derivatives Policy stated that "[u]nless leverage is also permitted by the Governing Documents,

derivative securities may not be used to leverage an account."  (PX 816.)  Because the Bond

Funds' declarations did not authorize leverage, their use of leverage violated the Derivatives

Policy.  (PX 816; Tr. 879-80, 898 Reigel.)   No State Street witness testified otherwise.

### 6.    Liquidity Risk

Many of the Bond Funds' subprime investments were highly illiquid.  (FOF ¶¶ 113-16.)

For example, the TRS were based on an index that was repriced only weekly and were with a

single counterparty – both of which indicated a lack of liquidity.  (Tr. 78-79 Blume; Tr. 1024

Armstrong.)  The secondary markets for home equity ABS periodically experienced periods of

illiquidity that severely reduced the prices of subprime cash bonds.  (Tr. 97-98 Blume; PX 22.)

While ratings assessed credit risk, they did not address this liquidity risk.  (Tr. 84 Blume.)  State

Street ignored this risk.  (*See* PX 531 ("Liquidity risk has traditionally received the least focus");

FOF ¶ 114.)

### D.    State Street Persisted in the Face of Known Dangers.

In 2007, State Street pursued an imprudent investment strategy for the Bond Funds after

repeated warning signs of the risks to investors created by that strategy.  (FOF ¶¶ 117-43.)  The

red flags came from multiple sources, including:

- Macroeconomic trends like falling home prices, rising interest rates, and rising foreclosures and delinquencies.  (PX 143; PX 178.)

- Warnings that underwriting and credit standards for subprime loans had deteriorated.  (Tr. 69-71 Blume.)

- Warnings from State Street's Risk Management unit about the "adverse risk/return relationship" in subprime instruments, and the knowledge that this unit took the "position to reduce subprime exposure prior to and throughout the market crisis" and "raised repeatedly" the issue of "[t]oo much undiversified risk" in the LDBF.  (PX 659; Tr. 1006-07 Armstrong; PX 525; Tr. 1017-18 Armstrong.)

- Warnings to Flannery, the CIO, from the head of Credit Policy, Dan Stachel, about "disturbing trends in collateral" and the housing market being "in a bubble and very vulnerable."  (Tr. 648-51 Flannery.)

- Warnings from State Street's Cash Desk about the deterioration in the quality of subprime securities.  (Tr. 704-06 Flannery.)

- Warnings from State Street's Asset Liability Committee about "deterioration in underwriting standards" in home equity ABS.  (PX 687; Tr. 679-82 Flannery.)

The turbulence in the subprime market in February 2007 should have made State Street acutely aware of the risks of "extreme market volatility" and "extreme illiquidity in the market." (PX 171; *see* FOF ¶¶ 125-43.)  The impact on the BBB ABX was particularly pronounced, with implied spreads over LIBOR ballooning from 278 bps in early January to 958 bps in late February (PX 121; Tr. 661-63 Flannery) – far higher than spreads for distressed or junk bonds (PX 121; Tr. 663-64 Flannery).[6]  AAA and AA subprime instruments also experienced significant volatility, reflecting systemic risk in the subprime sector.  (PX 18, Ex. 8B; Tr. 82-83 Blume.)  State Street observed these effects of the February turbulence "at the higher end of the capital structure in March" (PX 121), where spreads increased by 50% or more (Tr. 665-66 Flannery).  (Carron asserted that spreads on AAA and AA home equity ABS were "relatively

---

[6]   The ABX Indices "added a great deal of visibility to trends in market opinion regarding home equity ABS."  (Tr. 1205-06 Carron.)

stable," but that was based on a highly misleading chart with data through December 2007 and a scale up to 1,000 bps.  (Tr. 1202-04.))

A few years earlier, a "volatile market" had caused a State Street fund to adopt temporarily "a more neutral or passive style."  (DX 147.)  But Reigel flatly rejected that notion as "not doing your job" (Tr. 896), even though it would have controlled risk (Tr. 877).  She testified that, even after "an unprecedented period of volatility and disruption in the subprime home market that had happened in February" (Tr. 875), and even after risk metrics had skyrocketed (Tr. 871), the IBF increased its subprime holdings from $1.4 billion at the end of March 2007 to $1.8 billion at the end of June 2007.  (PX 318; PX 319; Tr. 874-75 Reigel.)

