UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
PRUDENTIAL RETIREMENT INSURANCE    :
AND ANNUITY COMPANY,               :
                                   :
        Plaintiff and Third-Party Defendant, :       07 Civ. 8488 (PAC)
                                   :                 **ECF Case**
            vs.                    :
                                   :
STATE STREET BANK AND TRUST        :
COMPANY,                           :
                                   :
        Defendant and Third-Party Plaintiff. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## PRIAC'S MEMORANDUM OF LAW IN SUPPORT
## OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Edwin G. Schallert
Steven Klugman
Jeremy N. Klatell
Kerith Knechtel
Katherine Kern
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Attorneys for Plaintiff and Third-Party
Defendant Prudential Retirement
Insurance and Annuity Company*

Dated: New York, New York
      May 7, 2012

# TABLE OF CONTENTS

Page

Summary of Argument ...................................................................................................1

Statement of the Case...................................................................................................2

    A.    The ERISA Decision................................................................................2

           1.    The Bond Funds...............................................................................3

           2.    State Street's Violations of ERISA .................................................3

           3.    Damages Caused by State Street's Violations ........................................5

    B.    State Street's Claims ................................................................................5

    C.    Undisputed Facts .....................................................................................6

           1.    PRIAC's Reporting to the Plans .....................................................6

           2.    Information Provided to PRIAC Through June 2007 ................................6

           3.    Information Provided to PRIAC in July and August 2007 ...................................7

           4.    Actions Taken by PRIAC in August 2007................................................8

            5.    Information Not Provided to PRIAC in July and August 2007 ............................9

           6.    Name of the Intermediate Bond Fund.............................................10

Argument ..................................................................................................................10

I.    The Findings and Conclusions in the ERISA Decision Justify a Successive Summary Judgment Motion........................................................................................10

II.    The ERISA Decision Precludes State Street from Prevailing on Its ERISA Contribution Claim. ..............................................................................................11

    A.    State Street Must Show That PRIAC Is Jointly Liable to the Plans  for the Same ERISA Violations for Which State Street Is Liable.........................................12

           1.    Contribution under *Chemung*..................................................12

           2.    Scope of Common-Law Contribution under Section 258......................12

            3.    Authorities Cited in *Chemung* ..............................................13

i

　　　　4.　　Scope of Contribution under Other Authorities..........................................14

　　　　5.　　Contribution in ERISA Cases ...............................................................14

　　B.　PRIAC Cannot Be Liable for State Street's  ERISA Violations as Determined by the Court...........................................................................................................15

　　　　1.　　State Street's Violations.....................................................................16

　　　　2.　　PRIAC's Alleged Violations..................................................................16

　　　　3.　　No Joint Liability .............................................................................16

　　C.　As a Matter of Law, State Street Was Substantially More at Fault. ..............................18

III.　State Street Cannot Prevail on Its Defamation Claim Because PRIAC's Statements Were Substantially True...............................................................................................20

　　A.　Six Allegedly Defamatory Statements Are at Issue. .....................................................20

　　B.　A Defamatory Statement Is Not Actionable If It Is Substantially True. ........................21

　　C.　The PRIAC Statements Were Substantially True. .........................................................22

　　D.　PRIAC Cannot Be Liable for True Statements. ............................................................24

Conclusion ...................................................................................................................25

<u>**TABLE OF AUTHORITIES**</u>

CASES

*Arnold v. Flook*,
  No. 06-00356, 2010 Mass. Super. LEXIS 112 (Mass. Super. Jan. 29, 2010) ........................21

*Astra USA, Inc. v. Bildman*,
  914 N.E.2d 36 (Mass. 2009), *cert. denied*, 130 S.Ct. 3276 (2010)....................................24, 25

*Boyle v. Cape Cod Times*,
  No. BACV2006-00760-A, 2009 Mass. Super. LEXIS 418 (Mass. Super. Nov. 9,
  2009), *aff'd*, 959 N.E.2d 457 (Mass. App. Ct. 2012)............................................................21

*Chemung Canal Trust Co. v. Sovran Bank/Md.*,
  939 F.2d 12 (2d Cir. 1991)..............................................................................12, 13, 16, 18, 19

*In re Citigroup ERISA Litig.*,
  662 F.3d 128 (2d Cir. 2011)..............................................................................................17

*Daniels v. Thomas & Betts Corp.*,
  263 F.3d 66 (3d Cir. 2001).................................................................................................17

*In re Estate of Chrisman*,
  746 S.W.2d 131 (Mo. Ct. App. 1988).................................................................................14

*Free v. Briody*,
  732 F.2d 1331 (7th Cir. 1984) ...........................................................................................19

*Friedman v. Boston Broadcasters, Inc.*,
  522 N.E.2d 959 (Mass. 1988).............................................................................................24

*Gbur v. Cohen et al.*,
  155 Cal. Rptr. 507 (Cal. Ct. App. 1979) ...........................................................................14

*Gillespie v. Seymour*,
  823 P.2d 782 (Kan. 1991)..................................................................................................14

*Global Relief Foundation v. New York Times Co.*,
  390 F.3d 973 (7th Cir. 2004) ...........................................................................................23

*Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*,
  122 F. Supp. 2d 444 (S.D.N.Y. 2000),
  *rev'd in part on other grounds*, 302 F.3d 18 (2d Cir. 2002)......................................................15

*Haynes v. Alfred A. Knopf, Inc.*,
  8 F.3d 1222 (7th Cir. 1993) ..........................................................................................21, 24

*In re Hyde Trust*,
   458 N.W.2d 802 (S.D. 1990) ............................................................................14,19

*LaChance v. Boston Herald*,
   942 N.E.2d 185 (Mass. App. Ct. 2011) .........................................................21, 24

*Marcus v. Otis*,
   168 F.2d 649 (2d Cir. 1948)...............................................................................14

*Masson v. New Yorker Magazine, Inc.*,
   501 U.S. 496 (1991)...........................................................................................21

*In re Masters Mates & Pilots Pension Plan Litig.*,
   957 F.2d 1020 (2d Cir. 1992)..............................................................................12

*In re Mueller*,
   135 N.W.2d 854 (Wis. 1965)..............................................................................15

*Noonan v. Staples, Inc.*,
   556 F.3d 20 (1st Cir. 2009)................................................................................24

*Perry v. Knott*,
   4 Beav. 179 (N.Y. Ch. 1842) .............................................................................13

*Reilly v. Associated Press*,
   797 N.E.2d 1204 (Mass. 2003) ..........................................................................21

*In re Rosenfeld's Estate*,
   40 N.Y.S.2d 114 (N.Y. Surr. Ct. 1943) ............................................................14

*Scalp & Blade, Inc. v. Advest, Inc.*,
   755 N.Y.S.2d 140 (N.Y. App. Div. 2002) .........................................................19

*Shaari v. Harvard Student Agencies, Inc.*,
   691 N.E.2d 925 (Mass. 1998) ............................................................................24

*Sherman v. Parish*,
   53 N.Y. 483 (N.Y. 1873) ...................................................................................13

*Sira v. Morton*,
   380 F.3d 57 (2d Cir. 2004)..................................................................................10

*In re State St. Bank & Trust Co. ERISA Litig.*,
   772 F. Supp. 2d 519 (S.D.N.Y. 2011) ....................................................... *passim*

*In re State St. Bank & Trust Co. ERISA Litig.*,
   2012 U.S. Dist. LEXIS 13556 (S.D.N.Y. Feb. 3, 2012).............................. *passim*

*Steele v. Leopold*,
    135 A.D. 247 (N.Y. App. Div. 1909) ...................................................................14

*Sunderlin v. First Reliance Standard Life Ins. Co.*,
    235 F. Supp. 2d 222 (W.D.N.Y. 2002) ...........................................................14

*U.S. v. Quintieri*,
    306 F.3d 1217 (2d Cir. 2002)...........................................................................11

*Whitford v. Boglino*,
    63 F.3d 527 (7th Cir. 1995) ............................................................................11

**STATUTES**

29 U.S.C. § 1104(a)(1).......................................................................... *passim*

Mass. Gen. Laws ch. 231, § 92 .........................................................................24

**OTHER AUTHORITIES**

Amy Morris Hess, George Gleason Bogert and George Taylor Bogert,
    THE LAW OF TRUSTS AND ESTATES (3d ed. 2009) .................................12, 13, 14, 18

Austin W. Scott, William F. Fratcher and Mark L. Ascher,
    SCOTT & ASCHER ON TRUSTS (5th ed. 2007) ...........................................12, 14, 18

RESTATEMENT (SECOND) OF TRUSTS (1959).....................................12, 13, 14, 15, 17, 18

Robert D. Sack,
    SACK ON DEFAMATION: LIBEL, SLANDER AND RELATED PROBLEMS (3d ed. 2008)................21

Plaintiff and third-party defendant Prudential Retirement Insurance and Annuity Company ("PRIAC") submits this memorandum in support of its motion for partial summary judgment dismissing the contribution and defamation claims brought by defendant and third-party plaintiff State Street Bank and Trust Company ("State Street").