In April 2007, Flannery told the Bank's CFO that State Street would be "wrestling with mortgage-related issues for some time," that "risk levels" were "elevated," and that fixed income funds "may take some bruises along the way."  (PX 697; Tr. 676-77 Flannery.)  Yet the heightened risk to investors and the prospect of "bruises" had no impact on State Street's unwavering commitment to subprime.  Even though market movements demonstrated those risks, Reigel captured State Street's mentality when she testified that "the pricing of a lot of these securities we didn't think properly reflected the fundamentals of the securities."  (Tr. 844.)  As Gianatasio wrote in late July 2007, "we believe that current pricing at all rating levels is overstating the level of risk embedded in the underlying securities."  (PX 509.)  When an investment manager's strategy is losing tens of millions of dollars of plan assets, it is imprudent to decide that the markets have mispriced securities.  (COL ¶¶ 14-18.)

Because the fixed income group did not have a "toolbox" of trades to run an active fund (PX 589), portfolio managers had no meaningful alternatives to subprime even in the face of

these warnings.  When asked what State Street's "Plan B" was if investing in subprime was

"Plan A," Flannery testified that he did not know what the portfolio managers would have done

as an alternative.  (Tr. 683-84.)  There was no Plan B, so in 2007 State Street "doubled-down" on

its subprime bets.  (FOF ¶¶ 79, 105, 106, 136; PX 594.)

  **E.**  **State Street's Management of the Bond Funds Violated Its Written Risk Control Policies.**

  There was substantial evidence – including contemporaneous admissions – that State

Street violated several of its risk policies in 2007 in making investments for the Bond Funds.

(FOF ¶¶ 144-71.)  At trial, State Street attempted to rewrite much of this inculpatory history.

  For example, State Street asserted that there were only "two or three instances" of hard

stops being exceeded before the end of July 2007, that violations of its hard stop policy were

limited to the ABX BBB trade, and that "senior management" had asserted control over that

trade.  (Tr. 959-60, 942 Armstrong.)  However, the evidence showed that the ABX BBB

exceeded hard stops on multiple occasions, that $650 million in ABX AA and BBB positions

moved through hard stops in early July 2007, and that TRS and other subprime positions moved

through hard stops in July 2007.  (Tr. 981-82, 992-94 Armstrong; PX 188; Tr. 837-38 Reigel.)

Even after the ABX AA and BBB positions passed through hard stops in early July, the portfolio

manager for the LDBF and the IBF retained his discretion over those trades (PX 188; PX 155;

PX 263) – a clear violation of policy.  (Tr. 997 Armstrong.)  After additional hard stops were hit

in late July 2007, the decision on the ABX was made not by "senior management" but by Greff,

acting alone.  (PX 358; Tr. 861 Reigel.)[7]  Management determinations were never "documented and file[d]," as the policy required.  (PX 704.)  A recorded conversation between Wands and Armstrong from July 2007 reinforces that senior managers had not met.  (PX 595.)

Even though State Street documented violations of its trade template policy, Armstrong claimed that he was mistaken in believing there were violations because the ABX was not a "global" trade.  The template on its face applied to trades made in the Boston office only, and in any event the ABX trade had been made in both London and Boston.  (PX 201; Tr. 974-76 Armstrong.)  While the trade template was aimed in part at "front trading" (Tr. 947 Armstrong), it also ensured that senior management and the risk team knew about trades and that there was a disciplined approach to trades, including as to stop losses.  (Tr. 978-79; PX 122.)  Although Armstrong sent emails in June and July 2007 trying to find out what stop losses were, he now claims those were "rhetorical" questions.  (Tr. 989, 991.)  Even after policy violations were documented, portfolio managers failed to circulate required templates.  (Tr. 995-96 Armstrong.)

The Bond Funds exceeded their risk budgets consistently in 2007, at times consuming double their budgets.  (PX 16, Ex. 7; Tr. 398 Culp ("persistent systematic violations").)  State Street pointed to an apparent decrease in risk budget consumption between March and June 2007, but that reflected decisions to increase the risk budgets of the LDBF and the Bond Funds.  (Tr. 391-93, 514-15 Culp.)  State Street noted that certain positions consumed large portions of the risk budget, but that is no excuse.  (Tr. 507 Culp.)  State Street also pointed to a conservative

---

[7]    Although Greff decided on July 24 that ABX positions should be sold (PX 253), the LDBF continued to hold them.  They became part of the Bond Funds' holdings in August 2007, resulting in "indefensible" additional losses.  (PX 253; PX 857; Tr. 862-66 Reigel.)