## Summary of Argument

This case arises out of losses suffered by 196 retirement plans from their investments in two bond funds managed by State Street. Both State Street and PRIAC had fiduciary obligations to the plans under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1 *et seq.* ("ERISA"). State Street, which had sole discretion over the investment of assets in the bond funds, has been found to have breached its fiduciary obligations to manage the bond funds prudently and to diversify their holdings. PRIAC, which made the bond funds available to its retirement plan clients, had fiduciary obligations to monitor and report on the bond funds.

State Street repeatedly described its objective in managing each fund as seeking to modestly outperform its benchmark index through a disciplined, risk-controlled approach. However, in 2006 State Street unilaterally changed the investment strategy for the bond funds in ways that materially increased investors' risks, and by June 2007 State Street had exposed the bond funds to massive bets on securities that were tied to subprime mortgages, including novel derivatives. Both bond funds suffered large losses in the summer of 2007.

PRIAC, acting in its capacity as a fiduciary of the retirement plans, sued State Street in October 2007. PRIAC alleged that State Street had violated its ERISA obligations and that those violations had caused the plans to incur losses. State Street in turn alleged that PRIAC had violated an ERISA obligation to make disclosures to the plans about the bond funds, and added claims of defamation based on PRIAC's statements to the plans. After a trial on PRIAC's ERISA claims, Judge Holwell held State Street liable for violating its obligations of prudence

and diversification, causing damages to the plans.  *In re State St. Bank & Trust Co. ERISA Litig.,* 2012 U.S. Dist. LEXIS 13556 (S.D.N.Y. Feb. 3, 2012) (the "ERISA Decision").

No trial of State Street's claims is necessary because the findings and conclusions in the ERISA Decision establish, with additional undisputed facts, that State Street cannot prevail on its contribution and defamation claims for the following reasons:

      1.     State Street cannot show that PRIAC is jointly liable with it for its ERISA violations identified in the ERISA Decision.  In the absence of such joint liability, State Street has no right of contribution against PRIAC under ERISA.

      2.     Even if State Street could establish PRIAC's joint liability for State Street's ERISA violations, it would have no right to contribution because State Street was substantially more at fault than PRIAC for the violations for which it seeks contribution.

      3.     The findings in the ERISA Decision establish the substantial truth of PRIAC's alleged defamation:  that without informing PRIAC, State Street managed the bond funds differently from the way in which it had led PRIAC to believe it would.

### Statement of the Case

This motion is based on (1) the findings of fact in the ERISA Decision, which in large part covered the period through June 30, 2007, and (2) undisputed facts regarding State Street's and PRIAC's conduct in July and August 2007.

**A.**    **The ERISA Decision**

On August 12, 2011, the parties submitted a joint pretrial order with respect to the entire case.  Citing the constraints of its trial calendar, the Court limited the initial trial to PRIAC's ERISA claims.  (Declaration of Jeremy N. Klatell ("Klatell Dec.") ¶ 8.)  That trial lasted for seven days in October 2011.  With some exceptions, the evidence was limited to State Street's management of the bond funds and its communication to PRIAC about the bond funds through

June 2007.  On February 1, 2012, the Court ruled that State Street had violated its duties of prudence and diversification under Sections 404(a)(1)(B) and (C) of ERISA and held State Street liable for $28,143,656.  The Court did not resolve PRIAC's claims for pre-judgment interest and for attorneys' fees under Section 502(g) of ERISA.  ERISA Decision at *144.

### 1.    The Bond Funds

As the manager of the Intermediate Bond Fund and the Government Credit Bond Fund (the "Bond Funds"), State Street "alone held discretion over the management of the Bond Funds' assets." *Id.* at *17.  As an intermediary between State Street and 196 retirement plan clients that invested in the Bond Funds (the "Plans"), PRIAC provided the Plans with information about the Bond Funds. *Id.* at *17, *28.  PRIAC "had no input into State Street's management of the Bond Funds [or its] investment decisions for the Bond Funds." *Id.* at *17.

State Street repeatedly presented the Bond Funds to PRIAC as enhanced index funds – which fall between "passive" or index funds (that attempt to mirror the performance of a "benchmark" index) and actively managed funds. *Id.* at *24.  The performance of each Bond Fund was measured against that of a benchmark Lehman Brothers index consisting of U.S. government and investment-grade corporate securities. *Id.* at *18.  From 1996 until May 2006, the Bond Funds "employed a 'low tracking error,' 'risk controlled strategy,' that sought to 'add value over the index while mirroring its risk profile,' and 'combine the predictable strengths of passive management with the repeatable aspects of active management.'" *Id.* at *101 (internal citations omitted).  The stated goal for each fund was to "modestly outperform" its benchmark, with "minimal additional risk." *Id.* at *29.

### 2.    State Street's Violations of ERISA

In May 2006 State Street doubled the predicted tracking error for the Bond Funds (a measure of risk) and increased their return target by 75%. *Id.* at *34-35.  Thereafter, the risk

metrics used by State Street differed from those of a "low tracking error" enhanced index strategy. *Id.* By pursuing an investment strategy that was much riskier than the investment goals for the Bond Funds, State Street imprudently managed the Bond Funds "to accept risks significantly beyond those of 'an enterprise of a like character and with like aims'" and failed to "give appropriate consideration to the role the Bond Funds were intended to play in the Plans' portfolio," as required by ERISA. *Id.* at *103.

> The Court summarized State Street's violations of ERISA as follows:
>
> State Street breached its fiduciary duties by managing the Bond Funds to accept risks significantly greater than PRIAC reasonably expected; by further disregarding the Bond Funds' established risk budgets, thus exposing the Bond Funds to risks greater than even State Street itself thought it was willing to accept; by concentrating the investments that generated the excess risk in a single asset class, consisting in large part of untested derivatives used to create significant leverage in the portfolios; and by failing adequately to diversify the portfolio to minimize the risk of large losses.

*Id.* at *126-27. The factual findings on which Judge Holwell based his conclusion that PRIAC violated its duty to manage the Bond Funds prudently, as required by ERISA Section 404(a)(1)(B), *id.* at *100-10, included the following:

- The amount of each of the Bond Funds' exposures to subprime securities relative to its net asset value.

- The size and nature of the Bond Funds' exposures to novel, derivative subprime securities, for which State Street could not reliably model the risk.

- The Bond Funds' use of leverage to increase their subprime exposure and risks.

- The view of State Street's portfolio managers for the Bond Funds – the investment decision-makers – that the Bond Funds were not enhanced index funds.

- In 2006 and 2007, the concerns expressed within State Street by senior management about investments in the subprime housing market.

- The increase in June 2007 of the Bond Funds' investment in subprime securities, despite State Street's knowledge of the high degree of risk in such investment.

- State Street's repeated violation of its internal risk policies in connection with the risk to investors in the Bond Funds as calculated by State Street.

*Id.* at \*30, \*34, \*35, \*38, \*45, \*46, \*50-52, \*53, \*55, \*69, \*70, \*77, \*90.

Judge Holwell also held that State Street had failed to diversify the Bond Funds' investments "so as to minimize the risk of large losses," in violation of Section 404(a)(1)(C).  *Id.* at \*116-20.  The Court explained:  "State Street's decision to place a significantly leveraged bet in a single off-index sector, and to increase that bet in the face of known risks about that sector, cannot be said to satisfy State Street's duty to diversify the Bond Funds. . . ."  *Id.* at \*117-18.