"correlation of 1" assumption (Tr. 776-77 Armstrong), although that assumption is customary (Tr. 181 Blume).  Numerous other assumptions embedded in its risk calculations were anything but conservative, such as an assumption that a limited time series of subprime trades was representative.  (Tr. 78-79 Blume; Tr. 870-71 Reigel.)

### F.    State Street's Disclosures Obscured Risks to Investors.

State Street's periodic reports to PRIAC were misleading in several critical respects, including their failure to disclose that (1) the Bond Funds' "ABS" holdings were almost entirely in subprime and (2) the Bond Funds' investment strategy used extensive leverage, including in subprime holdings.  (FOF ¶¶ 172-81.)  At trial, State Street witnesses conceded that its practice of "normalizing" sector weights to add up to 100% was "skewing the actual weights" (Tr. 880 Reigel) and "indefensible" (Tr. 969-70 Armstrong).  State Street suggested that it had conveyed the key facts, for instance through a passing reference to "financing opportunities" (Tr. 1105 Carron), but none of those communications conveyed the size or nature of the subprime exposures.

### G.    State Street's Admissions Reinforce Its Imprudence.

State Street tried to dismiss its "damning phone calls" and other admissions as "hindsight" and "finger-pointing" by people "outside" the fixed income group.  (Tr. 28 Opening.)   The admissions that PRIAC presented at trial are highly credible.  (*E.g.*, FOF ¶¶ 52, 83-84, 94, 99, 105-06, 140-41, 185, 190.)  They are statements by State Street employees who participated in the events they described (Armstrong, Tenczar, Kramer), who supervised the Bond Funds (Greff, Wands), or who otherwise were knowledgeable about State Street's

investment strategy (Meier, Kelly). The admissions were candid, reflect an understanding of what was going on, were made close in time to the event and often refer back in time.

### H.     State Street's Process-Based Defense Is Flawed.

State Street asserted in pretrial submissions that its prudence under ERISA would be established by its sound processes. Nothing about its processes justifies the unduly risky investment strategy of the Bond Funds. In any event, the evidence at trial reinforced that State Street's "processes" had severe shortcomings.

State Street pointed to its credit analysis process but (i) in many instances there was no record of any credit analysis, (ii) the independent Credit Research Group did not conduct credit analyses for the Bond Funds, and (iii) the credit analysis by its nature did not address liquidity and other risks. (Tr. 1218 Carron; Tr. 703-08 Flannery; Tr. 1023-24 Armstrong.) State Street pointed to its risk management process, but the evidence showed that (i) there were multiple violations of risk management policies and (ii) portfolio managers routinely ignored the warnings of risk management. (Tr. 719-22, 725-26 Flannery; Tr. 1018-21 Armstrong.) State Street pointed to purported "state of the art" technology systems, but the evidence showed that those who had to use those systems saw serious deficiencies in them. (Tr. 868-70 Reigel; PX 247; PX 262; PX 388; PX 464; PX 465; PX 689.)

## II.    The Plans' Losses Resulted from State Street's Breaches of Its Fiduciary Obligations to the Plans.

Section 409(a) requires State Street to make good to the Plans "any losses . . . resulting from" its breaches. State Street's breaches created risks in the Bond Funds that were vastly

disproportionate to an enhanced index fund,[8] and its subprime-dominated strategy caused

substantial losses to the Plans – both in absolute loss of value and in comparison to other

enhanced index funds with the same benchmarks.[9]  As this Court observed in its ruling on

summary judgment:  "Certainly State Street's conduct in managing the Bond Funds (if indeed

culpable) was a 'substantial factor' in bringing about the situation in which the Bond Funds'

losses occurred . . . ."  *In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 772 F.

Supp. 2d 519, 545 (S.D.N.Y. 2011).

State Street asserts that the losses in the Bond Funds resulted from an "unprecedented

liquidity crisis" (Tr. 37 Opening) during which the subprime "market seized up at the end of July

and into August."  (Tr. 51 Opening).  However, since State Street's imprudent investment

strategy led to the Plans' losses, those losses "result[ed] from" the breach.