### 3.  Damages Caused by State Street's Violations

The Court held that State Street's ERISA violations were the proximate cause of the Plans' investment losses from June 1 to August 31, 2007, when the Bond Funds closed, and caused $76,733,879 in "losses" to the Plans within the meaning of Section 409(a) of ERISA.  *Id.* at \*142.  The Court deducted from those losses $48,590,223, representing a credit for a portion of the payments made by State Street into a victims' "fair fund" as part of its settlement with the SEC, leaving a liability of $28,143,656, exclusive of interest and attorneys' fees.  *Id.* at \*144.

## B.   State Street's Claims

State Street seeks contribution based on its claim that PRIAC violated its disclosure obligations under ERISA by (1) failing to disclose immediately to the Plans information that State Street provided to PRIAC in July and August 2007 about the Bond Funds' subprime exposures and use of leverage, and (2) using "Passive Intermediate Bond Index Securities Lending Series Fund" as the name for the Intermediate Bond Fund.  State Street's Proposed Findings of Fact ("State Street Findings") ¶¶ 100-05, 125-33 and Conclusions of Law ("State Street Conclusions") ¶ 17 [Dkt. #284].  State Street also claims that PRIAC, in its communications with the Plans beginning in August 2007, defamed State Street by accusing it of

misrepresenting the Bond Funds' investments and concealing their investment in subprime. State Street's Pretrial Memorandum of Law [Dkt. #283] ("State Street Mem.") at 38-40.

## C.   Undisputed Facts

The detailed findings and conclusions in the ERISA Decision provide a sufficient basis for summary judgment.  PRIAC sets forth below additional facts, which it believes cannot genuinely be disputed, relating to events and communications about the Bond Funds after June 30, 2007, because (1) those facts provide additional support for PRIAC's motion, and (2) information about those events may assist the Court's understanding of this dispute.[1]

### 1.   PRIAC's Reporting to the Plans

After the end of each calendar quarter, PRIAC assembled information about each Bond Fund's performance and provided that information to the Plans in standardized fact sheets and reports.  These periodic communications focused on longer-term performance because the Funds were offered to retirement plans as buy-and-hold investments.  (Tr. 220-21 Hatfield; Tr. 287-88 Frascona.)  After the end of each quarter, PRIAC also provided the Plans with a Watch List of funds that had underperformed or where PRIAC had identified issues with the manager of the fund.  (Tr. 199-200 Kalamarides; Palms Dec. ¶ 6.)

### 2.   Information Provided to PRIAC Through June 2007

Through June 30, 2007, PRIAC reasonably believed that the Bond Funds were enhanced index bond funds.  ERISA Decision at *29.  PRIAC knew that each Bond Fund invested in securities outside its benchmark index and was aware by April 2007 that the Bond Funds had

---

[1]   The underlying sources for these facts are presented in (1) transcripts of the trial on PRIAC's ERISA claims ("Tr." followed by the page number and witness), (2) the deposition testimony and trial exhibits designated by PRIAC ("PX __") and State Street ("DX __") in the Joint Pretrial Order dated August 12, 2011, and (3) the accompanying declarations of George L. Palms ("Palms Dec."), Robert F. Frascona ("Frascona Dec."), Matthew Dingee ("Dingee Dec."), and Dean M. Molinaro ("Molinaro Dec.").

investments in subprime. *Id.* at \*88-89. State Street told PRIAC that the Bond Funds would "employ leverage, if at all, only in a way that would not 'contribute to the risk profile of the fund in a meaningful way.'" *Id.* at \*117 (internal citation omitted). As the Court noted, investing in subprime was not itself imprudent, and PRIAC understood that the Bond Funds might use leverage but that such use would not add significant risk to investors. *Id.* at \*50, \*55, \*89.

As of June 30, 2007, State Street had not informed PRIAC of the changes it made to the management strategy of the Bond Funds in 2006, and PRIAC was not aware of those changes. *Id.* at \*35-37. Judge Holwell found that State Street failed to "adequately disclose the increase in predicted tracking error of the Bond Funds," that it "did not disclose fully the size or nature of the Bond Funds' exposure to subprime securities before the end of June 2007," that it "did not disclose fully the extent to which the Bond Funds employed leverage to gain exposure to subprime securities," and that it "had not made PRIAC aware in 2007 of the true risk profile of the Bond Funds." *Id.* at \*36, \*87, \*89, \*90.

### 3. Information Provided to PRIAC in July and August 2007

In July and August 2007, State Street provided PRIAC with additional information about the Bond Funds. *See* State Street Findings ¶¶ 117-40. CIGNA, a Plan with a large investment in the Intermediate Bond Fund, had sought additional information about the fund because it was considering a large additional investment in it. (Forde Dep. 46-47; PX 745.) PRIAC, on CIGNA's behalf, asked State Street for information. In response, State Street (a) on July 6 provided PRIAC with a commentary about its management of the Bond Funds (DX 179), (b) on July 12 provided PRIAC with a list of the Intermediate Bond Fund's holdings and certain data about subprime exposure as of March 30 and June 30, 2007 (DX 178), and (c) on July 18 had a conference call with PRIAC and CIGNA about the fund (DX 188; DX 190).

Throughout late July and August 2007, PRIAC asked State Street for more information about the Bond Funds in an effort to understand better how they were being managed.  (*E.g.*, PX 733, PX 734, PX 764; *see also* Dingee Dec. ¶ 5.)  State Street responded slowly or incompletely, and in some instances did not provide the information requested, and it acknowledged that its responses to PRIAC's questions were often delayed or incomplete.  (*E.g.*, PX 34; PX 35; PX 396; PX 733; PX 734; PX 761; PX 785, Dalis Dep. 107-108; *see also* Dingee Dec. ¶ 5.)

On July 30, 2007, PRIAC asked State Street to review a fact sheet for the Intermediate Bond Fund that, like earlier PRIAC fact sheets, described that Bond Fund as following an "enhanced bond indexing strategy."  (PX 33.)  PRIAC also asked State Street whether there had been any changes in the management of the Bond Funds in the prior five years.  (*Id.*)  State Street responded that there had been "no material change in the way this Fund has been managed" over that period and that the information on PRIAC's fact sheet was accurate.  (*Id.*)

In August 2007, State Street sent to PRIAC additional information about the Bond Funds, including an email on August 2 about poor performance through July 2007 of its fixed income bond funds (DX 142), an email on August 14 explaining that the subprime market had become "chaotic and illiquid" and that "many judicious investors will hold the positions" in State Street funds (PX 75), a characteristics report for the Intermediate Bond Fund reflecting leverage, sent on August 15 (PX 35), and an August 23 document about State Street's use of leverage in the Bond Funds that stated: "Notional leverage is a result of the level of risk in the portfolio, and not a key measure of risk, or a driver of risk levels."  (PX 737.)

### 4.    Actions Taken by PRIAC in August 2007

On August 20, 2007, PRIAC placed the Bond Funds on its Watch List – weeks in advance of the usual timing.  PRIAC told the Plans that the Watch Listing was based on (a) the Bond Funds' underperformance, (b) the undisclosed amounts of subprime investments causing

the underperformance, and (c) State Street's lack of responsiveness to PRIAC's questions. PRIAC's notification to the Plans included a copy of State Street's August 14 email.  (DX 198.)

On August 28, 2007, PRIAC implemented a "negative election" process with respect to the Bond Funds, in which PRIAC caused the Plans to redeem their investments in the Bond Funds unless a Plan instructed PRIAC otherwise.  (Tr. 200 Kalamarides.)  In notifying the Plans about the negative election, PRIAC pointed to "unusual losses" and the "extreme unexpected volatility" of the Bond Funds, adding that PRIAC "has not received sufficient information from State Street to allow us to monitor" the Bond Funds.  (PX 779.)  On August 29, 2007, PRIAC requested that the Plans be redeemed out of their investments in the Bond Funds.  (*Id.*)

### 5. Information Not Provided to PRIAC in July and August 2007

As of late August 2007, State Street had not told PRIAC that the Bond Funds no longer were being managed under the "low tracking error" "risk controlled strategy" of an enhanced index fund.  PRIAC was not told that State Street had increased the Bond Funds' return targets and predicted tracking error in May 2006, *id.* at *33-35, or that State Street's portfolio managers for the Bond Funds did not view them as enhanced index funds.  *Id.* at *37-38.