Moreover, market turbulence and liquidity risk are among the risks to which State Street

imprudently exposed investors.  State Street was aware that the subprime market had exhibited

severe illiquidity in February 2007, with bid/ask spreads for the BBB ABX widening from

12.5 cents to $8.  (Tr. 660-61 Flannery.)  By holding relatively illiquid positions like nearly $2

billion of TRS, the Bond Funds were deeply exposed to the risk of illiquidity.  (Tr. 96-98

Blume.)  Armstrong acknowledged that risk and State Street's imprudence when he wrote,

---

[8]   If the Bond Funds had been managed in a way to adhere to a maximum standard deviation
of tracking error of 75 bps, tracking error for each Bond Fund for June through August
would have been limited to 37.5 bps.  (Tr. 103-04 Blume.)

[9]   The two enhanced index bond funds with the same benchmarks as the Bond Funds each had
off-index exposures, but each closely adhered to its benchmark in 2007.  (Tr. 451-52
Fischel.)  Indeed, compared to several other enhanced index bond funds, the Bond Funds'
performance was an outlier.  (Tr. 1227-28 Carron.)

"Liquidity risk has traditionally received the least focus," yet only belatedly did he advise that "[l]iquidity [r]isk should be monitored."  (PX 531.)[10]

In addition, what State Street calls a "liquidity crisis" was not an absence of willing buyers, but a drop in the prices at which they would buy – the market risk to which State Street's imprudence exposed the Plans.  For example, portfolio managers for the Bond Funds found willing buyers for all tranches of ABX positions throughout July and August 2007.  (Tr. 863-65 Reigel; PX 857.)  State Street decided to retain the Bond Funds' subprime positions as market prices declined *not* because of the absence of willing buyers, but because it had no "Plan B" and it adhered to the misguided belief that those prices were below the "fundamental" value of the subprime positions.  (Tr. 844-45 Reigel; PX 509.)

Even now, State Street maintains that its conduct did not *really* injure investors because AAA and AA subprime cash bonds "were not downgraded at the time of the losses" (Tr. 37 Opening) or "as of the end of 2009" (Tr. 1158-59 Carron).  It follows, according to State Street, that the Plans' losses "were not realized losses on the underlying securities."  (Tr. 1158 Carron.)  Even if true, that would not affect the causation of the Plans' losses when they redeemed their interests in the Bond Funds at the end of August 2007.  In addition, the suggestion that the market for subprime securities would eventually have turned around could hardly be more wrong.  The largest subprime bond holdings in the Bond Funds have been downgraded, with some having defaulted and most in "substantial risk" of default.  (Tr. 1208-10 Carron.)  That

---

[10]   While these notes were memorialized in September 2007, they reflect Armstrong's "thinking" during the "past few months."  (PX 531; Tr. 1022-23 Armstrong.)

market continued to decline – years after the purported "liquidity event."  (Tr. 104 Blume; PX 18, Ex. 32.)

### III.     PRIAC Is Entitled to Recover $76,733,879 Under Section 409 for the Plans' Losses.

####    A.     Professor Fischel Properly Calculated the Losses to the Plans.

In developing the standards for deciding the amount of losses that plans can recover under Section 409(a) for investment managers' violations of Section 404(a), the Second Circuit has been guided by several principles:

- "[T]he ultimate goal of ERISA § 409(a) is 'the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust.'"  *Chao v. Merino*, 452 F.3d 174, 185 (2d Cir. 2006) (quoting *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985)).

- When a plan has established a violation of ERISA, "uncertainties in fixing damages will be resolved against the wrongdoer."  *Bierwirth*, 754 F.2d at 1056.

- In looking to the common law of trusts to develop ERISA law, the courts should consider "the nature of modern employee benefit plans."  *Id.* at 1055.

Applying these principles, the Second Circuit has prescribed a straightforward way to measure such a loss.  It calls for the calculation of two amounts:  (1) "what the Plan actually earned" and (2) "what the Plan would have earned had the funds been available for other Plan purposes," *Bierwirth*, 754 F.2d at 1056, and in determining the latter courts "should presume that, but for the breach, the funds would have been invested in the most profitable of the alternatives and that the errant fiduciary bears the burden of proving that the fund would have earned less than this amount."  *Dardaganis v. Grace Capital Inc.*, 889 F.2d 1237, 1244 (2d Cir. 1989).  The difference between the two amounts represents the plan's loss.  (*See* COL ¶¶ 57-60.)