State Street's communications to PRIAC did not reveal the heightened risk to investors from its change in the management of the Bond Funds.  State Street did not tell PRIAC that, in the spring of 2007, turbulence in the subprime markets caused a significant increase in State Street's risk metrics for the Bond Funds, *id.* at *68-70, or that State Street repeatedly violated its internal risk policies and exposed the Bond Funds to greater risk than its policies allowed, *id.* at *76.  Nor did State Street tell PRIAC that the limited history of the novel, derivative securities the Bond Funds invested in made State Street's risk models for those investments unreliable.  *Id.* at *45-46.  State Street did not tell PRIAC about the internal discussions at State Street about the

9

excessive risk of subprime investments.  *Id.* at \*62-64, \*104, \*116-20.  (Palms Dec. ¶ 10; Frascona Dec. ¶ 5; Dingee Dec. ¶ 7; Molinaro Dec. ¶ 5.)

### 6.    Name of the Intermediate Bond Fund

On September 21, 2005, State Street had told PRIAC that the name of the Intermediate Bond Fund had been changed to "Passive Intermediate Bond Index Securities Lending Series Fund," but that the fund's investment strategy had not been changed.  (PX 450.)  That notification of the name change was "a mistake," according to State Street.  (Hughes Dep. 42.)  In its communications with the Plans from October 2005 through July 2007, PRIAC used the name State Street provided, while it continued to describe that fund to the Plans as employing "an enhanced index strategy."  (*E.g.*, DX 220.)  PRIAC continued to believe the Intermediate Bond Fund was an enhanced index bond fund as described to the Plans.  (Tr. 255-56 Frascona.)

On July 12, 2007, State Street told PRIAC that in 2005 State Street had provided PRIAC with the wrong name for the Intermediate Bond Fund.  (DX 175.)  On August 1, 2007, PRIAC notified its personnel of the corrected name, corrected the name on its client websites, and set in motion PRIAC's process for changing the name in its reports to the Plans.  (DX 199.)  On August 20, 2007, PRIAC sent an email to the Plans about the name change.  (DX 198.)

## Argument

The ERISA Decision, augmented by undisputed facts about the parties' conduct in July and August 2007, establishes conclusively that State Street cannot prevail on either its contribution claim or its defamation claim.

### I.    The Findings and Conclusions in the ERISA Decision Justify a Successive Summary Judgment Motion.

The Court has "considerable discretion in entertaining" a successive summary judgment motion.  *Sira v. Morton*, 380 F.3d 57, 68 (2d Cir. 2004).  A successive motion is "appropriate

especially if" the movant supports it with "an expanded factual record." *Whitford v. Boglino,* 63 F.3d 527, 530 (7th Cir. 1995) (internal citations omitted). The ERISA Decision provides an expansion of the record by adding factual findings and legal conclusions that make it possible to dispose of State Street's remaining claims. When Judge Holwell ruled on PRIAC's initial summary judgment motion, the Court had before it a far more limited record of undisputed facts about the Bond Funds and the parties' conduct, and was presented with competing characterizations of State Street's management of the Bond Funds and its alleged ERISA violations. *In re State St. Bank & Trust Co. ERISA Litig.,* 772 F. Supp. 2d 519 (S.D.N.Y. 2011) (the "S.J. Decision"). The ERISA Decision enables PRIAC to present additional facts in a way that was not previously possible.

Although the findings and conclusions in the ERISA Decision are not yet binding as *res judicata,* they are binding under the law of the case doctrine: "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, unless 'cogent' and 'compelling' reasons militate otherwise." *U.S. v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (internal citations omitted). While courts have discretion not to apply the law of the case, the reasons for not doing so – such as "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice," *id.* at 1230 (internal citations omitted) – do not apply here.

## II.     The ERISA Decision Precludes State Street from Prevailing on Its ERISA Contribution Claim.

State Street is liable to the Plans for violating its duties of prudence and diversification under Sections 404(a)(1)(B) and 404(a)(1)(C) of ERISA based on its investment decisions and their effect on the Plans. Because State Street cannot establish that PRIAC is jointly liable with it for those same violations, it cannot prevail on its contribution claim.

A.   **State Street Must Show That PRIAC Is Jointly Liable to the Plans
for the Same ERISA Violations for Which State Street Is Liable.**

1.   **Contribution under *Chemung***

Even though ERISA does not expressly provide that a fiduciary has a right of

indemnification or contribution, the Second Circuit has held that a fiduciary that violated ERISA

has those rights.  *Chemung Canal Trust Co. v. Sovran Bank/Md.*, 939 F.2d 12, 15-16 (2d Cir.

1991).  That holding was rooted in the Court of Appeals' determination that the "right of

contribution among co-trustees has been for over a century, and remains, an integral and

universally recognized part of trust doctrine." *Id.* at 16.  In light of Congress's direction that the

courts create "federal common law for ERISA by incorporating what has long been embedded in

traditional trust law and equity jurisprudence," the Second Circuit held that ERISA defendants

are "entitled to the protection of contribution that has been traditionally granted fiduciary

defendants under the equitable provisions of trust law." *Id.*

2.   **Scope of Common-Law Contribution under Section 258**

In concluding that contribution has long been "an integral and universally-recognized

part of trust doctrine," the Second Circuit relied primarily on Section 258 of the RESTATEMENT

(SECOND) OF TRUSTS (1959) (the "Restatement").  *Id.*  Section 258 sets forth the traditional

common-law right of contribution.  *See e.g., In re Masters Mates & Pilots Pension Plan Litig.*,

957 F.2d 1020, 1032 (2d Cir. 1992); Austin W. Scott, William F. Fratcher and Mark L. Ascher,

SCOTT & ASCHER ON TRUSTS ("*Scott on Trusts*") § 24.32 (5th ed. 2007); Amy Morris Hess,

George Gleason Bogert and George Taylor Bogert, THE LAW OF TRUSTS AND ESTATES ("*Bogert

on Trusts*") §§ 701, 718, 862 (3d ed. 2009).  Restatement § 258(1) provides, in relevant part:

> [W]here two trustees are liable to the beneficiary for a breach of trust, each of
> them is entitled to contribution from the other, except that (a) if one of them is
> substantially more at fault than the other, he is not entitled to contribution from
> the other but the other is entitled to indemnity from him. . . .

The fundamental prerequisite for contribution under Section 258 is set forth in its initial clause: the trustees must be liable to a beneficiary for the same breach of trust.  Comment a to Section 258 echoes that point by describing the right of contribution as applicable "[w]here several trustees are liable for a breach of trust."  The singular "a breach of trust" is used in subsections 1, 1(b), and 2 of Section 258, and repeatedly in the comments.  Comment a to Section 258 confirms that common-law contribution is available only where co-trustees are jointly and severally liable for a single breach of trust.[2]  Under the common law of trusts, *contribution is available only to co-trustees who are jointly liable for the same breach of trust.*  That is the "integral and universally-recognized part of trust doctrine" that *Chemung* applied to ERISA.

### 3.    Authorities Cited in *Chemung*

*Chemung* cited, in addition to Restatement Section 258, *Bogert on Trusts* § 701 (2d ed. rev. 1982) and two nineteenth-century cases.  *Chemung*, 939 F.3d at 16.  The cited section of *Bogert on Trusts* states that where "[t]rustees are jointly and severally liable for breaches of duty," a beneficiary "can collect the full liability from any one of *the trustees who took part in the breach*, actively or inactively."  *Bogert on Trusts* § 701 (emphasis added).  The cases cited by the court similarly recognized a right of contribution against co-trustees that breached the same fiduciary obligation.  *See Sherman v. Parish,* 53 N.Y. 483, 488 (N.Y. 1873) (inactive trustees who had "permitted their co-trustee to manage [the trust] alone," if held liable, would have rights of contribution against one another); *Perry v. Knott*, 4 Beav. 179 (N.Y. Ch. 1842) (executors

---

[2]    Comment a describes two alternative ways in which a common-law trustee can establish a right of contribution, each of which is based on the joint and several liability of the trustees seeking and liable for contribution.  The first way is for a trustee to prove that the trustees together committed a single breach of trust for which they are jointly liable: "several trustees are liable for a breach of trust committed by them jointly."  The second way is for a trustee to prove "a breach of trust committed by [itself] for which the other [trustees] are liable under the rule stated in Section 224 of the Restatement, [making them] jointly and severally liable to the beneficiary for the breach of trust."  Restatement § 258 cmt. a.

who had agreed to a payment "contrary to the trust reposed in them by the testator" had rights of contribution against one another).