In *Dardaganis*, the Court of Appeals applied these principles in rejecting an investment manager's contention that to prove its losses, a plan had to present evidence about individual investment decisions and their impact on the plan.  It explained that *Bierwirth* does not "require inquiries into specific investment decisions," 889 F.2d at 1244, and that where

> the breach arises from a pattern of investment rather than from investment in a particular stock, courts will rarely be able to determine, with any degree of certainty, which stock the investment manager would have sold or declined to buy had he complied with investment guidelines.

*Id.*  As in *Dardaganis*, State Street's violations of ERISA "arise[] from a pattern of investment rather than from investment in a particular stock."  *Id.*

Fischel presented calculations of the two amounts called for:  (1) what each Plan obtained from its investment in the Bond Funds, and (2) what it would have earned from June 1, 2007 on if its interest in the Bond Funds had been invested in an enhanced index bond fund with the same benchmark.  (Tr. 446-47, 451-52 Fischel.)  The difference between the two amounts is $76,733,879.  (Tr. 454 Fischel.)  That is the Plans' losses.

State Street did not present an alternative calculation consistent with Second Circuit law. Instead, Carron testified about the purported "gain or loss" (Tr. 1180) that is meaningless under ERISA:

- Carron's calculation of losses started on January 3, 2005, when CIGNA's retirement business became PRIAC, although there was no logical basis for using that date.  (Tr. 1228-29 Carron.)[11]

- Carron offset against losses incurred in the summer of 2007 gains in the Bond Funds before State Street's violations of ERISA, dating back to 2005, in violation

---

[11]   If Fischel had used an inception date earlier than June 1, 2007, that would have resulted in no change in the losses.  (Pl.'s Demos. 9-10.)

26

of the long-standing "anti-netting" rule in trust law, Restatement (Third) of Trusts § 213 – not the first time Carron ignored that rule.  *See Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, No. CV964036CASJGX, 1999 WL 1457226, at *14-15 (C.D. Cal. Mar. 26, 1999) (overruled on other grounds).

- Carron did not assume any alternative investment of the Plans' funds from 2005 to 2007.  (Tr. 1229 Carron.)  He essentially assumed that the Plans' alternative was to stuff retirement plan assets under a mattress for 2 ½ years.  "This argument ignores our opinion in *Donovan v. Bierwirth*."  *Dardaganis*, 889 F.2d at 1243.

## B.    PRIAC Did Not Have to Prove Losses from Specific Investment Decisions.

In its Rule 52(c) motion, State Street argues that PRIAC was required to prove damages in a different way.  It asserts that, since PRIAC does not contend that every investment in subprime by the Bond Funds was imprudent, it was obligated to prove that *specific* investment decisions by State Street to buy or hold *specific* subprime securities were improper, and to present an "[a]ttribution of losses resulting from particular holdings" that reflect the imprudent investment decisions.  State Street's Updated Mem. of Law in Supp. of Mot. Under Rule 52(c) for J. on Partial Findings ("State Street Mem.") at 15.  State Street relies on a comment to Section 205 of the Restatement (Second) of Trusts and *California Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036 (9th Cir. 2001).

State Street's position is inconsistent with the law of this Circuit.  Because PRIAC's claim "arises from a pattern of investment rather than from investment in a particular [security]," the rule set forth in *Bierwirth* and *Dardaganis* applies.  *Dardaganis*, 889 F.2d at 1244.  State Street's contrary argument flies in the face of the principles underlying the Second Circuit's approach to Section 409(a) losses as well as its concerns about the quagmire of speculative inquiries into specific investment decisions.  Requiring PRIAC to prove this case on an investment-by-investment basis would be even more impractical in light of the nature of

27

employee benefit plans' investments, and more likely to thwart recovery of plan losses from ERISA violations, than in *Dardaganis*. State Street made thousands of investment decisions for the Bond Funds. Demanding individualized proof in cases like this would significantly undermine the utility of the Section 409(a) remedy of restoring plans' losses. That result would be contrary to the spirit as well as the letter of the rules prescribed in *Bierwirth* and *Dardagani*s.