### 4.    Scope of Contribution under Other Authorities

Numerous cases recognize trustees' common-law right of contribution as a right to recover from another trustee that breached the same fiduciary duty.[3]   The principal treatises on trust law confirm that.  *Scott on Trusts* states the common-law rule as follows:  "When the trustees are equally responsible *for the breach of trust*, and one of them has fully made good the loss, he or she is entitled to sue the others for their [pro rata] shares."  § 24.32 (emphasis added).  *Bogert on Trusts* similarly refers to a trustee's right of contribution "when co-trustees are held jointly and severally liable," and explains that such joint and several liability arises "[i]f several trustees unite in a breach of trust. . . ."  § 718, § 862.

### 5.    Contribution in ERISA Cases

Only a few decisions have discussed the scope of a fiduciary's rights of contribution in ERISA cases.  In *Sunderlin v. First Reliance Standard Life Ins. Co.*, a fiduciary that allegedly had breached its ERISA obligation to provide plan documents to participants brought a contribution claim against another fiduciary.  235 F. Supp. 2d 222 (W.D.N.Y. 2002).  Relying on Restatement Section 258, the court reasoned that contribution would be available only if the second fiduciary had breached the same obligation to provide documents to those participants.  *Id.* at 237.  Since the second fiduciary had no such obligation, the first fiduciary had no right of

---

[3]   *See, e.g.*, *Marcus v. Otis*, 168 F.2d 649, 658-59 (2d Cir. 1948); *Gillespie v. Seymour*, 823 P.2d 782, 800 (Kan. 1991); *In re Hyde Trust*, 458 N.W.2d 802, 806 (S.D. 1990); *In re Estate of Chrisman*, 746 S.W.2d 131, 136 (Mo. Ct. App. 1988); *Gbur v. Cohen et al.*, 155 Cal. Rptr. 507, 510 (Cal. Ct. App. 1979); *In re Mueller*, 135 N.W.2d 854, 866 (Wis. 1965); *In re Rosenfeld's Estate*, 40 N.Y.S.2d 114, 115-16 (N.Y. Surr. Ct. 1943); *Steele v. Leopold*, 135 A.D. 247, 257 (N.Y. App. Div. 1909).

contribution. *Id.* The allegation that the second fiduciary was liable to the same participants for "breach of a *separate* fiduciary duty" was not a legally sufficient basis for contribution. *Id.*

In *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, a fiduciary, who was found liable for improperly investing plan assets that he held and imposing charges on those assets, sought contribution from the plan's trustees. 122 F. Supp. 2d 444, 464 (S.D.N.Y. 2000), *rev'd in part on other grounds*, 302 F.3d 18 (2d Cir. 2002). The claim failed. One reason for this was the fiduciary's inability "to prove that [the co-fiduciaries] played any role in the actions that resulted in a breach of [claimant's] fiduciary obligations." *Id.* (citing Restatement § 258).

In his summary judgment ruling, Judge Holwell recognized that in order to have a right of contribution, State Street would have to prove that it and PRIAC had acted "jointly." S.J. Decision at 551. On the record before him, he determined that the only ERISA duties State Street and PRIAC jointly owed to the Plans "could intersect at nondisclosure." *Id.* Citing Section 258, the Court applied its rule that contribution requires a shared obligation between co-fiduciaries. *Id.*

## B.   PRIAC Cannot Be Liable for State Street's ERISA Violations as Determined by the Court.

In denying PRIAC's summary judgment motion on contribution, Judge Holwell reasoned that both State Street and PRIAC could have had a disclosure obligation to the Plans under ERISA and that they "may have failed jointly to fulfill that obligation. . . ." *Id.* at 554. The ERISA Decision established State Street's liability for violating other ERISA obligations, leaving no possibility that State Street and PRIAC jointly violated a joint fiduciary obligation. State Street instead seeks contribution on the basis of PRIAC's "own fiduciary breaches, [which] contributed significantly to the Plans' investment losses." State Street Conclusions ¶ 12.

### 1.   State Street's Violations

State Street's violations of its ERISA obligations of prudence and diversification stemmed from the ways in which it exercised the discretion that "State Street alone held. . . over the management of the Bond Funds' assets."  ERISA Decision at *16.  In contrast, PRIAC had no input or involvement in "State Street's management of the Bond Funds, in [its] assessment of the risks the Bond Funds incurred, or in [its] investment decisions for the Bond Funds."  *Id.*

### 2.   PRIAC's Alleged Violations

State Street alleges that PRIAC violated disclosure obligations by not immediately providing to the Plans information about the Bond Funds that it gave PRIAC in July and August 2007, and by using the confusing name provided to it by State Street for the Intermediate Bond Fund.  State Street Findings ¶¶ 125-133.  State Street is emphatic that it did not violate any disclosure obligations:  it says that PRIAC "failed to carry out specific duties that it – and it alone – undertook to perform. . . ."  State Street Mem. at 37.

### 3.   No Joint Liability

What Judge Holwell regarded before the trial as an open question has been resolved as a matter of law:  State Street cannot establish joint and several liability by proving that it and PRIAC "failed jointly to fulfill" a fiduciary obligation that both owed to the Plans.  *See* S.J. Decision at 554.[4]  Because State Street cannot establish that PRIAC and it are jointly liable for the violations determined in the ERISA Decision, its contribution claim is not within the scope of the established common-law contribution right that was imported into ERISA by *Chemung*.

---

[4]   This discussion is limited to the first way in which contribution may be available under Restatement Section 258.  State Street did not argue that the second way in which joint and several liability can be established under Section 258 – proving PRIAC's liability for State Street's breach of trust under Section 224 of the Restatement – as a basis for contribution.  S.J. Decision at 550 n.19; State Street Conclusions ¶¶ 12-18.

The distinctions between State Street's ERISA violations and PRIAC's separate alleged violations are clear. Among other things:

(1)     State Street's misconduct involved improper investment decisions for which it had sole authority, and in which PRIAC had no role.

(2)     State Street violated its duties of prudence and diversification under subsections (B) and (C) of Section 404(a)(1). PRIAC allegedly violated ERISA disclosure obligations, which are imposed as part of the duty of loyalty under subsection (A) of Section 404(a)(1). *In re Citigroup ERISA Litig.*, 662 F.3d 128, 135 (2d Cir. 2011).

(3)     State Street's violations of ERISA began well before any alleged violations by PRIAC. State Street breached its ERISA obligations and caused the Plans losses by investment decisions starting before June 30, 2007. PRIAC allegedly breached ERISA disclosure obligations in July and August 2007.

(4)     The ERISA claims against State Street and against PRIAC have different damage measures. Where a trustee recovers in contribution against other trustees, each trustee ordinarily bears an equal portion of the damages, Restatement § 258 cmt. b, consistent with the premise that they are jointly liable for the same breach. That approach would make no sense here. The Plans' damages from State Street's ERISA violations are measured by the difference between the Bond Funds' performance and that of a comparable enhanced index fund. ERISA Decision at *136-37. If PRIAC violated ERISA disclosure obligations, its liability to a Plan would be subject to ERISA's causal requirement in Section 409. *Id.* at *121. A Plan could then recover only to the extent it showed that PRIAC's failure to make timely disclosures, in violation of ERISA, caused its losses. *See e.g., Daniels v. Thomas & Betts Corp*., 263 F.3d 66, 76 (3d Cir. 2001).

(5)    Even if State Street and PRIAC had a joint duty of disclosure to the Plans, State Street

and PRIAC could not have jointly violated that duty.  If the Court were to conclude that

any fact should have been disclosed earlier to the Plans, *either* (a) State Street failed to

make a timely disclosure of that fact to PRIAC, *or* (b) PRIAC failed to make a timely

disclosure of that fact to the Plans.  State Street does not allege any joint breach.

State Street's contribution claim is therefore not the "integral and universally-recognized

part of trust doctrine" invoked in *Chemung*.  *See* 939 F.2d at 16.  Conferring such a right on

ERISA violators would be "creating a right from whole cloth" – precisely what *Chemung* said

*not* to do.  *Id.*

## C.    As a Matter of Law, State Street Was Substantially More at Fault.

Under Restatement Section 258, "if one of [the jointly liable co-trustees] is substantially

more at fault than the other, he is not entitled to contribution from the other but the other is

entitled to indemnity from him."  Comment d to Section 258 explains that "[w]here a breach of

trust is committed and one of two trustees is substantially more at fault than the other, although

both are liable to the beneficiary for the breach of trust, the loss should ultimately be borne by

the trustee who is more at fault."  *Accord, Scott on Trusts* §§ 24, 32.1; *Bogert on Trusts* § 862.