State Street's argument misapplies the common law of trusts. The applicable rule governing a claim like PRIAC's is set forth in Section 227(a) of the Restatement (Third) of Trusts: the prudence standard "is to be applied to investments not in isolation but in the context of the trust portfolio and as a part of an overall investment strategy, which should incorporate risk and return objectives reasonably suitable to the trust." Thus, in *Liss v. Smith*, 991 F. Supp. 278, 295 (S.D.N.Y. 1998), the court held that a comparison of a pension fund's overall performance to that of other Taft-Hartley plans stated "a prime facie case of loss" since "the allegations of fiduciary breaches relate to the overall investment strategy of the Funds (or the lack thereof) as opposed to the wisdom of a single transaction or investment."[12] The testimony of both parties' experts is in accord. (Tr. 148-49 Blume ("I would have to look at the entire portfolio"); Tr. 1215-16 Carron ("There are many things that potentially could cause tracking error. It all has to be looked at on a portfolio basis.").) Where, as here, a pattern of ERISA violations is alleged on a portfolio-wide basis, plans' losses "resulting from" that portfolio-wide breach of Section 404 are properly determined on the basis of the full portfolio as well.

---

[12]   *See also, e.g.*, *In re Unisys Sav. Plan Lit.*, No. 91-3067, 1997 WL 732473, at *30 (E.D. Pa. Nov. 24, 1997) ("The proper inquiry into whether any harm has been suffered by participants looks to the performance of the portfolio in the aggregate . . . and *not* to the performance of the individual contracts.").

A comment to Section 205 of the Second Restatement reflects an exception to this general rule of a trust beneficiary's losses that applies where "a breach of trust consists *only* in investing too large an amount in a single security or type of security."  § 205 cmt. f (emphasis added).  This is not remotely a case where the breach consists only in investing too much in a single type of security.  Rather, State Street's multiple breaches of its fiduciary duties as investment manager include deciding to expose the Bond Funds to excessive risks that were inappropriate for an enhanced index fund, seeking more risk and emphasizing subprime to advance its own business interests, making enormous bets on a broad array of subprime securities including novel and risky derivatives, investing in relatively illiquid securities, failing to diversify the portfolio, leveraging the subprime investments, proceeding in the face of known dangers, and violating internal risk control policies.  State Street's ERISA violations were not only a *pattern* of improper investment management, but a complex and multi-layer pattern.

### C.     Prejudgment Interest

The appropriate measure for prejudgment interest is based on an estimate of State Street's unsecured borrowing rate (Tr. 456-57 Fischel), resulting in interest through September 30, 2011 totaling $3,019,041.  (Tr. 457-58 Fischel; *see* COL ¶¶ 64-66.)  This amount should be updated before the entry of judgment.

### D.     Credit for Fair Fund Payments

The parties agree that State Street is entitled to a credit against the Plans' losses based on the *non-penalty portion* of the its payment for the benefit of the Plans from the Fair Fund established as part of an SEC settlement.  PRIAC's calculation of that amount is more appropriate since it recognizes that State Street's payment for the benefit of the Plans came from

the Fair Fund, not from its pre-SEC settlement payments to resolve claims by other investors.

(FOF ¶ 201.)  Those earlier payments have nothing to do with the Plans.  The settlement

payments were included in the $663 million overall figure cited in an SEC press release (PX

811), and State Street improperly used the overall figure in calculating the credit.  (State Street

FOF ¶ 157.)  The Court should reject that approach.[13]  The proper credit is $44,174,509,

resulting in a net amount of $76,733,879 + $3,019,041 − $44,174,509 = $35,578,411.

### Conclusion

The Court should determine that State Street violated Section 404 of ERISA and is liable

to the Plans for losses of $35,578,411, including interest through September 30, 2011.

Dated: New York, New York
　　　 November 18, 2011

　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　DEBEVOISE & PLIMPTON LLP

*Of Counsel:*　　　　　　　　　　　By: /s/ Edwin G. Schallert
　Steven Klugman　　　　　　　　　　Edwin G. Schallert
　Jeremy N. Klatell　　　　　　　　919 Third Avenue
　Courtney M. Dankworth　　　　　New York, New York 10022
　Kerith D. Knechtel　　　　　　　(212) 909-6000
　Miranda H. Turner　　　　　　　egschall@debevoise.com

　　　　　　　　　　　　　　　*Attorneys for Plaintiff and Third-Party*
　　　　　　　　　　　　　　　*Defendant Prudential Retirement*
　　　　　　　　　　　　　　　*Insurance and Annuity Company*

---

[13]　To the extent there is any doubt about the proper way to calculate the credit, it should be
resolved against State Street.  *See Bierwirth*, 754 F.2d at 1056.

30