It is clear from the ERISA Decision that State Street was substantially more at fault than

PRIAC, and summary judgment can be granted on that alternative basis.  The Court held State

Street liable because of its unlawful investment strategy and decisions, which caused the Plans'

losses.  State Street was substantially more at fault for the violations described in the ERISA

Decision than PRIAC, which had nothing to do with, and did not know about, those violations.

In denying summary judgment, Judge Holwell focused on the possibility that PRIAC

"knew that State Street had breached its fiduciary duties by July 18" in declining to "say

definitively at this stage of the litigation that State Street was substantially more at fault for the

Plans' losses than PRIAC." S.J. Decision at 558. PRIAC disputes that knowledge of State Street's violations of its fiduciary duties would be sufficient to create an issue of fact as to whether State Street was "substantially more at fault." In any event, now that State Street's conduct and ERISA violations have been defined, there can be no genuine dispute that PRIAC did not know "that State Street had breached its fiduciary duties" and did not know many of the facts underlying those violations. (Palms Dec. ¶ 9-10; Frascona Dec. ¶ 4-5; Dingee Dec. ¶ 6-7; Molinaro Dec. ¶ 4-5.) Indeed, the ERISA Decision shows the extreme improbability that anyone outside State Street had contemporaneous knowledge of its ERISA violations. Those violations involved a complex, internally developed and executed strategy that, over time, led to a complex pattern of investment decisions, which the Court assessed in light of State Street's knowledge and conduct – not simply exposures to subprime securities or the use of leverage. Only someone with access to State Street's internal deliberations could have known of those violations.

In cases involving joint liability arising from imprudent investing by fewer than all trustees, courts have rejected contribution claims by investment decision-makers on the ground that the fiduciary that made the investment decisions is substantially more at fault than a fiduciary that did not participate in those decisions. *See, e.g.*, *Scalp & Blade, Inc. v. Advest, Inc.*, 755 N.Y.S.2d 140, 140 (N.Y. App. Div. 2002); *In re Hyde Trust*, 458 N.W.2d at 806. This traditional exception to the common-rule applies under ERISA. *Chemung*, 939 F.3d at 16. In *Free v. Briody*, a fiduciary had entrusted exclusive control over a retirement plan's assets to a co-fiduciary, leading to those fiduciaries' joint liability when losses resulted. 732 F.2d 1331, 1337 (7th Cir. 1984). The Seventh Circuit held that the fiduciary who mismanaged the plan's assets should bear the full burden of the liability because he was substantially more at fault. *Id.*

### III. State Street Cannot Prevail on Its Defamation Claim Because PRIAC's Statements Were Substantially True.

The findings of fact in the ERISA Decision establish that the allegedly defamatory statements were substantially true. As a result, those statements are not actionable, and summary judgment should be granted dismissing State Street's defamation claim.

### A. Six Allegedly Defamatory Statements Are at Issue.

State Street has asserted that PRIAC defamed it in 24 communications to the Plans, beginning on August 20, 2007. S.J. Decision at 558 & App. A. Judge Holwell determined that these statements are conditionally privileged, and that the defamation claim as to each should be dismissed unless there is an issue of fact as to whether State Street can prove that the statement was made with either actual malice or common-law malice. *Id.* at 560-61. He held that State Street's evidence of common-law malice was "too attenuated to create a triable issue of fact," but that there was a triable issue regarding PRIAC's actual malice as to six of the statements – identified in Appendix A to the S.J. Decision as Statements No. 12, 13, 15, 16, 17 and 23 – insofar as they relate to State Street's investment strategy. *Id.* at 561 n.27.

These six statements are reproduced in Appendix 1, with the same numbers used by Judge Holwell to identify them. The portion or portions of each that relate to State Street's investment strategy (the "PRIAC Statements") are bolded; these portions are the surviving basis for State Street's "thin" defamation claim. *Id.* at 562. State Street asserts that the PRIAC Statements are defamatory because they "accused State Street of misrepresenting the investments held by the Bond Funds, and concealing their concentration in subprime-backed ABS," causing investment professionals to "believe that State Street hid the Bond Funds' leverage and concentration in subprime-backed ABS until [PRIAC] uncovered this information on an August 22, 2007 conference call." State Street Mem. at 39-40.

**B.    A Defamatory Statement Is Not Actionable If It Is Substantially True.**

Defamation law "overlooks minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991).  A defamation claim cannot succeed if the allegedly defamatory statement is substantially true.  *Id.* at 516-17.  The Supreme Court observed in *Masson* that a more stringent standard than substantial truth would be "inconsistent with our precedents and First Amendment principles."  *Id.* at 514.  A statement is substantially true if its allegedly defamatory gist is true.  *Id.* at 517; 1 Robert D. Sack, SACK ON DEFAMATION: LIBEL, SLANDER AND RELATED PROBLEMS *("Sack")* § 3:7 (3d ed. 2008) ("proof of falsity must go to the 'gist' or 'sting' of the statement.").  Massachusetts law, which governs the defamation claim, S.J. Decision at 558-59, follows this rule.  *E.g., Reilly v. Associated Press,* 797 N.E.2d 1204, 1211 (Mass. 2003); *LaChance v. Boston Herald*, 942 N.E.2d 185, 189 (Mass. App. Ct. 2011); *Arnold v. Flook*, No. 06-00356, 2010 Mass. Super. LEXIS 112, at *3 (Mass. Super. Jan. 29, 2010); *Boyle v. Cape Cod Times*, No. BACV2006-00760-A, 2009 Mass. Super. LEXIS 418 (Mass. Super. Nov. 9, 2009), *aff'd*, 959 N.E.2d 457 (Mass. App. Ct. 2012).

Substantial truth can be assessed by determining whether, if the defendant had made a precisely accurate statement instead, that statement "would have a different effect on the mind of the reader from that which the pleaded truth would have produced."  *Masson*, 501 U.S. at 517.  If the inaccuracies would not cause a "material change in the meaning conveyed by the statement," the statement is not actionable despite the inaccuracy.  *Id.*  Facts constituting the "truth" are relevant in this comparison even if they were unknown to the defendant at the time of the statement since a defamation plaintiff "does not have a legally protected right to a reputation based on the concealment of the truth."  *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1228 (7th Cir. 1993); *see also Sack* § 3:6 ("Truth discovered during the course of litigation is likely as effective a defense as truth known at the time of publication.").

C.      **The PRIAC Statements Were Substantially True.**

The ERISA Decision establishes the truth of the gist of each of the PRIAC Statements.
From 1996 until mid-2006, State Street managed the Bond Funds as enhanced index funds with a
"low tracking error, risk controlled approach that sought modestly to outperform the benchmark
while taking on minimal additional risk."  ERISA Decision at *29 (internal citations omitted).  In
mid-2006, State Street increased the Bond Funds' risk and return targets and began to manage
them in ways that exposed investors to significantly greater risk, in violation of State Street's
fiduciary duties of prudence and diversification.  *Id.* at *30-37.  As of June 30, 2007, over a year
after changing its investment strategy for the Bond Funds, State Street still had not told PRIAC
about these changes.  *Id.* at *87-90.  It did not advise PRIAC that it had changed the risk and
return targets for the Bond Funds, *id.* at *34-35, *90, and never disclosed to PRIAC numerous
additional facts about the heightened level of risk that it had unlawfully created for investors, *id.*
at *38, *50-56, *63, *69-70, *77.  As a matter of law, the gist of the PRIAC Statements – that
State Street did not disclose to PRIAC that it had significantly changed the way it managed the
Bond Funds – is true.

When he kept a portion of the defamation claim alive, Judge Holwell noted that the
PRIAC Statements said "that it did not learn about the Bond Funds' 'off-strategy' leverage and
exposure until August 2007," but there was evidence that State Street may have disclosed those
facts to PRIAC weeks earlier, by providing data to PRIAC on July 12 and on the July 18
conference call.  S.J. Decision at 562; *see also* State Street Mem. at 41.  In Statements No. 15
and 16, PRIAC said that it had learned about the use of leverage in the Bond Funds and their
exposure to subprime during a telephone call between PRIAC and State Street on August 22,
2007.  (DX 481; DX 258.)  In Statements No. 17 and 23, PRIAC said that State Street "did not
explain the [Bond Funds'] extensive leveraged sector concentration" until "mid-August."  (DX

269; DX 270.)  (Statements No. 12 and 13 do not refer to the timing of State Street's disclosures.)

The facts found in the ERISA Decision show that the PRIAC Statements are substantially true for two reasons.  First, State Street's communications to PRIAC in July and August 2007 about subprime exposures and leverage did not inform PRIAC how those facts reflected the changes it had made in the Bond Funds investment strategy since 2006 or the heightened risk to which State Street was exposing investors.  (Palms Dec. ¶ 10; Frascona Dec. ¶ 5; Dingee Dec. ¶ 7; Molinaro Dec. ¶ 5.)  Second, even if the PRIAC Statements inaccurately placed State Street's disclosures five weeks later than they occurred, as a matter of law that would not make the gist of the PRIAC Statements false.  Either way, State Street managed the Bond Funds under a different, riskier investment strategy for over a year without disclosing that important change to PRIAC.  The additional impact on a reader of a reference to State Street's disclosure of extensive leverage and subprime investments in the Bond Funds in "mid-August" rather than in "mid-July" would be minimal, and are non-existent when the PRIAC Statements are compared to a hypothetical statement by PRIAC of the complete truth about State Street's management of the Bond Funds.  The five-week difference does not, as a matter of law, undermine the substantial truth of the PRIAC Statements.  *Cf. Global Relief Foundation v. New York Times Co.*, 390 F.3d 973, 987 (7th Cir. 2004) (affirming summary judgment dismissing a defamation claim on grounds of substantial truth, where defendant said plaintiff had been added to a list of terrorist-funding organizations on September 24, 2001 – two weeks after the 9/11 terrorist attacks – rather than on the accurate date, December 14, 2001).

The facts and conclusions in the ERISA Decision establish that PRIAC significantly *understated* the truth about State Street's conduct in connection with the Bond Funds.  If PRIAC

had known and communicated the complete truth about that conduct, the light in which State Street would have been cast would have been much worse.  As in *LaChance*, the truth "would have been, at the very least, equally as damaging to the plaintiff's reputation in the mind of a reader" as the PRIAC Statements.  942 N.E.2d at 189.  State Street's claim that it was defamed is, in light of the far more damning facts that it kept from PRIAC, a cynical assertion of a "right to a reputation based on the concealment of the truth."  *Haynes*, 8 F.3d 2d at 1228.

## D.     PRIAC Cannot Be Liable for True Statements.

State Street argues that even if a PRIAC Statement were true, it would be actionable under Mass. Gen. Laws ch. 231, § 92, which makes truth a defense in defamation actions "unless actual malice is proved."  State Street Mem. at 39 n.12.  State Street cannot avail itself of this statutory exception for two reasons.  First, it applies only to statements made with common-law malice, *Noonan v. Staples, Inc.,* 556 F.3d 20, 28-29 (1st Cir. 2009), as to which the Court held there is no triable issue of fact.  S.J. Decision at 561.

Second, the statutory exception for common-law malice does not apply to statements about matters of public concern.  *Shaari v. Harvard Student Agencies, Inc*., 691 N.E.2d 925 (Mass. 1998).  Statements about the commercial conduct of companies that deal with the public raise matters of public concern.  *See, e.g., Astra USA, Inc. v. Bildman,* 914 N.E.2d 36, 57 (Mass. 2009), *cert. denied*, 130 S.Ct. 3276 (2010) (statement about employee conduct at a public company and "other issues of general interest, such as corporate integrity, corporate governance and corporate financial controls"); *Friedman v. Boston Broadcasters, Inc.,* 522 N.E.2d 959, 962-63 (Mass. 1988) (statements about a finance company's deceptive business practices).  In 2007, State Street was a publicly traded corporation with $1.9 trillion in assets under management that called itself "a world leader in financial services."  (Klatell Dec. Exs. C, D.)  By late August 2007, there was considerable media attention to the emerging fact that State Street's investment

strategies had caused thousands of investors to lose billions of dollars, and there were "a lot of negative articles written about [State Street] in the summer of 2007." (Roberts Dep. 99; *see also* Roberts Dep. 59-61; PX 666.)  State Street's management of the Bond Funds was an "issue[] of general interest" that had attracted "much recent media attention." *Astra USA, Inc.,* 914 N.E.2d at n.43.  The PRIAC Statements were about a matter of public concern, and they are actionable only if they were false.

## Conclusion

For the foregoing reasons, the Court should grant PRIAC's motion and direct the entry of an order dismissing, with prejudice, State Street's contribution and defamation claims.

Dated: New York, New York
        May 7, 2012

                                  Respectfully submitted,

                                  DEBEVOISE & PLIMPTON LLP


                                  By: /s/ Edwin G. Schallert
                                      Edwin G. Schallert
                                      Steven Klugman
                                      Jeremy N. Klatell
                                      Kerith Knechtel
                                      Katherine Kern
                                  919 Third Avenue
                                  New York, New York 10022
                                  (212) 909-6000

                                  *Attorneys for Plaintiff and Third-Party*
                                  *Defendant Prudential Retirement*
                                  *Insurance and Annuity Company*

# Appendix 1

# APPENDIX 1

## ALLEGEDLY DEFAMATORY STATEMENTS

| No. | Date and Text of Statement |
|---|---|
| 12 | August 29, 2007<br><br>We wanted to bring your attention to several of the key elements included in State Street Global Advisors' response which we have summarized below:<br>**Overall, the investment approach does not comport with what we were previously lead [sic] to believe.**<br>Many questions remain unanswered or only partially answered, resulting in an overall response that is in our view insufficient.<br><br>Even with this latest communication, Prudential has not received sufficient information from State Street Global Advisors to allow us to monitor the Alliance Fund's investment in this fund.  We have written letters and placed phone calls at all levels of the State Street Global Advisors organization and have received what we believe is an insufficient response.<br><br>While State Street Global Advisors may not concur with our assessment, the lack of information provided by them to assess the investment, strategy, holdings, liquidity demands and other issues associated with this fund is of great concern.  Its failure to provide us with this information prevents us from meeting our obligation to you to monitor the fund.<br><br>State Street is not providing sufficient information to allow us to monitor the State Street Fund.<br><br>Since learning of unusual losses, Prudential has not received sufficient information from State Street to allow us to monitor the Alliance Fund's investment in the State Street fund.  We have written letters and placed phone calls at all levels of the organization, and have not received the information we requested. |
| 13 | August 29, 2007<br><br>**Overall, the investment approach does not comport with what we were previously lead [sic] to believe.**<br><br>Many questions remain unanswered or only partially answered, resulting in an overall response that is in our view insufficient.<br><br>Even with this latest communication, Prudential has not received sufficient information from State Street Global Advisors to allow us to monitor the Alliance Fund's investment in this fund.  We have written letters and placed phone calls at all levels of the State Street Global Advisors organization and have received what we believe is an insufficient response.<br><br>While State Street Global Advisors may not concur with our assessment, the lack of |

| No. | Date and Text of Statement |
|-----|----------------------------|
|  | information provided by them to assess the investment, strategy, holdings, liquidity demands and other issues associated with this fund is of great concern.  Its failure to provide us with this information prevents us from meeting our obligation to you to monitor the fund. |
| 15 | September 4, 2007 |

First, SSgA informed us just this quarter that they had earlier "misnamed" the Intermediate Bond fund.

Second, **we did not learn about the fund's extensive leverage and broad exposure to sectors outside its stated benchmark strategy until a call with the head of SSgA's North American Fixed Income division, on August 22, well after we had begun questioning SSgA about their index-lagging performance.  In short, we learned "after the fact" about SSgA's actual investment strategy and holdings did not at all comport with what we had been led to believe.**

It was the cumulative effect of these and other factors, and the general lack of cooperation from SSgA, that first led us to place the fund on our Watch List on August 20.

When SSgA did respond, they did not provide adequate information to explain poor performance.  We also learned new facts that were disturbing.

In short, SSgA intended to maintain its past practices, while providing inadequate information about the portfolio's holding and risk levels, making it effectively impossible for us to monitor the fund.  Continuation of possible fiduciary breaches by SSgA was not acceptable.

In fact, this immediate action allowed all our clients to be redeemed in cash at a fair market value price.  We believe that remaining investors (none of whom is a Prudential client) may face an uncertain and potentially lengthy liquidation process.

For the period of time through the end of June 2007, the fund appeared to be performing within a range of expected returns for an enhanced index fund.  In August, however, we noticed that the fund was experiencing returns quite different from both our expectation and past patterns of proximity to the fund's benchmarks.  We contacted SSgA to better understand the issues behind these performance numbers, but even after multiple requests and repeated follow-ups, they failed to provide satisfactory information.  (And as should be clear throughout this document, what limited information they did provide was not at all comforting.)

We believe that the detailed, thoughtful, and prompt work we did to deal with the Intermediate Bond Fund situation, over a very short period of time, represents strong value added to our clients.

| No. | Date and Text of Statement |
|-----|---------------------------|
|  | We had already begun to ask questions of SSgA and received limited answers after significant delays.  We intensified our efforts to obtain information from SSgA.  While we received some very limited information, in our view it created more questions and did not fully resolve those that we previously asked.<br><br>Due to the fund's poor performance, SSgA's inability to provide timely, thorough responses to our inquiries, and the risk created by the fund's concentrated exposure to the sub-prime credit markets, we put the fund on Watch List on Monday, August 20.<br><br>Throughout this entire process, we have focused on understanding the impact on our clients of the fund's performance, continuously reaching out to SSgA for information, and acting as a catalyst for taking action to minimize the financial impact.  In fact, we were forced to reach out to the highest levels of SSgA management in our attempts to get information, and those efforts were rebuffed.  What limited information we did receive was passed along to clients in its entirety, however, we do not believe it provided either the level of clarity warranted, given the situations, or justified the fund's past investment practices.<br><br>Despite a continuing information vacuum from SSgA, we developed and then quickly implemented a variety of appropriate actions and solutions, including: Providing to clients the information we received from SSgA in as close to "real time" as possible.<br><br>Once the deteriorating performance was identified, we aggressively pursued SSgA with numerous inquiries, including conference calls with portfolio managers and multiple phone conversations.  Their responses to those conversations and requests for information were not satisfactory.<br><br>**In short, SSgA's reporting on this fund did not clearly indicate a widespread concentration of assets outside the sectors identified as part of the fund's investment benchmark nor the use of leverage, let alone the extent to which leverage was being used.**  Once we became concerned, we placed the fund on Watch list and once we became fully aware of the fund's actions and its ongoing intentions we immediately began the process leading to redemption of shares in the fund.<br><br>Though the information that has been provided by SSgA was not as clear or as complete as we would have expected, and many of our questions remained unanswered, we nevertheless distributed the information we received to clients in as close to real time as possible.<br><br>**Where we were troubled with the SSgA funds is that they behaved well outside of expectations and approved disclosures, and the source of that performance behavior ultimately stemmed from both undisclosed leverage and a large exposure to the sub-prime market.** |

| No. | Date and Text of Statement |
|-----|---------------------------|
| 16 | September 5, 2007<br><br>Earlier this quarter, SSgA advised us in writing that the State Street Fund was not correctly named, and that going forward, it would be known as the SSgA Intermediate Bond NL Series Fund—rather than the name on the prior literature—the SSgA Passive Intermediate Bond Index SL Series Fund.<br><br>As part of our ongoing monitoring procedures, periodically we ask the asset managers of the underlying investment funds in our Alliance Funds program to update the Fund Fact Sheets we provide quarterly to plan sponsors and participants.  On August 1, SSgA reviewed and approved the Fund Fact Sheet that characterized the State Street Fund's investment strategy as an enhanced index approach, while noting two changes—the name of the fund and the name of the portfolio managers—changes that we made.<br><br>**On August 22, during a call we made to SSgA as part of a series of inquiries about the State Street Fund's index-lagging performance, the head of SSgA's North American Fixed Income division stated for the first time that the State Street Fund was leveraged and had broad exposure to sectors outside its stated benchmark strategy.**<br><br>**The SSgA fund troubled us because it behaved well outside of expectations, appeared to be inconsistent with disclosures SSgA had reviewed, and the source of that performance behavior ultimately stemmed from both leverage and a large exposure to the sub-prime market.** |
| 17 | October 1, 2007<br><br>State Street did not disclose important relevant information about these funds to Prudential Retirement, to plan sponsors, or to individual plan participants—even after weeks of questions from Prudential.  As a result, investors and individual plan participants suffered significant losses inappropriate to enhanced index bond funds.<br><br>When we noticed that the funds were experiencing returns quite different from our expectations, we aggressively pursued SSgA with numerous inquiries, including conference calls with their portfolio managers and multiple phone conversations.  Their responses to those conversations and requests for information were not satisfactory.<br><br>Due to the fund's [sic] deteriorating performance and SSgA's inability to provide timely and complete responses to our inquiries in July and August, we put the funds on the Watch List on August 20.<br><br>**SSgA also did not disclose these off-strategy investment strategies and practices to Prudential Retirement, to plan sponsors, or to individual plan participants—even after weeks of receiving questions from Prudential.**<br><br>**SSgA did not explain the fund's extensive leveraged sector concentration until a call** |

| No. | Date and Text of Statement |
|-----|----------------------------|
|  | **with the head of SSgA's North American Fixed Income division, in mid-August, well after we had begun questioning SSgA about their index-lagging performance. In short, what they told us after the fact about SSgA's actual investment strategy and holdings did not at all comport with what we had previously been led to believe.**<br><br>It was the cumulative effect of these and other factors, and the general lack of cooperation from SSgA, that first led us to place the fund on our Watch List on August 20.<br><br>We contacted SSgA, but even after multiple requests and repeated follow-ups, they failed to provide satisfactory information.<br><br>We believe that the detailed, thoughtful, and prompt work we did to deal with the Intermediate Bond Fund situation, over a very short period of time, represents strong value added for our clients. Due to the Fund's deteriorating performance and SSgA's inability to provide timely and complete responses to our inquiries in July and August, we put the Fund on the Watch List on August 20.<br><br>Throughout this process we also provided our clients information we received from SSgA as quickly as possible. |
| 23 | February 1, 2008<br><br>**SSgA also did not disclose these off-strategy investment strategies and practices to Prudential Retirement, to plan sponsors, or to individual plan participants—even after weeks of receiving questions from Prudential.**<br><br>**SSgA did not explain the fund's extensive leveraged sector concentration until a call with the head of SSgA's North American Fixed Income division, in mid-August, well after we had begun questioning SSgA about their index-lagging performance. In short, what they told us after the fact about SSgA's actual investment strategy and holdings did not at all comport with what we had previously been led to believe.**<br><br>It was the cumulative effect of these and other factors, and the general lack of cooperation from SSgA, that first led us to place the fund on our Watch List on August 20.<br><br>For the period of time through the end of June and into July 2007, the fund appeared to be performing within a range of expected returns for an enhanced index fund. Subsequently, however, we noticed that the fund was experiencing returns quite different from our expectations. We contacted SSgA, but even after multiple requests and repeated follow-ups, they failed to provide satisfactory information.<br><br>We believe that the detailed, thoughtful, and prompt work we did to deal with the Intermediate Bond Fund situation, over a very short period of time, represents strong value added for our clients. Due to the Fund's deteriorating performance and SSgA's inability to |

| No. | Date and Text of Statement |
|---|---|
| | provide timely and complete responses to our inquiries in July and August, we put the Fund on the Watch List on August 20.<br><br>State Street did not disclose important relevant information about these funds to Prudential Retirement, to plan sponsors, or to individual plan participants—even after weeks of questions from Prudential.  As a result, investors and individual plan participants suffered significant losses inappropriate to enhanced index bond funds.<br><br>For the period of time through the end of June and into July 2007, each fund appeared to be performing within a range of expected returns for an enhanced index fund.<br><br>When we noticed that the funds were experiencing returns quite different from our expectations, we aggressively pursued SSgA with numerous inquiries, including conference calls with their portfolio managers and multiple phone conversations.  Their responses to those conversations and requests for information were not satisfactory.<br><br>Due to each fund's deteriorating performance and SSgA's inability to provide timely and complete responses to our inquiries in July and August, we put the funds on the Watch List on August 20. |